# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRACE*, MINA*, GINA*, MONA*, and MARIA*,<br>T. Don Hutto Residential Center<br>1001 Welch Street, Taylor, TX 76574;<br><br>CARMEN* and her minor daughter, J.A.C.F. (by and through her mother),<br>South Texas Family Residential Center<br>300 El Rancho Way<br>Dilley, TX 78017;<br><br>GIO*,<br>Albany County Correctional Facility<br>840 Albany Shaker Road<br>Albany, NY 12211<br><br>NORA* and her minor son, A.B.A. (by and through his mother),<br>c/o 125 Broad Street<br>New York, NY 10004;<br><br>CINDY ARDON MEJIA and her minor daughter, A.P.A. (by and through her mother)<br>c/o 125 Broad Street<br>New York, NY 10004;<br><br>*Plaintiffs,*<br><br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS III,<br>Attorney General of the United States, in his official capacity,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530;<br><br>KIRSTJEN M. NIELSEN, Secretary of the Department of Homeland Security, in her official capacity,<br>245 Murray Lane, SW,<br>Washington, DC 20528; | No. 2018-cv-_____ |

\* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

| | |
|---|---|
| LEE FRANCIS CISSNA, Director of United States Citizenship and Immigration Services, in his official capacity, 20 Massachusetts Ave., NW Washington, DC 20529; <br><br> JAMES MCHENRY, Director of the Executive Office for Immigration Review, in his official capacity, 950 Pennsylvania Avenue, NW Washington, DC 20530, <br><br>                    *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## PLAINTIFFS NORA, CARMEN, GIO, GINA, MARIA, MINA, GRACE, AND MONA'S UNOPPOSED MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS AND TO FILE SUPPORTING EXHIBITS UNDER SEAL

Plaintiffs Nora, Carmen, Gio, Gina, Maria, Mina, Grace, and Mona ("Pseudonymous Plaintiffs") are asylum applicants who have suffered extensive past persecution and fear continued persecution in their countries of origin. Pseudonymous Plaintiffs fear that their persecution will become more severe if their identities and status as asylum applicants are publicly disclosed. Pseudonymous Plaintiffs respectfully move this Court for leave to file under seal Exhibits 1-9 — their declarations and pseudonym chart in support of this motion — and to proceed in this suit under their proposed pseudonyms. In addition, Pseudonymous Plaintiffs request an order prohibiting Defendants from publicly disclosing their identities. (They do not seek to remain pseudonymous with respect to Defendants and are providing (simultaneously with the filing of this motion and suit) Defendants with Exhibit 9 – the pseudonym chart of their true names and alien numbers, matched with the pseudonyms they seek to use in this suit.)

Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel, who indicated that Defendants do not oppose the relief requested in this motion.

Pseudonymous Plaintiffs are asylum applicants from Central America who seek to challenge the policies under which their asylum claims were rejected. They wish to proceed under pseudonyms and to file their declarations under seal due to their fears that they will face grave physical harm or death if their identities and status as asylum applicants are publicly disclosed. Specifically:

1. Plaintiff Grace* fled Guatemala to escape her abusive partner and his violent gang-member sons. Grace's partner of 22 years repeatedly beat and threatened to kill her and her children throughout their relationship and after she tried to leave him. He also sexually assaulted her and her daughter over many years. Grace is part of an indigenous group that is discriminated against in Guatemala by Ladinos (non-indigenous Guatemalans). Grace's abuser, who is Ladino, would often berate her for being an "India" (a slur used to denigrate indigenous people) and "stupid," because she could not read or write, especially when he was violently abusing her. Once, he beat Grace's pregnant daughter so severely that she had a miscarriage. In October 2016, Grace sought police protection from her abuser and his two gang member sons from another relationship, who had recently joined their father in abusing Grace and her children. However, the police did nothing to stop him and his sons from returning to Grace's house to attack her. When she tried to leave him, Grace's abuser took advantage of her illiteracy to take the legal title to her home. He then arranged to have the police evict Grace from her longtime residence, and she and her son were forced to move in with a neighbor. Even after having evicted her, Grace's abuser and his sons continued to terrorize her and her son. Because his sons are members of a powerful gang, which has a network across the country, Grace does not believe

---

* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

3

she could find safety in another city. Despite being found to have testified credibly, she received a negative credible fear determination on July 20, 2018. Grace is detained at T. Don Hutto Residential Center in Taylor, Texas.

2. Plaintiff Carmen*, together with her young daughter, Plaintiff J.A.C.F., fled her home in El Salvador to escape two decades of horrific sexual abuse by her husband and death threats from a violent gang. Carmen's husband routinely raped, stalked, and threatened her with death, treating her as his property, even after they were living apart. Carmen did not report her husband's threats to the police because she had seen that the police did not protect women from their husbands' abuse. She had also heard about women who reported abuse to the police, only to be killed by their husbands in retaliation, and believed her husband would do the same if she reported him. Carmen also fears that she and her daughter would be killed by a violent gang, who targeted her because she was a vulnerable single mother living alone with her child, and because she had a good factory job. They held her up at gunpoint in May 2018 when she was on her on her way home from work and demanded that she pay a monthly "tax," making clear that they would kill her and her little girl if she did not comply. The gang also threatened to kill her if she went to the police. Because four or five of her co-workers were killed by the same gang in the past year, she knew their threats were serious and fled with J.A.C.F. to avoid death. In June 2018, Carmen and her daughter sought asylum in the United States. Despite being found to have testified credibly, they both received negative credible fear determinations on June 29, 2018, which were affirmed by an immigration judge on July 23, 2018. Carmen and her little girl are detained at the South Texas Family Residential Center in Dilley, Texas.

3. Plaintiff Mina* fled her home in Honduras after suffering a vicious attack and receiving death threats from a powerful drug trafficking gang that controlled her town. Members of the

4

gang targeted Mina and her family after her husband and father-in-law helped a friend escape when the gang was trying to kill him. After murdering her father-in-law and threatening to kill her husband, members of the gang beat Mina so badly that she could not walk the next day. Her attackers told her they would rape her and mutilate her body if she did not leave town. Mina knew she could not report the attack to the police because of their close ties to the gang and because the police had failed to investigate her father-in-law's murder after her family sought police assistance. Mina and her husband fled to the United States and sought asylum. Despite being found to have testified credibly, Mina received a negative credible fear determination on July 23, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

4. Plaintiff Gina* fled her home in Honduras in June 2018 because she fears death or torture at the hands of a powerful Honduran family that threatened to kill her because of her relationship to her nephew, who murdered someone close to them years ago. The family has already succeeded in murdering Gina's brother and maiming her son in an attempt to kill him. Although Gina made several police reports following these crimes, the police did not help her because the family targeting her is powerful and well-connected to the Honduran government; the family has also threatened to kill her because she dared to report their crimes. She attempted to find safety by moving away from the area, but people sent by the family recently came to her new town, asking for her by name. Gina fled to the United States to save her life. Despite being found to have testified credibly, she received a negative credible fear determination on July 16, 2018. Gina is detained at T. Don Hutto Residential Center in Taylor, Texas.

5. Plaintiff Mona* fled her country and sought asylum in the United States after a powerful gang brutally murdered her long-term partner, who was a member of a special military force dedicated to combating gangs, and threatened to kill her next because of her relationship with

him. Earlier this year, Mona's partner and four other people were gunned down by armed men in a hail of bullets. Mona was present at the shooting and narrowly escaped with her life. When she called her partner's phone after the shooting to try to locate it, the killers answered, taunting her and threatening that they knew she was his partner and she would be next. Shortly after her partner's death, she was accosted by gang members at the market while attempting to purchase flowers for his funeral. They repeated that they knew she was her partner's woman and threatened to kill her. She was recently alerted by family members that gang members were following her bus, forcing her to get off quickly and hide until someone could pick her up. Mona feared that if she reported the threats to the local police, many of whom collaborate with gangs, she would only put herself in greater danger. She also knew of other cases where the police were not able to protect family members of police officers and soldiers who were killed by gangs just because of their relationship with law enforcement. Fearing for her life, Mona fled to the United States and sought asylum. Despite being found to have testified credibly, she received a negative credible fear determination on July 20, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

6. Plaintiff Gio* fled his home in El Salvador after being targeted by members of two rival gangs. Gio lived in a neighborhood controlled by one notoriously brutal gang, whose members recently threatened his life when he refused to sell drugs for them because of his deep Christian faith. Gio also fears the gang will kill him if it learns that his half-brother is a member of their rival gang. If the gang that controls his neighborhood does not kill him, Gio fears that the rival gang will. Some years ago, Gio was terrorized by members of the rival gang when he visited his father, who lives in their territory. The rival gang members kidnapped him, accused him of being a spy for the other gang, broke his arm during a vicious beating, and threatened to throw

him in a well and leave him to die. They also threatened to harm him if he made a police report. He escaped, but the gang's members have continued to threaten him for years, any time he has encountered them. In June 2018, after the gang that controls his neighborhood threatened him for refusing to sell drugs, Gio fled to the United States to save himself. Gio believed that attempting to get help from the police would only put him and his family in even graver danger. Despite being found to have testified credibly, he received a negative credible fear determination on July 16, 2018. Gio is detained at Albany County Correctional Facility in Albany, New York.

7. Plaintiff Maria*, a recently orphaned teenager, fled her home in El Salvador to escape a forced relationship and sexual violence at the hands of a gang member nicknamed "F." When Maria's brother-in-law, a member of the same gang, began to use her recently deceased mother's house as a gathering place for the gang, Maria stood up to him because her strong Christian faith leads her to morally oppose gangs. After she asked her brother-in-law to leave, F. threatened her by screaming at her and beating the walls of her house with a baseball bat, to teach her a lesson about defying the gang. He then began to make aggressive sexual advances toward her, telling her that she had no choice but to be his "woman" and that he would force her if she resisted. He continued to escalate these advances until he attempted to sexually assault her days before she fled. Maria resisted F. because of her Christian faith and because she saw that gang members treat their girlfriends like property and frequently beat them. Maria knew this because her brother-in-law abuses her older sister, who has a physical disability and has trouble defending herself. Maria knew the police could not control the gang's violence against women, and she had seen the gang retaliate against people who file police reports. The gang killed a woman in Maria's town in front of her children just days after she reported that the gang had kidnapped one of her sons. Maria fled to the United States to save her life. Despite being found to have

testified credibly, she received a negative credible fear determination on July 23, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

Plaintiff Nora* and her three-year-old son, Plaintiff A.B.A., fled their home in El Salvador in May 2018, after their lives and safety were threatened by members of a notoriously brutal gang. Over the course of years, Nora suffered rape and physical beatings at the hands of her partner, who is the father of her son, A.B.A. Nora's abuser is affiliated with the gang and has had the gang surveil her since she attempted to end their relationship. Earlier this year, gang members who gather at a corner near Nora's house began to question her about whether A.B.A. was the son of her abuser. One of the gang's members named "E.T." began to make aggressive sexual advances whenever she passed by. In May, when Nora was walking home with her three young children, E.T. pursued her down the street and told her that he knew that she lived alone with her children and that he would come to her house at night to have sex with her. He showed her a gun in his waistband and then looked to her son, indicating that he would kill them both if she did not submit to his sexual demands. She fled to the United States to save her son's life as well as her own. Despite being found to have testified credibly, Nora and her son both received negative credible fear determinations on June 15, 2018, which were affirmed by an immigration judge on June 26, 2018. USCIS denied their request for reconsideration and Nora and her son were removed to El Salvador on or about July 26, 2018, where they continue to fear for their lives.

## ARGUMENT

### I.    The Use of Pseudonyms Is Justified Here.

While Federal Rule of Civil Procedure 10(a) and Local Civil Rules 5.1(c) and 11.1 generally require that the complaint name all parties, this Court and the D.C. Circuit have

permitted parties to proceed pseudonymously when circumstances justify the need to maintain confidentiality. *See, e.g., Doe v. Stephens*, 851 F.2d 1457, 1459 n.2 (D.C. Cir. 1988); *Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d 31, 40 (D.D.C. 2009); *Doe v. MAMSI Life & Health Ins. Co.*, 471 F. Supp. 2d 139, 140 (D.D.C. 2007); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 117 (D.D.C. 2003).

For a plaintiff to proceed pseudonymously, "the need for anonymity" should "outweigh[] the general presumption that parties' identities are public information and the risk of unfairness to the opposing party." *Qualls v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005) (internal quotation marks and citation omitted). The burden on Plaintiffs is not a heavy one at the time of filing— Plaintiffs need only make a "colorable argument in support of the request." *Id.* at 10. A trial court abuses its discretion when it fails to consider thoroughly "that in some cases the general presumption of open trials—including identification of parties and witnesses by their real names—should yield in deference to sufficiently pressing needs for party or witness anonymity." *James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189- 90 (2d Cir. 2008); *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 684-87 (11th Cir. 2001); *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

This Court has exercised its broad discretion to "allow plaintiffs to proceed under a pseudonym in cases involving matters of a sensitive and highly personal nature." *Doe v. Cabrera*, 307 F.R.D. 1, 4 (D.D.C. 2014) (citing *Nat'l Ass'n of Waterfront Emp'rs v. Chao*, 587 F.Supp.2d 90, 99 (D.D.C.2008)); *see also Yaman v. U.S. Dep't of State*, 786 F.Supp.2d 148, 152-53 (D.D.C. 2011); *Doe v. Von Eschenbach*, No. 06–2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007). In addition to assessing whether the justification asserted is to "preserve privacy in a

matter of a sensitive or highly personal nature," courts deciding a motion for leave to proceed pseudonymously consider whether identification poses a risk of retaliatory physical or mental harm to the requesting party, the age of the person whose privacy interests are sought to be protected, whether the action is against the government or a private party, and whether there is any risk of unfairness to the opposing party from allowing the action to proceed pseudonymously. *See Doe v. United States Dep't of State*, No. 1:15-CV-01971, 2015 WL 9647660, at *2 (D.D.C. Nov. 3, 2015).

The relevant factors in this case weigh heavily in favor of allowing plaintiffs to proceed under pseudonyms. The sensitive nature of this action and the high risk of physical harm faced by Pseudonymous Plaintiffs demonstrate that their need for confidentiality outweighs the public's interest in knowing their identities. *See Qualls*, 228 F.R.D. at 11. They fled their countries of origin because they were persecuted or feared that they would be persecuted if they remained. As asylum seekers fleeing persecution, they fall within a particularly vulnerable class of migrants for whom confidentiality about the nature and existence of their claims is particularly important, as their "identification [would] create[] a risk of retaliatory physical or mental harm." *Qualls*, 228 F.R.D. at 10-11 (internal quotation marks and citation omitted); *see also* U.N. High Comm'r for Refugees, *Advisory opinion on the rules of confidentiality regarding asylum information* ("UNHCR Advisory Opinion") (Mar. 31, 2005) at 2-3, http://www.refworld.org/docid/42b9190e4.html ("[P]rivacy and its confidentiality requirements are especially important for an asylum-seeker, whose claim inherently supposes a fear of persecution by the authorities of the country of origin and whose situation can be jeopardized if protection of information is not ensured.").

The federal government itself recognizes that protecting the identities of asylum seekers is of critical importance. Asylum regulations provide for the confidentiality of asylum applicants and credible fear interviewees, including the fact that an applicant has applied for asylum or received a credible fear interview. *See* 8 C.F.R. §§ 208.6, 1208.6.

DHS has acknowledged the importance of these regulations to the future safety of asylum applicants. *See Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008) ("As DHS recognizes, the confidentiality regulations are of utmost importance in protecting asylum applicants because the 'regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.'") (quoting U.S. Citizenship & Immig. Serv. Asylum Div., U.S. Dep't of Homeland Sec., *Fact Sheet: Fed. Regulations Protecting the Confidentiality of Asylum Applicants* (2005)). Indeed, the disclosure of an asylum applicant's identity creates such a severe risk of persecution in her country of origin that a breach of confidentiality can itself serve as grounds for asylum. *See, e.g., id.* at 256 (remanding asylum case to BIA so that petitioner could present new asylum claim based upon U.S. Government's breach of her confidentiality).

In recognition of the powerful interest that asylum seekers possess in maintaining their confidentiality, numerous courts have allowed them to proceed with pseudonyms or initials. *See, e.g., R.I.L-R*, 80 F. Supp. 3d at 172; *N.L.A. v. Holder*, 744 F.3d 425, 428 n.1 (7th Cir. 2014); *Doe v. Holder*, 736 F.3d 871, 872 n.1 (9th Cir. 2013); *Doe v. Holder*, 651 F.3d 824, 826 (8th Cir. 2011); *Smith v. Holder*, 627 F.3d 427, 427 n.* (1st Cir. 2010); *Doe v. INS*, 867 F.2d 285, 286 n.1 (6th Cir. 1989).

Moreover, "[c]ourts may be more inclined to permit pseudonymous suits by plaintiffs when the government is the defendant or when the plaintiff is a minor." *Qualls*, 228 F.R.D. at 11, All of the defendants in this case are sued in their official capacity as officers of the federal government, and a number of the plaintiffs are children or young adults.

In contrast to Pseudonymous Plaintiffs' strong interest in confidentiality, the countervailing interests in disclosure are minimal or nonexistent. The public's interest, if any, in knowing the identities of Pseudonymous Plaintiffs is negligible. To be sure, the issues that Pseudonymous Plaintiffs raise in this lawsuit are important ones and may well be a matter of concern to the general public. However, that is not true of their identities: "[P]arty anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them." *Does I Thru XXIII*, 214 F.3d at 1068-69 (quoting *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981)).

Nor would granting Pseudonymous Plaintiffs' request create any risk of unfairness or prejudice to Defendants. As stated above, Defendants do not oppose this motion, and Pseudonymous Plaintiffs do not seek to withhold their identities from Defendants. And there is no reason to believe a fact-finder would be influenced by the fact that Pseudonymous Plaintiffs are proceeding anonymously. *See, e.g., Sealed Plaintiff*, 537 F.3d at 190; *Does I thru XXIII*, 214 F.3d at 1068; *James*, 6 F.3d at 240-41; *see also Doe #1 v. Williams*, 167 F. Supp. 2d 45, 46, n.1 (D.D.C. 2001) (granting plaintiffs leave to proceed by pseudonym on condition that they disclose identity to defendants), *rev'd on other grounds*, 2003 WL 21466903 (D.C. Cir. June 19, 2003).

## II. Pseudonymous Plaintiffs Should Be Permitted To File Their Declarations and Pseudonym Chart Under Seal in Support of This Motion

This Court and the D.C. Circuit have recognized that the general presumption in favor of public access to court filings "is not without its time-honored exceptions," including the need to

protect the "privacy . . . of victims of crimes." *United States v. Hubbard*, 650 F.2d 293, 315 (D.C. Cir. 1980) (citing *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978)); *see also Hamen v. Islamic Republic of Iran*, No. CV 16-1394 (RDM), 2018 WL 3459914, at *2 (D.D.C. July 18, 2018) (granting leave for witness to testify under seal where witness alleged his safety would be put at risk if his testimony were made part of the public record, particularly since he had been detained one before). The D.C. Circuit has established a six-factor "*Hubbard* test" for assessing the need for privacy, requiring courts to weigh:

> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing *Hubbard*, 620 F.2d at 317-22).

The relevant factors, like the closely related ones that concern proceedings under pseudonyms, weigh heavily in favor of allowing Pseudonymous Plaintiffs to file their declarations and exhibit in support of this motion under seal. In particular, this Court has recognized that where the moving party's "safety will be at risk" if the public is provided unrestricted access to court filings, the fourth *Hubbard* factor "weighs strongly in favor of sealing." *Hamen*, 2018 WL 3459914, at *2. The high risk of physical harm or death faced by Pseudonymous Plaintiffs (some of whom are children) demonstrates that their need for confidentiality outweighs the public's interest in knowing all of the sensitive details of their persecution. As asylum seekers fleeing persecution, they fall within a particularly vulnerable class of migrants for whom confidentiality is particularly important — as the government itself has frequently recognized. *See supra* Part I.

The second *Hubbard* factor, "the extent of previous public access" also weighs against disclosure because Pseudonymous Plaintiffs have not previously filed federal court documents containing their names or other sensitive details that they wish to conceal from the public record. *See Hamen v. Islamic Republic of Iran*, No. CV 16-1394 (RDM), 2018 WL 3459914, at *2 (D.D.C. July 18, 2018). The third *Hubbard* factor, "the fact that someone has objected to disclosure, and the identity of that person," also weighs against disclosure as Pseudonymous Plaintiffs hereby vigorously object to filing unsealed declarations due to their fear for their safety. *Id.* The sixth *Hubbard* factor, the "purpose of the information," also weighs against disclosure because personal details concerning Pseudonymous Plaintiffs are not "relevant . . . to the central claims of the litigation." *Id.* at *3 (quoting *United States v. Harris*, 204 F. Supp. 3d 310, 17-18 (D.D.C. 2016)

The countervailing interests in complete disclosure are minimal or nonexistent. The public's interest, if any, in knowing all of the sensitive details of Pseudonymous Plaintiffs' persecution are negligible. To be sure, the issues that Plaintiffs raise in this lawsuit are important ones and may well be a matter of concern to the general public. Yet the public will still be able to gain a comprehensive understanding of Pseudonymous Plaintiffs' persecution and the basis of their claims for relief based on the complaint and other public filings in this case. Defendants will not face any prejudice if this Court provides leave for Pseudonymous Plaintiffs to file their declarations and pseudonym chart in support of this motion under seal. The unredacted declarations, filed under seal, will provide Defendants with all of the information they need to know to prepare their defense in this case.

## CONCLUSION

For the foregoing reasons, Pseudonymous Plaintiffs should be permitted to proceed in this suit under their proposed pseudonyms and to file their declarations and pseudonym chart in support of this motion under seal , and Defendants should be prohibited from publicly disclosing Pseudonymous Plaintiffs' identities or any personal identifying information that could lead to identification of Pseudonymous Plaintiffs by non-parties.

Dated: August 7, 2018

Respectfully submitted,

/s/ Scott Michelman

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800

Jennifer Chang Newell**
Katrina Eiland**
Cody Wofsy**
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Judy Rabinovitz**
Omar C. Jadwat**
Lee Gelernt**
Celso J. Perez*** (D.C. Bar No. 1034959)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Sandra S. Park**
Lenora M. Lapidus
American Civil Liberties Union Foundation,
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7871

Eunice Lee**
Karen Musalo**
Anne Dutton**
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Thomas Buser-Clancy
Andre Segura
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

*Attorneys for Plaintiffs*

**Pro hac vice application forthcoming*
***Admission to D.D.C. forthcoming*

## CERTIFICATE OF SERVICE

I certify that I caused a copy of this motion, supporting exhibits (under seal) and proposed order to be served on the following, together with the summons and complaint:

Jefferson Beauregard Sessions, III
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

Kirstjen Nielsen
Secretary of Homeland Security
245 Murray Lane, SW
Washington, DC 20528

Lee Francis Cissna
Director of the United States Citizenship and Immigration Services
20 Massachusetts Ave., NW
Washington, DC 20529

James McHenry
Director of the Executive Office for Immigration Review
950 Pennsylvania Avenue, NW
Washington, DC 20530

/s/ Scott Michelman
Scott Michelman