# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GRACE, et al., | ) |
| *Plaintiffs,* | ) |
| v. | ) |
| JEFFERSON BEAUREGARD SESSIONS, III, Attorney General of the United States, et al., | ) Civil Action No. 1:18-cv-01853 (EGS) |
| *Defendants.* | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION AND/OR
## EMERGENCY MOTION FOR STAY OF REMOVAL

Jennifer Chang Newell**
Katrina Eiland**
Cody Wofsy**
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Judy Rabinovitz**
Omar C. Jadwat**
Lee Gelernt**
Celso J. Perez*** (D.C. Bar No. 1034959)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

**Pro hac vice application forthcoming*
***Admission to D.D.C. forthcoming*

*Additional counsel on next page*

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800

Eunice Lee**
Karen Musalo**
Anne Dutton**
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Sandra S. Park**
Lenora M. Lapidus**
American Civil Liberties Union Foundation,
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7871

*Attorneys for Plaintiffs*

Thomas Buser-Clancy
Andre Segura
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iiii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

   A. Asylum Protections ................................................................................................ 3

   B. The Expedited Removal System and Credible Fear .............................................. 4

   C. *Matter of A-B-* and the New Credible Fear Policies ............................................ 6

   D. Plaintiffs ................................................................................................................ 7

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT .................................................................................................................... 9

   I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................ 9

     A. The Credible Fear Standard is a Low Threshold Intended to Ensure All Potentially
       Meritorious Claims Receive a Full Hearing ................................................... 9

     B. The New "Condoned" or "Complete Helplessness" Formulation Is Unlawful .............. 11

     C. The General Rule Against Claims Related to Domestic Violence and
       Gangs Is Unlawful .......................................................................................... 18

       1. The General Rule Against Claims Related to Domestic and Gang-Based Violence Is
         Contrary to the INA and Refugee Act ....................................................... 20

       2. The General Rule Against Claims Related to Domestic and Gang-Based Violence is
         Arbitrary and Capricious .......................................................................... 22

     D. The Revised Nexus Standard Is Unlawful ................................................... 24

     E. The Requirement of an "Exact Delineation" of the Particular Social Group
       Is Unlawful ..................................................................................................... 27

F. The Blanket Direction to Disregard Circuit Court Decisions is Unlawful. ...................... 29

   1. The Policy of Disregarding Circuit Law is Illegal. ........................................................ 29

   2. The "Relevant Circuit" Policy is Illegal. ...................................................................... 36

II. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ............................................... 39

III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR
    INJUNCTIVE RELIEF ..................................................................................................... 41

CONCLUSION ......................................................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Aldana-Ramos v. Holder*, 757 F.3d 9 (1st Cir. 2014) ................................................... 19

*Aliyev v. Mukasey*, 549 F.3d 111 (2d Cir. 2008) ........................................................... 15

*Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) ................................. 21

*Anderson v. Heckler*, 756 F.2d 1011 (4th Cir. 1985) ............................................. 30, 35

*Avetova-Elisseva v. INS*, 213 F.3d 1192 (9th Cir. 2000) ....................................... 15

*Baires v. INS,* 856 F.2d 89 (9th Cir. 1988) ................................................. 37

*Bi Xia Qu v. Holder*, 618 F.3d 602 (6th Cir. 2010) ......................................... 26

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................. 39

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) (en banc) ..................... 15, 21, 26

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .......................................... 30, 31

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ........................................ 18, 31

*Cooper v. Aaron,* 358 U.S. 1 (1958) ....................................................... 30

*Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011) ................................. 15

*Damus v. Nielsen*, -- F.Supp.3d. ---, 2018 WL 3232515 (D.D.C. July 23, 2018) ................ 42

*Doe v. Holder*, 736 F.3d 871 (9th Cir. 2013) .............................................. 14

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................... 18, 36, 39

*Ferreira v. Lynch*, 831 F.3d 803 (7th Cir. 2016) (per curiam) ............................. 10, 27

*Fiadjoe v. Att'y Gen. of U.S.*, 411 F.3d 135 (3d Cir. 2005) ................................ 15

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) ............................................. 23

*Galina v. INS*, 213 F.3d 955 (7th Cir. 2000), ............................................ 15

*Garcia v. Att'y Gen. of the U.S.*, 665 F.3d 496 (3d Cir. 2011) ........................... 19

*Gathungu v. Holder*, 725 F.3d 900 (8th Cir. 2013) ........................................ 15

*Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142 (10th Cir. 2016).......................................................... 33

*Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007)...................................................................... 19

*Hengan v. INS*, 79 F.3d 60 (7th Cir. 1996) ............................................................................ 14

*Hor v. Gonzales,* 400 F.3d 482 (7th Cir. 2005) ........................................................................ 15

*Hor v. Gonzales*, 421 F.3d 497 (7th Cir. 2005) ....................................................................... 15

*In Re J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007).................................................................. 25

*In re Kasinga*, 21 I&N Dec. 357 (BIA 1996). ......................................................................... 26

*In Re S-P-*, 21 I&N Dec. 486 (BIA 1996)............................................................................... 17

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................................. passim

*Ivanov v. Holder*, 736 F.3d 5 (1st Cir. 2013)..................................................................... passim

*Judulang v. Holder*, 565 U.S. 42 (2011)......................................................................... passim

*Kamar v. Sessions*, 875 F.3d 811 (6th Cir. 2017) ............................................................... 15, 26

*Krastev v. INS*, 292 F.3d 1268 (10th Cir. 2002) .......................................................................... 15

*Lone Mountain Processing, Inc. v. Sec'y of Labor*,

   709 F.3d 1161 (D.C. Cir. 2013)................................................................................. 18, 24, 27

*Lopez v. Heckler*, 725 F.2d 1489 (9th Cir. 1984) ......................................................................... 30

*M.G.U. v. Nielsen*, No. 18-1458, 2018 WL 3474189 (D.D.C. July 18, 2018) ............................. 42

*Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013) ....................................................................... 25

*Marbury v. Madison*, 5 U.S. 137 (1803)..................................................................................... 30

*Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018)..................................................................... passim

*Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985) ......................................................... 4, 12, 20, 32

*Matter of Cienfuegos*, 17 I&N Dec. 184 (BIA 1979) ............................................................ 30, 36

*Matter of Cruz De Ortiz*, 25 I&N Dec. 601 (BIA 2011)......................................................... 30, 36

*Matter of Douglas*, 26 I&N Dec. 197 (BIA 2013) .......................................................... 34

*Matter of Eusaph*, 10 I&N Dec. 453 (BIA 1964) .......................................................... 13

*Matter of Fajardo Espinoza*, 26 I&N Dec. 603 (BIA 2015) ........................................ 30

*Matter of Marquez Conde*, 27 I&N Dec. 251 (BIA 2018) ............................................ 34

*Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014) ...................................................... 20

*Matter of N-M-*, 25 I&N Dec. 526 (BIA 2011) ............................................................. 25

*Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000) ............................................................ 26

*Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189 (BIA 2018) ........................................ 29

*McMullen v. INS.*, 658 F.2d 1312 (9th Cir. 1981) ........................................................ 13

*MikLin Enterprises, Inc. v. Nat'l Labor Relations Bd.*, 861 F.3d 812 (8th Cir. 2017) ................ 32

*Nabulwala v. Gonzalez*, 481 F.3d 1115 (8th Cir. 2007) ................................................ 26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................... 31

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................... 8, 41

*O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420 (D.C. Cir. 1992) .......................... 42

*Pereira v. Sessions*, 138 S. Ct. 2105 (2018) .......................................................... 31, 32

*Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014) ..................................................... 20

*R.I.L-R. v. Johnson*, 80 F.Supp.3d 164 (D.D.C. 2015) ................................................... 42

*Rosa v. INS*, 440 F.2d 100 (1st Cir. 1971) ................................................................ 13

*Rosales Justo v. Sessions*, --- F.3d ---, 2018 WL 3424685 (1st Cir. July 16, 2018) ..................... 14

*Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018) ........................................... 19, 23

*Sarhan v. Holder*, 658 F.3d 649 (7th Cir. 2011) ..................................................... 15, 26

*Shaikh v. Holder*, 702 F.3d 897 (7th Cir. 2012) .......................................................... 25

*Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010) ..................................................... 8

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005) ................................................... 33

*Velazquez-Herrera v. Gonzales*, 466 F.3d 781 (9th Cir. 2006) (per curiam) ............................... 33

*Zhang v. Holder*, 585 F.3d 715 (2d Cir. 2009) ..................................................... 10, 27

**Statutes**

8 U.S.C. § 1101(a)(42) ............................................................... 4, 15, 21, 24

8 U.S.C. § 1158(a)(1) ..................................................................................... 4

8 U.S.C. § 1158(b)(1)(A) ................................................................................. 4

8 U.S.C. § 1158(b)(1)(B)(i) ....................................................................... 4, 25, 28

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................................... 4

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................................. 5

8 U.S.C. § 1225(b)(1)(A)(iii) ............................................................................. 5

8 U.S.C. § 1225(b)(1) .................................................................................. 4, 6

8 U.S.C. § 1225(b)(1)(B) ................................................................................. 5

8 U.S.C. § 1225(b)(1)(B)(ii) .............................................................................. 5

8 U.S.C. § 1225(b)(1)(B)(ii)(v) ........................................................................... 5

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ......................................................................... 20

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ......................................................................... 5

8 U.S.C. § 1225(b)(1)(B)(v) ...................................................................... 9, 17, 27

8 U.S.C. § 1229 ......................................................................................... 5

8 U.S.C. § 1229a ........................................................................................ 5

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 .............................................. 42

## Regulations

8 C.F.R. § 208.30 ................................................................................................ 5, 35

8 C.F.R. § 208.30(d) ................................................................................................ 28

8 C.F.R. § 208.30(d)(4) ............................................................................................ 29

8 C.F.R. § 208.30(e) ................................................................................................ 20

8 C.F.R. § 208.30(e)(4) ................................................................................... 27, 35, 37

8 C.F.R. § 208.30(f) ......................................................................................... 5, 27, 38

8 C.F.R. § 208.30(g)(1) .............................................................................................. 5

8 C.F.R. § 235.3(b)(4) ................................................................................................ 5

8 C.F.R. § 1003.20. ................................................................................................... 37

8 C.F.R. § 1208.30(g)(2)(iv)(A) ................................................................................. 5

Asylum and Withholding Definitions, 65 Fed. Reg. 76 (Dec. 7, 2000) ....................... 28

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48 (Aug. 11, 2004) ............ 5

Detention Following a Determination of Credible Fear, 62 Fed. Reg. 10 (Mar. 6, 1997) .......... 10

## Legislative History

142 Cong. Rec. H11081 (daily ed. Sept. 25, 1996) ..................................................... 28

142 Cong. Rec. S11491 (daily ed. Sept. 27, 1996) ..................................................... 10

H.R. Conf. Rep. No. 109-72 (2005) ........................................................................... 25

H.R. Rep. No. 104-469 (1996) ................................................................................... 28

H.R. Rep. No. 104-469, pt. 1 (1996) .......................................................................... 11

H.R. Rep. No. 104-828 (1996) ................................................................................... 28

**Other Authorities**

Anker, Requirement of Individualized Determination, *Law of Asylum in the United States* § 2:4

    (2018 ed.). ........................................................................................................................ 22

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Asylum Officer Basic Training*, Corps Values &

    Goals, 2006 WL 6410316 (Sept. 13, 2006) ............................................................ 35

U.S. Dep't of Justice, Exec. Office for Immigration Review, FY 2016 Statistics Yearbook C7-C8

    (2017).................................................................................................................................. 37

UNHCR*, Guidelines on International Protection No. 1: Gender-Related Persecution within the

    Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status

    of Refugees (2002)* ............................................................................................................ 19

## INTRODUCTION

Plaintiffs seek immediate relief from recently adopted policies that deprive adults and children fleeing domestic and gang violence of their right to seek asylum in the expedited removal process.  The new expedited removal policies stem from a legal opinion issued on June 11, 2018, *Matter of A-B-,* 27 I&N Dec. 316 (A.G. 2018), which articulated new, erroneous standards for adjudicating asylum claims relating to domestic and gang-related violence, and subsequent guidance applying these erroneous standards to expedited removal screenings.

Because asylum seekers like Plaintiffs are placed in expedited removal proceedings after they arrive in the United States, they must first pass a threshold "credible fear" screening before they are entitled to file an application for asylum.  Defendants' new policies impose a heightened credible fear standard on individuals who are seeking to escape countries that have been universally recognized as among the most dangerous in the world.  The heightened screening standard imposed by Defendants' new policies means that many will be unlawfully deprived of a meaningful opportunity to apply for asylum.  Instead, Plaintiffs and others like them have been and will be sent back to the life-threatening situations they fled, in violation of their rights under the Immigration and Nationality Act, the Refugee Act, the Administrative Procedure Act, the separation of powers, and the Due Process Clause of the U.S. Constitution.

When Congress established "expedited removal" proceedings in 1996, it was careful to carve out an exception for individuals fleeing persecution.  Congress intended the threshold credible fear screening standard to be low, so that asylum seekers would be given the benefit of the doubt and no one with a potentially meritorious asylum claim would be sent back to danger.  Instead, under Defendants' new policies, the credible fear passage rate is plummeting, and claims that should easily pass the threshold screening are being unfairly rejected.

Defendants have made it clear that they want to deter individuals fleeing gender-based or gang violence from coming to the United States to seek refuge, and to remove those who do come as quickly as possible.  And they have expressly argued for a higher credible fear standard in order to screen these claims out – even though the credible fear standard is a statutory one that can only be amended by Congress.  The challenged policies unlawfully heighten the credible fear standard in the following interrelated ways:

First, they require individuals fleeing such non-governmental violence to show, at the credible fear stage, that the government either "condones or is completely helpless" to protect them from such violence.  Defendants impose this new requirement even though it goes well beyond the well-established standard, which requires merely a showing that the government "is unwilling or unable to protect," and even though it is inconsistent with the low credible fear threshold provided for by statute.

Second, the credible fear polices instruct asylum officers to apply a general rule against domestic violence and gang related claims, thereby depriving individuals of the individualized, fact-specific consideration of their claims mandated under the asylum laws.  The attempt to foreclose those categories of claims violates the Refugee Act and Immigration and Nationality Act,  ("INA"), 8 U.S.C. § 1101 *et seq*.

Third, the new policies require applicants who are eligible for asylum based on their membership in a particular social group (one of the five protected grounds for asylum) to articulate their particular social group theory at a credible fear interview, and to provide the facts that specifically identify it, even though such a burden is fundamentally inconsistent with the credible fear standard and process.

Fourth, the credible fear policies impose a higher standard for meeting the requirement that the feared persecution be "on account of" (or have a "nexus" to) one of the protected grounds for asylum, for claims based on domestic or gang violence. However, Defendants' policies are inconsistent with the statutory standard and with uniform case law recognizing that persecution is cognizable under the asylum laws even if the persecutor has mixed motives.

Finally, notwithstanding existing guidance to the contrary, the credible fear policies instruct asylum officers to disregard all circuit court authority that is inconsistent with *Matter of A-B-*, even though such authority could provide support for an individual's domestic violence or gang-based claims. This contravenes fundamental separation-of-powers principles, and ignores the fact that under the credible fear standard an individual need only establish a "significant possibility" that he or she would be able to establish eligibility for asylum. If there is circuit court authority under which an individual's claim would prevail, this standard is met.

Each of these policies alone unlawfully heightens the credible fear standard and deprives Plaintiffs and other bona fide asylum seekers of their right to pursue asylum. Taken together, the effect of these policies is to distort the credible fear process beyond recognition, in violation of law.

## BACKGROUND

### A.     Asylum Protections

The immigration laws provide that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for

asylum[.]" 8 U.S.C. § 1158(a)(1).  That statutory guarantee applies to all noncitizens, although

the procedure for seeking asylum varies depending on the status and location of the applicant.

To be eligible for asylum, a noncitizen must establish that she is "a refugee within the

meaning of [8 U.S.C.] section 1101(a)(42)(A)."  8 U.S.C. § 1158(b)(1)(A); *see also* 8 U.S.C. §

1158(b)(1)(B)(i).  A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case
> of a person having no nationality, is outside any country in which such person last
> habitually resided, and who is unable or unwilling to return to, and is unable or
> unwilling to avail himself or herself of the protection of, that country because of
> persecution or a well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A).

An applicant fearing harm by non-governmental actors is eligible for asylum if the other

criteria are met and the government is "unable or unwilling to control" the persecutor.  *Matter of*

*Acosta*, 19 I&N Dec. 211, 222 (BIA 1985).

Notably, the definition of "refugee" does not require a showing of certain harm, but only

a "well-founded fear of persecution."  The Supreme Court has held this standard can be met by a

showing of a 1 in 10 chance of persecution.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440

(1987).

### B.     The Expedited Removal System and Credible Fear

Prior to 1996, no person could be removed from the United States without a hearing

before an immigration judge.  However, in 1996, Congress amended the immigration statute to

provide for "expedited removal."  Under the expedited removal provision, 8 U.S.C. § 1225(b)(1),

certain persons who are seeking admission to the United States or who have very recently

entered without inspection can be summarily removed without a hearing or any process other

than a cursory inspection by an immigration officer.  *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 U.S.C.

§ 1225(b)(1)(A)(iii); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).

However, Congress carved out an exception to this process for individuals with a "credible fear" of persecution.  If an individual indicates any fear of return to his or her home country, the immigration officer must refer the individual for an interview with a U.S. Citizenship and Immigration Services ("USCIS") asylum officer, at which the officer should "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture[.]"  8 C.F.R. § 208.30; *see also* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(B).  If the asylum officer finds that that the individual does have a "credible fear," meaning a "significant possibility" of eligibility for asylum, the individual is taken out of the expedited removal process and referred for a full hearing before an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (v).  At such a full asylum hearing, the individual will have the opportunity to develop a full record with respect to his or her claim.  An adverse decision may be appealed to the Board of Immigration Appeals ("BIA") and federal court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 U.S.C. §§ 1229 (INA § 240), 1229a.

If the asylum officer makes a negative credible fear determination, the individual may request a review by an immigration judge.  That abbreviated review is only of the negative credible-fear determination (not ultimately eligbility for asylum) and does not include the procedural protections of a regular immigration court removal proceeding.  8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1).  The immigration judge's decision is "final and may not be appealed."  8 C.F.R. § 1208.30(g)(2)(iv)(A).

C.    *Matter of A-B-* **and the New Credible Fear Policies**

On June 11, 2018, Attorney General Sessions issued a precedential decision in an asylum

case, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).  Declaration of Sarah Mujahid ("Mujahid

Decl."), Exh. A.  In *Matter of A-B-,* the Attorney General reversed a grant of asylum to a

Salvadoran woman who fled more than fifteen years of extreme domestic violence at the hands

of her then-husband.  In so ruling, the Attorney General articulated new legal standards

governing the adjudication of asylum cases based on persecution from non-governmental actors

on account of membership in a particular social group, focusing particularly on claims by victims

of domestic abuse and gang violence.  He specifically opined that few claims pertaining to

domestic or gang violence by non-governmental actors could qualify for asylum or satisfy the

credible fear standard.  *See id.* at 320 & n.1.  On June 13, 2018, USCIS issued an Interim

Guidance instructing asylum officers to apply *Matter of A-B-* to credible fear interviews.

Mujahid Decl., Exh. B.  On July 11, 2018, USCIS issued a final guidance (hereinafter "USCIS

Guidance" or "Guidance") to employees, including asylum officers responsible for conducting

credible fear interviews, on assessing asylum claims and credible fear in light of *Matter of A-B-*.

Mujahid Decl., Exh. C.

*Matter of A-B-*, and the subsequently issued interim and final USCIS Guidance, constitute

written policies concerning credible fear interviews and implementing the expedited removal

provisions at 8 U.S.C. § 1225(b)(1).  Defendants implemented these policies some time on or

after June 11, 2018.  These new credible fear policies unlawfully heighten the credible fear

standard in multiple significant ways that work together to effectively foreclose claims brought

by women, children, and other migrants fleeing gender and gang-related violence in Central

America.

### D.      Plaintiffs

Plaintiffs are predominantly women and children, seeking safety from harrowing

violence in Central America, including brutal beatings, sexual abuse, and murder.  For example,

Plaintiff Grace fled Guatemala after having been raped, beaten, and threatened with death for

more than two decades at the hands of her partner, a non-indigenous man, who frequently

disparaged her for being indigenous and illiterate.  *See* Declaration of Grace ("Grace Decl.")

¶ 9.[1]  After she tried to leave him, her abuser and his gang-member sons from another

relationship continued to pursue and terrorize her.  *Id.* at ¶ 18.  The local authorities could not, or

would not, protect Grace from this unrelenting violence.  *Id.* at ¶ 19.  In fact, at one point, they

even helped her abuser forcibly evict her from her home.  *Id.*  Plaintiff Carmen escaped from El

Salvador with her young daughter, fleeing two decades of horrific sexual abuse by her husband,

who routinely raped, stalked, and threatened her, even after they were living apart.  Declaration

of Carmen ("Carmen Decl.") ¶ 2.  Carmen, a single mother living alone, also faced imminent

death threats from a notoriously violent gang.  ¶ 25.  *See also* Declaration of Mina ("Mina

Decl.") (fled a Honduran gang that murdered her father-in-law for helping a family friend escape

them and threatened to rape and kill her as well); Declaration of Mona ("Mona Decl.") (fled her

country after a gang brutally murdered her long-term partner – a member of a special military

force dedicated to combating gangs – and threatened to kill her next); Declaration of Gio ("Gio

Decl.") (fled two rival gangs, one of whom broke his arm and almost threw him into a well, and

the other of whom threatened to murder him after he refused to deal drugs due to his Christian

---

[1] The Court has granted eight of the plaintiffs permission to proceed under pseudonym. Plaintiffs are filing, contemporaneous with this motion, a motion for leave to seal their declarations in support of this motion, to protect from public disclosure sensitive information about the persecution they suffered and details that could potentially lead to disclosure of the identities of the plaintiffs proceeding pseudonymously.

faith); Declaration of Gina ("Gina Decl.") (escaped violence from a politically-connected Honduran family who killed her brother, maimed her son, and threatened her with death); Declaration of Maria ("Maria Decl.") (orphaned teenage girl fled a forced sexual relationship with Salvadoran gang member who targeted her after her Christian faith led her to stand up to the gang); Declaration of Nora ("Nora Decl.") (single mother, together with her son, fled abusive partner and members of his Salvadoran gang who threatened to rape her and kill her and her son if she did not submit to their sexual advances); Declaration of Cindy Ardon Mejia ("Ardon Decl.") (mother, together with her young child, fled rape, beatings, and shootings, by a notorious member of a local gang who claimed her as his woman and began abusing her when she was just fourteen years old).

Although asylum officers found that each of these Plaintiffs testified credibly, under the heightened standard in *Matter of A-B-* and the Guidance the officers denied their claims by entering negative credible fear determinations.

## LEGAL STANDARD

On a motion for a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted). *See also Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that the factors governing whether a stay of removal should be issued are the following: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

other parties interested in the proceeding; and (4) where the public interest lies."). Plaintiffs meet these requirements.

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

In multiple ways, the new credible fear policies seek to foreclose the claims of vulnerable asylum applicants fleeing domestic violence and gangs. The policies ratchet up the credible fear standard in violation of Congress's intent to establish a low threshold to ensure potentially meritorious claims would receive a full hearing. They also seek to restrict the availability of asylum for persecution committed by non-governmental persons and organizations, even though the viability of such claims is enshrined in the Refugee Act. Further, they attempt to sweep aside decades of circuit law by executive fiat. The policies are unlawful.

### A. The Credible Fear Standard is a Low Threshold Intended to Ensure All Potentially Meritorious Claims Receive a Full Hearing.

As an initial matter, Defendants' unlawful attempt to change, through Executive policy, the statutory credible fear standard must be understood against the backdrop of the system Congress enacted. The credible fear standard is intended to be a low, threshold standard, and to satisfy it the individual need not establish her ultimate eligibility for asylum. To prevail at a credible fear interview, the applicant need only show a "significant possibility" of asylum eligibility – i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a *fraction* of 10%. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (defining "credible fear" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien *could* establish eligibility for asylum") (emphasis added); *Cardoza-Fonseca*, 480 U.S. at 440.

As the Second Circuit has explained, "credible fear interviews are not designed to elicit all the details of an alien's claim, but rather only to determine whether there is 'a significant possibility . . . that the alien could establish eligibility for asylum.'"  *Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009); *see also Ferreira v. Lynch*, 831 F.3d 803, 809 (7th Cir. 2016) (per curiam) (citing disclaimer on credible fear form that "[t]here may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening").  Congress intended to create "a low screening standard for admission into the usual full asylum process." 142 CONG. REC. S11491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch, a principal sponsor); *see also* Detention Following a Determination of Credible Fear, 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997) (stating that credible fear is "a low threshold of proof of potential entitlement to asylum," the purpose of which is to ensure access to a full hearing for all individuals who have such potential entitlement).

The reason for the low threshold at the credible fear stage is straightforward.  An asylum claim is highly fact-specific and often will take significant time, resources, and expertise to develop properly, including expert testimony and extensive country conditions evidence.  In the expedited removal system, however, cursory credible fear proceedings occur within days of arrival, while the individual is detained, with little to no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, and no opportunity to examine witnesses or gather evidence.  *See* Declaration of Deborah Anker ("Anker Decl."), at ¶ 24 (credible fear applicants are "recent arrivals to the country, almost universally unrepresented, and very frequently traumatized and afraid"); *Zhang*, 585 F.3d at 724 (a detained "alien appearing at a credible fear interview . . . is . . . likely to be more unprepared, more vulnerable, and more wary

of government officials than an asylum applicant who appears for an interview before

immigration authorities well after arrival").

Thus, the low credible fear standard that Congress enacted is intended to ensure that

"there should be no danger that an alien with a genuine asylum claim will be returned to

persecution."  H.R. REP. NO. 104-469, pt. 1, at 158 (1996).  Yet, as explained below, the new

credible fear policies seek to ratchet up the standards in credible fear proceedings in multiple

interrelated ways – leading to the denial of many potentially meritorious claims, especially those

like Plaintiffs' that are related to domestic violence or gangs.

**B.      The New "Condoned" or "Complete Helplessness" Formulation Is Unlawful.**

The new credible fear policies, including the USCIS Guidance, direct asylum officers and

immigration judges to impose a heightened legal standard on claims involving non-governmental

persecutors.  After acknowledging that the applicable standard is the one that has been settled

since before the enactment of the Refugee Act – that in such cases the applicant must only show

the government is "unable or unwilling to protect" him or her – the new credible fear policies go

on to instruct that the unable or unwilling standard can only be met with a starkly more

demanding showing: "The applicant must show the government *condoned* the private actions or

at least demonstrated a *complete helplessness* to protect the victim."  USCIS Guidance at 6

(emphasis added); *see also Matter of A-B-*, 27 I&N Dec. at 337.  Defendants' new "complete

helplessness" formulation is inconsistent with the statute Congress enacted and decades of case

law in the BIA and federal courts.  These authorities make clear that an applicant who has

received some assistance, though ineffective, from the government can nonetheless meet the

"unable" prong of the standard.  Likewise, they recognize that the "unwilling" prong of the

standard can be met where a government declines to provide assistance, even if it has not *condoned* the persecutor's actions.

It is well settled that, under the Refugee Act, an applicant may seek asylum based on a well-founded fear of persecution inflicted "by persons or an organization that the government [is] unable or unwilling to control."  *Matter of Acosta*, 19 I&N Dec. at 222.  Defendants cannot reasonably dispute this standard, and do not try.  Instead, in the new credible fear policies they recite the "unable or unwilling to control" standard, while asserting that only a heightened showing will now satisfy it.  But the standard, as used in the Refugee Act, had an accepted meaning that is not subject to change at Defendants' whim.  As the BIA explained over thirty years ago in *Matter of Acosta*, the "accepted construction" of the term "persecution" before passage of the Act included the requirement that the harm or suffering inflicted by non-governmental actors had to be inflicted "by persons or an organization that the government was unable or unwilling to control."  *Id.* at 222 (collecting cases).  And the meaning of this language was reflected in case law.  Because "words used in an original act or section, that are repeated in subsequent legislation with a similar purpose, are presumed to be used in the same sense in the subsequent legislation," the BIA concluded that Congress, "in using the term 'persecution' . . . *intended to adopt the judicial and administrative construction of that term existing prior to the Refugee Act of 1980*."  *Id*. at 222-23 (emphasis added).  Because Defendants' new construction of the standard is inconsistent with such case law, it is unsupportable.

a. The "condoned" or "complete helplessness" formulation is inconsistent with the universal understanding at the time the Refugee Act was enacted that the correct standard is whether the government is both able and willing to provide "effective protection."  *See* Anker

Decl., at ¶¶ 7-12.  For example, the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status, contemporaneous with the enactment of the Refugee Act, provides that persecution includes harm by non-governmental actors "if the authorities refuse, or prove unable, to offer *effective* protection."  UNHCR Handbook ¶ 65 (1979, rev. 1992), Mujahid Decl., Exh. D (emphasis added).  The Supreme Court has explained that "[i]f one thing is clear from the legislative history of the [] definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees," and the UNHCR Handbook "provides significant guidance in construing the Protocol."  *Cardoza-Fonseca*, 480 U.S. at 436-37, 439 n.22.

The same understanding – that "unwilling or unable to control" refers to the government's willingness or ability to offer *effective* protection – was clear under domestic law at the time of the Refugee Act.  *See, e.g.*, *Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971) (recognizing viability of refugee claim if non-governmental persecutor is able "to carry out its purposes without effective hindrance"); *Matter of Eusaph*, 10 I&N Dec. 453, 454 (BIA 1964) (indicating that non-governmental persecution would qualify if "the police powers of the government have degenerated to the point where it is unable to take proper measures to control individual cases of violence"); *see also McMullen v. INS*, 658 F.2d 1312, 1315 & n.2, 1318 (9th Cir. 1981) (noting government concession that "unable or unwilling" is the correct standard, and reversing denial of relief based on evidence that non-governmental persecutor "regularly maim[ed] and execute[d] informers and persons it considers disloyal").

A government may be ultimately unable to effectively control a persecutor and protect an asylum seeker, but still not "completely helpless."  A government might be able to, for example,

investigate a potential persecutor, and conduct some arrests and prevent some instances of harm, without establishing effective control.  *Compare, e.g.*, *Matter of A-B-*, 27 I&N Dec. at 320 ("The mere fact that a country may have problems *effectively* policing certain crimes – such as domestic violence or gang violence – . . . cannot itself establish an asylum claim.") (emphasis added).  But, as all the relevant sources reflect, the "unable or unwilling" standard adopted in the Refugee Act requires only a showing that the government will not provide *effective* protection.

b. Defendants' new "condoned" or "complete helplessness" formulation is also at odds with the consistent understanding of the federal courts as to the settled meaning of both "unwilling" and "unable."  As the First Circuit recently reiterated, the "unable or unwilling" standard is "disjunctive": "an applicant must prove *either* unwillingness *or* inability."  *Rosales Justo v. Sessions*, --- F.3d ---, 2018 WL 3424685, at *6, *7 n.8 (1st Cir. July 16, 2018).  Defendants' new formulation is contrary to both.

"Condoning" persecution is a different and higher standard than being "unwilling" to prevent it, as is clear from even the briefest examination of the situations in which courts have found governments to be "unwilling" to protect asylum seekers.  *See, e.g.*, *Doe v. Holder*, 736 F.3d 871, 879 (9th Cir. 2013) (finding government unwilling to protect applicant where Russian police dismissed his complaints without acting on them); *Ivanov v. Holder*, 736 F.3d 5, 14 (1st Cir. 2013) (finding the police unwilling to protect where there "is no evidence that the police made any efforts to apprehend or punish Ivanov's attackers"); *Hengan v. INS*, 79 F.3d 60, 62 (7th Cir. 1996) (finding the government might be unwilling to control the persecutors because it needed their political support).  These cases reflect that, as Professor Anker, a leading scholar of asylum law, explains, "a government may be unwilling to protect a refugee for many reasons

including corruption, bias, lack of political will, or desire to prioritize the protection of other segments of society."  Anker Decl., at ¶ 14.

Likewise, the new "complete helplessness" formulation is different and higher than the "unable to control" standard, as demonstrated by decades of case law.  Over and over, the circuit courts have held that applicants established that their government was "unable to control" the feared persecutors even where the government may have taken some, albeit ineffective, steps in response to the feared harm.  *See, e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1075 (9th Cir. 2017) (en banc) (government was unable to protect gay man despite various reforms including a "specialized hate crimes prosecution unit"); *Gathungu v. Holder*, 725 F.3d 900, 906, 908-09 (8th Cir. 2013) (government was unable to protect from political group despite evidence of "very strong policies" and somewhat effective governmental "action" against the group); *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011) (evidence that government had "focused law enforcement efforts on suppressing gang violence" was not dispositive).[2]

c.  Moreover, Defendants' new formulation is inconsistent with Congress's overall standard for asylum: "a well-founded fear of persecution" on a protected ground, 8 U.S.C. § 1101(a)(42).  As the Supreme Court has explained, "an applicant [who] only has a 10% chance

---

[2] *See also, e.g.*, *Kamar v. Sessions*, 875 F.3d 811, 818-20 (6th Cir. 2017); *Sarhan v. Holder*, 658 F.3d 649, 660 (7th Cir. 2011); *Aliyev v. Mukasey*, 549 F.3d 111, 119 (2d Cir. 2008); *Fiadjoe v. Att'y Gen. of U.S.*, 411 F.3d 135, 162 (3d Cir. 2005); *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002); *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000).  *Matter of A-B-* and the Guidance do not grapple with any of this case law.  Instead, *Matter of A-B-* selectively quotes dicta in two Seventh Circuit decisions, *Galina v. INS*, 213 F.3d 955 (7th Cir. 2000), and *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005), to give the impression that those cases support applying its formulation as policy.  *See* 27 I&N Dec. at 337.  They do not.  In fact, *Galina* held *in favor of* the noncitizen *despite* successful prior police intervention, stating in pure dicta only that persecution "ordinarily" requires the government to condone or be completely helpless.  213 F.3d at 958.  As for *Hor*, that stay decision was rejected in relevant part when the Seventh Circuit considered the merits, and, as in *Galina*, held in favor of the noncitizen despite police intervention in his defense.  *See Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005).

of being shot, tortured, or otherwise. . .  persecuted" nonetheless has a "'well-founded fear' of the event happening." *Cardoza-Fonseca*, 480 U.S. at 440.

The new policies instead essentially require asylum applicants to show an absolute certainty that the government will not protect them from feared harm.  That requirement has the effect of denying relief to individuals fleeing non-governmental persecutors who can show substantially more than a 10% chance of harm.  *See* Anker Decl., at ¶ 13 ("requiring applicants to show 'complete helplessness' . . . would impose extreme evidentiary burdens on the applicant inconsistent with the well-founded fear standard").  Indeed, even an individual facing a *likelihood* of serious harm may well fail under the "complete helplessness" formulation.[3] *Compare Cardoza-Fonseca*, 480 U.S. at 449 (rejecting argument that asylum applicant must establish harm is more likely than not).

For years, the government itself has recognized that the "unable or unwilling" standard for persecution by non-governmental actors must be evaluated in consonance with the "well-founded fear" threshold for persecution.  Thus, the government's established position had been that the relevant question is not "complete helplessness," but whether the government will take "measures that reduce the risk of claimed harm below the well-founded fear threshold."  Asylum Officer Basic Training, Female Asylum Applicants & Gender-Related Claims at 21 (Dec. 5, 2002), Mujahid Decl., Exh. E.  As the government has further explained: "In evaluating whether a government is unwilling or unable to control the infliction of harm or suffering, the asylum

_____

[3] For example, imagine an asylum seeker who faces a high likelihood that a non-government source, like a gang, will attempt to inflict harm – say 80% likelihood.  And imagine the government in that person's country is largely, but not entirely, unable to protect her – a 75% chance of failing to protect, but not complete helplessness.  Overall, that person would have a roughly 60% chance of actually suffering the relevant injury.  But, under the government's new formulation, she would not be eligible for asylum despite the grave overall risk on account of a protected ground.  Yet a person showing only a 10% chance of harm from the government of that same country would prevail.

officer should consider whether the government takes *reasonable* steps to control the infliction of harm or suffering and whether the applicant has *reasonable* access to the existing state protection." *Id*. (emphases added).

The new requirement that applicants show "*complete* helplessness" thus "do[es] violence to Congress' intent" in establishing the well-founded fear standard. *Cardoza-Fonseca*, 480 U.S. at 436; *cf. In Re S-P-*, 21 I&N Dec. 486, 489 (BIA 1996) (requiring an asylum applicant "to show conclusively why persecution has occurred or may occur . . . would largely render nugatory the Supreme Court's decision in [*Cardoza-Fonseca*] and would be inconsistent with the 'well-founded fear' standard embodied in the 'refugee' definition").

And applying the requirement to the credible fear process, where applicants need only show a "significant possibility" of meeting the asylum eligibility standard, 8 U.S.C. § 1225(b)(1)(B)(v), compounds the problem. It is both unreasonable and inconsistent with Congress's scheme to require applicants at the threshold screening stage, with no opportunity to gather or develop evidence, to marshal the evidence that would be necessary to satisfy the erroneous heightened standard of "complete helplessness" or even a significant possibility of "complete helplessness." *See supra* at I.A; Anker Decl., at ¶¶ 13, 24.[4]

d. An additional reason that the new "complete helplessness" standard is unlawful – even apart from being incorrect – is that neither the Attorney General nor USCIS has acknowledged that the standard *is* being ratcheted up, let alone supplied a reasoned explanation for that change. Indeed, the new credible fear policies parrot the "unable or unwilling" standard, but then go on to

---

[4] Because the "complete helplessness" standard denies relief to applicants with a high overall probability of harm on account of a protected ground (from non-governmental persecutors), while applicants with a lower overall probability of harm (from governmental persecutors) are eligible for relief, it is also arbitrary and capricious. *See Judulang v. Holder*, 565 U.S. 42, 58 (2011).

establish a new formulation inconsistent with that standard's settled meaning.  And they offer *no* justification for the change, instead simply acting as though the standard were always so.

It is black letter law that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (internal quotation marks omitted); *see also, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And "agencies 'may not . . . depart from a prior policy *sub silentio*,'" casting aside settled constructions without even acknowledging that the standard is being changed. *Comcast Corp. v. FCC*, 600 F.3d 642, 659 (D.C. Cir. 2010) (quoting *Fox Television,* 556 U.S. at 515 (2009)).  The new standard is thus arbitrary and capricious in violation of the APA.

### C.    The General Rule Against Claims Related to Domestic Violence and Gangs Is Unlawful.

The new credible fear policies not only heighten the "credible fear" standard in general, but also establish a general rule against two categories of claims in particular: those relating to domestic violence and gangs.  In sweeping terms, *Matter of A-B-* asserts that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum."  27 I&N Dec. at 320.  Even though that case did not consider a claim at the credible fear stage (or a gang-related claim), it went on to state that "few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."  *Id*. at 320 n.1.  These statements were a thinly-veiled directive to asylum officers to deny claims related to domestic violence or gangs.

The veil was lifted in the USCIS Guidance, which codifies the same approach of singling out domestic violence and gang claims as agency policy.  It directs, in bold font, that "**[i]n general, . . . claims based on membership in a putative particular social group defined by**

**the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for asylum, refugee status, or a credible . . . fear of persecution.**" USCIS Guidance at 6 (emphasis in original); *see also id.* at 10.  These policies direct asylum officers to apply a general rule *against* certain asylum applicants because their claims "pertain[]" to domestic violence or gangs.  27 I&N Dec. at 320.

But the premise of the general rule – that gang and domestic violence-related claims cannot pass the credible fear threshold or qualify for asylum – is simply incorrect.  Courts have recognized asylum based on gang-related or gender-based harms in a variety of circumstances. *See, e.g.*, *Salgado-Sosa v. Sessions*, 882 F.3d 451, 460 (4th Cir. 2018) (family-based claim involving gang violence); *Aldana-Ramos v. Holder*, 757 F.3d 9 (1st Cir. 2014) (same); *Ivanov v. Holder*, 736 F.3d 5, 8 (1st Cir. 2013) (religious persecution by gang); *Garcia v. Att'y Gen. of the U.S.*, 665 F.3d 496, 503 (3d Cir. 2011) (claim involving gang targeting of witness); *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007) (claim based on female genital cutting dictated by marriage agreement).  *See also* Anker Decl., at ¶¶ 19-21; *id.* at ¶ 20 ("'there is no doubt that . . . domestic violence . . . ha[s] been used as [a] form[] of persecution' and may be on account of any of the protected grounds, including membership in a particular social group") (quoting UNHCR*, Guidelines on International Protection No. 1: Gender-Related Persecution within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (2002), HCR/GIP/02/01, ¶¶ 9, 30) (alterations in original).

As explained below, the general rule against gang and domestic violence-related claims is contrary to the text and history of the INA, and is arbitrary and capricious.

1.    **The General Rule Against Claims Related to Domestic and Gang-Based Violence Is Contrary to the INA and Refugee Act.**

The INA requires an individualized approach to asylum adjudication.  *See, e.g.*, *Matter of M-E-V-G-*, 26 I&N Dec. 227, 242 (BIA 2014) ("[S]ocial group determination[s] must be made on a case-by-case basis[.]"); *id.* at 251 (citing *Matter of Acosta*, 19 I&N Dec. at 233); *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("[T]he BIA may not reject a group solely because it had previously found a similar group in a different society" not to meet the legal standard); *see* Anker Decl., at ¶ 16 ("Eligibility for asylum must be determined on an individualized basis.").  In each case, the question is whether the facts satisfy the standard for asylum.  There is no space in the statutory scheme for the agency to impose a general rule against claims that pertain to domestic violence or gangs.

This individualized analysis is also specifically incorporated into the expedited removal statute and credible fear standard.  The statute requires, for example, that the asylum officer conducting the credible fear interview must prepare a case-specific factual and legal analysis for each applicant.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(II); *see* 8 C.F.R. § 208.30(e).[5]  Credible fear interviews, like asylum in general, must be resolved based on the particular facts and circumstances of the case.

In the Refugee Act, Congress quite consciously chose to reject any categorical restrictions on asylum based on the source of harm or violence the applicant experienced or feared or her country of origin.  Before the Refugee Act, U.S. refugee policy was characterized

---

[5] *See also, e.g.*, Refugee, Asylum, and International Operations Directorate Officer Training Course ("RAIO"), Credible Fear of Persecution and Torture Determinations, at 25 (Feb. 13, 2017), Mujahid Decl., Exh. F ("2017 Credible Fear Training") ("Asylum officers should evaluate the entire scope of harm experienced by the applicant to determine if he or she was persecuted, taking into account the individual circumstances of each case."); *id.* at 28 ("The applicant may meet his or her burden with evidence that the government was unable or unwilling to control the persecution in the specific locale where the applicant was persecuted.").

by responses to specific crises and world events, providing protection based on the identity of the

persecutor or the geographic origin of the applicant.  *See Bringas-Rodriguez*, 850 F.3d at 1059.

The Refugee Act rejected this approach, instead enacting "the nondiscriminatory definition of

refugee" codified at 8 U.S.C. § 1101(a)(42)(A).  *Id.* at 1060.  That definition provides protection

for *anyone* who satisfies the relevant standards, regardless of their nationality or the identity of

their persecutor.  *See Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 799 (N.D. Cal.

1991) (stipulated settlement agreement acknowledging that "foreign policy and border

enforcement considerations are not relevant to the determination of whether an applicant for

asylum has a well-founded fear of persecution" and "the same standard for determining whether

or not an applicant has a well-founded fear of persecution applies to Salvadorans and

Guatemalans as applies to all other nationalities").

That statutory choice was part of Congress's broader intent "to bring United States

refugee law into conformance" with the Refugee Protocol.  *Cardoza-Fonseca*, 480 U.S. at 436-

37.  Like Congress's definition, under the Protocol "refugee status must . . . be determined on an

individual basis."  UNHCR Handbook ¶ 44; *see also id.* at ¶ 43 ("The situation of each person

must . . . be assessed on its own merits."); ¶ 52 (whether conduct rises to the level of persecution

"will depend on the circumstances of each case").  Professor Anker, an expert in the history and

context of the 1980 Act, explains that:

> The drafters of the 1951 Convention Relating to the Status of Refugees . . . and
> 1967 Protocol, upon which the Refugee Act was based, rejected prior selective
> protection regimes that focused on particular nationalities or groups.  In contrast,
> the Protocol's definition of refugee, incorporated into U.S. law in the Refugee Act
> of 1980, is individualized and universal . . . The Convention—which . . .  the
> Protocol amended—broke with previous international refugee protection regimes
> in adopting a general definition applicable to any refugee who could establish he
> or she met the general standards.

Anker Decl., at ¶¶ 17-18; *see also* Anker, Requirement of Individualized Determination, *Law of Asylum in the United States* § 2:4 (2018 ed.).

The new credible fear policies' general rule against domestic violence and gang-related claims is incompatible with Congress's intent to adopt a nondiscriminatory refugee definition that eschews category-based analysis and mandates an individualized inquiry into the specific facts of each case.  There is no space in this scheme for a rule against the claims of those fleeing particular categories of persecutors or with claims related to certain kinds of violence.  The new policy of directing asylum officers to treat claims related to domestic violence or gangs as a category that must generally fail is thus contrary to the Refugee Act and the INA.

Moreover, the new policy is contrary to the standard Congress established for the initial credible fear screening interviews.  *See supra* at I.A (explaining the purpose of the initial screening standard).  A direction to generally deny claims relating to domestic violence or gang violence is the antithesis of a low threshold screening to identify claims that may be meritorious and lead to an eventual finding of eligibility in full removal proceedings.  This is particularly the case when, as noted above, courts have recognized that claims relating to gangs or gender-based violence may be cognizable in any number of circumstances.

### 2. The General Rule Against Claims Related to Domestic and Gang-Based Violence is Arbitrary and Capricious.

The new policy is also arbitrary and capricious.  For one thing, the new policy irrationally discriminates among asylum applicants, treating some victims of non-governmental persecutors worse than others without any basis in the statute for doing so.  The general rule singles out individuals asserting persecution by gangs or intimate partners for denial when, as noted, courts have recognized that claims relating to gangs or gender-based violence may be cognizable in any number of circumstances.  *See, e.g.*, Anker Decl., at ¶19-21.  Thus, the new polices are arbitrary

and capricious.  *Cf., e.g.*, *Judulang*, 565 U.S. at 55 (rule disfavoring certain noncitizens that

"bears no relation" to "the purposes of the immigration laws or the appropriate operation of the

immigration system" is arbitrary and capricious).

Moreover, the general rule against claims related to domestic violence and gangs is

supported only by inaccurate and generalized statements, which fail to provide an adequate

rationale for the change.  The Guidance offers varying reasons for its instruction that "in general"

claims involving domestic violence or gangs **will not establish the basis for . . . a credible . . .**

**fear**."  USCIS Guidance at 6 (emphasis in original).  At some points in its analysis, it suggested

the problem was that such claims are "based on membership in a putative particular social group

defined by the members' vulnerability to harm of domestic violence or gang violence."  *Id*. at 6.

That is not correct – claims involving these kinds of persecutors can be based on all sorts of

protected grounds and social groups.  *See, e.g.*, *Ivanov*, 736 F.3d at 8 (religious persecution by

gang); *Salgado-Sosa*, 882 F.3d at 460 (family-based persecution by gang).  Elsewhere in the

Guidance, USCIS asserts that such claims will likely fail because applicants must satisfy the

heightened standard of showing the government condoned the persecution or was completely

helpless to protect the applicant.  USCIS Guidance at 10; *but see supra* at I.B (explaining that the

new heightened standard is unlawful).  Thus, the general rule against domestic violence claims

and gang-related claims is not supported by any logical justification and is arbitrary and

capricious.  *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) (judgment that is "neither

'logical' nor 'rational'" is "arbitrary and capricious for want of reasoned decisionmaking").

Finally, the rule against claims relating to domestic violence or gang violence is also

arbitrary and capricious because – regardless of whether the rule is even justifiable – once again,

the policies have failed to acknowledge a change in course, and failed to provide a reasoned

explanation for the change.  The government has long acknowledged the requirement that asylum eligibility determinations must be made on a case-by-case basis.  *See, e.g.*, 2017 Credible Fear Training at 25 ("Asylum officers should evaluate the entire scope of harm experienced by the applicant to determine if he or she was persecuted, taking into account the individual circumstances of each case.").  The new credible fear policies have altered that settled practice by imposing a general rule, above and beyond the other attempted alterations to asylum standards, against claims related to domestic violence and gangs.  Yet the new policies have failed to display awareness of their departure from prior practice, let alone explain the basis for that departure.  *See Lone Mountain Processing*, 709 F.3d at 1164.  The policies are unlawful and should be enjoined.

> **D.**     **The Revised Nexus Standard Is Unlawful.**

The credible fear policies also impermissibly instruct that persecution occurring between people with a pre-existing relationship generally does not qualify for asylum protection because applicants will fail to establish "nexus" – meaning the requirement to show that persecution is "on account of" a protected ground such as religion, race, or membership in a particular social group.  8 U.S.C. § 1101(a)(42)(A).  Specifically, the new credible fear policies direct asylum adjudicators to presume that "[w]hen a private actor inflicts violence based on a personal relationship with the victim," the victim "often" will be unable to establish nexus to a protected ground like a particular social group.  USCIS Guidance at 6; *Matter of A-B-*, 27 I&N Dec. at 338-39; *see also id.* at 337 ("[P]rivate criminals are motivated more often by greed or vendettas than by an intent to 'overcome [the protected] characteristic of the victim.'") (alteration in original).

By instructing that where personal motives are at issue the claim will generally fail, the new rule is fundamentally inconsistent with the statutory standard for establishing nexus, which expressly contemplates mixed motives for persecution.  The statute specifies that a protected ground must be "*one* central reason" for the persecution – thus recognizing that multiple central reasons may exist, and that a protected ground need not be even the primary reason.  8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); *see also* H.R. REP. NO. 109-72, at 165 (2005) (Conf. Rep.) ("[A]sylum may be granted where there is more than one motive for mistreatment."); *Shaikh v. Holder*, 702 F.3d 897, 902 (7th Cir. 2012) (noting that the protected "ground may be a secondary (or tertiary, etc.) reason [for the persecution] and still justify asylum"); *Matter of N-M-*, 25 I&N Dec. 526, 533 (BIA 2011) (allowing for a showing of nexus "where an [individual] demonstrates more than one plausible motive for the harm imposed or the harm feared").[6]

The credible fear policies flout this statutory mixed-motives framework, asserting that the existence of "personal" motives will in general foreclose nexus to a protected ground.  *See* USCIS Guidance at 6.  But the "one central reason" standard must be applied case by case, to all claims, including where the persecutor has a pre-existing relationship to the applicant.  *See, e.g.*, *Madrigal v. Holder*, 716 F.3d 499, 505–06 (9th Cir. 2013) ("Although mistreatment motivated purely by personal retribution will not give rise to a valid asylum claim, if a retributory motive exists alongside a protected motive, an applicant need show only that a protected ground is 'one central reason' for his persecution.") (citation omitted).  Indeed, if virtually all claims based on non-governmental actors who have some personal relationship with the victim will fail, then

---

[6] This statutory standard codified prior jurisprudence establishing that reasons for persecution may include both protected and non-protected bases.  *In Re J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007).

effectively the only non-governmental actor cases that could qualify for asylum would be those in which the persecutor does not know the victim.

Yet courts have found nexus established in contexts that *inherently* or *predominantly* involve persecutors with close ties to the applicant, particularly in the context of gender-based asylum claims.  For example, female genital cutting almost always is imposed by those with close family or community ties.  *See, e.g.*, *In re Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996).  Honor killings and forced marriages likewise are almost always perpetrated by family members. *See, e.g.*, *Sarhan*, 658 F.3d at 651; *Kamar v. Sessions*, 875 F.3d 811, 818 (6th Cir. 2017); *Bi Xia Qu v. Holder*, 618 F.3d 602, 604, 608 (6th Cir. 2010).  And other examples abound.  *See, e.g.*, *Nabulwala v. Gonzalez*, 481 F.3d 1115, 1117–18 (8th Cir. 2007) (applicant's family sought to violently 'change' her sexual orientation); *Bringas-Rodriguez*, 850 F.3d at 1056 (persecution by family members and neighbor on account of applicant's homosexuality); *Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000) (father's assault and mistreatment constituted religious persecution).[7]

Further, Defendants' rule violates Congress's requirement, discussed above, that each credible fear case be determined based on an individualized analysis of the actual facts, rather than based on any gross generalization concerning individuals fearing violence by certain kinds of non-governmental actors.  *See supra* I.C.  There is simply no basis in asylum law for a bar against claims by non-governmental actors who have a personal relationship with the victim. Particularly because applicants at the credible fear stage need only show a significant possibility of establishing asylum eligibility, it is impermissible to instruct asylum adjudicators that an applicant's "personal relationship" with their persecutor will generally preclude establishing the

---

[7] In none of these contexts was nexus defeated by the fact that persecutors failed to target *other* individuals with whom they lacked a personal relationship.  But in *Matter of A-B-*, 27 I&N Dec. 337-39, the Attorney General suggested that nexus would not exist unless persecutors bear animosity toward other group members.

nexus requirement at that threshold stage.  Further, the policies do not explain why "personal"

claims should be presumed to fail nexus, despite the statutory mixed-motive analysis, rendering

them arbitrary and capricious.  *Lone Mountain Processing*, 709 F.3d at 1164.

E.     **The Requirement of an "Exact Delineation" of the Particular Social Group Is Unlawful.**

The new credible fear policies purport to impose a new requirement for applicants to

identify a specific social group in the credible fear context, contrary to the statutory text and

congressional intent.  Specifically, *Matter of A-B-* stressed a requirement to articulate "the exact

delineation of any proposed particular social group."  27 I&N Dec. at 344.  The USCIS

Guidance, addressing credible fear as well as other kinds of asylum proceedings, quotes that

same requirement from *Matter of A-B-* and instructs that "an applicant seeking asylum or refugee

status based on membership in a particular social group must present facts that *clearly identify*

the proposed particular social group."  USCIS Guidance at 3 (emphasis added).

This new requirement for the applicant to articulate and identify a specific legally

cognizable particular social group is inconsistent with the purpose and nature of the credible fear

process – namely, to identify cases that *may* ultimately be meritorious for further development in

a full asylum hearing.  *See* 8 U.S.C. § 1225(b)(1)(B)(v) (noncitizen has credible fear if there is "a

significant possibility" she "*could* establish eligibility for asylum") (emphasis added); 8 C.F.R.

§ 208.30(e)(4) (similar); *id*. § 208.30(f) (individual with credible fear is placed in ordinary

removal proceedings "for full consideration of the asylum and withholding of removal claim");

*supra*, at I.A (explaining Congress's intent).  Notably, "credible fear interviews are not [even]

designed to elicit all the details of an alien's claim."  *Zhang*, 585 F.3d at 724; *see also Ferreira*,

831 F.3d at 809.  The process certainly is not designed to require articulation of complex factual

or legal principles.  *See* 2017 Credible Fear Training at 37 (issues that "require complex legal

and factual analyses" are "more appropriately considered in a full hearing before an immigration judge"). Yet what qualifies as a cognizable social group is a complex question informed by myriad BIA and circuit court decisions, and frequently requires expert testimony. *See* Anker Decl., at ¶ 23 ("Even experienced immigration attorneys often need to undertake extensive research and analysis to determine the relevant cognizable particular social group. The precise basis for eligibility often emerges through testimony and the presentation of evidence during the course of a full removal hearing."); *see also* Asylum and Withholding Definitions, 65 Fed. Reg. 76,588, 76,593 (Dec. 7, 2000) ("Membership in a particular social group is perhaps the most complex and difficult to understand" of the five protected grounds for asylum).

Congress, well aware that individual applicants would be in no position to articulate legal theories or fit their experiences into legal doctrine, required that officers specially trained in asylum law would be responsible for identifying potential legal bases for asylum through the credible fear process. *See* 142 CONG. REC. H11081 (daily ed. Sept. 25, 1996) (statement of Rep. Hyde) (explaining "[s]pecially trained asylum officers [would] screen cases to determine whether aliens have a 'credible fear of persecution'—and thus qualify for more elaborate procedures"); H.R. REP. NO. 104-828, at 209 (1996) (Conf. Rep.) (emphasizing training); H.R. REP. NO. 104-469, at 158 (1996) (same). By contrast, in ordinary removal proceedings the "burden of proof is on the *applicant* to establish that the applicant is a refugee, within the meaning of" the INA. 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

Accordingly, the regulations are clear that, far from a full hearing at which the applicant must articulate her legal theories, the credible fear process is an *interview* to be conducted in "a nonadversarial manner." 8 C.F.R. § 208.30(d). By contrast, the BIA authority cited in *Matter of A-B-* regarding the "exact delineation" requirement specifically emphasized that regular removal

proceedings are "adversarial in nature."  *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190-91

(BIA 2018); *see* 27 I&N at 344.  Likewise, not only are most credible fear applicants

unrepresented, but in fact the regulations indicate that asylum officers have discretion forbid

attorneys from offering *any* legal argument at a credible fear interview.  8 C.F.R. § 208.30(d)(4)

(placing the question "in the discretion of the asylum officer").  It is thus plain that a requirement

to articulate a particular cognizable social group or marshal facts specifically identifying such a

group is inconsistent with Congress's plan for a threshold, nonadversarial screening interview.

Anker Decl., at ¶ 24.  Moreover, it is arbitrary and capricious to impose on the credible fear

screening process a BIA rule grounded in the adversarial nature of removal proceedings.

**F.      The Blanket Direction to Disregard Circuit Court Decisions is Unlawful.**

The new credible fear policies, and in particular the USCIS Guidance, go beyond *Matter

of A-B-* in a crucial respect by directing asylum adjudicators to ignore relevant circuit court

precedent.  The Guidance instructs asylum officers to apply circuit holdings only "to the extent

that those cases are not inconsistent with *Matter of A-B-*."  Guidance at 8.  That unjustified

refusal to abide by the determinations of federal courts violates bedrock separation-of-powers

principles.  And the Guidance goes even further, dictating that, even when circuit cases can be

considered, officers may only apply the law in "the circuit where the alien is physically located

during the credible fear interview."  *Id*. at 8-9.  This new pronouncement marks a radical change

from longstanding agency practice, is based on irrational justifications, and is irreconcilable with

the statutory "credible fear" standard.

**1.      The Policy of Disregarding Circuit Law is Illegal.**

There is little more fundamental to our constitutional system than the principle that

Executive Branch officials are bound by the decisions of Article III courts.  *See Marbury v.*

*Madison*, 5 U.S. 137, 177 (1803); *see also Cooper v. Aaron,* 358 U.S. 1, 17-19 (1958).  Thus

USCIS, like all Executive agencies and officials, "is required to apply federal law as interpreted

by the federal courts."  *Lopez v. Heckler*, 725 F.2d 1489, 1503 (9th Cir.), *vac'd on other*

*grounds*, 469 U.S. 1082 (1984).  "[T]he executive branch defying the courts," *id*. at 1497,

represents "shocking disrespect" for a co-equal branch, *Anderson v. Heckler*, 756 F.2d 1011,

1013 (4th Cir. 1985).

The government has long acknowledged these principles in the immigration context.  *See,*

*e.g.*, *Matter of Cruz De Ortiz*, 25 I&N Dec. 601, 603 n. 1 (BIA 2011) (noting "we are bound" by

circuit holding); *Matter of Cienfuegos*, 17 I&N Dec. 184, 186 (BIA 1979) (same).  And USCIS,

in particular, has long acknowledged that "circuit court opinions are binding on the BIA,

immigration judges and asylum officers located within that circuit court's jurisdiction."  Asylum

Officer Basic Training, Reading Caselaw at 3 (January 9, 2006), Mujahid Decl., Exh. G

("Reading Caselaw); *see also* RAIO Training Course, Reading and Using Case Law at 10, 15

(Apr., 2012), Mujahid Decl., Exh. H (acknowledging that circuit cases are binding within the

circuit, and constitute higher authority than Attorney General or BIA opinions).

The Guidance, however, jettisons this general principle, instructing asylum officers to

disregard any circuit case that is not consistent with *Matter of A-B-*, without even limiting that

instruction to *Matter of A-B-*'s *holdings*.  In so instructing, the Guidance cited to *Matter of*

*Fajardo Espinoza*, 26 I&N Dec. 603, 606 (BIA 2015)—which in relevant part cited the principle

that reasonable agency interpretations to fill statutory gaps left by Congress are ordinarily

entitled to deference, *see Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), and that in such

cases "a prior judicial construction of a statute [will not] trump[] an agency construction otherwise entitled to *Chevron* deference," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).

*Brand X* does not justify the sweeping policy established by the Guidance.  The Guidance purports to set a blanket rule: *Everything* in *Matter of A-B-* should get *Chevron* deference, so *any* circuit case inconsistent with *Matter of A-B-* in *any* respect may be cast aside under *Brand X*. Such an assertion of agency supremacy flouts well-established *Chevron* and separation-of-powers principles.

a. There are many reasons why a particular agency conclusion may not be entitled to deference.  Only "an interpretation of . . . statutory language" is even potentially entitled to *Chevron* deference.  *Judulang*, 565 U.S. at 52 n. 7.  Moreover, no deference is warranted if Congress provided "a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).  And then, even if Congress did leave a gap for the agency to fill, courts will only defer if the proposed rule is reasonable, adequately explained, and neither arbitrary nor capricious.  *Judulang*, 565 U.S. at 52-53 & n.7; *Comcast Corp.*, 600 F.3d at 659.  In light of the many barriers, "reflexive deference" under *Chevron* is an impermissible "abdication of the Judiciary's proper role in interpreting federal statutes." *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring).

Equally important, *Chevron* deference is not dispensed in bulk.  Assuming an issue involves the agency's interpretation of a statute, the question – for purposes of determining whether *Chevron* deference is due at all – is whether "the statute is silent or ambiguous with respect to *the specific issue*" the agency resolves.  *Chevron*, 467 U.S. at 843 (emphasis added); *see also Pereira*, 138 S. Ct. at 2113 (question is whether Congress answered "the interpretive

question at hand"). *Matter of A-B-* addresses a huge range of asylum issues, from particular

social groups to discretionary factors. Yet the Guidance blithely asserts that *everything* in *Matter*

*of A-B-* is entitled to deference, in clear violation of the context-specific analysis under *Chevron.*

In fact, when examined in detail, it becomes clear that very little in *Matter of A-B-* is

entitled to deference. The "condoned" or "complete helplessness" formulation, for example,

fails the *Chevron* analysis at each step. Assuming that the new "complete helplessness" standard

is even properly understood as actually "an interpretation of . . . statutory language," *Judulang*,

565 U.S. at 52 n. 7, deference is not warranted because Congress has provided "a clear and

unambiguous answer to the interpretive question at hand," *Pereira*, 138 S. Ct. at 2113.[8]  As

discussed above, *supra* at I.B, the text, context, history, and uniform case law all confirm that the

"unable or unwilling" standard requires only a showing of a lack of effective state protection –

not complete helplessness. *See Matter of Acosta*, 19 I&N Dec. at 223 ("Congress, in using the

term 'persecution' in the definition of a refugee under section 101(a)(42)(A) of the Act, intended

to adopt the judicial and administrative construction of that term existing prior to the Refugee

Act of 1980."). Thus, *Matter of A-B-*'s new higher formulation for government involvement is

foreclosed as a matter of clear congressional intent.

In any event, even if the new formulation could survive *Chevron*'s first step, it would still

fail because it is an unreasonable interpretation of the statute. *See Judulang*, 565 U.S. at 52 n.7

("Were we to [apply *Chevron*,] our analysis would be the same, because under *Chevron* step two,

---

[8] It is doubtful that the complete helplessness rule represents the "agency's statutory
interpretation[]," which is necessary to bring the issue within the *Chevron* framework. *Judulang*,
565 U.S. at 53 n. 7. As explained above, the "unable or unwilling" standard itself is grounded in
administrative and judicial decisions reflecting a widespread understanding of the standard at the
time the Refugee Act was enacted. As such, an alteration of that standard, rather than a
reinterpretation of any *statute*, is simply not the kind of decision to which *Chevron* applies. *Cf.
MikLin Enterprises, Inc. v. Nat'l Labor Relations Bd.*, 861 F.3d 812, 823 (8th Cir. 2017) ("*Brand
X* does not require a court to defer to an agency's interpretations of judicial precedent.").

we ask whether an agency interpretation is arbitrary or capricious in substance.") (internal

quotation marks omitted).  The "completely helpless" formulation arbitrarily differentiates

among asylum seekers based on the identity of their persecutor.  *See supra* at nn. 3, 4.  The new

standard is also arbitrary and capricious because, as noted above, the Attorney General and

USCIS have not even acknowledged any change, let alone supplied a reasoned basis for it.  *See*

*supra* at I.B.  Various other parts of *Matter of A-B-* are likewise disentitled to deference.  *See,*

*e.g.*, *supra* at I.C. (addressing general rule against asylum claims related to domestic violence

and gangs).

Indeed, much of *Matter of A-B-* is pure dicta expressing the Attorney General's views on

various aspects of asylum law apart from the adjudication of any issue presented in that case.

Yet agency dicta does not "constitute[] a statutory interpretation that carries the force of law"

warranting *Chevron* deference.  *Velazquez-Herrera v. Gonzales*, 466 F.3d 781, 783 (9th Cir.

2006) (per curiam) (internal quotation marks omitted); *see also United States v. Yakou*, 428 F.3d

241, 248 (D.C. Cir. 2005) (BIA "was not required to apply" its "interpretation of the INA" in

published opinions, "thus leaving only dicta" that was "not dispositive" under *Chevron*).  The

Guidance, however, directs asylum officers to *assume* that these portions of *Matter of A-B-*, like

the rest, are controlling law, and disregard circuit law.

b.  The Guidance's direction to disregard circuit law presumes that the *agency*, rather

than the judiciary, gets to decide when *Brand X* applies and thus when a new agency

determination trumps a prior court decision.[9]  But even if that were correct, the agency could not

---

[9] *But see Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1145 (10th Cir. 2016) (Gorsuch, J.)
(explaining that a BIA decision reinterpreting a statute "was not legally effective in the Tenth
Circuit until this court discharged its obligation under *Chevron* step two and *Brand X* to
determine that the statutory provisions at issue were indeed ambiguous, that the BIA's

simply disregard circuit law without undertaking the requisite analysis.  Here, however, the

Guidance conducts *no* analysis to determine whether particular issues addressed in that decision

are in fact entitled to deference and covered by *Brand X*.  *Cf., e.g.*, *Matter of Marquez Conde*, 27

I&N Dec. 251, 255 (BIA 2018) (examining whether the particular statutory question fell within

*Brand X*); *Matter of Douglas*, 26 I&N Dec. 197, 199-201 (BIA 2013) (same).  And *Matter of A-*

*B-* itself invoked *Brand X* on one issue only: the interpretation of "the term "'particular social

group.'" 27 I&N Dec. at 327.  Even assuming the Attorney General's analysis is sufficient and

*Brand X* applies to that interpretive question, the narrowness of the invocation in *Matter of A-B-*

underscores the overall point: The Guidance cannot simply assert that everything in *Matter of A-*

*B-* gets deference when the agency has never undertaken the required analysis for each issue.

    Nor does the Guidance indicate that individual asylum officers should attempt to analyze

*Brand X* questions as they arise.  On the contrary, it directs officers *as a rule* not to apply circuit

law if it is inconsistent with *Matter of A-B-*, going forward into the future.  It is far from clear

that asylum officers are even empowered to decide whether any particular circuit decision is

displaced pursuant to *Brand X*.[10]  But they certainly cannot ignore circuit law without conducting

---

interpretation of them was indeed reasonable, and that [the court's prior decision] was indeed
overruled.").

    [10] To be sure, it may be difficult for asylum officers to do so, particularly while
conducting credible fear interviews, which are ordinarily short and serve only an initial screening
function.  Indeed, many asylum officers are not attorneys, *see* U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, *Asylum Officer Basic Training*, Corps Values & Goals, 2006 WL
6410316 (Sept. 13, 2006), and, while they are trained in asylum standards, the *Brand X* questions
turn on complex administrative law and statutory interpretations issues well beyond their
training.  To achieve a simple rule and avoid undertaking the *Brand X* analysis, USCIS may
direct asylum officers to err on the side of honoring circuit precedent unless and until the circuit
holds that precedent has been superseded under *Brand X*.  What it may not tell them to do is what
the Guidance directs: ignore circuit decisions across the board, regardless of whether the
agency's position is ultimately controlling.

the *Brand X* analysis.[11]  To disregard circuit law regardless of whether *Brand X* in fact permits

the agency to override it would demonstrate "shocking disrespect" for the courts.  *Anderson*, 756

F.2d at 1013.

      d.  For all the reasons above, the Guidance's rule would be unlawful even as applied to

asylum officers considering the ultimate question whether an individual is in fact eligible for

asylum.  But at the credible fear stage, the unlawfulness of the Guidance's rule is even more

apparent.  At that stage, asylum officers must determine not whether the individual is eligible for

asylum, but whether there is merely "a *significant possibility* . . . the alien can establish eligibility

for asylum" or other similar protection.  8 C.F.R. § 208.30 (emphasis added); *see also supra* at

I.A.

      The new circuit-law rule makes a difference where an individual would be eligible for

asylum under an existing circuit case but would fail to meet the standards and analysis

articulated under *Matter of A-B-*.  In that situation, whether the person is eligible turns on

whether the new agency decision eliminates the prior court holding under *Brand X*.  But at the

credible fear stage the question is whether there is a *significant possibility* of eligibility—

meaning a significant possibility that the prior court decision will survive under *Brand X*.  The

contrast between the forgiving "credible fear" standard and the strict instruction to ignore all

circuit precedent in conflict with *Matter of A-B-* highlights the impropriety of the new circuit-law

rule.  In essence it asserts not only that *everything* in *Matter of A-B-* is entitled to deference, but

---

[11] Notably, regulations provide that in assessing credible fear "the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge."  8 C.F.R. § 208.30(e)(4).  Novel *Brand X* applications present such circumstances.

that there is no significant possibility that deference will ultimately be denied to any aspect of the

decision.  In this regard, the policy is unlawful.

d. Finally, an additional reason the new policy of disregarding circuit law is unlawful is

that the USCIS Guidance once again fails to acknowledge that it represents a break from prior

practice, and therefore also fails to provide a reasoned explanation for *why* the agency is

changing course.  *See Fox Television,* 556 U.S. at 515-16.  In the past, USCIS has consistently

directed asylum officers to follow circuit precedent, *see* Reading Caselaw at 3 ("[C]ircuit court

opinions are binding on the BIA, immigration judges and asylum officers located within that

circuit court's jurisdiction."), and the BIA has asserted that the agency's interpretation displaces

circuit law only as to specific individual statutory questions, *see, e.g., Matter of Cruz De Ortiz*,

25 I&N Dec. at 603 n.1; *Matter of Cienfuegos*, 17 I&N Dec. at 186 – not anything and

everything addressed in a wide-ranging opinion.  The policy is therefore arbitrary and capricious

under the APA.

## 2.     The "Relevant Circuit" Policy is Illegal.

The Guidance compounds the problem of ignoring circuit law by establishing a second,

likewise illegal policy to define the relevant circuit.  The Guidance provides that, to the extent

asylum officers can consider circuit law at all, they should consider only the circuit "where the

removal proceedings will take place if the officer makes a positive credible fear . . .

determination."  Guidance at 8-9.  The Guidance then observes that the asylum officer cannot

actually predict where DHS will initiate removal proceedings, and that there might be no

proceedings if the applicant does not pass the credible fear screening.  *Id*. at 9.  And then, in a

dramatic change from prior agency practice, the Guidance illogically decrees that, as a result, the

only relevant circuit law is from "the circuit where the alien is physically located during the credible fear interview." *Id*. That rule is unjustifiable even on its own terms.

If the applicant is placed in regular removal proceedings, her eventual asylum case will be decided based on the circuit law where removal proceedings take place. If those removal proceedings could take place anywhere in the United States, and if there is a circuit case *somewhere* under which the applicant would win, there is by necessity a "significant possibility" that person will, in fact, ultimately win.[12] Thus, the credible fear standard requires that the circuit law *most favorable* to the applicant, not only the circuit law in the location of the credible fear interview, be used when making a credible fear determination.

Further, giving noncitizens the benefit where courts disagree with each other or with the BIA – rather than applying the law of the place of interview, which may have no relationship to where removal proceedings would take place – is far more consistent with Congress's intent to establish a low screening standard to identify *potentially* meritorious claims to be further developed in full immigration court proceedings. *See supra* at I.A; *see also* 8 C.F.R. § 208.30(e)(4) ("the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge"). Legal uncertainty must, in the credible fear context, adhere to the applicant's benefit." 142 CONG. REC. H3616

---

[12] The Guidance itself recognizes that DHS could initiate proceedings against a particular person in any of the twelve federal circuits, and thus wherever the law is most favorable to the applicant. Moreover, even if DHS initially files charges in one circuit, it is common for noncitizens who have been released from custody to obtain a change of venue, *see* U.S. Dep't of Justice, Exec. Office for Immigration Review, FY 2016 Statistics Yearbook C7-C8 (2017), *available at* https://bit.ly/2oZkmgC – which is decided by an immigration judge, not DHS, *see* 8 C.F.R. § 1003.20. For example, individuals may seek and obtain a change of venue if they move to a more permanent place to live or consolidate their cases with related family members' cases. *See, e.g.*, *Baires v. INS*, 856 F.2d 89 (9th Cir. 1988) (denial of change of venue was abuse of discretion).

(daily ed. Apr. 18, 1996) (statement of Rep. Smith) (explaining that under the credible fear standard, "[i]n a close case, they must give the benefit of the doubt to the applicant.").

This is exactly what well-settled USCIS policy provided: "generally the interpretation most favorable to the applicant is used when determining whether the applicant meets the credible fear standard." *See, e.g.*, 2017 Credible Fear Training at 17; RAIO Training Course, Credible Fear (Feb. 28, 2014), at 16, Mujahid Decl., Exh. I (same); RAIO Training Course, Credible Fear of Persecution and Torture Determinations (Apr. 14, 2006), at 14, Mujahid Decl., Exh. J (same).

Moreover, the reasons the Guidance gives for changing this policy are illogical and arbitrary. Again, the fact that DHS can initiate removal proceedings anywhere – and that it does not ultimately control venue – is a reason for the prior "most favorable" circuit rule, not a reason to arbitrarily select the circuit where the credible fear interview takes place. And the other reason the Guidance gives – that applicants may fail the credible fear screening – likewise makes no sense. The reason circuit law is relevant at all is to figure out if the applicant has a significant possibility of establishing eligibility *if she demonstrates credible fear and is put in ordinary removal proceedings*. *See* 8 C.F.R. § 208.30(f) (after a finding of credible fear, the noncitizen is entitled to "full consideration of the asylum . . . claim in proceedings under section 240 of the Act"). If the applicant *fails* to show credible fear, she gets no chance to establish eligibility. In assessing the likelihood an applicant would ultimately win her case *once* she is in ordinary removal proceedings, it is illogical and arbitrary to rely on the fact that she might not get to those removal proceedings in the first place. *Cf. Judulang*, 565 U.S. at 56 (rejecting illogical reasoning as arbitrary and capricious).

Taken together, these changes represent a major alteration in the credible fear process – an assertion of executive authority to disregard federal court decisions in bulk, without reasoning, and in violation of the credible fear screening standard.  Yet once again, USCIS has failed to even acknowledge that it is departing from its old policy, let alone explained why it has reversed course.  The policy is arbitrary and capricious for this reason as well.  *See Fox Television*, 556 U.S. at 515-16.

Finally, it also bears emphasis that such decisions will be largely beyond the reach of the federal courts to correct.  Under these new policies, the law of asylum applicable at the credible fear stage is whatever the Attorney General says it is, regardless of the views of any court.  Such lawlessness is anathema to the separation of powers.  *Cf. Boumediene v. Bush*, 553 U.S. 723, 742 (2008) (discussing constitutional protections against the dangers of "undivided, uncontrolled power").

## II.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM

There is no question that the Plaintiffs, asylum seekers who fear brutal persecution in their home countries, have suffered and are suffering irreparable harm based on the unlawful credible fear policies.  As detailed in their declarations, based on extensive past harms and threats they have already suffered, they fear rape, pervasive domestic abuse, beatings, kidnapping, shootings, and even death in their home countries.  *See* Grace Decl., at ¶ 22; Carmen Decl., at ¶ 28; Mina Decl., at ¶ 19; Mona Decl., at ¶ 22; Gio Decl., at ¶ 37; Maria Decl., at ¶ 20; Nora Decl., at ¶¶ 20-21; and Ardon Decl., at ¶ 37.  Without an injunction, Nora and her 3-year-old son and Ms. Ardon-Mejia and her 4-year-old daughter are living in terror after having been removed, and the remaining Plaintiffs are at risk of being removed to the countries where their lives are in danger.

Plaintiffs' experiences and feared harm are consistent with the findings of countless reports documenting the widespread violence and brutality faced by individuals in Central American countries, particularly women and children.  For example, a 2015 UNHCR report described individuals from El Salvador, Honduras, and Guatemala as "fleeing epidemic levels of violence, including gender-based violence."[13]  Gender-motivated killings and other murders of women in these countries are commonplace.[14]  Recent human rights reports have also documented the failure of the governments in these countries to provide protection to migrants fleeing gender-based and gang-related violence.[15]

Numerous migrants from Central America who were deported from the United States have suffered brutal harms, including death, after returning to their home countries.  For example, one study documented that up to 83 individuals deported to El Salvador, Honduras, and

---

[13] Mujahid Decl., Exh. K (UNHCR, *Women on the Run*, at 2 (2015)); *see also id.* (concluding that "women face a startling degree of violence that has a devastating impact on their daily lives" and that they "flee to protect themselves and their children from murder, extortion, and rape"**);** *id.* Exh. L (UNHCR, *Children on the Run* (2014)).

[14] *See, e.g.*, *id.* Exh. M (Amnesty International, *El Salvador 2017/2018* ("El Salvador's high rate of gender-based violence continued to make it one of the most dangerous countries to be a woman.")); *id.* Exh. N (Geneva Declaration on Armed Violence and Development, "Lethal Violence against Women and Girls," *Global Burdens of Armed Violence 2015: Every Body Counts*, at 94 (ranking El Salvador as number one, Honduras as number two, and Guatemala as number four in the world for homicides of women).

[15] *See e.g.*, *id.* Exh. O (U.S. Dep't of State Overseas Sec. Advisory Council, *El Salvador 2018 Crime & Safety Report* (stating that many rape victims in El Salvador "choose not to participate in the investigation and prosecution of the crime for fear of not being treated respectfully by the authorities" and that "many murder victims show signs of rape, and survivors of rape may not report the crime for fear of retaliation")); *id.* Exh. P (Rashida Manjoo, *Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences* ¶¶ 9, 82 (Mar. 31, 2015) (concluding that in Honduras, gender-based violence "is widespread and systematic and affects women and girls in numerous ways.  A climate of fear, in both the public and private spheres, and a lack of accountability for violations of human rights of women are the norm, despite legislative and institutional developments.")); *id.* Exh. Q (Center for Gender & Refugee Studies and National University of Lanús, *Childhood and Migration in Central and North America: Causes, Policies, Practices and Challenge*s (Feb. 2015)).

Guatemala between 2014 and 2015 have been killed.[16]  One report found that in El Salvador,

"[a]t least once a month, local news report the homicide of a recent deportee from the U.S."[17]

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF.

Plaintiffs ask this Court to enjoin Defendants' unlawful policies to prevent irreparable

harm to vulnerable asylum seekers issued negative credible fear determinations.  The issuance of

an injunction will not substantially injure the government, and would further the public interest.

Indeed, it is in the government's interest to ensure that asylum seekers like the Plaintiffs

are not removed to or forced to remain in a place where they fear grave persecution or death in

violation of the immigration laws.  Ensuring Plaintiffs a meaningful opportunity to pursue their

credible fear claims is also consistent with the public interest.  *See Nken*, 556 U.S. at 436 ("Of

course there is a public interest in preventing aliens from being wrongfully removed, particularly

to countries where they are likely to face substantial harm.").

The public interest is served when the government complies with its obligations under the

INA and the APA.  The "public also has an interest in ensuring that its government respects the

rights of immigrants[.]"  *M.G.U. v. Nielsen*, No. 18-1458, 2018 WL 3474189, at *10 (D.D.C.

July 18, 2018) (issuing a preliminary injunction and enjoining immigration authorities from

removing Plaintiffs pursuant to expedited removal orders).  *See also O'Donnell Const. Co. v.

District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (stating that the "issuance of a

---

[16] *Id.* Exh. R (Sibylla Brodzinsky & Ed Pilkington, *US Government Deporting Central American Migrants to Their Deaths*, THE GUARDIAN (Oct. 12, 2015) (discussing academic study)).

[17] *Id.* Exh. S (Elizabeth Kennedy, American Immigration Council, *No Childhood Here: Why Central American Children are Fleeing Their Homes*, at 5 (July 1, 2014)).  *See also id.* Exh. T (Nicholas Kristof, *We're Helping Deport Kids to Die*, N.Y. Times (July 16, 2016) (accounts of a girl from Honduras who was forced to become a gang member's "girlfriend" at age 11 after the gang raped and shot her friend, and that of a 15-year-old boy who was stabbed in the stomach for refusing to join a gang)).

preliminary injunction would serve the public's interest in maintaining a system of laws" where the government must comply with its legal obligations); *Damus v. Nielsen*, -- F.Supp.3d. ---, 2018 WL 3232515, at *17 (D.D.C. July 23, 2018) ("The public interest is served when administrative agencies comply with their obligations under the APA.") (citation and quotation marks omitted); *R.I.L-R. v. Johnson*, 80 F.Supp.3d 164, 191 (D.D.C. 2015) (explaining that public interest is served by an injunction that "ends an unlawful practice" and ensures compliance with APA) (citation and quotation marks omitted).

Far from undermining the public interest, treating asylum-seekers with basic fairness and dignity is among our nation's best traditions. *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

In short, the balance of harms and the public interest decisively favor enjoining Defendants' unlawful policies and affording asylum seekers a meaningful opportunity to establish their credible fear of persecution in accordance with correct legal standards.

Accordingly, Plaintiffs respectfully request that this Court enjoin Defendants, their agents, and any persons acting in concert with them from applying *Matter of A-B-*, the related USCIS Guidance, and any and all guidance issued by DHS and DOJ implementing *Matter of A-B-*, in credible fear proceedings.  As to Plaintiffs who have not been removed, Plaintiffs request that the Court stay their removal, vacate any credible fear determinations and removal orders issued to them, and order that Defendants provide new credible fear procedures or full removal proceedings in which they apply the correct legal standards.  As to Plaintiffs who have been

removed from the United States, Plaintiffs request that the Court order Defendants to parole them back into the United States, vacate any credible fear determinations and removal orders issued to them, and provide new credible fear procedures or full removal proceedings, applying the correct legal standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be GRANTED.

Dated: August 8, 2018                    Respectfully submitted,


_____
                                         */s/ Scott Michelman*

Jennifer Chang Newell\*\*                  Scott Michelman (D.C. Bar No. 1006945)
Katrina Eiland\*\*                         Arthur B. Spitzer (D.C. Bar No. 235960)
Cody Wofsy\*\*                             American Civil Liberties Union Foundation
American Civil Liberties Union Foundation      of the District of Columbia
Immigrants' Rights Project               915 15th Street NW, Second Floor
39 Drumm Street                          Washington, D.C. 20005
San Francisco, CA 94111                  (202) 457-0800
(415) 343-0774
                                         Eunice Lee\*\*
Judy Rabinovitz\*\*                        Karen Musalo\*\*
Omar C. Jadwat\*\*                         Anne Dutton\*\*
Lee Gelernt\*\*                            Center for Gender & Refugee Studies
Celso J. Perez\*\*\* (D.C. Bar No. 1034959)   200 McAllister St.
American Civil Liberties Union Foundation,   San Francisco, CA 94102
Immigrants' Rights Project               (415) 565-4877
125 Broad Street, 18th Floor
New York, NY 10004                       Thomas Buser-Clancy
(212) 549-2600                           Andre Segura
                                         ACLU Foundation of Texas
Sandra S. Park\*\*                         P.O. Box 8306
Lenora M. Lapidus                        Houston, TX 77288
American Civil Liberties Union Foundation,   (713) 942-8146
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7871

*Attorneys for Plaintiffs*

*\*\*Pro hac vice application forthcoming*
*\*\*\*Admission to D.D.C. forthcoming*