```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


GRACE,                             )
        et al.,                    )
                                   )  Civil Action
        Plaintiffs,                )  No. 18-1853
                                   )
        v.                         )  August 9, 2018
                                   )  10:00 a.m.
JEFFERSON BEAUREGARD               )
SESSIONS, III,                     )  Washington, D.C.
                                   )
        et al.,                    )
                                   )
        Defendants.                )
```

*TRANSCRIPT OF TEMPORARY RESTRAINING ORDER PROCEEDINGS*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*


APPEARANCES:

    For the Plaintiffs:      **Jennifer Chang Newell, Trial
                             Attorney**
                             (Appearing By Telephone)
                             AMERICAN CIVIL LIBERTIES UNION
                             FOUNDATION
                             Immigrants' Rights Project
                             39 Drumm Street
                             San Francisco, CA 94111
                             (415) 343-0774
                             Fax: (415) 395-0950
                             Email: Jnewell@aclu.org

                             **Arthur B. Spitzer, Trial Attorney**
                             AMERICAN CIVIL LIBERTIES UNION OF
                             THE DISTRICT OF COLUMBIA
                             915 15th Street, NW
                             2nd Floor
                             Washington, DC 20005
                             (202) 457-0800 x1004
                             Fax: (202) 457-0805
                             Email: Artspitzer@gmail.com
```

APPEARANCES: Cont.

For the Plaintiffs:        **Scott Michelman, Trial Attorney**
                          AMERICAN CIVIL LIBERTIES UNION OF
                          THE DISTRICT OF COLUMBIA
                          915 15th Street, NW
                          2nd Floor
                          Washington, DC 20005
                          (202) 457-0800
                          Fax: (202) 457-0805
                          Email: Smichelman@acludc.org

For the Defendants:        **Erez Reuveni, Trial Attorney**
                          UNITED STATES DEPARTMENT OF JUSTICE
                          P.O. Box 868
                          Ben Franklin Station
                          Washington, DC 20044
                          (202) 307-4293
                          Fax: (202) 305-7000
                          Email: Erez.r.reuveni@usdoj.gov

                          **Christina P. Greer, Trial Attorney**
                          UNITED STATES DEPARTMENT OF JUSTICE
                          P.O. Box 878
                          Ben Franklin Station
                          Washington, DC 20044
                          (202) 598-8770
                          Fax: (202) 305-7211
                          Email: Christina.p.greer@usdoj.gov

Court Reporter:            **Scott L. Wallace, RDR, CRR**
                          Official Court Reporter
                          Room 6503, U.S. Courthouse
                          Washington, D.C. 20001
                          202.354.3196
                          scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, AUGUST 9, 2018**</u>

1

2    (10:29 a.m.)

3         THE COURTROOM CLERK:  Your Honor, this is civil action

4    18-1853, *Grace, et al., versus Jefferson Beauregard Sessions,*

5    *III, et al.*

6         Will parties please come forward to this lectern and

7    identify yourselves for the record.

8         MR. SPITZER:  Good morning, Your Honor.  Arthur Spitzer

9    for the plaintiffs, and Scott Michelman is with me at the counsel

10   table.

11        I have one preliminary thing I would like to ask Your

12   Honor's permission on, to keep our cell phones on so that we can

13   confer with counsel in California the way we would if she were at

14   the table with us.

15        THE COURT:  Sure.  Good morning.

16        MR. SPITZER:  Thank you very much.

17        THE COURT:  And we have an attorney on the phone, I

18   assume.

19        MR. SPITZER:  Yes.

20        THE COURT:  And who might that be?

21        MS. NEWELL:  Yes, Your Honor.  This is Jennifer Chang

22   Newell of the American Civil Liberties Union for the plaintiff.

23        THE COURT:  All right.  Good morning.

24        MS. NEWELL:  Good morning.

25        THE COURT:  I guess it really is early where you are,

1    right?

2         MS. NEWELL:  It is.  It's not quite 7:30 yet.

3         THE COURT:  Okay.  Counsel.

4         MR. REUVENI:  Good morning, Your Honor.  Erez Reuveni on

5    behalf of the defendants, and with me today is Christina Greer,

6    also with the Department of Justice, on behalf of the defendants.

7         I would make the same preliminary request, that my -- that

8    plaintiffs counsel may have an on-the-phone issue because we have

9    attorneys who are not here as well that are on the case.

10        THE COURT:  Sure, that's fine.  Yeah.

11        MR. REUVENI:  Great.

12        THE COURT:  Sure.  Let me ask you to stay there for a

13   second.  I have a couple of questions to ask counsel.  If you

14   need to get your pleadings or whatever, go right ahead.

15        Counsel, let me thank everyone for their compliance or

16   their absolute compliance with the Court's order.  We appreciate

17   that.  Thank you.

18        What's your response to plaintiffs' argument I'm going to

19   quote that, quote, "were the government correct that in reviewing

20   a 1252(e)(3) action, the Court simply has no power to stay the

21   removal order, then Section 1252(e)(3) would be an empty exercise

22   and no plaintiffs would ever bring such a case since they could

23   derive no benefit from it."  That's the end of the quote.

24        MR. REUVENI:  We disagree with that, Your Honor.  I think,

25   first, as we mentioned in our papers -- and I don't know if the

1    plaintiffs squarely responded to this, although I may have missed

2    it.

3           THE COURT:  Can you weep your voice up?  Pull that

4    microphone down.

5           MR. REUVENI:  My apologies, Your Honor.  I think your

6    earlier case, AILA, that we discussed yesterday a bit, is a good

7    example of why that's not correct.  The two named plaintiffs in

8    that case were already removed from the United States at the time

9    they filed suit.

10          THE COURT:  I granted a temporary restraining order in

11   that case.

12          MR. REUVENI:  A very brief one that lasted about four

13   days, I believe, but as to the whole program, the whole statute.

14          And if I recall correctly, the department appealed but it

15   got mooted out very quickly.  But I think that's -- just as an

16   example, two named plaintiffs were broad, they sued.  If they

17   were to prevail on their 1253(e) systemic challenge, that the

18   orders were based on incorrect applications of law, were facially

19   invalid because they invited the Constitution, statute,

20   regulations, et cetera, the things that can be reviewed in an

21   (e)(3) claim, then the ER order would be invalid and they could

22   come back to the United States.

23          And as the government represented in -- before the Supreme

24   Court in *Nken*, which we cite in our brief, that wasn't an

25   expedited removal case, but if someone prevails on a challenge of

1      their removal order after they've been removed, it is generally,

2      generally the policy of the United States to allow them to return

3      to the United States.  Our position is they can litigate this

4      case from abroad, they can litigate all the removal cases, not

5      just this specific type of case, from abroad.  But I think beyond

6      that --

7            THE COURT:  How would they practically do that, though?

8            MR. REUVENI:  The same way they did it before you in 1998.

9      They have attorneys, very good ones, litigating the case on their

10     behalf.  They can communicate with those attorneys, presumably

11     just like the attorneys in the AILA matter communicated with

12     their clients.  We see a number of expedited removal --

13           THE COURT:  They would also then be subject to the very

14     harms that they complain about in their efforts to get -- to seek

15     asylum, though.

16           MR. REUVENI:  Without taking a position specifically on

17     whether the government does or does not agree with whether or not

18     they will, in fact, suffer the persecution they allege, I think

19     that's the design of the system.  The system is meant to continue

20     forward while they find -- a plaintiff --

21           THE COURT:  What do you mean, "the system"?  I don't work

22     for the system.

23           MR. REUVENI:  So this is 8 U.S.C. 1225(b), the expedited

24     removal system, I'm calling it or statute, if you'd prefer.

25           THE COURT:  Let's call it what it is.  I don't like the

1    words "the system."  People come in and talk about the system

2    doesn't allow this and the system doesn't allow that.  I don't

3    work for the system, so let's call it what it is.  If it's a

4    statute, call it a statute.

5         MR. REUVENI:  The expedited removal statute which was

6    passed in 1996, as Your Honor knows, with an effective date of

7    1998, Congress made very clear -- and this is again 8 U.S.C.

8    1252(e)(3) -- that it wanted the legality of the system -- my

9    apologies -- the removal process, the provisions that implemented

10   any regulations, written guidance and so on, the legality of it

11   was decided promptly.

12        As you know, at the time Congress viewed the problems of

13   hundreds of thousands of individuals seeking to enter the country

14   and entering the country illegally to be an issue that -- it was

15   exigent and needed to be dealt with, and they wanted to set up

16   for future review, if there were to be changes, and there have

17   been changes to the application of the expedited removal statute.

18   In 2004 DHS expanded it, as it is authorized to do so, to a

19   hundred miles within the United States.  That's within their

20   authority under 8 U.S.C. 1225(b).

21        No one challenged it at the time, but they could have

22   under 1252(e)(3).  And what A, led the Court of Appeals, what the

23   D.C. Circuit instructs is that essentially you need an individual

24   who has been subject to an order of expedited removal.  That's in

25   the statute, a determination under 8 U.S.C. 1225(b).

1     What that means is that they could issue a final order of

2   expedited removal; they've gone through the process; they've been

3   found to have no credible fear, and their order is executable.  I

4   understand we have two such plaintiffs in this case at this time.

5   Perhaps there will be more as the case progresses.  So Congress

6   wanted to find someone who has the Proverbial skin in the game to

7   challenge the system, and what Congress pretty clearly did not

8   want is for their removals to be stayed pending a challenge to

9   the system -- the statute.  And we know that because --

10     THE COURT:  You can call it that.  I mean, it's a systemic

11   challenge, so -- it's a systemic challenge.  I'm not going to

12   debate you on the word choices.

13     MR. REUVENI:  I appreciate that.

14     THE COURT:  You agree the plaintiffs are bringing a

15   systemic challenge?

16     MR. REUVENI:  Yeah, I think that's --

17     THE COURT:  -- they're challenge the policy -- right --

18     MR. REUVENI:  -- Yes, I think --

19     THE COURT:  -- they're challenging --

20     THE COURT REPORTER:  I'm sorry.

21     THE COURT:  They're challenging the policies as

22   unconstitutional, right?

23     MR. REUVENI:  As I read their preliminary injunction

24   papers, they're primarily challenging, at least for purposes of

25   the preliminary injunction, the new what they call credible fear

1      policies as inconsistent with the APA and not entitled to Chevron

2      Deference, that sort of thing.

3            I know their complaint has a due process component, but I

4      didn't see that argued in the PI, so I don't think that's what

5      we're here today on.

6            THE COURT:  It's a challenge to the policy.

7            MR. REUVENI:  In the government's view, this is

8      ultimately an AP -- some sort of APA case, just like Your Honor

9      saw it in 1998.  It seems they're arguing that the matter of

10     A-B-, which is the Attorney General's decision, and the USCIS's

11     guidance informing line officers how to apply that decision,

12     generally, is inconsistent with the I&A and violates the APA for

13     that reason.  But putting that aside for a minute to answer your

14     immediate question, I think plaintiffs give short shrift to

15     Section 12 -- I'm sorry, 1252(e)(1).  And I think it's

16     instructive to just quickly look at that provision.  So (e)(1)

17     essentially says -- Well, I don't have it right in front of me,

18     but I'll just do it from memory.

19           THE COURT:  If you need to get it from your colleague,

20     that's fine, counselor.

21           MR. REUVENI:  I'm not sure I have it there.  Oh, I do.

22     Thank you.

23           THE COURT:  Sure.

24           MR. REUVENI:  So 1252(e)(1), and this is the -- this

25     provision provides the sum total of review of any determination,

1    i.e., an order of expedited removal under the statute, and that

2    phrase, determination made under Section 1225(b)(1) is used both

3    in 1252(e)(2), which refers to individualized as applied limited

4    habeas challenges, which I think the parties agree is not what

5    plaintiffs are pursuing here, but that phrase is again used in

6    1252(e)(3), determination under Section 1225(b).

7          So, that phrase in both of those subsections, the systemic

8    challenge subsection, the as applied individualized subsection,

9    so then 1252(e)(1) --

10         THE COURT:  You're going to have to slow down a little bit

11   so the court reporter can get a clear transcript.

12         MR. REUVENI:  So 1252 -- my apologies, (e)(1), "without

13   regard to the nature of the action or claim and without regard to

14   the identity of the party or parties, no court --" and this is

15   the operative text "-- may enter declaratory injunctive or other

16   equitable relief in an action pertaining to an order to exclude

17   an alien in accordance with Section 1225(b)(1)."

18         And so as we read that statute and as five or six District

19   Court cases we cited at pages 12 to 13 of our brief have read

20   that statute, that applies generally to any challenge to a order

21   to exclude.  And again, that's the same language in 1225 --

22   1252(e)(2) and (e)(3).

23         Now, it says here at the end of that provision, "except as

24   specifically authorized in a subsequent paragraph."  So, what

25   Congress seems to be saying there is you need an affirmative

1   authorization to divert from this instruction, that there is no

2   authority for the courts to enter a stay of removal when there's

3   a final order of expedited removal.

4        1252(e)(2) provides for very limited review, and then that

5   has to be read with 1252(e)(4), which says, "in any case where

6   the Court determines --" and that -- it's essentially a

7   {indiscernible} review that is permissible under 1252 --

8        THE COURT:  It's a systemic challenge under 1252(e)(3).

9        MR. REUVENI:  Definitely.  It is, Your Honor.  But what

10  I'm getting at here --

11       THE COURT:  Well, let's take a look at 1252(e)(3) because

12  that provision states -- I guess in Roman II, "challenges --"

13  Challenges 3, Roman II, "challenges on validity of a system,

14  whether such a regulation or written policy, directive, written

15  policy, guideline, or written procedure issued by or under the

16  authority of the Attorney General to implement such section is

17  not consistent with the applicable provisions of this subchapter

18  and is otherwise in violation of the law."  And that's the

19  section under which the plaintiffs bring their systemic

20  challenge, correct?

21       MR. REUVENI:  Correct.  But what it doesn't say there,

22  which it does say to a limited extent in (e)(2) and (e)(4), is

23  that the Court may stay removal pending resolution of that

24  challenge.  So, the operative text, the default rule of (e)(1)

25  has not been rebutted as it were.  There's no affirmative

1    carveout in (e)(3).  It does say, "except as specifically

2    authorized in a subsequent paragraph."  So, there is a specific

3    authorization for equitable relief.  It's in (e)(4), and it's

4    limited to (e)(2) challenges.  (E)(4) says, if they satisfy the

5    showing they have to make under (e)(2), the Court may vacate the

6    order and refer them to -- remove proceedings under 8 U.S.

7    1229A -- those are regular removal proceedings, as opposed to

8    expedited removal proceedings.

9         So (e)(1) says the default rule.  (E)(2) and (e)(4)

10   provide an example of when something is, quote, "specifically

11   authorized in a subsequent paragraph."  And (e)(3) is completely

12   silent on that.  It doesn't say anything.  So, Congress knows how

13   to say what it means, generally, and it meant what it said.

14        In (e)(3) there's no exception to this general rule; for

15   (e)(2) there is.  So that pretty much, to us, suggests Congress

16   wanted the removal orders to be executed, even though those

17   individuals would then have to pursue their relief from abroad.

18   And the parties seemed to agree on this yesterday.  They would

19   not moot out the case.  This would not prevent them from pursuing

20   their, quote-unquote, systemic challenge, but what they can't do

21   is --

22        THE COURT:  Well, if they prevail, what would the remedy

23   be at that point?

24        MR. REUVENI:  If they prevail on the merits or on this

25   motion today?

```
1          THE COURT:  On the merits.

2          MR. REUVENI:  Hmmm.  I need to be careful on this one.

3     There's only one other case where this has come up, and that's

4     the last case, and the government won that one, so that wasn't an

5     issue, but I would think, since this is sort of a species of an

6     APA review, that the unlawful policy, if the policy is found to

7     be unlawful -- and we'll get to whether -- we think this

8     challenge, at least the matter of A-B- and most of the USCIS

9     memo, cannot proceed under this vehicle -- but we'll get to that

10    in a minute -- the policy will be set aside.

11         So if Your Honor finds the jurisdiction ultimately to hear

12    that claim --

13         THE COURT:  What relief would that give the plaintiffs who

14    are living in countries where they originally came from?

15         MR. REUVENI:  Well, their orders of removal would, by

16    necessity, expedited removal by necessity and operation of law,

17    would be invalidated.  That would not prevent them from coming

18    back to the United States.  And as I mentioned before --

19         THE COURT:  At the government's expense?

20         MR. REUVENI:  Well, that is what the Court told -- I

21    believe that is what the Office of the Solicitor General told the

22    Supreme Court in *Nken*.  I would have to double-check that and get

23    back to you.  If that's something that your decision ultimately

24    is contingent on today, I can get that to you very quickly.  But

25    as I stand here right now, I'm not in a position to say
```

1  absolutely yes, but my understanding is the *Nken* decision, that

2  was what was represented to the Supreme Court on behalf of DOJ,

3  that they would return them to the United States at no expense to

4  themselves.  But I, again, would have to double-check on that,

5  but that would be the relief.  The order would cease to exist,

6  the system or the portion of the system that they challenged

7  would be invalidated, the agency would presumably go back to the

8  drawing board and issue something else consistent with the

9  decision of the Court, so the Court gives guidance as to why it

10  believed it was unlawful.

11       But none of those are -- none of those change the fact

12  that 1252(a)(1) pretty clearly says what it says, "no injunctive,

13  declaratory, or other equitable relief," and we read equitable

14  relief to cover stays, and the District Court decisions that have

15  read that provision, which again applies to (e)(2) and (e)(3),

16  applies to the whole subparagraph, and would forego --

17       THE COURT:  Let me ask you this.  Do you agree that the

18  Court has jurisdiction to, at the very least, enter a stay of

19  removal until such time as -- until such time as it makes a

20  determination of jurisdiction?

21       MR. REUVENI:  We understand that to be a general default

22  scenario for the courts, but we think (e)(1) speaks pretty

23  clearly on this, and plaintiffs are correct, in every one of

24  these --

25       THE COURT:  Do you agree with this?

1        MR. REUVENI:  In this case, no?

2        THE COURT:  Why not?  What is it -- tell me what existing

3   precedent that you've relied on in your pleadings should persuade

4   the Court that it has no jurisdiction to enter a stay of removal,

5   at least until it makes a determination of jurisdiction.

6        MR. REUVENI:  Well, I have two answers to that; one long,

7   one short.  I'm going to start with the short.

8        THE COURT:  Give me the correct one.

9        MR. REUVENI:  They're both correct.  Let me start with the

10  short one, then.  So, we mentioned this in our brief, but given

11  that we put it together so quickly, I neglected to attach it as

12  an exhibit.  This is a decision by Judge Lamberth from 2015,

13  Melendez De Segovia.

14       THE COURT:  It would be nice to have it.  I can't even

15  read it.

16       MR. REUVENI:  I can give you a copy and I can give you a

17  copy of it.

18       THE COURT:  Have you shared a copy with plaintiffs'

19  counsel?

20       MR. REUVENI:  I will do that now.

21       THE COURT:  Putting that aside, since you didn't attach

22  it, is there any other authority?

23       MR. REUVENI:  Yeah, the five or so cases we cite in our

24  brief on pages 12 to 13 where that provision has been cited as

25  the basis for there not being jurisdiction to enter a stay.  Now,

1    to be clear, a number --

2           THE COURT:  Let me ask you this.  Did you cite Judge

3    Lamberth's order in your opinion?

4           MR. REUVENI:  I did.  I did, Your Honor.

5           THE COURT:  You did?  All right.  You gave what, the

6    docket number?

7           MR. REUVENI:  The docket number and -- there was no

8    written decision.  There's a transcript.  It was an oral

9    decision, and then shortly after, the plaintiffs dismissed their

10   case because their case -- there's at least turned on whether

11   they got the stay or not.

12          THE COURT:  And why didn't you attach it?

13          MR. REUVENI:  Filing difficulties.  It's my fault.  I just

14   failed to attach it.

15          THE COURT:  How long is his ruling?  I want to take a look

16   at it, of course, but how long is that?

17          MR. REUVENI:  The operative part where Judge Lamberth

18   finds no jurisdiction to enter a stay is two pages at the end,

19   and he relies on a number of cases that we cite in the brief, and

20   he refers to the NSPC decision in the District of Mexico in

21   particular which we cite in our brief.

22          THE COURT:  What about the controlling Supreme Court

23   precedent?  Does he distinguish the controlling Supreme Court

24   precedent on that issue?

25          MR. REUVENI:  I don't believe there's any controlling

1   Supreme Court precedent that addresses 1252(e).  It's never been

2   before the Court.

3        THE COURT:  No, no, I'm talking about the principle of law

4   that a court does have jurisdiction to enter a stay, a temporary

5   stay at least until it makes a determination of jurisdiction.

6        MR. REUVENI:  Well, that's generally true unless and until

7   Congress withdraws a piece of that jurisdiction.  So Article 3

8   jurisdiction is at the grace of Congress.  It can pare it back,

9   it can expand it, and, as we see it, it can pare back equitable

10  powers that exist to issue stays, and that's what it's done

11  through 1252(e)(1).  It said "no jurisdiction to enter a stay

12  pending resolution of a systemic challenge."

13       To be fair, plaintiffs alluded to this in their briefing,

14  a couple decisions we did cite, cited that doctrine, but I think

15  three years ago versus now, it's different.  Back then it was --

16  these were first cases addressing this provision.

17       THE COURT:  Did Judge Lamberth rely upon any Supreme Court

18  authority or Circuit authority, authority from this circuit in

19  announcing whatever decision was that he announced?

20       MR. REUVENI:  No, I don't believe so.  He relied primarily

21  on what he viewed as the persuasiveness of the judge in the

22  District of New Mexico case's reasoning.  That case does cite

23  Supreme Court authority, but not on the stay issue specifically;

24  on whether if Congress has authority to prevent the courts from

25  reviewing expedited removal orders at all.  That was the issue in

1    that case.

2         THE COURT:  My question deals with the jurisdiction to

3    enter a stay of removal pending termination of jurisdiction.

4         MR. REUVENI:  No -- He doesn't cite authority.  He simply

5    says, I find this other decision persuasive, I don't believe I'm

6    likely to find I have jurisdiction, therefore --

7         THE COURT:  Did he cite any authority for that?

8         MR. REUVENI:  Other than the District of New Mexico case.

9         THE COURT:  Let's assume that I disagree with you.  What

10   would be an appropriate period of time for that stay for the

11   Court to do a number of things, to determine jurisdiction and

12   also give the parties a merits determination along with a

13   determination of jurisdiction?

14        MR. REUVENI:  Two responses to that.  The government is

15   not arguing that their merits claim is barred as a jurisdictional

16   matter.  We're saying the request for a stay is barred.  So we

17   view that issue -- if you enter a stay, that issue proceeds

18   separately from whether you have jurisdiction to enter a stay.

19        We do take the position, as we did in our papers, that

20   they haven't plausibly alleged a claim you were 1252(e)(3).  They

21   can't challenge a board decision or an opinion of the Attorney

22   General issued under his authority under 8 U.S.C. 1103 --

23        THE COURT:  I want to make sure I understand what you're

24   saying.  You're not challenging the jurisdiction of the -- that

25   the plaintiffs are invoking here?  Is that what you just said?

1      MR. REUVENI:  Not quite.

2      THE COURT:  Do you agree that this Court has jurisdiction

3  to hear this matter?

4      MR. REUVENI:  We think the Court has general question

5  jurisdiction under 1331 and that 1252(e)(3) provides for a

6  limited cause of action, assuming they've properly pled that

7  cause of action, which we dispute, but a separate issue.

8      THE COURT:  But you're not disputing jurisdiction?

9      MR. REUVENI:  We're disputing that they've alleged a

10  proper claim under 1252(e)(3).  What we do dispute is whether the

11  Court has jurisdiction to enter this short-term equitable relief

12  that they seek.

13      So they may have -- the Court may have jurisdiction over

14  the lawsuit, the Court may even have jurisdiction over the

15  claims, if they properly pled them, but what the government's

16  position is here today is that the Court doesn't have

17  jurisdiction to enter the stay of removal pending resolution of

18  the other merits issues in the case.

19      Now, your question was, if you were, hypothetically, to

20  enter a stay to allow you time to decide what needs to be decided

21  in Your Honor's view, if the stay is a short one just to

22  determine if you have jurisdiction to issue a stay --

23      THE COURT:  Right.  Well, I would do a number of things.

24  If I issued a stay to determine whether I have jurisdiction,

25  during that period of time I would hope to determine whatever the

1    issues are that are pending before the Court.

2        MR. REUVENI:  Well, that sounds like a different sort of

3    stay, Your Honor.  That sounds like entering a temporary

4    restraining order against -- essentially granting the preliminary

5    injunction as a temporary restraining order and then requiring

6    the parties to brief the underlying issues in, I don't know, a

7    week, two weeks, three weeks as we were discussing yesterday.

8    That doesn't sound --

9        THE DEFENDANT:  No, no.  Just follow what I said.  If the

10   Court were to issue a temporary stay pending a jurisdiction

11   determination, whatever period of time it takes to do that,

12   within that period of time I may decide all the issues before me

13   on the merits.  What's wrong with that?  Don't you want a final

14   order?

15       MR. REUVENI:  We do want a final order.  There's a -- as

16   we discussed yesterday, they're competing tensions here for our

17   clients.  Issue one is --

18       THE COURT:  I understand that.  So what would be, in the

19   government's view, an appropriate temporary stay -- let's just

20   make it easy -- to determine jurisdiction?

21       MR. REUVENI:  Jurisdiction to enter the stay?  We think 24

22   to 48 hours.  That should be enough time to decide whether the

23   Court has jurisdiction to enter the stay.  I don't know that that

24   would be enough time to decide all the other merits issues, and

25   we could obviously set up a briefing schedule to that effect to

1    run parallel.  We all want a decision on this quickly.  The

2    statute itself instructs the courts at all levels to decide the

3    issue quickly.

4         So we're -- we would be comfortable with a briefing

5    schedule that follows a quicker briefing schedule.  But as to the

6    stay issue itself, if the Court's not inclined to adopt our view

7    on this, I think a very short stay would be appropriate to

8    determine solely the issue of whether you have jurisdiction to

9    enter a stay in the first place.

10        If you decide you do and you enter the stay, then we'll

11   just brief the merits, either as we discussed yesterday as a PI

12   or maybe cross motions for summary judgement.  We can talk about

13   that.  If you find you don't have jurisdiction to enter a stay,

14   as I --

15        THE COURT:  Well, let's assume the first scenario that I

16   have jurisdiction to enter a stay.  Let's assume that that's what

17   the Court's going to do.  Then what would be an appropriate

18   period of time from the government's view for a briefing schedule

19   for a merits determination?  And I'm not talking about a PI, I'm

20   talking about a consolidation of a PI with a request for a merits

21   determination under 65(a)(2).  Because I would prefer not to go

22   through the hoop of dealing with the PI or not and face the

23   specter of a party who loses having a matter in the circuit, and

24   then I'm focusing on a merits determination.  I don't think that

25   serves anyone's best interests.  And it's certainly a strain on

1   the court's resources.

2       MR. REUVENI:  I mean, the stay issue seems distinct

3   from --

4       THE COURT:  I'm sorry?

5       MR. REUVENI:  The stay issue to us seems distinct from the

6   merits issue.  If you find you have jurisdiction to enter a stay,

7   not just a temporary stay --

8       THE COURT:  -- just follow me.  If I determine that I have

9   jurisdiction to enter a stay --

10       MR. REUVENI:  -- okay --

11       THE COURT:  -- then I'll enter a stay and I'll put in

12   place an appropriate briefing schedule for a merits

13   determination -- not a PI -- for a merits determination and give

14   the parties one final decision, and whoever doesn't prevail can

15   file an appeal wherever they want to file an appeal.

16       MR. REUVENI:  Well, that would be certainly fine with us.

17   If you were to enter a stay, following Your Honor's hypothetical,

18   we would want a schedule, not unreasonable, but that gets the

19   issues decided quickly.

20       THE COURT:  Well, I'm giving you a chance to --

21       MR. REUVENI:  We discussed this yesterday.  Two weeks, I

22   think.

23       THE COURT:  And then two weeks to file your motion for

24   summary judgement?

25       MR. REUVENI:  I would ask, if you're going this way, an

1    opportunity to quickly consult with my side on whether we would

2    do a motion for --

3         THE COURT:  You can file whatever you want to file, motion

4    to dismiss and/or motion for summary judgment, right?

5         MR. REUVENI:  I mean, we do think it can be decided on the

6    papers without a record -- with a record.  It's a legal --

7    actually, even without a record.  It's a purely legal issue.

8         THE COURT:  Wait a minute now.  I think I need the

9    administrative record.

10        MR. REUVENI:  Well, you have the USCIS policy, and you the

11   matter of the A-B- decision.

12        THE COURT:  Is that it?

13        MR. REUVENI:  That's what they've pled -- I mean, on the

14   information and belief there may be other policies.  I'm not

15   aware of them, as I stand here today.

16        THE COURT:  Well, if I agree that your proposal is

17   reasonable, what I would do is direct the government to file

18   whatever the administrative record was to support that decision,

19   probably within a week or so.  And maybe there is no -- maybe the

20   government comes back and says, You know, judge, there is no

21   administrative record, we don't have a record.

22        MR. REUVENI:  At the very least, there's the decision of

23   the Attorney General and the guidance that they cite in their

24   papers from USCIS.  There may be other things.  I don't know if a

25   week -- if you're inclined to go this way, let me propose this.

1            THE COURT:  I'm trying to be reasonable with you.

2            MR. REUVENI:  Issue your order telling us that this is

3       what you want to do, give us until the end of the day to confer

4       with the other side and with our clients on a proposal moving

5       forward on that, including whether the government believes an

6       administrative record should be served and what the schedule

7       should be, whether it should be dueling motions for judgement.

8            THE COURT:  Well, I'm going to need the administrative

9       record.  The parties aren't going to waive the administrative

10      record.  I can tell you that.

11           MR. REUVENI:  I don't expect them to.

12           THE COURT:  All right.  I'm trying to be reasonable.  I'm

13      trying to give you what you want now.  You want an expedited

14      decision, and believe me, I want to give you an expedited

15      decision, but if I go that route and determine that I'm going to

16      issue a stay, I'm going to put in place a schedule that's

17      sensitive to the competing considerations of everyone, but I'm

18      going to need an administrative record.

19           Now, I don't know how long it's going to take the

20      government to assemble the record, I don't know, but I want to be

21      sensitive to that.  So maybe it's more than a week.  I don't

22      know.  And it sounds like you don't know, with all due respect.

23      You may not know.  I don't know.

24           MR. REUVENI:  I don't know.

25           THE COURT:  Fair enough.  Fair enough.

1          MR. REUVENI:  I can represent to the Court that I can find

2     out very quickly, and we can confer with plaintiffs, if this is

3     the way you're going, but as I'm understanding Your Honor --

4          THE COURT:  I'm just sharing thoughts right now.

5          MR. REUVENI:  I appreciate these thoughts.  I think this

6     makes sense.  Let's forego the PI -- That's if you enter a stay.

7     I understand plaintiffs will have some things to say about the

8     schedule if you don't enter a stay, but if you do --

9          THE COURT:  All right.  Let's focus on the hypothetical

10    that I may enter a stay and that I want to issue a merits

11    determination under 65(a)(2) and, quite frankly, I don't think I

12    need the consent of the attorneys to do that, as opposed to going

13    through the PI route and then a merits determination.  So it

14    seems to me, if I do that, I'm going to want the administrative

15    record, I'm going to give plaintiffs a chance to file a motion

16    for summary judgement pursuant to our local and federal rules;

17    I'm going to give the defendants an opportunity to file cross

18    motions for summary judgment and/or a motion to dismiss raising

19    whatever arguments it wants to raise, and give the plaintiffs a

20    chance to file a reply; schedule an argument, because I'm sure

21    I'm going to have some questions, and issue a proper ruling.  All

22    we need to do is fill in the -- I want to share some

23    hypotheticals with counsel also, but I just want your best

24    thoughts about what those dates should be.

25          Now, if you need to speak with your supervisors, that's

1    fine, too.  If you want to consult with plaintiffs' counsel,

2    that's fine as well, but that's the broad parameters of what I'm

3    thinking.  That's one hypothetical.  The other hypothetical that

4    I don't grant the stay, then what?  And I'll ask -- I mean, you

5    can respond to that as well.  If I don't grant the stay, then

6    should the briefing schedule be the same?  It probably should be

7    the same, I think.

8           MR. REUVENI:  If I may just respond very quickly to the

9    first point?

10           THE COURT:  Yes.

11           MR. REUVENI:  Your proposal to us sounds quite reasonable.

12    Forget the -- let's table the preliminary injunction -- this is

13    assuming you enter the stay.  Table the preliminary injunction,

14    let's negotiate on a schedule, give you a record if one exists,

15    tell you what we believe the record to be, and then we'll do

16    cross motions for summary judgment.  That works for us, but I

17    think they may have some things to say on that as well.

18           On the second point, if you don't enter a stay, I think --

19           THE COURT:  Same schedule or accelerated?

20           MR. REUVENI:  We like our schedule.  I understand -- that

21    we proposed.  I understand plaintiffs' counsel may disagree

22    because they view the exigency to be greater if the stay is not

23    granted, so I'll let them speak to that, but the same schedule

24    from the government's view --

25           THE COURT:  I mean, they don't want their clients to be

1    removed, so my guess is that in view of the exigent circumstances

2    then, they may want a more expedited schedule, maybe even 3:00

3    this afternoon or so, I don't know.

4         MR. REUVENI:  Eastern or Pacific?

5         THE COURT:  Yeah, Eastern.

6         MR. REUVENI:  We wouldn't oppose necessarily an expedited

7    schedule if you don't grant the stay.  We're not trying to drag

8    this out, by any means.  I think all parties want a decision

9    quickly, and either party, if they're unhappy, will appeal, and

10   we just want to get it resolved soon, as the statute asks.

11        THE COURT:  Right.

12        MR. REUVENI:  I can talk about the merits, but I think

13   maybe you have an idea of where you're going.  If you have any

14   other --

15        THE COURT:  You don't know where I'm going.  I'm just

16   sharing.  I ask a lot of questions.  Don't read too much into the

17   questions.  You may walk out of here the victor.  Anything is

18   possible.

19        MR. REUVENI:  Anything.  It's a good day.  Not a lot of

20   sleep, so I'm glad to hear that.

21        THE COURT:  None of us have had a lot of sleep, and I

22   really appreciate everyone's professionalism, and I meant that

23   when I said that.  Everyone got their briefs in on time.  Believe

24   me, we really appreciate that.  It was a lot of work, but I had

25   to issue that schedule because I couldn't get anymore time from

1    the government.  So I appreciate everything.

2         MR. REUVENI:  Thank you, Your Honor.

3         THE COURT:  I do want to take -- do you have a copy of

4    Judge Lamberth's ruling?  I have the highest regard for my former

5    Chief Judge, but it doesn't sound like he cited any authority for

6    that ruling.

7         MR. REUVENI:  I don't believe he did, Your Honor.  Let me

8    just very quickly --

9         THE COURT:  I can read it.  You agree he didn't cite any

10   authority for it?  And again, I have a high regard for him.  He

11   was our former Chief Judge.

12        MR. REUVENI:  Towards the end.

13        THE COURT:  All right.

14        MR. REUVENI:  I think we've made our points on --

15        THE COURT:  All right.  I don't think I have any other

16   questions right now.  Let me pester the plaintiffs with a few

17   questions, okay.  Anything else you wanted to say?

18        MR. REUVENI:  Yeah, I would like to have an opportunity to

19   discuss likelihood of success on the merits.  If you

20   find jurisdiction, enter a stay, you would still need to find a

21   likelihood of --

22        THE COURT REPORTER:  Slow down, please.

23        MR. REUVENI:  You would still need to find a likelihood of

24   success on the merits --

25        THE COURT:  If I find I have jurisdiction, I still have to

1  go through the balancing test for the emergency order to stay

2  proceedings, right?

3          MR. REUVENI:  That's right.

4          THE COURT:  Unlike the TRO, although the factors are

5  somewhat similar.

6          MR. REUVENI:  The factors are somewhat similar, although

7  they derive from the Supreme Court's *Nken* case and not on a PI

8  case that --

9          THE COURT:  Let me invite you back for that.  I just want

10  to ask the plaintiffs a few questions.  I'm not going to overlook

11  you.

12          MR. REUVENI:  Thank you, Your Honor.

13          THE COURT:  Thank you, counsel.  Who's arguing, counsel on

14  the phone?

15          MS. NEWELL:  Good morning, Your Honor.

16          THE COURT:  Hi.  Good morning.

17          MS. NEWELL:  This is Jennifer Chang Newell on the phone.

18  How are you?

19          THE COURT:  Good.  So you followed most of my questions,

20  all of my questions, I'm sure.  If the Court were to enter a stay

21  of removal, at least until it determines jurisdiction, how long

22  should that be, or is that necessary in this case?

23          MS. NEWELL:  A stay in order to determine jurisdiction or

24  a stay to resolve the case?

25          THE COURT:  A stay of removal until the Court makes a

1    determination as to jurisdiction.  You've argued in your

2    pleadings that the Court certainly has jurisdiction to determine

3    jurisdiction, correct?

4         MS. NEWELL:  Correct, under the different court cases.

5         THE COURT:  If the Court agrees with you, following

6    Supreme Court and other authority, how long should the stay be?

7         MS. NEWELL:  The stay can be as long as it takes for the

8    Court to resolve the issue.  There are cases that the government

9    has cited, that the plaintiffs have also cited such as the *Castro*

10   case in the 3rd Circuit in which the District Court issued a stay

11   and the Court of Appeals issued a stay while it was considering

12   whether the Court had -- the District Court had jurisdiction at

13   all to hear the case, and that stay extended for many months.

14        I would also point out that there are other cases, I

15   believe in the NFPC case that we cited and the government cited,

16   that a stay is also issued.

17        The government has also in multiple cases that we have

18   litigated with them on expedited removal issues conceded that the

19   Court has jurisdiction to enter a stay.  There's also another

20   case I can think of that unfortunately is not cited in the

21   pleadings and is very difficult to spell.  It is a case called

22   *Phuraissigiam*, which is currently pending in the 9th Circuit,

23   which the government knows well because they are parties to that

24   case.  It's an expedited removal habeas case.

25        THE COURT:  Is that the case before Judge Sabraw?  Is that

1      how you pronounce his name?

2           MS. NEWELL:  No.  This case is pending in the 9th Circuit

3      Court of Appeals in front of a three-judge panel, and in that

4      case the 9th Circuit issued -- the entire question in the case is

5      whether the District Court had habeas jurisdiction over the

6      individual Sri Lanka asylum seekers, credible -- a challenge to

7      his credible fear determination and his expedited removal order.

8      And in that case the 9th Circuit issued a stay in March, and, you

9      know, we briefed the case on an expedited schedule; argument was

10     held in May; it is now August, and that case continues to be

11     pending.

12          So, you know, the Court clearly has power to enter the

13     stay for as long as necessary that it takes the Court to

14     determine the jurisdiction.

15          And if I could have an opportunity to talk about, you

16     know, at some point the question of why I don't think it's

17     necessary in the sense that the Court absolutely does have

18     jurisdiction to enter a stay, but in response to your question,

19     the stay can last for quite some time.  In *Nken* as well, the

20     Supreme Court *Nken* case, the question was not jurisdiction, but

21     the stay of removal --

22          THE COURT:  -- that lasted a couple of years, I think --

23          {Simultaneous conversation indiscernible}

24          MS. NEWELL:  -- These are long term in many cases.

25          THE COURT:  If I agree with you that jurisdiction is

1    clear, then the Court should go through the balancing factors for

2    a stay and if the Court grants a stay.  Then what would be an

3    appropriate briefing schedule for a merits determination?

4        MS. NEWELL:  I think that, if the Court is entering a stay

5    of removal pending the resolution of the merits under Rule 65,

6    you know, in consolidation with the merits as you mentioned, you

7    know, it would take some time, as the government noted, to

8    produce the administrative record, which we would like to see.

9    We do not have access to, for example, any written policies that

10   may have been issued by the Executive Office For Immigration

11   Review, which governs immigration judges, so there are some

12   questions there.

13       I think, with respect to, you know, being in a position to

14   file a motion for summary judgment, the work that we've done so

15   far in this case has been on an extremely expedited basis, so the

16   amount of, you know, evidence or {indiscernible} or experts,

17   declarations and things like that, are not at this point, you

18   know, what we would probably -- what -- they're not as extensive

19   as what one would want to do at a merits -- at a merits stage,

20   and so I think that those things would take some time to do

21   properly.

22       So I think, you know, each party -- I don't know how long

23   it would take the government to produce the administrative

24   record, but I think each party would need at least a few weeks to

25   get their filings in.  I think the government's proposal, if the

1    Court is inclined to enter a stay pending a resolution of the

2    merits, the government's proposal of allowing the parties to

3    confer, which would give them both an opportunity to confer with

4    their colleagues who are also working on this case and with each

5    other, makes a lot of sense.

6        THE COURT:  All right.  You argue that Section

7    1252(a)(1)(2)(A) is not a jurisdictional bar because that

8    section, quote, "specifically recognizes," end quote, that

9    certain challenges are authorized by 8 U.S. Code 1252(e).  Does

10   it matter that Section 1252(a)(1)(2)(A)(iii) makes no mention of

11   subsection (e)?

12       MS. NEWELL:  No, Your Honor, that does not matter, and

13   it's just -- I'm just flipping through my copy of the statute to

14   make sure I have the proper language in front of me.  That

15   provision refers to the application of section -- to individual

16   aliens, and this case is not about the application of expedited

17   removal for individual aliens.

18       As the government acknowledged, this case is a facial

19   systemic challenge about the unlawfulness of the government

20   policies across the board on their face.  And for that reason,

21   that subsection does not apply in this case.

22       THE COURT:  All right.  If the plaintiffs are removed

23   today or tomorrow, will they still have standing in this case?

24       MS. NEWELL:  Yes, Your Honor, I believe the government

25   conceded that the plaintiffs would have standing.  I think the

1    problem is more of a practical one, which is that they do fear

2    grievous harm, death threats, and death, and if the plaintiffs

3    are killed if they are returned, which is what they fear, then

4    obviously they would not be able to proceed in this case.

5         THE COURT:  All right.  Is the Attorney General entitled

6    to Chevron Deference?

7         MS. NEWELL:  Your Honor, it depends.  It depends on the

8    specific questions.  And in this case the USCIS guidance has an

9    across-the-board policy that everything in matter of A-D- is

10   controlling, and that is not proper.  The Attorney General is not

11   entitled to Chevron Deference on every single thing that the

12   Attorney General says no matter what.  He's not entitled

13   deference on every single thing that he said in matter of A-B-.

14        You know, just to begin with, Chevron Deference only

15   applies with respect to things that are actually interpretations

16   of statutes.

17        In addition, even assuming the particular issues were a

18   proper interpretation of the statute, no deference is warranted

19   when there's a clear and ambiguous answer in the statute.  And as

20   Step 2 of Chevron, courts will only defer if the interpretation

21   is reasonable, adequately explained, and not arbitrary and

22   capricious.

23        And in addition, as I noted and explained in our briefing,

24   Chevron is an issue-specific inquiry, so the Attorney General is

25   not entitled -- the agency is not entitled to make an

1    across-the-board rule that instructs that every single thing in

2    the matter of A-B- is controlling, and we gave some examples in

3    our brief.  Just to cite two of them, one of the issues in this

4    case is about the connection between the feared persecution and

5    the protected ground.  In other words, asylum seekers are

6    required to show that the harm that they fear is on top of one

7    the five protected grounds such as race, nationality, religion,

8    political opinion, and particular social group, and the new

9    policy has a heightened standard on that that we believe violates

10   the credible fear provisions in the statute, as well as the

11   immigration statute provision for mixed motive.

12          And as we cited in our case, in a our brief filed last

13   night in a case that I apologize I am not sure how to pronounce

14   the 3rd Circuit case, that court held that that mixed motive

15   standard, which is called the one central reason, the plain text

16   of the statute, that that's a plain text issue that the Attorney

17   General simply is not entitled -- or, I'm, sorry the agency is

18   simply not entitled deference there.

19          A second example is in the *Cardozo Fonseca* case, which is

20   one of the foundational asylum cases in the Supreme Court, the

21   Supreme Court held that the statutory term "well-founded fear of

22   persecution" is not entitled to Chevron Deference to have a plain

23   meaning, and in that case the Court rejected the agency's -- the

24   agency's position.

25          Here, you know, one of the issues -- one of the central or

```
 1    one of the main concerns is this heightened standard that the new

 2    policy imposes for proving asylum claims when the persecutors are

 3    nongovernmental actors.  And under the well-established standard,

 4    which the government appears not to dispute, since they have

 5    repeatedly cited it even in the matter of the A-B- decision, the

 6    correct standard is whether someone is unable or unwilling -- I'm

 7    sorry, whether the government is unable or unwilling to provide

 8    protection or control.  And it's well-established under decades

 9    of case law, under the UNHCR Handbook at the time that the 1980

10    Refugee Act was enacted, that what that means is effective

11    control.  And as we argue in our brief, that is totally

12    inconsistent with the new formulation that the new policies are

13    putting out, which is the requirement that noncitizens who are

14    applying for asylum and credible fear show that the government

15    either condoned or was completely helpless to protect them from

16    the feared harm.  And as they explained -- As we explain in our

17    briefing, that's completely inconsistent with not only the case

18    law and the statutory text and the context, but it's inconsistent

19    with the well-founded fear standard itself which, as I mentioned,

20    *Cardoza Fonseca* says is a plain text question and the Attorney

21    General and the agency doesn't get that one.

22         So those are just a couple of examples on why the Attorney

23    General doesn't get deference.

24         And finally on the *Chevron* point, Your Honor, we also

25    cited in our brief filed last night the issue in *Silver Traveno*
```

1    where in that case the decision -- the agency concluded that they

2    were entitled to deference there, and it was resoundingly

3    rejected by circuit court after circuit court.  So, those are my

4    points on Chevron, Your Honor.

5         THE COURT:  All right.  So, if the Court determines that

6    it has jurisdiction, no questions about it, what should be the

7    next step this morning?

8         MS. NEWELL:  I think the next step this morning would be

9    to issue a stay pending, you know, a decision on the merits, and

10   direct the parties to confer about what type of schedule would be

11   workable for them.

12        THE COURT:  And --

13        MS. NEWELL:  In the alternative, if the Court, you know --

14   if the Court is inclined to issue a stay, I think you could also

15   set a schedule that, you know, that gives the parties each a few

16   weeks, at least, you know, maybe three weeks or so, to file their

17   different briefs.

18        THE COURT:  Let me ask you this:  Are the standards -- are

19   the standards that the Court needs to consider for a stay of this

20   order, the removal order, different from the standards that the

21   Court needs to consider for the grant of a TRO?

22        MS. NEWELL:  I mean, they're very similar, Your Honor.

23        THE COURT:  They are.

24        MS. NEWELL:  The standard in our opening brief, as counsel

25   for defendants noted, the stay in the *Nken* case -- and I'm just

1  trying to pull up the standard so I can just read it to you

2  clearly, but they are very overlapping.  Essentially it's about

3  irreparable harm as well as a showing of a substantial likelihood

4  of success.

5       THE COURT:  Injury to the parties and the public

6  interests, et cetera.

7       MS. NEWELL:  Exactly.  So whether the plaintiff has made a

8  strong showing that they're likely to succeed on the merits,

9  whether the party would be irreparably injured absent a stay,

10  whether issuance of a stay would substantially injure the other

11  party, and where the public interest lies, and if you would like,

12  Your Honor, I'm happy to address this also.

13       THE COURT:  All right.  I hope I'm not misspeaking, but it

14  occurs to me that -- I think I'm correct -- that in the case

15  pending before Judge Sabraw -- am I pronouncing his name

16  correctly?

17       MS. NEWELL:  I believe it might be Sabraw.

18       THE COURT:  All right.  The government conceded

19  jurisdiction in that case.

20       MS. NEWELL:  Your Honor, I apologize.  I'm not familiar

21  with exactly what the government's representations in that case

22  might have been.

23       THE COURT:  All right.  And that's not an (e)(3)

24  challenge, I think it's an (e)(1) challenge.

25       MS. NEWELL:  I don't understand that to be an (e)(3)

1    challenge, Your Honor.

2         THE COURT:  All right.  Okay.  All right.  Let me do this.

3    I'm going to take a short recess just to speak with my staff for

4    a second, but I may want you to, when I return, counsel, to

5    address the four factors for the grant of a stay, and then I'll

6    give the government an opportunity to respond as well.  All

7    right.  There's no need to stand, the Court will stand in recess

8    for about ten minutes or so.  Thank you.

9         (Thereupon, a recess in the proceedings occurred from

10   11:19 a.m. until 12: 17 p.m.)

11        THE COURT:  All right.  Counsel.

12        MR. SPITZER:  If I may, Your Honor, before we get started,

13   we have an unexpected matter that we'd like to raise with you on

14   the telephone.

15        THE COURT:  Oh, sure.  Go right ahead.

16        MR. SPITZER:  Go ahead, Jenny.  Is she there?

17        THE COURTROOM CLERK:  Hello, hello.

18        THE COURT:  Do you want to try and reach her?  I'm sorry

19   it took so long.

20        MS. NEWELL:  Hello?  Can you hear me?

21        THE COURTROOM CLERK:  Yes, we hear you.

22        MS. NEWELL:  Can you hear me?

23        THE COURTROOM CLERK:  Yes.

24        THE COURT:  Yes, counsel.  Mr. Spitzer just --

25        MS. NEWELL:  We just learned during the recess that Carmen

1    and her little girl -- that's a pseudonym -- the ones who were --

2    we were told would not be removed before 11:59 p.m. today, we

3    received information suggesting that they likely were removed.

4         We learned from the direct service provider at the Dilley

5    Detention Facility where Carmen and her little girl were detained

6    that they were taken from their rooms this morning at Dilley.  We

7    understand that there was an 8:15 a.m. central flight out of San

8    Antonio, so they would have been taken directly from Dilley to

9    San Antonio for the flight.  They are no longer in the detainee

10   system at Dilley, which also suggests that they may have been

11   removed or put on a plane.

12        We wanted to raise this to the Court because this is,

13   obviously, unacceptable to plaintiff.  It violates the

14   representation that the government made to us, as well as the

15   representation the government made in open court yesterday that

16   our clients would not be removed before 11:59 p.m. Thursday,

17   today.  It also violates the entire premise of this entire

18   expedited stay proceeding, and so we would like to ask the Court

19   to order the government to bring her back.  The government has

20   conceded the Court has power to bring people back in an (e)(3)

21   action.

22        THE COURT:  All right.  Her flight has departed; is that

23   correct?

24        MS. NEWELL:  That is our understanding, but we believe the

25   government may have more accurate information than us.

1        THE COURT:  All right.  Thank you, counsel.

2        MR. REUVENI:  Yes.  Your Honor, I learned of this just as

3   plaintiffs' counsel learned of this as well.  In fact, the two

4   plaintiffs have been removed contrary to my representation in

5   open court.  I will -- we will do everything we can to remedy

6   that.  I will --

7        THE COURT:  Oh, I want those people brought back

8   forthwith.

9        MR. REUVENI:  We will bring them -- that is absolutely

10  what I have asked them to do, but first --

11       THE COURT:  I'm not asking, I'm ordering the government to

12  do it.

13       MR. REUVENI:  I understand, and we're doing it.

14       THE COURT:  It's not your fault.  I'm not getting mad at

15  you, and I know you told me yesterday in good faith that the

16  government would not be doing anything until 11:59, and

17  everyone's been working extremely hard around the clock,

18  literally, to address these very significant issues under

19  significant time constraints, but someone in the government made

20  a decision to remove those plaintiffs and I'm not happy at all

21  about that.  And if they aren't brought back forthwith, I'm going

22  to issue orders to show cause why people should not be held in

23  contempt of court, and I'm going to start with the Attorney

24  General.

25       MR. REUVENI:  Your Honor, we fully understand.  I have

1   been on the phone with folks from --

2        THE COURT:  I appreciate that, counsel.

3        MR. REUVENI:  -- and I'm doing everything I can --

4        THE COURT:  -- it's a forthwith --

5        MR. REUVENI:  -- to fix this.

6        THE COURT:  It's a forthwith order.  I know it's not your

7   problem, and I appreciate it, but just pass the word along, I'm

8   not happy about this at all.

9        MR. REUVENI:  I will certainly do so.  We are all working

10  right now to confirm whether this, in fact, has happened.  We

11  don't know yet, but as soon as -- I'm expecting a phone call.

12  I'm sure they're expecting the same.  As soon as we know whether,

13  in fact, this has happened --

14       THE COURT:  Nothing personal.  I know I'm raising my

15  voice, but I'm extremely upset about this.

16       MR. REUVENI:  I'm not taking it personal, and I am, too.

17       THE COURT:  Thank you, counsel.

18       MR. REUVENI:  I made representations.

19       THE COURT:  I appreciate your candor.  This is not

20  acceptable.  I'm prepared to rule.  I'm sorry it took -- I said

21  ten minutes or so an hour or so ago, and I got delayed, and my

22  staff and I were talking, and I'm going to issue this ruling.

23       This case has been presented and argued under significant

24  time constraints.  It's unfortunate that the Court does not have

25  the luxury of taking the case under advisement and issuing a

```
 1   longer memorandum opinion.  I've seriously considered plaintiffs'

 2   complaint and motion for emergency stay of removal.  I've

 3   considered the response by defendants and the numerous points and

 4   authorities that have been filed by both sides, and I've listened

 5   very attentively to the arguments this morning.

 6        Plaintiffs seek immediate relief from recently adopted

 7   policies related to the rights of adults and children fleeing

 8   domestic and gang violence to seek asylum in the expedited

 9   removal process.  The new expedited removal policy stems from a

10   legal opinion issued on June 11, 2018, the matter of A-B-, 27 I&N

11   Dec. 316.  That's an AG opinion, Attorney General opinion 2018,

12   which articulated standards for adjudicating asylum claims

13   related to domestic and gang-related violence and subsequent

14   USCIS guidance applying these standards to expedited removal

15   screenings.

16        The government challenges the Court's jurisdiction to

17   enter an emergency stay.  The government points to several

18   provisions of the Immigration and Nationality Act and argue that

19   they strip this Court of jurisdiction.

20        The Court is convinced that, at a minimum, the Court has

21   jurisdiction to issue a stay to, quote, "determine its own

22   jurisdiction," end quote, and thus to review the jurisdictional

23   questions, the serious and complicated jurisdictional questions

24   addressed in this case, and in that regard the Court relies upon

25   the opinion United States versus Ruiz, 536 U.S. 622, 628.
```

1          In quoting from *Ruiz*, "a federal court always has

2     jurisdiction to determine its own jurisdiction, end quote.

3          So, if there's any question about the Court's jurisdiction

4     under 18 U.S. Code Section 1252(e)(3) to enter a stay of removal,

5     it is clear, the Court could issue a stay to preserve the status

6     quo while these issues are fully briefed and resolved.  In that

7     regard the Court relies on the decision in *United States versus*

8     *United Mine Workers of America*, 330 U.S. 258, 291.

9          Courts have read United States versus Ruiz broadly to

10    support the proposition that a judge has the inherent, quote,

11    "power, until the jurisdictional issues are finally determined,

12    to make orders to preserve the existing conditions and the

13    subject of the petition," end quote, relying upon my colleague

14    Judge Bates in a decision in a case -- and I'm sure I'm going to

15    mispronounce it, so I'll spell it.  The first word is A-L; the

16    second word is M-A-Q-A-L-T-H versus Gates, a 2007 Westlaw

17    decision, 2059128 issued July 18 of 2007.

18         The Court notes that in several of the cases the

19    defendants' cite for the proposition that this Court does not

20    have jurisdiction to order a stay of execution of an order of

21    expedited removal at issue, the courts stayed removal proceedings

22    to determine jurisdictional questions.

23         In that regard, see *Castro versus United States Department*

24    *of Homeland Security*, 163 Fed Supp. 3d 157, 163, an Eastern

25    District of Pennsylvania decision issued in 2014 in which the

1   Court had stayed, quote, "the expedited removal of 16

2   petitioners," end quote, while determining jurisdictional issues.

3        In light of the significant issues pending before the

4   Court, the most sensible course at this time is to temporarily

5   stay the order of removal until the Court determines its

6   jurisdiction.

7        The Court shall issue an appropriate order shortly.  The

8   parties are directed to submit a proposed schedule for further

9   proceedings by no later than 5 p.m. tomorrow, August the 10th,

10  and it's this Court's intent to expedite a final determination on

11  the merits in this case just as soon as the Court can.

12       Anything further?  I'm going to issue a separate order

13  with respect -- I've already issued the order; I'm going to put

14  it in writing and post it, the forthwith order, directing the

15  government, the defendants in this case, directing the Attorney

16  General and subordinates and the government -- and I'll spell it

17  all out in an order, an appropriate order.  Are those people on a

18  government plane?

19       MR. REUVENI:  Your Honor, I --

20       THE COURT:  This is pretty outrageous.  Somebody in

21  pursuit of justice who has alleged a credible fear in her mind

22  and is seeking justice in a United States court is just -- is

23  spirited away while her attorneys are arguing for justice for

24  her?  It's outrageous.

25       MR. REUVENI:  I don't disagree with the sentiment, Your

1    Honor.  To answer your question -- I would be speculating -- but

2    generally it would be a plane charted by the government.  If they

3    are, in fact, on a plane, when they land they will be able to be

4    turned around and brought right back, and that's what I have

5    conveyed to the agencies, particularly ICE, who is responsible

6    for --

7            THE COURT:  I'm also directing the government to turn that

8    plane around either now or when it lands, turn that plane around

9    and bring those people back to the United States.  It's

10   outrageous.

11           MR. REUVENI:  I completely understand, Your Honor.

12           THE COURT:  Sure.  I know it's not your fault.

13           MR. REUVENI:  We will look for your order and we will make

14   sure that --

15           THE COURT:  The order is out there.  It's on the record.

16           MR. REUVENI:  No, not.  I've already -- I've already

17   sent -- I've already e-mailed them exactly your words.  So....

18           THE COURT:  All right.

19           MR. REUVENI:  I -- that's the best I can do.

20           THE COURT:  What else can I do?  I don't want to put you

21   in an awkward position, but what else can I do to expedite this?

22   Since we're talking about expedited, we're talking about an

23   expedited return now.

24           MR. REUVENI:  I think your order accompanied by your oral

25   order in open court to fix this immediately, unless orders of

1    contempt -- or show cause be issued directed at the Attorney

2    General and others, I think, in my humble opinion, should

3    suffice, but --

4         THE COURT:  Let me just talk with my staff.  Thank you.

5    Thank you, counsel.  I appreciate that.  I know it's not your

6    problem.  You know that.  It's been a pleasure to have you here

7    the last couple of days, and hopefully you can get some sleep

8    after you leave here after those people get back to this country.

9         MR. REUVENI:  Yes.

10        (Brief pause in proceedings.)

11        THE COURT:  All right.  Thank you, All.  Counsel, anything

12   further?

13        MR. SPITZER:  Nothing further.

14        THE COURT:  I'm really upset about that.  I really am.

15   I'm sorry to keep going back to it, but when you think about it,

16   these people are seeking justice in a United States court.  I

17   know it's not your fault.

18        MR. REUVENI:  {Indiscernible} for myself and as an

19   attorney with the Department of Justice, I agree with your

20   sentiment and everything you have said, Your Honor, and we will

21   fix it.

22        THE COURT:  And everyone has worked around the clock.  I

23   know you will.  I know you will.  Thank you very much, counsel.

24   All right.  Thank you.  Let me thank counsel on the phone.  Thank

25   you.

1       MS. NEWELL:  Thank you, Your Honor.

2       THE COURT:  All right.  And you're reasonably certain that

3  your clients have departed?

4       MS. NEWELL:  That's the best information that we have, but

5  we're looking to the government because they have better

6  information than we do.

7       THE COURT: All right.  All right.  Okay.  Thank you.  So

8  keep us informed, okay.

9       MS. NEWELL:  We will.

10      THE COURT:  In other words, I expect somebody to file

11  something or post something on the docket if and when -- not if,

12  when they're returned.  All right.  Thank you, everyone.  Thank

13  you again for your hard work -- I appreciate it, I really do,

14  thank you -- under the significant time constraints.

15      (Proceedings adjourned at 12:30 p.m.)

16                    **C E R T I F I C A T E**

17

18                    I, Scott L. Wallace, RDR-CRR, certify that
           the foregoing is a correct transcript from the record of
           proceedings in the above-entitled matter.

19

20          /s/ Scott L. Wallace                8/9/18
            ---------------------------       ----------------
21          **Scott L. Wallace, RDR, CRR            Date**
              **Official Court Reporter**

22

23

24

25