RECEIVED

AUG – 7 2018

Clerk, U.S. District and
Bankruptcy Courts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GRACE*, MINA*, GINA*, MONA*, and MARIA*,       )
T. Don Hutto Residential Center                )
1001 Welch Street                              )
Taylor, TX 76574;                              )
                                               )
CARMEN* and her minor daughter, J.A.C.F. (by and )
through her mother),                           )
South Texas Family Residential Center          )
300 El Rancho Way                              )
Dilley, TX 78017;                              )
                                               )
GIO*,                                          )
Albany County Correctional Facility            )
840 Albany Shaker Road                         )
Albany, NY 12211;                              )
                                               )
NORA* and her minor son, A.B.A. (by and through )
his mother),                                   )
c/o 125 Broad Street, 18th Floor               )
New York, NY 10004;                            )
                                               )
CINDY ARDON MEJIA and her minor daughter,      )
A.P.A. (by and through her mother)             )
c/o 125 Broad Street, 18th Floor               )
New York, NY 10004;                            )
                                               )
                          *Plaintiffs*,        )
                                               )
              v.                               )
                                               )
JEFFERSON BEAUREGARD SESSIONS III,             )
Attorney General of the United States, in his official )
capacity,                                      )
950 Pennsylvania Avenue, NW                    )
Washington, DC 20530;                          )
                                               )
KIRSTJEN M. NIELSEN, Secretary of the          )
Department of Homeland Security, in her official )
capacity,                                      )
245 Murray Lane, SW,                           )
Washington, DC 20528;                          )
                                               )
                                               )

Case: 1:18-cv-01853
Assigned To : Sullivan, Emmet G.
Assign. Date : 8/7/2018
Description: TRO/PI     **(D-DECK)**

|  |  |
|---|---|
| LEE FRANCIS CISSNA, Director of United States Citizenship and Immigration Services, in his official capacity, 20 Massachusetts Ave., NW Washington, DC 20529; | ) ) ) ) ) ) |
| JAMES MCHENRY, Director of the Executive Office for Immigration Review, in his official capacity, 950 Pennsylvania Avenue, NW Washington, DC 20530, | ) ) ) ) ) ) |
| *Defendants.* | ) ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Refugee Act, Immigration and Nationality Act, Administrative Procedure Act, Separation of Powers, and Due Process)

---

* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

## INTRODUCTION

1.  This case seeks to prevent the evisceration of asylum protections for the most vulnerable immigrants fleeing horrific persecution.  Plaintiffs are adults and children who fled their home countries after suffering pervasive sexual abuse, kidnapping, beatings, shootings, the murder of family members, and/or death threats.  They are challenging new policies that unlawfully deprive them of their right to seek humanitarian protection.

2.  Specifically, the Defendants have recently implemented written policies that subject Plaintiffs and other individuals placed into summary "expedited removal" proceedings to an unlawful screening standard–a standard intended to eliminate most domestic violence and gang-related asylum claims.  The new expedited removal policies stem from a legal opinion issued on June 11, 2018, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), which articulated new, erroneous standards for adjudicating asylum claims relating to domestic and gang-related violence, and subsequent guidance applying these erroneous standards to expedited removal screenings.

3.  As a result of the new policies, the immigration authorities summarily rejected Plaintiffs' asylum claims and ordered them removed to countries where they face grave danger or even death.  Unless the new policies are enjoined, many other bona fide asylum seekers face the same fate.

4.  When Congress created "expedited removal" proceedings in 1996, it was careful to build in protections for asylum seekers.  These protections require that *every* individual who comes to this country seeking humanitarian protection be given a fair chance to establish eligibility for asylum and related protection from deportation.  Specifically, immigrants in expedited removal who express fear of return to their home countries must be afforded a threshold screening interview with an asylum officer, called a "credible fear" interview.  At that interview, the

3

question is not whether that person will ultimately be eligible for asylum, but only whether there is "a significant *possibility* . . . that the alien *could* establish eligibility for asylum[.]" 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). If the noncitizen passes this low "credible fear" screening standard, the law requires that she be taken out of expedited removal and allowed to pursue her claim for asylum in regular removal proceedings, where she is entitled to a full trial-type immigration court hearing and administrative appellate review, followed by review in the federal court of appeals. Congress intended the credible fear standard to be low, so that asylum seekers would be given the benefit of the doubt and no one with a potentially meritorious asylum claim would be sent back to danger.

5.   Prior to Defendants' implementation of the challenged policies, all of the Plaintiffs would have satisfied the threshold credible fear standard and been entitled to seek asylum and related protection in full removal hearings before an immigration judge.

6.   But the new policies unlawfully elevate the credible fear standard far above the low threshold Congress enacted and prevent asylum seekers from ever pursuing their asylum claims. The new credible fear policies based on *Matter of A-B-* unlawfully change the credible fear standard in at least three ways.

7.   First, they direct asylum adjudicators to deny most credible fear claims connected to domestic violence or gangs, even though by law, credible fear must be decided on the specific facts of each case and there is no categorical bar against such claims under the asylum laws.

8.   Second, they instruct asylum adjudicators to evaluate and deny credible fear for such claims based on multiple erroneous legal standards. For example, although it is well-established that individuals fearing persecution by non-governmental actors can qualify for asylum if they show that their home government is "unable or unwilling" to protect them, the new policies

4

require applicants to meet a much more stringent test: showing that their government "condones or is completely helpless" to protect them. Similarly, for individuals who assert they are being targeted for persecution because they are a member of a particular social group (one of the five protected grounds for asylum), the new policies impose an erroneous, more demanding burden for showing that the persecution they fear is "on account of" such membership.

9. Finally, they require asylum adjudicators to ignore any federal court of appeals decisions that conflict with the new credible fear policies, thus purporting to make the immigration authorities the ultimate arbiters of the law, and undermining both Congress's lawmaking authority and the Article III judiciary's duty to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803).

10. Each of these instructions by themselves unlawfully alters and heightens the credible fear standard and deprive Plaintiffs and other asylum seekers of their right to pursue asylum. Taken together, their effect is to distort the credible fear process beyond recognition.

11. Plaintiffs seek a declaration that the new credible fear policies violate the Immigration and Nationality Act ("INA"), the Refugee Act, the Administrative Procedure Act, Article III's separation-of-powers principle, and the Due Process Clause; an order enjoining the application of the new credible fear policies; and an order that Plaintiffs' expedited removal orders be vacated and that they be provided with a new credible fear process under the proper legal standard or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a. Without an injunction, Plaintiffs and thousands of other immigrants like them desperately seeking safety will be unlawfully deported to places where they fear they will be raped, kidnapped, beaten, and killed.

## JURISDICTION AND VENUE

12. This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* and its implementing regulations; and the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

13. The Court has jurisdiction under 8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) is a provision of the INA that provides jurisdiction in the United States District Court for the District of Columbia over systemic challenges "to [the] validity of the [expedited removal] system," including regulations and "written" policies regarding expedited removal.  The Court also has jurisdiction under 28 U.S.C. § 1331.

14. Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

15. Plaintiff Grace[*] fled Guatemala to escape her abusive partner and his violent gang-member sons.  Grace's partner of 22 years repeatedly beat and threatened to kill her and her children throughout their relationship and after she tried to leave him.  He also sexually assaulted her and her daughter over many years.  Grace is part of an indigenous group that is discriminated against in Guatemala by Ladinos (non-indigenous Guatemalans).  Grace's abuser, who is Ladino, would often berate her for being an "India" (a slur used to denigrate indigenous people) and "stupid," because she could not read or write, especially when he was violently abusing her.

---

[*] Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

Once, he beat Grace's pregnant daughter so severely that she had a miscarriage. In October 2016, Grace sought police protection from her abuser and his two gang member sons from another relationship, who had recently joined their father in abusing Grace and her children. However, the police did nothing to stop him and his sons from returning to Grace's house to attack her. When she tried to leave him, Grace's abuser took advantage of her illiteracy to take the legal title to her home. He then arranged to have the police evict Grace from her longtime residence, and she and her son were forced to move in with a neighbor. Even after having evicted her, Grace's abuser and his sons continued to terrorize her and her son. Because his sons are members of a powerful gang, which has a network across the country, Grace does not believe she could find safety in another city. Despite being found to have testified credibly, she received a negative credible fear determination on July 20, 2018. Grace is detained at T. Don Hutto Residential Center in Taylor, Texas.

16. Plaintiff Carmen*, together with her young daughter, Plaintiff J.A.C.F., fled her home in El Salvador to escape two decades of horrific sexual abuse by her husband and death threats from a violent gang. Carmen's husband routinely raped, stalked, and threatened her with death, treating her as his property, even after they were living apart. Carmen did not report her husband's threats to the police because she had seen that the police did not protect women from their husbands' abuse. She had also heard about women who reported abuse to the police, only to be killed by their husbands in retaliation, and believed her husband would do the same if she reported him. Carmen also fears that she and her daughter would be killed by a violent gang, who targeted her because she was a vulnerable single mother living alone with her child, and because she had a good factory job. They held her up at gunpoint in May 2018 when she was on her on her way home from work and demanded that she pay a monthly "tax," making clear that

7

they would kill her and her little girl if she did not comply. The gang also threatened to kill her if she went to the police. Because four or five of her co-workers were killed by the same gang in the past year, she knew their threats were serious and fled with J.A.C.F. to avoid death. In June 2018, Carmen and her daughter sought asylum in the United States. Despite being found to have testified credibly, they both received negative credible fear determinations on June 29, 2018, which were affirmed by an immigration judge on July 23, 2018. Carmen and her little girl are detained at the South Texas Family Residential Center in Dilley, Texas.

17. Plaintiff Mina* fled her home in Honduras after suffering a vicious attack and receiving death threats from a powerful drug trafficking gang that controlled her town. Members of the gang targeted Mina and her family after her husband and father-in-law helped a friend escape when the gang was trying to kill him. After murdering her father-in-law and threatening to kill her husband, members of the gang beat Mina so badly that she could not walk the next day. Her attackers told her they would rape her and mutilate her body if she did not leave town. Mina knew she could not report the attack to the police because of their close ties to the gang and because the police had failed to investigate her father-in-law's murder after her family sought police assistance. Mina and her husband fled to the United States and sought asylum. Despite being found to have testified credibly, Mina received a negative credible fear determination on July 23, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

18. Plaintiff Gina* fled her home in Honduras in June 2018 because she fears death or torture at the hands of a powerful Honduran family that threatened to kill her because of her relationship to her nephew, who murdered someone close to them years ago. The family has already succeeded in murdering Gina's brother and maiming her son in an attempt to kill him. Although Gina made several police reports following these crimes, the police did not help her because the

family targeting her is powerful and well-connected to the Honduran government; the family has also threatened to kill her because she dared to report their crimes. She attempted to find safety by moving away from the area, but people sent by the family recently came to her new town, asking for her by name. Gina fled to the United States to save her life. Despite being found to have testified credibly, she received a negative credible fear determination on July 16, 2018. Gina is detained at T. Don Hutto Residential Center in Taylor, Texas.

19. Plaintiff Mona* fled her country and sought asylum in the United States after a powerful gang brutally murdered her long-term partner, who was a member of a special military force dedicated to combating gangs, and threatened to kill her next because of her relationship with him. Earlier this year, Mona's partner and four other people were gunned down by armed men in a hail of bullets. Mona was present at the shooting and narrowly escaped with her life. When she called her partner's phone after the shooting to try to locate it, the killers answered, taunting her and threatening that they knew she was his partner and she would be next. Shortly after her partner's death, she was accosted by gang members at the market while attempting to purchase flowers for his funeral. They repeated that they knew she was her partner's woman and threatened to kill her. She was recently alerted by family members that gang members were following her bus, forcing her to get off quickly and hide until someone could pick her up. Mona feared that if she reported the threats to the local police, many of whom collaborate with gangs, she would only put herself in greater danger. She also knew of other cases where the police were not able to protect family members of police officers and soldiers who were killed by gangs just because of their relationship with law enforcement. Fearing for her life, Mona fled to the United States and sought asylum. Despite being found to have testified credibly, she received a negative

9

credible fear determination on July 20, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

20. Plaintiff Gio* fled his home in El Salvador after being targeted by members of two rival gangs. Gio lived in a neighborhood controlled by one notoriously brutal gang, whose members recently threatened his life when he refused to sell drugs for them because of his deep Christian faith. Gio also fears the gang will kill him if it learns that his half-brother is a member of their rival gang. If the gang that controls his neighborhood does not kill him, Gio fears that the rival gang will. Some years ago, Gio was terrorized by members of the rival gang when he visited his father, who lives in their territory. The rival gang members kidnapped him, accused him of being a spy for the other gang, broke his arm during a vicious beating, and threatened to throw him in a well and leave him to die. They also threatened to harm him if he made a police report. He escaped, but the gang's members have continued to threaten him for years, any time he has encountered them. In June 2018, after the gang that controls his neighborhood threatened him for refusing to sell drugs, Gio fled to the United States to save himself. Gio believed that attempting to get help from the police would only put him and his family in even graver danger. Despite being found to have testified credibly, he received a negative credible fear determination on July 16, 2018. Gio is detained at Albany County Correctional Facility in Albany, New York.

21. Plaintiff Maria*, a recently orphaned teenager, fled her home in El Salvador to escape a forced relationship and sexual violence at the hands of a gang member nicknamed "F." When Maria's brother-in-law, a member of the same gang, began to use her recently deceased mother's house as a gathering place for the gang, Maria stood up to him because her strong Christian faith leads her to morally oppose gangs. After she asked her brother-in-law to leave, F. threatened her by screaming at her and beating the walls of her house with a baseball bat, to teach her a lesson

about defying the gang. He then began to make aggressive sexual advances toward her, telling her that she had no choice but to be his "woman" and that he would force her if she resisted. He continued to escalate these advances until he attempted to sexually assault her days before she fled. Maria resisted F. because of her Christian faith and because she saw that gang members treat their girlfriends like property and frequently beat them. Maria knew this because her brother-in-law abuses her older sister, who has a physical disability and has trouble defending herself. Maria knew the police could not control the gang's violence against women, and she had seen the gang retaliate against people who file police reports. The gang killed a woman in Maria's town in front of her children just days after she reported that the gang had kidnapped one of her sons. Maria fled to the United States to save her life. Despite being found to have testified credibly, she received a negative credible fear determination on July 23, 2018. She is detained at T. Don Hutto Residential Center in Taylor, Texas.

22. Plaintiff Nora* and her three-year-old son, Plaintiff A.B.A., fled their home in El Salvador in May 2018, after their lives and safety were threatened by members of a notoriously brutal gang. Over the course of years, Nora suffered rape and physical beatings at the hands of her partner, who is the father of her son, A.B.A. Nora's abuser is affiliated with the gang and has had the gang surveil her since she attempted to end their relationship. Earlier this year, gang members who gather at a corner near Nora's house began to question her about whether A.B.A. was the son of her abuser. One of the gang's members named "E.T." began to make aggressive sexual advances whenever she passed by. In May, when Nora was walking home with her three young children, E.T. pursued her down the street and told her that he knew that she lived alone with her children and that he would come to her house at night to have sex with her. He showed her a gun in his waistband and then looked to her son, indicating that he would kill them both if

she did not submit to his sexual demands. She fled to the United States to save her son's life as well as her own. Despite being found to have testified credibly, Nora and her son both received negative credible fear determinations on June 15, 2018, which were affirmed by an immigration judge on June 26, 2018. USCIS denied their request for reconsideration and Nora and her son were removed to El Salvador on or about July 26, 2018, where they continue to fear for their lives.

23. Plaintiff Cindy Ardon Mejia fled her home in Central America with her young daughter, Plaintiff A.P.A., after suffering extensive past persecution, including rape, physical beatings, and shootings carried out by ███████████████████████████████. Ms. Ardon Mejia's abuser, ███████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████ Ms. Ardon Mejia

and her little girl entered the United States in June 2018, seeking asylum. Despite being found to have testified credibly, they both received negative credible fear determinations on June 28, 2018, which were affirmed by an immigration judge on July 10, 2018. USCIS denied their request for reconsideration on July 25, 2018. ███████████████████████████

12

24. Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States.  In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration Review ("EOIR") (the administrative immigration court system), and is empowered to grant asylum or other relief.

25. Defendant Kirstjen M. Nielsen is sued in her official capacity as the Secretary of DHS.  In this capacity, she directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  In her official capacity, Defendant Nielsen is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum or other relief.

26. Defendant Lee Francis Cissna is sued in his official capacity as the Director of USCIS, which is the agency that, through its asylum officers, conducts interviews of certain individuals placed in expedited removal to determine whether they have a credible fear of persecution and should be permitted to apply for asylum before an immigration judge.

27. Defendant James McHenry is sued in his official capacity as the Director of the Executive Office for Immigration Review, the agency within the Department of Justice that, through its immigration judges, conducts limited review of negative credible fear determinations.

## BACKGROUND

### A. Asylum Protections in the United States

28.  The immigration laws provide that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum[.]"  8 U.S.C. § 1158(a)(1).

29. To be eligible for asylum, a noncitizen must establish that she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)[.]"  8 U.S.C. § 1158(b)(1)(A); *see also* 8 U.S.C. § 1158(b)(1)(B)(i).  A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A).

30. The current asylum system was enacted in 1980, as part of the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, and was intended to bring U.S. law into conformity with our obligations under the United Nations Convention Relating to the Status of Refugees and 1967 United Nations Protocol Relating to the Status of Refugees.  Consistent with international law, the definition of "refugee" does not require a showing of *certain* harm.  Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution."  The Supreme Court has explained that a showing of a 1 in 10 chance of persecution is sufficient to satisfy that standard.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).

31. At the time of the 1980 Act it was well understood in both domestic and international law that persecution included harm inflicted by actors other than the official government of a country, so long as the government was "unable or unwilling to control" the persecutors. *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985).

32. It is also well established that refugee protections extend to women fleeing gender-based persecution. For decades, the Board of Immigration Appeals ("BIA"), the immigration authorities, and federal courts have broadly recognized that women harmed by non-state actors because of their gender can show they are persecuted "on account of" one of the protected grounds of race, religion, nationality, political opinion, or membership in a particular social group. *See, e.g., In re Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996) (recognizing asylum claim based on female genital cutting by non-governmental actors); *Matter of Acosta*, 19 I&N Dec. at 233 (explaining that "persecution on account of membership in a particular social group" "mean[s] persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic . . . such as sex").

### B. The Expedited Removal System and Credible Fear

33. Prior to 1996, noncitizens were generally entitled to a full hearing in immigration court before they could be removed, whether they were seeking admission at the border or had already entered the country. They were also entitled to administrative appellate review before the BIA and judicial review in federal court.

34. In 1996, Congress enacted legislation that created a type of highly truncated removal mechanism called "expedited removal" that could be used for certain noncitizens seeking admission. *See* 8 U.S.C. § 1225(b)(1).

35. Noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

36. Congress, however, was careful to carve out an exception for individuals who express fear of return to their home countries. *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

37. If an individual indicates any fear of returning to his or her home country, the immigration officer must refer the individual for an interview with an asylum officer, called a "credible fear" interview. 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. If the noncitizen is referred to an asylum officer, the officer conducts (with the assistance of an interpreter if necessary) a rudimentary "credible fear interview" which is designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). The asylum officer must "conduct the interview in a non-adversarial manner." *Id.* Further, in determining whether credible fear is satisfied, the officer must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4).

38. At the conclusion of the interview, if the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination that "shall include . . . the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(iii)(II).

39. Upon the individual's request, the agency must provide for prompt review of the asylum officer's negative credible fear determination by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1). The immigration judge's decision is administratively "final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(iv)(A). Noncitizens undergoing credible fear review before immigration judges are still in expedited removal

proceedings, and do not get the full panoply of rights available in regular immigration court removal proceedings.

40. Noncitizens who receive a negative credible fear determination are issued an expedited removal order, which comes with significant consequences, beyond removal itself. Noncitizens who are removed pursuant to expedited removal orders are subject to a five-year bar on admission to the United States. 8 U.S.C. § 1182(a)(9)(A)(i).

41. To ultimately prevail on an asylum claim, the applicant need only establish that there is a 10% chance that he or she will be persecuted on account of one of the five protected grounds for asylum. To prevail at a credible fear interview, however, the applicant need only show a "significant possibility" of asylum eligibility—i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a *fraction* of 10%. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (defining credible fear as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]").

42. If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge. At that hearing, they will have the opportunity to develop a full record before the judge, and they may appeal an adverse decision to the BIA and federal court of appeals. 8 C.F.R. § 208.30 (f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

43. The reason for the low threshold at the credible fear stage is straightforward. An asylum claim is highly fact-specific and often will take significant time, resources and expertise to develop, including expert testimony and extensive evidence about country conditions. It may also involve complex legal questions. In the expedited removal system, however, abbreviated

credible fear proceedings occur within days of arrival, with little to no preparation or assistance

by counsel, little to no knowledge of asylum law by the applicant, no opportunity to examine

witnesses or gather evidence, and while the individual is detained. It is thus highly unrealistic

for applicants in the expedited removal system to present a fully developed asylum claim.

Accordingly, Congress established a low threshold at the credible fear stage to ensure that

potentially valid asylum claims could be developed properly in a full trial-type hearing before an

immigration judge. Congress viewed this credible fear process as an essential safeguard to

ensure bona fide asylum seekers would not be summarily removed.

### C. The New Written Credible Fear Policies

44. On June 11, 2018, Defendant Sessions, in his role as Attorney General, issued a

precedential decision in an asylum case, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), reversing

a grant of asylum to a Salvadoran woman who fled more than fifteen years of extreme domestic

violence at the hands of her then-husband. Although the BIA had held that Ms. A.B. had

established her eligibility for asylum, Defendant Sessions used an extraordinary procedure by

which he "certified" the BIA's decision to himself for review and reversed the BIA's earlier

precedent in *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014). *A-R-C-G-* had recognized,

consistent with the then-longstanding legal position of DHS, that asylum claims based on

domestic violence can qualify for protection.

45. Moreover, Defendant Sessions used *Matter of A-B-* as a vehicle to articulate new legal

standards for the adjudication of asylum cases based on persecution from non-governmental

actors on account of membership in a particular social group, focusing particularly on claims by

individuals fleeing domestic abuse and gang violence. *Matter of A-B-* misstates or

mischaracterizes multiple aspects of asylum law, seeking to heighten the asylum standards and

increase the burden on asylum seekers to prove eligibility. Defendant Sessions specifically opined that, based on the newly articulated standard, few claims pertaining to domestic or gang violence by non-governmental actors would qualify for asylum or satisfy the credible fear standard. *See id.* at 320 and n.1.

46. On June 13, 2018, USCIS issued a written Interim Guidance from John L. Lafferty to USCIS Asylum Division staff, instructing asylum officers to apply *Matter of A-B-* to credible fear interviews. *See* Asylum Division Interim Guidance – Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018), June 13, 2018 (hereinafter "USCIS Interim Guidance") ("we are issuing the following interim guidance on how to proceed with decision-making on asylum cases and CF . . . screening determinations").

47. On July 11, 2018, USCIS issued final written guidance to employees, including asylum officers responsible for conducting credible fear interviews, instructing them, inter alia, to assess credible fear in light of *A-B-* and directing that claims based on domestic violence and gang-related harms generally will not establish the basis for a credible fear of persecution. USCIS Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*, July 11, 2018 (PM-602-0162) (hereinafter "USCIS Guidance" or "Guidance"), at 1.[1] *See also id.* (indicating that the "Authority" for the Guidance includes the expedited removal statute, 8 U.S.C. § 1225, and its implementing regulations at 8 C.F.R. §§ 235 and 208).

---

[1] Although past agency practice has always been to have USCIS Asylum Division guidance drafted within that office and approved by the Chief of the Asylum Division, on information and belief, this USCIS Guidance was issued outside those channels, without approval from any of DHS's Asylum Division experts. Unlike previous guidance of this type, the USCIS Guidance memorandum has no "FROM" field, no authors identified, and no signature.

48. The USCIS Guidance also announces a new credible fear policy not mentioned in *Matter of A-B-*. Although under prior USCIS policy credible fear applicants could rely on the law of the most favorable federal court of appeals circuit, the Guidance mandates that in making credible fear determinations, USCIS asylum officers shall ignore all federal court of appeals case law that is inconsistent with *A-B-*, and even then consider only the law of the circuit where the applicant is physically located during her credible fear interview.

49. On information and belief, the components of DHS and the Department of Justice (including the Executive Office for Immigration Review) involved in adjudicating and enforcing the immigration laws have issued further written documents applying the pronouncements in *Matter of A-B-* to the credible fear process.

50. *Matter of A-B-* and the subsequently issued guidance documents establish written policies concerning credible fear interviews and implementing the expedited removal provisions at 8 U.S.C. § 1225(b)(1). Taken together, the *Matter of A-B-* decision and the guidance issued by USCIS, EOIR, and other components of DHS and DOJ addressing the applicability of *Matter of A-B-* to credible fear decisions are referred to herein as "the new credible fear policies." The new credible fear policies were first implemented during the last 60 days.

51. These policies unlawfully change the credible fear standard in multiple interrelated ways, to further an explicit goal of foreclosing claims brought by women, children, and other migrants fleeing gender and gang-related violence. The new credible fear policies are designed to ensure that those fleeing domestic violence or gang-related violence do not make it into full immigration proceedings. The new policies:

- instruct asylum officers to deny virtually all credible fear claims based on domestic violence or gang-related harms, in violation of the requirement that each case be adjudged based on its specific facts;

- ratchet up the showing for failure of government protection that such applicants must prove at the credible fear stage to establish eligibility for asylum based on fear of harm by non-governmental actors;

- impose a heightened, erroneous standard for proving that persecution is "on account of" (or has a "nexus" to) a protected ground for asylum;

- impose an inappropriate burden on credible fear applicants to articulate and provide precise evidence identifying the specific particular social group that forms the basis for their persecution;

- direct asylum officers to exercise "discretion" to deny eligible applicants, even though the only question at the threshold credible fear stage is legal eligibility and not discretion; and

- instruct asylum adjudicators making credible fear determinations to disregard contrary court of appeals precedents and to apply only the case law in the circuit where the credible fear applicant is detained.

Each of these unlawful changes to the credible fear standard is described further below.

### The Instruction to Deny Virtually All Credible Fear Claims Based on Domestic Violence and Gang-Related Harm

52. Even though it is well established that credible fear and asylum claims must be assessed on a case-by-case basis according to the specific circumstances and evidence presented, and even though there are no categorical bars in the INA based on the type of claim presented, the new credible fear policies instruct asylum adjudicators to reject credible fear claims based on domestic violence or gang-related harms in all but the most extraordinary cases.

53. In *A-B-*, the Attorney General asserted that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum." 26 I&N Dec. at 320.  Although Ms. A.B.'s case was not at the credible fear stage (and even though she did not present an asylum claim based on gang violence), the Attorney General

added that "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution. *See* 8 U.S.C. 1225(b)(1)(B)(v)[.]" *Id.* at 320 & n.1 (quoting the credible fear standard).

54. Moreover, the USCIS Guidance asserts, in bold font, that "**[i]n general, . . . claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for . . . a credible . . . fear of persecution.**" USCIS Guidance at 6.

55. This instruction is incorrect and arbitrary, deprives credible fear applicants of an impartial adjudication of their claims based on the specific facts of their case, violates the fundamental principle in the Refugee Act that a single standard should apply to all asylum seekers without discrimination, represents an improper departure from prior policy, and reflects Defendants' unlawful presumption against entire categories of claims at the credible fear stage.

### The New "Condoned" or "Complete Helplessness" Standard for Failure of Government Protection

56. It is well-settled that for all five protected grounds for asylum (race, religion, nationality, membership in a particular social group, and political opinion), a noncitizen can qualify for asylum based on a well-founded fear of persecution by a private actor, where the government is "unable or unwilling" to protect the applicant. However, the new credible fear policies mandate a new, higher standard in such cases.

57. In *A-B-*, the Attorney General asserted that victims of persecution by non-governmental actors, and specifically those asserting claims based on domestic or gang violence, must now establish that "the government condoned the private actions 'or at least demonstrated a complete helplessness to protect the victims.'" 27 I&N Dec. at 337. The USCIS Guidance repeats and adopts this instruction in *A-B-* for all asylum officers, including those making credible fear

22

determinations. *See, e.g.*, USCIS Guidance at 6 (explaining that the "unable or unwilling" standard requires a showing that "the government condoned the private actions or at least demonstrated a complete helplessness to protect the victim"); *id.* at 10 ("[T]he home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution."); *see also* USCIS Interim Guidance ("the applicant must show that the government condoned the behavior or demonstrated a complete helplessness to protect the victim").

58. This new "condoned" or "complete helplessness" formulation for credible fear interviews is inconsistent with the text and context of the Refugee Act and the INA and with Congress's intent in the Refugee Act to adopt the settled agency construction of "well-founded fear of persecution" and conform the refugee definition to international norms. It is also inconsistent with decades of asylum case law and the government's own longstanding policy, which have recognized the viability of claims involving non-governmental persecutors and have uniformly held that the "unable or unwilling" standard is met even where the applicant has not demonstrated that the government condones the harm or is completely helpless to prevent it.

### Nexus and Circularly Defined Particular Social Groups

59. *Matter of A-B-* concluded that in cases involving non-governmental actors–specifically, domestic violence and gang cases–it will be difficult to establish that the motive for the persecution was "on account of" (or has a "nexus" to) the protected ground and not any personal relationship between the applicant and the persecutor. 27 I&N Dec. at 337-39. *See also* USCIS Guidance at 6 ("[W]hen a private actor inflicts violence based on a personal relationship with the victim, the victim's membership in a larger group often will not be 'one central reason' for the abuse."). That assertion however, violates the plain text of the INA, which contemplates mixed

motives for persecution, as well as the credible fear standard itself.  Asylum applicants have

successfully established "nexus" in a range of circumstances that inherently or predominantly

involve personal relationships, including female genital cutting, honor killings, forced marriages,

and persecution of homosexuals by family members.  Further, the credible fear policies also set

forth an unprecedented and unlawful evidentiary requirement, demanding evidence that the

persecutor was aware of the social group as defined in the asylum claim in order to establish

nexus.  *See, e.g., A-B-*, 27 I&N Dec. at 339.

60. The new credible fear policies also establish a presumption that asylum claims founded

on domestic violence present impermissibly circular social groups.  Circularly defined particular

social groups generally do not meet the refugee definition because of a failure of nexus; for

example, a domestic abuser generally does not batter his victim because she is a battered woman.

*A-B-* erroneously concludes that groups defined in part by the applicant's inability to leave the

relationship are impermissibly circular because "the inability 'to leave' was created by harm or

by threatened harm" (referring to the harm committed by the abuser).  27 I&N Dec. at 335.  The

USCIS Guidance affirms this position and encourages adjudicators to reject similarly worded

social groups.  USCIS Guidance at 5 ("The applicant must show something more than the danger

of harm from an abuser if the applicant tried to leave, because that would amount to circularly

defining the particular social group by the harm on which the asylum claim was based.").  Yet

the inability of a woman to leave her relationship may be caused by many factors apart from the

fact of harm, including her abuser's beliefs or social and cultural norms that subordinate women

to men.  The credible fear policies are unlawful, represent an improper departure from prior

policy, and rely on impermissible generalizations about domestic violence asylum claims, their

societal context, and the motives of domestic violence perpetrators that have no basis in fact.

24

### *"Exact Delineation" of Particular Social Group*

61. *Matter of A-B-* asserted that "an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group." *Id.* at 344. *See also* USCIS Guidance at 3 ("an applicant seeking asylum or refugee status based on membership in a particular social group must present facts that clearly identify the proposed particular social group"). The new credible fear policies thus provide that noncitizens must specify the "particular social group" that they are claiming.

62. That requirement cannot be imposed at the credible fear screening stage. Congress intended the credible fear standard to be a low, threshold standard that would not screen out any potentially valid asylum claims or require development of legally or factually complicated issues in such a truncated, "nonadversarial" process. *See* 8 C.F.R. § 208.30. Yet defining and establishing membership in a "particular social group" is one of the most complex and difficult questions in asylum law, one frequently requiring expert testimony and extensive documentary evidence. *See, e.g.*, 65 Fed. Reg. 76588-01, Proposed Rule, Immigration and Naturalization Service, Asylum and Withholding Definitions (Dec. 7, 2000) ("Membership in a particular social group is perhaps the most complex and difficult to understand" of the five protected grounds for asylum). Such a requirement is fundamentally inconsistent with the credible fear scheme that Congress enacted.

### *Adverse Discretion at the Credible Fear Stage*

63. *Matter of A-B-* also made a point of "remind[ing] *all* asylum adjudicators that a favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for

asylum eligibility under the INA." 27 I&N Dec. at 345 n.12 (emphasis added). Likewise, the USCIS Guidance addresses the exercise of discretion, explaining under the heading of "USCIS Officers' General Duties" that "if eligibility is established, the USCIS officer must then consider whether or not to exercise discretion to grant the application." USCIS Guidance at 2. It then repeats *Matter of A-B-*'s discussion of the exercise of discretion, emphasizing the use of unlawful entry into the United States as a negative factor. *Id.* at 7-8.

64. Yet that requirement cannot be imposed at the credible fear stage, where discretion is simply irrelevant. Credible fear is defined as "a significant possibility . . . the alien can establish *eligibility* for asylum" or other similar protection. 8 C.F.R. § 208.30 (emphasis added).

### *Disregarding Contrary Court of Appeals Rulings*

65. The new credible fear policies assert a categorical rule that asylum officers should "apply the case law of the relevant federal circuit court" only "to the extent that those cases are not inconsistent with *Matter of A-B-*." USCIS Guidance at 8-9.

66. This new policy thus asserts that for every statement contained in *Matter of A-B-*, the Attorney General's opinion is controlling regardless, and credible fear adjudicators will not follow any contrary court of appeals decisions.

67. Under our Constitutional scheme, however, it is the Judiciary's authority to interpret the law, and the federal agencies cannot categorically disregard federal court rulings.

68. Moreover, because credible fear is a low screening threshold, designed to allow *all* meritorious cases to reach the asylum application stage, applicants should prevail if any circuit is likely to recognize the validity of her claim.

69. The new credible fear policies also seek to eliminate asylum seekers' ability to rely on federal circuit law by providing that the "relevant federal circuit court" from which to apply

decisions—to the extent the guidance permits such reliance at all—"is the circuit where the removal proceedings will take place if the officer makes a positive credible fear . . . determination." *See, e.g.*, USCIS Guidance at 8-9. The new credible fear policies then go on to assert that "the asylum officer should faithfully apply precedents of the Board and, if necessary, the circuit where the alien is physically located during the credible fear interview." *Id.* at 9.

70. This marks a dramatic change in policy. For example, for years, asylum officers have been trained that where circuit courts disagree on an issue of law, "generally the interpretation most favorable to the applicant is used when determining whether the applicant meets the credible fear standard." *See, e.g.*, Refugee, Asylum, and International Operations Directorate Officer Training Asylum Officer Training Course ("RAIO Training Course"), Credible Fear of Persecution and Torture Determinations (Feb. 13, 2017), at 17; RAIO Training Course, Credible Fear of Persecution and Torture Determinations (Feb. 28, 2014), at 16 (same); RAIO Training Course, Credible Fear of Persecution and Torture Determinations (Apr. 14, 2006), at 14 (same). This means that the relevant circuit law to apply is the most favorable circuit on that issue for the asylum seeker. The credible fear policies offer no adequate explanation for this change.

71. The prior policy of giving applicants the benefit of the most favorable circuit law is in keeping with the credible fear standard. If an applicant will prevail under a particular circuit's caselaw, then by necessity there is a significant possibility that she will prevail. The new policies, by contrast, violate the credible fear standard.

72. The new credible fear policies contain numerous other legal errors affecting the credible fear process.

73. Taken together, these changes impermissibly distort the credible fear process and undermine Congress's intent that the credible fear standard be a low, threshold standard that would not screen out any potentially meritorious claims.

### D. Defendants Sessions' and Nielsen's Public Statements Regarding Their Goal to Undermine Asylum Protections

74. Rather than comply with our asylum laws, Defendant Sessions and Defendant Nielsen have been open about their desire to weaken asylum protections, particularly for victims of domestic violence and gangs from Central America. Indeed, Defendant Sessions has repeatedly expressed his hostility towards such claims, and urged a higher credible fear screening standard in order to speed the removal of such individuals. The new policies seek to advance these goals.

75. For example, in October 2017, speaking to the Executive Office for Immigration Review, Defendants Sessions expressed his apparent view that the "particular social group" ground for asylum protection should not be included in the statute. The Attorney General stated that our asylum laws "are meant to protect those who because of characteristics like their race, religion, nationality, or political opinions cannot find protection in their home countries."[2] He did not acknowledge the "particular social group" ground. Instead, he complained that other claims— which he deemed "insubstantial," "vague," and "subjective" –have "swamped our system."[3] Because he listed the other four protected grounds as proper asylum claims, his implication was that claims based on a "particular social group" are insubstantial.

76. Defendant Sessions was also explicit about his goal to "elevate the threshold standard of proof in credible fear interviews."[4]

---

[2] Attorney General Jefferson Beauregard Sessions III, Remarks to the Executive Office for Immigration Review, Falls Church, VA (Oct. 12, 2017).
[3] *Id.*
[4] *Id.*

77. The same day he issued *Matter of A-B-*, he told an audience of immigration judges that "the vast majority of the current asylum claims are not valid."[5]

78. Defendant Nielsen has likewise been explicit about her goal of heightening the credible fear standard as well, testifying before a January 16, 2018, Senate hearing that "we must tighten case processing standards, including the 'credible-fear' standard[.]"[6]

79. Thus, the unlawful efforts to heighten the credible fear standard evinced in the credible fear policies culminated from Defendants' express desires to change that standard. But neither Defendant Sessions nor Defendant Nielsen have the power to change the credible fear standard, which can be changed only by Congress.

**E. The New Credible Fear Policies Place Plaintiffs in Grave Danger**

80. Under the correct legal standards, each of the Plaintiffs should have easily passed the credible fear interview and would have been referred for regular removal proceedings to seek asylum. Instead, because of the new credible fear policies, they were each issued a negative credible fear determination.

81. Many other bona fide asylum applicants who meet the credible fear standard similarly have received and will receive negative credible determinations based on the new policies.

82. Defendants' new policies are depriving Plaintiffs and other asylum seekers of their right to pursue potentially meritorious claims for protection. Indeed, immigration service providers across the country have already reported that the new credible fear policies are causing a dramatic increase in the proportion of asylum seekers who receive negative credible fear determinations.

---

[5] Attorney General Jefferson Beauregard Sessions III, Remarks to the Executive Office for Immigration Review Legal Training Program, Washington, D.C. (June 11, 2018).
[6] Secretary Kirstjen M. Nielsen, Department of Homeland Security, Testimony at Hearing Before the Senate Committee on Judiciary (Jan. 16, 2018).

83. The result is that individuals have been and will continue to be sent back to countries that have repeatedly been cited for their pervasive and widespread violence against women and children, including domestic violence, rape, and beatings, and other abuse by gangs. For example, it has been widely recognized, including by the State Department in 2018, that El Salvador has one of the highest homicide rates in the world, and Amnesty International has described El Salvador as "one of the most dangerous countries to be a woman." Numerous other reports, including by the UNHCR, have documented that gender-motivated killings and other murders of women in El Salvador, Honduras and Guatemala are commonplace, and that Central American gangs perpetrate "pervasive, pernicious, and often uncontrollable violence and disruption in the region." Human rights reports have also widely documented the systemic failures in state protection in Central American countries.

84. Indeed, numerous migrants from Central America who were deported from the United States have suffered brutal harms, including death, after returning to their home countries. For example, one study documented that up to 83 individuals deported to Northern Triangle countries between 2014 and 2015 have been killed.

85. Without judicial intervention, the Defendants will be able to effectively rewrite the expedited removal scheme and substantive asylum law to achieve the policy goal of eliminating the ability of Central American refugees to seek safety in the United States.

### FIRST CLAIM FOR RELIEF

#### (Refugee Act, Immigration and Nationality Act, Administrative Procedure Act)

86. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

87. Pursuant to 8 U.S.C. § 1252(e)(3), judicial review is available before the Court regarding whether "a written policy directive, written policy guideline, or written procedure issued by or

under the authority of the Attorney General to implement [8 U.S.C. § 1252(b)] is not consistent

with applicable provisions of [Subchapter II of the INA] or is otherwise in violation of law."

88. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides that a Court "shall

hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to

constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right."

89. The new credible fear policies relating to *Matter of A-B-* violate the INA and the Refugee

Act and are arbitrary and capricious and contrary to law under the APA for multiple reasons.

Among other reasons, the new policies conflict with the definition of "refugee," *see* 8 U.S.C. §§

1101(a)(42)(A), 1158(b)(1)(A); conflict with the credible fear standard at 8 U.S.C. §

1225(b)(1)(B)(v); represent a departure from the agency's longstanding policy without an

acknowledgement of or a reasoned explanation for that departure; are illogical and irrational; and

deprive credible fear applicants of a meaningful opportunity to establish their potential eligibility

for asylum pursuant to 8 U.S.C. §§ 1158(b)(1) and 1225(b)(1)(B).

## SECOND CLAIM FOR RELIEF

### (Separation of Powers, Immigration and Nationality Act, Administrative Procedure Act)

90. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91. The doctrine of separation of powers is embodied in the U.S. Constitution.  The

Constitution establishes the paramount authority of the Judiciary to interpret the law—"to say

what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)–and to render decisions that

bind the other branches of government in our constitutional system.  The Executive Branch–like

Congress–is bound by the decisions issued by the federal courts.  Respect for the controlling

authority of judicial opinions and judgments is a fundamental component of the rule of law.  The new credible fear policies violate the separation of powers; violate the INA, including the credible fear standard at 8 U.S.C. § 1225(b)(1)(B)(v); and are arbitrary and capricious and contrary to law under the APA.

92. In addition, the new mandate to ignore contrary circuit court precedent, and to apply only the case law in the circuit where the credible fear applicant is detained, is arbitrary and capricious and contrary to law in violation of the APA.

## THIRD CLAIM FOR RELIEF

### (Due Process Clause of the Fifth Amendment to the United States Constitution)

93. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

94. Plaintiffs have protected interests in applying for asylum, withholding of removal, and Convention Against Torture relief upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life.

95. Plaintiffs are entitled under the Due Process Clause to a fair hearing of their claims, and a meaningful opportunity to establish their potential eligibility for asylum and related relief from removal.

96. The new credible fear policies relating to *Matter of A-B-* have violated Plaintiffs' right to due process in numerous respects, including by foreclosing their claims regardless of their individual facts or merits; by applying an unlawful, more burdensome legal standard to Plaintiffs' claims; and by depriving them of a meaningful opportunity to establish their potential eligibility for asylum and related relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a. Declare the new credible fear policies (including but not limited to *Matter of A-B-*, the USCIS Guidance, and all written credible fear guidance issued by DHS and DOJ relating to *Matter of A-B-*) contrary to law;

b. Enter an order vacating the new credible fear policies (including but not limited to *Matter of A-B-*, the USCIS Guidance, and all written credible fear guidance issued by DHS and DOJ relating to *Matter of A-B-*);

c. Enter an order enjoining Defendants from continuing to apply the new credible fear policies (including but not limited to *Matter of A-B-*, the USCIS Guidance, and all written credible fear guidance issued by DHS and DOJ relating to *Matter of A-B-*) to credible fear determinations, interviews, or hearings issued or conducted by asylum officers or immigration judges;

d. Enter an order staying the expedited removal of each of the Plaintiffs and vacating the expedited removal orders issued to each of the Plaintiffs;

e. Enter an order enjoining Defendants from removing the Plaintiffs without first providing each of them with a new credible fear process under correct legal standards or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a; and, for any Plaintiffs who have been removed pursuant to an expedited removal order prior to the Court's order, to parole those Plaintiffs into the United States for the duration of those credible fear and/or removal proceedings;

f.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice

Act, and any other applicable statute or regulation; and

g.  Grant such further relief as the Court deems just, equitable, and appropriate.


Dated: August 7, 2018                              Respectfully submitted,

Jennifer Chang Newell**                          Scott Michelman (D.C. Bar No. 1006945)
Katrina Eiland**                                 Arthur B. Spitzer (D.C. Bar No. 235960)
Cody Wofsy**                                     American Civil Liberties Union Foundation
American Civil Liberties Union Foundation             of the District of Columbia
Immigrants' Rights Project                       915 15th Street NW, Second Floor
39 Drumm Street                                  Washington, D.C. 20005
San Francisco, CA 94111                          (202) 457-0800
(415) 343-0774

                                                 Eunice Lee**
Judy Rabinovitz**                                Karen Musalo**
Omar C. Jadwat**                                 Anne Dutton**
Lee Gelernt**                                    Center for Gender & Refugee Studies
Celso J. Perez*** (D.C. Bar No. 1034959)         200 McAllister St.
American Civil Liberties Union Foundation,       San Francisco, CA 94102
Immigrants' Rights Project                       (415) 565-4877
125 Broad Street, 18th Floor
New York, NY 10004                               Thomas Buser-Clancy
(212) 549-2600                                   Andre Segura
                                                 ACLU Foundation of Texas
Sandra S. Park**                                 P.O. Box 8306
Lenora M. Lapidus                                Houston, TX 77288
American Civil Liberties Union Foundation,       (713) 942-8146
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7871

*Attorneys for Plaintiffs*

**Pro hac vice application forthcoming*
****Admission to D.D.C. forthcoming*