# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GRACE, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFERSON BEAUREGARD SESSIONS, III, | ) | No. 1:18-cv-01853 (EGS) |
| Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

  A. The Expedited Removal System and Credible Fear ............................................... 4

  B. Asylum Framework ............................................................................................... 6

  C. Gender and Gang-Based Asylum Claims.............................................................. 7

  D. *Matter of A-B-* and the New Credible Fear Policies ........................................... 10

LEGAL STANDARD............................................................................................................ 12

ARGUMENT ...................................................................................................................... 13

  I. PLAINTIFFS' CLAIMS ARE JUSTICIABLE..................................................... 13

    A. 8 U.S.C. § 1252(e)(3) Authorizes Review of Plaintiffs' Claims. .................... 13

    B. Plaintiffs Have Standing. ............................................................................... 20

      1. Plaintiffs Have Standing to Challenge the USCIS Guidance. ..................... 20

      2. Plaintiffs' Claims Are Timely and Their Injuries Are Redressable............ 24

  II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS, AND
    DEFENDANTS' MOTION SHOULD BE DENIED. ....................................... 25

    A. The General Rule Against Claims Related to Domestic Violence
      and Gangs Violates the INA, the Refugee Act, the APA, and Due Process. .............. 27

      1. The General Rule Against Claims Related to Domestic and Gang-Based Violence
      Violates the Right to an Individualized Determination and is
      Arbitrary and Capricious. ............................................................................ 28

2. The Improper Pressure to Rule Against Claims Related to Domestic Violence and Gang-Based Violence Violates Due Process. ............................................................ 32

B. The New "Condoned" or "Complete Helplessness" Formulation Violates the Refugee Act, the INA, and the APA. ........................................................................................... 38

C. The New Nexus Rule Violates the INA, Refugee Act, and APA. .................................. 43

D. The New Rule Regarding Circularity of Social Groups Relating to Domestic Violence is Unlawful. .................................................................................................................... 46

E. The Requirement of an "Exact Delineation" of the Particular Social Group Violates the INA and the APA. .......................................................................................................... 49

F. The Instruction to Exercise Adverse Discretion at the Credible Fear Stage Violates the INA. .............................................................................................................................. 51

G. The Blanket Direction to Disregard Circuit Court Decisions Is Unlawful. .................... 53

1. The Policy of Disregarding Circuit Law Violates the Separation of Powers, the INA and the APA. ............................................................................................................. 53

2. The "Relevant Circuit" Policy Violates the INA and the APA. .................................. 58

III. PLAINTIFFS ARE ENTITLED TO PERMANENT RELIEF. ........................................ 61

A. The Court Has Power to Order the Remedies Plaintiffs Seek. ....................................... 61

B. The Balance of Equities Favors the Issuance of an Injunction. ...................................... 63

CONCLUSION ..................................................................................... 64

# TABLE OF AUTHORITIES

## Cases

*Abulashvili v. Att'y Gen.*, 663 F.3d 197 (3d Cir. 2011) ................................................ 35

*Anderson v. Heckler*, 756 F.2d 1011 (4th Cir. 1985) .................................................... 57

*AILA v. Reno*, 18 F.Supp.2d 38 (1998) ................................................................... 17, 18

*\*Aldana-Ramos v. Holder*, 757 F.3d 9 (1st Cir. 2014) ........................................... 10, 28

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................ 20

*Benitez-Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009) ............................................. 10

*Bi Xia Qu v. Holder*, 618 F.3d 602 (6th Cir. 2010) ....................................................... 7

*Bolante v. Keisler*, 506 F.3d 618 (7th Cir. 2007) ........................................................ 63

*Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667 (1986) ........................ 20

*\*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) (en banc) ........... 30, 40

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ....................................... 32, 33

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) ............................... 24

*Castaneda-Castillo v. Holder*, 638 F.3d 354 (1st Cir. 2011) ...................................... 44

*Castro v. USDHS*, 835 F.3d 422 (3d Cir. 2016) ..................................................... 19, 37

*Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013) (en banc) ........................................ 7, 47

*\*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ......... passim

*Christensen v. Harris County*, 529 U.S. 576 (2000) ................................................... 60

*Cordova v. Holder*, 759 F.3d 332 (4th Cir. 2014) ...................................................... 10

*Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011) ..................................... 40

*Damus v. Nielsen*, -- F.Supp.3d. --, 2018 WL 3232515 (D.D.C. July 23, 2018) ........ 64

*\*Defs. of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008) ............................. 21, 23

*Doe v. Holder*, 736 F.3d 871 (9th Cir. 2013) ............................................................ 41

*Fajardo v. U.S. Atty. Gen.*, 659 F.3d 1303 (11th Cir. 2011)...........................................56

*Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993) .........................................................................7

*Ferreira v. Lynch*, 831 F.3d 803 (7th Cir. 2016) (per curiam) .........................................6

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) .......................................................... 29, 45

*Galina v. INS*, 213 F.3d 955 (7th Cir. 2000)...................................................................42

*Garcia v. U.S. Att'y Gen.*, 665 F.3d 496 (3d Cir. 2011) ............................................ 10, 28

*Gathungu v. Holder*, 725 F.3d 900 (8th Cir. 2013) .................................................. 10, 40

*Gomez Zuluaga v. Att'y Gen. of U.S.*, 527 F.3d 330 (3d Cir. 2008)..............................10

*Gutierrez-Rogue v. INS*, 954 F.2d 769 (D.C. Cir. 1992) .................................................37

*Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007) .........................................................28

*Hengan v. INS*, 79 F.3d 60 (7th Cir. 1996).....................................................................41

*Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc) .........................10

*\*Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2014) .........................................10

*Hor v. Gonzales*, 400 F.3d 482 (7th Cir. 2005) .............................................................42

*Hor v. Gonzales*, 421 F.3d 497 (7th Cir. 2005) .............................................................42

*\*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ..............................................5, 38, 40

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) .................................................................45

*INS v. St. Cyr*, 533 U.S. 289 (2001)........................................................................ 20, 52

*Islam v. Gonzales*, 469 F.3d 53 (2d Cir. 2006).............................................................33

*Ivanov v. Holder*, 736 F.3d 5 (1st Cir. 2013)...........................................9, 28, 29, 41

*\*Judulang v. Holder*, 565 U.S. 42 (2011)......................................................54, 56, 61

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) .....................................................37

*Kucana v. Holder*, 558 U.S. 233 (2010) ........................................................................63

*Lone Mountain Processing, Inc. v. Sec'y of Labor,
  709 F.3d 1161 (D.C. Cir. 2013) ............................................................... 30, 45, 53, 54

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992) .......................................... 20

*Lukwago v. Ashcroft, 329 F.3d 157 (3d Cir. 2003)..................................... 47

M.G.U. v. Nielsen, No. 18-1458, 2018 WL 3474189 (D.D.C. July 18, 2018) ............................ 64

Madrigal v. Holder, 716 F.3d 499 (9th Cir. 2013) ........................................ 44

*Maldonado-Perez v. INS, 865 F.2d 328 (D.C. Cir. 1989) ............................ 37

Marbury v. Madison, 5 U.S. 137 (1803)......................................................... 53

Martinez v. Holder, 740 F.3d 902 (4th Cir. 2014).......................................... 10

Mathews v. Diaz, 426 U.S. 67 (1976) ............................................................ 35

Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018)...................................... passim

*Matter of Acosta, 19 I&N Dec. 211 (BIA 1985) .................................. passim

Matter of A-M-E- & J-G-U-, 24 I&N Dec. 69 (BIA 2007) ..................... 46, 47

Matter of A-R-C-G-, 26 I&N Dec. 388 (BIA 2014) ....................................... 9

Matter of C-A-, 23 I&N Dec. 951 (BIA 2006) .............................................. 46

Matter of Eusaph, 10 I&N Dec. 453 (BIA 1964) .......................................... 39

Matter of Gonzalez, 16 I&N Dec. 134 (BIA 1977) ....................................... 60

Matter of J-B-N- & S-M-, 24 I&N Dec. 208 (BIA 2007) .............................. 44

*Matter of Kasinga, 21 I&N Dec. 357 (BIA 1996).................................... 7, 8

Matter of M-E-V-G-, 26 I&N Dec. 227 (BIA 2014)....................................... 29

Matter of Murchison, 349 U.S. 133 (1955) ............................................. 32, 33

*Matter of S-A-, 22 I&N Dec. 1328 (BIA 2000) ............................................ 8

Matter of Waldei, 19 I&N Dec. 189 (BIA 1984)............................................ 60

McMullen v. INS., 658 F.2d 1312 (9th Cir. 1981) ......................................... 39

v

*Menjivar v. Gonzales*, 416 F.3d 918 (8th Cir. 2005) ................................................ 42

*MikLin Enterprises, Inc. v. Nat'l Labor Relations Bd.*, 861 F.3d 812 (8th Cir. 2017) ................ 56

*Moody v. Holman*, 887 F.3d 1281 (11th Cir. 2018) ................................................ 42

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ........ 54, 57, 58

*Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012) ............................ 13

*Ngengwe v. Mukasey*, 543 F.3d 1029 (8th Cir. 2009) ................................................ 7

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................ 64

*O'Donnell Const. Co. v. D.C.*, 963 F.2d 420 (D.C. Cir. 1992) .................................... 64

*Osorio-Martinez v. Attorney Gen*, 893 F.3d 153 (3d Cir. 2018) ................................ 19

*Pak v. Reno*, 196 F.3d 666 (6th Cir. 1999) ................................................ 52

*Perdomo v. Holder*, 611 F.3d 662 (9th Cir. 2010) ................................................ 7, 48

*\*Pereira v. Sessions*, 138 S. Ct. 2105 (2018) ................................................ 54, 55, 56

*Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014) ................................................ 29

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 1 (D.D.C. 2015) ...................................... 36, 64

*Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989) ................................................ 37

*Rasul v. Meyers*, 563 F.3d 527 (D.C. Cir. 2009) (per curiam) .................................... 37

*Rosa v. INS*, 440 F.2d 100 (1st Cir. 1971) ................................................ 39

*Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018) ........................................ 28, 29

*\*Sarhan v. Holder*, 658 F.3d 649 (7th Cir. 2011) ................................................ 7, 8

*Shabaj v. Holder*, 718 F.3d 48 (2d Cir. 2013) (per curiam) ...................................... 14

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) .............................. 36

*Shehu v. Gonzales*, 443 F.3d 435 (5th Cir. 2006) ................................................ 42

*Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*,
    841 F. Supp. 2d 349 (D.D.C. 2012) ................................................ 13

*Spirit of Sage Council v. Norton*, 294 F. Supp. 2d 67 (D.D.C. 2003) ........................................... 12

*Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013) ................................................................................. 24

*Texas Children's Hosp. v. Azar*, 315 F. Supp. 3d 322 (D.D.C. 2018) .......................................... 60

*Thomas v. Clements*, 797 F.3d 445 (7th Cir. 2015) ...................................................................... 43

*Transportation Workers Union of Am. v. TSA*, 492 F.3d 471 (D.C. Cir. 2007) ........................... 24

*Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990) .................................. 37

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................................................... 60

*\*United States v. Raya-Vaca*, 771 F.3d 1195 (9th Cir. 2014) ...................................................... 36

*Urbina-Mejia v. Holder*, 597 F.3d 360 (6th Cir. 2010) ................................................................. 10

*Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 502 F.3d 285 (3d Cir. 2007) .................................... 10

*W.G.A. v. Sessions*, --- F.3d ---, 2018 WL 3979276 (7th Cir. Aug. 21, 2018) ........................... 28

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) .......................................................................... 63

*Yadegar Sargis v. INS*, 297 F.3d 596 (7th Cir. 2002) .................................................................... 7

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................................... 35

*\*Zhang v. Holder*, 585 F.3d 715 (2d Cir. 2009) ............................................................................. 6

## Statutes

6 U.S.C. § 557 ................................................................................................................................ 14

8 U.S.C. § 1101(a)(42) ................................................................................................................... 39

8 U.S.C. § 1101(a)(42)(A) ..................................................................................................... 6, 7, 43, 55

8 U.S.C. § 1101(b)(4) ..................................................................................................................... 34

8 U.S.C. § 1158(b)(1)(A) ................................................................................................................. 6

8 U.S.C. § 1158(b)(1)(B)(i) ................................................................................................... 6, 43, 55

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................................................................. 4

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................................................ 4

8 U.S.C. § 1225(b)(1)(A)(iii) ...................................................................................... 4, 36

8 U.S.C. § 1225(b)(1)(B) ............................................................................................... 4

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................... 5, 53, 58

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ............................................................................. 30, 37

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ....................................................................... 5, 24, 30

8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................... passim

8 U.S.C. § 1225(b)(1)(C) ............................................................................................. 19

8 U.S.C. § 1229 ............................................................................................................. 5

8 U.S.C. § 1229a ........................................................................................................... 5

8 U.S.C. § 1252(a)(2)(A)(iii) ....................................................................................... 19

8 U.S.C. § 1252(b)(9) .................................................................................................. 19

8 U.S.C. § 1252(e)(2) ................................................................................................... 19

8 U.S.C. § 1252(e)(3) ........................................................................................... passim

## Regulations

8 C.F.R. § 208.30 .......................................................................................................... 4

8 C.F.R. § 208.30(e)(1) ................................................................................................ 30

8 C.F.R. § 208.30(e)(2) ................................................................................................ 51

8 C.F.R. § 208.30(f) ...................................................................................................... 5

8 C.F.R. § 208.30(g)(1) ................................................................................................. 5

8 C.F.R. § 208.9(b) ................................................................................................. 37, 50

8 C.F.R. § 208.9(e) ...................................................................................................... 37

8 C.F.R. § 235.3(b)(4) ................................................................................................... 4

8 C.F.R. § 1001.1(q) ............................................................................... 36

8 C.F.R. § 1003.10 .................................................................................. 36

8 C.F.R. § 1208.30(g)(2)(iv)(A) ............................................................... 5

8 C.F.R. § 1240.2 .................................................................................... 51

Asylum and Withholding Definitions, 65 Fed. Reg. 76,588 (Dec. 7, 2000) ............................... 49

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004) ............... 4, 36

Detention Following a Determination of Credible Fear,
  62 Fed. Reg. 10,312 (Mar. 6, 1997) ............................................................ 5

**Legislative History**

142 Cong. Rec. S11491 (daily ed. Sept. 27, 1996) ........................................... 5

H.R. Conf. Rep. No. 109-72 (2005) ........................................................... 45

H.R. Rep. No. 104-469 (1996) ................................................................ 5

**Other Authorities**

UNHCR, Guidelines on International Protection: "Membership of a particular social group,"
  U.N. Doc. HCR/GIP/02/02 (May 7, 2002), ................................................ 46, 47

## INTRODUCTION

Plaintiffs are twelve adults and children who sought asylum in the United States after suffering pervasive sexual abuse, kidnapping, beatings, shootings, or other grave harm in their home countries in Central America.  Because Plaintiffs were placed in a summary deportation process known as "expedited removal," they were required to pass a threshold "credible fear" screening before they would be entitled to a full hearing on their asylum claims.  The credible fear process is a critical safeguard in the expedited removal system.  When Congress established expedited removal in 1996, it deliberately established a low threshold screening standard so that no one with a potentially meritorious asylum claim would be sent back to danger.

But Plaintiffs' claims were rejected at the threshold stage because of the new credible fear policies challenged in this case, which seek to foreclose claims related to domestic violence and gang violence at the credible fear stage.  Defendants' new credible fear policies are reflected in an Attorney General decision, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), and two subsequent Guidance documents from the United States Citizenship and Immigration Services ("USCIS").  Because these new policies impose an unlawful, heightened credible fear standard, Plaintiffs and others like them have been wrongfully denied the right to submit a full application for asylum, and ordered removed to countries that have been universally recognized as among the most dangerous in the world.

The new credible fear policies violate the governing statutes and are arbitrary and capricious.  The challenged policies single out claims involving domestic violence and gang violence for denial, instructing adjudicators that such claims generally cannot meet the credible fear standard.  But there is simply no legal basis in immigration law for the extraordinary new rule against those categories of claims.  Rather, like all other credible fear claims, those relating

to domestic violence or gang harms are entitled to individualized, fact-specific consideration under the established, general standards.

The new policies further unlawfully direct credible fear adjudicators to ratchet up the various showings required for a credible fear claim, in ways that particularly burden claims related to domestic violence or gang violence.  They dictate an incorrect standard for claims based on persecution by non-governmental actors, requiring that applicants show their home government has "condoned" the persecution or is "completely helpless" to provide protection.  The new policies further direct asylum officers to presume, contrary to the statutory standard, that applicants with a personal relationship to their persecutor will often be unable to demonstrate their persecution is "on account of" (or has a "nexus" to) one of the five protected grounds for asylum – like religion or political opinion.  Further, for applicants whose claims are based on membership in a "particular social group" – another protected ground – the new credible fear policies break with well-established law in directing adjudicators to reject certain domestic violence-related social group definitions.  And the new policies unlawfully impose two aspects of ordinary, non-expedited removal proceedings which are fundamentally incompatible with the credible fear standard and process: a requirement that credible fear applicants articulate the relevant particular social group; and a directive that adjudicators should exercise discretion to deny claims at the credible fear stage.  Finally, the policies unlawfully instruct asylum officers to disregard all circuit court authority that is inconsistent with *Matter of A-B-*, directing officers to ignore decades of governing precedent and ignoring courts' critical role as arbiters of the law.

In response, Defendants argue that the challenged policies are not reviewable under 8 U.S.C. § 1252(e)(3) – which authorizes judicial review of written policies implementing the expedited removal system.  But Plaintiffs have come to this Court within the required timeframe,

2

challenging written policy guidance that instructs adjudicators on how to conduct credible fear proceedings.  Indeed, *Matter of A-B-* expressly addresses "the legal standard to determine whether an alien has a credible fear of persecution," 27 I&N Dec. at 320 n.1 (citing the expedited removal statute, 8 U.S.C. § 1225(b)(1)(B)(v)), and the USCIS Guidance is plainly reviewable under § 1252(e)(3).  There is no question that this case is justiciable.

On the merits of Plaintiffs' claims, Defendants' motion has strikingly little to say.  For example, with respect to the new rule singling out domestic violence and gang-related claims, curiously, Defendants are mostly silent.  They certainly do not attempt to defend the rule – yet they also seem unwilling to outright deny that the new credible fear policies instruct adjudicators to deny the vast majority of such claims.  And the merits defenses they do offer fall flat.  Defendants attempt to defend the policy of disregarding all circuit precedent inconsistent with *Matter of A-B-* by claiming blanket deference for everything in the decision under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  But that assertion is contrary to bedrock *Chevron* analysis, which is highly specific to a particular statutory term and interpretive question at issue.  Indeed, the government's assertion that the whole decision is entitled to deference as an interpretation of the statutory term "particular social group," Doc. 57-1 ("Def. MSJ") at 26, is clearly wrong.  The new credible fear policies relating to the state protection standard and nexus, for example, apply to claims based on *any* of the five protected grounds, and they are unlawful for reasons that have nothing to do with the interpretation of "particular social group."

Defendants largely focus on attempting to downplay the changes.  But the reality is that the challenged policies constitute a dramatic and unjustified break from the governing statutes and longstanding policies.  These new expedited removal credible fear policies violate the

Immigration and Nationality Act ("INA"), the Refugee Act, the Administrative Procedure Act ("APA"), the Separation of Powers, and the Due Process Clause.  Accordingly, Plaintiffs' cross motion for summary judgment should be granted, and Defendants' motion should be denied.

## BACKGROUND

### A.      The Expedited Removal System and Credible Fear

Prior to 1996, no person could be removed from the United States without a full hearing before an immigration judge, with the right to administrative and judicial review.  However, in 1996, Congress amended the INA to provide for "expedited removal," allowing certain persons who are seeking admission to the United States or who have entered the country without inspection to be summarily removed without a hearing or any process other than a cursory inspection by an immigration officer.  *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (A)(iii); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).

Congress specifically provided for judicial review of the expedited removal "system," granting jurisdiction to this Court to review any claim that a written policy "directive," "guideline," "procedure" or "regulation" implementing expedited removal is "not consistent with the applicable provisions of this title or is otherwise in violation of law."  8 U.S.C. § 1252(e)(3).

A critical part of the expedited removal process is the exception that Congress carved out for individuals with a "credible fear" of persecution.  If an individual indicates any fear of return to his or her home country, the immigration officer must refer the individual for an interview with a USCIS asylum officer to assess whether the applicant has a credible fear of persecution or torture.  *See* 8 C.F.R. § 208.30; 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(B).  If the asylum officer finds that that the individual does have a "credible fear," meaning a "significant possibility" of eligibility for asylum, the individual is taken out of the

expedited removal process and referred for a regular removal hearing before an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (v).  At such a hearing, the individual will have the opportunity to develop a full record with respect to his or her asylum claim, and an adverse decision may be appealed to the Board of Immigration Appeals ("BIA") and the federal court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 U.S.C. §§ 1229, 1229a.

If the asylum officer makes a negative credible fear determination, the individual may request review by an immigration judge.  That abbreviated review is only of the negative credible fear determination (not ultimate eligibility for asylum) and does not include the procedural protections of a regular immigration court removal proceeding.  8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1).  The immigration judge's decision is "final and may not be appealed."  8 C.F.R. § 1208.30(g)(2)(iv)(A).

Significantly, Congress established the credible fear standard as a low threshold that would ensure that all potentially meritorious claims receive a full hearing.  To prevail at the credible fear stage, an applicant need only show a "significant possibility" of asylum eligibility – i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a *fraction* of 10%.  *See* 8 U.S.C. § 1225(b)(1)(B)(v); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (well-founded fear showing can be met with only 10% chance of persecution).  That standard is "a low screening standard for admission into the usual full asylum process."  142 CONG. REC. S11491 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch, a principal sponsor); *see also* Detention Following a Determination of Credible Fear, 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997) (stating that credible fear is "a low threshold of proof of potential entitlement to asylum," the purpose of which is to ensure access to a full hearing for all individuals who have such potential entitlement); H.R. REP. NO. 104-469, pt. 1, at 158 (1996) (Congress intended that "there should

be no danger that an alien with a genuine asylum claim will be returned to persecution"); Pls. Prelim. Inj. Mem., Doc. 10-1 ("PI") at 9-11.

Given this low statutory screening standard, "credible fear interviews are not designed to elicit all the details of an alien's claim[.]'" *Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009); *see also Ferreira v. Lynch*, 831 F.3d 803, 809 (7th Cir. 2016) (per curiam) (citing disclaimer on credible fear form that "[t]here may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening"). The low threshold reflects that the credible fear interview typically occurs within days of arrival, while the applicant – who is frequently traumatized – is detained, unprepared, and unrepresented. *Zhang*, 585 F.3d at 724 (a detained "alien appearing at a credible fear interview . . . is . . . likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival"); Pl. Fact 46, ABROP0623 (Declaration of Stuart Lustig) ("Lustig Decl."), ¶ 8 (explaining that border interviews of asylum seekers that "occur in settings such as jails or detention centers" can trigger trauma reactions that make disclosing details difficult).[1]

## B.    Asylum Framework

There are well-settled standards applicable to determining whether an individual is eligible for asylum: A noncitizen must establish that she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1)(A); *see also id.* § 1158(b)(1)(B)(i). A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last

---

[1] Defendants have used the following pagination conventions for the administrative record: ABROP0001 for *Matter of A-B-*, and USCIS000001 for the USCIS Guidance.

habitually resided, and who is unable or unwilling to return to, and is unable or
unwilling to avail himself or herself of the protection of, that country because of
persecution or a well-founded fear of persecution on account of race, religion,
nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A).  An applicant fearing harm by non-governmental actors is eligible for

asylum if the other criteria are met and her government is "unable or unwilling to control" the

persecutor.  *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985).  Notably, the definition of

"refugee" does not require a showing of certain harm, but only a "well-founded fear of

persecution."

### C.     Gender and Gang-Based Asylum Claims

Applying these settled standards, the BIA and courts have, for decades, extended asylum

protections to women fleeing a range of gender-based harms.  For example, a landmark 1985

BIA decision recognized that "sex" could satisfy the requirement that a particular social group

definition must include an immutable characteristic.  *Matter of Acosta*, 19 I&N Dec. at 233; *see
also Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (Alito, J.) (same).  As the BIA later

observed, "[t]here is nothing about a social group definition based upon gender that requires us

to treat it as either an aberration, or as an unanticipated development requiring a new standard."

*Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996).[2]

---

[2] *See, e.g.*, *Cece v. Holder*, 733 F.3d 662, 672 (7th Cir. 2013) (en banc) (recognizing
social group of young Albanian women living alone in context of sex trafficking); *Sarhan v.
Holder*, 658 F.3d 649, 655 (7th Cir. 2011) (recognizing social group in context of "honor
killings"); *Ngengwe v. Mukasey*, 543 F.3d 1029, 1034 (8th Cir. 2009) (recognizing social group
of "Cameroonian widows"); *Bi Xia Qu v. Holder*, 618 F.3d 602, 607 (6th Cir. 2010) (recognizing
social group based on gender, nationality, and past harm in context of "honor killings" and
forced marriage); *Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010) (reversing summary
rejection of the social group "all women in Guatemala" in context of femicide); *Yadegar Sargis
v. INS*, 297 F.3d 596, 603 (7th Cir. 2002) (recognizing social group based on gender, religion,
and opposition to dress codes).

Likewise, the BIA and courts have routinely applied the ordinary asylum rules to determine that claims focused on familial or other personal relationships can succeed, including in the context of gender violence. *See, e.g.*, *Matter of Kasinga*, 21 I&N Dec. at 358, 368 (granting asylum to applicant fleeing female genital cutting threatened by her husband and aunt); *Matter of S-A-*, 22 I&N Dec. 132 (BIA 2000) (granting asylum to a woman who endured abuse by her father due to her refusal to conform to his religious beliefs on proper gender roles). These and similar cases have recognized that, although a family relationship exists and is part of the explanation for the persecution, adjudicators must assess whether the persecutor was also motivated by a protected ground for asylum in light of the broader social context, including norms that subordinate and discriminate against women. *See, e.g.*, *Sarhan*, 658 F.3d at 656.

Likewise, DHS and its predecessor agency have long recognized that gender-related harms can constitute persecution, that such persecution can have the requisite link to a protected ground, and that harm perpetrated by non-state actors in the absence of state protection – including family or other close relationships – can give rise to asylum eligibility.[3]

The same general standards apply to claims involving domestic violence. Like all cases, individual applicants must establish the prerequisites for an asylum claim. There has never been a categorical bar against such claims, nor a blanket rule that all claims involving domestic violence are valid. Rather, each case has traditionally been assessed on its merits, measured against the same general standards applicable to all claims.

---

[3] Pl. Fact 11, *Memorandum from Phyllis Coven, INS Office of International Affairs to all INS Asylum Officers and HQASM Coordinators, Considerations for Asylum Officers Adjudicating Asylum Claims for Women* (May 26, 1995), cited in 72 Interpreter Releases 771 (June 5, 1995), 2d Mujahid Decl., Exh. 1; Pl. Fact 11, DHS, Asylum Officer Basic Training Course, Female Asylum Applications and Gender-Related Claims (2009) (citing *id*.), 2d Mujahid Decl., Exh. 2.

DHS first recognized that domestic violence can, under some circumstances, form the basis for asylum in 2004.  *See* Pl. Fact 10, DHS Br., *Matter of R-A-* (Feb. 19, 2004), 2d Mujahid Decl., Exh. 3.  It repeatedly reiterated that position in subsequent cases, including *Matter of A-R-C-G-* and in *Matter of A-B-* itself.  *Matter of A-B-*, 27 I&N Dec. at 319 (explaining DHS position in *Matter of A-R-C-G-*); ABROP0368-409, DHS Br., *Matter of A-B-* (Apr. 20, 2018).[4]  For years, claims involving domestic violence have been granted (and denied) on a case-by-case basis.  *See, e.g.*, *Matter of A-R-C-G-*, 26 I&N Dec. n.12 (2014) (explaining that asylum was eventually granted on a stipulated basis in *Matter of R-A-*).

In *Matter of A-R-C-G-*, the BIA applied these well-established rules to a claim involving domestic violence.  Relying heavily on concessions made by DHS, the BIA held that the particular social group at issue in that case – "married women in Guatemala who are unable to leave their relationship" – was cognizable, and that the requirement of nexus to this protected ground was established.  26 I&N Dec. at 392, 395.  The BIA underscored that the questions were necessarily fact- and case-specific.  *See id*. at 392 (adopting concession regarding social group "under the facts presented in this case"); *id*. (social group "must be evaluated in the context of the evidence presented regarding the particular circumstances in the country"); 395 ("nexus will depend on the facts and circumstances of an individual claim"); *contra* Def. MSJ at 7 (asserting the decision "purport[ed] to resolve . . . questions about domestic violence" in general).

Asylum applicants have also successfully brought claims relating to gang violence in a range of contexts, and under multiple protected grounds.  For example, courts have recognized faith-based targeting of individuals by gangs,[5] as well as resistance to gangs or other organized

---

[4] *See also* ABROP1052-1084, DHS Br., *Matter of L-R-* (Apr. 13, 2009).
[5] *See, e.g.*, *Ivanov v. Holder*, 736 F.3d 5, 8 (1st Cir. 2013).

non-state criminal groups as a potential basis for asylum.[6]  Courts have also acknowledged the

viability of claims brought by witnesses or informants to gang activity,[7] as well as those brought

by renounced gang members who feared persecution at the hands of their former associates.[8]

Courts have also widely recognized that persecution by gangs on account of family ties is

cognizable.[9]

### D.     *Matter of A-B-* and the New Credible Fear Policies

On June 11, 2018, Attorney General Sessions overruled *Matter of A-R-C-G-* in a

precedential decision.  *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).  *Matter of A-B-* vacated a

BIA decision granting asylum to a Salvadoran woman who fled more than fifteen years of

extreme domestic violence at the hands of her then-husband.  The Attorney General criticized the

BIA's decision in *Matter of A-R-C-G-*, particularly for publishing a precedential decision that

relied heavily on legal issues that DHS had conceded.  *See, e.g.*, *id.* at 333.  He also articulated

why the reasoning in *Matter of A-R-C-G-* failed, in his view, to support the conclusions that the

particular social group at issue in that case was cognizable and that nexus had been established.

*See, e.g.*, *id.* at 335 ("The Board's scant analysis did not engage with [the] requirements" for a

social group); *id.* at 338 ("the Board did not evaluate" nexus).  The Attorney General did not

purport to conclude that, as a matter of law, domestic violence cannot form the basis of a viable

asylum claim.  *See id.* at 320.  Nor did he purport to alter the longstanding legal standards.  *Id.* at

---

[6] *See, e.g.*, *Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 502 F.3d 285, 291 (3d Cir. 2007); *Gomez Zuluaga v. Att'y Gen. of U.S.*, 527 F.3d 330, 348 (3d Cir. 2008).

[7] *See e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013) (en banc); *Garcia v. U.S. Att'y Gen.*, 665 F.3d 496, 504 (3d Cir. 2011).

[8] *See e.g.*, *Benitez-Ramos v. Holder*, 589 F.3d 426, 429 (7th Cir. 2009); *Urbina-Mejia v. Holder*, 597 F.3d 360, 366 (6th Cir. 2010); *Gathungu v. Holder*, 725 F.3d 900, 907 (8th Cir. 2013); *Martinez v. Holder*, 740 F.3d 902, 913 (4th Cir. 2014).

[9] *See, e.g.*, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2014); *Cordova v. Holder*, 759 F.3d 332, 339 (4th Cir. 2014); *Aldana-Ramos v. Holder*, 757 F.3d 9, 15 (1st Cir. 2014).

317 (applicants must "satisfy established standards"); *see also* Def. MSJ at 29 ("Aside from

overruling *A-R-C-G-*, *A-B-* did not change U.S. asylum law").

However, the Attorney General reached far beyond the legal issues presented and decided

in that case to opine that few claims pertaining to domestic or gang violence by non-

governmental actors could qualify for asylum or satisfy the credible fear standard. *Matter of A-*

*B-*, 27 I&N Dec. at 320 & n.1.  In support of that conclusion, he articulated new policies and

formulations of settled standards regarding the adjudication of asylum cases.  These new policies

were presented as guidance to adjudicators about how they should apply the settled legal

standards. *See, e.g.*, *id*. at 320 (vast majority of such claims would fail "in practice").

On June 13, 2018, USCIS issued Interim Guidance instructing asylum officers to apply

*Matter of A-B-* to credible fear interviews.  USCIS000011-14, Asylum Division Interim

Guidance -- *Matter of A-B-,* 27 I&N Dec. 316 (A.G. 2018) (hereinafter "USCIS Interim

Guidance" or "Interim Guidance"), June 13, 2018.  On July 11, 2018, USCIS issued final

guidance to asylum officers on assessing asylum claims and credible fear in light of *Matter of A-*

*B-*.  USCIS000001-10, USCIS Policy Memorandum, Guidance for Processing Reasonable Fear,

Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*, July 11, 2018

(PM-602-0162) (hereinafter "USCIS Guidance" or "Guidance").

Taken together, the broad statements included in *Matter of A-B-*, as well as the two

USCIS Guidance documents, established a set of new directives and policies governing credible

fear proceedings (collectively, the "new credible fear policies").  The central policy was that few

if any asylum claims involving domestic violence or gangs should be permitted to pass credible

fear and proceed to a full hearing in regular removal proceedings.  In support of that goal, and

contrary to the governing statutes, the new policies ratchet up standards applicable to credible

fear claims across the board, including the standard for governmental protection in cases involving non-governmental persecution, the test for establishing that the feared persecution bears a "nexus" to a protected ground for asylum, and the showing necessary to establish a particular social group.  In addition, for the first time, the new policies directed that an applicant in credible fear proceedings would be required to articulate the social group she intends to rely on, and would be subject to an exercise of discretion.  Finally, asylum officers considering credible fear interviews were directed to disregard vast swaths of applicable, binding circuit asylum law.  Each new policy, and all of them collectively, elevate the credible fear standard – especially as applied to claims involving domestic violence and gangs – far above what Congress intended.

## LEGAL STANDARD

"[W]hen ruling on cross-motions for summary judgment, the court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on material facts that are not genuinely disputed."  *Spirit of Sage Council v. Norton*, 294 F. Supp. 2d 67, 81 (D.D.C. 2003) (Sullivan, J.), *vacated in part as moot*, 411 F.3d 225 (D.C. Cir. 2005).  On APA review of agency action on summary judgment, the Court "'review[s] the administrative record directly.... [to] ... determine whether the agency has complied with the APA.'"  *Id.* (citations omitted).  Although APA claims are normally reviewed on the administrative record, as Plaintiffs explain in their accompanying motion to consider evidence outside the administrative record, the court may consider extra-record evidence in certain circumstances applicable here, including where such evidence is necessary to enable judicial review of whether the government has departed from a prior policy, and where plaintiffs have brought other claims in addition to

their APA claim.  *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156–57 (D.D.C. 2012);
*see also* Extra Record Evidence Mot., at 1-11.

To obtain a permanent injunction, a plaintiff must show "(1) that it has suffered an
irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate
to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff
and defendant, a remedy in equity is warranted; and (4) that the public interest would not be
disserved by a permanent injunction."  *Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*,
841 F. Supp. 2d 349, 356 (D.D.C. 2012) (citation omitted).[10]

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE JUSTICIABLE.

### A.  8 U.S.C. § 1252(e)(3) Authorizes Review of Plaintiffs' Claims.

Defendants concede, as they must, that § 1252(e)(3) provides jurisdiction to review
written policies to implement expedited removal.  Def. MSJ at 1.  Nonetheless, they argue that
the Court lacks jurisdiction to review the new credible fear policies challenged here because they
do not constitute the kind of policies reviewable under § 1252(e)(3).  *Id.* at 14-18.  This
suggestion is meritless.

By its plain language, § 1252(e)(3) provides jurisdiction to review whether "a written
policy directive, written policy guideline, or written procedure issued by or under the authority of
the Attorney General to implement [8 U.S.C. §1225(b)], is not consistent with applicable
provisions of this subchapter or is otherwise in violation of law."  8 U.S.C. § 1252(e)(3).  The
credible fear policies Plaintiffs challenge fall comfortably within the plain text of the statute.

---

[10] In support of the instant motion and opposition, and in light of the Court's preference
for consolidating Plaintiffs' preliminary injunction motion with the merits under Fed.R.Civ.P.
65(a)(2), Plaintiffs incorporate their preliminary injunction briefing and all evidence submitted in
support of that motion by reference.  *See* Docs. 10-1 through 10-7; Docs. 12-1 through 12-8.

They are in writing and include "policy directives" and "policy guidelines" that implement expedited removal.[11]

Specifically, Plaintiffs challenge the guidance contained in *Matter of A-B-* addressing credible fear determinations, as well as that contained in the two USCIS Guidance documents that instruct asylum officers on how to implement *Matter of A-B-* in credible fear proceedings. In *Matter of A-B-*, the Attorney General instructed that, based on the standards articulated in that decision, few claims pertaining to domestic or gang violence by non-governmental actors would satisfy the credible fear standard. *See* 27 I&N Dec. at 320 & n.1. The written USCIS interim and final guidance further instruct asylum officers on how to apply *Matter of A-B-* to credible fear interviews – including the analyses that credible fear adjudicators must perform, the factors they must consider, and whether certain kinds of claims can satisfy the credible fear standard. *See* USCIS Interim Guidance; Guidance.

Defendants do not dispute that *Matter of A-B-* and the USCIS Guidance apply to credible fear determinations that are made as part of the expedited removal process. *See* Def. MSJ at 14, 21, 23; Pl. Facts 4-5. Moreover, the Guidance expressly provides that the "Authority" for its issuance includes the expedited removal statute and its implementing regulations. USCIS Guidance at 1. Given that these multiple written policies expressly address credible fear and apply to the expedited removal credible fear process, there is no question that they are properly challenged under § 1252(e)(3). Defendants' arguments to the contrary are without merit.

---

[11] *Matter of A-B-* was issued "by . . . the Attorney General." 8 U.S.C. § 1252(e)(3). The USCIS Guidance was issued under the authority of the Secretary of Homeland Security, and the reference in § 1252(e)(3) to the Attorney General is "deemed to refer to the Secretary" as it relates to USCIS. 6 U.S.C. § 557. *See Shabaj v. Holder*, 718 F.3d 48, 51 n.3 (2d Cir. 2013) (per curiam).

First, Defendants contend that *Matter of A-B-* does not "implement" the expedited

removal statute because it "does not address expedited removal at all," and instead only

addresses the asylum statute.  Def. MSJ at 15.  But, as Defendants acknowledge, Def. MSJ at 15-

16, the decision explicitly addresses "the legal standard to determine whether an alien has a

credible fear of persecution," and quotes the expedited removal provision.  *Matter of A-B-*, 27

I&N Dec. at 320 n.1 (citing 8 U.S.C. § 1225(b)(1)(B)(v)).  Defendants seek to minimize *Matter*

*of A-B-*'s reference to credible fear, a key part of the expedited removal process, by asserting that

it "simply recognizes the logical consequence" of applying the rest of the decision to credible

fear determinations.  Def. MSJ at 15-16.  But that misses the point: the Attorney General

explicitly provided a "written . . . directive" and "written . . . guideline" to adjudicators setting

forth his view of how *Matter of A-B-* should be applied in the credible fear context.  8 U.S.C. §

1252(e)(3).  The Attorney General having chosen to issue that guideline as part of his decision in

*Matter of A-B-*, Defendants cannot now claim that the decision "does not address expedited

removal at all."  Def. MSJ at 15.

For the same reason, the government's half-hearted argument that the USCIS Guidance

does not qualify as a written policy directive, policy guideline, or procedure under § 1252(e)(3),

*see* Def. MSJ at 15, 18, is equally flawed.  Especially given the Guidance's numerous references

to credible fear determinations, as well as its citation to the expedited removal statute and

regulations as one of the authorities under which it issued, it is doubtless a written directive and

guideline implementing expedited removal and subject to review under § 1252(e)(3).

Second, Defendants also assert that, notwithstanding that *Matter of A-B-* expressly

addresses credible fear proceedings, it is not a "regulation," "policy directive," "policy

guideline," or "written procedure" under § 1252(e)(3) because it is an administrative

adjudication.  Def. MSJ at 16.  Yet, as the plain language of the statute makes clear, Congress

intended that a wide variety of writings be reviewable under § 1252(e)(3) regardless of the level

of formality (from "regulation" to "guideline") and regardless of whether the policy is a

"directive" or just a "guideline."  The government stresses that § 1252(e)(3) does not include the

word "rulings."  But neither does it include various other forms that a directive or guideline

might take, like memoranda, "frequently asked questions" documents, or letters to adjudicators.

And nothing in § 1252(e)(3) excludes directives or guidelines delivered in the form of an

adjudication.  The Attorney General's decision in *Matter of A-B-* goes far beyond Ms. A-B-'s

case to make policy on the credible fear standard, falling squarely into the jurisdiction Congress

authorized in § 1252(e)(3).

Moreover, Defendants fail to grapple with the implications of their argument.  On their

view, an Attorney General decision could *never* qualify as a writing under § 1252(e)(3) – no

matter how much it focused on expedited removal and altered the standards and procedures for

credible fear.  For example, the Attorney General might certify a case to himself and use it as an

opportunity to issue a directive that no asylum-seeker should receive a positive credible fear

determination for any reason.  On Defendants' reading, that decision would not be subject to

challenge under § 1252(e)(3).  It is Defendants, not Plaintiffs, who are urging the Court to permit

"an end-run around" the judicial review system Congress established.  Def. MSJ at 16.

Third, Defendants also argue that § 1252(e)(3) does not authorize review of policies

concerning "substantive outcomes," but instead limits judicial review to expedited removal

"procedures."  Def. MSJ at 16.  But nothing in § 1252(e)(3) precludes challenges to substantive

policies.  To the contrary, the plain text of the statute makes clear that § 1252(e)(3) permits

16

challenges not only to "procedures" but also to "directives," "guidelines," and "regulations."[12]

Had Congress intended to limit jurisdiction to *procedural* policies implementing expedited

removal, it could have said so.  Instead, "written procedures" is just one of the categories of

written policies that Congress authorized for review under (e)(3).

Further, the fact that expedited removal policies concerning credible fear will overlap

with substantive asylum law does not make these expedited removal policies unreviewable.

Indeed, some overlap is inevitable given that the definition of "credible fear" is "a significant

possibility . . . that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).

But the fact that credible fear is defined in part by reference to the asylum statute does not take

the challenged policies outside of the jurisdiction of § 1252(e)(3).  Instead, the text makes clear

that it authorizes review of claims that the challenged policy is "not consistent with the

applicable provisions of this title *or is otherwise in violation of law*" – regardless of whether the

legal provision being violated is the expedited removal statute itself or another statute like the

Refugee Act.  8 U.S.C. § 1252(e)(3) (emphasis added).  Indeed, if Congress had intended that the

only statutory challenges that could be brought under § 1252(e)(3) would involve violations of

the expedited removal statute and not the asylum laws or other provisions of the INA, then

presumably it would have used narrow language rather than the broad "otherwise in violation of

law."

Notably, in *AILA*, this Court exercised jurisdiction to review a claim requiring

interpretation of an expedited removal statutory provision that incorporated another provision of

---

[12] Although Defendants point to the nature of the challenge in *AILA v. Reno*, characterizing it as procedural, Def. MSJ at 16, the fact that a prior § 1252(e)(3) case involved a procedural challenge does not lead to the conclusion that such a challenge is the only kind authorized.  Notably, in the *AILA* litigation, no challenges concerning the credible fear standard were adjudicated because the only plaintiffs who sued within the 60-day deadline were not asylum seekers.  *See AILA*, 18 F.Supp.2d 38, 47 (1998) .  That is, of course, not the case here.

the INA by reference.  The plaintiffs contended that the challenged policies improperly subjected noncitizens with facially valid visas to expedited removal.  *AILA*, 18 F.Supp.2d at 56.  Although resolution of Plaintiffs' claim turned on the proper interpretation of two provisions of the INA that were incorporated by reference in the expedited removal statute but are not exclusively applicable to expedited removal – sections 1182(a)(6)(C) and (a)(7), which specify the grounds for inadmissibility – the Court nonetheless reviewed the question on the merits.  Similarly here, Plaintiffs' claims turn on the proper interpretation of the credible fear standard, 8 U.S.C. § 1225(b)(1)(B)(v), which references 8 U.S.C. § 1158, and § 1252(e)(3) authorizes review of such claims.

Defendants wrongly posit a slippery slope, asserting that if aspects of *Matter of A-B-* can be challenged via § 1252(e)(3), then every BIA decision, every federal court of appeals decision, and every Attorney General decision could be challenged this way as well.  Def. MSJ at 18.  But this is simply wrong.  Court of appeals decisions are not "issued by or under the authority of the Attorney General," and therefore would never be subject to § 1252(e)(3).  And BIA and Attorney General decisions that say *nothing* about expedited removal – as is generally the case – present a very different situation from this case.  *Matter of A-B-* and the USCIS Guidance explicitly speak to credible fear determinations.  That is a rare situation.  The BIA, which reviews removal orders issued in regular removal proceedings, has no role in the expedited removal process, and – unlike the Attorney General – has no authority to issue written expedited removal policies.  *See* Def. MSJ at 3 (explaining that there is no BIA appeal from expedited removal order).  The BIA would thus have no reason or authority to direct outcomes in credible fear determinations, as the Attorney General did in *Matter of A-B-*.  As for Attorney General decisions, the certification power is rarely used, and even more rarely to address expedited removal.  But when the Attorney

General wishes to issue written policies for implementing the credible fear process, as he did in *Matter of A-B-*, then his policies are subject to challenge under § 1252(e)(3).

Defendants attempt to draw support from § 1252(b)(9), asserting that Congress sought to channel all challenges into the petition for review process. But the petition for review process is not available to Plaintiffs and others in expedited removal who never make it into the regular removal process. Moreover, § 1252(b)(9) does *not* provide the only mechanism for review. *See* § 1252(b)(9) (expressly providing that it applies "except as otherwise provided in this section," i.e., § 1252). Here, Plaintiffs have identified written guidance, issued under the authority of the Attorney General, expressly governing credible fear determinations, and have come to this Court within the 60 day deadline. Section 1252(e)(3), which is part of the same "section" as § 1252(b)(9), provides jurisdiction in these circumstances.

Moreover, contrary to Defendants' contentions, the limited availability of alternative mechanisms for judicial review in the expedited removal context*, see* Def. MSJ at 3, weighs in favor of review here, not against, as does the obstacle to review that the 60-day deadline poses for many noncitizens, *id.* at 17.[13] Through § 1252(e)(3), Congress intended that noncitizens in expedited removal be able to challenge written expedited removal policies, including those concerning credible fear. Thus, "the strong presumption in favor of judicial review of administrative action" reinforces that § 1252(e)(3) must be construed to provide jurisdiction

---

[13] The government contends that a negative credible fear determination is "not subject to further review" in any "Article III court." Def. MSJ at 3 (citing 8 U.S.C. § 1225(b)(1)(C), 1252(a)(2)(A)(iii), 1252(e)(2)). The availability of review in individual habeas cases under § 1252(e)(2), and whether the denial of review would violate the Suspension Clause, U.S. Const. art. I, Sec. 9, Cl. 2, are contested issues. *Compare, e.g.*, *Castro v. USDHS*, 835 F.3d 422 (3d Cir. 2016) (petitioners could not seek review of credible fear determinations) *with Osorio-Martinez v. Attorney Gen*, 893 F.3d 153 (3d Cir. 2018) (petitioners entitled to review); *see also, e.g.*, *Thuraissigiam v. USDHS*, No. 18-55313 (9th Cir. arg. held May 17, 2018). Those questions are not at issue in this case – but the government's view that credible fear proceedings cannot be challenged in § 1252(e)(2) habeas cases underscores the need to give § 1252(e)(3) its full effect.

here.  *INS v. St. Cyr*, 533 U.S. 289, 299, 314 (2001); *see also Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (explaining that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review" of administrative action) (internal quotation marks omitted).

## B.  Plaintiffs Have Standing.

There is no question that Plaintiffs have a concrete stake in this case.  Defendants contend, however, that *if* Plaintiffs' challenge to *Matter of A-B-* itself fails, then Plaintiffs lack standing to challenge the USCIS Guidance.  Def. MSJ at 19.  Defendants' arguments are wholly without merit.

### 1.  Plaintiffs Have Standing to Challenge the USCIS Guidance.

Plaintiffs – asylum seekers fleeing horrific violence and abuse – have a clear "personal stake in the outcome" of this challenge.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  By applying the challenged credible fear policies to Plaintiffs and ordering them removed, Defendants have denied them a fair opportunity to seek asylum and escape the persecution they have suffered. *See* Pl. Facts 47-49.  This is an injury-in-fact that is directly traceable to Defendants' conduct. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  And the Court can redress Plaintiffs' harm by affording the relief they seek, including invalidating the challenged policies and allowing Plaintiffs another chance to pass the credible fear screening without the burden of an unlawfully heightened standard.  *Id.* at 561-62.

Defendants' standing arguments are meritless.  They assert that Plaintiffs lack standing to challenge the USCIS Guidance, but their arguments impermissibly assume away contested issues central to Plaintiffs' merits claims – including what the new credible fear policies mean.  It is black letter law that in evaluating standing, the Court must assume that "the plaintiffs would be

successful in their claims." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008)

(internal quotation marks omitted) (rejecting on summary judgment defendant's standing

argument based on a "disputed proposition" and assuming for standing purposes that the

plaintiffs' "view will prevail").  Among other things, the Court would be required to resolve

against Plaintiffs multiple contested questions about the application and meaning of the

challenged policies and the proper interpretation of judicial authority – questions that go to the

validity of Plaintiffs' claims for relief rather than standing.  These arguments are "nothing more

than an effort to bootstrap standing analysis to issues that are controverted." *Id.* (internal

quotation marks omitted).

 Defendants first argue that two of the policies in the USCIS Guidance – its instructions to

asylum officers regarding the adverse exercise of discretion and the requirement that applicants

delineate a particular social group – do not, in fact, apply to the credible fear stage and so

Plaintiffs lack an injury-in-fact with respect to those aspects.  Def. MSJ at 19-20.  However, the

interpretation of the USCIS Guidance with respect to those policies is a central *merits* dispute, as

Plaintiffs explain in detail below.  *See infra* at Part II.E.-F.  Defendants' argument thus

impermissibly assumes that Defendants are correct that the USCIS Guidance does not instruct

officers to apply these policies to credible fear screenings – a question that Plaintiffs contest on

the merits.  Defendants also argue that Plaintiffs have no standing to challenge the Guidance's

illegal circuit authority rule because, in Defendants' view, the Guidance merely describes what

Supreme Court precedent already commands; thus invalidating the policy would do nothing to

redress Plaintiffs' injuries.  *See* Def. MSJ at 21-22, 23.  Once again, however, this theory

depends on the Court resolving against Plaintiffs the merits of their challenge to that portion of

the Guidance, which Plaintiffs argue *conflicts with Supreme Court precedent*.  *See infra* at Part

II.G.  Plaintiffs explain in detail below why they should prevail on these merits issues, but in any event, because Defendants' arguments are about the ultimate validity of Plaintiffs' claims, they are not proper standing arguments and so must be rejected.

Defendants also assert that if Plaintiffs are jurisdictionally barred from challenging *Matter of A-B-*, then Plaintiffs would lack standing to challenge any part of the USCIS Guidance because their injuries would not be redressable.  That argument is likewise meritless.  As explained above, Plaintiffs *are* entitled to challenge the credible fear policies set forth in *Matter of A-B-*.  *See supra* at Part I.A.  That being so, the Court need not go further to reject this argument.

Yet, even if Plaintiffs could not challenge *Matter of A-B-* in this case, Defendants are wrong that the Guidance causes Plaintiffs no independent injury.  To accept Defendants' redressability theory, the Court would have to conclude that *Matter of A-B-* independently mandates each challenged USCIS policy contained in the Guidance.  However, Defendants' own arguments are contrary to such a conclusion.  Defendants are clear in their view that the only new legal precedent announced in *Matter of A-B-* is very narrow: the overruling of prior BIA precedent in *Matter of A-R-G-C-*.  *See* Def. MSJ at 27 ("The sole affirmative change to immigration law that *A-B-* implements is overruling the BIA's decision in *A-R-C-G-*.").[14]  If Defendants were correct about what *Matter of A-B-* does, then the Guidance transforms much beyond that decision's narrow holding into credible fear policies that would not otherwise be binding on asylum officers in credible fear proceedings.

---

[14] Plaintiffs, by contrast, contend that *Matter of A-B-* itself reaches beyond the holding in that case to articulate new credible fear policies, which Defendants deny – another disputed merits issue.

Indeed, the idea that the Guidance does nothing beyond the narrow holding of *Matter of A-B-* is belied by the Guidance itself. Defendants *could have* issued Guidance that merely informed adjudicators of the one narrow change concerning the overruling of *A-R-C-G-*. The interim Guidance was, in fact, largely focused on acknowledging the change. Interim Guidance ("*Matter of A-R-C-G-* has been overruled and can no longer be cited to or relied upon[.]"). Instead, Defendants ultimately issued a detailed, ten-page Guidance document setting forth the new credible fear policies reaching well beyond the effect of *Matter of A-B-* as legal precedent. Defendants can't have it both ways. Either *Matter of A-B-* sets forth credible fear policies – in which case it can be challenged under § 1252(e)(3) – or it does not, in which case the USCIS Guidance independently establishes each of the credible fear policies Plaintiffs allege, and thus causes redressable harm.

As just one example of the Guidance's reach beyond the overruling of *Matter of A-R-C-G-*, the Guidance establishes a general rule against claims related to domestic or gang violence, a conclusion that is not required by the overruling of *Matter of A-R-C-G-*. *See infra* at Part II.A; Guidance at 6, 10.[15] Of course, Defendants contest that many of the new credible fear policies that Plaintiffs challenge are in fact policies set by either *Matter of A-B-* or the Guidance. But, again, that is a merits question – not a basis to challenge Plaintiffs' standing.

Finally, even if Plaintiffs could not challenge *Matter of A-B-* and some of the challenged policies were imposed by both that decision and the Guidance, at a minimum the Court still should conclude that Plaintiffs have standing because it can grant Plaintiffs effective relief against the Guidance. *See, e.g.*, *Gutierrez*, 532 F.3d at 925 (standing existed where "an order from the district court could redress appellants' injury, at least in part"). In contending to the

---

[15] Another example is the new circuit law policy, which Defendants concede was "not discussed in" *Matter of A-B-*. *See* Def. MSJ at 11; *see also id.* at 21; *infra* at Part II.G.

contrary, Defendants mistakenly rely on cases in which the plaintiffs failed to show

redressability because whether their harm could be mitigated depended on the conduct of *third*

*parties not before the court* who had reasons to continue the injurious conduct.  *See* Def. MSJ at

21-22 (citing cases).[16]  Here, by contrast, Plaintiffs are directly impacted by the challenged

government policies issued by the Defendants whose conduct the Court has the power to

restrain.[17]  *See, e.g.*, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017)

("After all, if a government action causes an injury, enjoining the action usually will redress that

injury.").[18]

      **2.  Plaintiffs' Claims Are Timely and Their Injuries Are Redressable.**

Finally, Defendants assert that Plaintiffs' injuries are "not redressable" because their

claims are about "long-standing" policies, and are therefore time-barred.  Def. MSJ at 23-24.

They contend that none of the policies challenged by Plaintiffs are *new*, so they fall outside of

the 60-day limit for an action under 8 U.S.C. § 1252(e)(3).  *See* Def. MSJ at 23-25.  But, once

---

[16] Defendants' remaining authorities are similarly unavailing.  Those cases merely stand for the uncontroversial position that, *even assuming* – as courts must – that the court granted the plaintiff all its requested relief, the alleged injury still would not be mitigated.  *See Transportation Workers Union of Am. v. TSA*, 492 F.3d 471, 475-76 (D.C. Cir. 2007); *Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013).

[17] Implicit in Defendants' argument is the notion that, notwithstanding a Court order holding that the policies contained in the USCIS Guidance are unlawful and enjoined, asylum officers employed by USCIS – the same Defendant before this Court – could apply the very same blocked policies to Plaintiffs, merely because they appear in a separate writing.  This cannot be so – otherwise, agencies could circumvent court orders merely by transforming enjoined policies into other forms.

[18] Defendants also halfheartedly argue that invalidating the USCIS Guidance would not redress Plaintiffs' injuries because IJs reviewing negative credible fear determinations would be bound by *Matter of A-B-* regardless.  *See* Def. MSJ at 23.  But if Plaintiffs obtain the relief they have requested, Plaintiffs' injuries would be redressed because they would get a second chance at receiving a positive credible fear determination from an asylum officer, under the correct standards.  Defendants' argument about IJ review is irrelevant, because positive credible fear determinations are not reviewed by IJs.  *See* 8 U.S.C. 1225(b)(1)(B)(iii)(III).

again, this argument impermissibly assumes away the merits of Plaintiffs' challenges.  As

explained below, as a matter of policy and guidance, *Matter of A-B-* and the USCIS Guidance in

fact *break* with settled law and practice in numerous ways.  *See, e.g.*, *infra* at Part II.A, PI at 18-

24 (new policy directing offices to deny most claims related to domestic violence and gangs);

*infra* at Part II.B, PI at 11-18 (new formulation ratcheting up "unable or unwilling" standard);

*infra* at Part II.G, PI at 29-39 (new policy ordering the blanket rejecting of all circuit law

inconsistent with *Matter of A-B-* and from any circuit other than the location of the credible fear

interview).  What legal rules applied to credible fear claims before, what the challenged policies

mean, and how the challenged policies differ from the existing legal framework are questions

that go to the heart of the merits disputes in this case, and therefore cannot properly be the basis

of a standing argument.   Defendants' argument that Plaintiffs' injuries are not redressable

because they are untimely must be rejected.

## II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS, AND DEFENDANTS' MOTION SHOULD BE DENIED.

The new expedited removal credible fear policies ratchet up the screening standard in

violation of Congress's intent to establish a low threshold to ensure potentially meritorious

claims would receive a full hearing.  They generally instruct adjudicators to deny claims relating

to domestic violence or gang violence, even though there is no legal basis for concluding that

such claims categorically should fail, and the INA guarantees credible fear applicants

individualized consideration of their claims.  But Defendants' summary judgment motion largely

seeks to avoid the merits of Plaintiffs' arguments -- failing to respond, for example, with any

defense of this general rule against domestic violence and gang-related claims.

The policies also make a range of other unlawful changes to the standards and procedures

applicable to credible fear claims, each of which improperly burdens claims involving domestic

violence or gangs.  For cases involving non-governmental persecutors, the policies impose a new "condoned" or "complete helplessness" formulation for proving a failure of state protection.  For cases in which the persecutor has a personal relationship with the applicant, they dictate a more stringent rule for proving that the feared persecution has a "nexus" to a protected ground for asylum.  And they instruct that certain domestic violence-related social group definitions should generally be rejected.  As to each of these arguments, Defendants concede that the well-established standards are controlling, but argue that the new rules are either equivalent to or a faithful application of those standards.  The governing statutes and settled case law elaborating each of the relevant standards make clear that Defendants' equivocations must be rejected.

The new credible fear policies also unlawfully import two features of the ordinary removal process into credible fear proceedings: requiring that applicants articulate their particular social group definition at the threshold screening stage, and authorizing and encouraging adjudicators to exercise discretion to deny credible fear.  Defendants concede such policies would be unlawful, asserting only that these new policies do not exist.  Their arguments are, however, unpersuasive.

Finally, the policies illegally instruct asylum officers to disregard all circuit court authority that is inconsistent with *Matter of A-B-*, and all authority from a circuit other than the one that includes the location of the credible fear interview.  Defendants contend that disregarding circuit law is justified because everything in *Matter of A-B-* is entitled to *Chevron* deference as an interpretation of the statutory term "particular social group."  But nearly all of the challenged policies are divorced from that statutory term and will be applied to claims based on all five asylum protection grounds.  Defendants' claim to blanket deference must be rejected.

26

The new policies are thus fundamentally at odds with the credible fear standard and process, and contrary to the governing statutes.  Plaintiffs' motion for summary judgment should therefore be granted, and Defendants' motion denied.[19]

### A.  The General Rule Against Claims Related to Domestic Violence and Gangs Violates the INA, the Refugee Act, the APA, and Due Process.

The new credible fear policies establish a general rule against applicants with credible fear claims relating to domestic violence and gangs.  *Matter of A-B-* asserts that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum."  27 I&N Dec. at 320.  Even though that case did not consider a claim at the credible fear stage (or a gang-related claim), it goes on to state that "few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."  *Id.* at 320 n.1.  The USCIS Guidance further directs in bold font that

> **[i]n general, . . . claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for asylum, refugee status, or a credible . . . fear of persecution.**

USCIS Guidance at 6 (emphasis in original); *see also id.* at 10.  These policies direct immigration judges and asylum officers to deny claims related to domestic violence or gangs.  As explained below, this rule is both contrary to the governing statutes and arbitrary and capricious.  *See* PI at 18-24.  Defendants offer *no* defense of this rule on the merits, nor any response to Plaintiffs' legal challenges to it.  Instead, they seek only to downplay the existence of

---

[19] Defendants assert that Counts II and III of Plaintiffs' complaint should be dismissed as redundant of Count I.  Def. MSJ at 34 n.16, 37 n.18.  But Count II focuses on the rule disregarding circuit authority, *see* Complaint ¶¶ 91-92, and Count III is a claim directly under the Due Process Clause, *see* Complaint ¶¶ 94-95.  The claims are not redundant, and Defendants have not articulated any reason that dismissal would be warranted.

any such rule in *Matter of A-B-* itself, and completely ignore the USCIS Guidance's repeated, emphatic instructions to generally deny such claims.  *See* Def. MSJ at 10.

Further, the policy violates due process.  When considered in context, the policies send an extraordinary signal to asylum officers and immigration judges to deny claims pertaining to domestic violence and gangs, regardless of their legal merits.  That signal injects a serious potential for and appearance of bias into the credible fear system.

1. **The General Rule Against Claims Related to Domestic and Gang-Based Violence Violates the Right to an Individualized Determination and Is Arbitrary and Capricious.**

The government's new rule against claims pertaining to domestic violence and gangs is unlawful.  Most fundamentally, the conclusion that all or most credible fear claims involving domestic violence and gang violence cannot succeed is simply incorrect.  In case after case, courts have recognized asylum based on gang-related or gender-based harms in a variety of circumstances.  *See, e.g.*, *W.G.A. v. Sessions*, --- F.3d ---, 2018 WL 3979276, at *6 (7th Cir. Aug. 21, 2018) (family-based claim involving gang violence); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 460 (4th Cir. 2018) (same); *Aldana-Ramos v. Holder*, 757 F.3d 9 (1st Cir. 2014) (same); *Ivanov v. Holder*, 736 F.3d 5, 8 (1st Cir. 2013) (religious persecution by gang); *Garcia,* 665 F.3d at 503 (claim involving gang targeting of witness); *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007) (claim based on female genital cutting dictated by marriage agreement); *supra* at Background Part C (citing cases); PI at 19 (citing authorities).  The new rule against such claims has no basis in immigration law.

Indeed, to the extent the credible fear policies attempt to provide reasons for the new rule, they are incorrect and inaccurate.  For example, at some points in its analysis, the USCIS Guidance suggests the problem with domestic violence and gang-related claims is that they are "based on membership in a putative particular social group defined by the members'

28

vulnerability to harm of domestic violence or gang violence." USCIS Guidance at 6. That is not correct – claims involving these kinds of persecutors can be based on all sorts of protected grounds and social groups. *See, e.g.*, *Ivanov*, 736 F.3d at 8 (religious persecution by gang); *Salgado-Sosa*, 882 F.3d at 460 (family-based persecution by gang); *supra* at Background Part C.[20] Elsewhere in the Guidance, USCIS asserts that such claims will likely fail because applicants must satisfy the heightened showing that the government condoned the persecution or was completely helpless to protect the applicant. USCIS Guidance at 10. But that new heightened formulation is unlawful, as discussed further below. *See infra* at II.B; *see also* PI at 11-17. Thus, the general rule against domestic violence claims and gang-related claims is not supported by any logical justification and is arbitrary and capricious. *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) (judgment that is "neither 'logical' nor 'rational'" is "arbitrary and capricious for want of reasoned decisionmaking"). *See also* PI at 23.

Because there is no legal basis for a categorical or near categorical bar on domestic violence and gang-related claims, the new rule violates the individualized analysis required by the immigration laws. *See* PI at 18-22. The INA requires an individualized approach to asylum adjudication.[21] In each case, the question is whether the facts satisfy the standard for asylum. This individualized analysis is also specifically incorporated into the expedited removal statute and credible fear standard. The statute requires, for example, that the asylum officer conducting

---

[20] Defendants wrongly assert that Plaintiffs alleged their feared persecution would be on account of "membership in particular social groups defined generally by domestic or gang violence." Def. MSJ at 12. That misstates the allegations in the complaint, which indicate simply that the Plaintiffs fled domestic violence and/or gangs. *See* Complaint ¶¶ 3, 15-23.

[21] *See, e.g.*, *Matter of M-E-V-G-*, 26 I&N Dec. 227, 242 (BIA 2014) ("[S]ocial group determination[s] must be made on a case-by-case basis[.]"); *id*. at 251 (citing *Matter of Acosta*, 19 I&N Dec. at 233); *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("[T]he BIA may not reject a group solely because it had previously found a similar group in a different society" not to meet the legal standard); *see* Anker Decl. ¶ 16 ("Eligibility for asylum must be determined on an individualized basis.").

the credible fear interview must prepare a case-specific factual and legal analysis for each

applicant.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(II) (requiring individualized analysis of credible

fear); 8 C.F.R. § 208.30(e)(1) (similar); 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (requiring an

"opportunity . . . to be heard" in immigration judge review).[22]  Credible fear interviews, like

asylum in general, must be resolved based on the particular facts and circumstances of the case.

Further, in the Refugee Act, Congress quite consciously chose to reject any categorical

restrictions on asylum based on the source of harm or violence the applicant experienced or

feared, or her country of origin.  *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th

Cir. 2017) (en banc) (the Refugee Act enacted a "nondiscriminatory definition of refugee,"

breaking with the prior, less individualized approach); PI at 20-22.  There is no space in this

scheme for a rule against the claims of those fleeing particular categories of persecutors or with

claims related to certain kinds of violence.  The new rule is thus contrary to the Refugee Act and

the INA.

      Further, the new rule is arbitrary and capricious, including because it reflects a dramatic

and unacknowledged departure from the government's longstanding recognition that credible

fear determinations must be individualized, based on the facts of each case.  *See* PI at 22-24;

*Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n

agency changing its course must supply a reasoned analysis indicating that prior policies and

standards are being deliberately changed, not casually ignored.").

---

[22] *See also, e.g.*, Pl. Fact 14, Refugee, Asylum, and International Operations Directorate Officer Training Course ("RAIO"), Credible Fear of Persecution and Torture Determinations, at 25 (Feb. 13, 2017), Mujahid Decl., Exh. F ("2017 Credible Fear Training") ("Asylum officers should evaluate the entire scope of harm experienced by the applicant to determine if he or she was persecuted, taking into account the individual circumstances of each case."); *id.* at 28 ("The applicant may meet his or her burden with evidence that the government was unable or unwilling to control the persecution in the specific locale where the applicant was persecuted.").

Rather than respond to any of these arguments, Defendants largely ignore the existence of the rule.  For example, with respect to the language in *Matter of A-B-* expressly stating that few domestic violence or gang claims will satisfy the credible fear standard, Defendants characterize this language as merely recognizing "the logical consequences of applying" the framework set out in *Matter of A-B-*.  Def. MSJ at 15-16.  They assert that it does no more than offer "examples of factual scenarios unlikely to, not categorically incapable of, meeting" the credible fear standard.  *Id*. at 10, 16-17.  But that characterization cannot be squared with *Matter of A-B-* or the USCIS Guidance.

Although *Matter of A-B-* did not involve review of a credible fear determination, the decision reached out specifically to offer directions to adjudicators considering credible fear applications by victims of domestic or gang violence, stating that "few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."  27 I&N Dec. at 320 n.1.  That statement regarding credible fear is not a logical consequence of *Matter of A-B-*.  Indeed, the direction to deny most domestic violence or gang violence-related claims at the credible fear stage is fundamentally incompatible with the threshold screening standard that Congress established, where the only question is whether there is a significant possibility such a claim would succeed, as many such claims have and can.  *See* PI at 22.

Defendants' attempt to characterize this statement as nothing more than offering "examples" is further undermined by the extraordinary emphasis the USCIS Guidance places on denying such claims.  The Guidance could hardly be clearer that the denial of credible fear claims pertaining to domestic violence and gangs is *central*, in the government's view, to the application of *Matter of A-B-* in credible fear proceedings.  It exhorts asylum officers that such claims in general "**will not establish the basis for . . . a credible . . . fear of persecution.**"

USCIS Guidance at 6 (emphasis in original).  As if that were not enough, the Guidance warns that asylum officers "should be alert" that under *Matter of A-B-* "few gang-based or domestic-violence claims" will meet the credible fear standard.  *Id*. at 10.  Yet, remarkably, Defendants ignore these statements in the USCIS Guidance, and barely acknowledge them in their summary judgment motion.

Indeed, Defendants' failure to disown the rule against domestic violence and gang claims is itself telling, especially when contrasted with its readiness to disavow other rules which they claim do not apply at the credible fear stage.  Their brief clearly disavows, for example, the application of the requirement that applicants delineate the relevant particular social group in the credible fear context.  Def. MSJ at 19-20.[23]  Yet it makes no such statement with regard to the rule against domestic violence and gang claims being able to satisfy credible fear.  That is perhaps because, ultimately, the very point of much of the broad language in *Matter of A-B-* and the USCIS Guidance is to direct officers to deny such claims.  That direction is illegal.

### 2.  The Improper Pressure to Rule Against Claims Related to Domestic Violence and Gang-Based Violence Violates Due Process.

Even if the new credible fear policies' general rule against domestic violence and gang-related claims were not unlawful for the reasons discussed above, it would still violate due process.  That is because the rule – which operates in a context where agency adjudicators are subject to extraordinary institutional pressures – deprives applicants of their right to an adjudicator who is, and is reasonably perceived to be, impartial.  It is "axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *Matter of Murchison*, 349 U.S. 133, 136 (1955)).  The

---

[23] As explained *infra* at Part II.E, its arguments in this respect are in fact inconsistent with the new credible fear policies themselves.

neutrality inquiry "is an objective one [that] asks not whether the judge is actually, subjectively biased, but . . . *whether there is an unconstitutional 'potential for bias.'*" *Id.* at 881 (emphasis added). *See also Matter of Murchison*, 349 U.S. at 136; *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006).

Here, the extraordinary pressure to deny claims is clear from the face of the policies themselves, which indicate that adjudicators are expected to deny all, or nearly all, claims related to gang or domestic violence. *Matter of A-B-*, 27 I&N Dec. at 320 n.1; USCIS Guidance at 6, 10. And it is clear from the context of the policies – ranging from the Attorney General's role as both adjudicator in *Matter of A-B-* and supervisor of immigration judges, to his exhortations to immigration judges to deny claims, to the pervasive climate of fear of employment consequences among immigration judges and asylum officers. As documented in Plaintiffs' extra-record evidence, immigration judges and asylum officers understand these statements as "a clear signal to deny domestic violence claims, and claims related to gang violence," regardless of the merits of an individual claim. Declaration of Rebecca Jamil ("Jamil Decl."), ¶ 11; *see also* Declaration of Ethan Nasr ("Nasr Decl."), ¶ 5 ("[A]n Asylum Officer reading this memorandum would feel strong pressure to not grant a positive credible fear determination for an applicant in a domestic violence or gang violence situation."). Likewise, the *New York Times* has publicly reported that the National Association of Immigration Judges views *Matter of A-B-*, like other new Justice Department policies, as "an attempt to turn judges from neutral arbiters into law enforcement agents enacting Trump administration policies." Pl. Fact 30, Liz Robins, *In Immigration Courts,*

*It Is Judges vs. Justice Department*, New York Times, Sept. 7, 2018, 2d Mujahid Decl., Exh. 14.[24]

The new credible fear policies' signal to deny cases is accompanied by, or at least appears to be accompanied by, an implicit threat to adjudicators' careers.  Unlike Article III judges who are insulated from political pressures, immigration judges are subject to the supervision of the Attorney General and can be terminated by the Department of Justice.  *See* 8 U.S.C. 1101(b)(4); Pl. Fact 31.  Likewise, asylum officers are employees of USCIS, subject to termination and other adverse employment actions.  Pl. Fact 34.  Asylum officers and immigration judges reasonably fear they will lose their jobs or be subject to other adverse action if they grant credible fear claims in contravention of the new policies.  *See* Jamil Decl., ¶ 11 ("Immigration Judges do not have lifetime appointments, and may face a risk of termination if their decisions are not viewed as being 'in line' with leadership in the Department of Justice.  The pressure to deny is heightened by performance evaluations and case completion quotas that discourage thorough decision-making."); Nasr Decl., ¶ 5 (stating an Asylum Officer would "at the very least would anticipate that granting a positive credible fear determination in such cases will trigger scrutiny from a supervisor, with possible additional professional repercussions"); Pl.

---

[24] Indeed, the appearance of bias created by the new policies is only strengthened by a steady drumbeat of publicly reported statements pressuring asylum officers and immigration judges to limit grants of asylum.  In an October 12, 2017 speech before the Executive Office for Immigration Review (EOIR), for example, the Attorney General declared the asylum system to be "subject to rampant abuse and fraud" and advocated for "elevat[ing] the threshold standard of proof in credible fear interviews," even though he has no power to alter the statutory standard. *See* Pl. Facts 21-22.  On June 11, 2018, the day he issued *Matter of A-B-*, Attorney General Sessions told the immigration judges that "the vast majority of the current asylum claims are not valid" – echoing the language in *Matter of A-B-* itself that all or most cases related to domestic violence or gangs will fail credible fear.  *See* Pl. Fact 23.  In a September 10, 2018 speech to the EOIR, Attorney General Sessions repeated his claim that the "asylum system has been abused for years to the detriment of the rule of law" and instructed the immigration judges that it was their "duty to carry out" *Matter of A-B-*.  *See* Pl. Fact 28.  *See also* Pl. Facts 20, 24, 25.

Fact 35, Seth Freed Wessler, *'When I Say I'm Complicit, This Is What I Mean*,*'* Topic (Sept.

2018), 2d Mujahid Decl., Exh. 15 (reporting an anonymous asylum officer's statement: "The

point I'm making is that we have lots of eyes on us.  It makes people scared.  They don't want to

lose their jobs."); Pl. Fact 33, Liz Robins, *In Immigration Courts, It Is Judges vs. Justice*

*Department*, New York Times, Sept. 7, 2018, 2d Mujahid Decl., Exh. 14 (reporting a statement

from a former supervising IJ in New York that the DOJ office that oversees immigration judges

was "absolutely" sending "a signal to the New York judges to adhere faithfully to what the

attorney general's program is").  The incentive that the new policies have created for asylum

officers and immigration judges deny cases involving domestic violence or gang violence to

protect their jobs creates at least an appearance of impropriety that violates due process.  *See,*

*e.g.*, *Abulashvili v. Att'y Gen.*, 663 F.3d 197, 207 (3d Cir. 2011) (due process is violated in an

asylum proceeding whenever the immigration judge "*appears biased*, even if she actually is not

biased") (emphasis added).  *See also* Pl. Facts 26-27, 32.  And indeed, the pressure created by the

new policy is working: service providers report that the grant rate for credible fear claims is

dropping markedly, particularly for claims involving domestic violence or gang violence.  *See* Pl.

Fact 37.

    In response, Defendants contend that Plaintiffs have no due process rights.  That

argument is simply wrong.  It is black letter law that every person who has entered the United

States has due process rights, regardless of the manner of entry.  *See Zadvydas v. Davis*, 533 U.S.

678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due

Process Clause applies to all 'persons' within the United States, including aliens, whether their

presence here is lawful, *unlawful, temporary*, or permanent.") (emphasis added); *Mathews v.*

*Diaz*, 426 U.S. 67, 77 (1976) (explaining that the Fifth Amendment uses the term "persons" and

"protects every one of these persons from deprivation of life, liberty or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (cited in Def. MSJ at 37) ("[A]liens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.") (emphasis added).  Most of the Plaintiffs entered the United States before they were arrested by immigration authorities and therefore plainly possess due process rights.[25]  Based on the well-established bright line rule that individuals who have entered the country are "persons" within the meaning of the Due Process Clause, noncitizens subjected to expedited removal after unlawfully entering the United States are protected by due process.  *See United States v. Raya-Vaca*, 771 F.3d 1195, 1203 (9th Cir. 2014) (holding that "[e]ven an alien who has run some fifty yards into the United States has entered the country" and is protected by due process in his expedited removal proceedings); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188 (D.D.C. 2015) (holding that plaintiffs who are "apprehended in the territory of the United States" are "entitled to the protection of the Due Process Clause").

Defendants invoke *AILA v. Reno*, Def. MSJ at 37, but that case addressed expedited removal policies that did not apply to individuals who had already entered the country – indeed, expedited removal was not expanded to cover such individuals until 2004.  *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004); *see also* 8 U.S.C. 1225(b)(1)(A)(iii).  In any event, as Defendants acknowledge, even noncitizens who are arriving at a port of entry in the United States are entitled to at least the rights that Congress has legislated

---

[25] *See* Pl. Fact 36.  Defendants acknowledge that some Plaintiffs entered the country before apprehension, but still incorrectly assert that Plaintiffs are all "arriving aliens."  Def. MSJ at 12; *see* 8 C.F.R. § 1001.1(q) (arriving aliens are those who arrive at a port of entry).

for them.  *See* Def. MSJ at 37 (quoting *Mezei*, 345 U.S. at 212).  Here, Congress has established

a system in which noncitizens in expedited removal are entitled to individualized consideration

of their cases by neutral adjudicators. [26]

Defendants also argue that even if the Due Process Clause applies to Plaintiffs, they lack

any cognizable liberty interest.  However, "[i]t is clearly established in this circuit that . . . 'an

alien who has unlawfully entered the United States has a Fifth Amendment procedural due

process right to petition the government for political asylum and a statutory procedural due

process right [to a meaningful or fair evidentiary hearing.]'"  *Gutierrez-Rogue v. INS*, 954 F.2d

769, 773 (D.C. Cir. 1992) (quoting *Maldonado-Perez v. INS*, 865 F.2d 328, 332-33 (D.C. Cir.

1989)) (internal quotation marks omitted) (alteration in original); *see also Maldonado-Perez v.

INS*, 865 F.2d 328, 329-30, 332 (D.C. Cir. 1989) (due process right to petition for asylum for

noncitizen apprehended one day after unlawful entry). [27]  The Plaintiffs have due process rights,

and the new credible fear policies violate them.

---

[26] *See, e.g*., 8 C.F.R. § 1003.10 (providing that in all cases immigration judges "shall seek
to resolve the questions before them in a timely and impartial manner" and "shall exercise their
independent judgment"); 8 U.S.C. § 1225(b)(1)(B)(iii)(II) (providing that asylum officer's
determination must be based on the facts in the applicant's case); 8 C.F.R. § 208.9(b) ("The
asylum officer shall conduct the interview in a nonadversarial manner"); 8 C.F.R. § 208.9(e)
("The asylum officer shall consider evidence submitted by the applicant . . . .").

[27] Defendants cite *Castro*, 835 F.3d 422, but the Third Circuit in that case ruled on
Suspension Clause grounds, and expressly declined to reach the question of whether the
noncitizens in that case had due process rights, *id.* at 446 n.26.  And the cases they cite involving
Guantanamo detainees who had "never entered or attempted to enter the country, and . . . never
applied for admission under the immigration laws," are likewise inapposite.  *Kiyemba v. Obama*,
555 F.3d 1022, 1031 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010); *Rasul v. Meyers*, 563 F.3d
527, 529 (D.C. Cir. 2009) (per curiam); *see also Rafeedie v. INS*, 880 F.2d 506, 508-09, 524
(D.C. Cir. 1989) (lawful permanent resident entitled to due process); *Ukrainian-Am. Bar Ass'n,
Inc. v. Baker*, 893 F.2d 1374, 1382 (D.C. Cir. 1990) (third party lacked derivative Sixth
Amendment right).

**B. The New "Condoned" or "Complete Helplessness" Formulation Violates the Refugee Act, the INA, and the APA.**

The new credible fear policies direct asylum officers and immigration judges to impose a new, heightened legal requirement for claims involving non-governmental persecutors. Under the Refugee Act, an applicant may seek asylum based on a well-founded fear of persecution inflicted "by private parties the government is unable or unwilling to control." Def. MSJ at 29 (citing *Matter of Acosta*, 19 I&N Dec. at 222). But the new policies require a different and heightened showing: "The applicant must show the government *condoned* the private actions or at least demonstrated a *complete helplessness* to protect the victim." USCIS Guidance at 6 (emphasis added); *see also Matter of A-B-*, 27 I&N Dec. at 337. Defendants' new "condoned" or "complete helplessness" formulation is inconsistent with the governing statutes and decades of case law in the BIA and federal courts. *See* PI at 11-18.

1. The new "condoned" or "complete helplessness" formulation is contrary to the statutes Congress has enacted, so it must be rejected. Defendants concede that the "unable or unwilling" standard "has been universally accepted." Def. MSJ at 29. Indeed, the "unable or unwilling" standard was incorporated in the Refugee Act, and had an accepted meaning at the time of the Act. *See Matter of Acosta*, 19 I&N Dec. at 222 (explaining that the standard was the "accepted construction" of the term "persecution" before passage of the Act); PI at 11-13.

Contrary to the new "complete helplessness" formulation, the universal understanding of the standard at the time of the Refugee Act was enacted was whether the government was unable or unwilling to provide "effective protection." *See, e.g.*, UNHCR Handbook ¶ 65 (1979, rev. 1992), Mujahid Decl., Exh. D (standard was whether "the authorities refuse, or prove unable, to offer effective protection"); *see also Cardoza-Fonseca*, 480 U.S. at 436-37, 439 n.22 (Handbook

"provides significant guidance" in interpreting the Refugee Act).[28]  Because "words used in an

original act or section, that are repeated in subsequent legislation with a similar purpose, are

presumed to be used in the same sense in the subsequent legislation," Congress, "in using the

term 'persecution' . . . intended to adopt the judicial and administrative construction of that term

existing prior to the Refugee Act of 1980."  *Matter of Acosta*, 19 I&N Dec. at 222-23.  Thus, the

new "condoned" or "complete helplessness" formulation violates the correct, "effective

protection" standard incorporated into the Refugee Act.  *See also* PI at 12-14.

   The new formulation is also inconsistent with the overall statutory standard for asylum,

under which applicants need only show "a well-founded fear" of persecution on a protected

ground.  8 U.S.C. § 1101(a)(42).  The new formulation essentially requires asylum applicants to

show an absolute certainty that the government will not protect them from feared harm –

meaning that applicants who face a greater than ten percent chance of suffering persecution will

fail the new formulation.  *See* PI at 15-17.  As Defendants previously recognized, however, the

proper question is not whether the home government is completely helpless, but whether "the

government takes *reasonable* steps to control the infliction of harm or suffering" that "reduce the

risk of claimed harm below the well-founded fear threshold."  Pl. Fact 12, Asylum Officer Basic

Training, Female Asylum Applicants & Gender-Related Claims at 21 (Dec. 5, 2002), Mujahid

Decl., Exh. E (emphasis added).  Only that understanding is in keeping with the well-founded

fear standard.  And applying the new formulation to the *credible fear* process, where applicants

need only show a "significant possibility" of meeting the asylum eligibility standard, 8 U.S.C.

---

[28] *See also, e.g.*, *Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971) (recognizing viability of refugee claim if non-governmental persecutor is able "to carry out its purposes without effective hindrance"); *Matter of Eusaph*, 10 I&N Dec. 453, 454 (BIA 1964) (indicating that non-governmental persecution would qualify if "the police powers of the government have degenerated to the point where it is unable to take proper measures to control individual cases of violence"); *see also McMullen v. INS*, 658 F.2d 1312, 1315 & n.2, 1318 (9th Cir. 1981).

§ 1225(b)(1)(B)(v), compounds the problem by requiring a showing of *complete* helplessness where applicants need only demonstrate a significant possibility of a ten percent chance of persecution, *see Cardoza-Fonseca*, 480 U.S. at 440. Thus, the new formulation "do[es] violence to Congress' intent" in numerous ways. *Id.* at 436.

2. Defendants do not even attempt to grapple with these sources, or explain how the new formulation can be squared with the statutes Congress enacted. Instead, their principal response is to contend that the "condoned" or "complete helplessness" language is just one of "multiple formulations of the existing standard," and so is not "substantively distinct" from the "unable or unwilling" standard. Def. MSJ at 10, 29. Defendants are incorrect.

As a matter of plain language, a government may be ultimately unable to effectively control a persecutor and protect an asylum seeker, but still not be "completely helpless." A government might be able to, for example, investigate a potential persecutor, and conduct some arrests and prevent some instances of harm – going beyond complete helplessness – without establishing effective control. Thus, courts have repeatedly held that applicants established that their government was "unable to control" the feared persecutors even where the government may have taken some, albeit ineffective, steps in response to the feared harm. *See, e.g.*, *Bringas-Rodriguez*, 850 F.3d at 1075 (government was unable to protect gay man despite various reforms including a "specialized hate crimes prosecution unit"); *Gathungu v. Holder*, 725 F.3d 900, 906, 908-09 (8th Cir. 2013) (government was unable to protect applicant from political group despite evidence of "very strong policies" and somewhat effective governmental action against the group); *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011) (evidence that government had "focused law enforcement efforts on suppressing gang violence" was not dispositive); *see also* PI at 15 n.2 (collecting cases).

40

Likewise, a government may be "unwilling" to protect an applicant from harm for a variety of reasons, including "corruption, bias, lack of political will, or desire to prioritize the protection of other segments of society."  Anker Decl., ¶ 14.  Accordingly, courts have repeatedly found governments to be "unwilling" to protect asylum seekers in an array of situations falling short of "condoning" the persecution.  *See, e.g.*, *Doe v. Holder*, 736 F.3d 871, 879 (9th Cir. 2013) (finding government unwilling to protect applicant where Russian police dismissed his complaints without acting on them); *Ivanov v. Holder*, 736 F.3d 5, 14 (1st Cir. 2013) (finding the police unwilling to protect where there "is no evidence that the police made any efforts to apprehend or punish Ivanov's attackers"); *Hengan v. INS*, 79 F.3d 60, 62 (7th Cir. 1996) (finding the government might be unwilling to control the persecutors because it needed their political support).

To be sure, some courts of appeals have used the language of "condoned" or "complete helplessness."  But, as explained immediately below, those cases nevertheless applied the correct "unable or unwilling" standard, examining whether the government could or would offer effective protection.  In contrast, Defendants' adoption of the new formulation flatly contradicts the "unable or unwilling standard" by directing officers to *ignore* whether state protection is effective.  The USCIS Guidance, for example, explicitly dismisses the significance of the "fact that a country . . . has problems *effectively* policing . . . domestic violence or gang violence."  Guidance at 7; *see also* Interim Guidance (similar); *Matter of A-B-*, 27 I&N Dec. at 320 (similar).  The new formulation is thus clearly different from the settled "unable or unwilling" standard.

3.  Defendants also contend that their new formulation of the standard "is not new."  Def. MSJ at 24.  Specifically, they argue that the adoption of the new formulation is justified because some circuit courts have previously used the same language.  The argument should be rejected.

*First*, the circuit cases relied on by Defendants do not actually apply the formulation.  In both cases cited by *Matter of A-B-*, in fact, the noncitizen prevailed *despite* police intervention demonstrating the government was not completely helpless.  *See Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005), *rejected in relevant part by Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005); *see also* PI at 15 n.2 (describing cases).  The other cases on which Defendants rely are likewise inapposite.[29]  In none of these cases did the outcome actually turn on the question of whether the government "condoned" the persecution or was "completely helpless" to protect the applicant.  And when a case is presented that actually involves that question, those courts might well abandon or curtail that language.  *Cf., e.g.*, *Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018) (describing Supreme Court's clarification of prior "loose language").  But a policy document dictating standards for all future credible fear decisions is another matter.  Defendants cannot justify the latter by pointing to the former.

*Second*, if those few circuits actually adopted the "condone" or "complete helplessness" formulation as the controlling standard, they would be wrong to do so.  None of the circuit cases Defendants cite explain how the new formulation can be squared with the Refugee Act – including the well-founded fear standard.  Nor do they seek to explain how the two formulations could possibly mean the same thing.  Indeed, the circuit cases on which the government relies

---

[29] *Shehu v. Gonzales*, 443 F.3d 435, 437-38 (5th Cir. 2006), rejected an asylum claim where the noncitizen could not even identify her feared persecutors – much less establish any lack of government protection from them.  Likewise, *Menjivar v. Gonzales*, 416 F.3d 918 (8th Cir. 2005), rejected an asylum claim based on evidence that the "police conducted a thorough investigation of [the persecutor's] criminal acts, and apparently forced him into hiding as a result," *id*. at 922.

simply cite without analysis back to *Galina* – which likewise offers no support for the

formulation and, as explained above, did not even apply it.  Defendants' cases thus represent "the

judicial equivalent of a rumor chain" in which a first decision "makes an unreasoned assertion on

which no one had focused" and later cases repeat it without examination.  *Thomas v. Clements*,

797 F.3d 445, 448 (7th Cir. 2015) (Easterbrook, J., concurring in the denial of en banc).

    *Third*, the circuit court cases Defendants cite do nothing to change the fact that the

"condoned" or "complete helplessness" formulation is new *as policy* – and in particular as

credible fear policy.  Indeed, the USCIS Guidance specifically and repeatedly highlights the

"condoned" or "complete helplessness" formulation as a key change for asylum officers to

note.[30]  That change is unlawful.

### C.  The New Nexus Rule Violates the INA, Refugee Act, and APA.

    The credible fear policies impermissibly direct asylum officers to presume that "[w]hen a

private actor inflicts violence based on a personal relationship with the victim," the victim

"often" will be unable to establish "nexus," USCIS Guidance at 6 – referring to the requirement

to show that persecution is "on account of" a protected ground like a particular social group.  8

U.S.C. § 1101(a)(42)(A); *see also Matter of A-B-*, 27 I&N Dec. at 338-39.  This instruction is

contrary to the nexus standard Congress enacted.

    The INA expressly contemplates mixed motives for persecution by specifying that a

protected ground must be "*one* central reason" for the persecution.  8 U.S.C. § 1158(b)(1)(B)(i)

---

[30] *See* USCIS Guidance at 6 (emphasizing that "[t]he applicant must show the government condoned the private actions or at least demonstrated a complete helplessness to protect the victim"); *see also* USCIS Guidance at 2; *id.* at 10 ("Again, the home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution."); USCIS Interim Guidance ("When the harm is at the hands of a non-governmental actor, the applicant must show that the government condoned the behavior or demonstrated a complete helplessness to protect the victim.").

(emphasis added).  Defendants do not contest the governing legal standard; indeed, they endorse both the "one central reason" standard and the need to conduct a "mixed-motive" analysis where there is more than one reason for persecution.  *See* Def. MSJ at 5, 24, 31.

Defendants assert, however, that there is no improper directive here, emphasizing that *Matter of A-B-* and the Guidance recite the correct "one central reason" standard.  Def. MSJ at 31.  But merely reciting the proper standard is not enough when the policies go on to state positions that are inconsistent with that standard.  The Guidance in particular directs that the mere existence of a "personal" relationship, and thus a personal motive, will often foreclose nexus to a protected ground.  USCIS Guidance at 6.  This is a far cry from the pre-existing law that nexus is foreclosed in the case of "*purely* personal disputes," Def. MSJ at 30 (emphasis added) – which is consistent with the nexus standard because in such cases a protected ground necessarily *cannot* be one central reason for the persecution.  *See, e.g.*, *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007) (interpreting "one central reason" standard to permit "mixed motives"), *overruled in other part by Ndayshimiye v. Att'y Gen. of U.S.*, 557 F.3d 124 (3d Cir. 2009); *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013) ("Although mistreatment motivated *purel*y by personal retribution will not give rise to a valid asylum claim, if a retributory motive exists alongside a protected motive, an applicant need show only that a protected ground is 'one central reason' for his persecution.") (emphasis added, citation omitted); *Castaneda-Castillo v. Holder*, 638 F.3d 354, 365 (1st Cir. 2011); *see also* PI at 24-26.  Indeed, courts have routinely found nexus established where a personal relationship exists – including in contexts that *inherently* or *predominantly* involve persecutors with close ties to the applicant.  *See supra* at Background Part C (collecting cases involving persecution by family members such as female genital cutting, forced marriage, and honor killings); PI at 26.

44

Moreover, the application of this new nexus policy at the credible fear stage violates the low threshold screening standard Congress established.  Asylum officers and immigration judges are supposed to grant all potentially meritorious claims, ensuring the relevant facts can be fully developed in ordinary removal proceedings.  *See supra*, Background Part A; *see also* PI at 26-27. But the new nexus rule directs officers to be skeptical that an applicant with a "personal relationship" with her persecutor will be able to marshal evidence to satisfy the "one central reason" standard in future ordinary removal proceedings.  That is the opposite of giving the benefit of the doubt to applicants, as the credible fear statute requires.

Finally, the policies are also arbitrary and capricious because they provide no logical explanation why "personal" claims should be presumed to *often* fail nexus.  *Lone Mountain Processing*, 709 F.3d at 1164; *Fox*, 684 F.3d at 80; *see* PI at 26-27.  The government states that with respect to nexus, *Matter of A-B-* held only that the applicants in both *Matter of A-B-* and *Matter of A-R-C-G-* "fail[ed] to prove that a protected ground was a motive at all."  Def. MSJ at 31.  But even if those particular applicants "fail[ed] to prove that a protected ground was a motive at all," Def. MSJ at 31, that does not mean that other applicants will be unable to provide proof of motive.[31]  Indeed, for example, any generalized conclusion that applicants who experienced domestic violence will be unable to prove that a protected ground is at least one central reason for persistent rape, violent abuse, psychological terror, and torture in relationships is flatly inconsistent with the extensively-documented research establishing that such violence is

---

[31] Notably, it is well established that direct evidence of motive is not required.  *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992) (approving of circumstantial evidence); H.R. Conf. Rep. No. 109-72, at 290 (2005) (same).

no mere "personal" dispute, but rather is rooted in gender dynamics arising from sociocultural,

legal, and historical factors.[32]  The new nexus policy is unlawful.

### D. The New Rule Regarding Circularity of Social Groups Relating to Domestic Violence Is Unlawful.

The new credible fear policies establish a general rule that particular social group

definitions relating to domestic violence should be rejected as impermissibly circular and are

therefore not cognizable.  The new rule violates the Refugee Act and is arbitrary and capricious

in violation of the APA.

The legal standard governing this issue is well-established.  As *Matter of A-B-* itself

recognizes, settled law provides that "a social group may not be defined *exclusively* by the fact

that its members have been subjected to harm."  27 I&N Dec. at 330-31 (emphasis added)

(citing, *inter alia*, *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007)).  The problem

with such a social group is that it would be impermissibly "circular."  *See*, *e.g.*, *Matter of C-A-*,

23 I&N Dec. 951, 960 (BIA 2006) (relying on the UNHCR Particular Social Group Guidelines

("UNHCR PSG Guidelines"), which articulate the same rule).[33]  The UNHCR Guidelines

explain that particular social groups cannot be defined *solely* by harm because the Refugee

Convention did not envision sweeping all persecuted people within the scope of protection,

instead specifying five grounds for protection; allowing particular social group to be defined

based on the fact of persecution alone would "render the other four Convention grounds

superfluous."  UNHCR PSG Guidelines ¶ 2.  Once an immutable characteristic other than the

---

[32] *See, e.g.*, Pl. Fact 40, ABROP0732 (Lemon Decl.) ("Cross-cultural studies also confirm that domestic violence occurs because of gender inequality predicated on hierarchical and distinct gender roles.") (discussing studies); *see also* ABROP0695-96; ABROP0647.

[33] *See* UNHCR, Guidelines on International Protection: "Membership of a particular social group," U.N. Doc. HCR/GIP/02/02 (May 7, 2002), *available at* http://www.unhcr.org/3d58de2da.pdf .

fact of persecution is added to the social group definition, however, this concern drops away. *See id.* ¶¶ 2, 14.

Thus, it is well-established that a group defined by persecutory conduct plus an immutable characteristic can be cognizable, and that actions of the persecutors can "identify or even cause the creation of a particular social group in society." UNHCR PSG Guidelines ¶ 14; *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74 ("Although a social group cannot be defined exclusively by the fact that its members have been subjected to harm, we noted that this may be a relevant factor in considering the group's visibility in society."); *see also id.* (citing UNHCR PSG Guidelines).[34]  Indeed, the courts have recognized social groups even where the harm suffered is a key feature of the group definition.  *See, e.g.*, *Lukwago v. Ashcroft*, 329 F.3d 157, 178 (3d Cir. 2003) (upholding the social group "former child soldiers who have escaped LRA enslavement"); *see also Matter of A-B-*, 27 I&N at 335 (citing *Lukwago*).

Yet the new credible fear policies direct asylum officers and immigration judges to reject groups defined *only in part* by persecution.  *Matter of A-B-* criticized the BIA's decision in *Matter of A-R-C-G-* for having "never considered" the possibility that the specific social group in that case, "married women in Guatemala who are unable to leave their relationship," was circular because "the inability 'to leave' was created by harm or by threatened harm," *Matter of A-B-*, 27 I&N Dec. at 335.  The USCIS Guidance relies on that necessarily fact-specific criticism about the group advanced in that case to establish a rule against such social groups.  *See* USCIS Guidance at 5 ("The [*A-B-*] analysis casts doubt on whether a particular social group defined solely by the ability to leave a relationship can be sufficiently particular."); *see also id.* (groups

---

[34] *See also, e.g.*, *Cece*, 733 F.3d at 671 ("Even if the group were defined in part by the fact of persecution . . . that factor would not defeat recognition of the social group under the Act" as long as the group also includes "immutable characteristics").

"would generally not share a 'narrowing characteristic other than their risk of being persecuted'" where the group definition includes inability to leave the relationship).[35]  The USCIS Guidance articulated a new rule – that domestic violence-based social groups that include "inability to leave" are not cognizable – which is arbitrary and capricious for three reasons.

First, even assuming that "inability to leave a relationship" was created by persecution or threat of persecution, the social group would not be circular.  As noted, settled caselaw, acknowledged in *Matter of A-B-*, prohibits at most those social groups defined *exclusively* by harm as circular, and the category of groups the policies single out generally include gender and nationality – two factors independent of the feared persecution – as immutable characteristics.  Gender and nationality are undoubtedly "characteristic(s) other than their risk of being persecuted," USCIS Guidance at 6, and exist independently of the perpetration or threat of rape, beatings, and psychological and emotional abuse.  *Cf. Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010) (recognizing that a social group based on gender and nationality alone might be cognizable).  The policies nevertheless direct officers that such social groups are generally circular, contrary to the settled circularity standard.

Second, the USCIS Guidance is arbitrary and capricious because it purports to impose a general rule against similarly-framed domestic violence-related social groups without taking account of the actual independent characteristics presented in individual cases.  That lack of individualized assessment is particularly inappropriate because frequently inability to leave a relationship is *not* in fact simply created by feared harm.  *See* Def. MSJ at 28 (asserting that circularity is established even if inability to leave only "might" result from harm).  The

---

[35] As noted, Plaintiffs do not challenge the reversal of *Matter of A-R-C-G-* itself.  Instead, Plaintiffs challenge the rule, set forth in the USCIS Guidance, that social group formulations that include the inability to leave a relationship should be rejected as impermissibly circular.

administrative record in *Matter of A-B-* itself demonstrates that a woman's inability to leave results from a variety of factors independent of the feared abuse, including the social inequality of women, discriminatory cultural norms, family and community pressures to stay in a relationship, and use of children as leverage, as well as an abuser's refusal to accept a woman's right to terminate the relationship.  *See, e.g.*, Pl. Facts 41-42, ABROP0742, ABROP0647.

Finally, the new credible fear policies fail even to acknowledge the change in course from settled caselaw, which recognizes that as long as the proposed social group definition contains characteristics independent from the feared persecution, the group is not circular. Neither does the Guidance provide a reasoned explanation for the change.  Certainly the narrow decision to overrule *Matter of A-R-C-G-* is not such a reason.  *Matter of A-B-*, in relevant part, principally criticized the BIA for failing to *consider* the question of circularity, and overruled the prior decision on that basis as well as the BIA's assertedly improper reliance on DHS's concession on the issue.  27 I&N Dec. at 334-35; *id.* at 333 ("concessions should not set precedential rules").  Moreover, *Matter of A-B-* suggested only that the social group at issue in *A-R-C-G-* was or might be "effectively" circular, *id.* at 335 – a notably tentative observation that the USCIS Guidance turns into a rule without explanation or justification.  Thus, the new policy is arbitrary, capricious, and contrary to law.

### E.  The Requirement of an "Exact Delineation" of the Particular Social Group Violates the INA and the APA.

The new credible fear policies purport to impose a requirement that is entirely novel *in the credible fear process*: Applicants, according to the policies, would now be required to articulate a specific social group even at the threshold screening stage.  *See Matter of A-B-*, 27 I&N Dec. at 344; USCIS Guidance at 3.  But that requirement cannot legally be applied at the credible fear stage.  Requiring the applicant to articulate and identify a specific legally

cognizable particular social group is inconsistent with the purpose and nature of the credible fear

process – namely, to identify cases that *may* ultimately be meritorious for further development in

a full asylum hearing.  *See* 8 U.S.C. § 1225(b)(1)(B)(v); *supra* at Background Part A.  The

articulation of a cognizable social group is a complex question informed by myriad BIA and

circuit court decisions, and frequently requires expert testimony.  *See* Asylum and Withholding

Definitions, 65 Fed. Reg. 76,588, 76,593 (Dec. 7, 2000).  Congress accordingly required that

officers specially trained in asylum law – *not* untrained, unprepared, traumatized, and

unrepresented applicants – would be responsible for identifying potential legal bases for asylum

through the credible fear process.  *See* PI at 27-29.  It is also arbitrary and capricious for the

policies to impose a requirement grounded in the adversarial nature of regular removal

proceedings at the non-adversarial credible fear stage.  *Id.* at 28-29.

　　In response, Defendants do not defend the application of this requirement to the credible

fear context.  Indeed, Defendants concede that the exact delineation requirement *should not* be

applied to credible fear proceedings.  *See* Def. MSJ at 31 ("Credible fear and asylum interviews

before USCIS are not adversarial in nature, *see* 8 C.F.R. § 208.9(b), and there is no requirement

that an applicant in those circumstances delineate her group like in such adversarial

proceedings."); *id.* at 20.  Instead, Defendants argue only that the new policies do not purport to

apply the requirement to articulate a particular social group to credible fear proceedings.  That

argument is incorrect.

　　*Matter of A-B-* emphasized a requirement to articulate "the exact delineation of any

proposed particular social group."  27 I&N Dec. at 344.  Defendants contend that this statement

has "nothing to do with credible fear" because the exact delineation requirement "does not apply

outside adversarial removal proceedings."  Def. MSJ at 31; *see id.* at 20.  But the requirement

was included in the USCIS Guidance, which has nothing to do with adversarial removal proceedings.  USCIS Guidance at 3 (instructing that "an applicant seeking asylum or refugee status based on membership in a particular social group must present facts that clearly identify the proposed particular social group").  The Guidance is directed to USCIS officers adjudicating asylum in "reasonable fear, credible fear, asylum, and refugee adjudications."  USCIS Guidance at 1.  It does *not* apply to ordinary removal proceedings; indeed USCIS officers are not involved in such proceedings.[36]  If, as Defendants contend, there is no policy of applying the exact delineation requirement outside of ordinary removal proceedings, there would be no need to address it at all in the USCIS Guidance.  Yet the Guidance imposes the requirement.

Thus Defendants' only defense of this policy – that there is no such policy in the credible fear context – is contrary to USCIS's own Guidance.[37]  And the requirement to articulate a particular cognizable social group is unlawful at the credible fear stage.

### F. The Instruction to Exercise Adverse Discretion at the Credible Fear Stage Violates the INA.

The new credible fear policies purport to authorize adjudicators to deny credible fear screenings based on *discretionary* factors, such as whether the applicant entered the country without inspection.  Defendants do not contest that a directive to exercise discretion in the credible fear process is unlawful.  Nor could they.  Officers have no discretion to deny credible fear; rather, the credible fear inquiry is whether there is a significant possibility a noncitizen

---

[36] An immigration judge (employed by EOIR, part of DOJ) presides over ordinary removal hearings, and the government is represented by an ICE attorney (which is not part of USCIS).  *See, e.g.*, 8 C.F.R. §§ 1003.10, 1240.2.

[37] The government also appears to defend the exact delineation policy as applied in ordinary removal proceedings, contending that it was adopted more than 60 days ago so cannot be challenged here.  That argument ignores the claim Plaintiffs have actually made: namely, a challenge to the requirement *in credible fear*.  The requirement in ordinary removal proceedings is not at issue in this case.

"could establish *eligibility* for asylum."  8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added); *see also*

8 C.F.R. § 208.30(e)(2); *cf. Pak v. Reno*, 196 F.3d 666, 674 (6th Cir. 1999) (determination of

eligibility for discretionary relief is a "statutory question separate from" the exercise of

discretion) (internal quotation marks omitted); *St. Cyr*, 533 U.S. at 307.  Because credible fear

turns only on eligibility, not on whether the noncitizen will eventually warrant a positive exercise

of discretion, asylum officers and immigration judges have no authority to reject credible fear as

an exercise of discretion.

Defendants argue that the credible fear policies do not actually direct officers to exercise

discretion in credible fear interviews.  Def. MSJ at 20; *see id*. at 29 n.10, 32.  But, as noted

above, the Guidance is directed to officers engaged in several kinds of asylum adjudications,

*including* credible fear.  *See* Guidance at 1.  And it indicates, without distinguishing among those

types of adjudications, that "USCIS [o]fficers' [g]eneral [d]uties" include the exercise of

discretion.  USCIS Guidance at 2.  Likewise, the section dedicated to discretion does not

distinguish among the types of adjudications in exhorting that officers "must . . . decide whether

to favorably exercise discretion."  Guidance at 7-8.  Notably, the Guidance is clear in specifying

that certain portions apply only to particular types of adjudications.  *See* Guidance at Part V

(credible fear and reasonable fear).  The balance of the Guidance – which does not specify that it

only applies to certain kinds of adjudications – must therefore be understood to apply to all of the

types of adjudications.

Thus, the new credible fear policies direct adjudicators to consider negative discretionary

factors at the credible fear stage.  That is directly contrary to the low threshold screening

standard that Congress established, *see supra* at Background Part A, and a violation of the terms

of the expedited removal statute and regulations.  It is also a dramatic, unacknowledged, and

unexplained change in policy.  *See* Pl. Fact 15, RAIO Training Course, Credible Fear of

Persecution and Torture Determinations (Feb. 13, 2017), at 24, Mujahid Decl., Exh. F ("[A] full

asylum hearing provides the appropriate venue to evaluate whether or not the applicant merits a

favorable exercise of discretion to grant asylum."); *Lone Mountain Processing*, 709 F.3d at 1164.

### G.  The Blanket Direction to Disregard Circuit Court Decisions Is Unlawful.

The USCIS Guidance establishes two new unlawful credible fear policies with regard to

circuit precedent.  First, the Guidance instructs asylum officers to apply circuit court holdings

only "to the extent that those cases are not inconsistent with *Matter of A-B-*."  USCIS Guidance

at 8.  Second, the Guidance directs that, even within that constraint, officers may only apply the

law of the "relevant circuit," defined as "the circuit where the alien is physically located during

the credible fear interview."  *Id*. at 8-9.  Defendants' summary judgment brief conflates the two

policies, but they are distinct, as are Plaintiffs' arguments against them.  The policy to disregard

circuit precedent violates the fundamental principle that Article III courts are the arbiters of

"what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and is not justified by the

narrow exception for executive statutory interpretations that are entitled to deference –

particularly at the credible fear stage.  *See* PI at 29-36.  The "relevant circuit" policy violates the

statutory credible fear screening standard Congress enacted – directing officers to deny claims

even though they would prevail in some circuits and so necessarily have a "significant

possibility" of establishing eligibility for asylum in removal proceedings.  8 U.S.C. §

1225(b)(1)(B)(ii); *see also* PI at 36-39.

### 1.  The Policy of Disregarding Circuit Law Violates the Separation of Powers, the INA and the APA.

Defendants' new policy of disregarding circuit law inconsistent with *Matter of A-B-*

violates the separation of powers and the APA.  It is constitutional bedrock that Executive

Branch officials are bound by the decisions of Article III courts.  Thus, no agency can adopt a policy of simply ignoring binding circuit precedent.  *See* PI at 29-30.  The Guidance, and the government's summary judgment motion, attempts to do just that, based on a narrow exception articulated in *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).  Where an agency's statutory interpretation addresses a question Congress has delegated authority to the agency to answer, and where the agency's interpretation is not arbitrary and capricious, it is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  *Brand X* held that an agency interpretation entitled to *Chevron* deference generally displaces prior circuit precedent on the same issue.  545 U.S. at 982-83.

The new policy directs officers to ignore *all* circuit law contrary to *Matter of A-B-* in any respect, without even assessing whether any given aspect of *Matter of A-B-* is entitled to deference.  That policy far exceeds the narrow permission under *Brand X* to displace circuit precedent on specific questions where the agency's interpretation is entitled to *Chevron* deference.  *Chevron* deference is not, contrary to Defendants' suggestion, automatic.  Courts refuse deference, for example, if the agency's determination is not "an interpretation of . . . statutory language" at all.  *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011).  Likewise, where Congress has provided "a clear and unambiguous answer to the interpretive question at hand," courts will refuse to defer to an agency's interpretation.  *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).  And, even where Congress has delegated authority to address a particular question, courts will not defer if the proposed rule is unreasonable, inadequately explained, or arbitrary or capricious.  *Judulang*, 565 U.S. at 52-53 & n.7; *Lone Mountain Processing*, 709 F.3d at 1164.

Accordingly, in light of the many ways in which deference may be unwarranted with regard to a particular question or the answer the agency has provided, *Chevron* deference is not

dispensed in bulk.  Rather, courts examine the specific "interpretive question at hand" to determine whether to grant deference.  *Pereira*, 138 S. Ct. at 2113; *see also Chevron*, 467 U.S. at 843; PI at 31-32.  Thus, the blanket disregard for circuit law and Defendants' assertion that *Matter of A-B-* is "entitled to *Chevron* deference in all respects," Def. MSJ at 2, cannot be squared with the established *Chevron* framework.  As is clear from Plaintiffs' various other challenges to the new credible fear policies, *Matter of A-B-* addresses various different aspects of asylum law.  Under *Chevron* principles, *each* answer the government provides to *each* gap Congress left as to *each* statutory provision must be analyzed on its own terms.

    1.  Neither *Matter of A-B-*, nor the Guidance, nor Defendants' summary judgment brief remotely demonstrates that every aspect of *Matter of A-B-* is entitled to deference.  Defendants portray the decision overall as an interpretation of the term "particular social group," Def. MSJ at 26, but, for example, Plaintiffs' challenge to the new credible fear policy regarding nexus is entirely independent of the interpretation of that statutory term.  *Compare* 8 U.S.C. § 1158(b)(1)(B)(i) (nexus standard) *with* 8 U.S.C. § 1101(a)(42)(A) ("particular social group").  And Defendants also flatly assert that every "aspect of *A-B-* Plaintiffs challenge relies on preexisting law that itself has already been accorded *Chevron* deference by numerous courts." Def. MSJ at 2.[38]  But that is patently wrong as well.

    For example, the new "condoned" or "complete helplessness" formulation cannot be an interpretation of the term "particular social group."  *See Matter of A-B-*, 27 I&N Dec. at 337 (recognizing that "unable or unwilling" standard is an aspect of the statutory term "persecution").  And the new formulation has clearly not "already been accorded *Chevron* deference."  Def. MSJ

---

[38] Defendants do offer a specific argument that the decision to overrule *Matter of A-R-C-G-* is entitled to deference.  Def. MSJ at 27-29.  As explained, Plaintiffs do not challenge that overruling in this case.  Whether it is entitled to deference is not presented in this case, and will be addressed in other fora.

at 2.  The new credible fear policies *just* adopted that formulation for the first time – so it cannot have *previously* been granted deference.  *See supra* at Part II.B.  Moreover, Defendants do not even defend the formulation as "an interpretation of . . . statutory language" that could warrant *Chevron* deference.  *Judulang*, 565 U.S. at 52 n. 7.  Instead, they justify the new formulation by pointing to certain circuit decisions that have used that language.  That argument is entirely backwards: Under *Chevron*, courts may defer to *agency* interpretations of statutes.  Here, the Attorney General accepted courts' statements, separate and apart from any agency interpretation; no deference is warranted under those circumstances.  *Cf. MikLin Enterprises, Inc. v. NLRB*, 861 F.3d 812, 823 (8th Cir. 2017) (courts need not "defer to an agency's interpretations of judicial precedent").

Even if the government had actually adopted the new formulation as a statutory interpretation, it would not be entitled to deference.  Rather, Congress provided "a clear and unambiguous answer to the interpretive question at hand."  *Pereira*, 138 S. Ct. at 2113.  As discussed above, *supra* at Part II.B., the text, context, history, and uniform case law all confirm that the "unable or unwilling" standard requires only a showing of a lack of effective state protection – not complete helplessness.  *See* also PI at 11-18, 32-33.  Thus, *Matter of A-B-*'s more stringent formulation for government involvement is foreclosed.  *Cf. Fajardo v. U.S. Atty. Gen.*, 659 F.3d 1303, 1309 (11th Cir. 2011) (refusing *Chevron* deference to Attorney General decision because Congress had answered the question at issue).

Likewise, with respect to the rule against credible fear claims related to domestic violence and gangs, it is nonsense to suggest that this new policy has *already* been afforded deference in some prior decision.  Def. MSJ at 2.  Neither is the new rule entitled to deference as an interpretation of the statutory term "particular social group" – as noted, such claims can be

based on multiple protected grounds for asylum.  *Supra* at Part II.A.1.  Moreover, the new rule is contrary to the INA and arbitrary and capricious – so would not be entitled to deference in any event.  *Supra* Part II.A; PI at 18-24.  The government thus is flat wrong that everything in *Matter of A-B-* is entitled to *Chevron* deference.

2.  It follows that *Brand X* does not justify the Guidance's blanket direction to ignore all circuit law inconsistent with *Matter of A-B-*.  *Brand X* is not a blank check.  Rather, it is a narrow exception to the general rule that Article III courts say what the law is.  An agency may refuse to follow circuit law *only* when the relevant agency determination is entitled to *Chevron* deference.  Yet neither *Matter of A-B-* nor the Guidance undertakes that analysis at the required, issue-specific level.  Indeed, *Matter of A-B-* itself invoked *Brand X* on one issue only: the interpretation of "the term 'particular social group.'"  27 I&N Dec. at 327.  As explained, the interpretation of that term is largely irrelevant with regard to the new policies Plaintiffs challenge.  The Guidance adds nothing, simply asserting blanket deference for *everything* in *Matter of A-B-*.  *See* PI at 30-31.  The new policy is unlawful and demonstrates "shocking disrespect" for the courts.  *Anderson v. Heckler*, 756 F.2d 1011, 1013 (4th Cir. 1985).

3.  Finally, the policy is particularly egregious as applied to the credible fear process.  At the credible fear stage, the question is whether there is a *significant possibility* of eligibility—meaning, in a case where this rule makes the difference, a significant possibility that a beneficial prior court decision will remain binding under *Brand X*.  For example, if an applicant would pass the credible fear screening under circuit law applying the settled "unable or unwilling" standard, but would not pass under the new "condoned" or "complete helplessness" formulation, then the case comes down to which formulation applies.  But, for the reasons Plaintiffs have explained, there is, at a very minimum, a significant possibility that a circuit court examining

*Matter of A-B-*'s new formulation would refuse to defer – and so the preexisting contrary caselaw would remain binding on the agency.  Thus, pursuant to the low threshold screening standard Congress enacted, an applicant in that situation *must* pass credible fear.  The new rule for disregarding circuit law is therefore contrary to the credible fear standard and unlawful.  *See* PI at 35-36.[39]

### 2. The "Relevant Circuit" Policy Violates the INA and the APA.

The new credible fear policies make an additional, likewise illegal change regarding circuit authority.  Even within the set of circuit decisions that are not inconsistent with *Matter of A-B-*, the USCIS Guidance directs officers to apply only the law of the "relevant circuit," which it defines as "the circuit where the alien is physically located during the credible fear interview." USCIS Guidance at 9.  That new policy also conflicts with the low threshold credible fear standard Congress enacted.  The credible fear standard directs asylum officers to decide whether an applicant "*could* establish eligibility for asylum" if she were placed in regular removal proceedings.  8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added).  But those removal proceedings, if the applicant passes credible fear, could take place anywhere in the country – in any circuit – as the Guidance itself makes clear.  *See* Guidance at 9 (recognizing removal proceedings following a positive credible fear determination can take place "in any forum" and will "not necessarily" be where the applicant is located during the credible fear interview); *see also* PI at 37 & n.12.  If a noncitizen would prevail under a particular circuit's law, then by necessity there is a "significant possibility" that person could win – so the expedited removal statute requires that an applicant be

---

[39] The new formulation is also arbitrary and capricious because it is an insufficiently explained break with the government's longstanding practice of abiding by circuit law and invoking *Brand X* only as to specific interpretive questions.  PI at 36.

afforded the benefit of the circuit law that is most favorable to her on any given issue.  *See also*

PI at 29, 37-38.

Defendants do not even address this statutory argument.  Instead, they mischaracterize

Plaintiffs' argument, contending that Plaintiffs challenge the new policy as a violation of USCIS'

training materials.  Def. MSJ at 20, 23.  But that is not Plaintiffs' argument.  Plaintiffs rely on

earlier USCIS materials to show that the agency has long applied the most favorable circuit law

in making credible fear determinations – thus making clear that this new policy marks a stark

departure from prior policy.  *See* Pl. Fact. 19, Nasr. Decl. ¶ 9; PI at 38-39 (collecting prior policy

statements); Pl. Facts 16-17.[40]

---

[40] Although Defendants take issue with Plaintiffs' reading of the prior policy, they are incorrect.  In relevant part, the former policy provides that:

> . . . where there is:
>     a. disagreement among the United States Circuit Courts of Appeal as to the proper interpretation of a legal issue; or,
>     b. the claim otherwise raises an unresolved issue of law; **and**,
>     c. there is no DHS or Asylum Division policy or guidance on the issue,
> then generally the interpretation most favorable to the applicant is used when determining whether the applicant meets the credible fear standard.

Pl. Fact 17, Refugee, Asylum, and International Operations Directorate Officer Training Course ("RAIO"), Credible Fear of Persecution and Torture Determinations, at 17 (Feb. 13, 2017), Mujahid Decl., Exh. F ("2017 Credible Fear Training") (emphasis in original); *see also* Pl. Fact 17, RAIO Training Course, Credible Fear (Feb. 28, 2014), at 16, Mujahid Decl., Exh. I; Pl. Fact 17, RAIO Training Course, Credible Fear of Persecution and Torture Determinations (Apr. 14, 2006), at 14, Mujahid Decl., Exh. J.  Contrary to the government's argument, this policy actually provided that applicants get the benefit of the most favorable interpretation in two scenarios: 1) there is disagreement among the circuit courts, regardless of DHS policy, *or* 2) the issue is otherwise an open question *and* DHS has not taken a position.  *Id.*  The policy reflected that disagreement among the circuits on a dispositive question necessarily means that there is a significant possibility the applicant will ultimately prevail, while the same cannot be said of legal questions that are simply unresolved.  At a minimum, the former policy is ambiguous in this regard, and should be construed to avoid placing the former policy in conflict with the expedited removal statute.

Defendants also make the striking assertion that the new relevant circuit rule – announced only in the USCIS Guidance, not in *Matter of A-B-* – is itself entitled to *Chevron* deference.  Def. MSJ at 33-34.  But as Defendants' own cited authority makes clear, "'[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.'"  *Texas Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 338 (D.D.C. 2018) (Sullivan, J.) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)) (cited in Def. MSJ at 33).  The USCIS Guidance is thus "beyond the *Chevron* pale."  *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001).[41]

Defendants further contend that the relevant circuit policy is not new at all, pointing to two BIA decisions to argue that the new policy "has long been the agency's standard approach."  Def. MSJ at 33 (citing *Matter of Gonzalez*, 16 I&N Dec. 134, 135-36 (BIA 1977); *Matter of Waldei*, 19 I&N Dec. 189, 193 (BIA 1984)).  But both cases are about the circuit law governing *ordinary* removal proceedings.  Credible fear proceedings present an entirely different situation: The significant possibility standard explicitly involves a prediction about the likelihood of prevailing in future removal proceedings.  Indeed, the Guidance recognizes this distinction.  Guidance at 8-9 (observing that "the relevant federal circuit court is the circuit where *the removal proceedings will take place*" if the applicant passes credible fear, citing those two BIA cases) (emphasis added).  As noted above, and as the Guidance acknowledges, removal

---

[41] Defendants' suggestion that the balance of the Guidance warrants "some" deference is also wrong.  *See* Def. MSJ at 32.  For the reasons already explained, the new policies are legally flawed, so have no "power to persuade."  *Id.* (internal quotation marks omitted).

proceedings could take place anywhere in the country.  The BIA cases are thus inapposite and do not represent a prior basis for the new relevant circuit policy in the expedited removal context.[42]

Finally, Defendants assert that the Guidance has provided a reasoned explanation for the new relevant circuit rule.  Def. MSJ at 34.  But they simply quote what the Guidance says on the matter – which makes no sense.  That "removal proceedings can take place in any forum," and "an asylum officer cannot predict with certainty" where that will be, Guidance at 9, is a reason for the *prior* "most favorable" circuit rule, not a reason to arbitrarily select the circuit where the credible fear interview takes place.  And the fact that "there may not be removal proceedings if the officer concludes the alien does not have a credible fear" is totally beside the point.  *Id.*  The credible fear standard requires a prediction of success *in regular removal proceedings*, meaning *if the applicant passes credible fear*.  In assessing the likelihood an applicant would ultimately win her case *once* she is in ordinary removal proceedings, it is illogical and arbitrary to rely on the fact that she might not get to those removal proceedings in the first place.  *See also* PI at 38. It is not enough for the government to just provide *some* reason, no matter how illogical.  *See Judulang*, 565 U.S. at 55 (rejecting illogical reasoning as arbitrary and capricious).

## III. PLAINTIFFS ARE ENTITLED TO PERMANENT RELIEF.

### A.  The Court Has Power to Order the Remedies Plaintiffs Seek.

Plaintiffs seek an order enjoining, and preventing the government and its officials from applying, the challenged credible fear policies, as reflected in *Matter of A-B-*, the related USCIS Guidance, and any other guidance implementing *Matter of A-B-*, in credible fear proceedings. As to Plaintiffs who have not been removed, Plaintiffs request that the Court vacate any credible fear determinations and removal orders issued to them, and order that Defendants provide new

---

[42] For the same reason, the government's proffered analogy to a criminal case (Def. MSJ at 35) is irrelevant.

credible fear proceedings applying the correct legal standards or place the Plaintiffs in ordinary removal proceedings.  As to Plaintiffs who have been removed, Plaintiffs request that the Court order Defendants to parole them back into the United States, vacate any credible fear determinations and removal orders issued to them, and provide new credible fear proceedings applying the correct legal standards or place them in ordinary removal proceedings.

Defendants have conceded that the Court has power to vacate the challenged policies as well as Plaintiffs' removal orders.  *See* Tr., Aug. 9, 2018, at 13-14 (government counsel stating that "if the policy is found to be unlawful . . . the policy will be set aside" and Plaintiffs' "orders of removal . . . would be invalidated").  And Defendants also indicated that returning the removed Plaintiffs to the United States would be appropriate.  *See id.* (government counsel stating that with respect to Plaintiffs who have been removed, Defendants "would return them to the United States at no expense to themselves").  Indeed, Defendants made these representations in the course of arguing that a stay was unnecessary.  Yet Defendants now argue that once Plaintiffs have been removed, they cannot be returned to the United States even if the Court concludes that their removals were unlawful.  Def. MSJ at 25.  Defendants' argument must be rejected.

Defendants rely on *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009), as support for their contention that the Court "lacks authority" to order that the removed Plaintiffs be returned to the United States and paroled.  Def. MSJ at 25.  But *Kiyemba* is inapposite.  *Kiyemba* concerned the habeas petitions of seventeen Chinese citizens who had never been to the United States and were detained at Guantanamo Bay, Cuba.  *Id.* at 1023.  The Court determined that a district court had no authority to compel "the Executive to release [plaintiffs] into the United States *outside the framework of [U.S.] immigration laws.*" *Id.* at 1028 (emphasis added); *see also*

*id.* at 1028 n.12 (noting petitioners could not invoke the authority of the judiciary where they had not entered or sought admission under immigration law).  Here, Plaintiffs were in the United States until they were unlawfully deported by the government, sought asylum *within* the framework of U.S. immigration laws, and had their applications erroneously pretermitted.  The Court clearly has power to undo that unlawful action by ordering that they be returned to the United States.  *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050-51 (9th Cir. 1998) (affirming injunction requiring parole into the United States of noncitizens unlawfully removed).[43]

### B.  The Balance of Equities Favors the Issuance of an Injunction.

Plaintiffs are entitled to the permanent relief they seek.  Plaintiffs, asylum seekers who fear brutal persecution in their home countries, have suffered and are suffering irreparable harm caused by the unlawful credible fear policies.  As detailed in their declarations, based on extensive past harms and threats they have already suffered, they fear rape, pervasive domestic abuse, beatings, kidnapping, shootings, and even death in their home countries.  *See* Pl. Facts 47, 49.  The five Plaintiffs who have been removed are living in fear for their lives, and the remaining Plaintiffs are at risk of being removed to the countries where their lives would be in grave danger.   Pl. Facts 48-49.  These harms cannot be compensated through legal remedies.  Plaintiffs' experiences and feared harm are consistent with the findings of countless reports documenting the widespread violence and brutality faced by individuals in Central American countries, particularly women and children.  *See* Pl. Facts 49-56, PI at 39-41.

---

[43] Defendants also cite two cases suggesting that, when the government denies parole, that denial is not judicially reviewable because it is discretionary.  Def. MSJ at 25 n.7 (citing *Kucana v. Holder*, 558 U.S. 233, 237 (2010), and *Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007)).  However, these cases are beside the point, as Plaintiffs are not seeking judicial review of any discretionary determination.

Further, the balance of hardships favors the issuance of an injunction.  An injunction will not substantially injure the government, and would further the public interest.  Indeed, it is in the government's interest to ensure that asylum seekers like the Plaintiffs are not removed to or forced to remain in a place where they fear grave persecution or death in violation of the immigration laws.  Ensuring Plaintiffs and other asylum seekers a meaningful opportunity to pursue their credible fear claims is also in the public interest.  *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  The public interest is also served when the government complies with its obligations under the law.  The "public also has an interest in ensuring that its government respects the rights of immigrants[.]" *M.G.U. v. Nielsen*, No. 18-1458, 2018 WL 3474189, at *10 (D.D.C. July 18, 2018) (issuing a preliminary injunction and enjoining immigration authorities from removing Plaintiffs pursuant to expedited removal orders). *See also* PI at 41-43.[44]

In short, the balance of harms and the public interest decisively favor enjoining Defendants' unlawful policies and affording asylum seekers a meaningful opportunity to establish their credible fear of persecution in accordance with correct legal standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be GRANTED and Defendants' motion should be DENIED.

---

[44] *See also O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (stating that the "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" where the government must comply with its legal obligations); *Damus v. Nielsen*, -- F.Supp.3d. --, 2018 WL 3232515, at *17 (D.D.C. July 23, 2018) ("The public interest is served when administrative agencies comply with their obligations under the APA.") (internal quotation marks omitted); *R.I.L-R. v. Johnson*, 80 F.Supp.3d 164, 191 (D.D.C. 2015) (explaining that public interest is served by an injunction that "ends an unlawful practice" and ensures compliance with APA) (internal quotation marks omitted).

Dated: September 26, 2018                     Respectfully submitted,


*/s/ Jennifer Chang Newell*

Eunice Lee**                                  Jennifer Chang Newell**
Karen Musalo**                                Katrina Eiland**
Anne Dutton**                                 Cody Wofsy**
Center for Gender & Refugee Studies           American Civil Liberties Union Foundation,
200 McAllister St.                            Immigrants' Rights Project
San Francisco, CA 94102                       39 Drumm Street
(415) 565-4877                                San Francisco, CA 94111
                                              (415) 343-0774
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)       Judy Rabinovitz**
American Civil Liberties Union Foundation     Omar C. Jadwat**
    of the District of Columbia               Lee Gelernt
915 15th Street NW, Second Floor              Celso J. Perez*** (D.C. Bar No. 1034959)
Washington, D.C. 20005                        American Civil Liberties Union Foundation,
(202) 457-0800                                Immigrants' Rights Project
                                              125 Broad Street, 18th Floor
Thomas Buser-Clancy**                         New York, NY 10004
Andre Segura**                                (212) 549-2660
ACLU Foundation of Texas
P.O. Box 8306                                 Sandra S. Park**
Houston, TX 77288                             Lenora M. Lapidus
(713) 942-8146                                Emma Roth**
                                              American Civil Liberties Union Foundation,
                                              Women's Rights Project
*Attorneys for Plaintiffs*                    125 Broad Street, 18th Floor
                                              New York, NY 10004
**Admitted pro hac vice*                      (212) 519-7871
***Admission to D.D.C. pending*