# DECLARATION OF REBECCA JAMIL
## FORMER IMMIGRATION JUDGE AND ICE ATTORNEY

I, Rebecca Jamil, make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

**Background and Experience**

1. My name is Rebecca Jamil. I received my Bachelor of Arts from Stanford University and my Juris Doctor from the University of Washington Law School.

2. I was sworn in to be an Immigration Judge in March of 2016, and served in that capacity for over two years, until July 2018. Before serving as an Immigration Judge, I worked as Assistant Chief Counsel for U.S. Immigration and Customs Enforcement ("ICE") for five years, from 2011 until 2016. In this capacity, I handled a number of asylum cases, including cases related to domestic violence and gang violence. Previously, I served as a staff attorney in the Ninth Circuit Court of Appeals from 2006 to 2011, where I handled primarily immigration cases. I am currently working in private practice in San Francisco, California.

3. Because I was formerly an ICE Assistant Chief Counsel, when I began serving as an Immigration Judge, I was assigned to only new cases to avoid any conflict from matters handled by my former office. Thus, I was assigned to the "surge docket" which had only new cases. The cases on this docket were of Unaccompanied Alien Children (UAC) or family units largely of immigrant mothers with children; the overwhelming majority of these involved asylum claims based on domestic or intra-familial violence, rooted in the particular social group ground for asylum. A smaller number of cases involved particular social group claims based on persecution from gangs.

4. I have experience reviewing Credible Fear Interviews ("CFIs") while covering for the detained docket in the San Francisco Immigration Court. I am familiar with the CFI process from direct experience, as well as reviewing the record in merits asylum cases where an individual passed a credible fear interview.

***Matter of A-B-* and the USCIS Guidance**

5. About one month before my last day as an Immigration Judge in July 2018, Attorney General Sessions announced his decision in *Matter of A-B-*, 27 I. & N. Dec. 316 (2018).

In my capacity as an Immigration Judge, I carefully reviewed the decision and was expected to apply it.

6.  Based on my knowledge and expertise as an Immigration Judge and ICE attorney, I believe that *Matter of A-B-* fails to fairly or correctly interpret U.S. asylum law. Having considered the issues carefully, I have concluded that the Attorney General's decision is contrary to long-standing legal standards for properly evaluating asylum claims on a case-by-case basis under the refugee definition.

7.  As I mentioned, as an Immigration Judge my docket overwhelmingly involved particular social group claims for asylum raised by children and mothers. Most of these cases involved asylum seekers who had suffered severe forms of domestic violence. Prior to *Matter of A-B-*, many of these cases passed credible fear and/or were able to establish eligibility for asylum.

8.  There are many troubling aspects to the *Matter of A-B-* decision. In particular, it was highly unusual for the Attorney General to declare that entire categories of claims— namely, those based on domestic violence and gang violence—would "generally" be evaluated negatively, notwithstanding his inability to predict the individual facts and circumstances of each asylum seeker's case. Based on my experience as an Immigration Judge, the statement in *Matter of A-B-* that certain claims "generally" will not qualify for asylum and will fail to satisfy the credible fear standard (27 I. & N. at 320 & n.1) sends a clear signal to Immigration Judges that they are to prejudge and deny these claims. Before *A-B-*, this was not the case; applicants in domestic violence and gang violence cases could, with the right facts and credible testimony, establish asylum eligibility. I myself previously granted asylum to such individuals in my capacity as an Immigration Judge.

9.  Additionally, by incorrectly interpreting various elements of the refugee definition—even in hypothetical scenarios not presented by the facts in Ms. A-B-'s case itself—*Matter of A-B-* created a roadmap for Immigration Judges to broadly and categorically deny otherwise meritorious claims, including at the credible fear review stage.  For example, the language in *Matter of A-B-* indicating that "complete helplessness" or "condoned" is the standard for failure of State protection against non-State actor persecution is not, in my view, consistent with the refugee definition and case law, and will likely lead to

2

denial of meritorious claims. *See* 27 I. & N. Dec. at 337. The language in *Matter of A-B-* addressing nexus, indicating that "[w]hen private actors inflict violence based on a personal relationship with the victim" this "may well not be 'one central reason' for the abuse," will likely lead to incorrect categorical denials of meritorious claims, despite the persecutor's intent being a fact-specific inquiry. *Id.* at 338-39.

10. Immigration Judges are bound to apply the new standards articulated in a precedential case such as *Matter of A-B-* in their reviews of negative credible fear determinations.

11. It is my opinion that the decision taken as a whole creates pressure on Immigration Judges to affirm the rejection of such claims by Asylum Officers at the credible fear stage, as well as to deny domestic violence and gang violence asylum claims at the merits stage. The language of the decision itself indicates to Immigration Judges that they should deny such claims. Immigration Judges do not have lifetime appointments, and may face a risk of termination if their decisions are not viewed as being "in line" with leadership in the Department of Justice. The pressure to deny is heightened by performance evaluations and case completion quotas that discourage thorough decision-making. Additionally, Immigration Court Performance Measures published by the Department of Justice on January 17, 2018 explicitly state that one hundred percent of all credible fear reviews should be carried out within seven days of the initial determination. As an Immigration Judge, I read the *Matter of A-B-* decision as a clear signal to deny domestic violence claims, and claims related to gang violence.

12. I have reviewed the July 11, 2018 U.S. Citizenship and Immigration Services formal guidance on *Matter of A-B-* ("USCIS Guidance"). That Guidance states that, during CFIs, Asylum Officers must rely on *Matter of A-B-* and disregard conflicting case law from federal circuits. Moreover, the USCIS Guidance narrowly limits application of circuit case law to the circuit where an asylum seeker is temporarily located. Previously, Asylum Officers would apply circuit law in general, and the most favorable circuit for the applicant in particular. That earlier rule was correct because credible fear interviews are intended to allow meritorious claims to reach a full hearing, and that full hearing may take place in any jurisdiction. The new policy is a dramatic departure from past practice and will make credible fear passage more difficult for many applicants, leading to denial

of asylum claims that would have had a significant possibility of prevailing within the jurisdiction of some federal circuit courts.

13. The USCIS Guidance also appears to impose a new requirement that asylum seekers articulate their precise particular social group, even at the credible fear stage, which to my knowledge was not previously required. Based on my time as an Immigration Judge, I can say first-hand that articulating a particular social group is an extremely complex enterprise—one that even experienced and diligent attorneys often fail to do properly in merits proceedings. It is ludicrous to expect that asylum seekers in CFIs articulate their own particular social groups. Considering the purposes and format of a CFI, it is the responsibility of Asylum Officers, and not asylum applicants, to formulate the proper particular social group in CFIs based on the facts provided by asylum applicants and elicited by or otherwise known to the asylum officers. CFIs are not full blown hearings. They are intended to serve as screening mechanisms to allow meritorious claims to reach a full immigration hearing.  They are not intended to elicit all relevant facts and evidence. It would not be reasonable to expect applicants in a CFI to present the full range of facts and evidence in support of an asylum claim that would be presented at a merits immigration hearing.

14. This is especially true considering the many obstacles that asylum seekers face in CFIs. Many asylum seekers are traumatized when they arrive to the U.S., and the majority lacks an understanding of U.S. asylum law. Few have the time and ability to marshal significant evidence in support of their claims. Moreover, a lack of qualified interpreters plagues CFIs, as has been well documented. When interpretation is available, it is usually done over the phone despite low-quality equipment and faulty connections, and results in an overall inability to communicate effectively in many cases. Indigenous asylum seekers are especially disadvantaged and often receive no interpretation in their first language whatsoever.

//

I, Rebecca Jamil, swear under the penalties of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

_____
Rebecca Jamil

_San Francisco, CA_
Location

_9/6/18_
Date

## DECLARATION OF ETHAN NASR
## FORMER USCIS ASYLUM OFFICER AND ASSOCIATE COUNSEL

I, Ethan Nasr, make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

**Background and Experience**

1. My name is Ethan Nasr. I received my Bachelor's in Arts from Harvard University and my Juris Doctor from the University of California, Hastings College of the Law.

2. Between January 2013 and May 2018, I served as Associate Counsel at the U.S. Citizenship and Immigration Services ("USCIS") Office of the Chief Counsel. In this capacity, I reviewed and revised asylum training materials and policy memoranda, for legal sufficiency and clarity. For several years during my tenure, I also led classroom instruction at the Refugee, Asylum and International Operations ("RAIO") Combined Training Courses for new asylum and refugee officers, covering the material from the RAIO Lesson Plans for Well-Founded Fear, Gender-Related Harm, and Nexus - Particular Social Groups.

3. Between February 2012 and January 2013 I also served as an Asylum Officer in the RAIO Directorate of the USCIS. In this capacity, I interviewed asylum applicants and determined their eligibility for asylum. Many of the applications I adjudicated involved claims of persecution by gangs, cartel members, and other third-party actors, as well as several claims involving harm from domestic violence.

***Matter of A-B-* and the USCIS Guidance**

4. I have reviewed Attorney General Sessions' decision in *Matter of A-B-*, 27 I. & N. Dec. 316 (2018). I have also reviewed the June 13, 2018 USCIS interim guidance ("USCIS Interim Guidance"), and the July 11, 2018 USCIS formal guidance on *Matter of A-B-* ("USCIS Guidance"). In my capacities as an Asylum Officer and Associate Counsel to USCIS, I was expected to be familiar with documents like *Matter of A-B-*, the USCIS Guidance, and the USCIS Interim Guidance.

5. I believe an Asylum Officer reading this memorandum would feel strong pressure to not grant a positive credible fear determination for an applicant in a domestic violence or gang violence situation, or at the very least would anticipate that granting a positive credible fear determination in such cases will trigger scrutiny from a supervisor, with possible additional professional repercussions. The demanding caseload for credible fear interviews, coupled with performance reviews that are tied to meeting those daily goals, has an inhibiting effect on atypical conclusions because such determinations involve considerable additional time on a single case – either to revise or reverse such a decision after supervisory review - at the expense of limited time available for other cases and job demands.

6. Based on my knowledge and expertise as an Asylum Officer and USCIS Associate Counsel, I believe that the USCIS Guidance heightens the standard applied by asylum officers in making credible fear determinations for certain applicants, making it more difficult for applicants with claims related to domestic violence or gang violence to receive a positive credible fear determination. I believe *Matter of A-B-* and the USCIS Guidance depart from prior practices and standards for AOs in making credible fear determinations for particular social groups.

7. First, the USCIS Guidance purports to categorically dismiss domestic violence and gang violence claims in the credible fear context. It explicitly states in bold letters that as a general matter "claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors **will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution.**" USCIS Guidance at 6 (emphasis added).

8. The USCIS Guidance's statement that claims relating to domestic violence and gang violence should generally fail is a departure from prior policy and practice. Asylum Officers are expected to evaluate each credible fear case based on the specific facts in the case, performing an individualized analysis of whether there is a significant likelihood the applicant could establish eligibility for asylum. By encouraging Asylum Officers to deny claims falling in these categories, the Guidance sends a message that undermines truly individualized determinations. In my experience, I have never seen a guidance or training material that specifically excludes a category of claims like this.

9. Similarly, the USCIS Guidance adopts a more restrictive reading of what law can be applied during a credible fear determination. Under previous guidance, Asylum Officers would apply the federal circuit law most favorable to the applicant, because the applicant's case may ultimately be heard in any circuit, depending on where he or she ultimately resided. The new USCIS Guidance, however, now explicitly instructs Asylum Officers to apply the law of "the circuit where the alien is physically located during the credible fear interview." USCIS Guidance at 9. Moreover, it adds that federal circuit law should *only* be applied "to the extent that those cases are not inconsistent with *Matter of A-B-*." *Id.* at 8. This last exhortation is particularly unusual and not something I have ever otherwise seen as an Asylum Officer or otherwise during my time at USCIS.

10. Likewise, the USCIS Guidance suggests that applicants claiming asylum based on domestic violence or gang claims must demonstrate at the credible fear stage that the government has either condoned or is completely helpless to prevent such violence. USCIS Guidance at 6. USCIS has never before required that showing in credible fear interviews. In my view, this formulation is wrong as a matter of law, but it is particularly inappropriate to require such a showing at the credible fear stage. In a similar manner, the USCIS Guidance also adopts a presumption in cases involving a personal relationship against finding a nexus between membership in a particular social group and the persecutor's intent. The Guidance states that "when a private actor inflicts violence based on a personal relationship with the victim, the victim's membership in a larger group *often will not be* 'one central reason' for the abuse." USCIS Guidance at 8 (emphasis added). USCIS did not previously impose such a presumption in credible fear interviews. In my view, this is also wrong as a matter of law, and will likely predispose at least some Asylum Officers to deny these claims.

//

//

//

11. Overall, I believe that *Matter of A-B-* and the USCIS Guidance purport to interject into the credible fear stage a number of complex legal determinations that have been traditionally carried out *after* an applicant passes the credible fear screening standard. This policy appears to target certain particular social groups, and marks a stark departure from previous practice in the context of expedited removal.

I, Ethan Nasr, swear under the penalties of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

_____          Amsterdam, Netherlands     9/24/18
Ethan Nasr                         Location              Date

### DECLARATION OF ALLEGRA LOVE

I, Allegra Love, make the following declaration based upon my personal knowledge and, if called to testify, I would as follows:

1. I am an immigration attorney and the Executive Director of the Santa Fe Dreamers Project.

2. I work primarily in the Cibola County Correctional Center in New Mexico, where I, along with other members of my organization, provide legal services to those in detention. Cibola's detained population consists of two main categories of individuals: (1) transgendered women who are seeking asylum based on the violence they have suffered due to being transgendered; and (2) men, mostly from Central America, who are seeking asylum based on claims of gang violence.

3. With respect to the men at Cibola who are seeking asylum based on claims of gang violence, we meet with this population both before and after they have gone through the CFI process. Although we do not keep exact statistics, I would estimate that I meet with well over 100 men a month. In these meetings, men who have been through the credible fear process let us know the results. For that reason, I am able to observe general trends in CFI passage rates.

4. I am familiar with the decision issued by Attorney General Session on June 11, 2018, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). Additionally, I am familiar with both the interim and final guidance issued by the USCIS Asylum Division staff regarding *Matter of A-B-*.

5. After *Matter of A-B-* and the subsequent guidance, the number of men at Cibola who failed their CFI increased dramatically. Prior to *Matter of A-B-* and the guidance, I would estimate that the passage rate for CFIs for this population—who are seeking asylum largely based on claims of gang violence—was around 80%. However, that number has significantly gone down subsequent to *Matter of A-B-* and the guidance. I would estimate that for the male population at Cibola, the passage rate is now closer to 5 or 10%.

6. In contrast, I have not seen a similar decline in CFI passage rates for the transgender population at Cibola.

7. Indeed, *Matter of A-B-* has so drastically reduced the number of men who pass their CFI, that there is a significantly smaller population of males who remain in Cibola long term. Instead, a large amount of this population is now being transferred out soon after failing their CFI. This has led to an increasingly transitory population at Cibola, and also caused me to hire a staff attorney to be present at the El Paso Processing Center, where those individuals who failed their CFI will have that decision reviewed by an Immigration Judge. I made this

decision because, with so many individuals now receiving a negative credible fear determination, the review by the Immigration Judge is their last chance to not be subject to expedited removal.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20 th day of September , 2018, in Santa Fe, NM .

ALLEGRA LOVE

2

## DECLARATION OF JODI GOODWIN

I, Jodi Goodwin, make the following declaration based upon my personal knowledge and, if called to testify, I would as follows:

1. I have been an immigration attorney in the Rio Grande Valley of Texas for the past 23 years. For the past 22 years, I have run my own immigration law practice, located in Harlingen, Texas.

2. A large majority of my clients come from Central America, and many come seeking asylum in the United States for claims related to gang violence and domestic violence.

3. I am familiar with the decision issued by Attorney General Session on June 11, 2018, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).  Additionally, I am familiar with both the interim and final guidance issued by the USCIS Asylum Division staff regarding *Matter of A-B-*.

4. I often represent clients as they prepare for their CFIs, and in this capacity, I have had the opportunity to observe how the CFI process has operated both before and after *Matter of A-B-* and the guidance.

5. Based on my observations, *Matter of A-B-* and the subsequently issued guidance have significantly impacted the CFI process.

6. Following *Matter of A-B-* and the guidance, I have noticed that Asylum Officers are not willing to ask questions about domestic violence or gang violence.  If an applicant brings up domestic violence or gang violence, the Asylum Officer will often interrupt the applicant and ask if there are any *other* reasons the applicant might be afraid to return to their country. Before *Matter of A-B-* and the subsequent guidance, Asylum Officers would typically ask questions to better understand what harms the applicant had suffered as a result of domestic or gang violence and why the applicant feared such harms would happen again if they returned to their country.

7. I have also seen a change in the outcomes of credible fear interviews, especially with regard to victims of domestic violence and gang violence.

8. The rate of positive credible fear determinations for victims of domestic and gang violence plummeted following *Matter of A-B-* and the subsequent guidance.  It was drastic and very sudden.  Prior to these new policies, the clients I represent with such claims would typically have passed their CFIs around 60-70% of the time.  That number has now significantly

declined.  I would estimate the current CFI passage rate for my clients with gang or domestic violence claims to be less than 10%.

9.  I have had numerous conversations with immigration law colleagues, who have told me that they have observed a similar trend following *Matter of AB* and the subsequent guidance in terms of the sharp decrease in credible fear grant rates for individuals with domestic violence or gang claims.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20 th day of September , 2018, in Harlingen, Texas .

_____

JODI GOODWIN

## DECLARATION OF RUBY L. POWERS

I, Ruby L. Powers, make the following declaration based upon my personal knowledge and, if called to testify, I would as follows:

1. I have been an immigration attorney in Houston, Texas for the past 10 years. For the past 9 years, I have owned my own immigration law firm, Powers Law Group, P.C.  Additionally, I am Board Certified in Immigration and Nationality law with the Texas Board of Legal Specialization.

2. Although I am based in Houston, my firm and I handle cases arising all over the United States and have an office in northern New Jersey. My law firm has four full-time attorneys in which three are involved in immigration litigation regularly. We have had clients in seven detention centers in and around Texas.

3. Approximately 20% of my firm's practice is asylum. Of my clients from Central America, many come seeking asylum in the United States for claims related to domestic violence.

4. In addition, I have an active pro bono practice, which involves, amongst other things, advising clients with respect to their CFI interviews and representing clients following their CFI interviews. Through both my asylum practice and my pro bono practice, I have had the opportunity to observe the CFI process and CFI outcomes, and to gain an understanding of the facts and circumstances that normally yield a positive CFI determination.

5. I am familiar with the decision issued by Attorney General Session on June 11, 2018, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).  Additionally, I am familiar with both the interim and final guidance issued by the USCIS Asylum Division staff regarding *Matter of A-B-*.

6. Based on my observations, *Matter of A-B-* has made it substantially more difficult for victims of domestic violence to receive a positive CFI determination.  Indeed, the increase in negative credible fear determinations for victims of domestic violence has been alarming.  Following the new policies, I have witnessed case after case where victims of domestic violence receive a negative fear determination, whereas, before *Matter of A-B-*, based on my experience these individuals would have received a positive determination.

7. Additionally, following *Matter of A-B-* and the subsequent guidance, I have noticed that Asylum Officers are generally less willing to ask questions about domestic violence.  If an applicant brings up domestic violence, the Asylum Officer will cut off the applicant. Before *Matter of A-B-* and the guidance, Asylum Officers would typically ask questions to better understand what harms the applicant had suffered as a result of domestic violence and why the

1

applicant feared such harms would happen again if they returned to their country.  This does not generally happen anymore.

8.   I have had numerous conversations with my colleagues who practice immigration law, and they have told me that they have similarly observed a significant decline in positive CFI determinations for both domestic violence and gang cases following *Matter of A-B-* and the guidance.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20 th day of September , 2018, in Houston, Texas .

RUBY L. POWERS

2