# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GRACE,** *et al.*,

        **Plaintiffs,**

    v.

**JEFFERSON BEAUREGARD SESSIONS III,**
Attorney General of the United States, in his
official capacity, *et al.*,

        **Defendants.**

**Civil No. 18-cv-01853**
**HON. EMMET G. SULLIVAN**

---

### BRIEF OF THE TAHIRIH JUSTICE CENTER, ET AL.
### AS *AMICI CURIAE* IN SUPPORT OF
### PLAINTIFFS' OPPOSITION AND MOTION FOR SUMMARY JUDGMENT

---

Paul M. Thompson (D.C. Bar No. 973977)
Philip J. Levine (D.C. Bar No. 470553)
Joseph Speyer (D.C. Bar No. 1018560)
McDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
(202) 756-8032
Pthompson@mwe.com

Julie Carpenter (D.C. Bar No. 418768)
The Tahirih Justice Center
6402 Arlington Boulevard, Suite 300
Falls Church, VA 22042
(571) 282-6161
Juliec@tahirih.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Local Rules of the United States District Court for the District of Columbia LCvR(o)(5) and Federal Rule of Appellate Procedure 26.1, *Amici Curiae* submit the following corporate disclosure statements with respect to those *amici* that are corporations:

The Tahirih Justice Center is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The National Network to End Domestic Violence is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Public Counsel is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The ASISTA is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The National Asian Pacific American Women's Forum is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Women's Refugee Commission is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Asian Pacific Institute on Gender-Based Violence is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Futures without Violence is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The National Domestic Violence Hotline is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Sanctuary for Families is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The New York City Anti-Violence Project is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

The Michigan Immigration Rights Center is a private, non-profit organization. It has no parent company, and no publicly held company holds more than 10% of its stock.

**TABLE OF CONTENTS**

I.    THE ATTORNEY GENERAL'S DECISION IN MATTER OF A-B- IS
      ARBITRARY, CAPRICIOUS, UNREASONED, AND CONTRARY TO
      LAW .......................................................................................................... 7

      A.    SURVIVORS OF GENDER-BASED VIOLENCE CAN
            ARTICULATE SOCIAL GROUPS THAT ARE NOT DEFINED
            SOLELY BY THE HARM AND ARE THEREFORE NOT
            "CIRCULAR." ............................................................................. 7
            1.    The Attorney General Distorted The Articulated PSG ............ 7
            2.    The New "General" Conclusion are Contrary to Well-
                  Understood Dynamics of Gender-Based Violence Showing
                  That Many Factors Can Create an Inability to Leave. ............... 9

      B.    THE ATTORNEY GENERAL'S CONCLUSION THAT
            SURVIVORS OF GENDER-BASED DOMESTIC VIOLENCE
            "GENERALLY" CANNOT MEET THE NEXUS REQUIREMENT
            IS ARBITRARY AND CAPRICIOUS ............................................ 15

II.   EVEN IF MATTER OF A-B- WERE A VALID AGENCY ACTION,
      APPLYING THAT DECISION TO CREDIBLE FEAR DETERMINATIONS
      IS NOT ..................................................................................................... 17

      A.    "CREDIBLE FEAR" IS A LOW BAR ......................................... 18
            1.    Background .............................................................................. 18
            2.    The Legislative History of the "Credible Fear" Interview
                  Shows That Congress Did Not Want to Screen Out Bona Fide
                  Asylum Seekers ....................................................................... 19
            3.    The Practical Realities of the "Credible Fear" Interview Make
                  it Impossible for Many Bona Fide Asylum Seekers to Meet a
                  Higher Burden of Proof .......................................................... 21

      B.    THE NEW CREDIBLE FEAR POLICIES DIRECTING THAT
            DOMESTIC VIOLENCE CLAIMS WILL "GENERALLY" NOT
            MEET CREDIBLE FEAR STANDARDS IMPERMISSIBLY
            RAISES THE "CREDIBLE FEAR" BURDEN ................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agbor v. Gonzales*,
  487 F.3d 499 (7th Cir. 2007) ..........................................................................9

*Al-Ghorbani v. Holder*,
  585 F.3d 980 (6th Cir. 2009) ...................................................................14, 17

*Aldana-Ramos v. Holder*,
  757 F.3d 9 (1st Cir. 2014), *as amended* (Aug. 8, 2014)....................14, 15, 16

*Ali v. Ashcroft*,
  394 F.3d 780 (9th Cir. 2005) ........................................................................14

*Asylum Officer Basic Training: Credible Fear*,
  2001 WL 36205685 (Nov. 30, 2001) .......................................................5, 23

*Balasubramanrim v. I.N.S.*,
  143 F.3d 157 (3d Cir. 1998) .........................................................................22

*Cece v. Holder*,
  733 F.3d 662 (7th Cir. 2013) (en banc) ......................................................8, 9

*Constanza-Martinez v. Holder*,
  739 F.3d 1100 (8th Cir. 2014) ......................................................................14

*Crespin-Valladares v. Holder*,
  632 F.3d 117 (4th Cir. 2011) ..................................................................14, 17

*Cruz v. Sessions*,
  853 F.3d 122 (4th Cir. 2017) ..................................................................17, 23

*Doe v. Holder*,
  736 F.3d 871 (9th Cir. 2013) ........................................................................14

*Garcia v. U.S. Att'y Gen.*,
  665 F.3d 496 (3d Cir. 2011), *as amended* (Jan. 13, 2012)...........................14

*Gibson Wine Co. v. Snyder*,
  194 F.2d 329 (D.C. Cir. 1952).........................................................................5

*In re Kasinga*,
   21 I. & N. Dec. 357 (BIA 1996) ......................................................................3

*Jonaitiene v. Holder*,
   660 F.3d 267 (7th Cir. 2011) ..........................................................................8

*Kante v. Holder*,
   634 F.3d 321 (6th Cir. 2011) ........................................................................14

*Karki v. Holder*,
   715 F.3d 792 (10th Cir. 2013) ......................................................................14

*Malu v. U.S. Att'y Gen.*,
   764 F.3d 1282 (11th Cir. 2014) ....................................................................14

*Marroquin-Ochoma v. Holder*,
   574 F.3d 574 (8th Cir. 2009) ........................................................................16

*Matter of A-B-*,
   27 I. & N. Dec. 316 (AG 2018) ..............................................................*passim*

*Matter of A-M-E- & J-G-U-*,
   24 I. & N. Dec. 69 (BIA 2007) ........................................................................8

*Matter of A-R-C-G-*,
   26 I & N Dec. 388 (BIA 2014) ..............................................................3, 7, 15

*Matter of Acosta*,
   19 I. & N. Dec. 211 (BIA 1985) ......................................................................6

*Matter of M-E-V-G-*,
   26 I. & N. Dec. 227 (BIA 2014) ......................................................................8

*Matter of S-A-*,
   22 I. & N. Dec. 1328 (BIA 2000) ..................................................................14

*Matter of W-G-R-*,
   26 I. & N. Dec. 208 (BIA 2014) ......................................................................8

*Mirisawo v. Holder*,
   599 F.3d 391 (4th Cir. 2010) ..........................................................................5

*Mohammed v. Gonzales*,
 400 F.3d 785 (9th Cir. 2005) ........................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
 *Ins. Co.*,
 463 U.S. 29 (1983)..........................................................................................16

*Mulyani v. Holder*,
 771 F.3d 190 (4th Cir. 2014) ..........................................................................5

*Nabulwala v. Gonzales*,
 481 F.3d 1115 (8th Cir. 2007) .......................................................................14

*Ndayshimiye v. U.S. Att'y Gen.*,
 557 F.3d 124 (3d Cir. 2009) ..........................................................................16

*Oliva v. Lynch*,
 807 F.3d 58 (4th Cir. 2015) .............................................................................6

*Pacas-Renderos v. Sessions*,
 691 F. App'x 796 (4th Cir. 2017)....................................................................6

*Paloka v. Holder*,
 762 F.3d 191 (2d Cir. 2014) ..........................................................................14

*Penick Corp. v. DEA*,
 491 F.3d 483 (D.C. Cir. 2007).........................................................................6

*Qu v. Holder*,
 618 F.3d 602 (6th Cir. 2010) .........................................................................16

*R.R.D. v. Holder*,
 746 F.3d 807 (7th Cir. 2014) .........................................................................14

*R-A-*,
 22 I. & N. Dec. at 921....................................................................................15

*Ramaprakash v. F.A.A.*,
 346 F.3d 1121 (D.C. Cir. 2003)......................................................................7

*Sarhan v. Holder*,
 658 F.3d 649 (7th Cir. 2011) .............................................................9, 14, 16

*Senathirajah v. I.N.S.*,
   157 F.3d 210 (3d Cir. 1998) ........................................................................22

*Singh v. Gonzales*,
   134 F. App'x 158 (9th Cir. 2005)................................................................22

*Tesfamichael v. Gonzales*,
   469 F.3d 109 (5th Cir. 2006) ......................................................................14

*Vata v. Gonzalez*,
   243 F. App'x 930 (6th Cir. 2007)................................................................16

*Zhang v. Holder*,
   585 F.3d 715 (2d Cir. 2009) ..................................................................5, 22

**Statutes**

8 U.S.C. § 1158(b)(1)(B)(i) ................................................................................17

8 U.S.C. § 1225(b)(1) ........................................................................................19

8 U.S.C. § 1225(b)(1)(A)....................................................................................19

8 U.S.C. § 1225(b)(1)(B)....................................................................................19

8 U.S.C. § 1225(b)(1)(B)(v) ..............................................................................19

5 USC § 552.........................................................................................................5

Illegal Immigration Reform and Immigrant Responsibility Act of
   1996, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) ......................18

INA § 101(a)(42)(A)............................................................................................24

INA § 207(c)(1) (codified at 8 U.S.C. §§ 1157-58) ..........................................24

INA § 208(b)(1) (codified at 8 U.S.C. §§ 1157-58) ..........................................24

INA § 235(b)(1) ..................................................................................................24

INA § 235(b)(1)(B)(v) ........................................................................................25

Refugee Act,
   Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980)........................................19

**Other Authorities**

8 C.F.R. § 208.30(d) ........................................................................19

8 C.F.R. § 208.31 ..............................................................................24

8 C.F.R. § 1003.42(f) ........................................................................19

142 Cong Rec. H11054 (daily ed. September 25, 1996) (statement
    of Rep. Smith) ............................................................................20

142 Cong Rec. H11054 (daily ed. September 25, 1996) (statement
    of Rep. Smith) ............................................................................21

142 Cong. Rec. H11071 (daily ed. May 1, 1996) (statement of Rep.
    Hyde) ....................................................................................20, 21

142 Cong. Rec. S11491-02 (daily ed. September 27, 1996)
    (statement of Sen. Hatch) ......................................................20, 21

142 Cong. Rec. S4457 (daily ed. May 1, 1996) (statement of Sen.
    Simpson) ....................................................................................21

142 Cong. Rec. S4457-91 (daily ed. May 1, 1996) (statement of
    Sen. Hatch) ................................................................................20

Afghanistan 2016 Human Rights Report 9 .......................................13

Armenia 2016 Human Rights Report 30 (2016) ................................13

Burma 2016 Human Rights Report 38 (2016) ...................................12

Cameroon 2017 Human Rights Report 26 (2017) .............................12

Comisión Internacional Contra la Impunidad en Guatemala,
    Human Trafficking for Sexual Exploitation Purposes in
    Guatemala 30 (2016) ..................................................................12

Haiti 2016 Human Rights Report 21 (2016) ......................................12

Kenya 2016 Human Rights Report 37 (2016) ...................................13

Mary Ann Dutton & Lisa A. Goodman, Coercion in Intimate
    Partner Violence: Towards a New Conceptualization,
    52 Sex Roles 743 (2005) ............................................................... 12

National Research Council, *Understanding Violence Against
    Women* (Nancy A. Crowell, Ann W. Burgess, eds. 1996) ........................... 12

*Report of the Special Rapporteur on Violence Against Women, Its
    Causes and Consequences, Mission to Afghanistan* 5, U.N.
    Doc. A/HRC/29/27/Add.3 (May 12, 2015) .................................................. 12

Russia 2016 Human Rights Report 56 (2016) ..................................................... 13

Saudi Arabia 2016 Human Rights Report 41 (2016) ......................................... 13

U.N. Secretary-General, In-Depth Study on All Forms of Violence
    against Women U.N. Doc A/61/122/Add. 1 (July 6, 2006) ......................... 11

UNHCR, *Handbook on Procedures and Criteria for Determining
    Refugee Status* ¶ 65 (1979, rev. 1992) ............................................................ 14

United Nations Secretariat Department of Economic and Social
    Affairs, *The World's Women 2010*, at 127, U.N. Doc.
    ST/ESA/STAT/ SER.K/19 (2010) ................................................................... 11

## STATEMENT OF INTEREST[1]

The Tahirih Justice Center is the largest multi-city direct services and policy advocacy organization specializing in assisting immigrant women and girls who survive gender-based violence.  In five cities across the country, Tahirih offers legal and social services to women and girls fleeing all forms of gender-based violence, including human trafficking, forced labor, domestic violence, rape and sexual assault, and female genital cutting/mutilation.  Since its beginning in 1997, Tahirih has provided free legal assistance to more than 20,000 individuals, many of whom have experienced the significant psychological and neurobiological effects of that trauma.  Through direct legal and social services, policy advocacy, and training and education, Tahirih protects immigrant women and girls and promotes a world where they can live in safety and dignity.  Tahirih amicus briefs have been accepted in numerous federal courts across the country.  Tahirih is joined in this brief by Asian Pacific Institute on Gender-Based Violence, ASISTA, Casa de Esperanza, Futures Without Violence, Michigan Immigrant Rights Center, National Alliance to End Sexual Violence, National Asian Pacific American Women's Forum, National Domestic Violence Hotline, National Network to End Domestic Violence, New York City Anti-Violence Project, Public Counsel, Sanctuaries for Families, Women's Refugee Commission.  Additional information regarding *amici* is provided in this brief's Appendix.

---

[1] No counsel for a party authored this brief in whole or in part; no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amici*, their members, or their counsel made such a monetary contribution. *See* Local Civil Rule 7(o)(5); Federal Rule of Appellate Procedure 29(a)(4)(E).

## INTRODUCTION[2]

In many corners of the world, women are treated as property: they are regarded as second class citizens with little if any inherent value. They are trafficked, literally bought and sold for sex or labor. Their bodies are mutilated in order to perpetuate notions of female sexuality as vile and uncontrollable. They are forced into marriages and into lifetimes of subordination. And they are coerced into relationships with men who use violence—sexual, verbal, emotional, and physical abuse—to establish power over them, effectively forcing them into the submissive role that they are expected to fill in their society as a woman in a domestic relationship.

These acts of brutality occur because, in some countries, governments are unwilling or unable to control these actors. In these cultures, women are viewed as subordinate to men and, in turn, the state affords them few legal protections or safety nets. Even if acts of violence against women are outlawed, police and prosecutors scoff at women who try to use the law to protect themselves, refuse to believe their claims, and harass and even rape them in these moments of extreme vulnerability. These are countries where there is no place for a woman to turn for protection. The abuses are not unique to these specific places, but the inability to escape the abuse is.

Over the course of more than two decades, U.S. Courts of Appeals and the Board of Immigration Appeals ("BIA") have held that survivors of gender-based violence, just like those fleeing religious or political persecution, are eligible for asylum if they meet the statutory criteria

---

[2] Amici are filing this brief pursuant to Defendant's position that "Defendants consent to the timely filing of amicus briefs provided that those briefs do not refer to or seek to introduce non-record factual material into the case." Email from Erez R. Reuveni to Jennifer Chang Newell, Joshua S. Press, Joseph A. Darrow (Sept. 24, 2018). Because amici have "not refer[red] to or [sought] to introduce non-record factual material into the case," Defendant's consent applies to this filing.

that establish them as refugees.  This legal precedent considers the social, economic, and legal reality that these women face.  It recognizes that these women are survivors of violence brought about by a public code of conduct that allows them to be victimized simply because they are women.  In the 1996 case that first established gender-based persecution as grounds for asylum, the BIA granted 17-year-old Fauziya Kassindja asylum after she fled a forced, polygamous marriage and female genital mutilation.  *In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996).  To escape guaranteed, life-long, physical, sexual, and psychological harm, Ms. Kassindja fled her country and found refuge in the United States.  In the decades since that case, the United States has provided asylum to women and girls fleeing other forms of gender-based persecution, including human trafficking, forced marriage, severe domestic abuse, rape and sexual violence (including as a weapon of war), so-called "honor" crimes and killings, acid burnings, dowry deaths, and widow rituals.

Most recently, however, in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), the Attorney General has attempted to corrode this settled law.  In *Matter of A-B-*, the Attorney General vacated a prior Board decision on the ground that it was insufficiently reasoned.[3]  Then, while claiming to simply apply existing law, he nevertheless repeatedly declared a wholly new series of "general" rules:

- "Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors *will not qualify for asylum*."  *Id.* at 320 (emphasis added)

- "[I]n practice such claims [relating to persecution by non-governmental actors] *are unlikely to satisfy the statutory grounds* for proving group persecution that the government is unable or unwilling to address."  *Id.* (emphasis added)

---

[3] *Matter of A-R-C-G-*, 26 I & N Dec. 388 (BIA 2014).

- "Social groups defined by their vulnerability to private criminal activity *likely lack the particularity* required . . . ." *Id.* at 335 (emphasis added)

Moreover, despite lengthy discussion of why he believes that gender-based violence claims should fail—based on personal assumptions about the nature of that violence[4]—he gives not a single clue as to what kind of claims might succeed under his decision. Instead of detailed analysis of particular facts, the decision rests on unsubstantiated generalities that offer no indication of what facts might qualify as an exception to these "general" guidelines. The Attorney General seeks on the one hand to avoid judicial review by claiming he has not established a new rule. On the other hand, his decision imposes a broad categorical change to the asylum process so that "generally," gender-based violence claims will fail. Thus, the Attorney General instructs asylum officers that the vast majority of asylum applicants who are victims of gender-based persecution "will not qualify for asylum" and should therefore be denied in a credible fear proceeding.

The government cannot have it both ways: *Matter of A-B-* either is supposed to result in a change or it is not. And given the guidance that has been issued, it is clear that, *outside* of court, the government's view is that *Matter of A-B-* should be applied to significantly reduce or perhaps even eliminate asylum claims based on gender-based violence. Indeed, that is the import of the USCIS Policy Memorandum, issued on July 11, 2018 (one month after *Matter of A-B-* was

---

[4] Little, if any, of the decision is based on actual evidence in the case before him. To the contrary, the reams of evidence submitted in the original proceeding in *Matter of A-B-* as well as the additional evidence submitted in the proceeding before him are barely referenced at all. Instead, he based his newly issued "general" rules on his own assumptions about domestic violence. For example, without citation to any record evidence, he concluded broadly that "in domestic violence cases, like *A-R-C-G-*" there could be no nexus because the persecutor "attacked her [the victim] because of his preexisting personal relationship with the victim." *Matter of A-B-*, 27 I&N Dec. 316, 339.

issued), which restates in bold-face type the general rules the Attorney General announced.   In short, the decision intentionally created either a sweeping "general" rule or a virtually irrebuttable presumption that so-called "private actions," like domestic violence, cannot qualify as a basis for asylum.[5]

For the reasons described below, *amici* believe that the agency action in *Matter of A-B-* is arbitrary, capricious, and contrary to law.   Its application as part of the credible fear policies challenged in this case is particularly egregious.   The twelve Plaintiffs here have had their opportunities to apply for asylum summarily rejected at the "credible fear" interview stage, even though asylum officers are instructed to apply "a low-threshold test" and to "draw all reasonable inferences in favor of the applicant." *Zhang v. Holder*, 585 F.3d 715, 724 n. 3 (2d Cir. 2009) (quoting INS, *Asylum Officer Basic Training: Credible Fear*, 2001 WL 36205685, at Pt. V (Nov. 30, 2001)).

## ARGUMENT

To qualify for asylum, an applicant must demonstrate that (i) she has a well-founded fear of persecution; (ii) she is a member of a particular social group ("PSG"); and (iii) her persecution is "on account of" her membership in a PSG.[6]   As to what constitutes a PSG, the BIA and several circuit courts hold that a PSG is valid if it is "(1) composed of members who share a common

---

[5] To the extent the Attorney General contends his instructions are "statements of general policy or interpretations of general applicability" rather than "substantive rules of general applicability," 5 USC § 552, such general policies and interpretations are reviewed with less deference by courts who endeavor to determine the merits of these general policies and interpretations. *See, e.g., Gibson Wine Co. v. Snyder*, 194 F.2d 329, 332-33 (D.C. Cir. 1952) (differentiating between statements of general policy or interpretations of general applicability, which courts review on the merits, and substantive rules, which have the effect of law and are not reviewable except for arbitrariness).

[6] *See Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014) (quoting *Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010)).

immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Pacas-Renderos v. Sessions*, 691 F. App'x 796, 804 (4th Cir. 2017) (quoting *Oliva v. Lynch*, 807 F.3d 58, 61 (4th Cir. 2015)).[7]

For decades prior to the Attorney General's decision in *Matter of A-B-*, the BIA and numerous federal courts held that survivors of gender-based violence *can* meet all three criteria. In other words, while domestic violence victimhood or gender-based victimhood may not itself define a freestanding PSG, survivors of gender-based and domestic violence may nonetheless be members of cognizable PSGs. This is not to say that *every* such victim may qualify for asylum in the United States. Such a general policy would run afoul of congressional intent and decades of settled law. *See Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985) (establishing current asylum framework) (subsequent history omitted). Instead, *amici* argue that, just as a general policy admitting *every* gender-based violence survivor into the United States is overbroad, so, too is a general policy *excluding* them. For the reasons set forth below, any policy "generally" excluding domestic violence victims from asylum protection would be overbroad and arbitrary— especially at the credible fear stage—and is contrary to both available evidence and years of precedent.[8] Notwithstanding any protests to the contrary, the government has attempted to implement just such a policy.

---

[7] While *amici* address these elements as current law in a majority of circuits, we note that the Court of Appeals for the D.C. Circuit has not decided whether these elements are valid. *Amici*'s position on these issues is that the current PSG requirements as articulated by the agency are problematic as a matter of law. We do not intend by this briefing to endorse these requirements.

[8] "At a minimum, . . . the arbitrary or capricious standard requires the agency to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Penick Corp. v. DEA*, 491 F.3d 483, 488 (D.C. Cir. 2007) (citations and quotation marks omitted). "[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation. Agencies are free to change

(continued…)

I.      **THE ATTORNEY GENERAL'S DECISION IN *MATTER OF A-B-* IS ARBITRARY, CAPRICIOUS, UNREASONED, AND CONTRARY TO LAW.**

In *Matter of A-B-*, the Attorney General vacated the decision in *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014) on the ground that the *A-R-C-G-* Board arrived at its decision without "performing the rigorous analysis required by the Board's precedents." *Matter of A-B-* at 319. In reexamining an analysis purportedly lacking rigor, however, the Attorney General's analysis itself was anything but rigorous.  He ignored evidence of political and social mores that foster and fail to protect against gender-based violence when he concluded that social groups relating to domestic violence are "circular," and he impermissibly assumed, contrary to evidence, that personal animosity is the only explanation for domestic violence.  This results-driven decision cannot withstand scrutiny under the Administrative Procedure Act (the "APA").

A.      **SURVIVORS OF GENDER-BASED VIOLENCE CAN ARTICULATE SOCIAL GROUPS THAT ARE NOT DEFINED SOLELY BY THE HARM AND ARE THEREFORE NOT "CIRCULAR."**

1.      **The Attorney General Distorted The Articulated PSG**

To justify his general rule that PSGs involving victims of domestic violence are circular, the Attorney General addressed not the particular social group actually at issue there, but a straw man argument of his own creation.  He complained that "*A-R-C-G-* never considered that 'married women in Guatemala who are unable to leave their relationship' *was effectively defined* to consist of women in Guatemala who are victims of domestic abuse because the inability 'to

---

course as their expertise and experience may suggest or require, but when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (citations and quotation marks omitted).

leave' was created by harm or threatened harm." *A-B-* at 335. But his "effective" definition is significantly different from the actual, articulated PSG; his definition allows him to assume, without any evidentiary basis, that the sole reason victims of domestic abuse cannot leave relationships is the physical harm they face if they try to do so.

Under established case law, social groups are not circular unless they are *solely* defined by the persecution. In those cases, including *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014) and *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014), which relied on *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74 (BIA 2007), the Board held: "a social group cannot be defined *exclusively* by the fact that its members have been subjected to harm" (emphasis added). Nor does a shared harm disqualify an otherwise valid social group:

> Although it is true that "where a proposed group is defined *only* by the characteristic that it is persecuted, it does not qualify as a 'social group,'" the Board of Immigration Appeals has never required complete independence of any relationship to the persecutor. *Escobar*, 657 F.3d at 545 (emphasis ours). And just because all members of a group suffer persecution, does not mean that this characteristic is the only one that links them. Id. at 545-46. A social group "cannot be defined *merely* by the fact of persecution" or "*solely* by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors." *Jonaitiene v. Holder*, 660 F.3d 267, 271-72 (7th Cir. 2011) (emphasis ours). That shared trait, however, does not disqualify an otherwise valid social group. *Escobar*, 657 F.3d at 547 (instructing that we cannot tease out one component of the group's characteristics to defeat the definition of social group).

*Cece v. Holder*, 733 F.3d 662, 671-72 (7th Cir. 2013) (en banc) (BIA wrongly rejected social group on ground that it was "defined in large part by the harm inflicted on the group, and [did] not exist independently of the traffickers"). As the *M-E-V-G-* Board succinctly noted, the act of persecution "may be the catalyst that causes the society to distinguish the [social group] in a meaningful way and consider them a distinct group, but the immutable characteristic of their shared past experience exists independent of the persecution." 26 I. & N. Dec. at 243.

Here, the Attorney General distorted the circularity framework because he appears more interested in creating general rules than in analyzing the facts underlying the actual claim. A proposed social group must be analyzed based on the particular circumstances of each case. It cannot be "effectively defined" as something other than what an applicant presents to the court by way of evidence, and it cannot be "effectively defined" as circular unless the articulated group is defined solely and exclusively by the persecution. *See Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007) (social group consisting of "women who fear being circumcised should they return to their home countries," was valid despite the fact that it was defined in part by the persecution inflicted on the group); *Sarhan v. Holder*, 658 F.3d 649, 654-655 (7th Cir. 2011) (noting BIA accepted social group consisting of "women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing" despite reference to the harm they feared). Where applicants can demonstrate the immutable characteristics of gender, nationality, and, for example, the inability to alter their past labels of nonconformist, or the culturally normed inability to leave a relationship, "it is not fair to conclude that the group is defined by the harm or potential harm inflicted merely by the language used rather than determining what underlying characteristics account for the fear and vulnerability." *Cece*, 733 F.3d at 672.

> 2. **The New "General" Conclusion are Contrary to Well-Understood Dynamics of Gender-Based Violence Showing That Many Factors Can Create an Inability to Leave.**

The government's new policies ignore overwhelming evidence showing that the inability to leave a relationship may be due to factors independent of the harm threatened by an abuser. Indeed, such evidence shows that the dynamics of domestic violence may involve not simply personal disputes and animosity, but also a culturally-normed, gender-based intention to dominate and control a woman because of her gender. In such cases, the inability to leave is not

just related to the fear of physical abuse, but to the other areas of control—isolation from family and friends, economic dependence, severance from social networks, inability to use phones or leave the home—that are cultural norms in certain places.  Women in countries where these norms are prevalent quickly learn, or already know, that reporting abuse to law enforcement is futile and that the state is unwilling or unable to provide protection for them.  It is these combined factors, separate from the physical act of persecution, that create the inability to leave.  Thus, the general rules the Attorney General articulates are not just inapposite, but affirmatively wrong because they improperly suggest that asylum officers apply the Attorney General's impressions about the causes of gender-based violence instead of giving full consideration to the evidence before them.

In fact, contrary to the Attorney General's assumption, an applicant can certainly show that a social group of women of a particular nationality or ethnicity "who are unable to leave a relationship" is not defined solely by the harm threated by their abusers.  That a woman is unable to leave a relationship does not logically imply that the *only* reason she cannot leave is the threat of harm.  Indeed, there is substantial evidence that women may be unable to leave for many reasons quite apart from their fear of more abuse.  Those reasons include social attitudes in their countries or communities that permit or even encourage such treatment, and an unwillingness to help on the part of police, social service agencies, religious institutions, and family members.

Overwhelming evidence from the U.S. State Department, international NGOs, the United Nations and other international bodies, and social science research over the past two decades establishes that gender-based violence is often rooted in social, political, and cultural mores, just as is violence on account of religion, ethnicity, nationality, or political opinion. The evidence confirms that many factors independent of the harm inflicted by domestic abusers create an

inability to leave a relationship.   They include, for example: social and cultural gender inequality, societal pressure to remain with an abuser based on deeply entrenched belief systems that women must be subservient to men, legal systems that do not allow women access to protection or to courts, cultural and religious beliefs that women are inferior to men, and economic dependence or the need to protect children.   A woman may also be unable to leave if her partner or community will not recognize a divorce or separation as ending the relationship or altering his authority and right to control her.

As the United Nations Report on the World's Women in 2010 summarized:

Violence against women throughout their life cycle is a manifestation of the historically unequal power relations between women and men. It is perpetuated by traditional and customary practices that accord women lower status in the family, workplace, community and society, and it is exacerbated by social pressures. These include the shame surrounding and hence difficulty of denouncing certain acts against women; women's lack of access to legal information, aid or protection; a dearth of laws that effectively prohibit violence against women; [and] inadequate efforts on the part of public authorities to promote awareness of and enforce existing laws . . . .[9]

Findings from studies and research for well over thirty years have consistently identified significant risk factors for gender-based violence in some countries.   Those factors include women's isolation and lack of social support, community attitudes that tolerate and legitimize male violence, and high levels of social and economic disempowerment.[10]   Other studies emphasize that patriarchal families' and cultures' acceptance of violence and gender stereotypes

---

[9] United Nations Secretariat Department of Economic and Social Affairs, *The World's Women 2010*, at 127, U.N. Doc. ST/ESA/STAT/ SER.K/19 (2010), available at: https://unstats.un.org/unsd/demographic/products/Worldswomen/WW.pdf.

[10] U.N. Secretary-General, In-Depth Study on All Forms of Violence against Women U.N. Doc A/61/122/Add. 1 (July 6, 2006), available at https://documents-dds-ny.un.org/doc/UNDOC/GEN/N06/419/74/PDF/N0641974. pdf. ?OpenElement.

are considered major risk factors.[11]   And finally, research shows that repeated violence in personal relationships often flows not from personal animosity, but from the abuser's need to exercise control in his relationship with the victim.[12]   Accordingly, the vast majority of research over the past thirty years has discarded the previous view that domestic violence is simply a private matter of personal animosity.

In some places, cultural norms inculcate the belief that women are subordinate to men and are considered "objects owned by men."  Comisión Internacional Contra la Impunidad en Guatemala, Human Trafficking for Sexual Exploitation Purposes in Guatemala 30 (2016).[13]   In others, cultural and political authorities excuse or allow domestic violence based on their view of a married woman's subservient role as they "attribute the abuse to a woman's alleged disobedience of her husband." U.N. Human Rights Council, *Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences, Mission to Afghanistan* 5, U.N. Doc. A/HRC/29/27/Add.3 (May 12, 2015).[14]   As a result, domestic violence is not a crime in many countries, such as Burma, Cameroon, and Haiti.  *See* U.S. Dep't of State, *Burma 2016 Human Rights Report* 38 (2016);[15] U.S. Dep't of State, *Cameroon 2017 Human Rights Report* 26 (2017);[16] U.S. Dep't of State, *Haiti 2016 Human Rights Report* 21 (2016).[17]   Furthermore, last

---

[11] National Research Council, *Understanding Violence Against Women* (Nancy A. Crowell, Ann W. Burgess, eds. 1996).

[12] *See* Mary Ann Dutton & Lisa A. Goodman, Coercion in Intimate Partner Violence: Towards a New Conceptualization, 52 Sex Roles 743, 743 (2005)  ("Violence is simply a tool, within this framework [of coercive control] that the perpetrator uses to gain greater power in the relationship to deter or trigger specific behaviors, win arguments, or demonstrate dominance .")

[13] http://www.cicig.org/uploads/documents/2016/Trata_Ing_978_9929_40_829_6.pdf.

[14] http://www.un.org/ga/search/view_doc.asp?symbol=A/HRC/29/27/Add.3.

[15]  https://www.state.gov/documents/organization/265536.pdf.

[16] https://www.state.gov/documents/organization/277223.pdf.

[17] https://www.state.gov/documents/organization/265806.pdf.

year, Russia decriminalized domestic violence for first time offenders.  *See* U.S. Dep't of State *Russia 2016 Human Rights Report* 56 (2016).[18]

Religious beliefs and practices also create norms that both foster gender-based violence and help keep it hidden.  For example, Article 130 of the Afgani constitution allows courts to apply Hanafi jurisprudence, a form of sharia law, to rule on matters not specifically covered by the constitution or other laws.  Afghanistan 2016 Human Rights Report 9.  As a result, Afghan courts have charged women with crimes of "immorality" or "running away from home" when they attempt to leave their abusers. *Id*.

These norms also help keep domestic violence hidden.  The U.S. Department of State reports that in Saudi Arabia, rape is underreported because of "societal and familial reprisal, including diminished marriage opportunities, criminal sanctions up to imprisonment or accusations of adultery or sexual relations outside of marriage."  U.S. Dep't of State, *Saudi Arabia 2016 Human Rights Report* 41 (2016).[19]  Likewise, in Armenia, "[r]ape, spousal abuse, and domestic violence was underreported due to social stigma, the absence of female police officers and investigators, and at times police reluctance to act."  U.S. Dep't of State, *Armenia 2016 Human Rights Report* 30 (2016).[20]  And in some countries, police may not even bother to respond to allegations of violence because it is regarded as a "family matter."  *See* U.S. Dep't of State, *Kenya 2016 Human Rights Report* 37 (2016).[21]

In contrast to the Attorney General's assumptions, the BIA and federal courts have long recognized these realities.  Moreover, they have regularly recognized that, especially in matters

---

[18] https://www.state.gov/documents/organization/265678.pdf.
[19] https://www.state.gov/documents/organization/265730.pdf.
[20] https://www.state.gov/documents/organization/265604.pdf.
[21] https://www.state.gov/documents/organization/265478.pdf.

involving domestic violence, other countries are unable or unwilling to control the actions of non-state actors. *Aldana-Ramos v. Holder*, 757 F.3d 9, 17 (1st Cir. 2014), *as amended* (Aug. 8, 2014); *see also Matter of S-A-*, 22 I. & N. Dec. 1328, 1335 (BIA 2000) (finding persecution when Moroccan father had "unfettered" power over daughter, and it was futile to report criminal acts to the police); *Sarhan v. Holder*, 658 F.3d 649, 658 (7th Cir. 2011) (finding persecution when home country recognized honor killing as a crime, but punished it with "little more than a slap on the wrist"); *Al-Ghorbani v. Holder*, 585 F.3d 980, 998–99 (6th Cir. 2009) (Yemeni government unwilling or unable to protect petitioners against death threats made by military officer); *Nabulwala v. Gonzales*, 481 F.3d 1115, 1116–18 (8th Cir. 2007) (family-arranged rape constitutes persecution); *Mohammed v. Gonzales*, 400 F.3d 785, 798 n.19 (9th Cir. 2005) (mutilation by "family members or fellow clan members" constitutes persecution); *Ali v. Ashcroft*, 394 F.3d 780, 785–87 (9th Cir. 2005) (persecution "need not be directly at the hands of the government"). [22]

Thus, the new "general" rules are not just inapposite, but are wrong because they improperly direct asylum officers to apply the Attorney General's assumptions about the causes of domestic violence instead of giving full consideration to the particular claim before them.

Asylum applicants who survive rape, sexual assault, severe beatings, female genital mutilation, forced marriage, and other forms of persecution that may constitute "private criminal

---

[22] *See also Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1291 (11th Cir. 2014); *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014); *R.R.D. v. Holder*, 746 F.3d 807, 809 (7th Cir. 2014); *Constanza-Martinez v. Holder*, 739 F.3d 1100, 1102 (8th Cir. 2014); *Doe v. Holder*, 736 F.3d 871, 877–78 (9th Cir. 2013); *Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013); *Garcia v. U.S. Att'y Gen.*, 665 F.3d 496, 503 (3d Cir. 2011), *as amended* (Jan. 13, 2012); *Kante v. Holder*, 634 F.3d 321, 325 (6th Cir. 2011); *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011); *Tesfamichael v. Gonzales*, 469 F.3d 109, 113 (5th Cir. 2006); *see also* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 65 (1979, rev. 1992).

activity" can offer ample evidence to support their applications.  Under the INA, they are eligible for asylum where governments are unwilling or unable to provide protection from persecution by a non-government actor.  *Aldana-Ramos*, 757 F.3d at 17.  Any agency action that seeks to exclude domestic violence survivors from asylum eligibility disregards substantial evidence of country conditions where domestic violence is not a private criminal matter and, therefore, is arbitrary and capricious under the APA.

> **B. THE ATTORNEY GENERAL'S CONCLUSION THAT SURVIVORS OF GENDER-BASED DOMESTIC VIOLENCE "GENERALLY" CANNOT MEET THE NEXUS REQUIREMENT IS ARBITRARY AND CAPRICIOUS.**

The Attorney General also concluded that survivors of domestic violence are not likely to meet asylum requirements because they cannot show nexus.  To justify this conclusion, he pointed to the example of *A-R-C-G-*,  and held that the BIA failed to properly analyze nexus in that case. He then went on to conclude, as a factual matter, with *no reference to any evidence whatsoever*, that: "[The abuser] attacked her because of his preexisting personal relationship with the victim."  *Matter of A-B-*, 27 I. & N. Dec at 339.  In fact, the only support for this extraordinary new factual finding is the following quote about a different—and vacated—case: "*See R-A-*, 22 I. & N. Dec. at 921 ('the record does not reflect that [R-A-'s] husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala')."  This overreach demonstrates that the decision depended more on the personal

1:18-cv-01853-EGS   Document 72-1   Filed 09/28/18   Page 27 of 38

biases of the Attorney General about gender-based violence than it did on the evidence before him, and that it is arbitrary and capricious. [23]

A gender-based violence survivor applying for asylum must demonstrate that her membership in a PSG (or other protected ground) "was or will be at least one central reason for" her persecution.   8 U.S.C. § 1158(b)(1)(B)(i).   The Attorney General's decision fails to acknowledge or discuss controlling authority holding that the statutory requirement of "one central reason" does not mean "the only reason," and that a personal motivation need not preclude any other motivation.   "[I]f there is a nexus between the persecution and the membership in a particular social group, the simultaneous existence of a personal dispute does not eliminate that nexus."   *Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010); *see also Sarhan*, 658 F.3d at 655–57 (although a man's honor killing of his sister "may have a personal motivation," honor killings have "broader social significance," and the killing of the applicant would be "on account of" membership in a PSG comprising "women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing"); *Aldana Ramos*, 757 F.3d at 18–19 (recognizing that "multiple motivations [for persecution] can exist, and that the presence of a non-protected motivation does not render an applicant ineligible for refugee status"); *Ndayshimiye v. U.S. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009) (reversing BIA holding that would have required showing that protected ground of persecution was not subordinate to any other ground).   The applicant "need not disprove

---

[23] "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983).

every [other] possible motive" for the persecution.  *See also Vata v. Gonzalez*, 243 F. App'x 930, 940 (6th Cir. 2007); *Marroquin-Ochoma v. Holder*, 574 F.3d 574, 579 (8th Cir. 2009).

As discussed above, gender-based persecution may be *on account of* the abuser's belief that he was entitled to inflict persecution with impunity because, as a married woman, she "belonged" to him as a matter of cultural, religious, or political norms.  That the abuse is in part personal simply does not defeat a showing of nexus, as the Attorney General urges.  "Persecution occurs 'on account of' membership in an immediate family when that relationship is at least one central reason for the feared persecution."  *Cruz v. Sessions*, 853 F.3d 122, 127 (4th Cir. 2017) (quoting *Crespin-Vallardes*, 632 F3.d at 127); *see also Al-Ghorbani v. Holder*, 585 F.3d 980, 997-98 (6th Cir. 2009) ("[T]he General's personal motives cannot be unraveled from his motives based on . . . [applicants'] opposition to Yemeni paternalistic rights.").  Thus, an applicant whose husband regularly beats her for leaving home against his orders (but does not beat his son, brother, or sister for doing the same) may well be able to show (1) that she belongs to a PSG consisting of, for example, married women who cannot leave a relationship and (2) that the beatings are, at least in part, on account of her membership in that PSG.  There is no logical basis for holding that a personal relationship should negate the showing of nexus.  And where statutory language and logic do not require or allow credible fear or asylum adjudicators to "generally" exclude the category of domestic violence victims, the Attorney General's decision announcing such a general rule is arbitrary, capricious, and contrary to law.

## II.    EVEN IF *MATTER OF A-B-* WERE A VALID AGENCY ACTION, APPLYING THAT DECISION TO CREDIBLE FEAR DETERMINATIONS IS NOT.

For the reasons stated above, the Attorney General's decision in *Matter of A-B-* is arbitrary, capricious, and contrary to law because it created a general rule excluding potentially

all survivors of gender-based violence from obtaining asylum.  However, applying this standard to the threshold "credible fear" interview is even less defensible.  The new USCIS policies issued on July 11, 2018 undermine the intentionally low statutory "credible fear" standard: they will, in fact, prevent meritorious asylum seekers from ever having their claims heard.  Thus, standing alone, the application of these new policies is arbitrary, capricious, and contrary to law.

The "credible fear interview" is a threshold screening interview held to determine whether a noncitizen who is otherwise immediately removable may seek asylum in the United States. In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") provided for the "expedited removal" of certain individuals from the U.S. without a full hearing.  Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996).  However, Congress carefully preserved the treaty-based statutory protections for refugees required to fulfill our nation's obligations under international and domestic law.  To do so, it created a specific process to exempt from expedited removal any potential refugee who expressed a "credible fear" of persecution if they are returned to their homeland.  Congress intended this "credible fear" inquiry to be a low threshold—it was designed to be over-inclusive so as to not screen out any potentially meritorious asylum seekers.  The credible fear policies challenged in this matter heighten the burden of proof for credible fear determinations, contrary to that which is set forth in the INA, and should be set aside.

### A.    "CREDIBLE FEAR" IS A LOW BAR

#### 1.    Background

The United States has long been committed to providing refuge for people fleeing from persecution. Our nation joined the international refugee regime in 1967, when it acceded to the Protocol Relating to the Status of Refugees, and in so doing bound itself to the 1951 Convention Relating to the Status of Refugees.  Then, in 1980, Congress enacted the Refugee Act, which

created the U.S. asylum adjudication system and signaled the intention to bring U.S. refugee law into conformity with international legal obligations. Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980). At that time, noncitizens were generally entitled to a hearing in immigration court before they could be removed.

In 1996, IIRIRA provided for the immediate "expedited" removal of certain noncitizens, including those who arrive in the United States without valid travel documents. 8 U.S.C. § 1225(b)(1). Under the INA (as amended by IIRIRA), if an alien indicates either "an intention to apply for asylum . . . or a fear of persecution," the immigration officer is required to refer the individual to an asylum officer for a "credible fear interview" to determine whether the individual has a "credible fear" of persecution. 8 U.S.C. § 1225(b)(1)(A) & (B). "Credible fear" is defined as a "significant *possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien *could* establish eligibility for asylum under section 1158 of this title." 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). The asylum officer must "conduct the interview in a non-adversarial manner." 8 C.F.R. § 208.30(d). If an individual receives a negative credible fear determination, she may seek limited review from an Immigration Judge, whose decision is final. 8 C.F.R. § 1003.42(f). A positive credible fear determination enables the interviewee to apply for asylum in the United States.

2. **The Legislative History of the "Credible Fear" Interview Shows That Congress Did Not Want to Screen Out Bona Fide Asylum Seekers**

The legislative history of the IIRIRA demonstrates that Congress did *not* intend for the credible fear interview to prevent bona fide asylum seekers from applying. Senator Hatch stated that the credible fear standard was "intended to be a low screening standard for admission into the usual full asylum process." 142 Cong. Rec. S11491-02 (daily ed. September 27, 1996)

(statement of Sen. Hatch).   He explained that this standard was a compromise between the Senate provisions, which would allow for expedited removal "only in extraordinary migration situations," and the House provisions, which applied a higher credible fear standard across the board.   *Id.*   Specifically, as Representative Henry Hyde noted, the credible fear standard was redrafted to ensure that the "more probable than not" language in the original House version was not "too restrictive."   142 Cong. Rec. H11071, H11081 (daily ed. May 1, 1996) (statement of Rep. Hyde).

The legislation was designed to provide "major safeguards" to prevent the persons with a significant chance of obtaining asylum from being returned to persecution.   *Id.*   Representative Lamar Smith, for example, stressed the importance that "the process be fair—and particularly that it not result in sending genuine refugees back to persecution." 142 Cong Rec. H11054, H11066-67 (daily ed. September 25, 1996) (statement of Rep. Smith).   And Senator Hatch expressed concern "about the harsh consequences that could result to asylum applicants who do have a valid claim but who may not speak English, may not have the necessary proof of their claim with them," and those in similar situations.   142 Cong. Rec. S4457-91 (daily ed. May 1, 1996) (statement of Sen. Hatch).

The contemplated safeguards included having sufficient training for those individuals responsible for administering credible fear interviews (and those overseeing their decisions). As Representative Smith recognized, the asylum officer's "power to send people summarily back to dangerous places" is "extraordinary."   142 Cong Rec. H11054, H11067 (daily ed. September 25, 1996) (statement of Rep. Smith).   Senator Hatch emphasized that the credible fear screening would done "by fully-trained asylum officers supervised by officers who have not only had comparable training but have also had substantial experience adjudicating asylum applications."

142 Cong. Rec. S11491-02 (daily ed. September 27, 1996) (statement of Sen. Hatch).  Senator Alan Simpson and Representative Hyde each also highlighted that the asylum officers performing the credible fear interviews would be "specially trained." *Id.* 142 Cong. Rec. S4457, S4467 (daily ed. May 1, 1996) (statement of Sen. Simpson); 142 Cong. Rec. H11071, H11081 (daily ed. May 1, 1996) (statement of Rep. Hyde).

Although the safeguards built into the credible fear process do not always live up to the standards envisioned by Congress, it is clear that the interview was intended to be a low threshold.  It was designed to prevent the removal of anyone with a significant possibility of being able to establish a valid asylum claim, and to allow those individuals the chance to develop their case in a normal asylum hearing.  Representative Smith urged that "in a close case, [asylum officers] must give the benefit of the doubt to the applicant."  142 Cong. Rec. H11054, H11067 (daily ed. September 25, 1996) (statement of Rep. Smith).

3.   **The Practical Realities of the "Credible Fear" Interview Make it Impossible for Many Bona Fide Asylum Seekers to Meet a Higher Burden of Proof**

In practice, many reasons justify the legislative concern about a low burden at the credible fear stage.  Attorneys are rarely present at these initial screening interviews, and refugees from other countries are unlikely to understand American legal standards or processes as they first cross the border.  In addition to significant language and cultural barriers, refugees who have just fled from persecution in their home countries may be initially fearful or reluctant to talk about that persecution with U.S. authorities.  *See, e.g., Senathirajah v. I.N.S.*, 157 F.3d 210, 218 (3d Cir. 1998) ("Given [the alien's] allegations of torture and detention, he may well have been reluctant to disclose the breadth of his suffering in Sri Lanka to a government official upon arriving in the United States even if he could understand the questions he was being asked at the airport."); *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 163 (3d Cir. 1998) ("[A]n arriving

alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country."); *Singh v. Gonzales*, 134 F. App'x 158, 160 (9th Cir. 2005).

Other problems abound.  Language barriers, translation issues, record and document availability, fear and anxiety related to detention—especially for parents separated from their children—lack of access to counsel, and inability to communicate with family are heavy weights on the ability of applicants to articulate the basis of their fears of return as they first enter the United States.  The availability and adequacy of translators, the sufficiency of recordkeeping, and the duty of the asylum officer to elicit information are theoretical "safeguards" against wrongful summary removal that do not always exist in reality.  *See, e.g.*, *Balasubramanrim*, 143 F.3d at 162-63 (noting defects in the arrival interview including lack of proper translation, an inadequate record of the interview, inadequate questioning by INS officer, and the reluctance of applicants to divulge information).

The credible fear interview is a low bar for precisely these reasons.  As the Second Circuit noted, asylum officers are instructed to apply "a low-threshold test" during the credible fear interview, and to "draw all reasonable inferences in favor of the applicant." *Zhang v. Holder*, 585 F.3d 715, 724 n. 3 (2d Cir. 2009) (quoting INS, *Asylum Officer Basic Training: Credible Fear*, 2001 WL 36205685, at Pt. V (Nov. 30, 2001)).

**B.     THE NEW CREDIBLE FEAR POLICIES DIRECTING THAT DOMESTIC VIOLENCE CLAIMS WILL "GENERALLY" NOT MEET CREDIBLE FEAR STANDARDS IMPERMISSIBLY RAISES THE "CREDIBLE FEAR" BURDEN.**

In *Matter of A-B-*, the Attorney General stated that "few such claims [by aliens pertaining to domestic violence] would satisfy the legal standard to determine whether an alien has a credible fear of persecution."  *Matter of A-B-*, at 320, note 1.  Two days after the Attorney

General issued his decision in *Matter of A-B-* on June 11, 2018, USCIS issued interim guidance, instructing asylum officers to apply the decision at the credible fear interview stage. *See* Asylum Division Interim Guidance – Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018), June 13, 2018. On July 11, 2018, USCIS published final guidance through a Policy Memorandum, again instructing asylum officers to apply *Matter of A-B-* to credible fear determinations. *See* USCIS Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*, July 11, 2018, *available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-18-PM-602-0162-USCIS-Memorandum-Matter-of-A-B.pdf ("Guidance"). The Guidance impermissibly raises the burden of proof for credible fear determinations.

While the government in this case seeks to limit the reach of *Matter of A-B-*, the Attorney General himself has explicitly stated that "[w]e can elevate the threshold standard of proof in credible fear interviews." *See* Attorney General Jeff Sessions, Remarks to the Executive Office for Immigration Review, 2017 WL 4547884 (Oct. 12, 2017). The new Guidance attempts to do just that, acknowledging that, "[a]lthough the alien in *Matter of A-B-* claimed asylum and withholding of removal, the Attorney General's decision and this [policy memorandum] apply also to . . . credible fear determinations. *See* INA §§ 207(c)(1), 208(b)(1), 101(a)(42)(A), 235(b)(1); 8 C.F.R. § 208.31." *Guidance* at n.1. Contrary to his assertions, the Attorney General cannot subvert the clear language and intent of the INA, which sets forth the standard of proof for credible fear determinations. None of the authority that the Guidance purportedly relies upon

suggests that the Attorney General has the power to unilaterally increase the burden of proof for credible fear determinations from that which Congress legislated.[24]

The new Guidance raises the bar for threshold credible fear determinations, demanding too much of noncitizens at that early stage.  At a minimum, it establishes a going-in presumption that asylum claims founded on domestic violence will *not* meet the criteria of a "particular social group" necessary to prove eligibility.  Moreover, *Matter of A-B-* demands that an asylum applicant clearly indicate "the exact delineation of any proposed particular social group."  27 I. & N. Dec. at 334.  The Guidance specifies that *Matter of A-B-* applies at the credible fear stage, and thus can readily be read by asylum officers to require that credible fear interviewees precisely articulate the "particular social group" that they claim.  But defining a "particular social group" is complex and difficult to understand, even for experienced lawyers.  Women who are traumatized from past persecution, reluctant to speak with governmental authorities, and unrepresented by counsel at the credible fear interview stage cannot be expected to make the sophisticated legal arguments contemplated by the Guidance.  Demanding that noncitizens define their "particular social group" and explain how it meets the particularity, social distinction, and immutability requirements in their hour-long credible fear interview with no attorney, no access to documents, and no understanding of what the law requires is the very definition of arbitrary and capricious, particularly when the statutory scheme sets that interview as a low bar.

To satisfy the credible fear standard, the INA requires only that a noncitizen establish a "significant possibility . . . that the alien *could* establish eligibility for asylum."  INA §

---

[24] The cited INA sections 207(c)(1) and 208(b)(1) (codified at 8 U.S.C. §§ 1157-58) provide the Attorney General the discretion to grant asylum to eligible applicants. These provisions do *not* give the Attorney General or asylum officers discretion to deny the opportunity to apply for asylum to noncitizens who have expressed a "credible fear" of persecution.

235(b)(1)(B)(v) (emphasis added).   By requiring asylum officers at the credible fear stage to consider the granular points of particularity and social distinction, and by imposing "general" rules such as that "claims by aliens pertaining to domestic violence . . . will not qualify for asylum," the government's credible fear policies unlawfully heighten this burden from the low bar set by Congress, and thus should be set aside.

## CONCLUSION

For the foregoing reasons, this court should grant the Plaintiffs' Opposition and Motion for Summary Judgement.

Respectfully submitted,

/s/ Paul M. Thompson
Paul M. Thompson (D.C. Bar No. 973977)
Philip J. Levine (D.C. Bar No. 470553)
Joseph Speyer (D.C. Bar No. 1018560)
McDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
(202) 756-8032
plevine@mwe.com

Julie Carpenter (D.C. Bar No. 418768)
The Tahirih Justice Center
6402 Arlington Boulevard, Suite 300
Falls Church, VA 22042
(571) 282-6161
Juliec@tahirih.org

*Counsel for Amici Curiae*

September 28, 2018

25

## APPENDIX

The following organizations, whose work focuses both nationally and internationally on domestic and gender-based violence, join Tahirih Justice Center as *amici* in this brief and urge the Court to invalidate the credible fear policies challenged in this matter, and to continue to recognize long-established protections for those victims of gender-based and domestic violence who meet the requirements for asylum.

Asian Pacific Institute on Gender-Based Violence
500 12th Street, Suite 330
Oakland, CA 94607

ASISTA
PO Box 12
Suffield, CT

Futures Without Violence
1320 19th St. NW, Suite 401
Washington, D.C. 20036

Michigan Immigrant Rights Center
3030 S 9th St., Ste. 1B
Kalamazoo, MI 49009

National Asian Pacific American Women's Forum
www.napawf.org

National Domestic Violence Hotline
P.O. Box 161810
Austin, TX 78716

National Network to End Domestic Violence
1325 Massachusetts Ave. NW, 7th Floor
Washington, D.C. 20005

New York City Anti-Violence Project
116 Nassau Street, 3rd Floor
New York, NY 10038

Public Counsel
610 South Ardmore Avenue

Los Angeles, CA 90005

Sanctuaries for Families
30 Wall Street, 8th Floor
New York, NY 10005

Women's Refugee Commission
1012 14th Street NW, Suite 1100
Washington, D.C. 20005