IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Grace, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civ. No. 18-1853 (EGS) |
| | ) | |
| JEFFERSON BEAUREGARD SESSIONS III, | ) | |
| Attorney General of the United States, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**BRIEF FOR THE DISTRICT OF COLUMBIA AND THE STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF THE PLAINTIFFS**

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................... 1

BACKGROUND ................................................................................................. 1

ARGUMENT ..................................................................................................... 5

    I.    *Matter of A-B-* And The Subsequent USCIS Guidelines Contravene The Amici States' Interest In Welcoming Immigrants, Including Individuals Seeking Asylum Related To Domestic Violence and Gang-Related Crime........... 5

        A.  Immigrants bolster States' economies and support innovation. ...................... 5

        B.  Victims of domestic and gang-related violence deserve the protection of States and the United States .......................................................................... 8

        C.  *Matter of A-B-* is inconsistent with state, federal, and international policies intended to protect women from gender-based harm ....................... 11

CONCLUSION.................................................................................................. 16

# TABLE OF AUTHORITIES

## *Cases*

*Afriyie v. Holder*, 613 F.3d 924 (9th Cir. 2010) ........................................................................ 10

*Aguilar-Escoto v. Sessions*, 874 F.3d 334 (1st Cir. 2017) ............................................................ 2

*Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013) .............................................................................. 2

*Fiadjoe v. Attorney Gen. of U.S.*, 411 F.3d 135 (3d Cir. 2005) ............................................... 3, 11

*Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc) ........................................ 2

*Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015) ...................................................... 2, 8

*INS v. Cardoza-Fonesca*, 480 U.S. 421 (1987) ........................................................................ 2, 15

*Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2004) ................................................................... 2

*Martinez v. Holder*, 740 F.3d 902 (4th Cir. 2014) ....................................................................... 2

*Rodriguez-Roman v. I.N.S.*, 98 F.3d 416, 425 (9th Cir. 1996) ................................................... 15

*Sowe v. Mukasey*, 538 F.3d 1281 (9th Cir. 2008) ........................................................................ 9

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................................................ 13

## *Administrative Decisions*

*Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018) ........................................... 1, 3-5, 7, 10-11, 14-15

*Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) ..................................................................... 3

*Matter of Kasinga*, 21 I&N Dec. 357, 366-67 (BIA 1996) .......................................................... 2

## *Statutes and Regulations*

8 U.S.C. § 1101 ........................................................................................................................ 2-3, 14

8 U.S.C. § 1154 ............................................................................................................................. 13

8 U.S.C. § 1158 ............................................................................................................................... 1

8 U.S.C. § 1225 ................................................................................................................ 4

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386,
   114 Stat. 1464 (2000) ............................................................................................ 13-14

Violence Against Women Act of 1994, Pub. L. No. 103-322,
   108 Stat. 1902 (1994) ............................................................................................... 13

Cal. Labor Code § 246.5 .................................................................................................. 12

D.C. Code § 51-131 ......................................................................................................... 13

N.Y. Penal Law § 240.75 ................................................................................................. 13

Wash. Rev. Code § 49.76 ................................................................................................. 12

### Other Authorities

Am. Bar Assoc., *Domestic Violence Arrest Policies* ....................................................12

Am. Bar Assoc., *Domestic Violence Civil Protection Orders (CPOs)* ...........................12

Am. Immigration Council, *Immigrants in California* (Oct. 4, 2017) ............................. 7

Am. Immigration Council, *Immigrants in the District of Columbia*
   (Oct. 16, 2017) ............................................................................................................ 7

Am. Immigration Council, *Immigrants in the United States*
   (September 10, 2018) ................................................................................................ 5-6

Dany Bahar, *A Spicy Red Sauce and How Immigrants Generate Jobs
   and Growth in the US* (Feb. 7, 2017) ..................................................................... 6-7

*Battered Immigrant Protection Act of 1999: Hearing on H.R. 3083 Before the H. Comm. on the
   Judiciary*, 106th Cong. 70 (2000) ........................................................................... 14

Katie Benner & Caitlin Dickerson, *Sessions Says Domestic and Gang Violence
   are not Grounds for Asylum*, N.Y. Times, (Jun. 11, 2018) ...................................... 8

Domestic Shelters, *Economic Impact of Domestic Violence* (Jan. 7, 2015) ................ 12

Brenan Hoban, *Do Immigrants "Steal" Jobs from American Workers*
   (Aug. 24, 2017) ........................................................................................................... 5

Humanitarian Innovation Fund, *Gender Based Violence Interventions:
   Opportunities for Innovation* (2016) .........................................................................9

Int'l Rescue Comm., *Families Seeking Asylum From Violence in Central America are not Criminals* ................................................................................ 8

Rocio Cara Labrador & Danielle Renwick, *Central America's Violent Northern Triangle* (Jun. 26, 2018) .......................................................................... 8

Silva Mathema, *They Are (Still) Refugees: People Continue to Flee Violence in Latin American Countries* (Jun. 11, 2018) ....................................... 8-9

Claire McEvoy & Gergely Hideg, Small Arms Survey, *Global Violent Deaths 2017* (2017) ............................................................................................. 9

Nadwa Mossaad & Ryan Baugh, *Refugees and Asylees: 2016* (2018) ................................... 4, 6, 8

New Am. Econ., *New Americans and a New Direction, The Role of Immigrants in Reviving the Great Lakes Region* (2017) ....................................... 5-6

Robert Pearl, *Domestic Violence: The Secret Killer That Costs $8.3 Billion Annually*, Forbes (Dec. 5, 2013) ........................................................... 11

Safe Horizon, *Domestic Violence Statistics and Facts* ................................................. 11

United Nations High Comm'r for Refugees, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status* (Geneva 2011 ed.) ............................................................................ 15

United Nations High Comm'r for Refugees, *Women on the Run* (Oct. 2015) ......................... 9, 15

U.S. Citizenship & Immigration Servs., *Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with* Matter of A-B- (July 11, 2018) ................ 3-4

U.S. Citizenship & Immigration Servs., *Victims of Human Trafficking: T Nonimmigrant Status* ................................................................................. 14

U.S. Citizenship & Immigration Servs., *Victims of Criminal Activity: U Nonimmigrant Status* .................................................................................. 14

U.S. Dep't of Justice, *State Court Processing of Domestic Violence Cases* (Mar. 21, 2008) ....... 13

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, El Salvador* (2017) ....................................... 10

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, Guatemala* (2017) ....................................... 10

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, Honduras* (2017) ....................................... 10

iv

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are the District of Columbia and the States of California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington, which have an interest in ensuring that asylum-related protections continue to exist for individuals relocating to their States based on a well-founded fear of persecution due to domestic or gang-related violence. The *Amici* States are home to hundreds of thousands of immigrants, many of whom came to this country through the asylum process. The States recognize the important contribution these immigrants have made to society, and believe that immigrants are vital to their economic success.

As home to the majority of this country's successful asylum grantees, the *Amici* States are concerned about the impact of Attorney General Sessions's recent precedential opinion in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). The decision, which generally calls for the denial of asylum claims related to domestic and gang-related violence, contravenes existing precedent from both the federal courts of appeals and the Board of Immigration Appeals ("BIA"). Federal law requires that all asylum claims be adjudicated on the particular facts and circumstances of the claim, and such a bar violates that principle. Consequently, the *Amici* States fear that those fleeing from domestic and gang-related violence will not receive a fair opportunity to establish their individual eligibility for asylum, to which they are entitled under federal law. As a result, worthy applicants will be turned away, and the *Amici* States will suffer both economically and culturally.

## BACKGROUND

Federal law provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). To qualify for asylum, the individual must establish that she is a refugee, *id.* § 1158(b)(1)(A), meaning that she is "unable or unwilling to return" to her home country "because

of a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).  The applicant need not establish a fear of *certain* persecution; rather, she must simply show fear of a one-in-ten chance of persecution on account of a protected ground.  *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 440 (1987).

Additionally, asylum law imposes no requirement of direct governmental persecution.  *See* 8 U.S.C. § 1101(a)(42)(A); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004).  An asylum applicant who is persecuted by non-state actors may still merit asylum if she establishes that the persecution was "committed by . . . forces the government is either unable or unwilling to control." *Knezevic*, 367 F.3d at 1211; 8 U.S.C. § 1101(a)(42)(A).  In this vein, the federal courts of appeals and the BIA have routinely granted asylum to victims of private criminal activity.  *See, e.g.*, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 951 (4th Cir. 2015) (granting asylum to a woman and son who were violently threatened by gang members); *see also Matter of Kasinga*, 21 I&N Dec. 357, 366-67 (BIA 1996) (granting asylum to a woman who feared her family would subject her to female genital mutilation).

Asylum applicants fleeing from domestic and gang-related violence often claim a well-founded fear of persecution on account of their "membership in a particular social group."  8 U.S.C. § 1101(a)(42)(A).  Federal courts of appeals have recognized that applicants with these types of claims qualify for asylum.  *See Aguilar-Escoto v. Sessions*, 874 F.3d 334, 337 (1st Cir. 2017) (remanding where BIA failed to consider evidence of domestic abuse); *Martinez v. Holder*, 740 F.3d 902, 909-13 (4th Cir. 2014) (finding former gang membership to constitute a particular social group); *Cece v. Holder*, 733 F.3d 662, 672 (7th Cir. 2013) (determining "young Albanian women living alone" constituted a particular social group); *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1091-94 (9th Cir. 2013) (en banc) (recognizing that individuals who publicly testify against gangs may

qualify as a particular social group); *Fiadjoe v. Attorney Gen. of U.S.*, 411 F.3d 135, 160-62 (3d Cir.

2005) (disagreeing with the BIA's determination that a victim of incest and domestic violence did

not qualify for asylum).  Notably, in a 2014 decision, *Matter of A-R-C-G*, 26 I&N Dec. 388 (BIA

2014), the BIA explicitly acknowledged that victims of domestic violence could qualify for asylum.

*Id*. at 389 (holding that "married women in Guatemala who are unable to leave their relationship"

was a particular social group, and granting the applicant asylum).

Despite widespread recognition of the validity of domestic violence and gang-related asylum

claims, on June 11, 2018, Attorney General Sessions issued *Matter of A-B-*, a precedential opinion

that reversed the BIA's grant of asylum to an El Salvadoran woman who was brutalized by her

husband.  27 I&N Dec. at 321, 346.  The opinion overruled the BIA's decision in *Matter of A-R-C-

G-* and stated that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence

perpetrated by non-governmental actors will not qualify for asylum."  *Id*. at 320.  Additionally, the

decision heightened the standard that asylum applicants must meet when claiming persecution by a

non-governmental actor.  *Id*. at 337.  Rather than requiring a showing that the government is "unable

or unwilling" to control the private persecutor, as dictated by statute, 8 U.S.C. § 1101(a)(42)(A),

*Matter of A-B-* now requires that the applicant show that the  "government condoned the private

actions or at least demonstrated a complete helplessness to protect the victims," 27 I&N Dec. at 337

(internal quotation marks omitted).

On July 11, following the publication of *Matter of A-B-*, the United States Citizenship and

Immigration Services ("USCIS") issued a policy memorandum entitled "Guidance for Processing

Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*"

("Policy Memorandum").[1]  The policy memorandum, which serves as guidance to all asylum officers, reiterated (in bold font) the categorical rejection of asylum claims based on domestic and gang violence.  It also directed asylum officers to apply the case law only of the circuit in which the immigrant is actually detained, and only "to the extent that those cases are not inconsistent with *Matter of A-B-*."  Policy Mem. 8.

Coupled together, *Matter of A-B-* and the policy memorandum repudiated well-recognized asylum protections for individuals fleeing from domestic and gang-related violence.  These effects are especially detrimental to those asylum seekers facing expedited removal, who do not have access to the full panoply of procedural protections.  *See generally* 8 U.S.C. § 1225(b)(1)(B)(iii).  To protect those individuals in expedited removal who express "a fear of persecution," Congress guaranteed the right to a credible fear interview conducted by an asylum officer.  *Id.* § 1225(b)(1)(a)(ii).  By design, these interviews have a low threshold of proof.  Applicants must only demonstrate "a significant possibility" of establishing eligibility for asylum. *Id.* § 1225(b)(1)(B)(v).  In fact, according to the latest available data, in 2016, 75 percent of individuals referred to a credible fear interview met that standard.[2]  However, *Matter of A-B-* and the policy memorandum cut against these established protections.

---

[1]    *Available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/ 2018/2018-06-18-PM-602-0162-USCIS-Memorandum-Matter-of-A-B.pdf.

[2]    Nadwa Mossaad & Ryan Baugh, *Refugees and Asylees: 2016* at 6 (2018), https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2016.pdf.

# ARGUMENT

I.   ***Matter of A-B-*** **And The Subsequent USCIS Guidelines Contravene The** *Amici* **States'**
     **Interest In Welcoming Immigrants, Including Individuals Seeking Asylum Related To**
     **Domestic Violence and Gang-Related Crime.**

   A.   **Immigrants bolster States' economies and support innovation.**

The United States was founded on the principle of immigration. When the country became a

signatory to the 1967 United Nations Protocol Relating to the Status of Refugees, it vowed to protect

individuals escaping persecution.[3]  The benefits associated with immigration are reciprocal; not only

do immigrants benefit from the opportunities associated with living in the United States, but the

States and country as a whole benefit from immigrants.

Immigrants contribute greatly to the nation's prosperity by contributing to the state and

national economies.  Nationally, one in six workers is an immigrant.[4]  Immigrants supply necessary

labor in a variety of fields such as healthcare, manufacturing, food services, and agriculture,[5] often

taking jobs that native-born citizens either do not want or cannot fill.[6]  For example, in the Great

Lakes region of Wisconsin, Illinois, Michigan, Ohio, Pennsylvania, and New York,[7] population

---

[3]      *Id.* at 2.

[4]      Am. Immigration Council, *Immigrants in the United States* 2 (September 10, 2018),
https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_the_united_
states.pdf.

[5]      *See id.*

[6]      Brenan Hoban, *Do Immigrants "Steal" Jobs from American Workers?* (Aug. 24, 2017),
https://www.brookings.edu/blog/brookings-now/2017/08/24/do-immigrants-steal-jobs-from-
american-workers/.

[7]      New Am. Econ., *New Americans and a New Direction, The Role of Immigrants in Reviving
the Great Lakes Region* 6 (Oct. 2017), http://www.newamericaneconomy.org/wp-
content/uploads/2017/10/NAE_Great-Lakes_V9_FINAL.pdf.

growth fell behind the national average, resulting in decreased tax revenue and a reduction in jobs.[8]
However, while citizens were leaving the area, immigrants began steadily moving into the region.[9]
Nearly half of the new residents in the Great Lakes region from 2000 to 2015 were foreign-born
individuals, contributing to population growth in areas that otherwise would have declined.[10]  This
increased population led to added jobs and increased wages for U.S.-born workers.[11]  What is more,
these immigrants helped revive an aging population, keeping the workforce viable.[12]  This trend is
not unique to the Great Lakes region.  Nationally, successful asylum grantees have a median age
much lower than citizens.[13]  The majority of asylum-seekers are of working age, and thus contribute
to the earning potential of states and the country as a whole.[14]

Additionally, immigrants pursue entrepreneurship at disproportionately high levels.
Although nationally immigrants make up around 15 percent of the workforce, approximately 25
percent of business owners are immigrants, with even higher percentages in metropolitan areas.[15]
For example, immigrants make up over half of all business owners in the Washington, D.C.

---

[8]      *See id.* at 7.

[9]      *See id.* at 7-8.

[10]     *Id.* at 8.

[11]     *Id.* at 3, 17, 32

[12]     *Id.* at 2, 12.

[13]     *See* Mossaad, *supra* n.3, at 8.

[14]     *Id.* (finding that 57 percent of those granted asylum in 2016 were between the ages of 18 and 44).

[15]     *See Immigrants in the United States*, *supra* n.4, at 4.  *See also* Dany Bahar, *A Spicy Red Sauce and How Immigrants Generate Jobs and Growth in the US* (Feb. 7, 2017), https://www.brookings.edu/blog/up-front/2017/02/07/a-spicy-red-sauce-and-how-immigrants-generate-jobs-and-growth-in-the-us.

metropolitan area,[16] and over 40 percent of the business owners in the Los Angeles metropolitan area.[17]   These companies, which employ both immigrants and non-immigrants, create jobs and support a thriving local economy.[18]  On a national level, in 2015 alone, immigrant-owned companies generated $72.3 billion in business income.[19]  This number is predicted to grow.

David Tran, who escaped persecution in Vietnam and came to this country as a refugee in 1978, is the prototypical example of a refugee who has contributed to the robust growth of the local and national economies.[20]  Mr. Tran founded and runs Huy Fong Foods, the manufacturer of the popular Sriracha sauce.[21]  With a factory located in Irwindale, California, Mr. Tran's company employs hundreds of workers and brings in over $60 million in revenue yearly.[22]

Mr. Tran's story is just one example of how immigrants, including refugees and asylum-seekers, have contributed to economic growth.  In California alone, immigrant-owned businesses generated almost $22 billion in business income in 2015.[23]  By limiting the asylum process, *Matter of A-B-* threatens the economic and social growth of states and localities all across the country.

---

[16]    Am. Immigration Council, *Immigrants in the District of Columbia* 4 (Oct. 16, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_the_district_of_columbia.pdf.

[17]    Am. Immigration Council, *Immigrants in California* 4 (Oct. 4, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_california.pdf.

[18]    *See* Bahar, *supra* n.15.

[19]    *Id.*

[20]    *See id.*

[21]    *Id.*

[22]    *Id.*

[23]    *Immigrants in California*, *supra* n.17, at 4.

**B.**     **Victims of domestic and gang-related violence deserve the protection of States and the United States.**

A large portion of applicants who seek asylum based on domestic and gang-related violence come from El Salvador, Honduras, and Guatemala, collectively known as the "Northern Triangle."[24] This area is widely regarded as one of the most dangerous regions in the world.[25]  In the United States, more individuals sought asylum from that region from 2014 to 2016 (the last available data), "than in the proceeding 17 years combined." [26]  Nearly 30 percent of all asylum grantees in 2016 came from the Northern Triangle,[27] illustrating both the viability of such asylum claims, *see Hernandez-Avalos v. Lynch*, 784 F.3d at 951, and the necessity to aid individuals fleeing from such harm.

Violence and crime in the region is widespread.  Because of this, the Northern Triangle has been likened to "the deadliest war zones around the world."[28]  Consistently, El Salvador, Honduras, and Guatemala rank among the top ten countries with the highest homicide rates in the world.[29]  In

---

[24]     *See* Katie Benner & Caitlin Dickerson, *Sessions Says Domestic and Gang Violence Are Not Grounds for Asylum*, N.Y. Times (Jun. 11, 2018), https://www.nytimes.com/2018/06/11/us/politics/sessions-domestic-violence-asylum.html.

[25]     Silva Mathema, *They Are (Still) Refugees: People Continue to Flee Violence in Latin American Countries* (Jun. 11, 2018), https://www.americanprogress.org/issues/immigration/reports/2018/06/01/451474/still-refugees-people-continue-flee-violence-latin-american-countries.

[26]     Mossaad, *supra* n.3, at 7.

[27]     *Id.*

[28]     Int'l Rescue Comm., *Families Seeking Asylum from Violence in Central America Are Not Criminals*, https://www.rescue.org/article/families-seeking-asylum-violence-central-america-are-not-criminals (last updated July 26, 2018).

[29]     Rocio Cara Labrador & Danielle Renwick, *Central America's Violent Northern Triangle*, https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle (last updated Jun. 26, 2018).

2017, El Salvador and Honduras were reported to have the highest rate of violent deaths per capita among countries not engaged in armed conflict.[30]   The vast majority of this violence is gang-related.[31]

Women and children in the region are particularly vulnerable.  El Salvador and Honduras hold the first- and second-highest rates of femicide in the world, respectively.[32]  In 2017, more than nine women were killed each week in El Salvador.[33]  Women are seen as targets for gangs. [34]  As one victim reported, "it's never just sex with the one [gang member], it's forced sex with all of them." [35]  To make matters worse, not only do these women face gang-related violence, but they also suffer from violence at home.  Studies show that "[d]omestic violence in the [Northern Triangle] is commonplace and is rarely discussed openly."[36]

Reports from the State Department, which courts have recognized as "the most appropriate and perhaps the best resource[] for information on . . . foreign nations," *Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008), show widespread human rights violations associated with domestic and gang-related violence.  In El Salvador, although there are laws that carry trivial prison sentences for

---

[30]     Claire McEvoy & Gergely Hideg, Small Arms Survey, *Global Violent Deaths 2017* at 25 (2017),    http://www.smallarmssurvey.org/fileadmin/docs/U-Reports/SAS-Report-GVD2017.pdf (ranking El Salvador as number one).

[31]     *See* Mathema, *supra* n.25.

[32]     Humanitarian Innovation Fund, *Gender Based Violence Interventions: Opportunities for Innovation* 89-90 (2016),http://www.elrha.org/wp-content/uploads/2015/11/GBV_report_23_08.pdf.

[33]     Mathema, *supra* n.25.

[34]     United Nations High Comm'r for Refugees, *Women on the Run* 16 (Oct. 2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.pdf.

[35]     *Id*.

[36]     *Id*. at 17.

domestic violence, these laws "remain[] poorly enforced."[37]  Domestic violence is considered a "widespread and serious problem" throughout the country.[38]  Furthermore, "police officers, soldiers, and their families,"[39] as well as "women and girls," remain gang targets.[40]  Honduras fares no better, as there is violence and harassment perpetrated by "organized criminal elements and gangs."[41]  Additionally, in Guatemala, the most egregious human rights issues include "killing of women because of their gender" and the gang recruitment of children, many of whom are the victims of domestic abuse.[42]

These reports confirm the continued need to protect those individuals escaping non-governmental domestic and gang-related crime.  To be sure, the *Amici* States do not contend that all applicants who claim asylum based on domestic violence and gang-related activity should automatically succeed on their claims.  But in cases of non-governmental persecution, establishing status as a refugee requires a showing that the government is unable or unwilling to control the private criminal actor.  *See Afriyie v. Holder*, 613 F.3d 924, 931-34 (9th Cir. 2010).  *Matter of A-B-*'s presumption against asylum claims based on domestic and gang violence ignores the necessary

---

[37]     U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, El Salvador* 23 (2017), https://www.state.gov/documents/organization/277575.pdf.

[38]     *Id.*

[39]     *Id.* at 11.

[40]     *Id.* at 1.

[41]     U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, Honduras* 13 (2017), https://www.state.gov/documents/organization/277585.pdf.

[42]     U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Country Reports on Human Rights Practices for 2017, Guatemala* 1, 19 (2017), https://www.state.gov/documents/organization/277579.pdf.

analysis of whether the government was in fact unable or unwilling to control the private perpetrator. The prevalence of such crime, as shown by the above data, evidences the inability of multiple countries to protect women and targets of gang violence. *See Fiadjoe*, 411 F.3d at 160-62 (considering evidence of widespread human rights abuses against women in concluding that the government was unable or unwilling to aid the petitioner). *Matter of A-B-* wrongfully denies asylum applicants the opportunity to establish that their government is unable or unwilling to control their private attackers.

C. ***Matter of A-B-* is inconsistent with state, federal, and international policies intended to protect women from gender-based harm.**

In issuing *Matter of A-B-*, the government has stripped away an essential lifeline for victims of gender-based harm. Although both men and women can suffer from gender-based harm, such as domestic violence, it is women and their children who predominantly suffer.[43] State, federal, and international policies have recognized the importance of protecting women from harm, yet *Matter of A-B-* disregards this consensus.

Without a doubt, states throughout the country recognize that domestic violence not only has a social impact, but also an economic impact as well. Annually, domestic violence costs this nation over $2.5 billion in lost productivity.[44] Because of the abuse, these women have difficulties

---

[43]    *See* Safe Horizon, *Domestic Violence Statistics and Facts*, https://www.safehorizon.org/get-informed/domestic-violence-statistics-facts/# description/ (last visited Sept. 27, 2018) (identifying national statistics of domestic violence against both females and males).

[44]    Robert Pearl, *Domestic Violence: The Secret Killer That Costs $8.3 Billion Annually*, Forbes (Dec. 5, 2013), https://www.forbes.com/sites/robertpearl/2013/12/05/domestic-violence-the-secret-killer-that-costs-8-3-billion-annually/#22bda43b4681.

performing their job duties.[45]   Domestic abuse has cost the United States eight million days of paid work.[46]

Every state in this country has enacted both civil and criminal laws to protect the victims of domestic violence.[47]   These innovative laws demonstrate the States' understanding that it "is in the public interest to reduce domestic violence, sexual assault, and [related crimes]."[48]   Washington State's Domestic Violence Leave Act is a prime example of innovative protections for victims of domestic violence.[49]   The Act grants victims the ability to take reasonable leave from work to handle the aftermaths of abuse, such as seeking legal or medical assistance.[50]   California's Healthy Workplaces, Healthy Family Act functions in a similar manner by requiring employers to provide paid days off "for employees who are subjected to domestic violence, sexual assault, or stalking."[51]   Additionally, recognizing the toll domestic violence takes on an individual's ability to work, District

---

[45]    *See* Domestic Shelters, *Economic Impact of Domestic Violence* (Jan. 7, 2015), https://www.domesticshelters.org/domestic-violence-statistics/economic-impact-of-domestic-violence (last visited Sept. 24, 2018).

[46]    *See id.*

[47]    *See* Am. Bar Assoc., *Domestic Violence Civil Protection Orders (CPOs)*, https://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/Resources/statuto rysummarycharts/2014%20CPO%20Availability%20Chart.authcheckdam.pdf (describing state civil penalties for domestic violence and abuse); *see also* Am. Bar Assoc., *Domestic Violence Arrest Policies*, https://www.americanbar.org/content/dam/aba/images/domestic_violence/Domestic%20 Violence%20Arrest%20Policies%20by%20State%202011%20(complete).pdf (describing state criminal laws and arrest policies).

[48]    Wash. Rev. Code § 49.76.010(1).

[49]    *See id.* at § 49.76 *et seq.*

[50]    *See id.* at § 49.76.030.

[51]    Cal. Labor Code § 246.5(a)(2).

of Columbia allows individuals who leave work due to domestic abuse to recover unemployment compensation.[52]

In the criminal context, New York Penal Law § 240.75 is another example of innovative state domestic abuse policy. The law imposes heightened penalties for repeat domestic abuse offenders, by creating the crime of "aggravated family offense."[53] Indeed, nationally, prosecution and conviction rate of state domestic abuse cases is significantly higher than that of non-domestic abuse cases.[54]

The federal government has also taken significant steps to protect women from domestic violence. In 1994, Congress enacted the comprehensive Violence Against Women Act ("VAWA") of 1994, Pub. L. No. 103-322, 108 Stat. 1902 (1994), with the goal of ensuring that "all persons within the United States shall have the right to be free from crimes of violence motivated by gender," *United States v. Morrison*, 529 U.S. 598, 605 (2000). VAWA not only included protection for U.S. citizens facing domestic violence, but it also aided immigrant women facing the same issues. The Act introduced new immigration law procedures which allowed immigrant women who "ha[ve] been battered or ha[ve] been the subject of extreme cruelty perpetrated by" a spouse or fiancé to self-petition for a visa. 8 U.S.C. § 1154(a)(1)(A)(iii)(bb).

In 2000, Congress heightened protections for immigrant women who were victims of sex trafficking and domestic abuse. *See* Victims of Trafficking and Violence Protection Act of 2000,

---

[52]     D.C. Code § 51-131.

[53]     N.Y. Penal Law § 240.75.

[54]     *See* U.S. Dep't of Justice, *State Court Processing of Domestic Violence Cases* 1 (Mar. 21, 2008), https://www.bjs.gov/content/pub/pdf/scpdvc.pdf.

Pub. L. No. 106-386, 114 Stat. 1464 (2000).   It created two new categories of visas for those seeking admission to the United States— "T" visas for victims of sex trafficking, *id*. div. A § 107, 114 Stat. 1464, 1474-80 (codified at 8 U.S.C. § 1101(a)(15)(T)), and "U" visas for victims of other serious crimes, like domestic abuse, who testify against their attackers, *id*. div. B § 1513, 114 Stat. at 1533-37 (codified at 8 U.S.C. § 1101(a)(15)(U)).   With the passage of this Act, Congress recognized the importance of "providing battered immigrant women and children who [are] experiencing domestic violence at home with protection against deportation." *Id*. §1502(a)(2), 114 Stat. at 1518. Indeed, in discussing the need for T and U visas, members of Congress noted that the visas would provide protection for domestic violence victims in the United States,[55] who if coming to this country alone, could seek and qualify for asylum on account of the abuse, but may have difficulty doing so when their abuser is also within the United States.[56] Yet, *Matter of A-B-*, which was issued solely by the Attorney General, closes this avenue of protection and contravenes States' and Congress's desire to aid immigrant women who are victims of domestic abuse.

Moreover, a policy that categorically rejects asylum claims from victims of domestic and gender-based abuse is contrary to the guidelines set forth by the United Nations High Commissioner

---

[55]     *See* U.S. Citizenship & Immigration Servs., *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status (last visited Sept. 24, 2018) (stating that only those who are "in the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or at a port of entry due to trafficking" are eligible for T visas); *see also* U.S. Citizenship & Immigration Servs., *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/ humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last visited Sept. 24, 2018) (considering that "[t]he crime occurred in the United Sates or violated U.S. law" to be a requirement for a U visas).

[56]     *Battered Immigrant Protection Act of 1999: Hearing on H.R. 3083 Before the H. Comm. on the Judiciary*, 106th Cong. 70 (2000) (statement of Rep. Sheila Jackson Lee) ("A battered woman who is not a legal resident, whose immigration status depends completely on her partner . . . may [be] prevented from leaving her husband or seeking asylum.").

14

for Refugees ("UNHCR").  The Supreme Court and, consequently, federal appellate courts, consider

UNHCR guidance authoritative, particularly the guidance found in its often-cited Handbook and

Guidelines on Procedures and Criteria for Determining Refugee Status (Geneva 2011 ed.)

("Handbook").[57]    *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 439 (1987) (relying on the

Handbook's analysis for the interpretation of the definition of "refugee"); *see, e.g.*, *Rodriguez-

Roman v. INS*, 98 F.3d 416, 425 (9th Cir. 1996) ("[The court] is also bound . . . to consider the

principles established by the Handbook.").  The Handbook notes that women who suffer from

gender-related persecution, such as "sexual violence, family/domestic violence, coerced family

planning, [and] female genital mutilation" may qualify as refugees.[58]  That remains the case when

there is "a risk of being persecuted at the hands of a non-State actor" such as a "husband [or]

partner."[59]   *Matter of A-B-* blatantly ignored the Handbook's reasoning, which this Court must take

into account.  *See Cardoza-Fonesca*, 480 U.S. at 439 n. 22.

What is more, in recent years, UNHCR has recognized the heightened domestic abuse crisis,

reiterating that it "takes the position that women who suffer serious domestic harm can qualify for

refugee protection."[60]  At a time when the UNHCR is declaring "a clear need for international

protection" for women who are unsafe from gender-based violence in their home countries,[61] the

United States is turning these same women away.  This Court should reject *Matter of A-B-*'s refusal

---

[57]      *Available    at*    http://www.unhcr.org/en-us/publications/legal/3d58e13b4/handbook-procedures-criteria-determining-refugee-status-under-1951-convention.pdf.

[58]      Handbook at 80.

[59]      *Id*. at 84.

[60]      *See Women on the Run*, *supra* n.34, at 36.

[61]      *Id*. at 44.

to allow victims of domestic violence to seek asylum, which is contrary to the UNHCR's guidelines

and to well-established federal and state policies.

## CONCLUSION

For the foregoing reasons, the *Amici* States urge this Court to rule in the Plaintiffs' favor.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Deputy Solicitor General

IRINA M. MAJUMDAR
Assistant Attorney General
Office of the Solicitor General

/s/ Stephanie Litos /cvz
STEPHANIE LITOS
Assistant Deputy Attorney General
Civil Litigation Division

Office of the Attorney General
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 724-6650
(202) 741-0647
stephanie.litos@dc.gov

| | |
|---|---|
| XAVIER BECERRA<br>Attorney General<br>State of California<br>1300 I Street<br>Sacramento, CA 95814 | GEORGE JEPSEN<br>Attorney General<br>State of Connecticut<br>55 Elm Street<br>Hartford, CT 06106 |
| MATTHEW P. DENN<br>Attorney General<br>State of Delaware<br>Carvel State Building, 6th Floor<br>820 North French Street<br>Wilmington, DE 19801 | RUSSELL A. SUZUKI<br>Attorney General<br>State of Hawaii<br>425 Queen Street<br>Honolulu, HI 96813 |

16

LISA MADIGAN
Attorney General
State of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601

TOM MILLER
Attorney General
State of Iowa
1305 East Walnut Street
Des Moines, IA 50319

JANET T. MILLS
Attorney General
State of Maine
6 State House Station
Augusta, ME 04333-0006

BRIAN E. FROSH
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

LORI SWANSON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

GURBIR S. GREWAL
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
Attorney General
State of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

BARBARA D. UNDERWOOD
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court Street N.E.
Salem, OR 97301

PETER F. KILMARTIN
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609-1001

MARK R. HERRING
Attorney General
State of Virginia
202 North 9th Street
Richmond, VA 23219

ROBERT W. FERGUSON
Attorney General
State of Washington
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

17