# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

GRACE, *et al.*

   Plaintiffs,

v.

JEFFERSON BEAUREGARD
SESSIONS III, in his official
capacity as Attorney General of
the United States, *et al.*,

   Defendants.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:18-cv-01853-EGS

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: */s/ Erez Reuveni*
  EREZ REUVENI
  Assistant Director, Office of Immigration Litigation
  U.S. Department of Justice, Civil Division
  450 5th Street NW
  Washington, DC 20530
  Tel. (202) 307-4293
  Erez.R.Reuveni@usdoj.gov

  JOSEPH DARROW
  CHRISTINA P. GREER
  JOSHUA S. PRESS
  Trial Attorneys

Dated: October 10, 2018   *Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.     The Court Lacks Jurisdiction Over Plaintiffs' Claims ............................................... 2

     A.     *A-B-* is not a written policy directive reviewable through section 1252(e)(3). ....... 2

     B.     The Court also lacks authority to review the PM under section 1252(e)(3). ........ 11

     C.     The Court also lacks authority to review the PM under section 1252(e)(3) ......... 13

II.     Plaintiffs' Claims Fail on the Merits ....................................................................... 17

     A.     Plaintiffs misstate how APA review works ........................................................ 17

           1.     Plaintiffs may not rely on extra-record evidence ..................................... 18

           2,     The Attorney General and USCIS are entitled to varying types of deference ................................................................................................... 20

     B.     *A-B-* is a lawful interpretation and re-statement of the asylum laws and is entitled to some form of deference in all respects, and because the PM merely implements *A-B-*, it too is entitled to deference ................................................................. 24

           1.     *A-B-* and the implementing PM did not create a "rule" against asylum claims resulting from domestic or gang violence ................................... 25

                    a.     Plaintiffs lack any cognizable APA claim premised on any alleged "general rule" against domestic or gang violence claims ............. 26

                    b.     Plaintiffs' due process "bias" claim is meritless ......................... 31

           2.     *A-B-* did not change the existing standard for showing the government is unwilling or unable to protect the applicant from private actors ............. 36

           3.     *A-B-* did not create a new nexus standard, but simply requires adjudicators to apply the old one ............................................................................. 40

           4.     *A-B-*'s disapproval of particular social groups based on a term used to describe domestic violence is an application of existing law that a "particular social group" must exist independently of the persecution ..... 42

5.      The PM does not require exact delineation of particular social groups in credible fear interviews ........................................................................48

6.      The PM does not instruct asylum officers to exercise discretion in credible fear interviews ........................................................................50

C.     The PM, to the extent it does not simply repeat *A-B-*, is entitled to deference .....50

**III.    Plaintiffs are not entitled to declaratory or injunctive relief ....................................56**

A.     Section 1252(e)(3) does not permit the Court to grant equitable relief ...............57

B.     Under the APA, the Court cannot grant relief beyond a remand to the agency ....57

C.     The Court may not order that Plaintiffs already removed be returned to the country...............................................................................................................60

**CONCLUSION ......................................................................................................60**

**CERTIFICATE OF SERVICE ............................................................................62**

# TABLE OF AUTHORITIES

## CASE LAW

*Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ..................................................................................33

*Aldana-Ramos v. Holder*,
  757 F.3d 9 (1st Cir. 2014) ........................................................................31

*\*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ..................................................................60

*Alvarado-Garcia v. Lynch*,
  665 F. App'x 620 (9th Cir. 2016) .............................................................45

*\*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  271 F.3d 262 (D.C. Cir. 2001) ..................................................................19

*\*Am. Immigration Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998) ........................................... 5, 15, 17, 24

*Am. Immigration Lawyers Ass'n v. Reno*,
  No. 97-0597, 1997 WL 161944 (D.D.C. Mar. 31, 1997) .........................58

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ..........................................................12, 13

*Am. Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) ..................................................................13

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ..................................................................60

*Anderson v. Carter*,
  802 F.3d 4 (D.C. Cir. 2015) ..................................................................4, 56

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ..................................................................................15

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*,
  297 F. Supp. 2d 165 (D.D.C. 2003) ..........................................................44

*Ass'n of Nat. Advertisers, Inc. v. F.T.C.*,
  627 F.2d 1151 (D.C. Cir. 1979) ..................................................................3

*Atrium Med. Ctr. v. US HHS.*,
766 F.3d 560 (6th Cir. 2014) ........................................................................24

*Auer v. Robbins*,
519 U.S. 452 (1997) .....................................................................................24

*Barrios v. Holder*,
581 F.3d 849 (9th Cir. 2009) ........................................................................30

\*Bellion Spirits, LLC v. United States*,
--- F. Supp. 3d ---, 2018 WL 4637013 (D.D.C. Sept. 27, 2018) .....................20, 33

*Biolchini v. Gen. Elec. Co.*,
No. 97-C-1704, 1998 WL 155930 (N.D. Ill. Mar. 28, 1998) ...............................34

\*Boca Airport, Inc. v. FAA*,
389 F.3d 185 (D.C. Cir. 2004) ......................................................................23

*Bolante v. Keisler*,
506 F.3d 618 (7th Cir. 2007) ........................................................................62

*Broadgate Inc. v. USCIS.*,
730 F. Supp. 2d 240 (D.D.C. 2010) .............................................................13, 15

\*Cassell v. FCC*,
154 F.3d 478 (D.C. Cir. 1998) .....................................................................23, 46

*Castillo-Arias v. U.S. Att'y Gen.*,
446 F.3d 1190 (11th Cir. 2006) ...................................................................22, 44

\*Castro v. DHS*,
835 F.3d 422 (3d Cir. 2016) .................................................................11, 13, 36, 37

*Cece v. Holder*,
733 F.3d 662 (7th Cir. 2013) .......................................................................47, 48

*Cent. Virginia Cmty. Coll. v. Katz*,
546 U.S. 356 (2006) ......................................................................................9

*Chen v. Holder*,
607 F.3d 511 (7th Cir. 2010) ........................................................................22

\*Chevron, U.S.A. v. Nat. Res. Def. Counsel*,
467 U.S. 837 (1984) .....................................................................................24

iv

*Chiayu Chang v. USCIS,
    254 F. Supp. 3d 160 (D.D.C. 2017) ............................................................... 20, 33

*Children's Hosp. Ass'n of Texas v. Azar,
    300 F. Supp. 3d 190 (D.D.C. 2018) ................................... 19, 59, 60, 61

Citizens of Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) ..................................................................................... 33

Cohens v. Virginia,
    6 Wheat. 264 (1821)......................................................................................9

Columbia Gas Transmission Corp. v. FERC,
    477 F.3d 739 (D.C. Cir. 2007) .................................................................... 23

Corado v. Ashcroft,
    384 F.3d 945 (8th Cir. 2004) ...................................................................... 37

Cordoba v. Holder,
    726 F.3d 1106 (9th Cir. 2013) ..................................................................... 47

Cronin v. USDA,
    919 F.2d 439 (7th Cir. 1990) ...................................................................... 60

Dangler v. Yorktown Central Schools,
    771 F. Supp. 625 (S.D.N.Y. 1991)............................................................... 60

Delta Const. Co. v. EPA,
    783 F.3d 1291 (D.C. Cir. 2015)................................................................... 16

Dep't of the Treasury v. Fed. Labor Relations Auth.,
    494 U.S. 922 (1990)..................................................................................... 24

Diaz-Villaneuva v. Sessions,
    682 F. App'x 307 (5th Cir. 2017) ................................................................ 31

*Drake v. FAA,
    291 F.3d 59 (D.C. Cir. 2002)................................................................passim

Dugdale v. U.S. Customs & Border Prot.,
    2015 WL 2124937 (D.D.C. May 6, 2015) ................................................5, 17

Farm Econ. v. USDA,
    876 F.2d 994 (D.C. Cir. 1989)..................................................................... 23

*Fatin v. INS,*
  12 F.3d 1233 (3d Cir. 1993) ................................................................22

*\*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................................25, 57

*\*Florida Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ............................................................................59

*Fogo De Chao (Holdings) Inc. v. DHS,*
  769 F.3d 1127 (D.C. Cir. 2014) .........................................................59

*Fund for Animals v. Williams,*
  391 F. Supp. 2d 191 (D.D.C. 2005) ...................................................19

*Gaitan v. Holder,*
  671 F.3d 678 (8th Cir. 2012) .............................................................30

*\*Galina v. INS,*
  213 F.3d 955 (7th Cir. 2000) .....................................................37, 38

*Gen. Motors Corp. v. Ruckelshaus,*
  742 F.2d 1561 (D.C. Cir. 1984) ...................................................11, 13

*Giammarco v. Kerlikowske,*
  665 F. App'x 24 (2d Cir. 2016) .........................................................63

*Gonzalez-Cano v. Lynch,*
  809 F.3d 1056 (8th Cir. 2016) ...........................................................45

*Grant Med. Ctr. v. Burwell,*
  204 F. Supp. 3d 68 (D.D.C. 2016) .....................................................54

*Haoua v. Gonzales,*
  472 F.3d 227 (4th Cir. 2007) .............................................................31

*Harutunyan v. Gonzales,*
  421 F.3d 64 (1st Cir. 2005) ................................................................40

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
  23 F.3d 412 (D.C. Cir. 1994) ..............................................22, 38, 57

*Heartland Reg'l Med. Ctr. v. Sebelius,*
  566 F.3d 193 (D.C. Cir. 2009) ...........................................................60

*Henry Ford Health Sys. v. Dep't of Health and Human Servs.*,
  654 F.3d 660 (6th Cir. 2011) ...............................................................25

*Herbert v. Nat'l Acad. of Sciences*,
  974 F.2d 192 (D.C. Cir. 1992) ...............................................................15

*Herman v. Assoc. Elec. Coop., Inc.*,
  994 F. Supp. 1147 (E.D. Mo. 1998) .......................................................59

*Hill Dermaceuticals, Inc. v. FDA*,
  709 F.3d 44 (D.C. Cir. 2013) .................................................................18

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
  284 F. Supp. 2d 15 (D.D.C. 2003) .........................................................52

*Hor v. Gonzales*,
  421 F.3d 497 (7th Cir. 2005) .................................................................38

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014) ...........................................................60

*INS v. Aguirre-Aguirre*,
  526 U.S. 415 (1999) .................................................................4, 20, 41

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) .......................................................................20, 21

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) .............................................................................23

*INS v. Orlando Ventura*,
  537 U.S. 12 (2002) ...............................................................................59

*INS v. Pangilinan*,
  486 U.S. 875 (1988) .............................................................................60

*INS v. St. Cyr*,
  533 U.S. 289 (2001) .............................................................................10

*Ivanov v. Holder*,
  736 F.3d 5 (1st Cir. 2013) ....................................................................31

*Jarita Mesa Livestock Grazing Ass'n v. U.S.F.S.*,
  58 F. Supp. 3d 1191 (D.N.M. 2014) ......................................................20

*Kaspersky Lab, Inc. v. DHS,
   311 F. Supp. 3d 187 (D.D.C. 2018) ...................................................................16

*Kiyemba v. Obama,
   555 F.3d 1022 (D.C. Cir. 2009) .............................................................59, 60

Kucana v. Holder,
   558 U.S. 233 (2010) ........................................................................................62

Kwai Fun Wong v. United States,
   373 F.3d 952 (9th Cir. 2004) .........................................................................36

Lafler v. Cooper,
   566 U.S. 156 (2012) ........................................................................................35

*Landon v. Plasencia,
   459 U.S. 21 (1982) ..........................................................................................36

Larios v. Holder,
   608 F.3d 105 (1st Cir. 2010)..........................................................................30

*Lindeen v. SEC,
   825 F.3d 646 (D.C. Cir. 2016) .........................................................22, 24, 25

Lopez v. Sessions,
   No. 17-9517, 2018 WL 3730137 (10th Cir. Aug. 6, 2018) ...................22, 54

Lopez-Velasquez v. Sessions,
   --- F. App'x ---, 2018 WL 3423900 (9th Cir. July 16, 2018) .................31

*Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) ........................................................................................15

Lujan v. Nat'l Wildlife Fed'n,
   497 U.S. 871 (1990) ........................................................................................13

Lukwago v. Ashcroft,
   329 F.3d 157 (3d Cir. 2003) ....................................................................44, 47

*Marcello v. Bonds,
   349 U.S. 302 (1955).........................................................................................34

Marshall Cty. Health Care Auth. v. Shalala,
   988 F.2d 1221 (D.C. Cir. 1993)......................................................................19

*Martinez-Perez v. Sessions,*
    897 F.3d 33 (1st Cir. 2018) .......................................................................... 22, 54

*Mayorga-Rosa v. Sessions,*
    888 F.3d 379 (8th Cir. 2018) ............................................................................... 31

*Mazloum v. District of Columbia,*
    442 F. Supp. 2d 1 (D.D.C. 2006) ........................................................................ 44

*McLeod v. INS,*
    802 F.2d 89 (3d Cir. 1986) ................................................................................... 33

*Mei Fun Wong v. Holder,*
    633 F.3d 64 (2d Cir. 2011) ................................................................................... 22

*Mercy Hosp., Inc. v. Azar,*
    891 F.3d 1062 (D.C. Cir. 2018) ............................................................................. 4

*Morquecho-Saico v. Sessions,*
    696 F. App'x 34, (2d Cir. 2017) .......................................................................... 31

*Mulyani v. Holder,*
    771 F.3d 190 (4th Cir. 2014) ............................................................................... 40

*Nahrvani v. Gonzales,*
    399 F.3d 1148 (9th Cir. 2005) ............................................................................. 40

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................................................. 53

*Nat'l Mining Ass'n v. Kempthorne,*
    512 F.3d 702 (D.C. Cir. 2008) ............................................................................. 14

*Orellana-Monson v. Holder,*
    685 F.3d 511 (5th Cir. 2012) ......................................................................... 30, 44

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
    506 F.2d 33 (D.C. Cir. 1974) ................................................................................. 3

*Paiz-Morales v. Lynch,*
    795 F.3d 238 (1st Cir. 2015) ............................................................................... 31

*Paloka v. Holder,*
    762 F.3d 191 (2d Cir. 2014) ..................................................................... 22, 23, 39

*Perez-Rabanales v. Sessions*,
  881 F.3d 61 (1st Cir. 2018).............................................................. 44, 45, 47

*\*Petit v. U.S. Dep't of Educ.*,
  675 F.3d 769 (D.C. Cir. 2012).............................................................53, 54

*Pharm. Research & Mfrs. of Am. v. FTC*,
  790 F.3d 198 (D.C. Cir. 2015).................................................................57

*Pharm. Research & Mfrs. of Am. v. US HHS*,
  43 F. Supp. 3d 28 (D.D.C. 2014)...........................................................57

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  374 F.3d 1251 (D.C. Cir. 2004).............................................................58

*\*Renal Physicians Ass'n v. US HHS*,
  489 F.3d 1267 (D.C. Cir. 2007)........................................................15, 16

*Ritonga v. Holder*,
  633 F.3d 971 (10th Cir. 2011)..............................................................40

*Rivera-Barrientos v. Holder*,
  666 F.3d 641 (10th Cir. 2012)..........................................................22, 30

*Roblero-Morales v. Boente*,
  677 F. App'x 849 (4th Cir. 2017)..........................................................31

*Rodas Orellana v. Holder*,
  780 F.3d 982 (10th Cir. 2015)..............................................................31

*Rodriguez v. U.S. Att'y Gen.*,
  735 F.3d 1302 (11th Cir. 2013)............................................................47

*Rosales Justo v. Sessions*,
  895 F.3d 154 (1st Cir. 2018)...........................................................39, 54

*Rreshpja v. Gonzales*,
  420 F.3d 551 (7th Cir. 2005)................................................................47

*\*S.E.R.L. v. Att'y Gen. of the U.S.*,
  894 F.3d 535 (3d Cir. 2018) ......................................................22, 27, 54

*Saldana v. Lynch*,
  820 F.3d 970 (8th Cir. 2016)................................................................40

*Salgado-Sosa v. Sessions,*
   882 F.3d 451 (4th Cir. 2018) .................................................................. 31

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n,*
   789 F.2d 26 (D.C. Cir. 1986) .................................................................. 25

*Saravia v. Att'y Gen. of U.S.,*
   No. 17-2234, 2018 WL 4688710 (3d Cir. Oct. 1, 2018) ....................... 54

*Sarkisian v. Att'y Gen. of U.S.,*
   322 F. App'x 136 (3d Cir. 2009) ............................................................ 44

*Seneca Nation of Indians v. US HHS,*
   144 F. Supp. 3d 115 (D.D.C. 2015) ................................................ 14, 15

*Sevilla v. Elizalde,*
   112 F.2d 29 (D.C. Cir. 1940) .................................................................. 60

*Shaughnessy v. United States ex rel Accardi,*
   349 U.S. 280 (1955) ......................................................................... 33, 34

*\*Shaughnessy v. United States ex rel. Mezei,*
   345 U.S. 206 (1953) ............................................................................... 36

*Singh v. INS,*
   134 F.3d 962 (9th Cir. 1998) .................................................................. 37

*Soto-Sosa v. U.S. Atty. Gen.,*
   154 F. App'x 141 (11th Cir. 2005) ........................................................... 7

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ................................................................................. 14

*Sugar Cane Growers Coop. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ................................................................. 60

*\*Tex. Children's Hosp. v. Azar,*
   315 F. Supp. 3d 322 (D.D.C. 2018) ....................................................... 57

*Tum-Lux v. U.S. Att'y Gen.,*
   --- F. App'x ---, 2018 WL 3342699 (11th Cir. July 9, 2018) ................. 31

*U.S. Telecom Ass'n v. F.C.C.,*
   295 F.3d 1326 (D.C. Cir. 2002) ....................................................... 22, 57

*Ukrainian-Am. Bar Ass'n v. Baker*,
   893 F.2d 1374 (D.C. Cir. 1990) ...................................................................36

*Umana-Ramos v. Holder*,
   724 F.3d 667 (6th Cir. 2013) .....................................................................30

*Unite Here Local 25 v. Madison Ownership, LLC*,
   850 F. Supp. 2d 219 (D.D.C. 2012) .........................................................15

*United States v. Decoster*,
   624 F.2d 196 (D.C. Cir. 1976) ..................................................................35

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ...................................................................................23

*United Technologies Corp. v. EPA*,
   821 F.2d 714 (D.C. Cir. 1987) ..................................................................12

*Ursack v. Sierra Interagency Black Bear Grp.*,
   639 F.3d 949 (9th Cir. 2011) .....................................................................33

*Velasquez-Otero v. U.S. Atty. Gen.*,
   456 F. App'x 822 (11th Cir. 2012) ............................................................30

*W.G.A. v. Sessions*,
   900 F.3d 957 (7th Cir. 2018) .....................................................................31

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ...................................................................62

*Yamataya v. Fisher*,
   189 U.S. 86 (1903) .....................................................................................59

*Yang v. Reno*,
   925 F. Supp. 320 (M.D. Pa. 1996) ..................................................33, 34, 35

*Yasinskyy v. Holder*,
   724 F.3d 983 (7th Cir. 2013) .....................................................................40

*Zaldana-Menijar v. Lynch*,
   812 F.3d 491 (6th Cir. 2015) .....................................................................31

*Zelaya v. Holder*,
   668 F.3d 159 (4th Cir. 2012) .....................................................................30

## ADMINISTRATIVE DECISIONS

*Matter of A-B-,
  27 I & N Dec. 247 (A.G. 2018) ...................................................................4

*Matter of A-B-,
  27 I. & N. Dec. 316 (A.G. 2018) .................................................................4

*Matter of Acosta,
  19 I. & N. Dec. 211 (BIA 1985) ................................................................37

Matter of A-K-,
  24 I. & N. Dec. 275 (BIA 2007) ..................................................................6

Matter of A-M-E- & J-G-U-,
  24 I. & N. Dec. 69 (BIA 2007) ....................................................................6

*Matter of A-R-C-G-,
  26 I. & N. Dec. 388 (BIA 2014) ..................................................................6

Matter of A-T-,
  24 I. & N. Dec. 296 (BIA 2007) ..................................................................6

Matter of A-T-,
  24 I. & N. Dec. 617 (A.G. 2008) .................................................................6

Matter of A-T-,
  25 I. & N. Dec. 4 (BIA 2009) ......................................................................6

Matter of C-A-,
  23 I. & N. Dec. 951 (BIA 2006) ..................................................................6

Matter of C-C-,
  23 I. & N. Dec. 899 (BIA 2006) ..................................................................6

Matter of C-Y-Z-,
  21 I. & N. Dec. 915 (BIA 1997) ..................................................................6

Matter of D-I-M-,
  24 I. & N. Dec. 448 (BIA 2008) ..................................................................6

Matter of E-A-G-,
  24 I. & N. Dec. 591 (BIA 2008) .............................................................6, 31

Matter of E-L-H-,
  23 I&N Dec. 814 (BIA 2005) ....................................................................52

*Matter of Fajardo Espinoza,*
  26 I&N Dec. 603 (BIA 2015) .............................................................52

*Matter of G-A-,*
  23 I. & N. Dec. 366 (BIA 2002) ..........................................................6

*Matter of H-L-H- & Z-Y-Z-,*
  25 I. & N. Dec. 209 (BIA 2010) ..........................................................6

*Matter of J-B-N- & S-M-,*
  24 I. & N. Dec. 208 (BIA 2007) ..........................................................6

*Matter of J-E-,*
  23 I. & N. Dec. 291 (BIA 2002) ..........................................................6

*Matter of J-F-F-,*
  23 I. & N. Dec. 912 (A.G. 2006) .........................................................6

*Matter of J-H-S-,*
  24 I. & N. Dec. 196 (BIA 2007) ..........................................................6

*Matter of J-S-,*
  24 I. & N. Dec. 520 (A.G. 2008) .........................................................6

*Matter of J-W-S-,*
  24 I. & N. Dec. 185 (BIA 2007) ..........................................................6

*Matter of K-R-Y- and K-C-S-,*
  24 I. & N. Dec. 133 (BIA 2007) ..........................................................6

*\*Matter of L-E-A-,*
  27 I. & N. Dec. 40 (BIA 2017) ...........................................................6

*Matter of L-S-,*
  25 I. & N. Dec. 705 (BIA 2012) ..........................................................6

*\*Matter of M-E-V-G-,*
  26 I. & N. Dec. 227 (BIA 2014) ................................................*passim*

*Matter of M-F-W- & L-G-,*
  24 I. & N. Dec. 633 (BIA 2008) ..........................................................6

*Matter of N-M-,*
  25 I. & N. Dec. 526 (BIA 2011) ..........................................................6

*Matter of N-M-A-,*
22 I. & N. Dec. 312 (BIA 1998) ..................................................6

*Matter of O-Z- & I-Z-,*
22 I. & N. Dec. 23 (BIA 1998) ....................................................6

*Matter of R-A-,*
22 I. & N. Dec. 906 (BIA 1999) ................................................29

*Matter of S-A-,*
22 I. & N. Dec. at 1336  (BIA 2000) .........................................42

*Matter of S-A-K- and H-A-H-,*
24 I. & N. Dec. 464 (BIA 2008) ..................................................6

*Matter of S-E-G-,*
24 I. & N. Dec. 579 (BIA 2008) ...........................................6, 31

*Matter of S-L-L-,*
24 I. &. N Dec. 1 (BIA 2006) ......................................................6

*Matter of S-V-,*
22 I. & N. Dec. 1306 (BIA 2000) ...............................................6

*Matter of T-Z-,*
24 I. & N. Dec. 163 (BIA 2007) ..................................................6

*\*Matter of W-G-R-,*
26 I. & N. Dec. 208 (BIA 2014) .........................................*passim*

## STATUTES

5 U.S.C. § 553(b)(3)(A) ............................................................57

5 U.S.C. § 553(b)(A) .................................................................11

5 U.S.C. § 704 ..........................................................................13

5 U.S.C. § 706 ..........................................................................59

6 U.S.C. § 557 .......................................................................3, 6

8 U.S.C. § 1101(a)(42) ............................................................51

8 U.S.C. § 1101(a)(42)(A) ........................................................26

8 U.S.C. § 1103.................................................................................................4

8 U.S.C. § 1103(a) ......................................................................................*passim*

8 U.S.C. § 1103(g) .............................................................................................34

8 U.S.C. § 1103(g)(2).........................................................................................4

8 U.S.C. § 1158.............................................................................................3, 50

8 U.S.C. § 1158(a) ....................................................................................4, 8, 10

8 U.S.C. § 1158(b)(1)(B)....................................................................................8

8 U.S.C. § 1158(b)(1)(B)(i)................................................................................22

8 U.S.C. § 1158(e) .............................................................................................10

8 U.S.C. § 1182(d)(5)(A)....................................................................................62

8 U.S.C. § 1225(b) .............................................................................................3,

8 U.S.C. § 1225(b)(1).......................................................................................5, 8

8 U.S.C. § 1225(b)(1)(A)(iii)(I).........................................................................13

8 U.S.C. § 1225(b)(1)(B)(iii)(II)........................................................................12

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ..............................................................3, 10, 12

8 U.S.C. § 1225(b)(1)(B)(iv).............................................................................12

8 U.S.C. § 1225(b)(1)(B)(v).......................................................................4, 9, 10, 51

8 U.S.C. § 1225(b)(1)(C)............................................................................8, 9, 10

8 U.S.C. § 1225(b)(1)(D) ....................................................................................9

8 U.S.C. § 1225(b)(1)(G) ...................................................................................10

8 U.S.C. § 1231(b)(3)..........................................................................................10

8 U.S.C. § 1252...................................................................................................10

8 U.S.C. § 1252(a) ...............................................................................................5

8 U.S.C. § 1252(a)(2)(A)................................................................................12

8 U.S.C. § 1252(a)(5)................................................................................4, 10

8 U.S.C. § 1252(b)(9)................................................................................4, 10

8 U.S.C. § 1252(e)(1)....................................................................................58

8 U.S.C. § 1252(e)(2)....................................................................................11

8 U.S.C. § 1252(e)(3).................................................................. 1, 10, 50, 57

8 U.S.C. § 1252(e)(3)(A)(ii).........................................................................58

8 U.S.C. § 1252(e)(3)(B)............................................................... 1, 5, 25, 49

8 U.S.C. § 1252(e)(4)(B)...............................................................................59

8 U.S.C. § 1255(a).........................................................................................10

8 U.S.C. § 1325(a).........................................................................................10

8 U.S.C. § 1326.............................................................................................10

28 U.S.C. § 2342(3)(A)...................................................................................5

## PUBLIC LAW

Pub. L. No. 109-13........................................................................................62

## FEDERAL REGULATIONS

8 C.F.R. § 103.3..............................................................................................7

8 C.F.R. § 103.3(c)........................................................................ 1, 16, 53, 55

8 C.F.R. § 208.13(b)(2)..................................................................................40

8 C.F.R. § 208.30(d)......................................................................................50

8 C.F.R. § 208.30(e)(1)..................................................................................49

8 C.F.R. § 1003.1(g) .......................................................................... 35, 53, 55

8 C.F.R. § 1003.1(h) ..........................................................................................4, 8

8 C.F.R. § 1208.30(g)(2) ........................................................................................3

## FEDERAL REGISTER NOTICES

68 Fed. Reg. 10350 (March 5, 2003) ......................................................................7

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a)............................................................................................33

Fed. R. Civ. P. 65...............................................................................................61

Fed. R. Civ. P. 65(a)(2) .......................................................................................61

## MISCELLANEOUS

*Case Priorities and Immigration Court Performance Measures, EOIR,*
   https://www.justice.gov/eoir/page/file/1026721/download (last visited Oct. 10, 2018) ............5

**INTRODUCTION**

In their opposition and cross-motion, Plaintiffs weave a misleading narrative, asserting that the Attorney General's decision in *Matter of A-B-* (*A-B-*), reversing a 2014 Board of Immigration Appeals (BIA) asylum decision that impermissibly relied on the parties' stipulations instead of legal analysis, somehow amounts to a revision of the credible fear process. Instead, the Attorney General's decision only restores substantive asylum law to where it was before the 2014 BIA decision created an erroneous carve-out exempting certain asylum claims from the generally applicable legal requirements for asylum eligibility. Plaintiffs fail to demonstrate, as they must, that this Court has jurisdiction to entertain their policy disputes with the Attorney General and USCIS, or that *A-B* or the USCIS Guidance (PM) implementing that decision are contrary to law.[1]

First, Plaintiffs cannot carry their burden of demonstrating that they can litigate their claims concerning *A-B-* or the PM through 8 U.S.C. § 1252(e)(3). As Plaintiffs themselves concede, *A-B-* is an *adjudication*, and under the plain text of section 1252(e)(3), is therefore not subject to review in district court. Moreover, Plaintiffs' challenge to the PM cannot succeed. Even if the Court could declare the PM unlawful—a point the Defendants dispute—that would be no more than an advisory opinion, because asylum officers, like all immigration officers, must apply the Attorney General's binding decisions. *See* 8 U.S.C. § 1103(a); 8 C.F.R. § 103.3(c). Any relief directed at the PM would not cure Plaintiffs' alleged injuries, because immigration officers and judges would still have to apply *A-B-* to all immigration proceedings, including any credible fear proceedings.

Second, even if *A-B-* or the PM, to the extent it implements *A-B-*, may be challenged through section 1252(e)(3), all that could be challenged would be new law issued within 60 days prior to the filing of their complaint. *See* 8 U.S.C. § 1252(e)(3)(B). But aside from overruling a recent BIA decision, *Matter of A-R-C-G-* (*A-R-C-G-*), *A-B-* and the PM's implementation of *A-B-* otherwise restate long-standing, preexisting law. And Plaintiffs themselves explicitly concede that they are not challenging *A-B-*'s overruling of *A-R-C-G-*. ECF 64-1 at 48 n.35.

Third, even ignoring these threshold problems, all of Plaintiffs' claims fail under well-

---

[1] As before, Defendants cite to legal authorities in the record, *see* USCIS001-346; ABROP0001-1716, using relevant case or statutory citation where appropriate. *See* ECF 57-1 at 8 n.2.

settled administrative law principles. *A-B-*, an adjudicative decision which restates and applies the existing standards for asylum, was issued pursuant to an express delegation of congressional authority to make such determinations, 8 U.S.C. § 1103(a), (g), and is entitled to deference in all respects. To the extent *A-B-* construed ambiguous statutory text, especially regarding the meaning of "particular social group," it is entitled to *Chevron* deference. And to the extent *A-B-* restates and applies preexisting law, construes prior precedents, or refines existing asylum standards, it is entitled to deference under the principle that courts defer to agencies' reasonable interpretation of their own precedents. Likewise, the PM, an agency interpretive document either providing guidance as to *A-B-*, or articulating reasons for interpretive policy choices, is entitled to deference in all respects. Although Plaintiffs and their amici labor to paint *A-B-* and the PM as something sinister, they are consistent with the INA and violate no constitutional right Plaintiffs may have.

The Court should grant Defendants summary judgment on all counts.

## ARGUMENT

Nothing in Plaintiffs' cross-motion changes the basic path to judgment set out in Defendants' motion. The Court lacks jurisdiction to review *A-B-*, and Plaintiffs lack standing to challenge any aspect of the PM implementing *A-B-*. Even if the Court had jurisdiction, *A-B-* is entitled to deference, *Chevron* and otherwise. Indeed, Plaintiffs now concede they are not even challenging the only new aspect of *A-B-* relevant to credible fear proceedings—the reversal of *A-R-C-G-*, a four-year-old BIA decision using stipulations to resolve legal issues by adopting a carve-out for certain claims. The Attorney General explained why he reversed *A-R-C-G-*, his explanation is reasonable, and that is all the law requires. Every other aspect of *A-B-* rests on long-standing BIA and circuit precedent, and to the extent refined by the Attorney General, also is entitled to deference. The PM merely provides interpretive guidance concerning *A-B-* to USCIS employees, so it too warrants deference. Finally, Plaintiffs' sweeping requests for injunctive and declaratory relief are not cognizable in an APA action or under section 1252(e)(3). Should the Court reach the merits and find any aspect of *A-B-* or the PM unlawful, the only available relief is a remand.

## I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims

A.      *A-B-* is not a written policy directive reviewable through section 1252(e)(3).

Contrary to Plaintiffs' assertions, *A-B-* is not a written policy guidance or directive implementing section 1252(e)(3), as necessary to create jurisdiction under that provision. By its own terms and under the relevant provisions of the INA, *A-B-* is an "adjudication" concerning 8 U.S.C. § 1158 issued under the authority of the Attorney General, *see* 8 U.S.C. § 1103(a)(1), (g) not a reviewable policy, guidance, or directive concerning expedited removal, issued by the Secretary of Homeland Security under 8 U.S.C. § 1225(b). Accordingly, the Court has no jurisdiction to review *A-B-* under section 1252(e)(3).

As we have explained, section 1252(e)(3), titled "Judicial review of orders under section 1225(b)(1)," provides (emphasis added):

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of . . . (ii) whether such a regulation, *or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the* [*Secretary of DHS*][2] *to implement such section*, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

First, *A-B-* is not a "policy" or "procedure" falling under this provision. Plaintiffs do not dispute that *A-B-* does not prescribe a "procedure . . . to implement" section 1225(b)(1). *See* ECF 64-1 at 16-17. Nor do they (or could they) assert that *A-B-* is a "policy" under this provision. Statements of policy differ from adjudications. An adjudication determines the rights and duties of the parties to a dispute, *see Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1160-61 & n.17 (D.C. Cir. 1979), and can "constitute binding precedent[]" which "will have the force of law." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). "A policy statement," on the other hand, "announces the agency's tentative intentions for the future." *Id.* "It is not finally determinative of the issues or rights to which it is addressed" but must still be "applied in future cases" where the policy can be challenged. *Id.* The Court "assume[s] that Congress means

---

[2] Pursuant to the Homeland Security Act of 2002, the former immigration functions of the Immigration and Naturalization Service (INS) were transferred from the Department of Justice to the Department of Homeland Security (DHS), *see* 6 U.S.C. § 557, as Plaintiffs concede, ECF 64-1 at 14 n.11. Therefore, as pertains to credible fear proceedings, outside of immigration judge (IJ) review of negative credible fear findings, 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1208.30(g)(2), the implementation of section 1225(b)(1) procedures now is entrusted to DHS.

what it says in a statute," *Anderson v. Carter*, 802 F.3d 4, 9 (D.C. Cir. 2015), and "presume[s] that Congress did not include words that have no effect, and so [it] generally avoid[s] a reading that renders some words altogether redundant." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018). Plaintiffs' reading of section 1252(e)(3) to include final agency *adjudications* such as *A-B-* would pervert the plain meaning of "adjudication" and also render Congress's inclusion of the word "policy" mere surplusage. Indeed, Congress knew how to specify AG determinations/rulings when it intended to do so. *Cf.* 8 U.S.C. 1103(a)(1) ("determination and ruling"), 1252(a)(1) ("final order of removal"), 1252(a)(1)(B)(i) ("judgment").

Second, *A-B-* is not a "directive" or "guideline," but a determination in an administrative adjudication. *A-B-* is an administrative adjudication in a removal case certified to the Attorney General under 8 U.S.C. § 1103(a)(1), which describes the Attorney General's (and the BIA's) authority to issue "determination[s] and ruling[s]" on "questions of law" arising under the INA, in the process of "review[ing] such administrative determinations in immigration proceedings," *Id.* § 1103(g)(2);[3] *see* 8 U.S.C. § 1103; *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). In *A-B-*, the Attorney General provided an adjudicatory opinion and order. *See, e.g.*, *Matter of A-B-*, 27 I. & N. Dec. 316, 317 (A.G. 2018) ("I overrule [*A-R-C-G-*] and any other Board precedent to the extent those other decisions are inconsistent with the legal conclusions set forth in this opinion.").

Had Congress intended for Attorney General (or BIA) decisions under section 1103(a) to be subject to review under section 1252(e)(3) it could have easily added the terms "adjudications," "determinations," "rulings," "opinions," or "orders," to the list of terms triggering review under section 1252(e)(3). Congress uses these terms to provide for court review of administrative adjudications when that is its intent. *See, e.g.*, 28 U.S.C. § 2342(3)(A) (providing for exclusive jurisdiction in the court of appeals to enjoin, set aside, suspend, or determine the validity of "all

---

[3] Plaintiffs' nightmare scenario about the Attorney General certifying a credible fear case and eliminating eligibility, ECF 64-1 at 16, is thus unfounded, agency regulations do not authorize such a result. *See* 8 C.F.R. § 1003.1(h). Moreover, the Attorney General could not eliminate all eligibility for positive credible fear because that would require eliminating all eligibility for asylum, *see* 8 U.S.C. § 1225(b)(1)(B)(v) (defining credible fear as a substantial possibility of eligibility for asylum), which is established by Congress via statute, 8 U.S.C. § 1158(a). And, as noted, denial of asylum is reviewable by federal courts on petitions for review, *see* 8 U.S.C. § 1252(a)(5), (b)(9), ensuring review of alleged unlawful narrowing of statutory asylum eligibility.

rules, regulations, *or final orders of*—the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46") (emphasis added); *id.* § 2342(5) (providing exclusive jurisdiction for the same review of "all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title"); *cf.* 8 U.S.C. § 1185(a)(1) (INA provision imposing travel controls on aliens "except under such reasonable rules, regulations, *and orders* . . . as the President may prescribe" (emphasis added)). Congress knew how to include a term such as "order" or "determination" in section 1252(e)(3)'s list of covered documents had it wanted to. That it did not demonstrates the lack of merit to Plaintiffs' position. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018).

Congress limited the period that plaintiffs could challenge expedited removal policies by making the 60-day requirement *jurisdictional. See Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) (*AILA*); *Dugdale v. U.S. Customs & Border Prot.*, 2015 WL 2124937, at *1 (D.D.C. May 6, 2015), *aff'd sub nom. Dugdale v. Lynch*, 672 F. App'x 35 (D.C. Cir. 2016) ("the D.C. Circuit affirmed the [*AILA*] Court's determination that Section 1252(e)(3)(B)'s 60-day requirement is jurisdictional rather than a traditional limitations period"). Challenges to directives or guidelines implementing section 1225(b)(1) "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(B). It would be incongruent to hold that Congress, which made clear its desire to limit challenges to the expedited removal system in 8 U.S.C. § 1252(a) and (e), *see* ECF 16 at 21, would provide plaintiffs a new 60-day opportunity to challenge new interpretations of sections 1158(b)(1)(B) and 1231 every time the BIA, the Attorney General, or a federal court analyzed the meaning of "particular social group," let alone any other aspect of the asylum eligibility standard. If any agency decisions affecting the substance of asylum law restarted the limitations period under section 1252(e)(3), Congress's effort to limit this period would be entirely thwarted. Indeed, between 1998 (the effective date of section 1252(e)(3)) and the present, the agency issued at least 30 precedential decisions affecting asylum standards.[4] Congress gave no basis to believe that it intended for each of these decisions

---

[4] The BIA has issued at least eight decisions interpreting the term "particular social group," *see,*

to restart the 60-day clock on any challenge to the expedited removal system, and Plaintiffs do not explain why all these other substantive asylum decisions did not result in 1252(e)(3) litigation. There is no evidence in section 1252(e)(3) that Congress meant to make it the mechanism for testing all substantive developments in asylum law.

Third, *A-B-* was decided by the Attorney General, but it is the Secretary of Homeland Security, not the Attorney General, who has the responsibility for implementing virtually all of 1225(b)(1)'s provisions, as Plaintiffs themselves admit. ECF 64-1 at 14 n.11 (citing 6 U.S.C. § 557) (conceding that "Attorney General" as used in section 1252(e)(3) is "deemed to refer to the Secretary" of Homeland Security). As Plaintiffs recognize, USCIS and its asylum officers conduct credible fear screenings, indicating that this function has been "transferred" to DHS, *see* 6 U.S.C. § 557, and thus the reference in section 1252(e)(3) to the Attorney General pertains to the Secretary of Homeland Security as it relates to credible fear interviews.[5] *See Soto-Sosa v. U.S. Atty. Gen.*,

_____

*e.g.*, *Matter of L-E-A-*, 27 I. & N. Dec. 40 (BIA 2017); *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014); *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014); *Matter of E-A-G-*, 24 I. & N. Dec. 591 (BIA 2008); *Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008); *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007); *Matter of C-A-*, 23 I. & N. Dec. 951 (BIA 2006), three precedential decisions interpreting the REAL ID Act's "one central reason" standard, *see Matter of L-E-A-*, 27 I. & N. Dec. 40; *Matter of N-M-*, 25 I. & N. Dec. 526 (BIA 2011); *Matter of J-B-N- & S-M-*, 24 I. & N. Dec. 208 (BIA 2007), and several affecting particular types of asylum claims, *see Matter of A-T-*, 24 I. & N. Dec. 296 (BIA 2007), *overruled by Matter of A-T-*, 24 I. & N. Dec. 617 (A.G. 2008); *Matter of J-S-*, 24 I. & N. Dec. 520 (A.G. 2008), *overruling Matter of S-L-L-*, 24 I. & N. Dec. 1 (BIA 2006), and *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997); *see also*, *Matter of L-S-*, 25 I. & N. Dec. 705 (BIA 2012); *Matter of H-L-H- & Z-Y-Z-*, 25 I. & N. Dec. 209 (BIA 2010); *Matter of A-T-*, 25 I. & N. Dec. 4 (BIA 2009); *Matter of M-F-W- & L-G-*, 24 I. & N. Dec. 633 (BIA 2008); *Matter of S-A-K- and H-A-H-*, 24 I. & N. Dec. 464 (BIA 2008); *Matter of D-I-M-*, 24 I. & N. Dec. 448 (BIA 2008); *Matter of A-K-*, 24 I. & N. Dec. 275 (BIA 2007); *Matter of J-H-S-*, 24 I. & N. Dec. 196 (BIA 2007); *Matter of J-W-S-*, 24 I. & N. Dec. 185 (BIA 2007); *Matter of T-Z-*, 24 I. & N. Dec. 163 (BIA 2007); *Matter of K-R-Y- and K-C-S-*, 24 I. & N. Dec. 133 (BIA 2007); *Matter of C-C-*, 23 I. & N. Dec. 899 (BIA 2006); *Matter of N-M-A-*, 22 I. & N. Dec. 312 (BIA 1998); *Matter of O-Z- & I-Z-*, 22 I. & N. Dec. 23 (BIA 1998). There have also been at least four decisions interpreting the requirements for protection under the United Nations Convention Against Torture (CAT). *Matter of J-F-F-*, 23 I. & N. Dec. 912 (A.G. 2006); *Matter of G-A-*, 23 I. & N. Dec. 366 (BIA 2002); *Matter of J-E-*, 23 I. & N. Dec. 291 (BIA 2002); *Matter of S-V-*, 22 I. & N. Dec. 1306 (BIA 2000).

[5] There is IJ review of an asylum officer's finding of no credible fear if requested. However, Plaintiffs have not produced any evidence that EOIR has issued any guidance regarding IJ's review of credible fear proceedings stemming from *A-B-*, and so IJ review is not at issue in this litigation.

154 F. App'x 141, 142 (11th Cir. 2005) (recognizing that, following "the transfer of the functions of the INS to the [DHS] under the Homeland Security Act of 2002," DHS took over INS's role of applying expedited removal provisions against alien in that proceeding) (citing 68 Fed. Reg. 10350 (Mar. 5, 2003)). Accordingly, given this transfer of authority over implementing the expedited removal system via the Homeland Security Act, it is the Secretary and DHS, *not* the Attorney General, that "implement[s]" section 1225(b)(1)'s credible fear procedures. The Attorney General lacks any such authority concerning those procedures, so *A-B-* cannot in any sense be "issued by or under the authority of" the currently appropriate Department head.

Plaintiffs do not directly address these points. Instead, they argue that deeming section 1252(e)(3) to encompass decisions following certification by the Attorney General "to issue written policies for implementing the credible fear process" would not mean that all agency asylum precedents would wind up susceptible to section 1252(e)(3) challenges because decisions impacting credible fear would issue "rarely," and because the BIA does not issue decisions impacting credible fear. ECF 64-1 at 18-19. As shown above, all decisions modifying asylum standards in any way affect credible fear proceedings in the same way *A-B-* does. Plaintiffs concede that if *A-B-* had not included a single footnote predicting that some credible fear claims would fail under *A-B-*, *A-B-* would not be reviewable at all, but Plaintiffs claim that the mere use of those words (which otherwise would be implicit) creates jurisdiction. *See* ECF 64-1 at 18 (asserting that section 1252(e)(3) review is available if any agency decision uses the words "credible fear"). This saving construction exalts form over substance. Had the term "credible fear" not appeared once in a footnote in *A-B-*, USCIS officers would still be required to apply *A-B-* to credible fear interviews, regardless of whether *A-B-* explicitly mentioned credible fear. *See* 8 U.S.C. § 1103(a); 8 C.F.R. § 103.3; AR002 ("Officers should continue to follow other binding precedents to the extent they are consistent with *Matter of A-B-*, including *Matter of M-E-V-G-* and *Matter of W-G-R-*")

Next, Plaintiffs contend that their theory would not sweep all BIA decisions within the ambit of section 1252(e)(3), because the BIA has no role in credible fear proceedings and it is only Attorney General's involvement that renders an asylum adjudication subject to challenge under that section. ECF 64-1 at 18. But the Attorney General certification process addresses issues taken

on review from the BIA (which indeed has no jurisdiction over issues arising from credible interviews or appeals of adverse credible fear determinations, 8 U.S.C. § 1225(b)(1)(C)). Moreover, the Attorney General is not "issu[ing] written polices for implementing the credible fear process" because authority to implement section 1225(b)(1) now rests primarily with the Secretary of DHS. Therefore, either Plaintiffs' proposed limiting principle does not cover this case, because *A-B-* is not an action by DHS, or it extends to cover all adjudicatory determinations by any governmental actor that either address asylum or mention section 1225(b)(1), because both types of adjudications would affect the credible fear process under Plaintiffs' theory. This would include countless federal court cases, including those Plaintiffs recite, *see* ECF 64-1 at 7 n.2, as well as many agency decisions, *see also Matter of A-B-*, 27 I. & N. Dec. at 318-19 (describing multiple cases in which the BIA and Attorney General have interpreted and redefined "particular social group" starting in 1985); AR016-017.

Finally, if *A-B-* could somehow be deemed not an administrative adjudication, but an "implement[ation]" of a statutory provision, it would be implementing section 1158(a). *A-B-* addresses the meaning of persecution on account of "membership in a particular social group" for purposes of qualifying for asylum under 8 U.S.C. § 1158(b)(1)(B). 27 I. & N. Dec. at 318; AR016. *A-B-* does not implement section 1225(b)(1), providing procedures for conduct of expedited removal and credible fear interviews. *Compare* 8 U.S.C. §§ 1158(a), *with* 1225(b)(1). Indeed, *A-B-* does not on its face address expedited removal at all, as review of expedited removal orders is not available before the BIA and the Attorney General cannot certify such decisions to himself. 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 1003.1(h) (omitting IJ review of expedited removal decisions as a decision the Attorney General may review).

Plaintiffs' entire argument thus turns on a footnote in *A-B-* observing that *A-B-*'s holdings (that few claims pertaining to domestic or gang violence as permitted by *A-R-C-G-* would pass the asylum test) have logical consequences for credible fear proceedings as well, because a credible fear requires showing a "significant possibility" that the applicant "could establish eligibility for asylum under section 1158." 27 I. & N. Dec. at 320 n.1 (citing 8 U.S.C. § 1225(b)(1)(B)(v)); AR032. This statement cannot constitute a policy or rule because it merely predicts the likelihood

of future outcomes. That footnote *descriptively* observes the small statistical likelihood that, given the asylum standard reaffirmed in *A-B-*, fear claims based on domestic or gang violence will make the threshold showing of merit in credible fear proceedings. However, it both (1) does not say that such claims are categorically barred, but implies that, as now, IJs and asylum officers will still need to determine this on an individual basis, and some may succeed; and more importantly (2) does not prescribe a standard or rule for credible fear adjudications. It is an assumption about the outcome of other cases not before the Attorney General, and cannot prescribe a rule for those cases. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (explaining that opinion's "assumption that the holding in that case would apply" in different circumstances not debated in the first case was dicta and nonbinding); *cf. Cohens v. Virgini*a, 6 Wheat. 264, 399-400 (1821) ("If [general expressions] go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."). *A-B-* does not address or alter the definition of credible fear—and it does not "implement" section 1225(b).

That *A-B-* does not implement section 1225(b)(1) is further evinced by the fact that *A-B-* addresses a substantive standard whereas section 1225(b)(1) provides only procedures for determining credible fear. Section 1225(b)(1) dictates *procedures* for screening and removing aliens, but nowhere does it define the *substantive content* of the eligibility for relief from removal that the procedures screen for—that it is a function of other parts of the INA. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (defining "credible fear of persecution" by reference to whether alien can show "eligibility for asylum under *section 1158*") (emphasis added). If section 1225(b)(1)'s mere reference to another statute was sufficient to invoke 1252(e)(3), several United States Code provisions materially unrelated to credible fear would suddenly be open to attack via a mechanism intended solely for systemic challenges to the expedited removal system. *See* 8 U.S.C. § 1225(b)(1)(C) (referencing 8 U.S.C. § 1157 and 28 U.S.C. § 1746); *id.* § 1225(b)(1)(D) (referencing 8 U.S.C. §§ 1325(a), 1326); *id.* § 1225(b)(1)(G) (referencing 8 U.S.C. § 1158(e)).

*A-B-* did not alter the procedural burden constituting "credible fear"—it still means a "significant possibility" of establishing eligibility for asylum, *see* 8 U.S.C. § 1225(b)(1)(B)(v),— but merely provided examples of factual scenarios unlikely to, not categorically incapable of,

meeting that standard. 27 I. & N. Dec. at 320 & n.1; AR018, 032. Plaintiffs mischaracterize Defendants' argument in saying that section 1252(e)(3) does not permit review of challenges to substantive policies in section 1225(b)(1) but only procedures. ECF 64-1 at 16-17. That is not Defendants' position. Rather, Defendants' position is that section 1225(b)(1) does not prescribe substantive policies, but only procedures for conducting credible fear interviews and implementing expedited removal. *See* 8 U.S.C. § 1225(b)(1)(C). Provisions of substantive immigration benefits or protections from removal are found in other parts of the INA and are not in any sense statutes implementing section 1225(b). *See, e.g.*, 8 U.S.C. §§ 1158(a), 1231(b)(3), 1255(a).

Allowing aliens to challenge BIA and Attorney General asylum and CAT decisions simply because such decisions, as most do, collaterally impact credible fear determinations or because DHS issues interpretive guidance apprising employees of significant developments in the law would be to ignore Congress's careful limitations on judicial review in 8 U.S.C. § 1252. It would be anomalous for *A-B-* to be challenged both through that petition for review process and in a district court on parallel tracks. Congress provided for review of agency determinations regarding the asylum standard exclusively through the petition-for-review process. *See* 8 U.S.C. § 1252(b)(9); *see id.* § 1252(a)(5). Plaintiffs argue that this does not provide review for persons who never show a positive credible fear and thus never make it into removal proceedings. ECF 64-1 at 19. However, they also admit that section 1252(b)(9) excepts review under other portions of section 1252(e)(9), *id.*, including section 1252(e)(2), which provides for individual habeas review over limited issues for aliens who do not show a credible fear and have final expedited removal orders. *See* 8 U.S.C. § 1252(e)(3). No clear statement is needed because section 1252 does not eliminate judicial review. *See INS v. St. Cyr*, 533 U.S. 289, 299, 314 (2001). Such aliens have an opportunity for IJ review of their negative credible fear findings, 8 U.S.C. § 1225(b)(1)(B)(iii)(III), the same IJs who are applying the section 1158(a) asylum standard in removal proceedings, subject to BIA review. And the limited review of other issues related to their expedited removal orders at 8 U.S.C. § 1252(e)(2) satisfies Suspension Clause concerns for the aliens on the threshold of admission without connections to the United States at issue in this case and expedited removal generally, as every court of appeals to address the issue for such aliens has

held. *See Castro v. DHS*, 835 F.3d 422, 450 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 1581 (2017) (collecting cases from the Second, Fifth, Seventh, Ninth, Tenth, and D.C. Circuits).

      B.     The Court also lacks authority to review the PM under section 1252(e)(3).

The Court also lacks authority to review the PM under section 1252(e)(3). First, as with *A-B-*, the PM does not primarily address section 1225(b)(1), but section 1158(a). Second, given that the PM merely explains *A-B-*, the PM is not reviewable under section 1252(e)(3) for all the same reasons that *A-B-* is not. *See supra*. And third, the PM is at best an interpretive rule which Congress did not intend for review under section 1252(e)(3).

First, the PM primarily addresses the asylum standard. Except for a few other scattered references, only four paragraphs of one section of the extensive memorandum focus on credible fear. AR008-09. The majority of the PM describes the standard for adjudicating asylum established by *A-B-* and pre-existing precedent. *See* AR001-07, 09.

Next, the structure and content of sections 1225(b)(1) and 1252(e)(3) indicate that Congress only intended to permit court review under section 1252(e)(3) of agency directives, guidelines, or procedures creating substantive rights, not merely interpretive documents explaining the law to government officials. "An interpretative rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties." *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984). "On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Id.* Because the latter sets standards or shapes conduct for the world outside the agency, it is subject to an external check in the way interpretive rules are not in the form of notice-and-comment APA rulemaking procedures. *See id.* (citing 5 U.S.C. § 553(b)(A)). Additional factors indicating that a rule is legislative as opposed to interpretive are

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1112 (D.C. Cir. 1993).

First, the INA conveys significant authority on DHS to create legislative rules implementing section 1225(b)(1). "[W]e have distinguished between cases where a rule is "based on specific statutory provisions" (interpretive), and where one is instead "based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate" (legislative). *Id.* at 1110 (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987)). "[A]n agency's authority to create rights and duties will typically be relatively broad (and the agency's actual establishment of rights and duties will be legislative)." *Id.* The INA creates such broad authority in DHS to create new substantive rules and obligations under section 1225(b)(1). Most notably, the provision permits DHS to extend the scope of inadmissible aliens subject to expedited removal, provided only for such aliens at the border, to include all those who cannot establish two years consecutive presence anywhere throughout the country, and any increment in between. 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (permitting now-DHS to designate for expedited removal any alien "who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the [prior] 2-year period"). Express delegation of authority to the agencies to create rules and rights for applying credible fear screenings is replete throughout the statute. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iii)(III) ("The Attorney General shall provide by regulation and upon the alien's request for prompt review by an [IJ] of a determination under subclause (I) that the alien does not have a credible fear of persecution."); *id.* § 1225(b)(1)(B)(iv) ("An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the [Secretary]."). Given that Congress otherwise barred court review of the validity of such substantive rules, *see* 8 U.S.C. § 1252(a)(2)(A), and even placed some outside the confines of notice and comment rules, *see* 8 U.S.C. § 1225(b)(1)(A)(iii)(I) (providing that the designation of additional aliens for expedited removal "shall be in the sole and unreviewable discretion of [DHS] and may be modified at any time"), it makes sense that Congress would provide a mechanism for review of such agency-created rights to avoid a possible constitutional issue. *See Castro*, 835 F.3d at 433 n.13 (suggesting that the constitution may require

some review of "the case of an alien who has been living continuously for several years in the United States before being ordered removed under § 1225(b)(1)").

However, the PM "simply states what the administrative agency thinks [*A-B-*'s interpretation of] the statute means," and therefore is an interpretive rule. *See Gen. Motors Corp.*, 742 F.2d at 1565. Bolstering this conclusion is the fact that the PM is not necessary to assert or enforce any underlying rights to asylum or positive credible fear, which are established by statute; USCIS has not published it in the Code of Federal Regulations; and DHS did not specifically invoke its legislative authority in drafting it. *Am. Mining Cong.*, 995 F.2d at 1112. Such interpretive rules are not generally reviewable under the APA, indicating that Congress did not likely intend for them to fall under the even more limited review provided at section 1252(e)(3). "Like agency policy statements, 'interpretative rules' that do not establish a binding norm are not subject to judicial review under the APA." *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (internal quotation omitted). "The APA only provides for judicial review of 'final agency action,' . . . and interpretative rules or statements of policy generally do not qualify because they are not finally determinative of the issues or rights to which [they are] addressed." *Id.* (internal citation and quotation marks omitted) (citing 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)). The PM clearly does not represent final agency action because USCIS's understanding of *A-B-* would have to first be applied in an individual's proceeding before it would alter their rights in a way challengeable under the APA. *See id.* Because the PM merely explains what the agency thinks about *A-B-*, and does not itself create substantive rules or rights representing final *agency* action, it is not challengeable under the APA. *See, e.g.*, *See Perez v. Mort. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) ("[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."); *Broadgate Inc. v. USCIS.*, 730 F. Supp. 2d 240, 246 (D.D.C. 2010) ("[USCIS] Memorandum establish[ing] interpretive guidelines for the implementation of the Regulation" is "interpretive" and "does not constitute final agency action subject to judicial review"). Therefore, it is highly unlikely that Congress sought to include such interpretive guidance within the scope of review under section 1252(e)(3), given that such review is, rather,

necessary to challenge the rights-creating rules that Congress gave the agencies great latitude to create under § 1225(b)(1) and absent any other judicial review.

      C. Plaintiffs lack standing to challenge the PM

      Plaintiffs lack standing to challenge the PM. As we have explained, each of Plaintiffs' theories fail to satisfy the Article III standing requirements. Plaintiffs' theories of injury based on delineation and exercise of discretion do not apply to credible fear hearings at all, and their other theories fail because Plaintiffs have no legally protected interest in agency training materials that create no rights for Plaintiffs or obligations for USCIS. Even if they had plead cognizable injuries, such injuries would not be fairly traceable to the PM but rather *A-B-* itself and existing asylum precedent, which the PM merely explains to asylum officers but does not itself create substantive duties for. And such injuries would not be redressable by invalidating the PM because, even absent the PM, Plaintiffs' eligibility for credible fear or asylum would still rise or fall under the terms of section 1158(a) as clarified and reaffirmed in *A-B-*. ECF 57 at 19-24.

      Plaintiffs do not directly engage with these arguments. Instead they argue that the Court must ignore them because the Court is required to assume that Plaintiffs will prevail on their claims and their arguments are not time-barred. ECF 64-1 at 25. But this turns the standing inquiry on its head. That the court may need to resolve issues overlapping with the merits as part of its standing analysis in no way means Plaintiffs have shown they have standing, nor that the Court can omit this determination before ruling on the merits. "A federal court may not rule on the merits of a case without first determining that it has subject matter jurisdiction." *Seneca Nation of Indians v. U.S. HHS*, 144 F. Supp. 3d 115, 118 (D.D.C. 2015) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)); *see Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706 (D.C. Cir. 2008) (court must discharge its "independent obligation to determine whether subject-matter jurisdiction exists . . . before ruling on the merits"). While a court may defer its ruling on jurisdiction at the motion to dismiss stage where jurisdictional facts are inextricably intertwined with the merits "until the merits are heard," on summary judgment, the Court must squarely address the issue. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992); *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219, 230 (D.D.C. 2012) (explaining that even "where

the jurisdictional question is closely intertwined with the merits of the case," and the court permits discovery before deciding jurisdiction, the D.C. Circuit has instructed that it is appropriate for a court . . . [nevertheless] to consider the issue of subject matter jurisdiction on a motion for summary judgment thereafter."). Here, whether Plaintiffs' claims are in whole or in part time-barred under section 1252(e)(3), is central to the standing analysis. *See AILA*, 18 F. Supp. 2d at 47 (explaining that the 60-day limitation period is jurisdictional), *aff'd*, 199 F.3d at 1357. And so the Court must address the argument even if it overlaps with the merits, before it may address any merits issues or grant relief. *See Seneca Nation of Indians*, 144 F. Supp. 3d at 118; *accord Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Herbert*, 974 F.2d at 198.

Apart from the time-bar issue, Plaintiffs also fail to address a number of other threshold failings to their standing. First, Plaintiffs have no legally protected interest in agency training materials or interpretive guidance that create no rights for Plaintiffs or obligations for USCIS. As explained, the PM is an interpretive document that does not create legal rights, but merely explains those already created by agency precedent. *Supra* at 13. But it is well-settled that Plaintiffs, on summary judgment, must "set forth by affidavit or other evidence specific facts" demonstrating "an invasion of a *legally protected interest* which is [] concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added).

Plaintiffs fail to rebut Defendants' traceability argument, which they cannot establish for any aspect of the PM that implements *A-B-*. Where a party challenges government action that is itself caused by different government action, that party "needs to show that . . . invalidating [the challenged government action] will be reasonably likely to cause the [defendants] to" change the different government action. *Renal Physicians Ass'n v. US HHS*, 489 F.3d 1267, 1276 (D.C. Cir. 2007). Plaintiffs must show a causal connection such that invalidating the PM would be reasonably likely to change Plaintiffs' eligibility for positive credible fear. *See id.* But that showing is impossible, because *A-B-*, which cannot be challenged through section 1252(e)(3), would be unaffected by any order of this Court.

Plaintiffs contend that the Court can grant at least partial redress, which is constitutionally sufficient, because both *A-B-* and the PM cause their injuries. ECF 64-1 at 22. But a "plaintiff

cannot demonstrate redressability when he challenges only one of two government actions that both independently produce the same alleged harm." *Kaspersky Lab, Inc. v. DHS*, 311 F. Supp. 3d 187, 219 (D.D.C. 2018). If "the undoing of the [challenged] governmental action will not undo the harm" caused by separate government action "because the new status quo is held in place by other forces," Plaintiffs' claims are not redressable because none of the relief they request will cure their alleged injuries. *Renal Physicians Ass'n*, 489 F.3d at 1277; *see Delta Const. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015). Invalidating the PM does not redress Plaintiffs' alleged injuries tied to *A-B-* because the INA and its implementing regulations—in provisions Plaintiffs do not and cannot challenge—require USCIS to apply *A-B-*. 8 U.S.C. § 1103(a)(1); 8 C.F.R. § 103.3(c).

Further, Plaintiffs' argument that their injuries are redressable by invalidating the PM would only work if *A-B-* were reviewable, which it is not, because such review is time barred and there is no jurisdiction under section 1252(e)(3). As Defendants explained, all but one of Plaintiffs' allegations against *A-B-* and the PM would be time-barred. ECF 57 at 24-25. As discussed, only one aspect of *A-B-* is in fact new: the reversal of *A-R-C-G-*. *Id.* Every other alleged change has been the state of law for far more than 60 days. ECF 57 at 25. Plaintiffs could thus challenge (at most) *A-B-*'s reversal of *A-R-C-G-* (discussed *infra*) and aspects of the PM that implement credible fear policies beyond *A-B-*, namely "instruct[ing] asylum adjudicators making credible fear determinations to disregard contrary court of appeals precedents and to apply only the case law in the circuit where the credible fear applicant is detained," ECF 3 at ¶ 51. Plaintiffs fail to rebut Defendants' time bar argument and therefore apparently concede the point. ECF 64-1 at 24-25.

Plaintiffs' argument that the PM must provide substantive rules governing credible fear if *A-B-* does not, ECF 64-1 at 22-23, is equally flawed. As explained, the PM is merely an interpretive document that does not create substantive rules—these must be contained in *A-B-* and pre-existing BIA precedent. *See* AR008 (explaining that, "[w]hen conducting a credible fear or reasonable fear interview, an asylum officer must determine what law applies to the applicant's claim," but not prescribing that law, but rather stating that "[t]he asylum officer should apply all applicable precedents of the Attorney General and the BIA," and nonconflicting circuit precedent). To the extent Plaintiffs challenge those, their injury is thus neither traceable to nor redressable by

16

invalidating the PM, and moreover is jurisdictionally time-barred to the extent that Plaintiffs do not challenge the narrow reversal of *A-R-C-G-* (which they concede they do not challenge). *See AILA*, 18 F. Supp. 2d at 47; *Dugdale*, 2015 WL 2124937, at *1.

Finally, Plaintiffs argue that the PM was a "detailed 10-page guidance document setting forth the new credible fear policies reaching well beyond the effect of *Matter of A-B-* as legal policy." ECF 64-1 at 23. First, this argument has no impact because the PM did not create new substantive policies, but merely explained the current law. Second, the mere fact that USCIS attempted to provide comprehensive analysis of credible fear screenings in its interpretive memorandum, stretching beyond the narrow scope of *A-B-*, does not indicate that the memorandum or *A-B-* otherwise altered the pre-existing substantive standards governing asylum. Plaintiffs provide no basis for their implicit contention that agency interpretive guidance must to be limited to a single precedential decision.

For these and the foregoing reasons, the Court should dismiss Plaintiffs' challenges to *A-B-* and the PM for lack of standing and jurisdiction under section 1252(e)(3) generally.

## II.     Plaintiffs' Claims Fail on the Merits

Plaintiffs' response brief misconceives textbook concepts of deference to which the Attorney General and USCIS are entitled. *A-B-* is entitled to *Chevron* deference because it reasonably interprets statutory language that Congress has instructed the Attorney General or his designees to interpret. And where *A-B-* simply restates or refines prior agency precedents, that too is entitled to deference, even if not technically called "*Chevron*" deference. And because the PM merely provides interpretive guidance to asylum officers who must apply *A-B-*, the PM is entitled to deference too, including with respect to any new interpretive guidance not directly repeating *A-B-*'s holding. Finally, even if Plaintiffs prevail on any aspect of their merits claims, the sole remedy available to them is for the Court to remand those portions of *A-B-* or the PM the Court finds unlawful to the agency under the ordinary remand rule.

### A.     Plaintiffs misstate how APA review works

Plaintiffs turn elementary principles of administrative law and deference to agency actions on their head. Plaintiffs fail to come to grips with Defendants' central merits arguments, and

critically misapprehend how APA review works in federal court. First, they attempt to rely on over *1,800* pages of extra-record material which was not before the agency and which is not properly part of review in this case. Second, Plaintiffs fail to comprehend Defendants' basic merits arguments: that the Attorney General is entitled to *Chevron* deference when he interprets ambiguous statutory terms as intended by Congress, *see* 8 U.S.C. § 1103(a), that the only *new* change to immigration law rendered by *A-B-*, the reversal of *A-R-C-G-*, is such an exercise of lawmaking authority entitled to *Chevron* deference, and that every other aspect of *A-B-* Plaintiffs challenge is not new and thus not subject to challenge in a 1252(e)(3) action. Plaintiffs and their amici also fail to acknowledge that even where an agency is not construing ambiguous statutory language, it nevertheless is entitled to deference when it construes its own prior precedents or regulations, and fail to come to grips with the settled principle that where agency documents themselves are challenged as ambiguous, as Plaintiffs allege with respect to the PM, the agency's view, as expressed in its briefs before the courts, is similarly entitled to deference.

### 1.    Plaintiffs may not rely on extra-record evidence

The Court may not consider Plaintiffs' over 1,800 pages of extra-record evidence. As explained in greater detail in the contemporaneously filed opposition to Plaintiffs' motion to consider extra-record evidence and motion to strike, in cases challenging the substance of agency decision-making, review is limited to the administrative record as certified by the agency, *see, e.g.*, *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013), and the agency is entitled to a "presumption that [it] has properly designated the administrative record absent clear evidence to the contrary." *Greater Yellowstone Coal. v. Kempthorne*, No. 07-211, 2008 WL 11398908, at 1-2 (D.D.C. May 23, 2008) (Sullivan, J.). And it is equally well-settled that Plaintiffs may only rely on extra-record materials by making a showing of "bad faith or improper behavior on the part of the agency, or that, the record is so bare that it prevents effective judicial review." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005) (collecting cases). Exceptions to the record rule involving extra-record evidence may generally only "be invoked to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review," and only where "evidence [is] provided" of such deficiencies.

*Children's Hosp. Ass'n of Texas v. Azar*, 300 F. Supp. 3d 190, 202 (D.D.C. 2018) (Sullivan, J.).

Plaintiffs acknowledge these limitations on record review, and fail to make any showing concerning bad faith. ECF 64-1 at 12-13; ECF 66-1. Yet they contend their extrinsic evidence is needed to facilitate review of the legality of *A-B-* and the PM's implementation of *A-B-. Id.* Plaintiffs are simply wrong. This case involves a facial challenge to an administrative adjudication, *A-B-*, and an interpretive document, the PM, that at most requires review of a legal determination by the Attorney General and an agency's guidance instructing its employees on how to apply the Attorney General's legal conclusions. Such review is quintessentially a legal determination that can be made by reviewing the INA, agency and federal court decisions, and the administrative record. *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("The entire case on review is a question of law, and only a question of law"); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (claim that agency decision violates statute it "is charged with enforcing" requires no more than "the statute and legislative history"). Indeed, any claim that *A-B-* or the PM breaks with past policies is readily ascertainable by simply reviewing the "past policies," *i.e.* legal decisions by the Attorney General, the BIA, and the Courts of Appeal on the standards governing asylum. Plaintiffs' heavy reliance on *factual* declarations submitted by *attorneys* expressing their personal views of what the law was and how they believe the Attorney General changed it is entirely improper. *See* ECF 10 at 10, 12-13, 14-15, 16, 17, 19, 20, 21-22, 28; ECF 64-1 at 13, 33-34, 41, 59.[6]

Plaintiffs also assert the Court must permit extrinsic *hearsay* evidence from third parties about the mind-state of asylum officers and IJs because they have plead a constitutional due process claim in addition to their APA claim. ECF 64-1 at 33-34; ECF 66-1 at 7-12. They are

---

[6] Plaintiffs' submissions from UNHCR and their suggestions that statements by the UNHCR are binding law, ECF 64-1 at 38, 46-47, are also inappropriate. Although they claim otherwise, the UNHCR Handbook "is not binding on the Attorney General, the [BIA], or United States courts." *Aguirre-Aguirre*, 526 U.S. at 426-27. Indeed, the UNHCR Handbook itself states that it does not have binding effect and that interpreting the Refugee Convention is left to each individual state that is a party to the Convention. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 (1987) ("the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself").

mistaken. Plaintiffs' due process claim essentially asserts that *A-B-* and the PM as a substantive matter require asylum officers to deny credible fear claims premised on domestic or gang related violence. ECF 3 at ¶ 96. But as their summary judgment motion makes clear, that claim is redundant of their APA claim asserting the same precise injury, *i.e.* the alleged new substantive rule(s) laid out by *A-B-* are unlawful. *See* ECF 64-1 at 29-31. As Judge Boasberg recently explained, "when a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that challenge must be judged on the record before the agency." *Bellion Spirits, LLC v. United States*, --- F. Supp. 3d ---, 2018 WL 4637013, *7 (D.D.C. Sept. 27, 2018) (collecting cases). The reason is simple: "permitting a broader record on judicial review for a constitutional claim would 'incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional violations to trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure.'" *Id.* (quoting *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237-38 (D.N.M. 2014); *accord Chiayu Chang v. USCIS*, 254 F. Supp. 3d 160, 163 (D.D.C. 2017) (Bates, J.) ("Plaintiffs cite no authority for the proposition that [their constitutional] claim is a separate cause of action that exists outside the APA and is therefore exempt from the record review rule"). Thus, Plaintiffs' due process claim, like their APA claim, must rise or fall based on the Court's review of the administrative record.

>     2.     The Attorney General and USCIS are entitled to varying types of deference

Plaintiffs and amici fundamentally misconstrue Defendants' arguments concerning deference or how deference works in agency review cases. The Defendants do *not* contend that *A-B-* or the PM is entitled to blanket *Chevron* deference. Rather, where, as here, the Attorney General interprets any *ambiguous* statutory terms in the INA, he is entitled specifically to *Chevron* deference. ECF 57-1 at 26-27; *see Cardoza-Fonseca*, 480 U.S. at 448 ("In [the] process of filling *any gap left*, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program.") (emphasis added). As we have explained, *A-B-*'s primary holding was to reject the BIA's application of the term "particular social group" in the domestic violence cases of *A-R-C-*

*G-* and *A-B-*, because *A-R-C-G-* allowed an asylum claim that did not meet the BIA's general principles for interpreting "particular social group," as articulated in *M-E-V-G-*, 26 I. & N. Dec. at 236-37, or the requirement that the persecutor must be motivated by the victim's membership in such a group. *See Matter of A-B-*, 27 I. & N. Dec. at 334-39. Because it is beyond dispute that "particular social group" is ambiguous and *A-B-* interpreted that ambiguous phrase, *A-B-* is entitled to *Chevron* deference, as Defendants have argued. ECF 57-1 at 26-27. In their memorandum, the Plaintiffs state that they do not challenge the overruling of *A-R-C-G-* in this case. *See* ECF 64-1 at 55 n.38. Thus, importantly, the one aspect of *A-B-* that could accurately be described as a change in the law is not at issue in this case.[7]

That being said, the remainder of *A-B-* and the PM are still entitled to *Chevron* deference to the extent they state long-standing law or interpret prior agency cases or regulations through case-by-case adjudication. *See U.S. Telecom Ass'n v. F.C.C.*, 295 F.3d 1326, 1332 (D.C. Cir. 2002) ("We [] defer to an agency's reasonable interpretation of its own rules and precedents"). It is well-settled that deference is appropriate not just to an agency's construction of statutory language, but also policy objectives reached through case-by-case adjudication. *See, e.g.*, *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) ("Resolution of an ambiguity in a statute, if it has consequences, inevitably requires the agency to consider competing policy objectives, and it is the reconciliation of such conflicts that is entitled to judicial deference."). Agency refinement of statutory concepts and agency precedents does not always involve construction of ambiguous terms, but nevertheless is accorded deference given the agency's expertise and authority. *See, e.g.*, *S.E.R.L. v. U.S. Att'y Gen.*, 894 F.3d 535, 554, 557 (3d Cir. 2018) (according *Chevron* deference to the BIA's establishment of additional requirements for particular social groups—"social distinction and particularity"—not explicitly in the INA because of "the BIA's experience

---

[7] Although the Plaintiffs do not challenge the *M-E-V-G-* interpretation of "particular social group" or the Attorney General's adoption of the *M-E-V-G-* standard as described at ECF 57-1 at 6, UNHCR does. UNHCR participated as amicus before the BIA in *M-E-V-G-*, opposing the adoption of the social distinction and particularity criteria. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 233 & n.8. The BIA addressed and rejected UNHCR's arguments in *M-E-V-G-*. 26 I. & N. Dec. at 248-49. UNHCR renews the same arguments before this Court. *See* ECF 84 at 13-20. Not only is a challenge to *M-E-V-G-* time-barred, but the BIA's interpretation has been accorded *Chevron* deference by every court that has addressed it. *See* ECF 57-1 at 27 n.9.

adjudicating prior cases and its desire to give further guidance"); *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014) ("[w]e give BIA interpretations *Chevron* deference," including where "BIA has interpreted [] phrase through a series of precedential opinions").[8]

Regardless, even if statutory terms may not be ambiguous, where the Attorney General is simply repeating or refining pre-existing law as construed by the BIA—as is the case with respect to each of Plaintiffs' claims concerning *A-B-* that is not interpreting ambiguous statutory language, *see infra*—such repetition of legal principles, even if it is not subject to *Chevron* deference, is still entitled to deference so long as it is reasonable. *See, e.g.*, *Boca Airport, Inc. v. FAA*, 389 F.3d 185, 190 (D.C. Cir. 2004) ("we have repeatedly held[] [that] an agency's interpretation of its own precedent is entitled to deference"); *accord Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 742-44 (D.C. Cir. 2007) (similar); *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998) (similar). Deference is appropriate where Congress has authorized rulemaking *and adjudications*. *See United States v. Mead Corp.*, 533 U.S. 218, 219 (2001). Even where an agency is not interpreting ambiguous language through adjudications, if it is simply articulating a view of its prior precedents, that articulation is entitled to deference. *See Boca*, 389 F.3d at 190; *Cassell*, 154 F.3d at 162; *accord Paloka*, 762 F.3d at 196 (explaining that BIA decisions "reformulat[ing]

---

[8]  Plaintiffs and their amici apparently assert that none of the statutory terms the Attorney General has interpreted or the interpretation of which he reaffirmed in *A-B-* are ambiguous as a statutory matter. The Court need not address the issue, given the Government's legal position, but the assertion is wrong in many instances and debatable in others, given the many cases according deference to the Attorney General or the BIA on each aspect of the legal standards governing claims for asylum that are not expressly defined by statute. *See, e.g.*, *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993) (Alito, J.) ("well-founded fear"); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 648 (10th Cir. 2012) ("particular social group"); *Mei Fun Wong v. Holder*, 633 F.3d 64, 71-72 (2d Cir. 2011) ("social distinction"); *Martinez-Perez v. Sessions*, 897 F.3d 33, 41 (1st Cir. 2018) ("nexus"); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006) ("social visibility"); *S.E.R.L.*, 894 F.3d at 551 ("particularity"); *Lopez v. Sessions*, No. 17-9517, 2018 WL 3730137, at *3 (10th Cir. Aug. 6, 2018) ("circularity"); *cf. Chen v. Holder*, 607 F.3d 511, 512 (7th Cir. 2010) ("The alien must establish that 'race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.' 8 U.S.C. § 1158(b)(1)(B)(i). These are not self-defining terms, so administrative officials have considerable leeway."). To the extent the Attorney General construed such terms, Plaintiffs must show that the Attorney General's construction of relevant ambiguous statutory provisions is "unambiguously foreclosed." *Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016).

[particular social group] test and accompanying analysis clarify[ing] several issues" entitled to deference). And where the agency is applying such law to facts, review is equally deferential: "To reverse the BIA finding we must find that the evidence not only supports that conclusion, but *compels* it[.]" *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (emphasis in original).

Plaintiffs and their amici attempt an end-run around these long-standing principles by asserting that *A-B-* violates a principle that Congress is presumed to have incorporated prior administrative and judicial interpretations or "common sense" or "well-established" definitions of terms when in legislates. *See, e.g.*, ECF 81 at 5-9. As explained below, that argument misses the mark because each of the asylum criteria considered and clarified by the Attorney General are long-standing and entitled to deference even if not time-barred. *Supra*. Even were that not so, this argument ignores the well-settled principle that where "Congress explicitly authorize[s]" an agency to "define [a] term," it "necessarily suggests that Congress did not intend the word to be applied in its plain meaning sense." *Women Involved in Farm Econ. v. USDA*, 876 F.2d 994, 1000 (D.C. Cir. 1989) (emphasis in original). Congress delegated the authority to define legal terms to the Attorney General, and thus it did not incorporate preexisting definitions of statutory terms, whatever they may be, into the INA. *See id.* Were it otherwise, section 1103(a) would be a nullity.

Finally, it is beyond dispute that at *Chevron* step two and when agencies interpret their prior precedents, all that is required is that the agency's construction of ambiguous statutory terms be reasonable, *i.e.*, "based on a permissible construction of the statute." *Chevron, U.S.A. v. Nat. Res. Def. Counsel*, 467 U.S. 837, 842-43 (1984). That is a permissive standard, with the agency's view deemed to be reasonable so long as it is not "flatly contradicted" by plain language. *Dep't of the Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 928 (1990). And that standard is equally applicable to agency interpretations of their own regulations or other guidance materials. *See, e.g.*, *Auer v. Robbins*, 519 U.S. 452 (1997); *Drake v. FAA*, 291 F.3d 59, 67 (D.C. Cir. 2002).

What Plaintiffs and their amici ignore, however, is that where Congress has explicitly delegated to an agency the authority to issue binding rules, the agency's "judgement [is owed] more than mere deference or weight." *Lindeen*, 825 F.3d at 655-56. Thus, where, as here, "there is an express delegation of authority [through 8 U.S.C. § 1103(a)] to the agency to elucidate a

23

specific provision of the statute by regulation," courts give the agency interpretation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 656; *see Atrium Med. Ctr. v. US HHS.*, 766 F.3d 560, 566 (6th Cir. 2014) (comparing standard when delegation is explicit versus implicit, and noting that, in the latter scenario, "the court's review is somewhat less deferential"); *see also AILA*, 18 F. Supp. 2d at 53 (Sullivan, J.), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) ("an agency is entitled to the highest degree of deference where Congress has delegated to the agency the authority to promulgate standards or classifications. Such standards or classifications are entitled to 'legislative effect' and are to be given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.") (internal quotations omitted). Simply put, the deference owed an agency is at its apex where, as here, Congress has directed the agency to define legal terms relevant to the statute at issue. *See Lindeen*, 825 F.3d at 653 (grant of definitional authority "manifests that the Congress intended the [agency] to enjoy broad discretion to decide" what the statute means by the terms to be defined); *Henry Ford Health Sys. v. Dep't of Health and Human Servs.*, 654 F.3d 660, 665 (6th Cir. 2011) ("An agency is at the apex of its administrative authority when Congress not only gives the agency general authority to implement a statute but also expressly asks the agency to define a specific phrase."). No more than a "reasoned explanation for why [the agency] chose that interpretation" is required, *Lindeen*, 825 F.3d at 656, and Plaintiffs bear the heavy burden of demonstrating the interpretation challenged is not reasonable. *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (same, where Plaintiffs allege agency changed its prior policies).

With these administrative law and evidentiary standards in mind, Plaintiffs cannot demonstrate that the Attorney General's decision, and thus the PM's informing line officers of aspects of that decision, are unreasonable, and summary judgment must be granted to Defendants.

B.    *A-B-* is a lawful interpretation and re-statement of the asylum laws and is entitled to some form of deference in all respects, and because the PM merely implements *A-B-*, it too is entitled to deference

As we have explained, the only arguably "new" law established by *A-B-* was overruling *A-R-C-G-*. ECF 57-1 at 24. Plaintiffs concede they do not challenge that decision. ECF 64-1 at 48

24

n.35. Accordingly, Plaintiffs' challenges to those aspects of *A-B-* applying settled law and the PM's reiterations of *A-B-*'s various statements are time-barred under 8 U.S.C. § 1252(e)(3)(B).

  Assuming it is appropriate to reach the merits, Plaintiffs' opposition—indeed, their entire case—rests on the suggestion that asylum claims based on domestic violence and gang violence were uncontroversial and well-settled until *A-B-*. *See* ECF 64-1 at 28. Nothing could be further from the truth. Asylum claims based on domestic and gang violence have been at the center of the decades-old controversy over the circumstances under which private crime may be inflicted on account of a protected ground such that is may form a basis for asylum. In brief, Congress designed the asylum statute to offer a limited form of relief, not to "provide redress for all misfortune." *Matter of A-B-*, 27 I. & N. Dec. at 318.. This fundamental limitation is hard-coded into the INA's definition of a refugee, which makes asylum available only for victims of persecution, and moreover, only persecution motivated by a specific list of protected grounds: race, religion, nationality, political opinion, and membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A). Harm resulting solely from ordinary crime and personal conflicts that do not involve a protected ground, even grievous harm, is not, and has never been, a basis for asylum.[9] *See generally Matter of M-E-V-G-*, 26 I. & N. Dec. at 234-35 (*MEVG*). Despite the evident statutory intent to create a limited form of relief, for years the "refugee" definition has been heavily tested in litigation, *see id.* at 232, as asylum applicants attempted to stretch the statutory terms— especially the ambiguous phrase "membership in a particular social group—to create a catch-all covering harm from personal disputes and crime. *See infra*. Over the last thirty-some years, the BIA, and now the Attorney General, have struggled to develop principled interpretations of the key statutory terms "persecution," "on account of," and especially "particular social group," that engage with novel claims, yet preserve the integrity of the refugee definition. *A-B-* is simply an installment in that story, and as with prior agency decisions addressing, refining, or repeating the definition of a refugee, entitled to deference.

    1.  *A-B-* and the implementing PM did not create a "rule" against asylum claims resulting from domestic or gang violence

---

[9] Cases are collected at ECF 57-1 at 30 nn.14 & 15.

Plaintiffs premise much of their case on their allegation that *A-B-* and the PM establish a *de facto* "rule" or "bar" against any asylum applications premised on domestic or gang violence that deprives Plaintiffs of an "individualized analysis" of their credible fear claims. ECF 64-1 at 27, 28, 30, 31. Plaintiffs misread *A-B-* and the PM. To be sure, *A-B-* and the PM do state that asylum claims based on domestic or gang violence "generally" will not satisfy the asylum (or credible fear) standard. But the Attorney General unambiguously disclaimed any purpose of deciding that asylum claims involving domestic or gang violence could never succeed. 27 I. & N. Dec. at 320. To the contrary, he emphasized that every claim had to be rigorously analyzed *on its own merits* "in the context of the evidence presented regarding the particular circumstances in the country in question" in *each case*. *Id.* at 339. Moreover, the Attorney General explained, consistent with long-standing law, that

> [a]n asylum applicant has the burden of showing her eligibility for asylum, [] which includes identifying a cognizable social group and establishing group membership, persecution based on that membership, and that the government was unwilling or unable to protect the respondent. The respondent must present facts that undergird each of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts *satisfy all of the legal requirements* for asylum.

*Id.* at 340. By requiring the BIA to assess each element, rather than accept a party's concession that an element is satisfied, the Attorney General has denied no one an individualized assessment of their claims—he has only eliminated a loophole created by *A-R-C-G-* exempting certain aliens from the requirement to demonstrate all elements of their claim, consistent with BIA decisions like *M-E-V-G-* and *W-G-R-*. *See, e.g.*, *S.E.R.L.*, 894 F.3d at 554 (noting "wide acceptance of the BIA's revised test from *M-E-V-G-*, and, in particular, the Ninth Circuit's analysis of the companion case, *W-G-R-*"). Accordingly, both Plaintiffs' APA and due process claims to the contrary fail.

          a.      Plaintiffs lack any cognizable APA claim premised on any alleged "general rule" against domestic or gang violence claims

Whether a particular social group is cognizable under the INA is a fact-intensive, case-by-case inquiry. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 251. There is no blanket rule that a specific group is or is not cognizable in all cases as long the same factual scenario has not been previously rejected by the BIA and the group is not circularly defined. And, contrary to Plaintiffs' assertions,

neither *A-B-* nor the PM create such a blanket rule against domestic violence- or gang-related claims. ECF 64-1 at 28-37. Both reinforce the long-standing requirement that the BIA and IJs analyze particular social groups under the *M-E-V-G-* framework. *A-B-* and the PM merely recognize that, in practice, claims based on gang or domestic violence generally do not prevail. Those conclusions are borne out by BIA and circuit court decisions. While victims of gang or domestic violence may be able to make an asylum claim if they can satisfy the requirements of the refugee definition, merely being a victim of crime or a personal dispute that is not related to a protected ground will not substitute for those requirements.

The Attorney General in *A-B-* accurately commented on problems typical of gang- and domestic violence-related claims: they often fall short of the requirements for particular social group and nexus. He said that groups defined to consist of persons who are victims of abuse would violate the rule that the group must exist independently of the persecution. 27 I. & N. Dec. at 334-35. They also likely fail to meet the particularity requirement, because "broad swaths of society may be susceptible to victimization." *Id.* at 335. Further, he said, artificial groups consisting of victims of violence often lack any characteristic that makes others consider them a group in society, "rather than each as a victim of a particular abuser in highly individualized circumstances." *Id.* at 336. He added that where the wrongdoer's ill treatment was motivated only by personal conflict or by the desire for money, there would not be the necessary nexus to membership in the particular social group. *Id.* at 338-39. The Attorney General made it clear that it would be these failings, not a rule against domestic or gang violence claims, that would likely prevent applicants from succeeding on their claims. *Id.* at 320.

Despite those failings, where the actor in a gang or domestic violence case is motivated by a protected ground and the violence meets the definition of persecution, the BIA and the Attorney General have been careful to recognize that asylum claims would not be precluded merely because they involve domestic or gang violence. They expressly stated that there is no rule that asylum claims resulting from domestic or gang violence are not viable, only a rule that they must satisfy the same standards as other claims. *Id.* at 317, 320, 340; *Matter of M-E-V-G-*, 26 I. & N. Dec. at 251 (BIA does not advocate "blanket rejection" of all claims involving gangs). Indeed, Plaintiffs

admit that the Attorney General did not make a new legal rule or alter the governing legal standards. *See* ECF 64-1 at 10 ("Attorney General did not purport to conclude that, as a matter of law, domestic violence cannot form the basis of a viable asylum claim. . . . [or] alter the long-standing legal standards."). Therefore, Plaintiffs' contention that *A-B-* impermissibly adopted a rule against asylum based on domestic or gang violence is not an accurate reading of *A-B-*.

Importantly, although Plaintiffs suggest that asylum was freely available for domestic violence and gang cases before *A-B-*, that is not true. As explained below, domestic and gang violence have been two arenas where the BIA and Attorney General have struggled to work out principled interpretations of the key statutory terms that would enable adjudicators to distinguish between persecution on account of a protected ground and violence arising out of ordinary crime or personal conflicts. Hence the emphasis on those kinds of scenarios in *A-B-*.

First, contrary to Plaintiffs' suggestions, *see* ECF 64-1 at 7-10, domestic violence-related claims have vexed the BIA, multiple Attorneys General, and the courts for decades, in particular, because of the difficulty of establishing an applicable protected ground or nexus to such a protected ground, and because the claims relied on the fact of violence to manufacture both a protected ground and nexus.[10] As explained previously, ECF 57-1 at 27-28, in 2014 after decades of uncertainty over the how to resolve these two elements in the context of domestic violence, in *A-R-C-G-* the BIA accepted party concessions that a group based on being "unable to leave a relationship" was a protected "particular social group," and that there was a nexus between

---

[10] The history of *Matter of R-A-*, 22 I. & N. Dec. 906 (BIA 1999) (en banc), exemplifies the struggle. Initially, the BIA denied R-A-'s asylum claim based on domestic violence for failing to establish a cognizable particular social group or nexus to any protected ground. In January 2001, Attorney General Reno vacated the BIA's decision and directed the BIA to stay consideration of the case pending publication of a final version of a regulation ("2000 draft rule") that addressed various issues in *R-A-*. In February 2003, Attorney General Ashcroft certified *R-A-* to himself and subsequently ordered briefing on R-A-'s eligibility for relief under the INA. Att'y Gen. Order No. 2696-2003 (unpublished). Attorney General Ashcroft declined to issue a decision on the merits and directed the BIA to reconsider the case following publication of the 2000 draft rule in final form. 23 I. & N. Dec. 694 (A.G. 2005). Attorney General Mukasey certified *R-A-* to himself in September 2008 and remanded the case to the BIA for reconsideration in light of significant developments in asylum law and the fact that the 2000 draft rule had not been promulgated. *See* 24 I. & N. Dec. 629, 630 (A.G. 2008). Ultimately, DHS agreed to a grant of asylum before an IJ.

domestic violence and such a group. This provisionally resolved the two problematic issues by creating a carve-out for claims based on domestic violence,[11] but with no guidance on how far this carve-out would extend into the heart of asylum law. Instead of reckoning with the difficult claims relating to domestic violence encountered over the past twenty years, Plaintiffs cite distinguishable cases where the Board found a protected ground and nexus, independent of the mere fact of violence. ECF 64-1 at 7-10. *Matter of Kasinga* granted asylum to a woman who feared female genital mutilation, a ubiquitous traditional practice, if returned to Togo, where the opposition to the traditional practice was held to constitute a particular social group. 21 I. & N. Dec. 357, 358, 368 (BIA 1996). *Matter of S-A-* granted asylum to a woman fleeing abuse by her father on religious grounds, because her liberal Muslim views conflicted with her father's conservative Muslim views. 22 I. & N. Dec. 1328 (BIA 2000). In both cases, the applicants established more than the mere fact of violence by persons with whom they had a personal relationship; instead, each was able to show that their persecutors were motivated by a protected ground, whether religion or a cognizable particular social group. Those are the missing elements which the Attorney General said in *A-B-* must be satisfied in each case.

Similarly, claims based on gang violence have been at the forefront of the BIA's struggle to distinguish persecution on account of a protected ground from crime. In a multitude of cases, applicants have failed to satisfy the tests for particular social group and nexus in gang violence cases.[12] Four of the key BIA precedents developing the current framework for "particular social

---

[11] Unlike in the gang context, as discussed below, prior to 2014 there were not many circuit court decisions regarding claims relating to domestic violence, because ICE generally conceded that groups such as the one in *A-R-C-G-* were cognizable. Because only aliens can petition for review in the courts of appeals, and aliens generally won on the issue of cognizability of such groups by virtue of ICE's concession, such cases did not make it to the courts. This policy of conceding the cognizability of the group is demonstrated in the ICE brief Plaintiffs seek to submit from *Matter of R-A-. See* ECF 64-4 at 73, Exhibit 3, DHS Brief, *Matter of R-A-* (Feb. 19, 2004) (arguing that the social group in *R-A-* would more accurately be defined as "married women in Guatemala who are unable to leave the relationship"). To the extent ICE may have conceded the cognizability of the group in the past, it is not binding on the BIA, the Attorney General, or the courts, as *A-B-* held. *See* ECF 57-1 at 28 (discussing precedent regarding the impropriety of accepting party concessions regarding legal issues).

[12] *E.g., Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010); *Zelaya v. Holder*, 668 F.3d 159, 166-67 (4th Cir. 2012); *Orellana-Monson v. Holder*, 685 F.3d 511, 519-22 (5th Cir. 2012); *Umana-*

group" arose out of claims that victims of gang violence constituted a particular social group, and while those cases do not preclude all asylum claims involving gang violence, they do explain why the mere fact of vulnerability to gang violence has fallen short of satisfying the criteria for membership in a particular social group.[13] And as explained, ECF 57-1 at 27 n.9, all circuits to have addressed the framework established by those cases have deferred to it. Although applicants still raise particular social groups based simply on being the victim of gang violence, the courts routinely reject those claims, after considering them under *M-E-V-G-*, the motive requirement, and the requirement that the government must be unwilling or unable to control private actors.[14]

The cases Plaintiffs cite in which gangs or domestic partners attacked a victim on account of a protected ground, such as religion, and the applicant was therefore eligible for asylum, do not disprove *A-B-*'s assertion that gang and domestic violence cases will often fail for lack of crucial elements. *See W.G.A. v. Sessions*, 900 F.3d 957, 965-67 (7th Cir. 2018) (threatening gang held to be motivated by applicant's membership in a "particular social group" consisting of the applicant's family, which was deemed a cognizable particular social group); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 457-590 (4th Cir. 2018) (same); *Aldana-Ramos v. Holder*, 757 F.3d 9, 17-19 (1st Cir. 2014) (remanding for BIA to consider nexus to family particular social group); *Ivanov v. Holder*, 736 F.3d 5, 14-15 (1st Cir. 2013) (religious persecution by skinheads); *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007) (female genital mutilation claim brought under theory recognized in *Kasinga*). Instead, they prove that applicants who satisfy the requirements for "persecution on

---

*Ramos v. Holder*, 724 F.3d 667, 671-74 (6th Cir. 2013); *Gaitan v. Holder*, 671 F.3d 678, 680-82 (8th Cir. 2012); *Barrios v. Holder*, 581 F.3d 849, 855-56 (9th Cir. 2009); *Rivera-Barrientos*, 666 F.3d at 647-54; *Velasquez-Otero v. U.S. Atty. Gen.*, 456 F. App'x 822, 825-26 (11th Cir. 2012) (per curiam).

[13] *See Matter of M-E-V-G-*, 26 I. & N. Dec. 227;*Matter of W-G-R-*, 26 I. & N. Dec. 208; *Matter of E-A-G-*, 24 I. & N. Dec. 591; *Matter of S-E-G-*, 24 I. & N. Dec. 579.

[14] *Paiz-Morales v. Lynch*, 795 F.3d 238, 243-45 (1st Cir. 2015); *Morquecho-Saico v. Sessions*, 696 F. App'x 34, (2d Cir. 2017); *Roblero-Morales v. Boente*, 677 F. App'x 849 (4th Cir. 2017) (per curiam); *Diaz-Villanueva v. Sessions*, 682 F. App'x 307, 308 (5th Cir. 2017); *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498-99 (6th Cir. 2015); *Mayorga-Rosa v. Sessions*, 888 F.3d 379, 385-85 (8th Cir. 2018) (; *Lopez-Velasquez v. Sessions*, --- F. App'x ---, 2018 WL 3423900, at *2 (9th Cir. July 16, 2018); *Rodas Orellana v. Holder*, 780 F.3d 982, 992-93 (10th Cir. 2015); *Tum-Lux v. U.S. Att'y Gen.*, --- F. App'x ---, 2018 WL 3342699, at * 3 (11th Cir. July 9, 2018).

account of a protected ground" could establish an asylum claim no matter what the identity of their persecutors, as they still can after *A-B-*.

Similarly, Plaintiffs treat the PM's quotation from *A-B-* as a separate "rule" against asylum claims resulting from domestic or gang violence, ECF 64-1 at 27, but the PM specifically qualifies its general statement about gang and domestic violence claims to a particular legal failing: defining the group by members' vulnerability to harm. AR006. Plaintiffs omit this key language from their quotation of the PM, ECF 64-1 at 31, and they change the meaning by this omission. After reiterating the Attorney General's legal framework discussing the requirements for particular social groups and persecution, the full language from the PM states: "In general, in light of the above standards, claims based on membership in a putative particular social group *defined by the members' vulnerability to harm* . . . will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution." AR006 (emphasis added); AR010 ("few gang-based or domestic violence claims involving particular social groups defined by the members' vulnerability to harm may merit a grant"). These statements in the PM reiterate black letter law: particular social groups cannot be based on the persecution or vulnerability to persecution, or as commonly phrased, they must be defined independently of the persecution. *See infra* 42-48. Plaintiffs' contention that the PM includes a per se rule against cases involving gang or domestic violence is wrong, as shown by examining the PM itself instead of Plaintiffs' truncated quotation from it. In sum, Plaintiffs' contention that either *A-B-* or the PM denies applicants an individual consideration of their claim is unfounded. *A-B-* and the PM are not contrary to existing law and are not arbitrary or capricious.

> b.      Plaintiffs' due process "bias" claim is meritless

Plaintiffs also repackage their claims concerning a presumption against asylum claims premised on domestic or gang violence into a due process claim by arguing that the alleged "presumption" violates due process by "depriv[ing] applicants of their right to an adjudicator who is, and is reasonably perceived to be, impartial" through "institutional pressure" to deny asylum claims. ECF 64-1 at 32-33. This is a serious allegation, but it does not make it any less meritless.

To start, Plaintiffs have dramatically narrowed their due process claims, by arguing only

that the "new" credible fear proceedings create the appearance of bias. *Id.* They have thus waived their other due process claims. *See* ECF 3 at ¶ 96. Second, the claim is entirely redundant of their APA claim. Both claims assert that *A-B-* and the PM prevent aliens from receiving an individualized hearing on their claims that is not pre-judged as unlawful because its premised on domestic or gang violence. *Compare id.*, ¶ 89 *with* ¶ 96; ECF 64-1 at 28-32, *with* 32-38. The claim is thus duplicative and cannot exist separate and apart from the APA claim. *See Ursack v. Sierra Interagency Black Bear Grp.,* 639 F.3d 949, 955 (9th Cir. 2011) ("Although Ursack separately argues that the decision also violated equal protection principles, the equal protection argument can be folded into the APA argument, since no suspect class is involved and the only question is whether the defendants' treatment of Ursack was rational (i.e., not arbitrary and capricious).")

Moreover, even assuming the "bias" claim may proceed independent of the APA claim, Plaintiffs cannot circumvent the record rule by simply labeling the same claim a constitutional claim. "[W]hen a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that challenge must be judged on the record before the agency." *Bellion*, 2018 WL 4637013, *7 (collecting cases); *Chiayu Chang*, 254 F. Supp. 3d at 162; *see* cases cited *supra* Part II.A1. And because Plaintiffs' due process bias claim rests exclusively on their proffered extra-record evidence, its exclusion means they fail to provide sufficient evidence on this claim to survive summary judgment. *See* Fed. R. Civ. P. 56(a).[15]

Regardless, Plaintiffs' bias claim fails even on its own merits. The decisions of IJs and asylum adjudicators are entitled to a presumption of regularity, and a party alleging bias bears the heavy burden of proving it. *See, e.g., Citizens of Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971); *McLeod v. INS*, 802 F.2d 89, 95 n. 8 (3d Cir. 1986). Consequently, "in order to warrant a hearing on their claim of political interference and ex parte communications, Petitioners must make a

---

[15] And even assuming that their bias claim exists independently of their APA claim, Plaintiffs would still have to show that this claim is cognizable under 8 U.S.C. § 1252(e)(3). Plaintiffs allegations concerning the Attorney General's role as a supervisor of immigration judges, his statements in the media and in speeches, and performance measures for IJs are clearly not claims cognizable under § 1252(e)(3) since they do not "implementat[]"8 U.S.C. § 1225(b).

'strong showing' of impropriety by administrative officials." *Yang v. Reno*, 925 F. Supp. 320, 331 (M.D. Pa. 1996). That is, Plaintiffs must establish that agency adjudicators failed to exercise their own discretion and instead allowed the Administration to dictate the outcome of their cases. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Shaughnessy v. United States ex rel. Accardi*, 349 U.S. 280 (1955). As other courts have explained, the Supreme Court has "ma[de] clear that a finding of political interference may not be based upon speculation that [agency] adjudicators were unconsciously influenced by the [] Administration's alleged desire that Petitioners be deported." *Yang*, 925 F. Supp. at 320 (citing *Accardi*, 349 U.S. at 282).

Under these standards, even assuming the Court may consider Plaintiffs' extra-record evidence, they fail to make any "strong showing" of bias. Indeed, Plaintiffs' primary sources of evidence are two *hearsay* declarations from third-party attorneys and a *newspaper* article. *See* ECF 64-1 at 33-34. Plaintiffs rely on these sources to assert that *A-B-* is "a clear signal to deny domestic violence claims, and claims related to gang violence," *id.* (quoting Jamil Decl, ¶ 11), that an asylum officer "reading [the PM] would feel strong pressure to not grant a positive credible fear determination for an applicant in a domestic violence or gang violence situation," *id.* (quoting Nasr Decl., ¶ 5), and that *A-B-* is "an attempt to turn judges from neutral arbiters into law enforcement agents enacting Trump administration policies." *Id.* (quoting opinion of source in newspaper article). Plaintiffs cite zero authority for the proposition that vague bias claims in an APA case may be proven by citing hearsay declarations and newspaper articles, and that such allegations may circumvent the record rule. Moreover, even were this a normal Rule 56 motion not subject to the record rule, Plaintiffs' hearsay evidence would not be admissible in any event. *See, e.g.*, *Biolchini v. Gen. Elec. Co.*, No. 97-C-1704, 1998 WL 155930, at *7 (N.D. Ill. Mar. 28, 1998), *aff'd*, 167 F.3d 1151 (7th Cir. 1999) ("Biolchini's purported evidence of bias is infirm because he cites speculative and inadmissible hearsay statements").

Plaintiffs nevertheless contend that the Attorney General's role as supervisor of IJs creates the potential for unconstitutional bias. ECF 64-1 at 33. This claim has been rejected repeatedly as frivolous. Since the first INA, Congress has vested the Attorney General with supervisory authority over the immigration courts and the BIA. *See Marcello v. Bonds*, 349 U.S. 302 (1955) (discussing

history); 8 U.S.C. § 1103(g). And the Supreme Court has clearly rejected any argument that this relationship *per se* violates due process. *See id*. at 311 ("Petitioner would have us hold that the presence of this relationship so strips the hearing of fairness and impartiality as to make the procedure violative of due process. The contention is without substance[.]").

Plaintiffs' contention that statements made by the Attorney General in the media and in speeches to IJs creates a risk of potential for unfairness or bias is similarly unavailing. ECF 64-1 at 33-34 & n.24. Plaintiffs take issue with the Attorney General's statements to IJs that it is "their duty to carry out *Matter of A-B*." *Id.* at 34. But that statement simply reiterates the statutory and regulatory requirement that the Attorney General's legal decisions must be followed by immigration officers, judges, and the BIA. *See* 8 U.S.C. § 1103(a)(1); 8 C.F.R. § 1003.1(g). Moreover, case law makes clear that a finding of political interference may not be based upon speculation that agency adjudicators were unconsciously influenced by statements made by the Attorney General absent a showing of actual pressure. *See Accardi*, 349 U.S. at 284; *Yang*, 925 F. Supp. at 320. Plaintiffs do not come close to making this showing.[16]

Finally, Plaintiffs have not pointed to any evidence that these factors combined with *A-B-* prejudiced the outcome of their cases. Nothing Plaintiffs allege shows that receiving asylum adjudications by agency adjudicators governed by standards established by the Attorney General is inherently prejudicial, and even if they had shown actual prejudice in the circumstances surrounding *A-B-*, which they have not, they still must show prejudice to their underlying claims to succeed on their due process claim. *United States v. Decoster*, 624 F.2d 196, 336 (D.C. Cir. 1976). Showing prejudice requires showing "there is a reasonable probability that, but for [the constitutional violation], the result of the proceeding would have been different." *See, e.g., Lafler v. Cooper*, 566 U.S. 156, 163 (2012). The record contains no evidence that Plaintiffs were found

---

[16] Plaintiffs also contend that the "pressure to deny cases is heightened by case completion quotas that discourage thorough decision making." ECF 64-1 at 34. Plaintiffs point to no evidence making this connection: court performance metrics are used by many different courts, and EOIR has made clear that the courts must still ensure due process in meeting these goals. *See* Case Priorities and Immigration Court Performance Measures, EOIR, (Jan. 17, 2018), at 2, available at https://www.justice.gov/eoir/page/file/1026721/download; *cf.* 28 U.S.C. § 476 (encouraging federal judges to resolve pending cases, motions, and trials within certain timeframes).

to have no credible fear for reasons other than because adjudicators of both USCIS (with supervisory review) and EOIR found that they did not establish the requisite likelihood that they could meet the standard for asylum under section 1158(a) as clarified by *A-B-* and other precedent.

Regardless, as we argued in our opening motion, Plaintiffs lack due process rights regarding their admission to any procedures or protections other than those prescribed by Congress via statute, which they have received. Plaintiffs are aliens with no prior ties or connections to this country who were apprehended at a port of entry or shortly after crossing the border illegally and who have requested asylum. ECF 3 at ¶¶ 2-3, 15-24. "[A]n alien seeking initial admission to the United States," such as Plaintiffs in their requests for asylum, "requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Alien applicants for admission at the border, which Plaintiffs are, *see Castro*, 835 F.3d at 445-46, lack any constitutional due process rights with respect to admission: "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). Plaintiffs do not address this argument and do not deny that they received credible fear reviews in accordance with statutory procedure; the Due Process Clause does not provide them with any additional protection respecting their bid to establish credible fear and eventually obtain admission. ECF 57 at 36-38.

At bottom, what Plaintiffs' "bias" argument demonstrates is that they believe they established the requisite likelihood of making an asylum claim which entitled them to a positive credible fear determination and therefore the fact they did not receive it must mean bias permeated the relevant immigration officers' decisions. But given that Plaintiffs received the process they were due under the statute with respect to their credible fear interviews, their claim is baseless. While arriving aliens like Plaintiffs may be entitled to fair proceedings when Congress provides them, they lack a constitutional right, whether dressed up as "bias" or otherwise, to any particular *outcome* in their efforts to gain admission or relief from removal. *See Landon*, 459 U.S. at 32. They are aliens seeking initial admission and are properly treated as at the threshold of initial entry. *See Kwai Fun Wong v. United States*, 373 F.3d 952, 971 (9th Cir. 2004) ("[A]n alien seeking

admission has not 'entered' the United States, even if [he] is in fact physically present.''). They thus lack any constitutional rights regarding their attempts to gain admission (including asylum) to the country, *see Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1382 (D.C. Cir. 1990), including receiving greater *procedures* which they contend would have achieved a different result. *See, e.g.*, *Castro*, 835 F.3d at 445-46 (collecting cases) (Plaintiffs "cannot invoke the Constitution . . . in an effort to force judicial review beyond what Congress has already granted them").

For these reasons, Plaintiffs' Due Process bias claim cannot survive summary judgment

> 2.    *A-B-* did not change the existing standard for showing the government is unwilling or unable to protect the applicant from private actors

Plaintiffs persist in asserting that the "condoned/complete helplessness" language in *A-B-*, 27 I. & N. Dec. at 337, as incorporated in the PM, is new and imposes a heightened legal requirement that is contrary to the INA and prior BIA and judicial precedents. ECF 64-1 at 38-43. They are wrong. The standard is well-established, and Plaintiffs' arguments that the INA and court precedent expressly foreclose the Government's reading is meritless.

As Defendants' motion for summary judgment points out, several courts have applied the "condoned/complete helplessness" formulation, beginning with *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000), and thus this standard is hardly new. ECF 57-1 at 29 n.3 (listing cases). To the contrary, the "condoned/complete helplessness" standard articulates the required governmental role. Indeed, the word "persecution" in the INA does not, on its face, supply an answer to the complex questions that arise under the refugee definition. Therefore, the BIA is charged with interpreting the term. *See, e.g.*, *Corado v. Ashcroft*, 384 F.3d 945, 947 (8th Cir. 2004) ("The BIA is entitled to deference in interpreting ambiguous statutory terms such as 'persecution.'"); *cf. Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (noting that the INA "does not define 'persecution' or specify what acts constitute persecution"). When an applicant seeks asylum based on private violence, whether the applicant's home government is willing and able to control the alleged persecutors is part of the larger persecution inquiry. *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985); *accord Matter of Kasinga*, 21 I. & N. Dec. at 365 (revising *Acosta* standard).

Plaintiffs and the administrative law professor amici argue that the "unwilling or unable to control private actors" element of persecution, as set out in *Acosta*, 19 I. & N. Dec. at 222-23, was

36

drawn from pre-Refugee Act understandings of "persecution," and so should be considered unambiguous for purposes of *Chevron* analysis.[17] ECF 64-1 at 38-39, ECF 75 at 8-9. But the agency has not hitherto regarded the *Acosta* definition of "persecution" to be beyond its authority to modify, as shown in *Matter of Kasinga*, 21 I. & N. Dec. at 365. *Kasinga* modified the *Acosta* definition of persecution, thus indicating that the BIA has viewed "persecution" as ambiguous, despite its roots in pre-Refugee Act authority. Whereas *Acosta* had held that persecution was harm inflicted upon a person "in order to punish him for possessing a belief or characteristic a persecutor sought to overcome," 19 I. & N. Dec. at 222 (relying on pre-Refugee Act authority), *Kasinga* eliminated the need for "punitive" intent, 21 I. & N. Dec. at 365. If, as Plaintiffs argue, the definition of "persecution" was set in stone by the adoption of "persecution" with its pre-Refugee Act meaning, *Kasinga*'s holding, on which Plaintiffs rely, would be *ultra vires*. *Kasinga* and the Attorney General's citation of *Kasinga* in *A-B-*, 27 I. & N. Dec. at 337, show that persecution has been thought to be ambiguous and thus subject to administrative interpretation. *See, e.g., Shalala*, 23 F.3d at 416. Plaintiffs' contrary theory would upset *Kasinga*, settled law going back to 1996.

In any event, the case law using the "condoned" or "complete helplessness" language shows that the language did not change the unwilling/unable standard. *See Galina*, 213 F.3d at 958 (using "condoned" or "complete helplessness" and also remanding, based in part on conclusion that if applicant were subjected to the feared future mistreatment, "it would still be persecution, even if the police might take some action against telephone threats"); *Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005) (using "condones" or "helpless" language and nevertheless concluding that evidence warranted a remand to the agency to find whether applicant proved a well-founded fear of future persecution).[18] Plaintiffs contend that even though the cases articulated the

---

[17] Plaintiffs also argue that because the UNHCR Handbook was in existence at the time of the Refugee Act, and the Handbook's standard was "effective protection," this means that the Refugee Act must have enshrined "effective protection" as the meaning of persecution. ECF 64-1 at 38-39 (citing *Acosta*, 19 I. & N. Dec. at 222-23). To the contrary, when *Acosta* described the pre-Refugee Act meaning of "persecution," it relied on the meaning of that term under *domestic* law prior to the Refugee Act, not on the interpretations of UNHCR. 19 I. & N. Dec. at 220-24. *Acosta* specifically rejected the notion that UNHCR's interpretations were binding on the BIA. *Id.* at 220.
[18] *See, e.g., Guillen-Hernandez v. Holder*, 592 F.3d 883, 887 (8th Cir. 2010); *Elias v. Gonzales*, 490 F.3d 444, 454 (6th Cir. 2007); *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006).

"condoned/complete helplessness" language, the courts failed to apply the standard they articulated. ECF 64-1 at 42 & n.29. But results matter, and these cases show that the "condoned/complete helplessness" formulation is not some departure from earlier standards that makes it impossible to prove persecution by private actors.

Neither the Attorney General in *A-B-* nor the PM suggest that the "condoned/complete helplessness" language is a new standard. The Attorney General uses the "condoned/complete helplessness" and "unwilling or unable" language interchangeably on the same page, and even within the same paragraph of *A-B-*, ECF 57-1 at 30 n.13 (citing 27 I. & N. Dec. at 337), without indicating that he thinks there is any difference between them. Plaintiffs' assertion that the PM "specifically and repeatedly highlights" the "condoned/complete helplessness" language as a "key change" is simply untrue. ECF 64-1 at 43. The "condoned/complete helplessness" language does not appear with any particular emphasis in the PM. Indeed, the number of times "condoned/complete helplessness" is used in the PM (three times) pales in comparison to the number of times the more familiar "unable/unwilling" standard appears within the same document (eleven times). The "condoned/complete helplessness" standard, to the extent that it has not been explicitly articulated by the agency previously, is an example of permissible synthesis or reaffirming of law on a case-by-case basis, which is entitled to deference. *See Paloka*, 762 F.3d at 196 (explaining that BIA decisions "reformulat[ing] [particular social group] test and accompanying analysis clarify[ing] several issues" entitled to deference).

Plaintiffs are also incorrect that asylum applicants, via the PM, are newly being required to demonstrate with "absolute certainty that the government will not protect them from feared harm." ECF 64-1 at 39. Nowhere in the PM or *A-B-* is "absolute certainty" recited as the standard.

Plaintiffs argue that this Court should fashion an interpretation of persecution that would make the "unwilling or unable to control" element synonymous with (and therefore duplicative of) the separate standard that the applicant must have a well-founded fear of persecution. ECF 64-1 at 39. The overall burden to be applied in an asylum determination—"a well-founded fear of persecution," 8 C.F.R. § 208.13(b)(2)—is separate from the requirement of government action/inaction. The BIA has never equated these two standards. The BIA and the Courts use the

"unwilling or unable to control" private actors standard to gauge the governmental role in persecution, even in the context of past persecution, where the existence of a well-founded fear is a moot point. In *Acosta*, the BIA held the accepted definition of persecution referred to suffering or harm "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." 19 I. & N. Dec. at 222. The past tense ("was") shows the BIA was not talking solely about likelihood of future persecution, but about the government's responsibility for harm that has already happened. That is how courts have applied the test. *See, e.g.*, *Harutunyan v. Gonzales*, 421 F.3d 64, 68-69 (1st Cir. 2005); *Mulyani v. Holder*, 771 F.3d 190, 198-99 (4th Cir. 2014); *Yasinskyy v. Holder*, 724 F.3d 983, 984, 989 (7th Cir. 2013); *Saldana v. Lynch*, 820 F.3d 970, 976-77 (8th Cir. 2016); *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 & n.4 (9th Cir. 2005); *Ritonga v. Holder*, 633 F.3d 971, 976-78 (10th Cir. 2011). Thus, Plaintiffs are urging the Court to adopt novel reasoning that is not part of the existing framework.

Finally, Defendants do not agree that the PM instructs officers to "*ignore* whether state protection is effective." ECF 64-1 at 41. Plaintiffs argue that the PM "explicitly dismisses the significance" of whether a country "'has problems effectively policing certain crimes, like domestic violence or gang-related activities.'" ECF 64-1 at 41 (quoting AR006). Plaintiffs, however, take this quoted language out of context. The sentence from which Plaintiffs excerpt this language explains that the effectiveness of combatting such crimes "cannot, *by itself*, establish eligibility for asylum or refugee status." AR006 (emphasis added). There is nothing incorrect about this statement when considered in its entirety. Merely being at risk of harm is not enough to establish eligibility for relief or protection. Critically and undisputedly, an applicant must establish a nexus to a protected ground to be granted asylum. The PM contains no instruction to "ignore" the effectiveness of a government's efforts to combat certain crimes; rather, the instruction is not to consider a country's difficulty effectively policing certain crimes, alone, as establishing eligibility for relief. This is consistent with existing law and is not new.

     3.     *A-B-* did not create a new nexus standard, but simply requires adjudicators to apply the old one

Defendants explained in their summary judgment memorandum that *A-B-* did not create a new motive standard, but rather, held that adjudicators needed to apply the existing standard,

instead of accepting a stipulation in lieu of proof, as the BIA did in *A-R-C-G-*. ECF 57-1 at 30. Plaintiffs do not dispute that the Attorney General and the PM stated the correct legal standards for nexus.[19] ECF 64-1 at 44. Nor do they (or could they) dispute that under pre-existing law, "nexus is foreclosed in the case of purely personal disputes," ECF 64-1at 44 (internal punctuation omitted), as Defendants have shown, ECF 57-1 at 30 nn.14 & 15 (collecting cases). And Plaintiffs do not dispute that the Attorney General correctly applied the nexus standard in *A-B-*, where he held that the BIA pointed to no record evidence that *A-B-*'s husband mistreated her "in any part" on account of her membership in the particular social group of "El Salvadoran women who are unable to leave their domestic relationship where they have children in common," since there was no evidence the husband knew any such group existed. 27 I. & N. Dec. at 343; *see* ECF 64-1 at 45. These concessions establish that the actual nexus holding of *A-B-* is not at issue here.

Instead, Plaintiffs argue that, even if the Attorney General correctly concluded that the domestic violence asylum claims in *A-B-* and *A-R-C-G-* failed for lack of nexus, "that does not mean that other applicants will be unable to provide proof of motive." ECF 64-1 at 45. That is true. Indeed, the Attorney General did not purport to foreclose cases in which, unlike *A-R-C-G-* and *A-B-*, the applicant could prove a protected-ground motive was a central reason for persecution. Nor did he suggest that cases where there was a nexus to a protected ground would fail because there is also a personal relationship between the persecutor and victim. *See* 27 I. & N. Dec. at 338-39. What the Attorney General did in fact rule, when quoted accurately rather than selectively, is that the personal conflict could not substitute for a protected-ground motive: "When private actors inflict violence based on a personal relationship with a victim, then the victim's membership in a larger group may well not be 'one central reason' for the abuse." *Id.*

To be sure, it is true, as Plaintiffs argue, *see* ECF 64-1 at 8-10, 44, that there are many cases in which persecutor and applicant have a relationship, yet the applicant is also able to show that the persecutor was motivated by a protected ground, rather than a purely personal dispute. For

___

[19] Unlike Plaintiffs, UNHCR takes issue with the U.S. law of nexus. The Court may not adopt UNHCR's interpretation of the Refugee Convention in lieu of Congress's implementation of the standard in the INA, or the Supreme Court's interpretation of the INA. *See Aguirre-Aguirre*, 526 U.S. at 427-28 (UNHCR's position not binding on Attorney General, the BIA, or U.S. courts).

instance, in one of the cases Plaintiffs cite, *Matter of S-A-*, 22 I. & N. Dec. at 1336, the applicant showed that she had suffered past persecution at the hands of her father on account of her religious beliefs, which differed from her father's orthodox Muslim views concerning the proper role of women in society, and the BIA held she was eligible for asylum. *Accord Matter of Kasinga*, 21 I. & N. Dec. at 368 (finding nexus between persecution and cognizable particular social group based on resistance to traditional practice of female genital mutilation in Togo). In the cases Plaintiffs cite, in addition to a personal relationship, there was thus a nexus between the harm and a cognizable particular social group or one of the other protected grounds. *A-B-* did not question or overrule such cases. 27 I. & N. Dec. at 338-39. *A-B-* simply held that there must be a nexus to a protected ground in addition to the non-protected motivation of personal conflict. *Id.* Nothing in *A-B-* suggests a *per se* rule that there can be no nexus where the persecutor and victim are in a personal relationship, and to the contrary, *A-B-* is replete with instructions to abide by the statutory "one central reason" standard.[20]

The PM also does not establish a *per se* rule against nexus in the context of personal relationships. Plaintiffs inaccurately claim that the PM says a personal relationship between persecutor and victim "forecloses" a nexus to a protected ground. ECF 64-1 at 44 (citing AR006). The PM does not say that. When read in context without selective citation, the PM states that if the evidence shows the victim was attacked "based solely" on a pre-existing personal relationship, nexus will not be established. AR006 (section III.B.ii). The PM also says that the victims' membership in a larger group will "often" not be one central reason for abuse when the violence is based on a personal relationship. AR006. The word "often" indicates that the PM was making an observation, not a rule. And both of these statements in the PM mirror those of the attorney General in *A-B-* in which the Attorney General cited the statutory "one central reason" mixed-motive standard. 27 I. & N. Dec. at 317, 319, 320, 321, 323 330, 332, 338, 339, 343.

Accordingly, neither *A-B-* nor the PM implementing *A-B-* is contrary to the existing law of nexus, including the basic motive and mixed-motive inquiries. Therefore, neither can be viewed

---

[20] To the extent Plaintiffs claim otherwise, the Government's position is that *A-B-* does not establish a *per se* rule, and that position is entitled to deference. *See Drake*, 291 F.3d at 67.

as arbitrary and capricious, and Plaintiffs' arguments to the contrary lack merit.

4.      *A-B-*'s disapproval of particular social groups based on a term used to describe domestic violence is an application of existing law that a "particular social group" must exist independently of the persecution.

As we have explained, one of the errors in *A-R-C-G-* that *A-B-* pointed out and overruled was that *A-R-C-G-* countenanced a circularly defined particular social group that was based in part on the persecution. *See A-B-*, 27 I. & N. Dec. at 334-35 (disapproving A-R-C-G-'s particular social group because including "unable to leave their relationship" rendered the group "effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability to leave was created by harm or threatened harm). *A-B-*'s holding was not a new rule but merely a reasonable application of the existing rule that a particular social group must be defined "independently" of the persecution.

In their Complaint, Plaintiffs objected to the anti-circularity holding of *A-B-* on the ground that *A-R-C-G-* might have been "unable to leave" for reasons unrelated to her spouse's abuse. ECF 3 at 24. This argument assumes that it would be improper to include the fact of abuse in the particular social group, but argues that not all groups based on "unable to leave" would necessarily rely on abuse. Now, on Summary Judgment, Plaintiffs for the first time raise a contrary argument: they contend that it is permissible to base a particular social group on the persecution as long as some other term is also added. ECF 64-1 at 46-47. Plaintiffs cannot amend their complaint through a summary judgment motion, and so the Court should disregard this argument and deem it forfeited. *See, e.g.*, *Mazloum v. Dist. of Columbia*, 442 F. Supp. 2d 1, 12 n.7 (D.D.C. 2006) (Bates, J.) (noting plaintiff cannot amend complaint through an opposition brief); *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (Collyer, J.) (same). Even if they could raise this claim for the first time in a responsive pleading, their arguments about the meaning of "particular social group" fail, because *A-B-* is based on an interpretation of "particular social group" that has been agency law since at least 2014, and is, in any case, a reasonable interpretation of the ambiguous term "particular social group."

The rule against circularly defined particular social groups is required to prevent "particular social group" from becoming a catch-all that swallows the rest of the refugee definition. *See Matter*

*of M-E-V-G-*, 26 I. & N. Dec. at 231. The BIA and courts have recognized that if "particular social group" is allowed to serve as a catch-all for anyone who is harmed by others, the "persecution on account of" clause will lose its limiting function. *Orellana-Monson*, 685 F.3d at 518-19; *Castillo-Arias*, 446 F.3d at 1197-98; *Matter of M-E-V-G-*, 26 I. & N. Dec. at 235, 242. The simplest way to make "particular social group" a catch-all is to take the fact of persecution itself and fashion it into a putative particular social group. But this is circular reasoning, as "persecution on account of . . . membership in a particular social group" requires that the membership causes the persecution, not vice versa. *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003); *Sarkisian v. Att'y Gen. of U.S.*, 322 F. App'x 136, 141 (3d Cir. 2009) ("This is a matter of logic: motivation must precede action; and the social group must exist prior to the persecution if membership in the group is to motivate the persecution."); *see Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018). As early as 2006, in *Matter of C-A-*, the BIA held that "particular social group" should not be interpreted as a catch-all, and, the BIA continued, as part of this principle, the social group cannot be defined by the fact that it is targeted for persecution. 23 I. & N. Dec. at 960; *accord Matter of M-E-V-G-*, 26 I. & N. Dec. at 235. The BIA repeated this anti-circularity rule in subsequent cases. *Matter of S-E-G-*, 24 I. & N. Dec. at 584; *Matter of M-E-V-G-*, 26 I & N. Dec. at 236-37 n. 11 (particular social group must be defined "independently" of the persecution); *Matter of W-G-R-*, 26 I. & N. Dec. at 215. Courts have routinely reiterated and affirmed this compelling logic. *E.g.*, *Gonzalez Cano v. Lynch*, 809 F.3d 1056, 1059 (8th Cir. 2016) ("Among other causation problems, the most severe harm Gonzalez Cano suffered—abduction and forced labor—are the characteristics that define his proposed social group. As such, his membership in that group could not have been the motive, at least initially, for the persecution."); *Perez-Rabanales*, 881 F.3d at 67 ("[T]he petitioner's proffered social group is defined by the persecution of its members. The distinction has decretory significance."). In *A-B-*, the Attorney General simply reiterated and applied the anti-circularity rule as stated in *M-E-V-G-*, and neither Plaintiffs' argument in their Complaint, nor their different argument in their summary judgment motion, shows anything arbitrary or capricious in the Attorney General's reasoning.

First, Plaintiffs' Complaint alleges that "inability to leave" may result from other factors

than a spouse's use of force to prevent the applicant from leaving. ECF 3 at 24. This is true, and the Attorney General did not say anything to the contrary. *Matter of A-B-*, 27 I. & N. Dec. at 334-35. However, the Attorney General reasonably disapproved of a particular social group including "unable to leave," because that term is so ambiguous that it could (and did) serve as a placeholder to obscure the fact that the particular social group was circularly defined. *Id.* In fact, that is how *A-R-C-G-* was interpreted during the time it was in effect: applicants making claims in reliance on *A-R-C-G-* relied on the fact of their partner's violence as a way of establishing that they were "unable to leave." In fact, in concluding that A-B- was unable to leave her relationship, the Board in *A-B-* relied entirely on threats and violence against A-B- by her ex-husband and his associates after her divorce. *See* ABROP0029-30; *see, e.g.*, *Alvarado-Garcia v. Lynch*, 665 F. App'x 620, 621 (9th Cir. 2016) (record compelled conclusion applicant was "unable to leave" where partner beat applicant when he discovered she had reported his abuse to the police, stalked her trying to convince her to reconcile, and threatened her that if she did not return to the relationship, she would be forced out of town). After all, if being a "married woman" or "woman in a domestic relationship" are immutable in the relevant societies without regard to the partner's abuse, then it is redundant to add "unable to leave" to a group defined by the marriage or domestic relationship. And if there is some non-persecutory reason other than being married that causes the group members to be unable to leave, that reason can be identified with sufficient specificity that it cannot be used to hide the existence of persecution in the group definition. Thus, the Attorney General's holding that *A-R-C-G-* erred in approving a group with language so vague it permitted an end-run around the rule against defining groups by persecution was a reasonable application of the BIA's existing rule against circularly defined particular social groups. "[An] agency's interpretation of its own precedent is entitled to deference." *Cassell*, 154 F.3d at 483. In any case, Plaintiffs' argument about whether the phrase "unable to leave" can be included in a particular social group definition is irrelevant at the credible fear stage, since USCIS does not require applicants to precisely articulate their "particular social group" in non-adversarial proceedings. *Infra* Part II.B.5.

In contrast to Plaintiffs' protestations in their Complaint that the particular social group in *A-R-C-G-* was not necessarily defined by the persecution, in their summary judgment motion,

Plaintiffs now say that the Attorney General has to allow groups to be defined by persecution, as long as something else is thrown into the definition. ECF 64-1 at 46-48. Although this claim is forfeited, *see supra*, it is also time-barred, as well as being meritless. Hybrid groups consisting of the persecution plus something else are not defined "independently" of the persecution, as required by BIA authority existing before *A-B-*, *see Matter of M-E-V-G-*, 26 I. & N. Dec. at 236-37 n.11; *Matter of W-G-R-*, 26 I. & N. Dec. at 215, as explained below.

Plaintiffs rely on the BIA's statements such as that in *C-A-*, where the BIA suggested that the particular social group cannot be defined "exclusively" by the persecution. 23 I. & N. Dec. at 960; *accord Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74. The Plaintiffs infer from the word "exclusively" that it would be permissible to define a social group partly by the persecution. ECF 64-1 at 47 (claiming that it is "well-established" that a group can be defined by persecution plus something else). But that inference is not mandatory, and the BIA has never drawn it. Even before the BIA explicitly stated that the group had to be defined "independently" of the persecution, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236-37 n.11, the BIA and courts alike applied the rule against defining a particular social group by its persecution where the groups in question were hybrids consisting of the persecution plus other terms.[21]  This shows that the BIA and at least some courts did not infer that "not exclusively" meant that hybrid groups would be cognizable.

To be sure, some courts, notably the Seventh Circuit, have reasoned that a hybrid particular social group could be cognizable. *See Cece v. Holder*, 733 F.3d 662, 671 (7th Cir. 2013) (en banc); *see also Cordoba v. Holder*, 726 F.3d 1106, 1113 n.1 (9th Cir. 2013).[22] But *Cece* specifically

---

[21] *E.g.*, *Matter of S-E-G-*, 24 I. & N. Dec. at 584; *Perez-Rabanales*, 881 F.3d at 66-67; *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005).

[22] Plaintiffs argue that the Third Circuit has also recognized hybrid particular social groups, consisting in part of the persecution, ironically citing *Lukwago*, the decision that first encapsulated the principle that the particular social group must be defined "independently" of the persecution. ECF 64-1 at 47. Plaintiffs cite a different part of *Lukwago* than that relied on in *M-E-V-G-*, 26 I & N. Dec. at 236-37 n.11, and *A-B-*, 27 I. & N. Dec. at 334-35. In the first part of *Lukwago*, the court correctly rejected the applicant's past persecution claim as circular because based on the persecution of being forced to be a child soldier. 329 F.3d at 172. But in the second part of *Lukwago*, the Court illogically held that there could be a well-founded fear of future persecution based on the applicant's escape and his membership in a particular social group of escapees. *Id.* at

based its holding on its assertion that the BIA had never required the particular social group to be independent of the persecution. 733 F.3d at 671. *Cece* failed to distinguish between a group being defined by persecution, which the Board had never held permissible, and the group having a history of being subject to mistreatment, which as explained below, is indeed relevant to the group's social distinction, but should be proved by evidence, not assumed by being included in the group definition. At any rate, *Cece*'s assertion that the BIA had never disapproved of hybrid groups was superseded by the BIA's 2014 decisions in *M-E-V-G-* and *W-G-R.*

In *M-E-V-G-* and *W-G-R-*, the BIA resolved any ambiguity about whether hybrid groups could be allowed when it said it was well-established that the group must be defined "independently of the fact of persecution." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 236-37 n.11; *accord Matter of W-G-R-*, 26 I. & N. Dec. at 215. At the same time *M-E-V-G-* clarified that the particular social group must be defined independently of the persecution, *M-E-V-G-* also stated that past mistreatment of a group (not an individual) by society (not an individual persecutor) is relevant to the criterion of social distinction. 26 I. & N. Dec. at 244. Plaintiffs argue that since a history of discrimination is relevant to social distinction, applicants ought to be able to put persecution in their group definition. ECF 64-1 at 47; *see also Cece*, 733 F.3d at 671-72 (stating that a group's history of persecution does "not disqualify" the group). Actually, the truth is just the opposite. The relevance of past discrimination to social distinction cuts *against* letting applicants insert persecution into a hybrid group definition. Social distinction needs to be proved by evidence, not assumed by sticking "distinction" words in the group definition. If applicants could manipulate the underlying group by separating out the members of the group who have been mistreated and positing an artificial sub-group consisting only of those members, any non-persecution characteristic could be made to seem socially distinct. By this method, the group of "alumnae of

---

178. But this ignores the fact that the escape (and the particular social group based on it) is just part of one continuing course of persecution. If applicants could defeat the rule against circularity by dividing up the same persecution into tranches, and predicating their particular social group on the second minute, rather than the first, the catch-all problem would re-emerge. In citing *Lukwago*'s statement that the particular social group must be defined "independently" of the persecution, neither the BIA in *M-E-V-G* nor the Attorney General in *A-B-* espoused the second, illogical part of *Lukwago*.

prestigious universities *subject to unfair discrimination*" would be recognized as a marginalized particular social group in United States society, despite the fact that the broader group without the adverse treatment qualifier would not. It follows that for evidence of discrimination or other adverse treatment to be useful as a way to evaluate the group's role in its society, the adverse treatment cannot be added in to create an artificial subgroup that is persecuted by definition. Instead, the experiences of all those with the non-persecution characteristic should be taken into account to ascertain whether people with that non-persecution characteristic are truly socially distinct in their society. And if they are, adding in the fact of persecution to the group definition is unnecessary. In fact, whether an applicant can include the persecution in her social group will likely only be a fighting point in cases where the group is not otherwise distinct.

Because the BIA adopted the "must be defined independently of the persecution" clarification in 2014, the Plaintiffs' attack on the rule against including the persecution in the particular social group, is time-barred under 8 USC § 1252(e)(3)(B).

Even if Plaintiffs' challenge to the rule were not time-barred, the rule requiring a particular social group to be defined independently of the persecution at issue is reasonable and the Court should defer to it. As all agree, "membership in a particular social group" is ambiguous and the Attorney General's interpretation is analyzed under *Chevron* step two. ECF 57-1 at 27 n.8. *M-E-V-G-*'s more precise formulation of the anti-circularity rule excludes the possibility of hybrid particular social groups consisting partly of the persecution and partly of something else, and thus is a reasonable measure to prevent "particular social group" from becoming a catch-all. This aspect of *M-E-V-G-* should receive *Chevron* deference, as has been accorded to *M-E-V-G-* generally. *See* ECF 57-1 at 27 n.9. Moreover, the holding in *Cece* approving hybrid particular social groups must be regarded as superseded under *Brand X* by the BIA's decision in *M-E-V-G-*.

In sum, both Plaintiffs' attacks on *A-B-*'s overruling of *A-R-C-G-* on circularity grounds—Plaintiffs' argument that the group was not necessarily defined by persecution and their argument that it was permissible to define it by persecution—fail to show that the Attorney General's decision or the PM implementing it were arbitrary or capricious.

5.      The PM does not require exact delineation of particular social groups in

credible fear interviews

Plaintiffs assert that the PM requires the "exact delineation" of a particular social group at the credible fear stage. ECF 64-1 at 49-51. That is wrong. The PM follows existing law and practice by instructing asylum officers on two principles: (1) an applicant bears the burden of showing he or she has a significant possibility of prevailing on an asylum claim by presenting facts that "clearly identify the proposed particular social group," AR003 (Section III), but (2) the officer is to conduct the interview in a non-adversarial manner, with the purpose of eliciting all relevant information bearing on eligibility, AR004 n.2 (citing 8 C.F.R. § 208.9(b)). This guidance is consistent with the regulation, which describes that the purpose of the credible fear interview is to determine whether "the alien has established a credible fear of persecution or torture." 8 C.F.R. § 208.30(e)(1) & (2). The PM is thus consistent with the law and does not establish any new standard.[23]

The PM does not impose a duty to articulate a particular social group on the applicants in credible fear interviews. Nor does the PM disregard the asylum officer's role in developing evidence in a non-adversarial manner, which the PM specifically acknowledges. AR004 n.2. While the PM cites *A-B-*, it does not instruct officers to require that applicants precisely articulate a particular social group. Instead, the PM phrases its instructions to asylum officers in terms of the applicant's responsibility to present facts, rather than to articulate claims: "[A]n applicant seeking asylum . . . must present facts that clearly identify the proposed particular social group." AR003. The PM thus accommodates the non-adversarial context of the asylum or credible fear interview by referring to the applicant's burden of proving facts that could support a claim, and reminding officers of their duty to elicit all relevant information. The PM does not instruct asylum officers that the applicant has to articulate the "exact delineation" of his or her particular social group before the officer, either at an affirmative interview or a credible fear interview. As in all aspects of a credible fear interview, the officer has a duty to elicit relevant testimony in order to determine whether the applicant may be eligible for relief or protection, which would include whether the applicant is a member of a cognizable particular social group. *See* 8 C.F.R. § 208.30(d).

Significantly, the duty to present facts that establish a particular social group in the non-

---

[23]  If Plaintiffs complain about the regulation, that claim is time-barred. 8 U.S.C. § 1252(e)(3).

adversarial credible fear process is different from the duty described in *A-B-* to articulate the exact delineation of a proposed particular social group in the adversarial defensive context of removal proceedings. The PM makes clear that the "exact delineation" requirement applies in adversarial proceedings. AR003 (quoting *Matter of A-B-*, 27 I. & N. Dec. at 344 ("an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the IJ, the exact delineation of any proposed particular social group.")). There should be no confusion that an applicant's obligation to articulate a particular social group as stated in *A-B-* relates to defensive applications in proceedings before an IJ, which accords with the nature of adversarial removal proceedings versus non-adversarial USCIS adjudications and screenings. Thus, Plaintiffs' contention that the PM demands that applicants at the credible fear stage must provide an "exact delineation" of a particular social group is unfounded. And even were the issue ambiguous, which it is not, the Court owes deference to the agency's statement that the "exact delineation" requirement is inapplicable at the credible fear stage. *See, e.g.*, *Drake*, 291 F.3d at 67 (explaining that deference is owed "to an agency's interpretation advanced during litigation regarding the meaning of an ambiguous regulation, if the position is not inconsistent with the agency's prior statements and actions regarding the disputed regulation").

6.     The PM does not instruct asylum officers to exercise discretion in credible fear interviews

Plaintiffs persist in misstating that the PM requires asylum officers to consider denying credible fear applications based on discretionary factors. *See* ECF 64-1 at 51-53. This claim is baseless, and nothing in the PM supports it. Nowhere does the PM state that discretion should be evaluated in the credible fear context. The PM applies to all situations in which USCIS is making a determination under 8 U.S.C. § 1101(a)(42), as reflected by the title of the memo: "Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*." The applicable statute defines credible fear as a "significant possibility" of establishing eligibility for asylum, 8 U.S.C. § 1225(b)(1)(B)(v), and does not provide for denial of that standard on the basis of discretionary factors applicable in an asylum application under 8 U.S.C. § 1158. It would be inconsistent with section 1225(b)(1)(B)(v) to consider the exercise of

discretion in determining eligibility at the credible fear stage. Although the PM includes information about exercising discretion, the memo does not direct officers to apply the exercise of discretion in the credible fear context. To the extent this may be ambiguous, again, the Court owes deference to the agency's interpretation advanced here that discretion is inapplicable at the credible fear stage. *See, e.g.*, *Drake*, 291 F.3d at 67.

C.      The PM, to the extent it does not simply repeat *A-B-*, is entitled to deference

Plaintiffs also assert that the PM "establishes two new unlawful credible fear policies with regard to circuit precedent," namely: "instructing asylum officers" to apply circuit precedents "to the extent that those cases are not inconsistent with *Matter of A-B-*," and to apply the law of the "relevant circuit" to credible fear proceedings, defined as "the circuit where the alien is physically located during the credible fear interview." ECF 64-1 at 53. Plaintiffs assert these instructions to line officers in the PM violate the separation of powers, the INA, and the APA. *Id.*

First, Plaintiffs do not address Defendants' argument that their separation of powers claim is redundant of their APA claim, and thus cannot proceed outside the confines of APA review. *See* ECF 57-1 at 34 n.16. They have thus waived any argument that Count II of their complaint can proceed separate and independent of Count I. *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded"), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004). In any event, Plaintiffs' assertions lack any factual support in the record, ignore basic principles of deference accorded to agency guidance, and are without merit. As we have explained, the PM's instruction to follow circuit precedent to the extent not inconsistent with *A-B-* is simply an instruction that line officers follow *A-B-* unless and until a competent court of appeals issues a decision that some aspect of *A-B-* is not entitled to deference or does not follow from the plain text of the INA. ECF 57-1 at 34-36.

The plain text of the PM provides that:

> When conducting a credible fear or reasonable fear interview, an asylum officer must determine what law applies to the applicant's claim. The asylum officer should apply all applicable precedents of the Attorney General and the BIA, *Matter*

*of E-L-H-*, 23 I&N Dec. 814, 819 (BIA 2005), which are binding on all immigration judges and asylum officers nationwide. The asylum officer should also apply the case law of the relevant federal circuit court, to the extent that those cases are not inconsistent with *Matter of A-B-*. *See, e.g.*, *Matter of Fajardo Espinoza*, 26 I&N Dec. 603, 606 (BIA 2015).

AR008. The requirement that asylum officers "apply all applicable precedents of the Attorney General and the BIA" simply states the truism that the INA *requires* all line officers to follow the binding decisions of the Attorney General and the BIA. *See* 8 U.S.C. § 1103(a) ("determination and ruling by the Attorney General with respect to all questions of law shall be controlling"); 8 C.F.R. § 103.3(c) ("Except as these decisions may be modified or overruled by later precedent decisions, they are binding on all Service employees in the administration of the Act."); 8 C.F.R. § 1003.1(g) ("Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board, and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States."). Plaintiffs do not and cannot dispute that asylum officers must follow Attorney General and BIA decisions.

Plaintiffs do however assert that the instruction that asylum officers "apply the case law of the relevant circuit court, to the extent that those cases are not inconsistent with *Matter of A-B-*" violates the separation of powers because it requires line officers to assume that "every aspect of *Matter of A-B-* is entitled to deference." ECF 64-1 at 55. The PM does no such thing. Indeed, the PM is far more modest: it reminds asylum officers that the INA requires them to follow *A-B-* and other binding BIA and Attorney General precedents, and further reminds them the Attorney General's decision is the law of the land unless and until a Circuit Court rules otherwise. Put another way, under textbook administrative law principles, when an agency—here the Attorney General—is delegated *express* authority to make rules with binding legislative effect, when that agency does so, that decision is binding law until a federal court of competent jurisdiction declares otherwise. *See, e.g.*, *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 791 (D.C. Cir. 2012). As Defendants explained in their prior brief, this is nothing but a straightforward application of the Supreme Court's *Brand X* decision. ECF 57-1 at 35.

As that decision explains, "[a] court's prior judicial construction of a statute trumps an

agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). But Plaintiffs (and their amici) point to no decisions published otherwise taking issue with *A-B-*, and so they cannot plausibly allege, let alone demonstrate with facts, that it would be wrong under *Brand X* for an asylum officer to follow *Matter of A-B-* as instructed. In order for *Brand X* not to apply, Plaintiffs must point to binding circuit precedent concluding that some aspect of *A-B-* is inconsistent with the plain text of the INA or prior judicial precedent finding terms the Attorney General may have viewed as ambiguous were not in fact ambiguous. *Brand X*, 545 U.S. at 982; *Petit*, 675 F.3d at 791. But the contrary is true: every Court to date to discuss *Matter of A-B-* in any meaningful sense has approved of it or at the least not criticized any aspect of it. *See, e.g.*, *Saravia v. Att'y Gen. of U.S.*, --- F.3d---, 2018 WL 4688710, at *8 (3d Cir. Oct. 1, 2018) (noting *A-B-*'s impact on domestic and gang violence based claims for asylum); *Martinez-Perez*, 897 F.3d at 41 (rejecting petitioner's construction of "nexus" in part because inconsistent with *A-B-*); *Rosales Justo*, 895 F.3d at 162-64 (agreeing with *A-B-*'s statement that "[t]he mere fact that a country may have problems effectively policing certain crimes cannot itself establish an asylum claim"); *S.E.R.L.*, 894 F.3d at 551 (deferring to interpretations concerning "particular social group" as "well within the bounds of reasonableness" and consistent with *A-B-* noting without disapproval *A-B-* abrogation of *A-R-C-G-* because it "caused confusion because it recognized an expansive new category of particular social groups based on private violence"); *Lopez*, No. 17-9517, 2018 WL 3730137, at *3 (relying on *A-B-*'s articulation of particular social group and circularity).[24]

At its crux, then, Plaintiffs' claim is that an agency that instructs its line officers to follow

---

[24]  Amici, Administrative Law Professors, suggest that "[t]o the extent that the Guidance directs officers to apply *Matter of A-B-*, notwithstanding any potential judicial opinion to the contrary, such policies have been "roundly 'condemned' by every circuit that has addressed the issue," citing *Grant Med. Ctr. v. Burwell*, 204 F. Supp. 3d 68, 79 (D.D.C. 2016). ECF 81 at 12-13, n.5. But in *Grant Med.* a court of appeals had *already* explicitly rejected the proposed agency approach as contrary to plain statutory text, and the issue of "intracircuit nonacquiescence," 204 F. Supp. 3d at 79-80. Those key facts are not presented here. *Grant Med.* does not—and could not—hold that an agency cannot instruct its line officers to follow binding agency decisions unless and until a court of competent jurisdiction tells it otherwise.

the law somehow violates the separation of powers because it is possible that some court in the future *might* declare some aspect of *A-B-* unlawful or contrary to the INA. ECF 64-1 at 57-58. Indeed, Plaintiffs, conflating the standard for credible fear with relevant administrative law principles, argue, without any record support, that there is "a significant possibility that a circuit court examining *Matter of A-B-*" in the future might "refuse to defer" to it, and therefore a credible fear applicant "must pass credible fear." *Id.* at 57-58. The argument is absurd. Predicting the likelihood of a court rejecting a legal opinion is not the kind of factual inquiry the "significant possibility" standard refers to. Moreover, this prospective, predictive interpretation of *Brand X* has no support in the law, and would severely limit an agency's ability to tell its employees to follow binding agency authority. No authority requires an agency to guess what aspect of binding agency decisions *might* at some point in the future be invalidated by a court. No conception of *Brand X* requires agency administrators and officers to learn the arts of clairvoyance and gaze into crystal balls pondering what courts of the future might decide. Indeed, as Defendants have already made clear in prior briefing: USCIS reads its own guidance on this score to simply require line officers to follow *A-B-* unless and until a circuit court of appeals declares some aspect of it contrary to the plain text of the INA. Then, line officers would by necessity, under *Brand X* have to follow the contrary circuit law. Thus, even were there any ambiguity in the PM, the agency's interpretation of its own guidance is entitled to deference, and Plaintiffs claims to the contrary lack any merit. *See Drake*, 291 F.3d at 67 ("[W]e owe deference to an agency's interpretation advanced during litigation regarding the meaning of an ambiguous regulation, if the position is not inconsistent with the agency's prior statements and actions regarding the disputed regulation.").[25]

Plaintiffs' response to Defendants' argument concerning their claim that instructing line officers to apply the law of the jurisdiction in which the credible fear interview occurs are equally

_____

[25] Plaintiffs half-heartedly in one undeveloped sentence suggest that the PM violates the APA because it does not explain a departure from long-standing practice of following circuit law. ECF 64-1 at 58 n.39. Plaintiffs cite no record evidence for this alleged long-standing policy, and there is no such policy. Rather, there is statutory authority which requires line officers to follow binding decisions of the Attorney General and the BIA. 8 U.S.C. § 1103(a). The regulations instructing line officers to follow such decisions are long-standing, and well outside the 60-day window for challenge. *See* 8 C.F.R. § 1003.1(g) (last amended on Feb. 27, 2018, on issues unrelated to this case; 8 C.F.R. § 103.3(c) (last amended August 29, 2011 on issues unrelated to this case).

nonsensical. Defendants argued that there is no constitutional, statutory, or regulatory right to have an agency decide a benefit application based on the law most favorable to the alien from *any* jurisdiction in the country. ECF 57-1 at 35-36. Plaintiffs have no response to this argument, and cite no authority to the contrary. Instead, they again pervert the statutory definition of "significant possibility" by reading the phrase "could establish eligibility for asylum" in 8 U.S.C. § 1225(b)(1)(B)(ii) to read: "could establish eligibility for asylum if they applied for asylum in the jurisdiction that has the law most favorable to their legal position." The statute, of course, says no such thing, and that Plaintiffs must invent an entirely different statute to make their argument should be the beginning and the end of this argument. *See, e.g.*, *Anderson*, 802 F.3d at 9.

Plaintiffs also argue that even without the invisible statutory text that requires USCIS to apply the law most favorable to plaintiffs, USCIS used to recognize such a "right," and so any change violates the APA. *See* ECF 64-1 at 59-60. But this claim is readily refuted by the very alleged "policies," contained in training materials, that Plaintiffs rely on. As Defendants already noted, and Plaintiffs appear to concede, the very training material Plaintiffs cite provides that

> [W]here there is:
> a. disagreement among the United States Circuit Courts of Appeal as to the proper interpretation of a legal issue; *or*,
> b. the claim otherwise raises an unresolved issue of law; *and*,
> c. there is no DHS or Asylum Division policy or guidance on the issue, then generally the interpretation most favorable to the applicant is used when determining whether the applicant meets the credible fear standard.

ECF 57-1 at 34-35; ECF 64-1 at 59 n.40 (emphasis added). The PM is precisely such "policy or guidance on the issue."

Nevertheless, Plaintiffs suggest that the disjunctive "or" after "disagreement among the United States Circuit Courts of Appeal as to the proper interpretation of a legal issue" and the conjunctive "and" after "the claim otherwise raises an unresolved issue of law" means that the exception for DHS policies applies only if "the claim otherwise raises an unresolved issue of law" and not if there is "disagreement among the United States Circuit Courts of Appeal." ECF 64-1 at 59 n.40. That strained reading is belied by the text, which provides that "disagreement among the United States Circuit Courts of Appeal" *or* that the "claim otherwise raises an unresolved issue of

law" are both *necessary* conditions to apply the most favorable law to the applicant, but neither is sufficient unless there is *no* "DHS or Asylum Division policy or guidance." Plaintiffs then suggest that "[a]t a minimum, the former policy is ambiguous," *id.*, but as already explained, where there is such ambiguity, the agency's interpretation is entitled to deference. *See Drake*, 291 F.3d at 67.

Plaintiffs' response is to assert that Defendants are wrong to suggest the PM is accorded blanket "*Chevron* deference." ECF 64-1 at 60. But Defendants never asserted the PM's "relevant circuit" guidance is subject to *Chevron* in every instance. *See* ECF 57-1 at 32-35. Indeed, the PM is interpretive guidance, and thus not subject to notice-and-comment requirements that accompany rulemaking. *See* 5 U.S.C. § 553(b)(A). Rather, Defendants argued, consistent with binding Circuit authority that agency interpretive guidance is entitled to deference independent of *Chevron*. *Id.*; *see, e.g.*, *Tex. Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 338 (D.D.C. 2018) (Sullivan, J.) ("an agency's [informal] interpretation may merit some deference in view of the agency's specialized experience and to support uniformity in agency administration of laws"); *Pharm. Research & Mfrs. of Am. v. US HHS*, 43 F. Supp. 3d 28, 36-37 (D.D.C. 2014) (courts "afford some deference to a non-binding agency interpretation of its guiding statute to the extent the interpretation has the power to persuade"); *but see Health Ins. Ass'n of Am., Inc.*, 23 F.3d at 424 ("We have often applied *Chevron* deference to interpretive rules"). And separate and apart from either *Chevron* deference or "power to persuade" deference, the agency is indisputably entitled to deference when it interprets its own prior guidance or decisions, *U.S. Telecom Ass'n*, 295 F.3d at 1332, including when it does so in a legal brief. *Drake*, 291 F.3d at 67. Regardless, contrary to Plaintiffs' arguments, the PM *is* entitled to deference, even if not *Chevron* deference. *See supra* Part II.A.2.

Plaintiffs' final argument is that the "relevant circuit" guidance is unreasonable because it is illogical. ECF 64-1 at 60-61. But asserting that something is illogical comes nowhere close to satisfying their heavy burden of *showing* the agency acted unreasonably. It is well-settled that "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Fox Television Stations, Inc.*, 556 U.S. at 513-14, and that agency's decision is entitled to a "presumption of procedural regularity and substantive rationality." *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198,

212 (D.C. Cir. 2015). The PM explains the basis for its decision quite clearly: "an asylum officer cannot predict with certainty where DHS will file a Notice to Appear or Notice of Referral to Immigration Judge, and [] there may not be removal proceedings if the officer concludes the alien does not have a credible fear or reasonable fear and the alien does not seek review from an immigration judge." AR009. Plaintiffs disagree, and would prefer a statutory right to have their credible fear proceedings adjudicated in a jurisdiction where they are guaranteed to pass their interview, but "policy disagreement" does not make agency action unreasonable. *See, e.g.*, *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004).

**III.    Plaintiffs are not entitled to declaratory or injunctive relief**

Plaintiffs assert that they are entitled to an injunction enjoining operation of and vacating *A-B-* and the PM, ECF 64-1 at 13, 61-64; ECF 3, Prayer for Relief, a-c, e, and an order requiring Defendants to allow Plaintiffs who have already been removed to enter the United States. ECF 64-1 at 61-62; ECF 3, Prayer for Relief, d. Both claims are without merit because the Court lacks authority under the INA or the APA to enter either form of relief.

A.    Section 1252(e)(3) does not permit the Court to grant equitable relief

Declaratory or injunctive relief is not permissible in a section 1252(e)(3) challenge. *See* ECF 16 at 9-14. Section 1252(e)(1) unambiguously provides that "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter *declaratory, injunctive, or other equitable relief* in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection.*" 8 U.S.C. § 1252(e)(1) (emphasis added). The sole, specifically authorized remedy in a "subsequent paragraph" is a "determination[]" whether  any alleged new written policy "is not consistent  with applicable provisions of this subchapter or is otherwise in violation of law," 8 U.S.C. § 1252(e)(3)(A)(ii), and to issue an "order" to that effect, *id.* § 1252(e)(3)(C). Where Congress intended for an equitable remedy in section 1252(e), it said so explicitly. *See id.* § 1252(e)(4)(B) (specifically authorizing delimited habeas relief); *see Am. Immigration Lawyers Ass'n v. Reno*, No. 97-0597, 1997 WL 161944, at *2 (D.D.C. Mar. 31, 1997) (Sullivan, J.) ("the Court does not have any authority" under section 1252(e) to

issue an order "restrain[ing] the effective date of [expedited removal] legislation"). Accordingly, under section 1252(e)(3), the court may only issue a legal determination that the alleged credible fear policies are inconsistent with section 1225(b), and no more.

>    B.    Under the APA, the Court cannot grant relief beyond a remand to the agency

Because section 1252(e)(3) provides no basis to enter declaratory or injunctive relief, the sole basis for relief in under the APA. As this Court has recently explained, where Plaintiffs allege agency action is arbitrary and capricious or exceeds or is contrary to statutory authority, the only appropriate remedy to "set aside [the] challenged agency action." *Children's Hosp. Ass'n of Texas*, 300 F. Supp. 3d at 202; *see* 5 U.S.C. § 706 (authorizing a Court to "hold unlawful and set aside" agency action that violates the APA). In the immigration context, when agency action is "set aside" the "ordinary remand rule" applies. *See Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1139 (D.C. Cir. 2014) ("consistent with our limited role in reviewing agency action, we reverse the district court's judgment and remand with instructions to vacate the Appeals Office's order and remand for further proceedings consistent with this opinion"). "Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question." *INS v. Ventura*, 537 U.S. 12, 17 (2002). "In such circumstances a judicial judgment cannot be made to do service for an administrative judgment." *Id.* Nor can a "court intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Id.* A federal court "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Ventura*, 537 U.S. at 17. Remand is appropriate because "[t]he agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides. *Id.* Thus, even if some aspect of *A-B-* or the PM is unlawful, the only proper remedy is remand. *Cf. Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) ("direct[ing] the district court to remand to the Service for further consideration consistent with this decision").

Even assuming the ordinary remand rule does not apply, it is settled law in this Circuit that where agency action is "set aside" under the APA, only one of two remedies is available: either the Court vacates the agency action outright, or the court declares the action unlawful and remands the agency decision back to the agency to "justify its decision on remand." *Children's Hosp. Ass'n of Texas*, 300 F. Supp. 3d at 202 (citing and quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) and *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 136 (D.D.C. 2014)). "An inadequately supported rule . . . need not necessarily be vacated." *Allied-Signal*, 988 F.2d at 150-51. What remedy should apply depends on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (internal quotation marks omitted).

Here, assuming the remand rule applicable to immigration cases does not apply and any aspect of *A-B-* or the PM is unlawful, remand without vacatur is the appropriate remedy. First, it is beyond dispute that the Attorney General had authority to issue *A-B-*, and that USCIS had authority to issue its PM. *See* 8 U.S.C. § 1103(a). Accordingly, the agencies can "arrive at the same conclusions reached" in *A-B-* or the PM, and this is not a case where "the actions taken were not statutorily authorized." *See Children's Hosp.*, 300 F. Supp. 3d at 211. Indeed, Plaintiffs' primary grievance is that Defendants did not adequately explain any change in policy. ECF 64-1 at 3-4. That claim is meritless, but if the Court disagrees, because the Attorney General can "readily [] cure a defect in its explanation of a decision, the first factor in *Allied–Signal* counsels remand without vacatur." *Heartland*, 566 F.3d at 198. Second, vacating *A-B-* and the guidance would have seriously disruptive consequences. Without *A-B-*, immigration officers examining asylum claims in any context would lack necessary guidance on how to apply the immigration laws now that *A-R-C-G-* is no longer good law. That would seriously disrupt the efficient handling of asylum claims, not just in credible fear intereviews, but in removal proceedings and affirmative cases before USCIS. Moreover, because *A-R-C-G-* is no longer good law—an issue Plaintiffs do not contest—"there is no apparent way to restore the status quo ante," also warranting remand without

vacatur. *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002)).[26]

     C.   The Court may not order that Plaintiffs already removed be returned to the country

     Longstanding precedent prohibits a court from ordering the United States to allow an alien to enter the country. *See, e.g.*, *Yamataya v. Fisher*, 189 U.S. 86, 98 (1903) ("It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government."); *Sevilla v. Elizalde*, 112 F.2d 29, 38 (D.C. Cir. 1940) (same). Plaintiffs do not grapple with these precedents. Instead, selectively quoting the TRO transcript, they claim that the Government conceded that the court could order it to return removed aliens to the United States. ECF 64-1 at 62. Not so. In response to a question as to whether the Government would return removed aliens to the United States, Government counsel did not concede the Court had such authority. *See* Tr. 13-14. Rather counsel sated "I'm not in a position to say . . . yes," while indicating that in a prior Supreme Court case, based on the facts in *that* case, the Department of Justice had informed the court it would return that alien if the government lost that case. Tr. 13:20-14:10. Regardless, the Government did not, and could not, concede a position contrary to long-standing, binding Supreme Court precedent.

     Plaintiffs also perplexingly assert that *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009)

---

[26]   Plaintiffs assert these rules do not apply because they filed a for preliminary injunction that they believe the Court combined with merits briefing under Rule 65(a)(2). ECF 64-1 at 13 n.10. The Court has not issued any such order, but even if it had, it is well-settled that "consolidation of [] motions for preliminary-injunctive relief and summary judgment under Federal Rule of Civil Procedure 65 effectively moots the Court's consideration of the preliminary injunctive factors because the court will enter judgment on the merits." *Children's Hosp. Ass'n of Texas*, 300 F. Supp. 3d at 202 (Sullivan, J.). In other words, if the preliminary injunction is combined with "a full hearing" on plaintiff's claim, "considerations of irreparable harm are out the window." *Cronin v. USDA*, 919 F.2d 439, 445 (7th Cir. 1990). Plaintiffs' attempts to invoke injunction concepts like irreparable harm and balance of the equities are irrelevant. *See Herman v. Assoc. Elec. Coop., Inc.*, 994 F. Supp. 1147, 1153 (E.D. Mo. 1998), *rev'd on other grounds*, 172 F.3d 1078 (8th Cir. 1999) ("Court need not and does not further address the factors ordinarily considered in the preliminary injunction context"); *Dangler v. Yorktown Cent. Sch.*, 771 F. Supp. 625, 632 (S.D.N.Y. 1991) ("If the trial of the merits is accelerated and consolidated with the preliminary injunction hearing, then no determination of irreparable harm need be made by this court."). Plaintiffs' preference to proceed under Rule 65(a)(2) in no way authorizes injunctive relief. *See infra*.

somehow supports their position. ECF 64-1 at 62. But that case quite clearly says that Courts lack any authority to order the government to allow an alien to enter the county. *See id.* at 1026 (such matters are "wholly outside the concern and competence of the Judiciary" and "is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien").[27]

Finally, Plaintiffs concede the statutory framework that governs parole, but then suggest the Court may exercise its equitable powers to remedy an alleged violation of their rights. ECF 64-1 at 62. As noted, Plaintiffs lack any due process claim to this remedy, but even if they did, it is "well established that courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *INS v. Pangilinan*, 486 U.S. 875, 883 (1988); *accord Rees v. Watertown*, 86 U.S. [19 Wall.] 107, 122 (1873) ("A Court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law."). Thus, the court lacks any authority to "compel[] the Executive to release [aliens] into the United States outside the framework of the immigration laws." *Kiyemba*, 555 F.3d at 1028; *accord Giammarco v. Kerlikowske*, 665 F. App'x 24, 26 (2d Cir. 2016) (court lacks jurisdiction to order alien be permitted to "temporar[ily] reent[er] so as to allow him to provide testimony").

## CONCLUSION

For these reasons, the Court should grant summary judgment to Defendants on all counts.

//

---

[27] Plaintiffs suggest *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) provides for such relief. ECF 64-1 at 63. But *Walters* is out-of-circuit authority in conflict with *Kiyemba*, and in any event is entirely inapt. *Walters* involved an injunction ordering the government to parole certain individuals as part of a non-APA remedy in a constitutional class action. However, *Walters* addressed a version of the parole statute that no longer exists. The INA has since been amended to make clear that parole is a discretionary decision not subject to judicial review. *See* REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Under the current statute, 8 U.S.C. § 1182(d)(5)(A), the authority to parole aliens into the country "is granted in the exclusive discretion of the Secretary of Homeland Security," *Kiyemba*, 555 F.3d at 1031, and any decision to parole or not parole an alien in any circumstances is not subject to judicial review by any Court. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("§ 1252(a)(2)(B) applies . . . to . . . determinations made discretionary by statute"); *Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007) (§ 1252(a)(2)(B)(ii) precludes judicial review of DHS parole determinations).

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director, Office of Immigration Litigation
U.S. Department of Justice, Civil Division
450 5th Street NW
Washington, DC 20530
Tel. (202) 307-4293
Erez.R.Reuveni@usdoj.gov

JOSEPH A. DARROW
CHRISTINA P. GREER
JOSHUA S. PRESS
Trial Attorneys

*Attorneys for Defendants*

Dated: October 10, 2018

### CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the District of Columbia by using the appellate CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

By:  /s/ Erez Reuveni
      EREZ REUVENI
      Assistant Director
      United States Department of Justice
      Civil Division