**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GRACE, *et al.*, | ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| JEFFERSON  BEAUREGARD SESSIONS III, | ) |
| Attorney General of the United States, *et al.*, | ) |
|  | ) No. 1:18-cv-01853 (EGS) |
| *Defendants*. | ) |
|  | ) |
|  | ) |
|  | ) |

**JOINT APPENDIX:  EXCERPTS CITED FROM
THE ADMINISTRATIVE RECORD**

# List of Excerpts Cited From the Administrative Record

1. U.S. Citizenship and Immigration Services, Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B- (July 11, 2018)

2. Email Guidance from John L. Lafferty, Chief, Asylum Division, U.S. Citizenship and Immigration Services to Asylum Division personnel (June 13, 2018)

3. *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018)

4. *Matter of A-B-*, Board decision, dated December 8, 2016

5. *Matter of A-B-*, Opening Brief from the Department of Homeland Security

6. Appendix to A-B-'s Opening Brief, Lustig Declaration (Excerpts)

7. Appendix to A-B-'s Opening Brief, Menjivar Declaration (Excerpts)

8. Appendix to A-B-'s Opening Brief, Bayona Declaration (Excerpts)

9. Appendix to A-B-'s Opening Brief, Lemon Declaration (Excerpts)

10. Appendix to A-B-'s Opening Brief, El Salvador 2016 Human Rights Report (Excerpts)

11. Appendix to A-B-'s Opening Brief, UN Committe on the Elimination of All Forms of Discrimination against Women: Concluding Observations on the Combined Eighth and Ninth Period Reports of El Salvador (Excerpts)

12. Appendix to A-B-'s Opening Brief, Report of the Special Rapporteur on Violence against Women, its causes and consequences: Follow-Up Mission to El Salvador

13. Appendix to A-B-'s Opening Brief, *Matter of L-R-* Department of Homeland Security Supplemental Brief

14. *Matter of A-B-*, Amicus Brief filed by Innovation Law Lab (Excerpts)

1

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Washington, DC  20529-2100



U.S. Citizenship
and Immigration
Services

**July 11, 2018**                                          **PM-602-0162**

# Policy Memorandum

SUBJECT:     Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in
             Accordance with *Matter of A-B-*

**Purpose**
This policy memorandum (PM) provides guidance to U.S. Citizenship and Immigration Services
(USCIS) officers for determining whether a petitioner is eligible for asylum or refugee status in light of
the Attorney General's decision in *Matter of A-B-*.  The guidance in this memorandum supersedes all
previous guidance dealing specifically with asylum and refugee eligibility that is inconsistent with this
guidance.

**Scope**
This PM applies to and shall be used to guide determinations by all USCIS employees.  USCIS
personnel are directed to ensure consistent application of the reasoning in *Matter of A-B-* in reasonable
fear, credible fear, asylum, and refugee adjudications.

**Authority**
Sections 101(a)(42), 207, 208, and 235 of the Immigration and Nationality Act (INA) (8 U.S.C.
§§ 1101(a)(42), 1157, 1158, 1225); Section 451 of the Homeland Security Act of 2002 (6 U.S.C. § 271);
Title 8 Code of Federal Regulations (8 C.F.R.) Parts 207, 208, and 235.

## I.     Background

On June 11, 2018, the Attorney General published *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), which
addresses how to adjudicate protection claims based on "membership in a particular social group" and
clarifies the substantive elements of eligibility.  The purpose of this memorandum is to provide guidance
to asylum and refugee officers on the application of this decision while processing reasonable fear,
credible fear, asylum, and refugee claims.[1]

In the decision, the Attorney General overruled the Board of Immigration Appeals' (BIA) precedent
decision in *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), on which the BIA had relied in finding

---

[1] Although the alien in *Matter of A-B-* claimed asylum and withholding of removal, the Attorney General's decision and this
PM apply also to refugee status adjudications and reasonable fear and credible fear determinations.  *See* INA §§ 207(c)(1),
208(b)(1), 101(a)(42)(A), 235(b)(1); 8 C.F.R. § 208.31.

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 2

A-B- eligible for asylum.  The Attorney General found that, in analyzing the particular social group at issue in *A-R-C-G-*, "married women in Guatemala who are unable to leave their relationship," the BIA failed to correctly apply the legal standards for a cognizable particular social group set forth in *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014), and *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014), *aff'd in relevant part and vacated in part on other grounds in Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016); *cert. denied*, 138 S. Ct. 736 (2018), which require that a group be composed of members who share a common immutable characteristic, be defined with particularity, and be socially distinct within the society in question.

In addition, the Attorney General stressed the requirement that membership in the particular social group must be a central reason for the persecution, and that officers must consider, where applicable and consistent with the regulations, whether internal relocation is reasonably available to avoid future persecution before granting asylum.  *See Matter of A-B-*, 27 I&N Dec. at 337-39, 343-45.  In cases where the persecutor is a non-government actor, the applicant must show the harm or suffering was inflicted by persons or an organization that his or her home government is unwilling or unable to control, such that the government either "condoned the behavior or demonstrated a complete helplessness to protect the victim."  *Id.* at 337 (quotation marks omitted).

Section 103(a) of the INA provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."  Further, under 8 C.F.R. §§ 103.10(b) and 1003.1(g), "decisions of the [BIA], and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security" and "shall serve as precedents in all proceedings involving the same issue or issues."  Accordingly, the decision in *Matter of A-B-* was effective immediately and is binding on all USCIS officers.  Officers should not cite or rely upon *Matter of A-R-C-G-* in any adjudications going forward.  Officers should continue to follow other binding precedents to the extent they are consistent with *Matter of A-B-*, including *Matter of M-E-V-G-* and *Matter of W-G-R-*, both of which were cited favorably in the Attorney General's decision.

## II.    USCIS Officers' General Duties

To be eligible for asylum or refugee status, the alien must establish in part that he or she was persecuted or has a well-founded fear of persecution on account of one of the protected grounds, is unable or unwilling to avail himself or herself of the protection of his or her country of nationality (or, if stateless, country of last habitual residence), and does not fall within one of the grounds for ineligibility.  Second, if eligibility is established, the USCIS officer must then consider whether or not to exercise discretion to grant the application.

In *Matter of A-B-*, the Attorney General reaffirmed the duty to determine whether the facts of each case satisfy all the elements for asylum.  *Matter of A-B-*, 27 I&N Dec. at 340 ("The respondent must present facts that undergird each of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of the legal requirements for asylum.").  The officer must determine the applicant's credibility in making findings of fact.  *Id.* at 341–42.  If an asylum application is fatally flawed on one essential ground—"for example, for failure to show membership in a proposed social group"—then a USCIS officer need not examine the remaining elements for asylum.  *Id.* at 340.

### III. Proving Persecution or a Well-Founded Fear of Persecution Based on Membership in a Particular Social Group

As an initial matter, an applicant seeking asylum or refugee status based on membership in a particular social group must present facts that clearly identify the proposed particular social group. *Matter of A-B-*, 27 I&N Dec. at 344 ("an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group.").

For claims based on membership in a particular social group, an applicant has the burden to prove: (1) membership in a particular group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; (2) that her membership in that group is a central reason for her persecution; and (3) that the alleged harm is inflicted by the government of her home country or by persons that the government is unwilling or unable to control. INA § 208(b)(1)(B)(i); *Matter of A-B-*, 27 I&N Dec. at 320.

#### A. Legal Framework for Analysis of Particular Social Group Claims

##### i. Immutability

The members of a proposed social group must have "a common immutable characteristic." *Matter of A-B-*, 27 I&N Dec. at 320; *see also Matter of M-E-V-G-*, 26 I&N Dec. at 237-38 ("Our interpretation of the phrase 'membership in a particular social group' incorporates the common immutable characteristic standard set forth in *Matter of Acosta*, 19 I&N Dec. [211,] 233 [(BIA 1985)], because members of a particular social group would suffer significant harm if asked to give up their group affiliation, either because it would be virtually impossible to do so or because the basis of affiliation is fundamental to the members' identities or consciences.").

##### ii. Particularity

The Attorney General reaffirmed that the particular social group also must be defined with particularity. *Matter of A-B-*, 27 I&N Dec. at 320, 335-36. A group is particular if the "group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* at 330 (citing *Matter of E-A-G-*, 24 I&N Dec. 591, 594 (BIA 2008)). A particular social group must not be "amorphous, overbroad, diffuse, or subjective," and "not every 'immutable characteristic' is sufficiently precise to define a particular social group." *Id.* at 335 (citing *Matter of M-E-V-G-*, 26 I&N Dec. at 239). For example, the combined terms "married," "women," and "unable to leave the relationship" are unlikely to be sufficiently particular even though the terms "married" and "women" may independently have commonly understood definitions within the relevant society. *See Matter of A-B-*, 27 I&N Dec. at 335. Officers must analyze each case on its own merits in the context of the society where the claim arises. An officer's analysis of a proposed social group is incomplete whenever the defining terms of the proposed group are analyzed in isolation, rather than collectively. *See id.*

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 4

Similarly, the Attorney General addressed proposed groups defined by their vulnerability to crime. A "particular" social group is a specific segment of the population. *See id.* at 322. Persecution on account of a protected ground can occur within the context of generalized violence. *See, e.g.*, *Konan v. Att'y Gen. of the U.S.*, 432 F.3d 497, 503-06 (3d Cir. 2005); *Vente v. Gonzales*, 415 F.3d 296, 301-02 (3d Cir. 2005); *Matter of Villalta,* 20 I&N Dec. 142 (BIA 1990). However, in societies where virtually *everyone* is at risk of crime—or broad swaths of society are at risk of crime—groups defined by vulnerability to crime are not a subdivision of the society, but instead are typical of the society as a whole. *See Matter of A-B-*, 27 I&N Dec. at 335. "[G]roups comprising persons who are 'resistant to gang violence' and susceptible to violence from gang members on that basis 'are too diffuse to be recognized as a particular social group.' . . . Victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group." *Id.* at 335. Thus, "[s]ocial groups defined by their vulnerability to private criminal activity likely lack the particularity required . . . given that broad swaths of society may be susceptible to victimization." *Id.*

### iii. Social Distinction

The Attorney General also reaffirmed that to satisfy the social distinction requirement, a particular social group "must be perceived as a group by society." *Id.* at 330. "[I]f the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *Id.* (citing *Matter of M-E-V-G-*, 26 I&N Dec. at 238). In other words, "[m]embers of a particular social group will generally understand their own affiliation with that group, as will other people in their country." *Id.*

The Attorney General offered examples of how these last two requirements of a particular social group—particularity and social distinction—work together. If a group is defined too narrowly, such as "Guatemalan women who are unable to leave their domestic relationships where they have children in common," then the group will likely not be socially distinct. *Id.* at 336. But if the proposed group is too broad, such as persons who are "resistant to gang violence" and susceptible to violence from gang members on that basis, then the group will likely not have definable boundaries and thus not be particular. *Id.* at 335. This is why the evidence presented must precisely demonstrate the particular social group claimed.[2]

In contrast, a tribe or a clan often constitutes a particular social group, because they have highly recognizable, immutable characteristics that have discrete boundaries. *Id.* at 336. As with all proposed particular social groups, officers should carefully apply the statutory factors to determine whether the group qualifies under the law.

---

[2] Asylum officers are reminded that interviews are to be conducted in a nonadversarial manner with the purpose to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. *See* 8 C.F.R. § 208.9(b).

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 5

### iv. Defined Independently of the Persecution at Issue

The Attorney General reaffirmed in *Matter of A-B-* that, to be cognizable, a particular social group "must exist independently of the harm asserted." 27 I&N Dec. at 334; *see also id*. at 335 ("The individuals in the group must share a narrowing characteristic other than their risk of being persecuted" (quoting *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005))). This requirement is essential because otherwise, "the definition of the group moots the need to establish actual persecution." *Id.*

The proposed group in *Matter of A-B-* was "married women in Guatemala who are unable to leave their relationship." *Id*. at 336. The Attorney General observed that this formulation "was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by [the] harm or threatened harm." *Id*. at 335. Such a formulation would generally not share a "'narrowing characteristic other than their risk of being persecuted.'" *Id*. (quoting *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005). Indeed, the Attorney General criticized *Matter of A-R-C-G-*, which "never considered" whether this proposed particular social group met this requirement. *Id.*

The above analysis casts doubt on whether a particular social group defined solely by the ability to leave a relationship can be sufficiently particular. Even if "unable to leave" were particular, the applicant must show something more than the danger of harm from an abuser if the applicant tried to leave, because that would amount to circularly defining the particular social group by the harm on which the asylum claim was based. Officers should carefully examine any proposed particular social group to ascertain whether it contains any attributes that "exist independently of the harm asserted."

### B. Proving Persecution, Nexus, and Internal Relocation

#### i. Persecution

Applicants must demonstrate past persecution or the requisite likelihood of future persecution.[3] The Attorney General observed that "persecution" consists of three elements: (1) it involves "an intent to target a belief or characteristic," (2) "the level of harm must be severe," and (3) "the harm or suffering must be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Matter of A-B-*, 27 I&N Dec. at 337 (quotation marks omitted); *see also id.* (observing that "private criminals are more often motivated by greed or vendettas than by an intent to 'overcome the protected characteristic of the victim'" (quoting *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996) (alterations omitted))).

---

[3] Persecution is defined as "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985), *modified on other grounds*, *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). As used in section 101(a)(42)(A) of the INA, the word "persecution" "clearly contemplates that harm or suffering must be inflicted upon an individual . . . for possessing a belief or characteristic a persecutor seeks to overcome." *Id*. at 223, *as modified by Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996); *see Matter of A-B-*, 27 I&N Dec. at 337 (citing *Matter of Kasinga*). It "does not embrace harm arising out of civil strife or anarchy," a definition specifically rejected by Congress by excluding the term "displaced persons" from the Senate's version of the Refugee Act of 1980. *Id.*

In a case where the alleged persecutor is not affiliated with the government, the applicant must show the government is unable or unwilling to protect him or her. *Id.* at 337. When the harm is at the hands of a private actor, the applicant must show more than the government's difficulty controlling the private behavior. The applicant must show the government condoned the private actions or at least demonstrated a complete helplessness to protect the victim. *Id.* (asylum claim not established where "the respondent was able to divorce and move away from her ex-husband, [the alleged persecutor,] and that she was able to obtain from the El Salvadoran government multiple protective orders against him.").

The mere fact that a country has civil strife or anarchy resulting in displaced persons or that it has problems effectively policing certain crimes, like domestic violence or gang-related activities, or that certain populations are or are more likely to become victims of crimes or violence, cannot, by itself, establish eligibility for asylum or refugee status. *See id.* at 337-38, 343-44.

**In general, in light of the above standards, claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution.** *Id.* at 320; *see also id.* ("While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address."); *id.* at 337–38 ("The fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States. There may be many reasons why a particular crime is not successfully investigated and prosecuted. Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it."). *Id.*

   ii.  Nexus

Membership in the particular social group must also be a central reason for the persecution. Aliens may suffer threats to their lives or freedom, or experience suffering or harm for a number of reasons, including social, economic, family, or personal circumstances. But, as the Attorney General emphasized in *Matter of A-B-*, "the asylum statute does not provide redress for all misfortune." *Id.* at 318. The asylum statute was not intended as a remedy for "the numerous personal altercations that invariably characterize economic and social relationships." *Id.* at 322. As such, when a private actor inflicts violence based on a personal relationship with the victim, the victim's membership in a larger group often will not be "one central reason" for the abuse. *Id.* at 338–39. In a particular case, the evidence may establish that a victim of domestic violence was attacked based solely on her preexisting personal relationship with her abuser. Also, even if the persecutor is a member of the government, there is no governmental nexus if the dispute is a "purely personal matter." *Id.* at 339 n.10.

   iii.  Internal Relocation

All officers must also consider whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum or refugee status. *Id.* at 345 ("Beyond the standards that victims of private violence must meet in proving refugee status in the first instance, they face the

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 7

additional challenge of showing that internal relocation is not an option (or in answering DHS's evidence that relocation is possible). When the applicant has suffered personal harm at the hands of only a few specific individuals, internal relocation would seem more reasonable than if the applicant were persecuted, broadly, by her country's government."). If an asylum applicant does not show past persecution, then he or she "bear[s] the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or government-sponsored." 8 C.F.R. § 208.13(b)(3)(i). If the asylum applicant does establish past persecution or if the persecutor is a government or is government-sponsored, then the officer must presume that internal relocation is unreasonable "unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate." *Id.* § 208.13(b)(3)(ii). In cases where internal relocation presents a reasonable solution, the officer should deny the applicant's claim consistent with the regulations. *Id* § 208.13(b)(1)(i)(B), (b)(2)(ii).

### C. Evaluating Credibility

An officer must also take into account an applicant's overall credibility when adjudicating a reasonable fear, credible fear, asylum, or refugee claim. There is no presumption of credibility for such claims. Rather, the applicant must demonstrate that he or she is credible. A negative credibility determination alone is sufficient to deny an asylum application and, consequently, to issue a negative credible fear or reasonable fear determination. *See* INA §§ 208(b)(1)(B)(iii), 235(b)(1)(B)(v), 241(b)(3)(C).

To determine whether an applicant or a witness is credible, the officer must consider the totality of the circumstances and all relevant factors, including the demeanor, candor, or responsiveness of the applicant; the inherent plausibility of the applicant's account; the consistency between the applicant's written and oral statements; and any inaccuracies or falsehoods in such statements. INA § 208(b)(1)(B)(iii); *see also Matter of J-Y-C*, 24 I&N Dec. at 262. Whether the inconsistencies, inaccuracies, or falsehoods go to the heart of the applicant's claim are irrelevant. INA § 208(b)(1)(B)(iii); *see also Matter of J-Y-C*, 24 I&N Dec. at 262.

### IV.    Exercising Discretion

Finally, the Attorney General emphasized in *Matter of A-B-* that asylum is a *discretionary* form of relief from removal. Therefore, once an officer has determined that an applicant is eligible for asylum, he or she must then decide whether to favorably exercise discretion by granting asylum. "[A] favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA." *Id.* at 345 n.12.

In exercising discretion, officers should consider any relevant factor, including but not limited to: "the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether he or she made any attempts to seek asylum before coming to the United States; the length of time the alien remained in a third country; and his or her living conditions, safety, and potential for long-term residency there." *Id.* (citing *Matter of Pula*, 19 I&N Dec. 467, 473–74 (BIA 1987)). Of particular note, the BIA has held that unlawful entry

"is a proper and relevant discretionary factor" and can even be a "serious adverse factor," but "should not be considered in such a way that the practical effect is to deny relief in virtually all cases" and that "the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution should be examined in determining whether a favorable exercise of discretion is warranted." *Pula*, 19 I&N at 473. The BIA has also instructed that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." *Matter of Kasinga*, 21 I&N Dec. 357, 367 (BIA 1996).

Specifically, USCIS personnel may find an applicant's illegal entry, including any intentional evasion of U.S. authorities, and including any conviction for illegal entry where the alien does not demonstrate good cause for the illegal entry, to weigh against a favorable exercise of discretion. In particular, "the circumvention of orderly refugee procedures" factor may take into account whether the alien entered the United States without inspection and, if not, whether the applicant had other ways to lawfully enter this country. For example, the applicant might show that the illegal entry was necessary to escape imminent harm and that he or she was thereby prevented from presenting himself or herself at a designated United States POE. An officer should consider whether the applicant demonstrated ulterior motives for the illegal entry that are inconsistent with a valid asylum claim that the applicant wished to present to U.S. authorities.

## V.    Credible Fear and Reasonable Fear Interviews

When aliens who are inadmissible under INA § 212(a)(6)(C) or § 212(a)(7) indicate either an intention to apply for asylum under INA § 208 or a fear of persecution or torture, an asylum officer will conduct a credible fear interview. INA § 235(b)(1)(A)(ii). Credible fear means a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208." *Id.* § 235(b)(1)(B)(v).

An asylum officer will conduct a reasonable fear interview when an alien is subject to either, (1) a final administrative removal order under INA § 238(b) or (2) a prior reinstated order of removal, exclusion, or deportation under INA § 241(a)(5), and indicates a fear of persecution or torture. The "reasonable possibility" standard is the same standard required to establish eligibility for asylum (the "well-founded fear" standard). The reasonable fear standard in this context is used not as part of an eligibility determination for asylum, but rather as a screening mechanism to determine whether an individual may be able to establish entitlement in Immigration Court to INA § 241(b)(3) withholding of removal, or withholding or deferral of removal pursuant to the regulations implementing the U.S. obligations under Article 3 of the Convention against Torture.

When conducting a credible fear or reasonable fear interview, an asylum officer must determine what law applies to the applicant's claim. The asylum officer should apply all applicable precedents of the Attorney General and the BIA, *Matter of E-L-H-*, 23 I&N Dec. 814, 819 (BIA 2005), which are binding on all immigration judges and asylum officers nationwide. The asylum officer should also apply the case law of the relevant federal circuit court, to the extent that those cases are not inconsistent with *Matter of A-B-*. *See, e.g.*, *Matter of Fajardo Espinoza*, 26 I&N Dec. 603, 606 (BIA 2015). The relevant federal circuit court is the circuit where the removal proceedings will take place if the officer makes a

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 9

positive credible fear or reasonable fear determination. *See Matter of Gonzalez*, 16 I&N Dec. 134, 135–36 (BIA 1977); *Matter of Waldei*, 19 I&N Dec. 189 (BIA 1984).

But removal proceedings can take place in any forum selected by DHS, and not necessarily the forum where the intending asylum applicant is located during the credible fear or reasonable fear interview. Because an asylum officer cannot predict with certainty where DHS will file a Notice to Appear or Notice of Referral to Immigration Judge, and because there may not be removal proceedings if the officer concludes the alien does not have a credible fear or reasonable fear and the alien does not seek review from an immigration judge, the asylum officer should faithfully apply precedents of the Board and, if necessary, the circuit where the alien is physically located during the credible fear interview.

*Matter of A-B-*, as discussed above in Section III, explained the standards for "eligibility for asylum under section 208" based on a particular social group. Therefore, if an applicant claims asylum based on membership in a particular social group, then officers must factor the above standards into their determination of whether an applicant has a credible fear or reasonable fear of persecution based on membership in a particular social group. Asylum officers should bear in mind that in considering credible or reasonable fear claims, they must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(a)(4).

## VI.    Summary

Under current precedent, including *Matter of A-B-*, *Matter of M-E-V-G-*, and *Matter of W-G-R-*, there are at least five basic inquiries that an officer must make in cases involving membership in a particular social group.

> *First*, the officers must consider whether the facts presented or otherwise known to the officer demonstrate that the applicant is a member of a clearly-defined particular social group, which is composed of members who share a common immutable characteristic, is defined with particularity, is socially distinct within the society in question, and is not defined by the persecution on which the claim is based.

> *Second*, the officer must require the applicant to prove that membership in the group is a central reason for the applicant's persecution.

> *Third*, if the alleged persecutor is not affiliated with the government, the officer must require the applicant to show that the applicant's home government is unwilling or unable to protect him or her.

> *Fourth,* the officer must analyze whether internal relocation in the applicant's home country is possible, would protect the applicant from the feared persecution, and presents a reasonable alternative to a grant of asylum or refugee status.

> *Fifth*, apart from the eligibility standards above, the officer must determine whether the applicant merits a grant of asylum or refugee status in the officer's discretion.

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-*
Page 10

Of course, the applicant must also satisfy all the other elements of the refugee definition in order to be granted asylum or refugee status. The officer must examine each element separately, even though certain types of evidence may be relevant to several elements. For example, evidence relevant to evaluating social distinction for the purpose of deciding whether a particular social group exists is often also relevant to whether the past or feared harm is "on account of" the applicant's membership (or imputed membership) in the particular social group. The same evidence might also be relevant to the government's willingness or ability to protect an applicant from a non-government persecutor. Social attitudes often may affect both an individual persecutor's motivations and government policies and practice. While there are often facts that are relevant to more than one aspect of the analysis, those facts must be analyzed separately, using the appropriate standard, for each element.

Officers should be alert that under the standards clarified in *Matter of A-B-*, few gang-based or domestic-violence claims involving particular social groups defined by the members' vulnerability to harm may merit a grant of asylum or refugee status—or pass the "significant possibility" test in credible-fear screenings, INA § 235(b)(1)(B)(v) or the "reasonable possibility" test in reasonable fear screenings—because an applicant must prove, or establish a significant possibility that, his or her government is unable or unwilling to protect him or her. The mere fact that perfect policing does not exist in the applicant's home country, that the country in question has an extremely high crime rate, or that certain populations are more likely to be targeted by private criminals, does not itself establish the home government is "unable or unwilling" to curb the persecution. Again, the home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution.

## VII.   Contact

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Office of Chief Counsel.

## VIII.   Use

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

2

| From: | Lafferty, John L |
|---|---|
| To: | RAIO - Asylum Field Office Managers; RAIO - Asylum Field Office Staff; RAIO - Asylum HQ |
| Cc: | RAIO - Executive Leadership; Zengotitabengoa, Colleen R |
| Subject: | Asylum Division Interim Guidance - Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018) |
| Date: | Wednesday, June 13, 2018 5:20:37 PM |

Asylum Division colleagues:

I'm sure that most of you have heard and/or read about the decision issued by Attorney General Sessions on Monday in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).

Below is our Office of Chief Counsel's summary of the AG's decision, which is followed by Asylum's summaries of two 2014 BIA decisions - *Matter of M-E-V-G-* and *Matter of W-G-R-* - that were cited by the AG in support of his decision.  While we continue to work with our OCC colleagues on final guidance for the field, we are issuing the following interim guidance on how to proceed with decision-making on asylum cases and CF/RF screening determinations:

- *Matter of A-R-C-G-* has been overruled and can no longer be cited to or relied upon as supporting your decision-making on an asylum case or in a CF/RF determination.
- Effective upon issuance of this guidance, no affirmative grant of asylum or positive CF/RF screening determination should be signed off on by a supervisor as legally sufficient, or issued as a final decision/determination, that specifically cites to or relies upon *Matter of A-R-C-G-* as justification for the result. Instead, it should be returned to the officer for reconsideration consistent with the next bullet.
- All pending and future asylum decisions and CF/RF screening determinations finding that the individual has shown persecution or a well-founded fear of persecution on account of membership in a particular social group must require that the applicant meet the relevant standard by producing evidence that establishes ALL of the following:
  - A cognizable particular social group that is 1) composed of members who share a common immutable characteristic, 2) defined with particularity, and 3) socially distinct within the society in question;
  - Membership in that PSG;
  - That membership in the PSG was or is a central reason for the past and/or future persecution; and
  - The harm was and/or will be inflicted by the government or by non-governmental actors that the government is unable or unwilling to control.
    - When the harm is at the hands of a non-governmental actor, the applicant must show that the government condoned the behavior or demonstrated a complete helplessness to protect the victim. This new decision stresses that, in applying this standard, "[t]he fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States.  There may be many reasons why a particular crime is not successfully investigated and prosecuted.  Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it." A-B- at 337-338.  (see RAIO Lesson Plan - Definition of

<u>Persecution and Eligibility Based on Past Persecution</u>, Section 4.2 "Entity the Government Is Unable or Unwilling to Control", for further guidance).

- The mere fact that a country may have problems effectively policing certain crimes or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

- Every asylum decision and CF/RF screening determination must consider and analyze whether internal relocation would be reasonable, as provided for at 8 CFR 208.13 (b).

If you have any questions on this interim guidance, please raise them up your local chain of command so that they can be brought to the attention of HQ Asylum QA Branch.

Thank you!!

---

<u>OCC Summary</u>

On June 11, 2018, the Attorney General (AG) issued a precedent decision in Matter of A-B-, 27 I&N Dec. 316 (A.G. 2018), an asylum case based on domestic violence in which the AG addressed issues relating to whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable particular social group for purposes of asylum and statutory withholding of removal.  In the decision, the AG overruled the Board of Immigration Appeals' (BIA) precedent decision in Matter of A-R-C-G-, 26 I&N Dec. 388 (BIA 2014), on which the BIA had relied in finding the respondent eligible for asylum.  The AG found that, in analyzing the particular social group at issue in A-R-C-G-, "married women in Guatemala who are unable to leave their relationship," the BIA had failed to correctly apply the legal standards for cognizable particular social group set forth in Matter of M-E-V-G, 26 I&N Dec. 227 (BIA 2014), and Matter of W-G-R-, 26 I&N Dec. 208 (BIA 2014), which require that a group be composed of members who share a common immutable characteristic, defined with particularity, and socially distinct within the society in question.  In addition, the AG articulated that membership in the particular social group must be a central reason for the persecution, and asylum officers must consider whether internal relocation is reasonable in every case before granting asylum.  In cases where the persecutor is a non-government actor, the applicant must show the government condoned the behavior or demonstrated a complete helplessness to protect the victim.

Under 8 CFR 1003.1(g), "decisions of the [BIA], and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security …" and "shall serve as precedents in all proceedings involving the same issue or issues."  Accordingly, Matter of A-B- is effective immediately and binding on officers.  Officers should not cite or rely upon Matter of A-R-C-G- in any adjudications going forward.  Officers should continue to follow other binding precedent to the extent they are consistent with Matter of A-B-, including Matter of M-E-V-G and Matter of W-G-R-, both of which were cited favorably in the AG's decision.  As a reminder, we have reproduced below the guidance issued in 2014 in reference to those decisions.

Further guidance will be forthcoming as we continue to review the decision in Matter of A-B- and consult with other components of DHS.

***Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014)** – available at

http://www.justice.gov/eoir/vll/intdec/vol26/3795.pdf

The respondent in *M-E-V-G-* was a citizen of Honduras who feared persecution at the hands of gangs in Honduras.  He claimed membership in a PSG of Honduran youth who have been actively recruited by gangs but who have refused to join because they oppose the gang.  The Board decided *M-E-V-G-* on remand from the Third Circuit, following oral arguments before the Board in December 2012.  *See Valdiviezo-Galdamez v. Attorney General of the U.S.,* 663 F.3d 582 (3d Cir. 2011).

In response to the Third Circuit's remand of *Validiviezo-Galdamez,* the Board in *M-E-V-G-* posited a three-part test to flesh out the definition of a PSG.  An applicant for asylum or withholding of removal seeking relief based on "membership in a particular social group" must establish that the group is: (1) composed of members who share a common **immutable** characteristic; (2) defined with **particularity**; and (3) **socially distinct** within the society in question.  The Board noted that when *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), was decided, there were few PSG claims, but the experience of three decades indicated that *Acosta* has led to confusion and inconsistency.  The Board noted that it added the social visibility and particularity requirements as a refinement in order to provide clarification.  The Board reasoned that a refinement is necessary because in making the PSG ground like the other protected grounds of race, religion, nationality, and political opinion, the protected grounds share not only an immutable characteristic, but also "an external perception component within a given society."  *M-E-V-G-*, 26 I&N Dec. at 236.

Specifically, the Board in *M-E-V-G-* renamed the "social visibility" requirement as "social distinction," clarifying that social distinction does not require literal visibility or "outwardly observable characteristics."  26 I&N Dec. at 238.  Rather, social distinction involves examining whether "those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it."  *Id*.  The Board also clarified that social distinction relates to society's, not the persecutor's, perception, though the persecutor's perceptions may be relevant to social distinction.  The Board defined particularity as requiring that a group "be defined by characteristics that provide a clear benchmark for determining who falls within the group."  *Id*. at 239.  Membership in a PSG can be established through "[e]vidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like."  *Id*. at 244.

The Board in *M-E-V-G-* noted that it had rejected the respondent's gang-related claim in the past based on its decisions in the companion cases of *Matter of S-E-G-*, 24 I&N Dec. 579 (BIA 2008), and *Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008).  The Board, however, acknowledged that *S-E-G-* and *E-A-G-* "should not be read as a blanket rejection of all factual scenarios involving gangs."  *M-E-V-G-*, 26 I&N Dec. at 251.  The Board remanded *M-E-V-G-* to the Immigration Judge for further proceedings consistent with the Board's clarifications.

***Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014)** – available at
http://www.justice.gov/eoir/vll/intdec/vol26/3794.pdf

The respondent in *W-G-R-* was a citizen of El Salvador who was a member of the Mara 18 gang for

less than a year and who was attacked by members of his former gang after he left the gang.  The respondent claimed that he feared persecution on account of his membership in a PSG consisting of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership."  An Immigration Judge found that the respondent did not establish that he was persecuted on account of his membership in a PSG.

On appeal, the Board found that the respondent did not establish that "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" constitute a PSG or that there is a nexus between the harm feared by the applicant and his status as a former gang member.

The Board in *W-G-R-* first determined that the respondent is not a member of a PSG.  According to the Board, the group of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" does not constitute a PSG because it fails both the particularity and social distinction requirements.  On particularity, the Board required further specificity, stating that "when a former association is the immutable characteristic that defines a proposed group, the group will often need to be further defined with respect to the duration or strength of the members' active participation in the activity and the recency of their active participation.…"  26 I&N Dec. at 221-22.  On social distinction, the Board found little evidence that Salvadoran society recognized the proposed PSG as a distinct group.  While the Board referenced one report asserting a stigma against tattooed former gang members, the Board questioned whether the discrimination was instead due to the difficulty in distinguishing former gang members from individuals suspected to be active gang members.

In addition, the Board concluded that the respondent's claim lacked a nexus between the feared harm and his status as a former gang member.  The Board attributed the gang's motives to their "desire to enforce their code of conduct and punish infidelity to the gang," rather than the respondent's status as a former gang member.  *W-G-R-*, 26 I&N Dec. at 224.  Accordingly, the respondent's appeal was dismissed.

USCIS000014

3

📄 KeyCite Yellow Flag - Negative Treatment
Distinguished by United States v. Reyes-Romero, W.D.Pa., July 2, 2018

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

U.S. Department of Justice

Office of the Attorney General

MATTER OF A-B-, RESPONDENT

Decided by Attorney General June 11, 2018

**\*\*1  \*316**  (1) *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014) is overruled. That decision was wrongly decided and should not have been issued as a precedential decision.

(2) An applicant seeking to establish persecution on account of membership in a "particular social group" must demonstrate: (1) membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; and (2) that membership in the group is a central reason for her persecution. When the alleged persecutor is someone unaffiliated with the government, the applicant must also show that her home government is unwilling or unable to protect her.

(3) An asylum applicant has the burden of showing her eligibility for asylum. The applicant must present facts that establish each element of the standard, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of those elements.

(4) If an asylum application is fatally flawed in one respect, an immigration judge or the Board need not examine the remaining elements of the asylum claim.

(5) The mere fact that a country may have problems effectively policing certain crimes or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

(6) To be cognizable, a particular social group must exist independently of the harm asserted in an application for asylum.

(7) An applicant seeking to establish persecution based on violent conduct of a private actor must show more than the government's difficulty controlling private behavior. The applicant must show that the government condoned the private actions or demonstrated an inability to protect the victims.

(8) An applicant seeking asylum based on membership in a particular social group must clearly indicate on the record the exact delineation of any proposed particular social group.

(9) The Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum.

**\*317**  BEFORE THE ATTORNEY GENERAL

On March 7, 2018, I directed the Board of Immigration Appeals ("Board") to refer for my review its decision in this matter, see 8 C.F.R. § 1003.1(h)(1)(i), and I invited the parties and any interested amici to submit briefs addressing questions relevant to that certification. *Matter of A-B-*, 27 I&N Dec. 227 (A.G. 2018). Specifically, I sought briefing on

whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

**\*\*2** For the reasons set forth in the accompanying opinion, I vacate the Board's December 6, 2016 decision and remand this case to the immigration judge for further proceedings. Consistent with the test developed by the Board over the past several decades, an applicant seeking to establish persecution on account of membership in a "particular social group" must satisfy two requirements. First, the applicant must demonstrate membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question. And second, the applicant's membership in that group must be a central reason for her persecution. When, as here, the alleged persecutor is someone unaffiliated with the government, the applicant must show that flight from her country is necessary because her home government is unwilling or unable to protect her.

Although there may be exceptional circumstances when victims of private criminal activity could meet these requirements, they must satisfy established standards when seeking asylum. Such applicants must establish membership in a particular and socially distinct group that exists independently of the alleged underlying harm, demonstrate that their persecutors harmed them on account of their membership in that group rather than for personal reasons, and establish that the government protection from such harm in their home country is so lacking that their persecutors' actions can be attributed to the government. Because *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), recognized a new particular social group without correctly applying these standards, I overrule that case and any other Board precedent to the extent those other decisions are inconsistent with the legal conclusions set forth in this opinion.

OPINION

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum if an alien is unable or unwilling to return to her country of origin because she has suffered past persecution or has a well- **\*318** founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(a), (b)(i). A recurring question in asylum law is determining whether alleged persecution was based on their membership in a """"particular social group." Over the past thirty years, this question has recurred frequently before the Board and the courts of appeals, and the standard has evolved over time.

The prototypical refugee flees her home country because the government has persecuted her--either directly through its own actions or indirectly by being unwilling or unable to prevent the misconduct of non-government actors--based upon a statutorily protected ground. Where the persecutor is not part of the government, the immigration judge must consider both the reason for the harm inflicted on the asylum applicant and the government's role in sponsoring or enabling such actions. An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet the asylum statute does not provide redress for all misfortune. It applies when persecution arises on account of membership in a protected group and the victim may not find protection except by taking refuge in another country.

**\*\*3** The INA does not define "persecution on account of . . . membership in a particular social group." The Board first addressed the term in *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), where it interpreted a "particular social group" in a manner consistent with the other four grounds of persecution identified in section 1101(a)(42)(A)--race, religion, nationality, or political opinion. *Id.* The Board concluded that a "particular social group" required a "group of persons all of whom share a common, immutable characteristic" that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* The Board noted that the "shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances, it might be a shared past experience such as former military leadership or land ownership." *Id.*

USCIS000016

In *Matter of R-A-*, 22 I&N Dec. 906, 917-23 (BIA 1999) (en banc), the Board considered whether a victim of domestic violence could establish refugee status as a member of a particular social group consisting of similarly situated women. The Board held that the mere existence of shared circumstances would not turn those possessing such characteristics into a particular social group. *Id.* at 919. Rather, the members of a particular social group must not merely share an immutable characteristic, but must also be recognized as a distinct group in the alien's society, *id.* at 918-19, and the persecution must be motivated by membership in that social group, *id.* at 919-22. Attorney General Reno vacated that decision for reconsideration in **\*319** light of a proposed regulation, *see* 22 I&N Dec. 906, 906 (A.G. 2001), but no final rule ever issued, and the case was eventually resolved in 2009 without further consideration by the Board. Despite the vacatur of *R-A-*, both the Board and the federal courts have continued to treat its analysis as persuasive.

In the years after *Matter of R-A-*, the Board refined the legal standard for particular social groups. By 2014, the Board had clarified that applicants for asylum seeking relief based on "membership in a particular social group" must establish that their purported social group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G*, 26 I&N Dec. 227, 237 (BIA 2014). Applicants must also show that their membership in the particular social group was a central reason for their persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Matter of W-G-R-*, 26 I&N Dec. 208, 224 (BIA 2014). Where an asylum applicant claims that the persecution was inflicted by private conduct, she must also establish that the government was unable or unwilling to protect her. *See, e.g., Acosta*, 19 I&N Dec. at 222.

**\*\*4** Later that year, the Board decided *A-R-C-G-*, which recognized "married women in Guatemala who are unable to leave their relationship" as a particular social group--without performing the rigorous analysis required by the Board's precedents. 26 I&N Dec. at 389; *see id.* at 390-95. Instead, the Board accepted the concessions by the Department of Homeland Security ("DHS") that the respondent suffered harm rising to the level of past persecution, that she was a member of a qualifying particular social group, and that her membership in that group was a central reason for her persecution. *Id.* at 395.

I do not believe *A-R-C-G-* correctly applied the Board's precedents, and I now overrule it. The opinion has caused confusion because it recognized an expansive new category of particular social groups based on private violence. Since that decision, the Board, immigration judges, and asylum officers have relied upon it as an affirmative statement of law, even though the decision assumed its conclusion and did not perform the necessary legal and factual analysis. When confronted with asylum cases based on purported membership in a particular social group, the Board, immigration judges, and asylum officers must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements set forth in *M-E-V-G* and *W-G-R-*.

In this matter, the immigration judge initially denied the respondent's asylum claim, which arises out of allegations of domestic abuse suffered in El Salvador. In reversing the immigration judge's decision, the Board did little more than cite *A-R-C-G-* in finding that she met her burden of **\*320** establishing that she was a member of a particular social group. In addition to failing meaningfully to consider that question or whether the respondent's persecution was on account of her membership in that group, the Board gave insufficient deference to the factual findings of the immigration judge.

For these and other reasons, I vacate the Board's decision and remand for further proceedings before the immigration judge consistent with this opinion. In so doing, I reiterate that an applicant for asylum on account of her membership in a purported particular social group must demonstrate: (1) membership in a particular group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; (2) that her membership in that group is a central reason for her persecution; and (3) that the alleged harm is inflicted by the government of her home country or by persons that the government is unwilling or unable to control. *See M-E-V-G-*, 26 I&N Dec. at 234-44; *W-G-R-*, 26 I&N Dec. at 209-18, 223-24 & n.8. Furthermore, when the applicant is the victim of private criminal activity, the analysis must also """"consider whether government protection is available, internal relocation is possible, and persecution exists countrywide." *M-E-V-G-*, 26 I&N Dec. at 243.

USCIS000017

**\*\*5**  Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. [1] While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address. The mere fact that a country may have problems effectively policing certain crimes--such as domestic violence or gang violence--or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

I.

The respondent, a native and citizen of El Salvador, entered the United States illegally and was apprehended by U.S. Customs and Border Protection agents in July 2014. After being placed in removal proceedings, the respondent filed an application for asylum and withholding of removal under **\*321** the INA, 8 U.S.C. §§ 1158, 1231(b)(3), and for withholding of removal under the regulations implementing the United Nations Convention Against Torture.

The respondent claimed that she was eligible for asylum because she was persecuted on account of her membership in the purported particular social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners. *Matter of A-B-*, Decision Denying Asylum Application at \*8, (Immig. Ct. Dec. 1, 2015). The respondent asserted that her ex-husband, with whom she shares three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage. *Id.* at \*2-3).

In December 2015, the immigration judge denied all relief and ordered the respondent removed to El Salvador. The immigration judge denied the respondent's asylum claim for four independent reasons: (1) the respondent was not credible; (2) the group in which she claimed membership did not qualify as a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A); (3) even if it did, the respondent failed to establish that her membership in a social group was a central reason for her persecution; and (4) she failed to show that the El Salvadoran government was unable or unwilling to help her. *Id.* at \*4-15. The respondent appealed the immigration judge's decision to the Board.

In December 2016, the Board reversed and remanded with an order to grant the respondent asylum after the completion of background checks. *Matter of A-B-*, (BIA Dec. 8, 2016). The Board found the immigration judge's adverse credibility determinations clearly erroneous. *Id.* at \*1-2. The Board further concluded that the respondent's particular social group was substantially similar to "married women in Guatemala who are unable to leave their relationship," which the Board had recognized in *Matter of A-R-C-G-*, 26 I&N Dec. at 390. *A-B-* at \*2. Moreover, the Board held that the immigration judge clearly erred in finding that the respondent could leave her ex-husband, and that the respondent established that her ex-husband persecuted her because of her status as a Salvadoran woman unable to leave her domestic relationship. *Id.* at \*2-3. Finally, the Board determined that the El Salvadoran government was unwilling or unable to protect the respondent. *Id.* at \*3-4.

**\*\*6**  In August 2017, the immigration judge issued an order purporting to certify and administratively return the matter to the Board in light of intervening developments in the law. [2] *Matter of A-B-*, Decision and Order **\*322** of Certification, (Immig. Ct. Aug. 18, 2017). The immigration judge observed that several courts of appeals had recently held that domestic-violence victims failed to prove their entitlement to asylum based on membership in particular social groups. *See id.* at \*2-3 (citing *Fuentes-Erazo v. Sessions*, 848 F.3d 847, 853 (8th Cir. 2017); *Cardona v. Sessions*, 848 F.3d 519, 523 (1st Cir. 2017); *Marikasi v. Lynch*, 840 F.3d 281, 291 (6th Cir. 2016); *Vega-Ayala v. Lynch*, 833 F.3d 34, 40 (1st Cir. 2016)). The immigration judge thus believed that the precedents relied upon by the Board in its December 2016 decision were no longer good law. *A-B-* at \*3-4 (Immig. Ct. Aug. 18, 2017).

USCIS000018

In particular, the immigration judge cited the Fourth Circuit's opinion in *Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017), which denied the petition for review on the ground that the alien had not established that her alleged persecution was on account of her membership in a particular social group. *A-B-* at *3-4 (Immig. Ct. Aug. 18, 2017) (citing *Velasquez*, 866 F.3d at 197). Distinguishing *A-R-C-G-* because of DHS's concessions there, 866 F.3d at 195 n.5, the court in *Velasquez* reiterated that "'[e]vidence consistent with acts of private violence or that merely shows that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground."DDD' *Id.* at 194 (quoting *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)). The court further noted, "'the asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships."DDD' *Id.* at 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)).

In a concurrence, Judge Wilkinson reiterated that the particular social groups protected from persecution under the asylum statute must be understood in the context of the other grounds for protection, which concern specific segments of the population who are marginalized or subjected to social stigma and prejudice. *Id.* at 198 (Wilkinson, J., concurring). Noting that victims of private violence were "seizing upon the 'particular social group' criterion in asylum applications," Judge Wilkinson considered the example of applicants who claim to be the victims of gang violence. Aliens seeking asylum on that basis "are often not 'exposed to more violence or human rights violations than other segments of society,' and 'not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests."DDD' *Id.* at 199 (quoting *Matter of S-E-G-*, 24 I&N Dec. 579, 587 (BIA 2008)). He recognized that the Board "has previously explained that 'victims of gang violence come from all segments of society, and it is difficult to conclude that any "group," *323 as actually perceived by the criminal gangs, is much narrower than the general population."DDD' *Id.* (quoting *M-E-V-G-*, 26 I&N Dec. at 250). The pervasive nature of this violent criminality, in Judge Wilkinson's view, suggested that membership in a purported particular social group "is often not a central reason for the threats received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies." *Id.*

**7 On March 7, 2018, pursuant to 8 C.F.R. § 1003.1(h)(1)(i), I directed the Board to refer this matter to me for my review. I invited the parties and any interested amici to submit briefs on the following question:

Whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

*A-B-*, 27 I&N Dec. at 227. After certifying this case, I received party submissions from the respondent and DHS and twelve amicus briefs.

II.

As a threshold matter, I address the respondent's procedural objections concerning my authority to review this case and the certification procedure.

A.

The respondent argues that I lack the authority to certify the Board's decision because it did not reacquire jurisdiction following its remand to the immigration judge. In the respondent's view, the Attorney General's authority to certify and review immigration cases is restricted to cases over which the Board expressly retains jurisdiction, excluding any cases that have been remanded for further proceedings. This restrictive interpretation of my jurisdiction finds no support in the law.

Under the INA, "[t]he Attorney General enjoys broad powers with respect to ""the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens."DDD' *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004) (quoting 8 U.S.C. § 1103(a)(1)); *see also Henderson v. INS*, 157 F.3d 106, 126

USCIS000019

[2d Cir. 1998)](#) ("[T]he extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique."); *Matter of D-J-,* 23 I&N Dec. 572, 573-74 & n.3 (A.G. 2003) (describing Attorney General's review authority under 8 U.S.C. § 1226(a)). The INA grants the Attorney General the authority to """"review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the **\*324** Attorney General determines to be necessary for carrying out" his duties related to the immigration and naturalization of aliens. 8 U.S.C. § 1103(g)(2). This authority includes the power to refer cases for my review, *see* 8 C.F.R. § 1003.1(h)(1), which the First Circuit has called an "unfettered grant of authority," *Xian Tong Dong v. Holder,* 696 F.3d 121, 124 (1st Cir. 2012). Nothing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge.

**\*\*8** It is likewise irrelevant that there has not been a final decision from the Board either granting or denying relief. The relevant federal regulation states: "The Board shall refer to the Attorney General for review of its decision all cases that . . . the Attorney General directs the Board to refer to him." 8 C.F.R § 1003.1(h)(1). Nothing in section 1003.1(h) requires, or even suggests, that the only Board "decisions" the Attorney General can review are *final* decisions that definitively grant or deny relief to a respondent. Nor do the applicable regulations or the INA define "decision" as a "final" decision. *See id.* § 1001.1 (defining terms in the relevant chapter); 8 U.S.C. § 1101 (defining terms under the Act).

B.

Both the respondent and certain amici also raise due process concerns with my certification of this matter. They argue principally that my certification improperly bypassed the Board and deprived it of the opportunity to consider the certified question in the first instance. The Board exercises "only the authority provided by statute or delegated by the Attorney General," *Matter of Castro-Tum,* 27 I&N Dec. 271, 282 (A.G. 2018), and the regulations allow the Attorney General to certify any case that is before the Board or where it has rendered a decision, 8 C.F.R § 1003.1(h). In any event, the respondent has already received full and fair opportunities to present her asylum claim before both the immigration judge and the Board. After those proceedings, both the immigration judge and the Board issued written decisions that analyzed the validity of the respondent's proposed particular social group and whether the respondent qualified for asylum on that ground.

The respondent also argues that the certification violated her due process rights because alleged "irregularities" in the certification "reflect prejudgment of her claim and lack of impartiality, in contravention of her right to a full and fair hearing by a neutral adjudicator." [3] There is no basis **\*325** to this claim. The respondent and some amici complain that I have advanced policy views on immigration matters as a U.S. Senator or as Attorney General, but the statements they identify have no bearing upon my ability to faithfully discharge my legal responsibilities in this case. I have made no public statements regarding the facts of respondent's case, and I have no "personal interest in the outcome of the proceedings." *Strivers v. Pierce,* 71 F.3d 732, 741 (9th Cir. 1995).

Nor is there any requirement that an administrator with significant policymaking responsibilities withdraw from "interchange and discussion about important issues." *Ass'n of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1168 (D.C. Cir. 1979). As the Supreme Court has held, a decision maker need not be "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'DDD' *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493 (1976) (*quoting United States v. Morgan,* 313 U.S. 409, 421 (1941)). If policy statements about immigration-related issues were a basis for disqualification, then no Attorney General could fulfill his or her statutory obligations to review the decisions of the Board.

III.

USCIS000020

**\*\*9**  I turn now to the question of whether, and under what circumstances, being a victim of private criminal activity constitutes persecution on account of membership in a particular social group. [4]

A.

An applicant for asylum bears the burden of establishing that she "is a refugee within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. § 1158(b)(1)(A), (B)(i). Under that definition, the applicant must demonstrate that she is an alien outside her country of nationality "who is  **\*326**  unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). Here, the respondent claims that she is eligible for asylum because of persecution she suffered on account of her purported membership in a particular social group--"El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners.

As the Board and the federal courts have repeatedly recognized, the phrase "'""membership in a particular social group" is ambiguous. *Matter of Acosta,* 19 I&N Dec. at 232-33; *Matter of M-E-V-G-,* 26 I&N Dec. at 230; *Matter of W-G-R-,* 26 I&N at 209; *see also*, *e.g.*, *Ngugi v. Lynch,* 826 F.3d 1132, 1138 (8th Cir. 2016); *Gonzalez v. U.S. Att'y Gen.,* 820 F.3d 399, 404 (11th Cir. 2016); *Henriquez-Rivas v. Holder,* 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc); *Mayorga-Vidal v. Holder,* 675 F.3d 9, 17 (1st Cir. 2012); *Valdiviezo-Galdamez v. U.S. Att'y Gen.,* 663 F.3d 582, 612 (3d Cir. 2011). Neither the INA nor the implementing regulations define "particular social group." [5]  "The concept is even more elusive because there is no clear evidence of legislative intent." *Valdiviezo-Galdamez,* 663 F.3d at 594. As then-Judge Alito noted for the court, "[r]ead in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.' Thus, the statutory language standing alone is not very instructive." *Fatin v. INS,* 12 F.3d 1233, 1238 (3d Cir. 1993) (Alito, J.).

 **\*\*10**  The Attorney General has primary responsibility for construing ambiguous provisions in the immigration laws. *M-E-V-G-,* 26 I&N Dec. at 230; *see also* 8 C.F.R. § 1003.1(g). The INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). The Attorney General's reasonable construction of an ambiguous term in the Act, such as "membership in a particular social group," is entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984); *see also Negusie v. Holder,* 555 U.S. 511, 516 (2009)  **\*327**  ("'""Consistent with the rule in *Chevron* . . ., the BIA is entitled to deference in interpreting ambiguous provisions of the INA."); *id. at* 525 (Scalia, J., concurring) (citing *Chevron* and agreeing that "the agency is entitled to answer" whether the alien is statutorily barred from receiving asylum); *Aguirre-Aguirre,* 526 U.S. at 425 ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations" (quotations omitted)). Thus, every court of appeals to have considered the issue has recognized that the INA's reference to the term ""particular social group" is inherently ambiguous and has deferred to decisions of the Board interpreting that phrase. [6]

The Supreme Court has "also made clear that administrative agencies are not bound by prior judicial interpretations of ambiguous statutory interpretations, because there is 'a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."'DDD' *Matter of R-A-,* 24 I&N Dec. 629, 631 (A.G. 2008) (quoting *Brand X,* 545 U.S. at 982 (internal quotation and citations omitted)). "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X,* 545 U.S. at 982.

USCIS000021

B.

**11**  In a number of opinions spanning several decades, the Board has articulated and refined the standard for persecution on account of membership in a "particular social group" so that this category is not boundless. The Board first interpreted the term in *Matter of Acosta*, 19 I&N Dec. at 233. Applying the canon of *ejusdem generis*, the Board concluded that the phrase """"particular social group" should be construed in a manner consistent with the other grounds for persecution in the statute's definition of refugee: race, religion, nationality, and political opinion. *Id.* Noting that each of these terms describes "a characteristic that either is beyond the power  **328**  of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed," the Board concluded that persecution on account of membership in a particular social group must similarly mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." *Id.* The Board stated that this definition "preserve[d] the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Id.* at 234.

In 1999, the Board, sitting *en banc*, considered for the first time "whether the repeated spouse abuse inflicted on the respondent makes her eligible for asylum as an alien who has been persecuted on account of her membership in a particular social group." *R-A-*, 22 I&N Dec. at 907. In a thorough, well-reasoned opinion, the Board first looked to the plain language of the INA to determine whether Congress intended the Act to provide asylum to battered spouses who are leaving marriages to aliens having no ties to the United States. *Id.* at 913-14. Finding no definitive answer in the language of the statute, the Board "look[ed] to the way in which the other grounds in the statute's 'on account of' clause operate." *Id.* at 914. Following that """"significant guidance," the Board concluded that R-A- was not eligible for asylum for two reasons. First, her claimed social group--"Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination"--did not qualify as a "particular social group" under the INA. *Id.* at 917-18. And second, even if it did qualify, she failed to show a sufficient nexus between her husband's abuse and her membership in that social group. *Id.* at 923.

**12**  The Board first observed that the purported social group appeared "to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever." *Id.* at 918. The Board found "little or no relation [of the purported social group] to the way in which Guatemalans might identify subdivisions within their own society or otherwise might perceive individuals either to possess or to lack an important characteristic or trait." *Id.* The Board reasoned that for a social group to be viable for asylum purposes, there must be some showing of how the immutable characteristic shared by the group is understood in the alien's home country so that the Board can "understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm." *Id.*

The Board held that a "particular social group" should be recognized and understood to be a societal faction or a recognized segment of the population  **329**  in the alien's society. *R-A-*, 22 I&N Dec. at 918. The Board found that R-A- had "shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group." *Id.* Without such a showing, the Board concluded that "if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

In addition to holding that R-A-'*s* proposed group did not qualify as a """"particular social group," the Board also held that she had not shown the persecution was "on account of" her membership in the group. *Id.* at 920; *see* 8 U.S.C. § 1101(a)(42)(A). Even if the Board were to accept the respondent's proposed social group, she "has not established that her husband has targeted and harmed [R-A-] because he perceived her to be a member of this particular social group." *R-A-*, 22 I&N Dec. at 920. R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." *Id.*

USCIS000022

**\*\*13** On January 19, 2001, Attorney General Reno summarily vacated *R-A-* and directed the Board to stay consideration of the case pending final publication of a proposed rule offering guidance on the definitions of "persecution" and """"membership in a particular social group" and what it means to be "on account of" a protected characteristic. *R-A-*, 22 I&N Dec. at 906; *see also* 65 Fed. Reg. 76,588, 76,588 (Dec. 7, 2000). No final rule ever issued, however. In September 2008, Attorney General Mukasey lifted the stay and directed the Board to reconsider the case in light of intervening Board and judicial decisions. *Matter of R-A-*, 24 I&N Dec. 629, 630 (A.G. 2008). In December 2009, before the Board issued an opinion, R-A- and DHS jointly stipulated that she was eligible for asylum, resolving the case. *See A-R-C-G-*, 26 I&N Dec. at 391-92 n.12.

Despite its vacatur, both the Board and federal courts have continued to rely upon *R-A-*. In 2014, the Board stated that the 1999 opinion's "role in the progression of particular social group claims remains relevant." *M-E-V-G-*, 26 I&N Dec. at 231 n.7. In 2013, the Ninth Circuit recognized that although "*R-A-* was later vacated[,] . . . litigants and other courts have relied heavily upon its analysis." *Henriquez-Rivas*, 707 F.3d at 1090 n.11. And in 2011, the Third Circuit quoted *R-A-* at length because "*R-A-* is so important to the claim before us here." *Valdiviezo-Galdamez*, 663 F.3d at 596-97 & n.8.

In the years since *R-A-*, the Board has refined its interpretation of """"particular social group" on a case-by-case basis. In *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006), *aff'd sub nom.* **\*330** *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), the Board held that a cognizable """"particular social group" should generally be "easily recognizable and understood by others to constitute social groups." In *S-E-G-*, 24 I&N Dec. at 584, the Board defined the "particularity" requirement as "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." In *Matter of E-A-G-*, 24 I&N Dec. 591, 594 (BIA 2008), the Board further explained that "the extent to which members of a society perceive those with the characteristic in question as members of a social group--is of particular importance in determining whether an alien is a member of a claimed particular social group."

**\*\*14** In 2014, the Board issued a pair of complementary precedential opinions, *M-E-V-G-* and *W-G-R-*, clarifying what is necessary to establish a particular social group. In those cases, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 234, 237; *see also W-G-R-*, 26 I&N Dec. at 212. The Board explained that those applicants also bear the burden of showing that their membership was a central reason for their persecution, and that their home government was "unable or unwilling to control" the persecutors. *W-G-R-*, 26 I&N Dec. at 224 & n.8.

Again echoing *R-A-*, the Board explained that the requirement that a group be socially distinct "considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *M-E-V-G-*, 26 I&N Dec. at 238. Members of a particular social group will generally understand their own affiliation with that group, as will other people in their country. *Id.* To be socially distinct, a particular social group "must be perceived as a group by society." *Id.* at 240.

*M-E-V-G-* also clarified that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Id.* at 242. The Board explained that to do otherwise would create two significant problems. First, it would conflate the inquiry into whether a "particular social group" is cognizable under the INA with the separate and distinct requirement that the persecution be "on account of" membership. *Id.* Second, defining a particular social group from the perspective of the persecutor would contradict the Board's prior holding that a social group may not be defined exclusively by the fact that its members **\*331** have been subjected to harm. *Id.* (citing *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007)).

USCIS000023

Finally, the Board explained that this definition did not abrogate or depart from *Acosta*, 19 I&N Dec. 211, or the Board's other decisions, but rather clarified how the definition of "particular social group" had developed through case-by-case adjudication. *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244-47.

C.

**\*\*15** Although the Board has articulated a consistent understanding of the term "particular social group," not all of its opinions have properly applied that framework. Shortly after *M-E-V-G-* and *W-G-R-*, the Board decided *A-R-C-G-*, 26 I&N Dec. 388, which held that "married women in Guatemala who are unable to leave their relationship" could constitute a particular social group, *id.* at 392. Importantly, the Board based its decision on DHS's concessions that: (1) A-R-C-G- suffered harm rising to the level of past persecution; (2) A-R-C-G-'s persecution was on account of her membership in a particular social group; and (3) A-R-C-G-'s particular social group was cognizable under the INA. *Id.* at 392-95. In fact, the only legal question not conceded by DHS was whether, under applicable Eighth Circuit law, the Guatemalan government was unwilling or unable to control her husband. *Id.* at 395; *see also Gutierrez-Vidal v. Holder*, 709 F.3d 728, 732 (8th Cir. 2013) (asylum applicant must show that assaults were either condoned by the government or were committed by private actors that the government was unwilling or unable to control). The Board declined to answer that question, electing instead to remand for further proceedings.

Because of DHS's multiple concessions, the Board performed only a cursory analysis of the three factors required to establish a particular social group. The Board concluded that A-R-C-G-'s purported particular social group was "'"""composed of members who share the common immutable characteristic of gender," and that "marital status can be an immutable characteristic where the individual is unable to leave the relationship." *A-R-C-G-*, 26 I&N Dec. at 392-93. With respect to particularity, the Board observed that the terms defining the group--"married," "women," and "unable to leave the relationship"--had commonly accepted definitions within Guatemalan society. *Id.* at 393. And finally, with respect to social distinction, the Board cited evidence that Guatemala has a "culture of machismo and family violence," and that although Guatemala's criminal laws that prohibit domestic violence, "'"""enforcement can be problematic because the National Civilian Police often failed to respond to requests for **\*332** assistance related to domestic violence." *Id.* at 394 (quotation marks omitted).

Subsequent Board decisions, including the decision certified here, have read *A-R-C-G-* as categorically extending the definition of a "particular social group" to encompass most Central American domestic violence victims. Like *A-R-C-G-*, these ensuing decisions have not performed the detailed analysis required. For instance, the Board's decision in this case offered only the conclusory statement that the respondent's proposed group was "substantially similar to that which we addressed in *Matter of A-R-C-G-*," and that the "'"""totality of the evidence, including the 2014 El Salvador Human Rights Report, establishes that the group is sufficiently particular and socially distinct in El Salvadoran Society." *A-B-* at \*2. The Board's entire analysis of the respondent's proposed particular social group consisted of only two sentences. *Id.* Other Board opinions have similarly treated *A-R-C-G-* as establishing a broad new category of cognizable particular social groups. *See, e.g., Matter of D-M-R-* (BIA June 9, 2015); *Matter of E-M-* (BIA Feb. 18, 2015).

**\*\*16** By contrast, several courts of appeals have expressed skepticism about *A-R-C-G-*. In *Velasquez v. Sessions*, the Fourth Circuit concluded that the petitioner's asylum claim concerned personal, private conflict rather than persecution on a protected ground. 866 F.3d at 197. The court distinguished *A-R-C-G-* "because, there, the Government conceded that the mistreatment suffered by the alien was, at least for one central reason, on account of her membership in a cognizable particular social group." 866 F.3d at 195 n.5 (quotation marks and alterations omitted). In *Fuentes-Erazo*, the Eighth Circuit declined to approve a particular social group of "Honduran women in domestic relationships who are unable to leave their relationships" after distinguishing *A-R-C-G-* because there "the petitioner's actual membership in the proposed particular social group was undisputed." 848 F.3d at 853. And in *Jeronimo v. U.S. Attorney General*, 678 F. App'x 796 (11th Cir. 2017), the Eleventh Circuit denied the asylum application of a woman who claimed membership in a group of "indigenous women who live with a domestic partner and who suffer abuse and cannot leave safely from that

USCIS000024

domestic partner relationship." *Id.* at 802-03. The court recognized that in *A-R-C-G-*, "DHS had conceded the petitioner had suffered past persecution and the persecution was because of membership in a particular social group." *Id.* at 802. [7]

**\*333** IV.

*A-R-C-G-* was wrongly decided and should not have been issued as a precedential decision. DHS conceded almost all of the legal requirements necessary for a victim of private crime to qualify for asylum based on persecution on account of membership in a particular social group. [8] To the extent that the Board examined the legal questions, its analysis lacked rigor and broke with the Board's own precedents.

A.

The Board should not have issued *A-R-C-G-* as a precedential opinion because DHS conceded most of the relevant legal questions. Precedential opinions of the Board are binding on immigration judges and guide the resolution of future cases. *See* 8 C.F.R. § 1003.1(d)(1) ("[T]he Board, through precedent decisions, shall provide clear and uniform guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations."). Yet the parties in *A-R-C-G-* decided significant legal issues on consent, and such concessions should not set precedential rules. Many of the issues that DHS conceded--such as the "existence of [the proposed] particular social group in Guatemala"--effectively stipulated key legal questions.

**\*\*17  \*334** But "[p]arties may not stipulate to the legal conclusions to be reached by the court." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) (internal quotation marks and alterations omitted); *see also Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."). The same principle has long applied before the Board. *Matter of A-*, 4 I&N Dec. 378, 384 (BIA 1951); *see also Sagastume v. Holder*, 490 F. App'x 712, 715-16 (6th Cir. 2012) (holding that immigration judge did not err in denying voluntary departure even though the parties had stipulated that the petitioner would qualify for such relief because "[p]arties cannot stipulate around a statutory requirement"). Given the decision's significant limitations in guiding future decisionmakers, the Board should not have designated *A-R-C-G-* as a precedential decision.

B.

Had the Board properly analyzed the issues, then it would have been clear that the particular social group was not cognizable. The Board's approach in *A-R-C-G-* was contrary to the appropriate way that the Board has in the past, and must in the future, approach such asylum claims. By accepting DHS's concessions as conclusive, the Board in *A-R-C-G-* created a misleading impression concerning the cognizability of similar social groups, and the viability of asylum claims premised upon persecution on account of membership in such groups.

1.

In *A-R-C-G-*, DHS conceded that A-R-C-G- was a member of a "cognizable" social group that was both particular and socially distinct. *Id.* at 392-95. The Board thus avoided considering whether A-R-C-G- could establish the existence of a cognizable particular social group without defining the group by the fact of persecution. *M-E-V-G-*, 26 I&N Dec. at 232; *W-G-R-*, 26 I&N Dec. at 215; *see also Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005); *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1198 (11th Cir. 2006); *Moreno v. Lynch*, 628 Fed. Appx. 862, 865 (4th Cir. 2015).

**\*\*18** To be cognizable, a particular social group *must* "exist independently" of the harm asserted in an application for asylum or statutory withholding of removal. *M-E-V-G-*, 26 I&N Dec. at 236 n.11, 243; **\*335** *W-G-R-*, 26 I&N

USCIS000025

Dec. at 215; *Perez-Rabanales*, 881 F.3d at 67; *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003). If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja*, 420 F.3d at 556 ("If the group with which Rreshpja is associated is defined noncircularly--i.e., simply as young attractive Albanian women-- then any young Albanian woman who possesses the subjective criterion of being ""attractive' would be eligible for asylum in the United States."). *A-R-C-G-*never considered that "married women in Guatemala who are unable to leave their relationship" was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability "to leave" was created by harm or threatened harm.

In accepting DHS's concession that this proposed particular social group was defined with particularity, the Board limited its analysis to concluding that the terms used to describe the group--"married," "women," and "unable to leave the relationship"--have commonly accepted definitions within Guatemalan society. *A-R-C-G-*, 26 I&N Dec. at 393. But that misses the point. To say that each term has a commonly understood definition, standing alone, does not establish that these terms have the requisite particularity in identifying a distinct social group as such, or that people who meet all of those criteria constitute a discrete social group. A particular social group must not be """""amorphous, overbroad, diffuse, or subjective," and "not every 'immutable characteristic' is sufficiently precise to define a particular social group." *M-E-V-G-*, 26 I&N Dec. at 239. The Board's scant analysis did not engage with these requirements or show that A-R-C-G-'s proposed group was "defined by characteristics that provide a clear benchmark for determining who falls within the group." *M-E-V-G-*, 26 I&N Dec. at 239.

Social groups defined by their vulnerability to private criminal activity likely lack the particularity required under *M-E-V-G-*, given that broad swaths of society may be susceptible to victimization. For example, groups comprising persons who are "resistant to gang violence" and susceptible to violence from gang members on that basis "are too diffuse to be recognized as a particular social group." *Constanza v. Holder*, 647 F.3d 749, 754 (8th Cir. 2011); *see also*, *e.g.*, *S-E-G-*, 24 I&N Dec. at 588; *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011); *Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010); *Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010); *Barrios v. Holder*, 581 F.3d 849, 855 (9th Cir. 2009). Victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group.

**\*\*19   \*336**  Particular social group definitions that seek to avoid particularity issues by defining a narrow class--such as "Guatemalan women who are unable to leave their domestic relationships where they have children in common"--will often lack sufficient social distinction to be cognizable as a distinct social group, rather than a description of individuals sharing certain traits or experiences. *See R-A-*, 22 I&N Dec. at 918 (holding that R-A-failed to show that her claimed social group "is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Guatemala"). A particular social group must avoid, consistent with the evidence, being too broad to have definable boundaries and too narrow to have larger significance in society.

DHS similarly admitted that *A-R-C-G-'s* proposed particular social group was socially distinct by conceding that it was cognizable. *A-R-C-G-*, 26 I&N Dec. at 392. In support of that concession, the Board cited evidence that Guatemala has a "culture of machismo and family violence" and that, although Guatemala has laws in place to prosecute domestic violence crimes, "enforcement can be problematic because the National Civilian Police often failed to respond to requests for assistance related to domestic violence." *Id.* at 394 (quotation marks omitted). [9] The Board provided no explanation for why it believed that that evidence established that Guatemalan society perceives, considers, or recognizes "married women in Guatemala who are unable to leave their relationship" to be a distinct social group. But the key thread running through the particular social group framework is that social groups must be classes recognizable by society at large. *See W-G-R-*, 26 I&N Dec. at 217 ("To have the 'social distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group."). Membership in a particular tribe or clan within a society is an instructive example: those distinctions often constitute a "particular social group" because that is a "highly recognizable, immutable characteristic"

USCIS000026

that makes members recognized in society as a group. *In re H-*, 21 I&N Dec. 337, 342-43 (BIA 1996). By contrast, there is significant room for doubt that Guatemalan society views these women, as horrible as their personal circumstances may be, as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances.

**\*337** 2.

**\*\*20**  In *A-R-C-G-*, DHS also conceded that the respondent established that she had suffered past persecution. 26 I&N Dec. at 392. It can be especially difficult, however, for victims of private violence to prove persecution because "[p]ersecution is something a *government* does," either directly or indirectly by being unwilling or unable to prevent private misconduct. *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) (emphasis in original). Persecution under the asylum statute "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240.

Board precedents have defined "persecution" as having three specific elements. First, "persecution" involves an intent to target a belief or characteristic. *See Matter of L-E-A-*, 27 I&N Dec. 40, 44 n.2 (BIA 2017) (citing *Acosta*, 19 I&N Dec. at 222). Yet private criminals are motivated more often by greed or vendettas than by an intent to "overcome [the protected] characteristic of the victim." *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996). For example, in *R-A-*, R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." 22 I&N Dec. at 920.

Second, the level of harm must be "severe." *Matter of T-Z-*, 24 I&N Dec. 163, 172-73 (BIA 2007). Private violence may well satisfy this standard, and I do not question that A-R-C-G-'s claims of repugnant abuse by her ex-husband were sufficiently severe.

Third, the harm or suffering must be "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Acosta*, 19 I&N Dec. at 222. The Board declined to address this prong of the analysis, instead remanding to the immigration judge for further proceedings to determine whether the Guatemalan government was unwilling or unable to control A-R-C-G-'s ex-husband.

An applicant seeking to establish persecution based on violent conduct of a private actor "must show more than 'difficulty . . . controlling' private behavior." *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005) (quoting *Matter of McMullen*, 17 I&N Dec. 542, 546 (BIA 1980)). The applicant must show that the government condoned the private actions "or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Hor*, 400 F.3d at 485. The fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States. There may be many reasons why a particular crime is not successfully investigated and  **\*338** prosecuted. Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it.

3.

**\*\*21**  Finally, DHS conceded the nexus requirement by agreeing that persecution suffered by A-R-C-G- "was, for at least one central reason, on account of her membership in a cognizable particular social group." *A-R-C-G-*, 26 I&N Dec. at 392, 395. This conclusion simply does not follow from the facts of that case or similar cases. Establishing the required nexus between past persecution and membership in a particular social group is a critical step for victims of private crime who seek asylum. *See R-A-*, 22 I&N Dec. at 920-23. Yet the Board did not evaluate the conclusion that A-R-C-G- was persecuted """"on account of" her status as a married woman in Guatemala who was unable to leave her relationship.

USCIS000027

Normally, an alien seeking asylum bears the burden of establishing a nexus between the alleged persecution and one of the five statutory grounds for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 349 (5th Cir. 2006). "If the ill-treatment was motivated by something other than one of these five circumstances, then the applicant cannot be considered a refugee for purpose of asylum." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). "In analyzing 'particular social group' claims" the Board's decisions "require that the persecution or well-founded fear of persecution be on account of, or, in other words, because of, the alien's membership in that particular social group." *R-A-*, 22 I&N Dec. at 920. The focus in determining whether an alien was persecuted "on account of" her group membership is on "the persecutors' motives"--why the persecutors sought to inflict harm. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Reasons incidental, tangential, or subordinate to the persecutor's motivation will not suffice. *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007).

The nexus requirement is critically important in determining whether an alien established an asylum claim. That requirement is "where the rubber meets the road" because the "importance of the 'on account of' language must not be overlooked." *Cece*, 733 F.3d at 673. "Although the category of protected persons [within a particular group] may be large, the number of those who can demonstrate the required nexus likely is not." *Id.* Indeed, a "safeguard against potentially innumerable asylum claims" may be found "in the stringent statutory requirements for all asylum seekers." *Id.* at 675.

**\*\*22** When private actors inflict violence based on a personal relationship with a victim, then the victim's membership in a larger group may well not be **\*339** "one central reason" for the abuse. [10] *See, e.g.*, *Zoarab*, 524 F.3d at 781 ("Courts have routinely rejected asylum applications grounded in personal disputes."). A criminal gang may target people because they have money or property within the area where the gang operates, or simply because the gang inflicts violence on those who are nearby. *See, e.g.*, *Constanza*, 647 F.3d at 754. That does not make the gang's victims persons who have been targeted "on account of" their membership in any social group.

Similarly, in domestic violence cases, like *A-R-C-G-*, the Board cited no evidence that her ex-husband attacked her because he was aware of, and hostile to, "married women in Guatemala who are unable to leave their relationship." Rather, he attacked her because of his preexisting personal relationship with the victim. *See R-A-*, 22 I&N Dec. at 921 ("the record does not reflect that [R-A-'s] husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala"). When """"""the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

4.

In *A-R-C-G-*, the Board recognized that it had a duty to evaluate "any claim regarding the existence of a particular social group in a country . . . in the context of the evidence presented regarding the particular circumstances in the country in question," 26 I&N Dec. at 392, but it did not adequately observe that duty. Although the immigration judge had previously denied A-R-C-G-'s applications, the Board accepted, with little or no analysis, DHS's concessions to the contrary on nearly every legal issue. By doing so, the Board recognized a new category of asylum claims that did not satisfy the requirements set forth by the Board's precedent.

**\*340** Future social group cases must be governed by the analysis set forth in this opinion.

V.

Having overruled *A-R-C-G-*, I must vacate the Board's December 2016 decision in this case as well. The Board's cursory analysis of the respondent's social group consisted of a general citation to *A-R-C-G-* and country condition reports.

USCIS000028

Neither immigration judges nor the Board may avoid the rigorous analysis required in determining asylum claims, especially where victims of private violence claim persecution based on membership in a particular social group. Such claims must be carefully analyzed under the standards articulated in this opinion and in past Board decisions, such as *M-E-V-G-* and *W-G-R-*.

**\*\*23** An asylum applicant has the burden of showing her eligibility for asylum, 8 C.F.R. § 208.13(a), which includes identifying a cognizable social group and establishing group membership, persecution based on that membership, and that the government was unwilling or unable to protect the respondent. The respondent must present facts that undergird *each* of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of the legal requirements for asylum.

Of course, if an alien's asylum application is fatally flawed in one respect--for example, for failure to show membership in a proposed social group, *see Guzman-Alvarez v. Sessions*, 701 F. App'x 54, 56-57 (2d Cir. 2017)--an immigration judge or the Board need not examine the remaining elements of the asylum claim. *See, e.g., Perez-Rabanale*s, 881 F.3d at 67 ("That ends this aspect of the matter. The petitioner's failure to satisfy both the particularity and the social distinctiveness requirements defeats her attempt to qualify as a refugee through membership in a particular social group.").

Having subjected the Board's decision to plenary review, I also address several additional errors and outline other general requirements relevant to all asylum applications to provide guidance to the Board and immigration judge on remand.

A.

First, the Board erred in finding several of the immigration judge's factual and credibility determinations to be "clearly erroneous."

Under Department regulations, the Board may not engage in fact-finding on appeals (except for taking administrative notice of commonly known facts). 8 C.F.R. § 1003.1(d)(3)(iv). Furthermore, the Board may "not engage **\*341** in *de novo* review of findings of fact determined by an immigration judge," and the immigration judge's factual findings, "including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." *Id.* § 1003.1(d)(3)(i); *see also Turkson v. Holder*, 667 F.3d 523, 527 (4th Cir. 2012) (noting that "[t]his rule stems from a sensible understanding of the roles and abilities of the two bodies"). Notably, "where credibility determinations are at issue, . . . 'even greater deference' must be afforded to the [immigration judge's] factual findings." *Rodriguez v. Holder*, 683 F.3d 1164, 1171 (9th Cir. 2012) (quoting *Anderson, v. Bessemer City*, 470 U.S. 564, 575 (1985)). The Board may find an immigration judge's factual findings to be clearly erroneous only if they are "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." *Id.* at 1170 (quoting *Anderson*, 470 U.S. at 577).

**\*\*24** Furthermore, the Board "cannot, under a clear error standard of review, override or disregard evidence in the record" or rely "simply on its own interpretation of the facts." *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012). If the Board disagrees with an immigration judge's factual findings, a "conclusory pronouncement" that the findings were erroneous "does not constitute clear error review." *Id*. While the Board purported to apply the "clear error" standard in this case, I cannot simply "rely on the Board's invocation of the clear error standard." *Rodriguez*, 683 F.3d at 1170. My task is to determine whether the Board "faithfully employed the clear error standard or engaged in improper de novo review" of the immigration judge's factual findings. *Id*.

1.

Here, the Board admitted that the immigration judge identified discrepancies and omissions in the respondent's testimony, but discounted the adverse credibility determination on various grounds including that the supportive

USCIS000029

affidavits were due greater weight, that the respondent sufficiently explained some discrepancies, and that the discrepancies did not ultimately undermine the respondent's account. In so doing, the Board failed to give adequate deference to the credibility determinations and improperly substituted its own assessment of the evidence.

When an asylum applicant makes inconsistent statements, the immigration judge is uniquely advantaged to determine the applicant's credibility, and the Board may not substitute its own view of the evidence on appeal. *See Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 334 (2d Cir. 2006) ("[W]here the [immigration judge]'s adverse credibility finding is based on specific examples in the record of inconsistent statements by the **\*342** asylum applicant about matters material to his claim of persecution, or on contradictory or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." (quotation omitted)). Under the REAL ID Act, "[t]here is no presumption of credibility" in favor of an asylum applicant. Pub. L. No. 109-13, div. B, §§ 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). Furthermore, the identified inconsistencies do not have to be related to an applicant's core asylum claim to support an adverse credibility determination: "Considering the totality of circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's or witness's written and oral statements . . ., the internal consistency of each such statement, [and] the consistency of such statements with other evidence of record . . ., *without regard* to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other factor." *Id.* (emphasis added). "'''''[O]missions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination," and the existence of "only a few" such issues can be sufficient to make an adverse credibility determination as to the applicant's entire testimony regarding past persecution. *Djadjou v. Holder*, 662 F.3d 265, 273-74 (4th Cir. 2011).

2.

 **\*\*25**  The Board further erred in concluding that the immigration judge's factual findings concerning the respondent's ability to leave her relationship and El Salvador's ability to protect her were clearly erroneous. *A-B-* at \*3. In support of his findings, the immigration judge cited evidence that the respondent was able to divorce and move away from her ex-husband, and that she was able to obtain from the El Salvadoran government multiple protective orders against him. [11] Although the Board questioned the significance of these facts in light of other evidence, it did not establish that the immigration judge's conclusions were "illogical or implausible," or without support from the record. *See Rodriguez*, 683 F.3d at 1170.

Instead, the Board substituted its view of the evidence for that of the immigration judge, again violating the standard of review applicable to the factual determinations of immigration judges.

**\*343**  B.

The Board also erred when it found that the respondent established the required nexus between the harm she suffered and her group membership. Whether a purported persecutor was motivated by an alien's group affiliation "is a classic factual question," *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247-48 (4th Cir. 2017) (internal quotation marks omitted), which the Board may overturn only if "clearly erroneous."

The Board stated that "the record indicates that the ex-husband abused [the respondent] from his position of perceived authority, as her ex-husband and the father of her children." *A-B-* at \*3. From this, the Board held, in a conclusory fashion, that the "record as a whole supports a finding that the respondent's membership in the particular social group of 'El Salvadoran women who are unable to leave their domestic relationship where they have children in common' is at least one central reason that he ex-husband abused her." *Id.* While citing the standard of review, the Board did not apply it in summarily dismissing the immigration judge's findings. Moreover, the Board's legal analysis was deficient. The Board, required to find "clear error" of a factual finding, pointed to no record evidence that respondent's husband mistreated

USCIS000030

her in any part "on account of" her membership in the particular social group of """"""El Salvadoran women who are unable to leave their domestic relationship where they have children in common." The Board cited no evidence that her husband knew any such social group existed, or that he persecuted wife for reasons unrelated to their relationship. There was simply no basis in the Board's summary reasoning for overturning the immigration judge's factual findings, much less finding them clearly erroneous.

C.

 **26**  The Board also erred when it overruled the immigration judge's finding that the respondent failed to demonstrate that the government of El Salvador was unable or unwilling to protect her from her ex-husband. This inquiry too involved factual findings to which the Board did not give proper deference. No country provides its citizens with complete security from private criminal activity, and perfect protection is not required. In this case, the respondent not only reached out to police, but received various restraining orders and had him arrested on at least one occasion. *See A-B-* at *14-15 (Immig. Ct. Dec. 1, 2015).

For many reasons, domestic violence is a particularly difficult crime to prevent and prosecute, even in the United States, which dedicates significant  **344**  resources to combating domestic violence. *See, e.g.*, Office of Justice Programs, U.S. Dep't of Justice, Extent, Nature, and Consequences of Intimate Partner Violence (2000). The persistence of domestic violence in El Salvador, however, does not establish that El Salvador was unable or unwilling to protect A-B- from her husband, any more than the persistence of domestic violence in the United States means that our government is unwilling or unable to protect victims of domestic violence. In short, the Board erred in finding, contrary to the record and the immigration judge's findings, that El Salvador was unable or unwilling to protect A-B- and that she thus had no choice but to flee the country.

D.

The Board, immigration judges, and all asylum officers should consider the following points when evaluating an application for asylum. First, an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group. *See Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190-91 (BIA 2018); *Matter of A-T-*, 25 I&N Dec. 4, 10 (BIA 2009). The immigration judge has a responsibility to "ensure that the specific social group being analyzed is included in his or her decision," as it critical to the Board's "appellate review that the proposed social group is clear and that the record is fully developed." *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. at 191. The Board must also remember that it cannot sustain an asylum applicant's appeal based on a newly articulated social group not presented before or analyzed by the immigration judge. *Id.* at 192; *see also, e.g.*, *Baltti v. Sessions*, 878 F.3d 240, 244-45 (8th Cir. 2017) (finding no jurisdiction to review a newly defined social group because the claim based on "membership in that narrowed social group" had not been raised below); *Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014) (declining to address a particular social group raised for the first time on appeal).

 **27**  Furthermore, the Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum. Asylum applicants who have "not established past persecution . . . bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or government-sponsored." 8 C.F.R. § 1208.13(b)(3)(i). An immigration judge, "in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution" if it is "found by a preponderance of the evidence" that "the applicant could avoid future  **345**  persecution by relocating to another part of the applicant's country of nationality, . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(1)(i). Beyond the standards that victims of private violence must meet in proving refugee status in the first instance, they face the additional challenge of showing that internal relocation is not an option (or in answering

USCIS000031

DHS's evidence that relocation is possible). When the applicant has suffered personal harm at the hands of only a few specific individuals, internal relocation would seem more reasonable than if the applicant were persecuted, broadly, by her country's government.

Finally, there are alternative proper and legal channels for seeking admission to the United States other than entering the country illegally and applying for asylum in a removal proceeding. The asylum statute "is but one provision in a larger web of immigration laws designed to address individuals in many different circumstances," and "[t]o expand that statute beyond its obviously intended focus is to distort the entire immigration framework." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). Aliens seeking a better life in America are welcome to take advantage of existing channels to obtain legal status before entering the country. In this case, A-B- entered the country illegally, and when initially apprehended by Border Patrol agents, she stated that her reason for entering the country was "to find work and reside" in the United States. Aliens seeking an improved quality of life should seek legal work authorization and residency status, instead of illegally entering the United States and claiming asylum.[12]

VI.

**\*346**  In reaching these conclusions, I do not minimize the vile abuse that the respondent reported she suffered at the hands of her ex-husband or the harrowing experiences of many other victims of domestic violence around the world. I understand that many victims of domestic violence may seek to flee from their home countries to extricate themselves from a dire situation or to give themselves the opportunity for a better life. But the "asylum statute is not a general hardship statute." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). As Judge Wilkinson correctly recognized, the Board's recent treatment of the term "particular social group" is "at risk of lacking rigor." *Id.* at 198. Nothing in the text of the INA supports the suggestion that Congress intended "membership in a particular social group" to be "some omnibus catch-all" for solving every "heart-rending situation." *Id.*

**\*\*28**  I therefore overrule *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) and all other opinions inconsistent with the analysis in this opinion, vacate the Board's decision, and remand to the immigration judge for further proceedings consistent with this opinion.

Footnotes

1    Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (requiring a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title [8 U.S.C. § 1158]").

2    As explained in my order of March 30, *Matter of A-B-*, 27 I&N Dec. 247, 248-49 (A.G. 2018), the immigration judge's *sua sponte* order purporting to certify the matter back to the Board was procedurally defective because the immigration judge had not issued any decision for the Board to review. Neither the immigration judge nor the Board has taken any other actions in this matter since the Board issued its December 2016 decision.

3    The only alleged "irregularity" cited by respondent is the notion that "[g]iven that Respondent's case was not under active consideration by Judge Couch or the Board at the time of the Attorney General's referral order, it is not clear how the Attorney General became aware of Respondent's case." Respondent's Opening Br. at 18 n.5. The Attorney General has the express authority under the INA to review "administrative determinations in immigration proceedings." 8 U.S.C. § 1103(g)(2). The suggestion that there is something """"irregular" about my exercise of that authority is meritless.

4    The respondent in this case also applied for withholding of removal under 8 U.S.C § 1231(b)(3) and for protection under the United Nations Convention Against Torture ("CAT"), *see* 8 C.F.R. § 1208.16(c). Because the Board sustained the respondent's appeal as to her asylum claim, the Board did not address the immigration judge's denial of her applications for withholding of removal or for CAT protection. *See A-B-* at \*4 (BIA). My opinion addresses only respondent's asylum claim. On remand, the immigration judge may consider any other issues remaining in the case.

USCIS000032

5    One of Congress's primary purposes in passing the Refugee Act of 1980, *Pub. L. No. 96-212, 94 Stat. 102*, was to implement the principles agreed to in the United Nations Protocol Relating to the Status of Refugees, *Jan. 31, 1967, 19 U.S.T. 6223*, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968), as well as the United Nations Convention Relating to the Status of Refugees, July 28, 1951, *19 U.S.T. 6259*, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954)). *See INS v. Cardoza-Fonseca*, *480 U.S. 421, 436-37 (1987)*. The Protocol offers little insight into the definition of "particular social group," which was added to the Protocol "as an afterthought." *Acosta*, *19 I&N Dec. at 232*.

6    *See*, *e.g.*, *Reyes v. Lynch*, *842 F.3d 1125, 1135 (9th Cir. 2016)*; *Gonzalez*, *820 F.3d at 404*; *Zaldana Menijar v. Lynch*, *812 F.3d 491, 498 (6th Cir. 2015)*; *Cantarero v. Holder*, *734 F.3d 82, 85 (1st Cir. 2013)*; *Cece v. Holder*, *733 F.3d 662, 668-69 (7th Cir. 2013)* (en banc); *Orellana-Monson v. Holder*, *685 F.3d 511, 520 (5th Cir. 2012)*; *Lizama v. Holder*, *629 F.3d 440, 446 (4th Cir. 2011)*; *Ngengwe v. Mukasey*, *543 F.3d 1029, 1033 (8th Cir. 2008)*; *Niang v. Gonzales*, *422 F.3d 1187, 1199 (10th Cir. 2005)*; *Ucelo-Gomez v. Mukasey*, *509 F.3d 70, 72 (2d Cir. 2007)*; *Fatin*, *12 F.3d at 1238-39 (3d Cir. 1993)*.

7    Other appellate courts have resisted attempts to expand *A-R-C-G-*'s reach. *See*, *e.g.*, *Menjivar-Sibrian v. U.S. Att'y Gen.*, ___ F. App'x. ___, *2018 WL 1415126, at \*1 (11th Cir. Mar. 22, 2018)* ("women abused by her partner she cannot control" is not a cognizable social group where defining attribute of proposed group is having suffered persecution); *Solorzano-De Maldonado v. Sessions*, ___ F. App'x ___, *2018 WL 1192988, at \*1 (5th Cir. Mar. 7, 2018)* ("single women living alone targeted by gangs for sexual abuse" does not constitute a socially distinct group in Salvadoran society); *Perez-Rabanales v. Sessions*, *881 F.3d 61, 66 (1st Cir. 2018)* (finding that purported social group of "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection" lacked particularity and social distinction"); *Vega-Ayala*, *833 F.3d at 39* ("Being in an intimate relationship with a partner who views you as property is not an immutable characteristic.").

8    In *Matter of L-E-A-*, *27 I&N Dec. 40 (BIA 2017)*, the Board similarly used key concessions by DHS to recognize a particular social group that might not have withstood the rigorous legal analysis required by Board precedent. The respondent and DHS "agree[d] that the immediate family unit of the respondent's father qualifies as a particular social group" and "that if family membership is a central reason for persecuting an asylum applicant, nexus may be established." *Id. at 42*. There is reason to doubt that a nuclear family can comprise a particular social group under the statute. *See*, *e.g.*, *Thomas v. Gonzales*, *409 F.3d 1177, 1192 (9th Cir.)* (en banc) (Rymer, J., dissenting), *rev'd*, *547 U.S. 183 (2005)*. Although the validity of the particular social group analysis in *Matter of L-E-A-* is beyond the scope of this opinion, the case reflects another instance where the Board purported to decide significant legal questions based upon concessions by the parties, rather than the appropriate legal analysis.

9    On this point, I note that conclusory assertions of countrywide negative cultural stereotypes, such as *A-R-C-G-*'s broad charge that Guatemala has a "culture of machismo and family violence" based on an unsourced partial quotation from a news article eight years earlier, neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations.

10    Even if mistreatment is suffered at the hands of a government official, there is no nexus between the purported persecution and one of the grounds for asylum if the dispute is a "purely personal matter." *Matter of Y-G-*, *20 I&N Dec. 794, 799 (BIA 1994)*; *see also*, *e.g.*, *Marquez v. INS*, *105 F.3d 374, 380-81 (7th Cir. 1997)* (concluding that a commercial dispute with a Philippine military officer was "apolitical"); *Iliev v. INS*, *127 F.3d 638, 642 (7th Cir. 1997)* (holding that a dispute with a Bulgarian secret service agent over employment was "personal, not political"). The Board has recognized this principle for decades, including in cases involving threats of domestic violence. *See Matter of Pierre*, *15 I&N Dec. 461, 463 (BIA 1975)* (holding that a husband's threats against his wife were "strictly personal," even though he was a Haitian government official, and, thus, she did not establish persecution).

11    The immigration judge's findings that the respondent was able to leave her relationship on the basis of her divorce and her ability to move from the home she shared with her ex-husband, and that she was able to obtain some measure of government protection, are supported by case law considering other particular social group claims. *See*, *e.g.*, *Menjivar-Sibrian*, *2018 WL 1415126, at \*1*; *Vega-Ayala*, *833 F.3d at 39*.

12    Asylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that she also merits asylum as a matter of discretion. *8 U.S.C. §§ 1158(b)(1)*, *1229a(c)(4)(A)(ii)*; *see also Romulus v. Ashcroft*, *385 F.3d 1, 8 (1st Cir. 2004)*. Neither the immigration judge nor the Board addressed the issue of discretion regarding the respondent's asylum application, and I decline to do so in the first instance. Nevertheless, I remind all asylum adjudicators that a favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA. Relevant discretionary factors include, *inter alia*, the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether she made any attempts to seek asylum

USCIS000033

before coming to the United States; the length of time the alien remained in a third country; and her living conditions, safety, and potential for long-term residency there. *See Matter of Pula, 19 I&N Dec. 467, 473-74 (BIA 1987).*

27 I. & N. Dec. 316 (U.S.Atty.Gen.), Interim Decision 3929, 2018 WL 3091048

4



**U.S. Department** ~~Justice~~

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Lopez, Andres**
**The Lopez Law Firm, PLLC**
**5701 Executive Center Rd., Suite 102**
**Charlotte, NC 28212**

**DHS/ICE Office of Chief Counsel - CHL**
**5701 Executive Ctr Dr., Ste 300**
**Charlotte, NC 28212**

Name: B█████ A█████          A█████

Date of this notice: **12/8/2016**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Liebowitz, Ellen C
Greer, Anne J.
O'Herron, Margaret M

YungD
Userteam: <u>Docket</u>

ABROP0026



U.S. Department, Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

B█████ A█████

**DHS/ICE Office of Chief Counsel - CHL**
**5701 Executive Ctr Dr., Ste 300**
**Charlotte, NC 28212**

Name: B██████ A████                    A██████████

Date of this notice: **12/8/2016**

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

Donna Carr

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Liebowitz, Ellen C
Greer, Anne J.
O'Herron, Margaret M

YungD
Userteam: Docket

ABROP0027

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File:   A███████ – Charlotte, NC                    Date:    DEC - 8 2016

In re:   A█████ B████████ a.k.a. A████ B█████

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Andres Lopez, Esquire

ON BEHALF OF DHS:          Cori White
                           Assistant Chief Counsel

CHARGE:

Notice:   Sec.   212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
                 Immigrant - no valid immigrant visa or entry document

APPLICATION:   Asylum; withholding of removal; Convention Against Torture

The respondent appeals from the Immigration Judge's December 1, 2015, decision denying her applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Sections 208(b)(1)(A), 241(b)(3)(A) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3)(A); 8 C.F.R. §§ 1208.13, 1208.16-1208.18. The Department of Homeland Security ("DHS") has filed a brief on appeal. We will sustain the appeal, and remand the record for completion of background checks.

We review for clear error the findings of fact, including determinations of credibility, made by the Immigration Judge. 8 C.F.R. § 1003.1(d)(3)(i). We review de novo all other issues, including whether the parties have met the relevant burden of proof, and issues of discretion. 8 C.F.R. § 1003.1(d)(3)(ii).

We find the Immigration Judge's adverse credibility finding to be clearly erroneous "[c]onsidering the totality of the circumstances" (I.J. at 4-5). Section 208(b)(1)(B)(iii) of the Act, 8 U.S.C. § 1158(b)(1)(B)(iii). We agree that the inconsistencies identified by the Immigration Judge exist, but we find that the respondent's testimony and the corroborative evidence, particularly the 2001 and 2008 protective orders and the affidavits of the respondent's former neighbors, reconcile the discrepancies and rehabilitate her credibility. Section 208(b)(1)(B)(ii) of the Act, 8 U.S.C. § 1158(b)(1)(B)(ii). While the respondent's written asylum statement was inconsistent with her credible fear interview in regard  to when her ex-husband started abusing her (1999 vs. 2009), the May 2001 protective order and the affidavits

ABROP0028

A█████████

of the neighbors support a finding that the abuse occurred as early as the late 1990's or early 2000's (I.J. at 5; Exh. 3, Tabs H, J).[1]

Further, although the respondent's written statement, unlike her testimony, fails to allege that her ex-husband raped her in 2014, the respondent's explanation that she forgot to mention it because she was focused on escaping sufficiently reconciles this discrepancy under the circumstances in this case (I.J. at 5; Tr. at 52, 62). We also do not find the discrepancy between the respondent's testimony and her written statement regarding whether her ex-husband called her after she changed her phone number to be clear enough to support an adverse credibility finding (I.J. at 5; Tr. at 55-56).

There is no genuine dispute that the respondent's ex-husband physically and emotionally abused her for several years, and the Immigration Judge found that the respondent "may have experienced significant abuse" by her ex-husband and that she "has suffered emotionally and psychologically" (I.J. at 14). Thus, the identified discrepancies regarding the dates and specific incidents of abuse do not undermine the respondent's credibility with respect to her overall claim that she suffered years of significant physical and emotional abuse by her ex-husband. Section 208(b)(1)(B)(iii) of the Act.[2]

We also disagree with the Immigration Judge's alternative finding that the respondent did not meet her burden of proof (I.J. at 7-15). We agree with the respondent that she set forth a cognizable particular social group and that she is a member of that group (Respondent's Brief at 10-14). The respondent's proposed group, "El Salvadoran women who are unable to leave their domestic relationships where they have children in common," is substantially similar to that which we addressed in *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) (holding that under the facts and evidence in that case, "married women in Guatemala who are unable to leave their relationship" was a cognizable particular social group). In this regard, we find that the totality of the evidence, including the 2014 El Salvador Human Rights Report, establishes that the group is sufficiently particular and socially distinct in El Salvadoran society (I.J. at 2, 10).[3]

We additionally conclude that the Immigration Judge's finding that the respondent was able to leave her ex-husband is clearly erroneous (I.J. at 10-11). The Immigration Judge's finding is

---

[1] The Immigration Judge gave the affidavits limited weight because they were not prepared contemporaneously with the incidents of abuse described therein, and the affiants were not made available for cross-examination (I.J. at 5-6). We point out that the affiants had no reason to document the abuse until requested to do so by the respondent, and the affidavits are worthy of some evidentiary weight.

[2] Although the Immigration Judge did not make a separate finding as to whether the abuse, including rape and other physical abuse, rose to the level of past persecution, on this record, we find that it did (I.J. at 14; Tr. at 41-47, 50-51; Exh. 2, Tab C). 8 C.F.R. § 1208.13(b)(1).

[3] The Immigration Judge took administrative notice of the 2014 Human Rights Report for El Salvador issued by the United States Department of State (I.J. at 2).

ABROP0029

based on the fact that the respondent separated and moved away from her ex-husband in 2008, and divorced him in 2013 (*Id.* at 11). However, the record reflects that the respondent's ex-husband continued to threaten and physically abuse the respondent after their separation, despite her move to a town over 2 hours away from him, and that he raped her in January of 2014, after their divorce (I.J. at 3; Tr. at 43-47, 50-51). Further, the ex-husband's brother, a local police officer, threatened the respondent in December of 2013, referred to her as his sister-in-law, despite the fact that she had already divorced his brother, commented that she would always be in a relationship with her ex-husband because they have children in common, and warned her to be careful as she would never know where the bullets would land (I.J. at 2; Tr. at 41-42). Moreover, in June of 2014, a friend of the ex-husband told the respondent that her ex-husband would kill her, and that he would help him dispose of her body (I.J. at 3; Tr. at 47). Thus, under the circumstances presented in this case, the Immigration Judge's finding that the respondent could leave the relationship with her ex-husband is not supported by the record (I.J. at 10-11).

The Immigration Judge also found that even if the respondent's proposed group is cognizable under the Act, she did not establish a nexus between the harm and her group membership (I.J. at 13-15). However, the record indicates that the ex-husband abused her from his position of perceived authority, as her ex-husband and the father of her children, and the threatening comments from her brother-in-law confirmed as much (I.J. at 2-3; Tr. at 41-47, 51). S*ee Matter of N-M-*, 25 I&N Dec. 526, 532 (BIA 2011) ("A persecutor's actual motive is a finding of fact to be determined by the Immigration Judge and reviewed by [the Board] for clear error"). The record as a whole supports a finding that the respondent's membership in the particular social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" is at least one central reason that her ex-husband abused her.

Finally, we disagree with the Immigration Judge's finding that the respondent has not demonstrated that the government of El Salvador is unable or unwilling to protect her from her ex-husband (I.J. at 14-15). *Mulyani v. Holder*, 771 F.3d 190, 197-98 (4th Cir. 2014) (harm must be inflicted by the government or a private person that the government is unable or unwilling to control). We recognize that the respondent was able to obtain 2 protective orders against her ex-husband (in 2001 and 2008), that the police arrested and detained the ex-husband for several days after 1 incident, and that the respondent did not always report her ex-husband's abuse to the police because she did not want her children to grow up without a father (I.J. at 14; Tr. at 56-59).

However, the neighbors' affidavits allege that they called the police during various episodes of abuse, and that the police often would not intervene, and the respondent's written statement asserts that her neighbors called the police at least 10 times over the course of several years, and that the police advised that they would not intervene unless they caught the ex-husband in the act or saw blood (I.J. at 14-15; Exh. 2, Tab C; Exh. 3, Tab J). Further, the respondent's brother-in-law, who warned her she would always be in a relationship with her ex-husband and that she would not know where the bullets came from, is a local police officer in El Salvador (I.J. at 2).

The 2014 El Salvador Human Rights Report does indicate some efforts have been made in the area of domestic violence. However, it also reflects that violence against women, including domestic violence, is a "widespread and serious problem," and that the government's efforts to

ABROP0030

A▮▮▮▮▮▮▮

combat it were "minimally effective" (2014 El Salvador Human Rights Report at 16). *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950-53 (4th Cir. 2015) (the respondent established that Salvadoran authorities were unwilling or unable to control gangs when her credible testimony and other record evidence reflected that the neighborhood police were subject to gang influence, and the country conditions evidence noted the existence of "widespread gang influence and corruption within the Salvadoran prisons and judicial system"). This information, when combined with the respondent's experiences, supports the conclusion that the respondent established that the police were unable and unwilling to protect her.

On this record, the respondent has demonstrated past persecution on account of her membership in a cognizable particular social group. 8 C.F.R. § 1208.13(b)(1). As the DHS has not demonstrated a fundamental change in circumstances or the reasonableness of internal relocation, the lead respondent is also entitled to a presumption of a well-founded fear of future persecution on the same ground (Tr. at 52-53). 8 C.F.R. §§ 1208.13(b)(1)(i), (ii). Thus, the respondent has met her burden of proving her eligibility for asylum. 8 C.F.R. § 1208.13(a).

Accordingly, we will sustain the respondents' appeal as to the denial of her asylum application, and we will remand the record for completion of background checks. As we are sustaining the respondent's appeal as to her asylum claim, we will not address the Immigration Judge's denial of the applications for withholding of removal or CAT protection (I.J. at 15-16).

ORDER: The appeal is sustained.

FURTHER ORDER: Pursuant to 8 C.F.R. § 1003.1(d)(6), the record is remanded to the Immigration Judge for the purpose of allowing the Department of Homeland Security the opportunity to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h).

_Ellen Liebowitz_
FOR THE BOARD

5

**NON-DETAINED**

Michael P. Davis
Exec. Deputy Principal Legal Advisor
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street, SW, Mail Stop 5900
Washington, D.C.  20536-5900

(202) 732-5000

## UNITED STATES DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| A█████ B█████ ) | File No:    A█████████ |
| ) | |
| In removal proceedings ) | |

## U.S. DEPARTMENT OF HOMELAND SECURITY
## BRIEF ON REFERRAL TO THE ATTORNEY GENERAL

ABROP0368

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ISSUES PRESENTED ...............................................................................................................1

STANDARD OF REVIEW.........................................................................................................2

SUMMARY OF THE ARGUMENT ..........................................................................................2

ARGUMENT...............................................................................................................................3
I.   PRIVATE CRIMINAL VICTIMIZATION DOES NOT PER SE ESTABLISH ELIGIBILITY FOR ASYLUM OR WITHHOLDING OF REMOVAL. ...................................3

   A.  Simply Being a Victim of Private Criminal Activity Per Se Does Not Establish Eligibility for Asylum or Statutory Withholding of Removal. ..................................................5

   B.  The Applicant's Burden to Establish the Existence of a Protected Ground, Including Membership in a Particular Social Group, Should be Strictly Enforced. ...............................7

      1.   The Particular Social Group Must Satisfy the Requirements of a Common, Immutable Characteristic, Particularity, and Social Distinction. ..........................................7

      2.   A Single Individual Cannot Constitute a Particular Social Group. ............................10

      3.   The Particular Social Group Must Exist Independently of the Harm Asserted to be Persecution Suffered and/or Feared. ....................................................................................11

      4.   Additional Principles Regarding the "Membership in a Particular Social Group" Ground. ................................................................................................................................14

      5.   *Matter of A-R-C-G-*'s Particular Social Group Analysis.............................................17

      6.   Respondent's Particular Social Group Formulation.....................................................22

   C.  Other Requirements. ......................................................................................................22

      1.   Adequate Testimony and, When Required, Corroboration. .........................................23

      2.   Nexus.............................................................................................................................25

      3.   Harm Suffered/Feared Must Amount to "Persecution." ...............................................31

      4.   Reasonable Internal Relocation. ...................................................................................34

      5.   Regulatory Presumption of Future Persecution Based on Past Persecution. ..............35

II.   THE BOARD EXCEEDED THE PROPER SCOPE OF ITS REVIEW........................35

CONCLUSION...........................................................................................................................37

A▆▆▆▆

ABROP0369

## INTRODUCTION

This case is currently pending before the Attorney General pursuant to his March 7, 2018 order directing the Board of Immigration Appeals (Board or BIA) to refer its December 8, 2016 decision for his review under 8 C.F.R. § 1003.l(h)(l)(i). *See Matter of A-B-*, 27 I&N Dec. 227 (A.G. 2018). The Attorney General invited the parties and interested amici curiae to submit briefs on points relevant to the disposition of the case, including: "[w]hether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable 'particular social group' for purposes of an application for asylum or withholding of removal." *Id.*

On March 14, 2018, the respondent requested an extension of the briefing schedule. On March 16, 2018, the Department of Homeland Security (Department or DHS) moved the Attorney General to suspend the briefing schedules for both the parties and amici curiae due to potential issues pertaining to *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954), and to clarify the central briefing question or, in the alternative, to extend the briefing schedules for the parties and amici curiae. On March 21, 2018, the respondent filed a response to the DHS motion, agreeing with certain aspects of that motion.

On March 30, 2018, the Attorney General denied the DHS motion to suspend the briefing schedules and clarify the question presented, but granted, in part, both parties' request for an extension of the briefing deadline to April 20, 2018. *See Matter of A-B-*, 27 I&N Dec. 247 (A.G. 2018).

## ISSUES PRESENTED

To resolve this matter on referral, the Attorney General should consider:

1) Whether, and, if so, under what circumstances, a victim of private criminal activity may establish eligibility for asylum or statutory withholding of removal; and

1

A

2) Whether the Board, in determining that the respondent in this case met her burden of proof to establish eligibility for asylum, exceeded the proper scope of its review.

## STANDARD OF REVIEW

The Attorney General reviews de novo all aspects of the Board's decision and retains full authority to receive additional evidence and to make de novo factual determinations. *See Matter of J-F-F-*, 23 I&N Dec. 912, 913 (A.G. 2006).

## SUMMARY OF THE ARGUMENT

The Attorney General should review the Board's decision consistent with the legal framework set forth by the Department in this brief concerning asylum and statutory withholding of removal applications that are based on or related to private criminal victimization.

In this regard, and of specific relevance to the instant case, the Department generally supports the legal framework set out by the Board in *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), for the adjudication of asylum and statutory withholding of removal applications premised on inter-partner domestic violence and the protected ground of membership in a particular social group. The Department, however, submits that the Attorney General, like the Board, should reject the cognizability of putative particular social groups defined in whole or part by the harm that an asylum or withholding applicant claims to have suffered or fears. Further, it is the Department's position that even within the context of Guatemalan domestic violence-based claims, such as at issue in *A-R-C-G-*, not all women who are married and unable to leave their relationships can qualify for asylum or statutory withholding of removal. Rather such applicants must establish all other applicable requirements, such as a nexus between the harm they suffered or fear and a protected ground, that the government is unable or unwilling to control their abuser, and the lack of reasonable internal relocation options.

2

A

ABROP0371

Rather than adjudicate the respondent's applications for asylum and statutory withholding of removal pursuant to any clarified standards that he may enunciate, the Attorney General should simply should vacate the Board's determination that the respondent met her burden of proof to establish eligibility for asylum. Specifically, the Board exceeded the proper scope of its review by making factual findings, including with respect the respondent's credibility, the facts that were asserted as establishing her putative particular social group, her membership in such group, past persecution, and nexus.

Finally, the Attorney General should return the case to the Board and direct it to further remand the case to the Immigration Judge so that the Immigration Judge can issue a new decision assessing the respondent's asylum and statutory withholding of removal applications under any clarified standards for the adjudication of persecution claims based upon private criminal victimization.

## ARGUMENT

I.   PRIVATE CRIMINAL VICTIMIZATION DOES NOT PER SE ESTABLISH ELIGIBILITY FOR ASYLUM OR WITHHOLDING OF REMOVAL.

In his March 7, 2018 order, the Attorney General invited the parties and amici curiae to address the following question to assist him in his review: "Whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable 'particular social group' for purposes of an application for asylum or withholding of removal."[1] *A-B-*, 27 I&N Dec. at 227. While the Attorney General will consider "any relevant issue," he encouraged the parties to focus their briefing on the "purely legal question" that he raised. *Id.* at 250. In this regard, the Attorney General noted the Immigration Judge's observation in his certification order that "several

---

[1] The essential facts pertaining to the respondent's applications for relief and protection, contested or otherwise, are adequately summarized in the Immigration Judge's December 1, 2015 decision, and will not be repeated here except as may be germane to the Department's arguments.

3

A▮▮▮▮▮▮

ABROP0372

Federal Article III courts have recently questioned whether victims of private violence may qualify for asylum . . . based on their claim that they were persecuted because of their membership in a particular social group." *A-B-*, 27 I&N Dec. at 249. The Attorney General instructed that if "being a victim of private criminal activity qualifies a petitioner as a member of a cognizable 'particular social group,' under the statute, the briefs should identify such situations. If such situations do not exist, the briefs should explain why not." *Id.*

The Department understands the Attorney General's question to relate primarily to the cognizability of particular social groups in the context of private criminal activity. Indeed, several of the key federal circuit court decisions relied upon by the Immigration Judge in his certification order dealt with particular social group status and distinguished the applicability of *A-R-C-G-. See* I.J. certification order at 2-3 (citing *Fuentes-Erazo v. Sessions*, 848 F.3d 847 (8th Cir. 2017); *Cardona v. Sessions*, 848 F.3d 519 (1st Cir. 2017); *Marikasi v. Lynch*, 840 F.3d 281 (6th Cir. 2016); and *Vega-Ayala v. Lynch*, 833 F.3d 34 (1st Cir. 2016)). In addition, the Immigration Judge focused on the U.S. Court of Appeals for the Fourth Circuit's decision in *Velasquez v. Sessions, see* I.J. certification order at 3-4, which dealt with the nexus requirement, i.e., whether the subject alien's "membership in her nuclear family 'was or will be at least one central reason for' her persecution" pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act (Act or INA). 866 F.3d 188, 194 (4th Cir. 2017).

Accordingly, the Department takes this opportunity to address the broader issue of whether, and under what circumstances, a victim of private[2] criminal activity may establish eligibility for asylum or statutory withholding of removal.

---

[2] The Department interprets "private" to mean when the direct perpetrator of harm is not "a government or government-sponsored" within the meaning of the standard for reasonable internal relocation. *See* 8 C.F.R. §§ 1208.13(b)(3)(ii) (asylum), 1208.16(b)(3)(ii) (statutory withholding of removal). Where the perpetrator of the harm

ABROP0373

**A.    Simply Being a Victim of Private Criminal Activity Per Se Does Not Establish Eligibility for Asylum or Statutory Withholding of Removal.**

The position of the Department is that private criminal victimization per se does not establish eligibility for asylum or statutory withholding of removal. As with any other type of harm, harm resulting from private criminal activity can only be a potential basis for asylum or statutory withholding of removal if the applicant establishes all of the many requirements for those forms of relief and protection, including: the existence of a protected ground; the requisite nexus between the harm suffered and/or feared and that protected ground; demonstration of past or future harm that qualifies as "persecution"; and the inability to reasonably internally relocate (absent an applicable regulatory presumption). *See* INA §§ 208(b)(1)(A), 241(b)(3)(A); 8 C.F.R. §§ 1208.13, 1208.16(a)-(b). Of course, at a minimum, to sustain his or her burden of proof, the basis of the applicant's claim must be credible, persuasive, and sufficiently detailed. *See* INA §§ 208(b)(1)(B)(ii), 241(b)(3)(C). In cases in which the applicant rests her claim on persecution on account of membership in a particular social group, it is the applicant's burden to "initially identify the particular social group or groups in which membership is claimed." *Matter of A-T-*, 24 I&N Dec. 617, 623 n.7 (A.G. 2008).

The Board has been clear that private criminal victimization per se, even when widespread in nature, is insufficient to establish eligibility for asylum or statutory withholding of removal.[3]

---

is private in this sense, the applicant also bears the burden of showing that the relevant government was unwilling or unable to control that persecutor. *See, e.g., Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

[3] With specific respect to private criminal victimization by gangs, while eschewing any "blanket rejection" of all such persecution claims, the Board has opined as follows:

The prevalence of gang violence in many countries is a large societal problem. The gangs may target one segment of the population for recruitment, another for extortion, and yet others for kidnapping, trafficking in drugs and people, and other crimes. Although certain segments of a population may be more susceptible to one type of criminal activity than another, the residents all generally suffer from the gang's criminal efforts to sustain its enterprise in the area. A national community may

5

ABROP0374

*See, e.g., Matter of M-E-V-G-*, 26 I&N Dec. 227, 235 (BIA 2014) (observing that, as a general matter, "asylum and refugee laws do not protect people from general conditions of strife, such as crime and other societal afflictions"). *See generally Matter of Mogharrabi*, 19 I&N Dec. 439, 447 (BIA 1987) (noting that "aliens fearing retribution over purely personal matters, or aliens fleeing general conditions of violence and upheaval in their countries, would not qualify for asylum"). The federal circuit courts have held the same. *See, e.g., Sosa-Perez v. Sessions*, 884 F.3d 74, 81 (1st Cir. 2018) (observing that the attacks on the alien were not shown to be on account of a protected ground, but, rather a "series of highly unfortunate criminal incidents occurring within a culture of widespread societal violence") (quotation marks omitted); *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015) ("widespread crime and violence does not itself constitute persecution on account of a protected ground"); *Kanagu v. Holder*, 781 F.3d 912, 918 (8th Cir. 2015) (noting that "the evidence primarily showed the extortionate focus of the Mungiki's interactions with Kanagu and their record of widespread and indiscriminate criminality," and that "a reasonable fact finder could infer that the Mungiki harassed and kidnapped Kanagu for extortionate purposes" as opposed to persecution on account of a protected ground); *Silva v. U.S. Atty. Gen.*, 448 F.3d 1229, 1242 (11th Cir. 2006) ("We agree that Colombia is a place where the awful is ordinary, but we must state the obvious: if four out of every ten murders are on account of a protected ground, six out of ten are not. The majority of the violence in Colombia is not related to protected activity."); *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) ("Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is

---

struggle with significant societal problems resulting from gangs, but not all societal problems are bases for asylum.

*Matter of M-E-V-G-*, 26 I&N Dec. 227, 250-51 (BIA 2014).

6

ABROP0375

not sufficient to permit the Attorney General to grant asylum to everyone who wishes to improve his or her life by moving to the United States without an immigration visa."). *See generally Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) ("[T]he concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country-and it seems most unlikely that Congress intended such a result.").

**B.      The Applicant's Burden to Establish the Existence of a Protected Ground, Including Membership in a Particular Social Group, Should be Strictly Enforced.**

The requirements to establish a protected ground, including membership in a particular social group, must be properly enforced.  As noted, to establish eligibility for asylum or statutory withholding of removal, an applicant whose claim is premised on private criminal victimization must demonstrate, *inter alia*, the existence of a protected ground, i.e., race, religion, nationality, membership in a particular social group, or political opinion.  *See* INA §§ 208(b)(1)(A) (asylum, referencing the definition of "refugee" at INA § 101(a)(42)(A)), 241(b)(3)(A) (statutory withholding of removal); *Matter of R-S-H-*, 23 I&N Dec. 629, 641 (BIA 2003).  Of specific relevance to the instant case, as well as many others based upon private criminal victimization, is the protected ground of membership in a particular social group.

1.      The Particular Social Group Must Satisfy the Requirements of a Common, Immutable Characteristic, Particularity, and Social Distinction.

The core requirements of cognizable particular social group status must be effectively enforced.  In the Department's experience, little more than lip service is paid to these critical requirements in some cases, or spurious arguments and analysis are provided purporting to explain why the requirements have been satisfied by what amount to purely "artificial" group constructs.

A▮▮▮▮▮

ABROP0376

*See generally Matter of E-A-G-*, 24 I&N Dec. 591, 595 (BIA 2008) (eschewing "artificial group definitions"). The Department urges the Attorney General to make clear that each requirement must be individually and thoroughly assessed.

Of foundational importance, a cognizable particular social group must be: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *A-R-C-G-*, 26 I&N Dec. at 392 (citing *M-E-V-G-*, 26 I&N Dec. 276, and *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014), *aff'd in relevant part sub nom. Garay-Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 736 (2018)).

The Board explained in *Acosta*, that a common, immutable characteristic "might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience."  19 I&N Dec. at 233.  The Board also underscored, however, that "whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*

With respect to the requirement of particularity, the Board considers "the question of delineation," emphasizing that "not every immutable characteristic is sufficiently precise to define a particular social group." *A-R-C-G-*, 26 I&N Dec. at 392 (citing *W-G-R-*, 26 I&N Dec. at 214, and *M-E-V-G-*, 26 I&N Dec. at 239) (internal quotation marks omitted). According to the Board, "[a] particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group. It is critical that the terms used to describe the group have commonly accepted definitions in the society of which the group is a part. The group must also be discrete and have definable boundaries—t must not be amorphous, overbroad, diffuse, or

8

A

subjective." *W-G-R-*, 26 I&N Dec. at 214 (citations omitted). Of special relevance to asylum and statutory withholding of removal applications based on private criminal victimization, the Board has emphasized that a major segment of a country's population ordinarily will not satisfy the particularity requirement. *See Matter of S-E-G-*, 24 I&N Dec. 579, 585–86 (BIA 2008) (discussing a "potentially large and diffuse segment of society"); *see also W-G-R-*, 26 I&N Dec. at 214, 223 (citing *Ochoa v. Gonzales*, 406 F.3d 1166, 1170-71 (9th Cir. 2005), for the proposition that "a particular social group must be narrowly defined and that major segments of the population will rarely, if ever, constitute a distinct social group."); *M-E-V-G-*, 26 I&N Dec. at 239 (same); *cf.* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 77 (Geneva 1979), http://www.unhcr.org/4d93528a9.pdf ("A 'particular social group' normally comprises persons of similar background, habits or social status."). At the same time, however, the Board has recognized that a "voluntary associational relationship," "cohesiveness," or "strict homogeneity" among group members is not required. *See Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007) (noting that such factors are "not generally require[d]" but not dismissing their potential relevance), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007).

Further, a cognizable particular social group also must possess social distinction, which involves "the importance of [societal] 'perception' or 'recognition' to the concept of the particular social group." *A-R-C-G-*, 26 I&N Dec. at 392 (citing *W-G-R-*, 26 I&N Dec. at 216). As the Board further explained:

> To have the "social distinction" necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group. Although the society in question need not be able to easily identify who is a member of the group, it must be commonly recognized that the shared characteristic is one that defines the group.

A▌

ABROP0378

*W-G-R-*, 26 I&N Dec. at 217. Consequently, the requisite social distinction cannot be met simply via the perception of the victims. Rather, there must be wide recognition that extends to the society in question. Concomitantly, although the perception of the putative persecutor—including a private criminal actor—may be relevant because it can be indicative of whether society perceives the group as distinct, whether a group is socially distinct is determined by the perception of the society in question, rather than by the perception of the persecutor.[4]  *M-E-V-G-*, 26 I&N Dec. at 242.    As the Board has made clear, the "'social distinction' requirement considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way," i.e., "if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *Id.* at 238.

>    2.    A Single Individual Cannot Constitute a Particular Social Group.

A particular social group is, by definition, composed of a "group of persons." *See, e.g.*, *Acosta*, 19 I&N Dec. at 233. A "group" of persons is commonly understood to mean "a number of individuals assembled together or having some unifying relationship." Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/group?src=search-dict-hed (last visited Apr. 20, 2018). Consequently, a lone individual cannot constitute a particular social group. *See Fatin*, 12 F.3d at 1238 (noting that "[v]irtually any set *including more than one person* could be

---

[4] For an individual alleged persecutor's perception to be relevant to the society's view of the putative particular social group, the Department avers that there would need to be more than one victim in the group. An individual persecutor need not have personally victimized multiple people within the society, but the persecution itself is only relevant to broader societal perceptions if there are multiple victims, whether by one or more persecutors.

ABROP0379

described as a 'particular social group,' and that, therefore, "the statutory language standing alone is not very instructive") (emphasis added).

3. The Particular Social Group Must Exist Independently of the Harm Asserted to be Persecution Suffered and/or Feared.

Moreover, to be cognizable, a particular social group must "exist independently" of the harm asserted in an application for asylum or statutory withholding of removal. *See, e.g.*, *Perez-Rabanales v. Sessions,* 881 F.3d 61, 67 (1st Cir. 2018); *Lukwago v. Ashcroft,* 329 F.3d 157, 172 (3d Cir. 2003); *M-E-V-G-*, 26 I&N Dec. at 236 n.11, 243; *W-G-R-*, 26 I&N Dec. at 215. Otherwise, positing a particular social group whose membership is dependent on the persecution at issue creates a backwards and, thus, illogical causation construct, i.e., one premised on circular reasoning. *See Gonzalez-Cano v. Lynch,* 809 F.3d 1056, 1059 (8th Cir. 2016) ("Among other causation problems, the most severe harm Gonzalez Cano suffered—abduction and forced labor— are the characteristics that define his proposed social group [i.e., escapee Mexican child laborers]. As such, his membership in that group could not have been the motive, at least initially, for the persecution."); *Lukwago*, 329 F.3d at 172 ("Although the shared experience of enduring past persecution may, under some circumstances, support defining a 'particular social group' for purposes of fear of future persecution, it does not support defining a 'particular social group' for past persecution because the persecution must have been 'on account of' a protected ground.").

The Board also has observed that a particular social group not only must "exist independently" of the persecution suffered and/or feared, it also cannot be "defined exclusively" by such persecution. *Matter of C-A-*, 23 I&N Dec. 951, 960 (BIA 2006), *aff'd sub nom Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006); *see also M-E-V-G-*, 26 I&N Dec. at 242; *W-G-R-*, 26 I&N Dec. at 218; *S-E-G-*, 24 I&N Dec. at 584; *A-M-E- & J-G-U-*, 24 I&N Dec. at 74. While the Board spoke in terms of "exclusively" defining a particular social group by the

11

A

persecution being claimed by the applicant, the Department does not view this as an endorsement by the Board of "hybrid" particular social groups that are based, in part, on the persecution suffered and/or feared, plus additional traits.  Indeed, such a hybrid formulation, "Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang based on their own personal, moral, and religious opposition to the gang's values and activities," was rejected by the Board in *Matter of S-E-G-*, which stated that "we do not find that in this case the social group can be defined exclusively by the fact that its members have been subjected to harm in the past (i.e., forced gang recruitment and any violence associated with that recruitment) . . . ." 24 I&N Dec. at 581, 584.

The Seventh Circuit dealt with this "hybrid" issue in *Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013) (en banc), which, according to the majority opinion, dealt with a putative particular social group involving a number of traits, including being "vulnerable to traffickers," *id.* at 671.  The majority disagreed with the Board's reasoning that the subject alien's particular social group was not cognizable because it was "defined in large part by the harm inflicted on the group, and does not exist independently of the traffickers." *Id.*  While the majority agreed that a particular social group could not be defined "merely" or "only" by the persecution suffered and/or feared, it ruled that a group "defined in part by the fact of persecution . . . would not defeat recognition of the social group under the Act." *Id.*

The validation of such "hybrid" particular social groups, however, is problematic for the reasons set forth by Judge Easterbrook in his dissenting opinion in *Cece*.  Specifically, he noted that even under such a hybrid approach, "any person mistreated in his native country can specify a 'social group' and then show in circular fashion that the mistreatment occurred because of membership in that ad hoc group." *Id.* at 682.  When "the selection criteria used by the persecutor

12

ABROP0381

. . . become the defining characteristics of the 'social group' . . . [t]he structure of [8 U.S.C.] § 1101(a)(42)(A) unravels." *Id.*

Accordingly, the Department contends that the Attorney General should rule that a cognizable particular social group must exist "independently" of the harm asserted as the persecution suffered and/or feared as the basis of an application for asylum or statutory withholding of removal, and reject the viability of so-called "hybrid" particular social groups.[5]

As directly applicable to the instant case, one certainly could fashion a colorable argument that the particular social group found cognizable by the Board in *A-R-C-G-*, and similar to the respondent's formulation here, was not fully independent of the persecution suffered and/or feared because it contained the trait of being "unable to leave their relationship." 26 I&N Dec. at 392. As a practical matter, however, in asylum and statutory withholding of removal cases premised upon domestic violence, the persecution at issue rarely, if ever, involves the simple inability to leave a relationship, such as via legal separation or divorce, as opposed to a central focus on the direct physical and mental abuse encountered.  Indeed, in its decision in *A-R-C-G-*, the Board specifically noted that the group was "not defined by the fact that the applicant is subject to domestic violence." *Id.* at 393 n.14.  The Board, as does the Department, understands "unable to leave" a relationship to signify an inability to do so based upon a potential range of "religious, cultural, or legal constraints," as opposed to simply harm or threats from the victim's domestic

---

[5] This rule, however, allows for the unique possibility, as recognized by the Board in *M-E-V-G-*, that in some situations "[u]pon their maltreatment, [victims] would experience a sense of 'group,' and society would discern that this group of individuals, who share a common immutable characteristic, is distinct in some significant way." 26 I&N Dec. at 243.  For example, it is conceivable that, based upon past private criminal victimization, such as kidnapping accompanied by rape, that victims might become so stigmatized in a society, that the potential for a cognizable particular social group exists, with the stigmatization resulting in separate and distinct persecution from the original private criminal victimization.

A▮▮▮▮

ABROP0382

partner.[6]  *Id.* at 393.  Accordingly, neither the particular social group at issue in *A-R-C-G-* nor the

respondent's putative group here runs afoul of the principle that a particular social group must

exist independently of the persecution suffered and/or feared.  Nevertheless, the Department

observes that it has encountered numerous particular social group formulations in the domestic

violence context that are, in fact, defined in whole or part by the persecution suffered and/or feared

forming the basis of the persecution claims.  The Department does not understand *A-R-C-G-* to

sanction the cognizability of such putative particular social groups, which should be rejected as

legally deficient.

       4.      Additional Principles Regarding the "Membership in a Particular Social
                Group" Ground.

In addition to the foregoing limiting principles and requirements, there are other important

parameters and points relevant to particular social group analysis, including in the context of

private criminal victimization.  For example, while some particular social group formulations

ostensibly may pass muster under the requirements discussed above, they nevertheless should not

be deemed cognizable because they are antithetical to the object and purpose of the Act.  Examples

include those formulations based on current or former criminal or terrorist associations.  *See, e.g.*,

*Arteaga v. Mukasey*, 511 F.3d 940, 946 (9th Cir. 2007) ("[C]alling a street gang a 'social group'

---

[6] The Board further explained that "a married woman's inability to leave the relationship may be informed by societal expectations about gender and subordination, as well as legal constraints regarding divorce and separation." *Id.* The Board also considered it relevant that the police had selectively withdrawn assistance that a citizen ordinarily could expect by refusing to assist the applicant "because they would not interfere in a marital relationship." *Id.*; *see generally Cece*, 733 F.3d at 681 (Easterbrook, J., dissenting) ("She does not say that the government of Albania persecutes Albanian women. Indeed, she does not contend that Albania discriminates in any way by national origin or sex. She does not maintain that police and courts protect male victims of crime but not female victims; instead she tells us that Albania's system of law enforcement is weak. Failure to achieve optimal deterrence is unfortunate but not 'persecution' by any useful understanding."). Thus, it is important to explore why assistance was refused, which may be informed by whether other victims of violence draw a different response from the authorities. Concomitantly, precisely why the authorities refuse to provide assistance in this context, informing the social distinction requirement for particular social group status, *see infra*, is a related, but separate inquiry from whether the authorities are "unable or unwilling to control" a non-state actor for purposes of assessing the existence of "persecution." *See Acosta*, 19 I&N Dec. at 222-23 (discussing the concept of "persecution").

A▮▮▮▮▮

ABROP0383

as meant by our humane and accommodating law does not make it so.  In fact, the outlaw group to which the petitioner belongs is best described as an 'antisocial group,' . . . . To [recognize a criminal gang as a "particular social group"] would be to pervert the manifest humanitarian purpose of the statute."); *Matter of E-A-G-*, 24 I&N Dec. 591, 595-96 (BIA 2008).  Some circuit courts would find that "former" membership in such nefarious groups may give rise to cognizable particular social groups, *see, e.g.*, *W-G-R-*, 26 I&N Dec. at 215 n.5 (citing the split among the circuit courts).  For example, the Fourth Circuit eschewed a focus on "the *former* status of membership in a gang" in favor of a focus on "a distinct *current* status of membership in a group defined by gang apostasy and opposition to violence*." See Martinez v. Holder*, 740 F.3d 902, 912 (4th Cir. 2014).  The circuit courts holding to the contrary have the better argument.  As observed by the First Circuit:

> A former gang member was still a gang member, and the BIA is permitted to take that into account. That he renounced the gang does not change the fact that [he] is claiming protected status based on his prior gang membership, and he does not deny the violent criminal undertakings of that voluntary association . . . . The shared past experiences of former members of the 18th Street gang include violence and crime. The BIA's decision that this type of experience precludes recognition of the proposed social group is sound.[7]

---

[7] In addition, the reasoning of the courts of appeals ruling to the contrary is based in part on the faulty premise that although groups such as the mafia or other criminal gangs could be recognized as particular social groups, other provisions of the INA—such as the "exceptions" at sections 208(b)(2) and 241(b)(3)(B)—would address concerns about granting protection to bad actors. *See, e.g.*, *Benitez Ramos v. Holder*, 589 F.3d 426, 431 (7th Cir. 2009). This reasoning misses the point. The exceptions (e.g., terrorist-related activity and serious nonpolitical crime), on the one hand, and the enumerated grounds protected under the refugee definition and withholding statute (race, religion, nationality, membership in a particular social group, and political opinion), on the other hand, are different in both their purpose and their operation. The exceptions are carefully constructed to define the limited circumstances under which a particular individual, who has otherwise met all the requirements of the refugee definition, for example, does not personally need or merit protection. In keeping with the carefully limited scope of these exceptions, rigorous evidentiary requirements must be met before an otherwise eligible individual can be barred from asylum or statutory withholding of removal because of criminal activity or other bad acts. The question of whether the reason for flight is one that warrants protection under our laws is separate from the question of individual worthiness addressed by the exceptions. For instance, regardless whether there is sufficient evidence to establish that an individual member of the mafia has committed acts that would bar him from protection, actions committed against him because of current or former membership in the mafia are not motivated by a characteristic that should be recognized as a protected ground. Plus, the exceptions should not be construed as constituting the sole authority to deny protection in such a situation. And precluding protection on the basis of past criminal acts or associations would avoid the undesirable effect of rewarding persons who joined gangs. *Cf. Elien v. Ashcroft*, 364 F.3d 392, 396 (1st Cir. 2004) (rejecting group of

15

ABROP0384

*Cantarero v. Holder*, 734 F.3d 82, 86 (1st Cir. 2013).

In addition, in assessing the cognizability of a particular social group, the Board has observed that "a purely statistical showing" of who is being harmed "is not by itself sufficient proof of the existence of a persecuted group," and that "[i]t is not enough to simply identify the common characteristics of a statistical grouping of a portion of the population at risk." *Matter of Sanchez & Escobar*, 19 I&N Dec. 276, 285 (BIA 1985), *aff'd sub nom. Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986). Thus, for example, the simple fact that a large number of women may suffer from domestic abuse does not, in itself, establish the cognizability of any related particular social group.[8]

Further, particular social group analysis is a case-specific and society-specific exercise. Simply because a putative particular social group may be found cognizable in one case and as to one society, at one particular point in time, such as "married women who are unable to leave their relationship" vis-à-vis Guatemala in *A-R-C-G-*, does *not* mean that a similar particular social group formulation automatically will be cognizable in other cases and as to other societies[9] (or that simply being a member of a cognizable group automatically qualifies one for asylum or statutory withholding of removal without the necessity of satisfying the plethora of other requirements).

---

"deported Haitian nationals with criminal records in the United States" because recognizing such a group would create perverse incentives to commit crimes in order to avoid deportation). In some instances, courts have found particular social group membership based on past membership in criminal enterprises, but not based on resisting recruitment, thus creating a perverse incentive for individuals to engage in criminal activity rather than to resist it.

[8] *See generally* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Intimate Partner Violence: Attributes of Victimization, 1993–2011* (Nov. 2013) at App. Table 3 (noting that, that, as late as 2000, almost 1 million females over the age of 12 in the U.S. had suffered some form of intimate partner violence), https://www.bjs.gov/content/pub/pdf/ipvav9311.pdf.

[9] And, of course, the converse also is true. For example, a putative particular social group composed of the "wealthy" ordinarily will not be cognizable. *See Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 73-76. However, one cannot reject its cognizability as a per se matter, as a case-by-case and society-by-society analysis is always required. *See M-E-V-G-*, 26 I&N Dec. at 241

16

A■

ABROP0385

*See, e.g., A-R-C-G-*, 26 I&N Dec. at 392; *M-E-V-G-*, 26 I&N Dec. at 241; *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1083–84 (9th Cir. 2014). Indeed, even within the same society, material conditions may change over time. Of special significance to asylum and statutory withholding applications premised on intra-partner domestic violence, as in the case at hand, the Board has emphasized:

> [C]ases arising in the context of domestic violence generally involve unique and discrete issues not present in other particular social group determinations, which extends to the matter of social distinction. However, even within the domestic violence context, the issue of social distinction will depend on the facts and evidence in each individual case, including documented country conditions; law enforcement statistics and expert witnesses, if proffered; the respondent's past experiences; and other reliable and credible sources of information.[10]

*A-R-C-G-*, 26 I&N Dec. at 394–95. Consequently, while retaining *A-R-C-G-*, the Attorney General should require a more rigorous focus on case- and society-specific analysis in particular social group analysis.[11]

5.  *Matter of A-R-C-G-*'s Particular Social Group Analysis.

The Department generally supports the legal framework set out by the Board in *A-R-C-G-* for the adjudication of asylum and statutory withholding of removal applications premised on intra-partner domestic violence and the protected ground of membership in a particular social group. As noted, however, the Department firmly rejects the cognizability of putative particular social groups in this context when they are defined in whole or part by domestic violence, i.e., the harm alleged as the persecution suffered and/or feared forming the basis of the claim.

---

[10] In this regard, while the burden of proof is firmly on the applicant to establish eligibility for asylum and statutory withholding of removal, such does not eviscerate all responsibility on the Department or the Immigration Judge to help build an adequate record for adjudication. Though adversarial, a "cooperative approach" in Immigration Court should not be eschewed. *See Matter of S-M-J-*, 21 I&N Dec. 722, 724 (BIA 1997).

[11] And, of course, this principle applies, as a general matter, to all asylum and statutory withholding of removal applications. *See Mogharrabi*, 19 I&N Dec. at 442 (emphasizing the importance of "assess[ing] each case independently on its particular merits").

ABROP0386

In his March 30, 2018 order, the Attorney General emphasized that the Immigration Judge's certification order noted that "several Federal Article III courts have recently questioned whether victims of private violence may qualify for asylum . . . based on their claim that they were persecuted because of their membership in a particular social group." *Id.* at 249; *see* I.J. certification order at 2-4. The Department agrees with the core aspects of those decisions and believes that they provide helpful guidance for assessing asylum and statutory withholding of removal applications based on intra-family violence, including domestic violence. However, none of the circuit court decisions cited by the Immigration Judge questioned the underlying validity of *A-R-C-G-*. Rather, several of the decisions upheld the Board's appropriate case-by-case, society-specific analyses in distinguishing the subject aliens' circumstances from that in *A-R-C-G-*, including by analyzing whether the applicant was in fact a member of the claimed group, a necessary step in determining whether the harm feared would be on account of said group membership.

For example, in *Vega–Ayala*, the First Circuit explained that the "facts are a far cry from the circumstances in *A-R-C-G-*" insofar as the subject alien could have left her purported persecutor, never lived with him, "saw him only twice a week and continued to attend a university," and he was incarcerated for twelve months of their eighteen-month relationship. 833 F.3d at 39. In *Cardona*, the same court agreed with the Board that the subject alien had not factually demonstrated that she fit within her own proposed particular social groups: "Guatemalan women in domestic relationships who are unable to leave or women who are viewed as property by virtue of their positions within a domestic relationship." 848 F.3d at 523 (internal citations and quotation marks omitted). The First Circuit upheld the Board's determination that she "was never in a 'domestic' relationship" with her abuser. *Id.*

18

A▮▮▮▮

ABROP0387

In *Marikasi*, the Sixth Circuit explained that the Board had properly distinguished the subject alien's case in "important respects from *Matter of A-R-C-G-*," including her ability to leave her husband and avoid further contact with him for a substantial period of time.  840 F.3d at 291. The court also noted that "because of her ability to freely move through the country and avoid her husband," she "failed to substantiate any religious, cultural, or legal constraints that prevented her from separating from the relationship . . . or moving to a different part of that country." *Id.* Finally, the court observed that the facts showed that the subject alien "had a substantial network of family, friends, and co-workers who showed willingness and ability to help her" and that she "did not credibly show any particular actions or complicity by the government which would have rendered her unable to avail herself of that country's protection." *Id.*

Finally, in *Fuentes-Erazo*, the Eighth Circuit observed that, in contrast to *A-R-C-G-*, the subject alien "was, in fact, able to leave her relationship" and reside in her country "safely for approximately five years, during which time she traveled and worked . . . entered into a relationship with another man, and gave birth to a second child—all without having any contact whatsoever with" her former partner.  848 F.3d at 853.[12]

---

[12] Both *Marikasi* and *Fuentes-Arazo* reinforce the point that a domestic relationship is not necessarily an immutable trait.  The Department recognizes that an applicant's ability, per se, to obtain a legal divorce or separation – if legally married – and leave her country for the United States does not *automatically* mean that her domestic relationship is mutable.  Her former husband may not recognize the legal termination of their relationship, the authorities may not enforce it, and the only way she may be free of the relationship is, in fact, to leave her country. However, the ability to obtain a divorce or separation and leave her country are relevant considerations as to whether that relationship is mutable, and serve as strong evidence of the viability of internal relocation.  In this regard, it would be important for an adjudicator to consider whether the applicant actually sought the help of the authorities to enforce the legal termination of her relationship, and their response.  In addition, an applicant's ability to marshal support and resources to travel to the United States has a weighty bearing on whether she could have availed herself of those same support networks and resources to reasonably internally relocate within her own country, *see infra*, as opposed to invoking the need for international protection.  *See generally Silva v. Ashcroft*, 394 F.3d 1, 7 (1st Cir. 2005) (noting that "if a potentially troublesome state of affairs is sufficiently localized, an alien can avoid persecution by the simple expedient of relocating within his own country instead of fleeing to foreign soil").  Likewise, if the applicant can demonstrate that she needed to cross borders in order to avoid persecution, rather than relocating internally, that would support her claim.

19

A▮▮▮▮▮▮

The remaining significant circuit court decision discussed by the Immigration Judge in his certification order is *Velasquez*, 866 F.3d 188. I.J. certification order at 3-4. Specifically, the Immigration Judge opined that, "[i]n the absence of a similar concession by the DHS [as in *A-R-C-G-*] to the legal validity of the particular social group implicated in this case," and in light of the Fourth Circuit's decision in *Velasquez*, "*Matter of A-R-C-G-* may not be legally valid within this jurisdiction in a case involving a purely intra-familial dispute." I.J. certification order at 3-4. In this regard, the Department notes that while the Board in *A-R-C-G-* did acknowledge the Department's concession, it noted that such "comports with our recent precedents clarifying the meaning of the term 'particular social group'." 26 I&N Dec. at 392. The Board then proceeded to engage in a detailed, independent analysis of the particular social group formulation vis-à-vis the requirements of a common, immutable characteristic, particularity, and social distinction. *See id.* at 392-94. Moreover, in *Velasquez*, the Fourth Circuit did not overrule or even criticize *A-R-C-G-*. Rather, it simply observed that *A-R-C-G-* did not "control," given that the subject alien's particular social group, i.e., her nuclear family, was different from that in *A-R-C-G-*, and the cognizability of her particular social group was not in question. *See Velasquez*, 866 F.3d at 194, 195 n.5. The Fourth Circuit's analytical focus was on nexus in the context of an intra-family dispute involving a custody battle between the subject alien and her mother-in-law over the subject alien's child. *Id.* at 194-96.

Consequently, with respect to *A-R-C-G-* (and other Board precedent cited in the instant brief), while the Department recognizes that the Attorney General is not ultimately bound by such, *see, e.g.*, *A-B-*, 27 I&N Dec. at 249-50, the Department avers that the Attorney General should not directly or indirectly abrogate *A-R-C-G-*. Rather, as previously noted, the Attorney General should emphasize the importance of case- and society-specific analysis, as conducted by the Board in the

20     A

pertinent decision cited by the Immigration Judge in his certification order (as well as the necessity of satisfying all other requirements before establishing eligibility for asylum or statutory withholding of removal).

In addition, should the Attorney General abrogate *A-R-C-G-* and its holding that "married women in Guatemala who are unable to leave their relationship" can constitute a cognizable particular social group under appropriate circumstances, 26 I&N Dec. at 390, the focus of related protection claims before the Executive Office for Immigration Review and the Department may well shift to other particular social group formulations involving different, but no less complex cognizability (and nexus) issues.  For example, claims based on more distilled gender-based particular social group formulations, such as women of a specific nationality per se, likely would need to be addressed. *See, e.g.*, *Perdomo v. Holder*, 611 F.3d 662 (9th Cir. 2010) (discussing, and ultimately remanding, the question of "women in Guatemala" as a cognizable particular social group); *see also A-R-C-G-*, 26 I&N Dec. at 395 n. 16 (noting that "[s]ince the respondent's membership in a particular social group is established under the aforementioned group, the Board "need not reach" the "gender alone" issue.).

Particular social group formulations based on gender alone, or gender and nationality alone, also would more directly implicate significant policy considerations.[13] *See generally Matter of Rodriguez-Majano*, 19 I&N Dec. 811, 816 (BIA 1988) (observing that as the concept of what constitutes persecution on account of a protected ground expands, not only does the class of victims potentially eligible for asylum and statutory withholding of removal expand, but also the class of

---

[13] Additional briefing would be required to adequately address such additional issues, which are as varied as they are fundamental. It would involve, at a minimum, an examination of the legislative history to the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 197, the ratification history to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, and the *travaux préparatoires* to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259.  In any event, the examination of such foundational issues with broad-reaching implications is an exercise probably best left to rulemaking.

ABROP0390

persecutors barred from most forms of relief and protection), *abrogated on other grounds*, *Negusie v. Holder*, 555 U.S. 511, 522–23 (2009); *see also* 8 C.F.R. § 1240.8(d) ("If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

> 6.     Respondent's Particular Social Group Formulation.

As will be discussed, the Department's position is that the Board exceeded its proper scope of review over the Immigration Judge's original December 1, 2015 decision, in finding, *inter alia*, the respondent's particular social group to be cognizable.  Consequently, the most appropriate course would be for the Attorney General to remand this matter to the Board, with instructions to remand the case to the Immigration Judge to reassess this issue in the first instance under any clarified standards the Attorney General may enunciate.  Consequently, it is appropriate for the Department to withhold its own definitive analysis and argument on this issue as well, so they may be made in light of the Attorney General's decision.  The Department, therefore, respectfully reserves the right to continue to contest the cognizability of the respondent's putative particular social group, as necessary.

### C.     Other Requirements.

Aside from establishing the existence of a protected ground, such as a cognizable particular social group, other significant requirements must be met before eligibility for asylum or statutory withholding can be established in scenarios involving private criminal victimization.   The

22                    A▮▮▮▮▮

Department urges the Attorney General to reemphasize the individual importance of each such requirement in the adjudicative process.[14]

        1.  Adequate Testimony and, When Required, Corroboration.

Pursuant to the Act, the testimony of the applicant alone may be sufficient to sustain the applicant's burden of proof for asylum and statutory withholding of removal, but only if the applicant satisfies the adjudicator that the testimony: (i) is "credible," (ii) is "persuasive," and (iii) "refers to specific facts sufficient to demonstrate that the applicant is a refugee." INA §§ 208(b)(1)(B)(ii) (asylum); 241(b)(3)(C) (statutory withholding of removal). Further, even when an adjudicator determines that the applicant's testimony is "otherwise credible," the adjudicator can require the applicant to produce corroborating unless the applicant establishes that he does not have the evidence and cannot reasonably obtain it. *Id.*

With respect to asylum and statutory withholding of removal applications premised on private criminal victimization due to domestic violence, as in the instant case, the applicant presumably should have detailed knowledge of the abuser. The applicant's knowledge in this regard, or failure to reasonably explain the lack thereof, is relevant as to whether the applicant's testimony is credible, persuasive, and sufficiently detailed to satisfy the applicant's burden of proof under the Act. In addition, such information could help to better identify persecutors should they ever attempt to enter the United States or otherwise gain immigration benefits while present here.

Accordingly, with respect to domestic violence-based asylum and statutory withholding of removal applications, the Attorney General should consider mandating that the applicant provide

---

[14] In so doing, however, the Department recognizes that any given asylum or statutory withholding of removal application may give rise to clearly dispositive issues that do not necessitate an assessment of all remaining issues. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."); *Matter of S-H-*, 23 I&N Dec. 462, 465 (BIA 2002) (recognizing that in some situations, "a dispositive issue is sufficiently clear that resolving the case on that basis alone will be a sound exercise of judicial economy").

A▮▮▮▮

ABROP0392

specific information about the putative persecutor (or a reasonable explanation as to why such cannot be provided), such as: (i) full name, date of birth, and place of birth; (ii) full names of parents and siblings; (iii) last known address; (iv) last known telephone number (if any); (v) physical characteristics (e.g., race, height, weight, hair color, eye color, prominent scars or tattoos); (vi) copies of photographs (if any); (vii) name and location of last known employer or, if self-employed, name and location of business; (viii) any known criminal record, with approximate dates; (ix) any known military service, with approximate dates; (x) any known violent or otherwise abusive behavior towards other persons, and the identity of such victims; (xi) any known visits to the United States, with approximate dates; (xii) the most recent information as to health; (xiii) the most recent information as to any additional domestic or intimate relationships; and (xiv) any and all direct or indirect contact the applicant may have had with, or information received about, the putative persecutor following the applicant's arrival in the United States.

In addition, the Attorney General should consider mandating that an applicant provide specific personal information that may be materially relevant to an applicant's domestic violence-based claim that, in the Department's experience, has not normally been requested to date with respect to this type of claim, such as: (i) the applicant's own current domestic or intimate relationships, if any; (ii) any children born in the United States (along with pertinent birth certificates); and (iii) whether the applicant or the applicant's children, if any, have traveled abroad to a place where the putative persecutor could contact them since their arrival in the United States. The Department recognizes that inquiry into an applicant's current domestic or intimate relationships must be done with due care and appropriate sensitivity. The legitimate purpose of such an inquiry is to develop the record with material information to better assist the adjudicator in making a fully informed decision. For example, the existence of a new domestic or intimate

24

A

relationship may be pertinent to the putative persecutor's perception of his relationship with the applicant or to the putative persecutor's inclination to harm the applicant, whether negatively or positively. Additionally, if the applicant has a current domestic or intimate relationship, especially one that is legally recognized in the country of alleged persecution, this may be pertinent to issues of internal relocation and state protection in that country.

      2. Nexus.

An applicant for asylum and statutory withholding of removal, of course, also must establish the requisite nexus between the persecution at issue and a protected ground, i.e., that a protected ground was or will be "at least one central reason" for the persecution. *See* INA § 208(b)(1)(B)(i) (asylum); *Matter of C-T-L-*, 25 I&N Dec. 341, 348, 350 (BIA 2010) (applying the "one central reason" standard to statutory withholding of removal applications); *but see Barajas-Romero v. Lynch*, 846 F.3d 351, 358-60 (9th Cir. 2017) (rejecting *C-T-L-* and applying "a reason" nexus standard to statutory withholding of removal applications).

As previously noted, the Department is in basic agreement with the decisions of the "Federal Article III courts" cited by the Immigration Judge in his certification order, including *Velasquez*, 866 F.3d 188, that specifically focuses on nexus in the private criminal victimization scenario of an intra-family dispute, i.e., a custody dispute over a child between the child's mother and paternal grandmother. The Fourth Circuit observed that the paternal grandmother "was motivated out of her antipathy toward [the mother] and desire to obtain custody over [the child], and not by [the mother's nuclear] family status," and agreed with the Board and the Immigration Judge that the situation simply involved a "personal conflict between two family members seeking custody of the same family member." *Id.* at 195-96. The Fourth Circuit noted that the scenario "necessarily invokes the type of personal dispute falling outside the scope of asylum protection."

25

ABROP0394

*Id.* at 196.  The court observed that the "'asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships.'" *Id.* at 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)); *see also Costa v. Holder*, 733 F.3d 13, 17 (1st Cir. 2013) (upholding the Board and Immigration Judge's finding that the subject alien had failed to establish the requisite nexus to particular social group status involving "informants," and that "[t]here is little to suggest that the scope of persecution extends beyond a 'personal vendetta'").

The Fourth Circuit went on to distinguish the situation in *Velasquez* from those in two of its prior decisions, where it found that family members had, in fact, been targeted on account of their familial status: "Unlike *Cruz* or *Hernandez-Avalos*, this case does not involve outside or non-familial actors engaged in persecution for non-personal reasons, such as gang recruitment or revenge." 866 F.3d at 196.  The Department, however, respectfully disagrees with the Fourth Circuit's nexus analysis in those two decisions—*Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017), and *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015)—both of which involved scenarios of private criminal victimization.  The Fourth Circuit should not have found nexus to a protected ground, i.e., family-based particular social groups.

Specifically, in *Cruz*, Ms. Cantillano Cruz's husband was "disappeared" by his employer after the husband learned that the employer was a drug trafficker and sought to leave his job.  853 F.3d at 125.  When Ms. Cantillano Cruz and her husband's uncle questioned the drug trafficker about the husband's whereabouts, he told them "to stop asking questions." *Id.*  After the uncle stated his intent to file a police report, the drug trafficker "threatened that they would suffer the same fate as" the husband. *Id.*  Ms. Cantillano Cruz and the uncle visited the husband's place of employment several more times, but the drug trafficker told them "not to come back, and further

26

A

ABROP0395

warned 'that there were dangerous people around.'" *Id.* Subsequently, the drug trafficker separately threatened Ms. Cantillano Cruz and her children at her home. *Id.* The Fourth Circuit held that the Board and the Immigration Judge had applied "an improper and excessively narrow interpretation of the evidence relevant to the statutory nexus requirement," in that they had "shortsightedly focused on [the drug trafficker's] articulated purpose of preventing Cantillano Cruz from contacting the police, while discounting the very relationship that prompted her to search for her husband, to confront [the drug trafficker], and to express her intent to contact the police." *Id.* at 129. The court continued that "[i]n their failure to identify the nuclear family relationship as a central reason for Ms. Cantillano Cruz's persecution, the BIA and IJ further erred by giving weight to the fact that [the drug trafficker] did not threaten additional family members other than [the] uncle," and that the uncle was not a member of the domestic partner's "immediate, nuclear family, the only relevant social group." *Id.*

In the Department's view, it is the Fourth Circuit in *Cruz*, not the Board or Immigration Judge, which had an inappropriate and "excessively narrow" nexus focus. Any person who may have persisted in confronting the drug trafficker about the husband's whereabouts, such as a close friend, may well have received the same level of threats and harassment. Moreover, the drug trafficker also threatened the uncle. If familial relationship rather than an intent to thwart efforts to locate the husband were, in fact, the central reason for the trafficker's threats, the threats toward the uncle would lead to a broader focus on a more attenuated familial relationship than that of a nuclear family. Attenuated familial relationships, of course, are of questionable cognizability. *See Matter of L-E-A-*, 27 I&N Dec. 40, 42-43 (BIA 2017) ("Not all social groups that involve family members meet the requirements of particularity and social distinction . . . . [T]he inquiry in a claim based on family membership will depend on the nature and degree of the relationships

27

A

involved and how those relationships are regarded by the society in question.") (internal citations omitted).

In addition, the Fourth Circuit appears to have misapprehended a fundamental principle of nexus analysis in emphasizing "the very relationship *that prompted her* to search for her husband, to confront [the drug trafficker], and to express her intent to contact the police." *Id.* at 129 (emphasis added). Specifically, the Supreme Court has instructed that "the statute makes motive critical," but it is "the persecutors' motives" in persecuting the applicant on the basis of a protected ground that are critical. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). That Ms. Cantillano Cruz's familial relationship may have motivated her actions does not mean that they also motivated the actions of the drug trafficker, which is the ultimately determinative issue when analyzing nexus.

In *Hernandez-Avalos*, the Fourth Circuit also criticized the Board for its "excessively narrow" nexus focus when it concluded that the threats to kill Ms. Hernandez unless she allowed her son to join a gang were not made on account of her membership in her nuclear family, "but rather because she would not consent to her son engaging in a criminal activity." 784 F.3d at 949 (internal quotation marks omitted). The Fourth Circuit reasoned that:

> Hernandez's relationship to her son is why she, and not another person, was threatened with death if she did not allow him to join Mara 18, and the gang members' demands leveraged her maternal authority to control her son's activities. The BIA's conclusion that these threats were directed at her not because she is his mother but because she exercises control over her son's activities draws a meaningless distinction under these facts. It is therefore unreasonable to assert that the fact that Hernandez is her son's mother is not *at least one* central reason for her persecution.[15]

---

[15] Even the Fourth Circuit has recognized, however, that simple opposition to gang recruitment does not give rise to eligibility for asylum or statutory withholding of removal. *See Zelaya v. Holder*, 668 F.3d 159, 166 (4th Cir. 2012) (holding, in the context of a particular social group-based claim, that opposition to gangs and resisting gang recruitment "is an amorphous characteristic providing neither an adequate benchmark for determining group membership nor embodying a concrete trait that would readily identify a person as possessing such a characteristic").

28

A

ABROP0397

*Id.* at 950. Respectfully, the court's reasoning is flawed. It ignores the reasonable assumption that the gang, which it described as "particularly violent and aggressive," *id.* at 947 n.3 (internal quotations and citations omitted), would have threatened almost anyone who dared to interfere with its recruitment efforts. Under the court's nexus logic, if Ms. Hernandez had stood alongside her family's minister, a local political leader, and her son's teacher, all rebuffing the gang's recruitment efforts of her son, a central reason for any resulting threats or harm from the gang would be: with respect to Ms. Hernandez, her particular social group/nuclear family status; with respect to the minister, his religion; and with respect to the local political leader, his political opinion. The teacher, presumably, would be unable to establish the requisite nexus to a protected ground. Thus, the Fourth Circuit, of necessity, would ascribe a multiplicity of "central motives" to the gang arising from the same cabined gang recruitment incident. Despite its holding to the contrary, 784 F.3d at 950, it is difficult to discern how the Fourth Circuit's reversal of the BIA's nexus determination in *Hernandez-Avalos* was based on evidence "so compelling that no reasonable factfinder could fail to find" otherwise. *Elias-Zacarias*, 502 U.S. at 483–84.

In both *Cruz* and *Hernandez-Avalos*, the Fourth Circuit places such an expansive gloss on the meaning of the INA § 208(b)(1)(B)(i) term *"central* reason," that it effectively eviscerates the corollary point, i.e., that reasons "incidental or tangential to the persecutor's motivation" will not suffice. *See Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 213 (BIA 2007) (examining the

---

*See also E-A-G-*, 24 I&N Dec. 591 (holding that, under the circumstances of the case, a young Honduran male applicant failed to establish that he was a member of a cognizable particular social group of "persons resistant to gang membership"); *S-E-G-*, 24 I&N Dec. 579 (holding that, under the circumstances of the case, neither Salvadoran youth subjected to gang recruitment and who have rejected or resisted such based on their own personal, moral, and religious opposition to the gang nor the family members of such Salvadoran youth constitute a cognizable particular social group); *cf. Elias-Zacarias*, 502 U.S. at 483 (rejecting a guerrilla recruitment claim where the applicant failed to establish that the guerrillas had a motive other than increasing the size of their forces).

29        A▮▮▮▮▮▮

legislative history to INA § 208(b)(1)(B)(i) to help inform the meaning of the term "central"). These Fourth Circuit decisions represent a *sub silento* return to the "at least in part" nexus construct of the Ninth Circuit in decisions such as *Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 1999) (en banc), which Congress, in enacting INA § 208(b)(1)(B)(i), found to have "substantially undermined a proper analysis of mixed motive cases."[16]  H.R. CONF. REP. NO. 109-72, at 163 (2005).

The *Cruz* and *Hernandez-Avalos* decisions' expansive nexus construct also effectively ignores the reality that such a construct must be applied not only when determining who is a victim of persecution on account of a protected ground, but also when determining who is a perpetrator of persecution on account of a protected ground and thus barred from most forms of relief and protection as ones "who ordered, incited, assisted, or otherwise participated in" persecution pursuant to INA §§ 101(a)(42), 208(b)(2)(A)(i), 241(b)(3)(B)(i).  For example, if one were to apply the Fourth Circuit's expansive meaning of the term "central" to a civil war setting, almost all participants potentially would be subject to the "persecutor" bar.

In sum, the Department would urge the Attorney General to consider Judge Wilkinson's thoughtful concurrence in *Velasquez*, in which he raised several salient points with respect to particular social group status and nexus assessments in the context of private criminal victimization. He recognized that while many persecution claims presented highly sympathetic situations, the "protected characteristics . . . are for the most part precisely defined," and particular social group status was not intended by Congress to be "some omnibus catch-all." 866 F.3d at 198.

---

[16] Of further relevance to *Cruz* and *Hernandez-Avalos* is the Ninth Circuit's nexus analysis in *Briones v. INS*, 175 F.3d 727, 728-29 (9th Cir. 1999) (en banc), where the court rejected the Board's assessment that a guerrilla group's targeting of a former informer would have occurred regardless of what political opinion he held and, instead, determined that his "active involvement in a fiercely ideological dispute between the government . . . [and the guerrilla group] leads us inexorably to the conclusion on these facts that the [guerrilla group] surely attributed to him an adverse political point of view when they placed him on their assassination list . . . ." In enacting INA § 208(b)(1)(B)(i), Congress specifically rejected *Briones* as well. *See* H.R. CONF. REP. NO. 109-72, at 163.

ABROP0399

Concerning private criminal victimization of families, he observed that "[v]ictims of general extortion . . . that is not unique to any family but rather that affects all segments of the population are nonetheless seizing upon the particular social group criterion in asylum applications." 866 F.3d at 199 (internal quotation marks and citations omitted) (citing *S-E-G-*, 24 I&N Dec. at 587-88). Judge Wilkinson reasoned that it is difficult "to establish the necessary causation when so many persons outside the particular social group experience identical persecution for the same overarching reasons," and that the "pervasive nature of the persecution threatened in these cases suggests that family membership is often not a central reason for the threats received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies." *Id.*

3. Harm Suffered/Feared Must Amount to "Persecution."

An additional requirement, of course, to establish eligibility for asylum or statutory withholding of removal based upon private criminal victimization is that the harm suffered and/or feared must amount to "persecution." "Persecution" is a legal term of art that is not defined in the Act. Rather, it has been defined almost exclusively by case law. *See, e.g.*, *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 340-41 (2d Cir. 2006). In this regard, case law has developed three core aspects of the term to help inform its meaning.

First, the concept of "persecution" involves an intent to target a belief or characteristic. *See, e.g.*, *L-E-A-*, 27 I&N Dec. at 44 n.2 ("In *Matter of Acosta*, 19 I&N Dec. at 222, our original definition of persecution included 'harm or suffering . . . inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor sought to overcome.' However, in *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996), we clarified that a punitive intent is not required and held, instead, that the focus is only whether the persecutor intended to 'overcome [the

31

A█████

ABROP0400

protected] characteristic of the victim.'"). Second, the level of harm must be "severe."[17] *See Matter of T-Z-*, 24 I&N Dec. 163, 172-73 (BIA 2007); *see also Fatin*, 12 F.3d at 1243 (observing that "'persecution' is an extreme concept that does not include every sort of treatment our society regards as offensive"). Third, to constitute "persecution," the harm or suffering must be "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Acosta*, 19 I&N Dec. at 222.

The "unable or unwilling to control" aspect of the concept of persecution is of critical importance in scenarios of private criminal victimization, which may include victimization by local officials acting in a private capacity.[18] "Perfect protection" is not the standard. Rather, the question is whether there is a reasonably effective government system in place for the prevention, investigation, prosecution, and punishment of mistreatment. In this regard, the fact that an individual may suffer severe private criminal victimization and the perpetrator is not brought to justice does not necessarily mean that the government is "unable or unwilling to control" the

---

[17] Of particular relevance to asylum and statutory withholding of removal applications based on domestic violence is the Eight Circuit's recent decision in *Lopez-Coronado de Lopez v. Sessions*, wherein the court concluded that Ms. Lopez had failed to establish past persecution at the hands of her husband. 886 F.3d 721 (8th Cir. 2018). The court noted that her husband had "hit her five to ten times over the course of a fourteen-year marriage," most recently assaulting her with a cell phone cord and a belt, but reasoned that "[a]lthough the two most recent assaults left temporary marks on her skin, Lopez never sought medical care and did not claim any lasting injuries," and that "[p]ersecution is an extreme concept, and minor beatings do not amount to persecution." *Id.* at 723, 724.

[18] As previously discussed, *see supra* note 2, the Department interprets "private" to mean when the direct perpetrator of harm is not "a government or . . . government-sponsored" within the meaning of the standard for reasonable internal relocation. *See* 8 C.F.R. §§ 1208.13(b)(3)(ii) (asylum),1208.16(b)(3)(ii) (statutory withholding of removal). In this regard, for example, the actions of low-level, corrupt officials ordinarily do not represent those of the "government" at large. *See Silva v. Ashcroft*, 394 F.3d 1, 7-8 (1st Cir. 2005) (holding that "an alien who asserts a fear of future persecution by local functionaries ordinarily must show that those functionaries have more than a localized reach," and determining that the putative persecutor in the case was "an individual whose sphere of influence apparently encompasses only one municipality in a large country," and there was "no evidence that the government cannot or will not protect the petitioner should he return," such that "relocation within the country is a feasible course of action"); *see generally Matter of C-T-L-*, 25 I&N Dec. 341, 349 (BIA 2010) (citing *Baghdasaryan v. Holder*, 592 F.3d 1018, 1024 (9th Cir. 2010), and noting that the "officers' scheme represents 'aberrational' conduct by individuals, not systemic government-sanctioned corruption"). Where the perpetrator is a private actor who is not exercising authority he has or is perceived to have by virtue of his official position, the applicant has the additional burden to establish that the government is unwilling or unable to control that private actor.

32

A▮▮▮▮▮▮

ABROP0401

perpetrator such that the individual has suffered "persecution." Just as in this country, the offense might not have been brought to the attention of the authorities,[19] the perpetrator might have absconded, there may be a lack of actionable evidence, etc. Further, while a lack of resources is relevant to a government's "ability" to control private criminal victimization, such an assessment must be informed by the fact that no country in the world has unlimited law enforcement resources. Even the United States is afflicted with significant violent crime, including hate crimes and intimate partner violence. *See* U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Hate Crime Victimization, 2004-2015* (June 2017) (Summary) (noting that from 2004 to 2015, U.S. residents experienced an average of 250,000 hate crime victimizations), https://www.bjs.gov/content/pub/pdf/hcv0415_sum.pdf; U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Intimate Partner Violence: Attributes of Victimization, 1993–2011* (Nov. 2013) at App. Table 3 (noting that, that, as late as 2000, almost 1 million women over the age of 12 in the U.S. had suffered some form of intimate partner violence), https://www.bjs.gov/content/pub/pdf/ipvav9311.pdf. And, in the United States, a significant portion of violent crimes are never resolved. *See* Gramlich, *Most violent and property crimes in the U.S. go unsolved*, Pew Research Center (Mar. 1, 2017) (citing official U.S. Government statistics), http://www.pewresearch.org/fact-tank/2017/03/01/most-violent-and-property-crimes-in-the-u-s-go-unsolved/; *see also Burbiene v. Holder*, 568 F.3d 251, 255 (1st Cir. 2009) (rejecting

---

[19] The Department's position is that there is no absolute requirement that an applicant must have reported private criminal victimization to the authorities in attempting to establish that a government is "unable or unwilling to control" private criminal victimization to the authorities. However, the lack of such reporting leaves a "leaves a gap in proof about how the government would respond if asked, which the petitioner may attempt to fill by other methods," such as via persuasive evidence that such reporting would have been futile. *See Rahimzadeh v. Holder*, 613 F.3d 916, 922 (9th Cir. 2010); *see also Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069-70 (9th Cir. 2017) (en banc) (clarifying that the lack of reporting creates no heightened evidentiary standard or burden of proof for an applicant, and that in a situation where a class of victims could not reasonably be expected to report, e.g., young gay children, an adjudicator cannot properly expect country condition information detailing how a government responds to their specific victimization).

A

ABROP0402

petitioner's argument "that Lithuania is unable or unwilling to control the problem of human trafficking," noting that "Lithuania is making every effort to combat human trafficking, a difficult task not only for the government of Lithuania, but for any government in the world") (internal quotation marks omitted); *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 (9th Cir. 2005) (observing that police inability to solve the crimes after some investigation does not compel a finding that the government is unwilling or unable to control the persecutors).

Accordingly, the Department asks the Attorney General to clarify the concept of "persecution" in this regard.

### 4. Reasonable Internal Relocation.

To establish the requisite risk of future persecution for either asylum or statutory withholding of removal when the persecution is not "by a government or . . . government-sponsored," such as in a scenario of private criminal victimization, an applicant must show that she or he could not avoid the harm via reasonable internal relocation.[20]  *See* 8 C.F.R. §§ 1208.13(b)(2)(ii), 1208.16(b)(2). As a primary matter, and as previously discussed, *see supra* note 19, when local officials are the perpetrators of the harm while acting in a private capacity, such should not be deemed persecution inflicted by or sponsored by the "government." Further, based upon the pertinent regulations, the Board has set out an appropriate framework for assessing whether an applicant for asylum or statutory withholding of removal has established an inability to reasonably relocate internally. *See Matter of M-Z-M-R-*, 26 I&N Dec. 28 (BIA 2012). In this regard, mere bald assertions are insufficient to establish an applicant's inability to do so. *See Gonzalez-Medina v. Holder*, 641 F.3d 333, 338 (9th Cir. 2011) (in the context of a domestic

---

[20] When an applicant has established past persecution, or that the perpetrator of future persecution is a government or is government-sponsored, there is a rebuttable presumption that "internal relocation would not be reasonable." *See* 8 C.F.R. §§ 1208.13(b)(3)(ii), 1208.16(b)(3)(ii).

34

A

ABROP0403

violence-based statutory withholding of removal application). Moreover, the more highly localized the threat, the more likely it is that reasonable internal relocation will be possible. *See generally Tendean v. Gonzales*, 503 F.3d 8, 11 (1st Cir. 2007) ("The troubling events that Tendean described occurred only in Tendean's very small home village . . . , and there is no evidence that his father's political opponent's supporters have any capacity or inclination to pursue Tendean outside of the village.").

5. Regulatory Presumption of Future Persecution Based on Past Persecution.

Finally, it is important to remember in the context of asylum and statutory withholding applications based upon private criminal victimization that even if an applicant establishes past persecution on account of a protected ground so as to trigger the regulatory presumption of future persecution, that presumption is subject to rebuttal. *See* 8 C.F.R. §§ 1208.13(b)(1), 1208.16(b)(1)(i). Specifically, the Department has the opportunity to establish by a preponderance of the evidence either that there has been "a fundamental change in circumstances," such that the applicant no longer has the requisite fear of future persecution, or that the applicant could avoid future persecution via reasonable internal relocation. *Id.*; *see M-Z-M-R-*, 26 I&N Dec. at 31; *Matter of Y-T-L-*, 23 I&N Dec. 601, 605 (BIA 2003). In addition, an applicant's ability to marshal support and resources to travel to the United States has a bearing on whether the applicant could have tapped that same support and resources to reasonably internally relocate within the country of alleged persecution. Further, an applicant's personal circumstances, or country conditions, can fundamentally change for the better, including in the context of private criminal victimization.

II. THE BOARD EXCEEDED THE PROPER SCOPE OF ITS REVIEW.

In contrast to the Attorney General, the Board does not review all issues de novo or retain full authority to receive additional evidence and to make factual determinations. Rather, the Board

35 A

reviews an Immigration Judge's findings of fact, including the determination of credibility, under the "clearly erroneous" standard, and reviews de novo questions of law, discretion, judgment, and all other issues on appeal from an Immigration Judge. *See* 8 C.F.R. § 1003.1(d)(3)(i)-(ii); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587-88 (BIA 2015). The Board is prohibited from engaging in factfinding in deciding an appeal, save for taking administrative notice of commonly known facts such as current events or the contents of official documents. *See* 8 C.F.R. § 1003.1(d)(3)(iv).

In this regard, the Department respectfully contends that the Board exceeded its scope of proper review when it determined that the respondent was eligible for asylum, because such a determination necessarily involved making determinations on factual issues which were contested below and remain contested on appeal. For example, the Board found that the respondent was credible, *see* BIA at 1-2, that her particular social group was cognizable, *id.* at 2, that she established membership in her particular social group, *id.* at 2-3, that she established the requisite nexus between the harm that she suffered and feared and her putative particular social group, *id.* at 3, and that she established "persecution" insofar as the Salvadoran Government was "unable or unwilling to control" her ex-husband, *id.* at 3-4. All of these issues involve factual determinations. *See Z-Z-O-*, 26 I&N Dec. 586, 587-88 (noting that credibility determinations involve findings of fact, citing 8 C.F.R. § 1003.1(d)(3)(i)); *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 191 (BIA 2018) (noting that while the Board reviews "the ultimate determination whether a proposed group is cognizable de novo," it reviews "an Immigration Judge's factual findings underlying that determination for clear error," and that a "determination whether a social group is cognizable is a fact-based inquiry made on a case-by-case basis, depending on whether the group is immutable and is recognized as particular and socially distinct in the relevant society") (internal quotation marks and citations omitted); *id.* (noting that the issues of membership in a particular social group

36

ABROP0405

and nexus between the persecution suffered and/or feared and group membership are "inherently factual in nature") (internal citations omitted); *Hernandez-Avalos*, 784 F.3d at 951 ("Whether a government is unable or unwilling to control private actors is a factual question.") (internal quotations marks, punctuations, and citations omitted).

While the Board unquestionably had the authority to review the Immigration Judge's factual findings for clear error, it did not have the authority to make factual findings based on a contested record in the Immigration Judge's stead on appeal. The Board, as "an appellate tribunal merely has authority to reverse erroneous fact findings and no authority to correct them." *See Board of Immigration Appeals: Procedural Reforms to Improve Case Management*, 67 Fed. Reg. 54878, 54890 (2002) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)). Consequently, the Board should have remanded the case to the Immigration Judge to make new factual determinations necessary to the disposition of the case free from the errors it identified.

Accordingly, the Attorney General should vacate the Board's determination that the respondent met her burden of proof to establish eligibility for asylum, insofar as the Board exceeded the proper scope of its review authority.[21]

## CONCLUSION

---

[21] The Department reserves the right to continue to contest all pertinent issues concerning the respondent's eligibility for asylum and statutory withholding of removal (and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture) on any remand to the Board or further remand to the Immigration Judge. In this regard, however, to ensure that "justice is done," *see S-M-J-*, 21 I&N Dec. at 727, the Department notes the following:  the Immigration Judge discounted part of the respondent's corroborating evidence concerning her marital relationship to her abuser because the translation of her 2001 Salvadoran protective order, which showed that she was ten years older than her abuser (i.e., "the respondent was thirty years old, and B▬ was twenty years old"), was inconsistent with her 1998 marriage certificate, which showed she only was one year older than her abuser, *see* I.J. (Dec. 1, 2015) at 6 (citing Exh. 3, Tab H); however, it appears that the Immigration Judge's finding in this regard was based on the respondent's mistranslation of the original 2001 Salvadoran protective order.  Specifically, the respondent's English language translation of the protective order states, in pertinent part: "Mr. W▬ A▬ L▬ B▬, who is twenty years old." Exh. 3, Tab H at 46.  However, the Spanish language Salvadoran document states, in pertinent part: "el señor W▬ A▬ B▬ L▬ quien es de veintinueve años de edad," *id.* at 48, which correctly translates as "Mr. W▬ A▬ B▬ L▬, who is twenty-nine years of age." *See, e.g.*, Google Translate, https://translate.google.com/.

A▬

ABROP0406

The Attorney General should issue a decision clarifying the standards for applications of asylum and statutory withholding of removal premised on private criminal victimization consistent with the arguments and authorities set forth by the Department, and abstain from abrogating *A-R-C-G-*. The Attorney General should vacate the Board's decision finding that the respondent established eligibility for asylum, because it exceeded the scope of its proper review authority. Finally, the Attorney General should remand the instant case to the Board and direct the Board to further remand it to the Immigration Judge for any additional factfinding that may be necessary, and an entirely new decision based on the Attorney General's clarified standards.[22]

---

[22] Although the Attorney General has de novo review authority, *see J-F-F-*, 23 I&N. Dec. at 913, remand to the Immigration Judge is the most appropriate course of action in this case. *See Matter of A-H-*, 23 I&N Dec. 774, 783, 785 (A.G. 2005) (concluding that the "BIA applied an incorrect legal standard," vacating its determination, and "remand[ing] for further proceedings consistent with the legal standard articulated herein," and further noting that it may be appropriate for the "BIA . . . to remand this case to an Immigration Judge for additional relevant fact-finding").

A

ABROP0407

Respectfully submitted on this 20th day of April, 2018, by:

_____

Michael P. Davis
Exec. Deputy Principal Legal Advisor
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security[23]

---

[23] The Department respectfully requests that all correspondence to it in this matter continue to be directed, in the first instance, to the local U.S. Immigration and Customs Enforcement (ICE) Office of the Chief Counsel in Charlotte, North Carolina, with copies to Christopher S. Kelly, Chief of the Immigration Law and Practice Division within ICE's Office of the Principal Legal Advisor.

A▮▮▮▮▮

ABROP0408



## PROOF OF SERVICE

On April 20, 2018, I, Christopher Kelly, Chief, Immigration Law and Practice Division, U.S.
Immigration and Customs Enforcement, mailed a copy of this U.S. Department of Homeland
Security Brief on Referral to the Attorney General and any attached pages to the respondent's co-
counsel, Benjamin Winograd, Esq., Immigrant & Refugee Appellate Center, LLC, 3602 Forest
Drive, Alexandria, VA  22302, by placing such copy in my office's outgoing mail system in an
envelope duly addressed.

6

## DECLARATION OF STUART L. LUSTIG, M.D., M.P.H.
## EXPERT ON TRAUMA AND ASYLUM SEEKERS

I, Stuart L. Lustig, declare under penalty of perjury of the laws of the State of California:

**Background and Qualifications**

1.  I am a psychiatrist, Board Certified in Child & Adolescent Psychiatry by the American Board of Psychiatry and Neurology. I am a Lead Medical Director for Cigna Behavioral Health, and an Associate Professor of Clinical Psychiatry at the University of California San Francisco where I served as Director of the Child and Adolescent Psychiatry Residency Training Program from 2005 to 2011. I have also served as a Fellow in Psychiatry at Harvard Medical School and an Assistant Professor in Psychiatry at Boston University School of Medicine. I received a Master in Public Health (M.P.H.) from the University of Illinois in Chicago in 1992. I received my Doctorate of Medicine (M.D.) from Rush Medical College in Chicago, Illinois in 1996, and completed a psychiatry internship at Stanford University in Palo Alto, California. I then completed two years of adult psychiatry training at the Harvard Longwood Psychiatry Residency Training Program in Boston, Massachusetts, followed by two years of fellowship training in child and adolescent psychiatry at Children's Hospital of Boston. I have served as a member of Boston Medical Center's Trauma Team within the Division of Child and Adolescent Psychiatry, and I have researched both medication and psychotherapy treatments for Post-Traumatic Stress Disorder. I have published articles in peer-reviewed journals about diagnostic patterns and service delivery in developing nations. I have also published book chapters and articles in peer-reviewed journals about the mental health of refugees, appropriate treatments for refugees, the assessment of trauma among asylum seekers, the role of medical evaluations in the asylum process, and the prevalence of stress and burnout among United States immigration judges.

ABROP0620

2. Over the past twenty years, I have been retained as an expert witness in numerous asylum-related matters, including the determination of mental illness as it pertains to late filings of asylum applications, adjudicated by U.S. Department of Homeland Security Asylum Offices and U.S. Department of Justice Immigration Courts. I have also been involved with civil cases pertaining to asylum and other matters. As part of that work, I have conducted psychiatric assessments of dozens of individuals seeking asylum, with a focus on torture, trauma and associated psychiatric consequence. I have written reports and declarations based on these assessments. I have also provided training sessions to other clinical volunteers on behalf of both Physicians for Human Rights and also HealthRight International (formerly called Doctors of the World), organizations that also conduct evaluations of asylum seekers who have experienced trauma. In addition, I have provided formal training sessions on trauma to both immigration judges and asylum officers on several occasions. A copy of my curriculum vitae is attached hereto.

3. I was asked by the Center for Gender and Refugee Studies to review the case of A ▮ and the psychological assessments completed by Dr. Jessica Pena-Cabana conducted in March 2018 and June 2015 specifically to provide my expert opinion regarding the psychological impact prior trauma likely had on the ability of Ms. B to subsequently disclose various aspects of that trauma, such as the harms she experienced in the past and the harms she fears in the future, in settings such as border screenings and credible fear interviews upon arrival to the United States and throughout the development of her case, even to seemingly trustworthy allies such as her attorneys. Several factors, such as those present in this case, can prevent the immediate recall and disclosure and cohesive description of traumatic events, even when directly asked about those events and even when victims may understand that their legal

ABROP0621

teams are sympathetic to their situation and in a position to maximize their chances of obtaining legal relief.

**Review and Analysis of Previous Assessment of Ms. B**

4. On April 17th and 18th, 2018, I reviewed the above mentioned psychological assessments completed by Dr. Pena-Cabana. In the medical field, it is common for clinicians to review each other's records in the context of rendering a second opinion, and/or evaluating forensic assessments. I have also reviewed Ms. B's supplemental declaration and the immigration judge's decision denying her asylum claim. Because the abuse Ms. B endured at the hands of her former husband and other actors in El Salvador is well described in the above records, I will not review the details here and will limit my comments to Ms. Pena-Cabana's assessment and the extent to which Ms. B's psychiatric symptoms would have impacted her ability to disclose her past trauma at the various stages in her case in a complete and linear manner.

5. Having reviewed Ms. Pena-Cabana's credentials, including her clinical training and experience, I opine that she is fully capable of diagnosing psychological illnesses. Additionally, she followed recognized procedures including the use of clinical interview techniques and clinical observations. As stated in her report, Ms. Pena-Cabana based her diagnoses on a clinical interview and other assessment tools, which are standard practice for mental health clinicians in this country for diagnosis and treatment. I agree with her diagnoses of Posttraumatic Stress Disorder (PTSD), Major Depressive Disorder and Generalized Anxiety Disorder.

6. I have reviewed Immigration Judge Couch's December 1, 2015 decision in this case in which he ruled that Ms. B was not a credible witness due to perceived omissions between her in-court testimony and her written submissions as well as previous interviews with immigration officials. As described below, the symptoms of psychological trauma displayed by

ABROP0622

Ms. B███ such as avoidance are entirely consistent with her diagnoses of trauma related disorders.

## Disclosure of Traumatic Events in Stressful Settings Such as Border Interviews

7. An extremely common consequence of all serious interpersonal violence, e.g. that which is perpetrated intentionally by other people and includes domestic and other forms of gender-based violence, is persistent avoidance by the victim of anything that evokes the memory of the trauma. Because these memories are painful both emotionally and physiologically, and often include sweating and palpitations and the feeling of panic, trauma victims take pains to avoid people, places, and activities that trigger these memories. For example, a victim of a trauma on a bus may avoid riding buses, or even walking along streets frequented by them. Victims of gang violence may go to great lengths to avoid anyone dressed like a gang member. Sometimes trauma victims avoid reading newspaper articles about their countries, or even conversations with their compatriots that can lead to unwanted memories.

8. Indeed, a common trigger for these haunting memories is a question or conversation about the trauma specifically, the kind of conversation that border agents attempt to conduct. Unfortunately, these interviews may occur in settings such as jails or detention centers that, by virtue of their harsh surroundings, either evoke the feelings of powerlessness in which recent trauma (within the country of origin or en route to the United States) may have occurred, or at the very least prevent a victim from letting down his or her guard sufficiently to trust the interviewer. Some victims can tolerate these conversations about their trauma to a limited extent, but most victims require significant psychotherapy to overcome their fear of activating these painful memories. Even with a trusted attorney, these memories take significant time to elicit and organize into a coherent narrative. Thus, many victims of trauma with symptoms of

123

ABROP0623

7

## DECLARATION OF CECILIA MENJIVAR, PH.D.
## EXPERT ON VIOLENCE AGAINST WOMEN IN EL SALVADOR

I, Cecilia Menjivar, Ph.D., hereby swear and affirm the following:

**Introduction and Summary**

1. I have been asked for my opinion regarding the case of Ms. A██ B███, who is applying for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture. I wrote this opinion and I am providing this opinion pro bono. I understand that Ms. B██ is seeking asylum due to severe domestic abuse, including physical, sexual and emotional violence, suffered from her former husband in El Salvador and her inability to get away from him in El Salvador as well as other past harms such as child abuse and current threats against her life at the hands of gang members. I have agreed to comment on gender relations, violence against women, and the sociopolitical conditions in El Salvador that will place Ms. B██ in danger should she be forced to return to El Salvador.

2. In general, violence against women is ingrained in El Salvador's sociocultural practices. Most men and many women in El Salvador believe that domestic violence is a normal part of relations in a domestic union. The impunity with which El Salvador's state institutions have reacted to the abuse, rape and killings of women serves to normalize violence and sends a message that the lives of women are expendable. The government of El Salvador is well aware of domestic violence and femicide, yet is broadly unable and unwilling to remedy the ingrained violence against women in abusive domestic relationships. Even though the government has made recent efforts to address domestic violence in El Salvador, these programs are minimally effective because the attitude and social expectations at large have remained unchanged. Additionally, although El Salvadoran law prohibits violence against women and institutes penalties for a series of crimes against women, violence against women continues underreported as a widespread and serious problem. Moreover, they who attempt to escape and are caught, often face escalated abuse at the hands of their abuser, because they dared to try to leave.

3. I believe that Ms. B██ is at risk because she is a woman who would be unable to escape her abusive former husband in a country that is unable and unwilling to remedy ingrained violence against women in abusive domestic relationships. There are also other layers of vulnerability in Ms. B██'s case, as she faces gang violence and is poor.

**My Knowledge of El Salvador**

4. I have considerable knowledge relevant to the sociopolitical conditions of El Salvador and how they relate to Ms. B██'s case, based on my formal education, field work, decades of academic research and publications, teaching at the university level, personal experience, and prior affidavits for asylum applicants from El Salvador. I wrote my first book on Salvadoran migration to the United States, for which I conducted extensive research of country conditions, including historical and political circumstances. My last visit to El Salvador was in October 2016. I have regularly worked closely (and keep in

142

ABROP0642

touch) with researchers and other key professionals there, including helping to write a UN Human Development Report for El Salvador, and presenting work at universities when I visit there.

5. I am a Foundation Distinguished Professor of Sociology at the University of Kansas. I am a member of the executive council for the Center for Latin American Studies at KU. Until June 30th 2015, I was a Professor in the School of Social and Family Dynamics at Arizona State University, an Affiliate of the Women's Studies Program at Arizona State University, and an Affiliate of the Department of Transborder, Latino/a & Chicano/a Studies. In 2012-2013 I was a Senior Fellow at the Immigration Policy Institute, American Immigration Council. There, I wrote a report on immigrant women as they go through the legalization process based on an article I published in a prominent academic journal. I was a member of the National Academy of Sciences panel on immigrant integration and we collectively wrote a report published in 2015 on the most cutting-edge scholarship on the topic. In addition, I am in charge of summarizing the most important sociological research about and from Central America that the Library of Congress publishes every two years.

6. I hold a Ph.D. in Sociology from the University of California (1992), a Master of Arts in Sociology from the University of California (1986), a Master of Science in International Education from the University of Southern California (1983) and a Bachelor of Arts in Psychology and Sociology from the University of Southern California (1981). I was awarded a 2014 John S. Guggenheim Fellowship and several awards related to my research of violence in the lives of women in Guatemala such as the 2012 Distinguished Scholarship Award from the Pacific Sociological Association, the 2012 Mira Komarovsky Book Award, the 2011 Hubert Herring best Book Award and others. At the moment I hold an Andrew Carnegie Fellowship, which allows me to devote the current academic year to writing a book about Salvadoran, Guatemalan, and Honduran migration to the United States.

7. My doctoral dissertation was on the topic, "Salvadoran Migration to the U.S: The Dynamics of Social Networks in International Migration," and I have written a book on Salvadoran migration to the United States. I have written many articles on Salvadoran immigrant families, women and gender relations, and domestic violence. I co-edited a book on women and gender in Latin America and co-authored the chapter on migration, gender and family to be included in the Human Development Report for El Salvador, sponsored by the United Nations Development Programme. Most recently, I published a book, Enduring Violence: Latina Women's Lives in Guatemala, which is based on research I conducted in eastern Guatemala, a region much closer (geographically, historically and socioculturally) to El Salvador than to the rest of Guatemala. And I co-authored an academic article published in Current Sociology which analyzes laws that seek to address gender-based violence in El Salvador and their faulty implementation.

8. Recently, in 2016, I co-authored an academic article, "Impunity and multisided violence in the lives of Latin American women: El Salvador in comparative perspective." In this article, we engaged in a comprehensive review of all the violence against women laws in El Salvador, published in *Current Sociology*, a well-known sociological journal. The

ABROP0643

article also examines the implementation of these laws. We conclude that although El Salvador has created institutions and laws to combat crimes against women, these crimes have continued undiminished. We also conclude that impunity and violence in El Salvador are deeply intertwined, and that violence is rooted in gender and gendered norms as well as other factors. Moreover, structural aspects, including social and governmental institutions, create and exacerbate the conditions that permit violent acts against women and impunity to persist.

9.  In the past few years, I have provided expert testimony for more than two-dozen Salvadoran women seeking asylum based on domestic abuse. I do not take all cases for which I am asked to be an expert, and have turned away many cases. The only cases I take are those which fall within my expertise on gender-based violence against women, particularly women in unions. And all the cases I take are pro bono.

10. Attached hereto is a copy of my CV.

**Sociocultural Context of Domestic Relationships in El Salvador**

11. Empirical evidence coupled with the legal framework applicable to domestic violence in El Salvador demonstrates that the country's government is extremely well aware of, yet broadly unable and unwilling to remedy, ingrained violence against women in abusive domestic relationships.

12. Violence against women, including domestic violence, has increased over this time. For example, in the first five months in 2000, there were reports of approximately 41 women killed in femicide cases (the killing of females by males because they are female). The official rate of femicide in the subsequent two decades demonstrates some fluctuation but overall a marked increase from the period of the early 2000's to the present day.  A 2012 report by the organization Small Arms Survey analyzed worldwide data from 2011 and ranked El Salvador as the country with the highest rate of femicides in the world, with 12 femicides per 100,000 people. According to the Gender Violence Observatory (*Observatorio de la Violencia de Género*), the organization that monitors gender violence (which analyzes data obtained directly from the Civil National Police) run by ORMUSA (Organization of Salvadoran Women), 468 women were killed in 2017. This is approximately one woman killed every 19 hours in a country with a population less than 1/50[th] the size of the United States. Moreover, these are only the reported cases, which are in all likelihood a significant underestimate of the actual femicide rate.  I should note the difference in usage between the term femicide and feminicide. Femicide refers to the killings of women because they are women. Feminicide also refers to the killings of women but points to the complicity of the state, through omission or commission, in these killings. Governments use the term femicide in their reports and statistics (and thus when referring to these sources I use this term). I use feminicide in all my writings, as this term more accurately points to the role of the state in the impunity for these crimes.

13. Data from the 2008 National Census of Family Health (FESAL-08) in El Salvador found high levels of physical, sexual, and other abuse within the context of marriage and domestic relationships. This data is entirely consistent with my own research and

ABROP0644

professional knowledge of the current conditions in El Salvador. Violence has generally increased since the Peace Accords were signed in December 1991 and made effective in 1992. El Salvador is now ranked among the most violent countries in the world, with the second-highest homicide rate in the Western Hemisphere. The homicide rate there is roughly three times that of Mexico and 14 times that of the United States.  And, as noted, the murder rate of women is the highest in the world.

14. The government of El Salvador has responded less than adequately and in fact may have exacerbated the problem, as I discuss below. The U.S. Department of State reported the 2012 conviction rate for domestic or intrafamilial violence as 1.5% in El Salvador (3367 cases and 51 convictions). The impunity with which El Salvador's state institutions have reacted to the abuse, rape and killings of women serves to normalize violence, sends a message that the lives of women are expendable, and ensures impunity to the abusers.

**Social Reaction to Domestic Violence in El Salvador**

15. The United States Department of State 2016 Human Rights report on El Salvador, consistent with prior years' reports, concluded that violence against women, including domestic violence, was a widespread and serious problem. Laws against domestic violence, though existent, were not well enforced, and cases were not effectively prosecuted. As the Human Rights reports indicate, even though the law prohibits violence against women and there are penalties for a series of crimes against women, violence against women continues underreported as a widespread and serious problem. The reports indicate that a large portion of the population considers domestic violence acceptable within the context of a union.

16. In my research examining Salvadoran communities in several cities in the United States—San Francisco, Phoenix, and Washington DC—the Salvadoran women indicated that they feel safer in the United States, that the laws in El Salvador against domestic violence do not exist or do not work, and that abuse in El Salvador is considered "normal." They are able to make these comparisons only after they are in the United States, as in El Salvador many people do not imagine anything different from the normalization of abuse. At the same time, practically all Salvadoran men I asked about these issues said they have to be more careful with their behavior in the United States, because, as one told me: "Here these things are serious and if you only touch a woman you go to jail. You're not in El Salvador anymore."

17. Violence against women is so ingrained in the Salvadoran sociocultural context that family members and neighbors generally do not intervene to protect victims of abuse. It is commonly accepted that there will be violence on the part of men in a union, so women who attempt to complain or try to escape their abusers are frequently consoled with stories of women suffering even worse abuse. They are advised that they should therefore endure, like others have done, and not complain. When neighbors or other family members try to interfere by either calling the police or by stopping the abuse themselves, they know they expose themselves to retaliation or to direct violence.

ABROP0645

18. Most men and many women in El Salvador believe that domestic violence is what men do if they are unable to get what they want. For instance, if a woman does not cook food that that husband finds tasty or does not serve him a dish just the way he likes it and the husband gets angry and hits her, this act is justified because the woman was not fulfilling expectations in the context of their relationship. The husband of a woman I interviewed in the course of my studies had pulled the tablecloth from the table with all the food and dishes and thrown it to her because he found the food cold when he finally sat to eat. Thus, women must accept their role in the home, which includes accepting demands for sex, and physical abuse. Women are treated as property, referred to using possessive pronouns. A married woman becomes "of" the husband through marriage—and in practice she is thought of as property of the husband. This belief that the man "owns" his woman frequently manifests in attempts to control her and in extreme jealousy over interactions with other men. This view of the woman as property persists even if a formally married couple is divorced, especially if they share children. Generations of women in El Salvador have suffered the same treatment and, as a result, believe this is simply part of a "normal" relationship so their daughters and granddaughters should not expect to be treated differently.

19. Women in such circumstances suffer even worse consequences if they protest. If women attempt to escape and are caught, the abuse usually escalates because they dared to try to leave. The same is true of reporting the abuse. Such conduct is viewed as a challenge to the man's power, and a violation of the largely accepted view that these are private matters between a man and woman. The result is often even worse abuse so the man can re-impose his dominance. Where the abuser and the woman share children together, children may be leveraged as a way to get the woman to give in to the abuser's whims. In addition, it is not uncommon for family members of the abuser, including siblings, to also participate in the abuse in direct or indirect ways.

20. Even the woman's family members will often shun or punish her for breaking the socially expected norm that she should accept her abuse as a "natural" part of the relationship. In my research I have come across cases of daughters desperately wanting to return to their parents' home after suffering severe abuse at the hands of their partners but being told that they should go back because that is part and parcel of marriage. The mother of one of my study participants told her, "you wanted a husband, you got a husband, you must endure and don't complain." Thus, women often rationally see no benefit to reporting abuse because cries will likely fall on deaf ears and only enrage their abuser even more, as women in my research have indicated. In some cases, family members of the woman or even abuser may seek to intervene against the abuse, but this is relatively rare and would likely to occur only in cases of very extreme abuse. A woman without strong family networks would be even more at risk at the hands of her abuser, as the lack of family to call upon for help adds another layer of risk.

21. Sometimes, women who speak up against domestic violence in El Salvador become targets for abuse themselves. There was an instance in which an activist against domestic violence was beaten and raped because of the work she does. Researchers working on a project sponsored by the Pan American Health Organization were unable to gather a group of 30 women to be interviewed about domestic violence; women were too afraid

ABROP0646

even to speak about the subject. This level of fear among women is only comparable to that experienced by many during the years of terror of the civil war, when people were afraid to speak up against the government. Those researchers were also unable to gather a group of men to discuss domestic violence; only 3 men showed up to a focus group discussion in which at least 30 were expected to participate.

22. In sum, Salvadoran society recognizes that domestic abuse is frequent and yet abets its persistent practice. The public is well aware that a discrete portion of the country's female population experiences domestic violence. Deep-seated sociocultural practices assign these women in abusive relationships unequal status, granting the male partner impunity to engage in verbal, physical, and sexual violence. Women face this abuse because of their gender, because of their inability to leave their domestic relationships including marriage, and because of a societal view that they are "property" of men.

23. The terms "women," "property," "marriage," "domestic relationship," and "unable to leave" all represent identifiable concepts in Salvadoran society. In my expert opinion, both "Salvadoran women unable to leave their domestic relationships" and "Salvadoran women who are treated as 'property' by virtue of their positions in their domestic relationships" are clearly defined groups recognized by Salvadoran society, which includes the public and the government. Ex-spouses are clearly recognized as falling within a commonly understood definition, including relevant legal definitions, of "domestic relationships." In addition, even after a divorce, women may still be viewed as being married to (and the property of) her divorced partner by Salvadoran society, due to the weight and social status given to formal marriage—especially when they have children together.

**Government Response to Domestic Violence**

24. El Salvador's government is becoming more aware of the problem of domestic violence, and though it has passed laws to address it there have not been the necessary accompanying institutional changes to address the problem effectively. Violent practices and the subjugation of women are so ingrained that governmental efforts are simply cosmetic and have not succeeded in significantly reducing abuse. The government has not made much of an effort. Local government offices do not employ trained counselors or qualified officials to listen to complaints. Police are also not well trained in how to handle such matters. And overall societal views have not been changed. As a result, there are no real institutional or governmental resources that are available or effective in protecting women from domestic violence in El Salvador.

25. The United Nations' periodic review of compliance with the Convention on the Elimination of All Forms of Discrimination against Women (CEDAW) voiced concerns about pervasive violence against women in El Salvador at its session in November 2008. CEDAW also made recommendations on how to address the issue:

> "[T]he Committee remains concerned at the high incidence of violence against women prevailing in the State party, notably intrafamilial violence, sexual violence and abuse, rape and sexual harassment in schools and in the workplace.

ABROP0647

The Committee is also alarmed at the cases of extreme violence manifested by the murder of women motivated by gender-specific causes. Furthermore, the Committee is concerned at the weak implementation of existing provisions criminalizing violence against women, the insufficient investigations into reported cases and impunity enjoyed by perpetrators.

The Committee urges the State party to accord priority attention to the adoption of a comprehensive approach to address violence against women and girls, taking into account the Committee's general recommendation 19 on violence against women. [...] The Committee also calls on the State party to take measures to modify social and cultural attitudes which are the root causes of most forms of violence targeting women, in particular murders motivated by gender prejudice."

26. In a follow-up session last year, CEDAW expressed ongoing concern about violence against women and "patriarchal stereotypes among the judiciary and law enforcement personnel." Thus officials, even when charged with interpreting and implementing laws designed to protect women against violence, fail to do so because they themselves see the situation through that lens. The fact that the UN's periodic review of CEDAW continues to memorialize these concerns reveals the lack of real governmental attention, in spite of (cosmetically) passing laws, to domestic violence and the extent of the problem in El Salvador.

27. The Funes presidential administration responded by creating a series of programs through the Salvadoran Institute for the Development of Women (*Instituto Salvadoreño para el Desarrollo de la Mujer* or ISDEMU) to raise awareness of domestic violence. Some of these programs are listed in the United States Department of State Human Rights reports on El Salvador. As the report indicates, however, given the sociocultural context existing in the country, these efforts have remained minimally effective at best. Even though the government has increased mechanisms for reporting, and the number of reports has slightly increased, there is still an attitude that domestic violence is a private affair for a couple and that it is best to leave it to the couple to resolve.

28. The Sánchez Cerén presidency has followed on its predecessor's footsteps, mostly by adhering to laws in place since the Funes administration, denouncing machismo, and declaring a firm commitment to apply laws in place to eradicate general conditions of violence in the country. In late 2016, the president repeated his commitment with the following statement published in a newspaper in the region, "I call on everyone, not only on women, but also on men, to commit ourselves to eradicate violence against women." http://www.contrapunto.com.sv/politica/gobierno/goes-busca-erradicar-violencia-de-genero/2322 But, as with the prior administration, implementation and enforcement of laws has been ineffective and statements such as these are mere lip service. The latest statistics on feminicides from 2017 reflect that there has been no meaningful change from past years, with murders of women continuing at high numbers with broad impunity. In September 2017 alone, there were 66 reported killings of women, many within the home.

29. Even when cases are reported, a number of activists report that they are rarely investigated seriously, much less prosecuted. There is severe corruption that undermines

ABROP0648

prosecution. Lack of action creates a climate that is hostile to addressing the problem of domestic violence. The government's formal efforts (through laws, hotlines, training and awareness campaigns) do not do anything to change violent practices toward women. The lack of implementation and the corruption that undermine these governmental actions end up normalizing and upholding the view that it is not out of the norm to mistreat women and that abusers will not be punished.

30. Nearly every country in Latin America created a law addressing intrafamilial violence in the 1990s, the majority of them following the 1994 creation of the Inter-American Convention on the Prevention, Punishment, and Eradication of Violence against Women (*Convention of Belém do Pará*). This regional convention establishes that violence against women constitutes a violation of human rights and calls for the establishment of mechanisms for protecting and defending women's rights in the public and private spheres.

31. In El Salvador, the Intrafamilial Violence Law (*Ley Contra la Violencia Intrafamiliar*) was passed in 1996. The law defines domestic violence broadly and is designed to prevent rather than punish physical and sexual violence, and psychological violence (e.g., threats, intimidation, humiliation, isolation), and patrimonial violence (e.g., a man withholding assets or property, thereby imperiling proper care of the family). The primary mechanism of prevention under the law is for women to obtain an order of protection (i.e., a restraining order). In the best case scenario, a victim may receive an order of protection and compensation for her losses (such as payment for medical costs). Very few women are given protection orders, however, and it is rare that these are enforced. The challenges are even greater for women outside major metropolitan areas, as the limited law enforcement resources and mechanisms that exist tend to be concentrated around the major cities.

32. Moreover, women who pursue protective orders do so with the serious risk of angering her aggressor whom the police will not be able to stop from retaliating against her. Even where minimal initial steps around an arrest or an order of protection are taken, it is also very possible for the man to bribe the police to avoid effective enforcement. Police in El Salvador are highly susceptible to bribery given underpayment and lack of resources, as well as high levels of corruption generally in the country. There are virtually no repercussions for corruption or failure to enforce the law for the vast majority of police. If the abuser has family ties or other connections to law enforcement officers, it is even more likely for him to avoid meaningful law enforcement action.

33. The Intrafamilial Violence Law does not function, in practice, to prevent domestic violence. The National Police and family judges, some of the authorities responsible for enforcing the law, have been criticized for their ineffectiveness and in some cases for siding with the aggressor rather than with the victim. Laws, campaigns, and trainings have not shifted the practices or attitudes of law enforcement officers with regard to domestic violence, nor resulted in meaningful protection of women.

34. Article 200 of the Criminal Code provides for punishing acts of domestic violence. However, criminal prosecution can only take place under a narrow range of

ABROP0649

circumstances, such as the victim having severe injuries (like bruises that last five days or longer), or when the aggressor is a repeat offender. Some of these obstacles formalize gender biases that prevent justice-system agents from appropriately applying the law. There is also confusion about the law's applicability within the court system and judges rely on the Intrafamilial Violence Law instead of the Criminal Code in cases where both should apply. This contributes to a lack of punishment and impunity for aggressors.

35. The most recent law addressing violence against women is the Special Integral Law for a Life Free of Violence for Women (*Ley Especial Integral para una Vida Libre de Violencia para las Mujeres*), passed in 2012. It mandates that the government systematically address various forms of violence against women. However, given the weak enforcement of existing laws and sustained practices within the police and judiciary that continue to blame women for violence committed against them, this law has not been implemented as written.

36. When applying these laws, police and courts most often encourage or pressure women to reunite and try to work out problems with their abusers through mediation at the expense of protecting women. For example, a women's advocate provides a detailed description of police failures to implement the Intrafamilial Violence Law:

> "The [Intrafamilial Violence Law] requires the police to file an incident report with the court that includes the victim's testimony and relevant documents….However, instead of telling the victim about her rights, the police often interrogate the victim and blame her for the violence. Though the law requires the police to escort the victim home to retrieve documents for her case and to the hospital to receive medical treatment, this rarely occurs in practice because officers claim that there are no available vehicles or there is not enough money for gasoline. If these steps are not taken, it is unlikely that the case will end up in the court where the woman can obtain protective measures."

37. Indeed, in El Salvador, mediation—a court-mediated attempt to reunite victims with their aggressors—is far more common than prosecution. This is commonly known to be ineffective, and some women describe it as a "joke," as it more often serves to reinforce the power of men in the household. Rather than men being punished for their abuse, the mediation process serves as a way of teaching women how to cope with an abusive man. Well known Salvadoran expert on domestic violence América Romualdo provides an example of how mediation (which she calls "conciliation") can endanger women:

> "[S]ocial norms requiring women to submit to men often pressure victims to enter binding agreements that actually endanger them. Conciliation generally concludes only once the man finally promises to not commit further acts that were the basis for the requested conciliation. However, domestic violence is cyclical, and male aggressors rarely keep their promises. Despite this tendency, risk assessment to determine the likelihood of future abuse and violence is not part of the PGR [Procurator General of the Republic] conciliation process. Furthermore, the PGR operates with the mission of reconciling and uniting families. PGR officers thus confuse the [Intrafamilial Violence Law] mandate of 'conciliation' with a theory

ABROP0650

of 'reconciliation.' Instead of attempting to secure an agreement from the aggressor to desist with his abuse, PGR personnel often effectively pressure women to continue relationships with abusive partners."

38. Most Latin American countries send offenders to civil or family courts rather than criminal ones. They insist on pushing women to work things out with their partners or "mediation" as a first step in the legal proceedings, privileging the family unit over the rights of abused women. As one analyst has noted, proceeding in this fashion re-naturalizes "domestic violence by implying that a couple can, or should, be reconciled even when one systematically abuses the other."

39. A Salvadoran lawyer I met in the course of my research explained that even though the government has now created offices throughout the country with officers dedicated to take declarations of violence against women, these are not effective because the attitude and sociocultural practices at large have remained unchanged. Thus, it is very rare for men in El Salvador to be arrested for allegations of domestic violence, and it is even rarer for such men to be prosecuted or jailed. Such cases are uncommon. During one of my research projects, I interviewed a Salvadoran woman in Phoenix, Arizona, who laughed when asked if she ever thought of calling the police about domestic violence. In her words, "The police? Who would think of calling the police back there [in El Salvador]? If you called them they'd think it's a prank and they won't even bother coming! No one does that. Everyone will laugh if a woman calls for help if her husband is beating her." Importantly, this woman's views were based on her experiences before the battery of laws that the Salvadoran government passed, but her words resemble the experiences of women after the laws passed, demonstrating that not much has changed on the ground with the passing of these laws.

40. Even when initial enforcement steps such as arrest or booking take place, the police are extremely easily corrupted or deterred from further action, especially given that they likely do not understand or agree with laws prohibiting violence against women. This combination makes the laws and the infrastructure created to address violence in the lives of women meaningless.

41. It does happen sometimes that men are arrested and then let go. Few are arrested, but where arrest happens, it still remains highly unlikely that the man will be fully prosecuted and serve a jail sentence. Arrests in and of themselves are not taken seriously, especially when subsequently there are no further consequences. In fact, this may even cause the arrested man to become angrier and more likely to abuse, given that the woman defied him, but the abuser faced no real repercussions in terms of prosecution and sentencing.

42. Even after divorce, a woman who had been formally married to her abuser, especially if they have children, continues to be at extreme risk of violence by her abuser and has little meaningful recourse for protection. As a general pattern, the man continues to think he has a right to abuse her and police continue to dismiss the complaints of divorced women against their former spouses. The general view that abuse of women is a domestic matter undeserving police intervention persists in these circumstances.

ABROP0651

43. The Salvadoran government is incapable, and in large measure unwilling, to take meaningful remedial action against domestic violence and its perpetrators.

**The Risk of Harm to A███ B███**

40. Based on my knowledge of relevant country conditions, it is my opinion that if a domestic violence survivor returns to El Salvador, it is likely she will be at risk of further harm. El Salvador is a very small country. I wrote a book on the social networks of Salvadorans and learned through my research how extremely efficient informal networks of friends and family are in the dissemination of information. Word quickly spreads when a family member or friend returns to the country. It would be quite easy for an abuser to locate his ex-partner, even if she were to return to another city or another region of the country, especially where they share children in common. Such was the case with Ms. B███ where her abuser found her through common networks when she tried to move away.

41. First, it would be almost impossible for many returning women to find work, rent a dwelling, and establish themselves in another city independently of their family and existing support networks. The country's economy is unstable and weak and does not generate jobs that permit people to support themselves easily without the help of family (a recent World Bank report notes how seriously El Salvador was hit by the global economic crisis). And, second, social networks are wide and dense in this small country and everyone seems connected. Even bus drivers know who comes and goes to a town, and they can easily divulge the whereabouts of someone who is being sought, particularly if they are bribed. During the course of fieldwork in the region I discovered how efficient bus drivers are at obtaining and disseminating information about their passengers, whom they tend to know. Bus drivers are just one example of social networks in El Salvador. An unfamiliar face is quickly spotted.

42. A woman in Ms. B███'s situation would have nowhere safe to go to avoid her abuser, and no ability to support herself. El Salvador is the size of Massachusetts and her abuser would be able to easily locate her through the dense networks described above. Moreover, she would have no job opportunities to start anew in a different part of the country with a lack of family and social support. Being poor and living on her own as a woman would also increase her risk of gang violence.

43. Even after having been away for some time and even if she has formally divorced her abuser, a woman who was once her abuser's partner is understood socially as never having extinguished his right to exercise dominance over her. The level of abuse will likely be worse than before. Abusive men are almost always furious at women who try to escape them. An abusive man "loses face" and his dignity when a woman dares to challenge his dominance, especially if the woman temporarily succeeds by leaving. Divorce would also serve to infuriate the abuser and would not change the view of the woman as "his," especially if he can leverage the children to ensure the relationship continues. But if the woman returns, she is made to "pay back" what she took from him, in order to restore his manhood. He will often punish her to the fullest extent he can. It is

ABROP0652



**ENGLISH TRANSLATION**

**DECLARATION OF ARACELY BAUTISTA BAYONA**
**LEGAL EXPERT ON VIOLENCE AGAINST WOMEN IN EL SALVADOR**

I, Aracely Bautista Bayona, declare as follows:

**Introduction**

1. My name is Aracely Bautista Bayona. I am a native and citizen of the Republic of El Salvador, Central America, Attorney and Notary, Specialist in Parliamentry Law and Public Policies.

2. For more than two and a half decades, I have worked and advocated for the rights of women, children, adolescents and youth, family and the migrant population in El Salvador as a lawyer, notary, and legal advisor specializing in human rights and judicial and administrative processes, and parliamentary law expert with a gender focus at the Legislative Assembly in the areas of civil rights, family, and criminal and criminal procedural rights and the human rights of women, children, youth and other vulnerable groups.

3. Through my experience, I have tried to transform and reform the legal norms entrenched in our country, which have promoted acts of gender-based violence, as well as social violence, lack of access to justice and all forms of discrimination against women which submit them to social sexist parameters of submission and unequal power relations in the personal, social and political aspects with men.

4. I recognize the different ways in which men use violence against women as a means of perpetuating social, family and patriarchal community norms. Although the Legislative Assembly, through the members of parliament, has enacted laws aimed at the eradication of gender discrimination and violence against women, such violence persists with impunity and at high levels of frequency and brutality, as does a lack of due diligence in the investigation of the offence as a result of not having comprehensive criminal investigation policies.

5. Over the last twenty years, the violence has increased considerably and has demonstrated that the passage of laws in El Salvador does not curb norms and cultural patterns, that are still so entrenched, of discrimination and violence against women.

6. The recently enacted laws regarding the prevention, protection, eradication, and punishment of violence and discrimination opened the possibility that women could access the justice system under better conditions, as victims of the revictimizing processes, which previously made it impossible to remain in the justice system reliably.

7. However, the system of judicial and administrative enforcement in the country in terms of law enforcement has failed and conintues to be seriously flawed in the sense that it has

1
190

ABROP0690

not improved effective and sustainable access to the justice system for women, who have continued to be revictimzed, worsening their situation of security and deteriorating the quality of their lives and of their families.

8.  We still have major shortcomings in the system of access to justice, with respect to victim assistance programs that respect the rights of women at a national and local level.

9.  In this regard, women face structural problems related to the multiple forms of discrimination they suffer, through the same insecurity of their communities and municipalities, which makes them flee from their territories in a systematic way.

**Experience and Expertise**

10.  I am an attorney mediator, legal counselor, specialist in human rights and victimology, specializing in the righs of women, family law, childhood, labor laws, criminal law and international law.

11.  In 1987, I received my degree of Attorney from the University of Dr. José Matías Delgado in the city of San Salvador. Later, I received authorization to practice law in El Salvador from the Supreme Court of Justice in the year of 1988, as well as studies of Graduates, Postgraduate in Public Policy and Gender from the Universidad Centroamericana José Simeón Cañas and now I am currently studying in a master's degree program on violence in the family at the university of Andres Bello.

12.  I have legal experience providing technical legal consultation to the legislative and judicial bodies in El Salvador regarding legal reforms and policies of protection directed women who suffer violence, and to promote compliance with international legal norms.

13.  Between 1990 and 1994, I worked for the Ministry of Justice as legal advisor for the Commission to Revise the Family Code (*Comisión de Redacción del Código de la Familia*). I proposed reforms to codify improved protections for women, children, and youth. I also helped write the Manual for the Enforcement of the Family Code (*Manual de Aplicación del Código de la Familia*). From 1992 to 1994, I provided technical legal consultation at the Civil Legal Assistance Division (*Dirección de Asistencia Jurídica Civil*) of the Ministry of Justice and the Executive Technical Unit of the Justice Sector; I also represented female victims of violence in court throughout the country. I have participated in procedural and judicial processes relating to the enforcement of new laws and reforms to the legal framework, as part of an effort to harmonize the legal framework of El Salvador with the International Treaties on the Human Rights of Women, both at the regional level and those of the United Nations. Finally, I have also worked as a special Consultant in the structuring of the Units on Gender of the Legislative Assembly and the Supreme Court of El Salvador.

14.  I currently serve as the Head of the Gender Unit of the Legislative Assembly and have been an advisor to the Steering Committee of the Parliamentary Group of Women (*Comité Directivo del Grupo Parlamentario de Mujeres* or GPM). In addition to my

ABROP0691

current role, I have served as a Special Consultant on Gender Issues to the Forum of Women in Political Parties in El Salvador (*Foro Nacional de Mujeres de Partidos Políticos de El Salvador*).

15. I have held these postions since 1994. I also serve as a Deputy Judge of the Fifth Court of Labor in San Salvador. From 1998 to 2000 I served as coordinator of the project of Mediation of the Justice Ministry and the Attorney General of the Republic (*el proyecto de Mediación del Ministerio de Justicia y la Procuraduría General de la República*).

16. Midway through 2000 I returned to the Parliament. Before my current position, I worked as the Legal Consultant to the Gender Unit of the Commission on Women and Gender Equality and the Commission on the Family, Children and the Elderly of the Legislative Assembly (*Asesora Legal de la Unidad de Género de la Comisión de la Mujer y la Igualdad de Género y de la Comisión de la Familia, Niñez y Adulta Mayor de la Asamblea Legislativa*). And before this, I worked as a Coordinator to the Commission on the Family, Women and Children of the Legislative Assembly.

17. As a Consultant to the Legislative Committees, I provide legal advice in drafting legislation in compliance with El Salvador's international obligations regarding human rights and women's issues. I worked as a legal specialist in the team to draft legislation to address the prevention, attention, and sanctions of violence against women, including the 1996 Law Against Intrafamilial Violence (*Ley contra la Violencia Intrafamiliar*, hereinafter "LVIF"),[1] and the 2010 Special Integral Law for Women's Access to a Life Free from Violence (*Ley Especial Integral para una Vida Libre de Violencia para las Mujeres*, hereinafter "Ley Integral" or "LEIV").[2] I also worked on the drafting of the 2011 Law of Equality, Equity and Eradication of Discrimination Against Women (*Ley de Igualdad, Equidad, y Erradicacion de la Discriminacion Contra las Mujeres*, hereinafter "Ley de Igualdad" or "LIE").[3] I continue to consult with the Legislative Assembly on the incorporation of a gender focus in parliamentary activities to ensure that the legislators oversee effective implementation and compliance with the laws, as well as adequate funding. I have continually worked towards the institutionalization of a gender focus throughout the legislative process. To this end, I prepared the first Parliamentary Gender Analysis in 2010, which is a comprehensive review of how the Legislative Assembly addresses the human rights of women.

18. Since 2000, I have served as a technical legal consultant and recognized women's rights expert in the official delegation of El Salvador to the Inter-American Court on Human

---

[1] *Ley Contra la Violencia Intrafamiliar* [Law Against Intrafamilial Violence][LVIF], *as amended*, Decreto No. 902, Diario Oficial [D.O.] No. 241, Tomo 333, 20 de diciembre de 1996 (El Sal.).

[2] The Legislative Assembly enacted this law on November 25, 2010; the law went into effect on January 1, 2012. *See Ley Especial Integral para una Vida Libre de Violencia para las Mujeres* [Special Integral Law for a Life Free of Violence for Women]["Ley Integral" or "LEIV"], Decreto No. 520, 25 de noviembre de 2010, D.O. No. 70, Tomo 390, 4 de enero de 2011 (El Sal.).

[3] The Legislative Assembly enacted this law on March 11, 2011; the law went into effect on April 8, 2011. *See Ley de Igualdad, Equidad y Erradicación de la Discriminación contra las Mujeres* [Law on Equality, Equity, and Elimination of Discrimination Against Women]["Ley de Igualdad" or "LIE"], Decreto No. 645, 17 marzo 2011, D.O. 70, Tomo No. 391, 8 de abril de 2011 (El Sal.).

ABROP0692

Rights (IACHR), as well as the Gender Focal Point for the Inter-American Commission on Women (CIM)[4] of the Organization of American States (OAS), and the Foundation of Justice and Gender (*Fundación Justicia y Género*) of Costa Rica.

19. Beginning in 2006, I served as the Institutional Coordinator for the CIM, as well as for the First Diagnostic on the Situation for Women and Girls, on the topic of sexual and other forms of human trafficking. I also developed the first two Regional Diagnostics to evaluate the compliance of Central American governments with their legal obligations under the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (also known as the Convention of Belém do Pará).[5] I also provide technical legal consultation to the United Nations Latin American Institute for the Prevention of Crime and the Treatment of Offenders (*Instituto Latinoamericano de las Naciones Unidas para la Prevencion del Delito y el Tratamiento del Delincuente - ILANUD*), and the Foundation of Justice and Gender both located in San Jose, Costa Rica.

20. Since the early 1990s, I have taught courses regarding the application of conventions and Salvadoran laws related to gender issues. I regularly teach these subjects to women's rights groups, prosecutors in the Office of the Prosecutor General of the Republic (*Fiscalía General de la República*), and officials in the Office of the Procurator General of the Republic (*Procuraduría General de la República*, or PGR), as well as judges in the justice system. Since 1997 and up to the present day, I have taught on the subjects of human rights and gender to judicial officials as a professor in the School of Judicial Training (*Escuela de Capacitación Judicial*) of the National Council of the Judiciary (*Consejo Nacional de la Judicatura*), under the auspices of international and institutional funds.

21. Throughout my career I have assisted many women victims of violence *pro bono*, either as legal counsel or as an advisor on the application of the Family Code, Criminal Code and the LVIF. The majority of these cases have involved domestic violence.

22. I have completed numerous specialized studies programs regarding violence against women in El Salvador and Latin America. I have particularly focused on the formation of laws and public policies to address patriarchal norms and gender discrimination, including the institutionalization of these norms in government bodies. The following are some of the certifications (*diplomados*) I have completed:

- Certification in Victimology and Women's Rights.
- Certification in Public Policy & Gender Studies, University of Central America[6] (UCA), San Salvador.

---

[4] The Commission is officially known by its Spanish name and acronym, *Comisión Interamericana de Mujeres* (CIM).

[5] Organization of American States, *Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women* [Convention of Belém do Pará], June 9, 1994, 33 I.L.M. 1534 (entered into force Mar. 5, 1995).

[6] Officially, University of Central America, José Simeón Cañas (*Universidad Centroamericana "José Simeón Cañas."*)

ABROP0693

- UNICEF Program Certification in Human Trafficking, University of Francisco Gavidia, San Salvador (sponsored by the Ministry of Foreign Affairs of El Salvador).
- Certification in Criminology, National Autonomous University of Mexico (UNAM), Mexico City.
- Certification in the Mainstreaming of Gender in the Legislative Function developed by ILANUD, the UCA Human Rights Institute,[7] the Justice and Gender Foundation (*Fundación Justicia y Género*), and Oxfam America.
- Specialized Studies in Gender Theory developed by the El Salvador Procurator for the Defense of Human Rights (*Procuraduría para la Defensa de Derechos Humanos*, or PDDH).
- Postgraduate in Public Policies and gender.
- Master Studies in Violence in the Family and gender, in process of study.

23. On behalf of the Republic of El Salvador and the Legislative Assembly, I have also participated in numerous regional intergovernmental conferences on women's rights, violence against women, human trafficking, public policy planning and structural reform of criminal and judicial systems. These conferences have been held throughout Latin America in "multilateral cooperation forums" with the governments of Argentina, Canada, Germany, Mexico, the United States, and Uruguay, in collaboration with CIM, OAS, IACHR, as well as other intergovernmental bodies.

24. I have written extensively on human rights, women's rights, and the rights of children in El Salvador, including the many forms of gender-based discrimination and violence pervading Salvadoran society. Among my most recent and significant writings are the following:

- *National Report on the Situation of Women in El Salvador*, CIM/OAS (2010).[8]
- *National Report on the Situation of Women in El Salvador*, CIM/OAS (2004).[9]
- *Interagency Campaign Against Violence Against Women and Girls, Section III: Legal Framework and Mechanisms for Implementation of Justice in the Area of Gender Violence and Domestic Violence*, United Nations Development Program (2000).[10]

**Entrenched Social Norms Perpetuate Discrimination and Violence Against Women**

25. Patriarchal norms of coexistence in the family and in Salvadoran society define the fundamental sociopolitical structure of El Salvador, which disadvantage women in every

---

[7] Officially, the *Instituto de Derechos Humanos de la Universidad Centroamericana "José Simeón Cañas"* (Human Rights Institute of the Central American University of "José Simeón Cañas" or IDHUCA) located in San Salvador.
[8] Delegation of El Salvador to the Inter-American Commission on Women, *Informe Nacional sobre la Situación de la Mujer en la República de El Salvador* [National Report on the Situation of Women in the Republic of El Salvador], OEA/Ser.L/II.2.35/CIM/doc.27/10.rev (2010).
[9] Delegation of El Salvador to the Inter-American Commission on Women, *Informe Nacional sobre la Situación de la Mujer en la República de El Salvador* [National Report on the Situation of Women in the Republic of El Salvador], OEA/Ser.L/II.2.32/CIM/doc.26/04.rev (2004).
[10] United Nations Development Program [UNDP], *Campaña Interagencial contra la Violencia hacia las Mujeres y las Niñas* [Interagency Campaign Against Violence Against Women and Girls], Regional Report RLA/97/014, (2000).

ABROP0694

aspect of Salvadoran society. Among the most entrenched characteristics of Salvadoran society is *machismo*, a system of patriarchal gender biases which subject women to the will of men. Salvadorans are taught from early childhood that women are subordinate to men to whom they own obedience and submission.

26. Children learn that a mother must obey the father of her children, just like a sister must obey her brothers. The inferior position of women is embedded in the cultural mindset of Salvadoran society, starting with the family and the community.

27. These social norms relegate women to domestic roles such as childrearing, housekeeping and serving the needs of men.

28. Society accepts and tolerates men's aggression towards women and their families, who violently punish women for violating these gender roles or disobeying male relatives.

29. Social norms in El Salvador continue to deprive women of a multitude of legal rights that men enjoy, while justifying the use of physical violence to perpetuate the control that men exert over women.

30. Patriarchal norms have persisted in Salvadoran society since the early sixteenth century, when *conquistadors* subjected indigenous groups to the patriarchal Spanish imperial order. The *conquistadors* systematically raped indigenous women. The origins of the *mestizo* population, which comprises the majority of Salvadorans today, began with sexual violence. Spanish colonialism also brought with it the Roman principle of the *pater familias* (the rule that a male head of household owned legal title to all the women in his family).

31. More recently in El Salvador's history, the thirteen-year Civil War was accompanied by gender-based violence, including rape as an official State war strategy. After the signing of the Chapultepec Peace Accords in Mexico in 1992, the State passed the 1993 Amnesty Law,[11] which granted a blanket amnesty, including even for those who had committed violent atrocities and crimes against humanity. The amnesty gave perpetrators a sense of impunity for their actions, and contributed to the long-standing belief that violence against women is acceptable.

32. Discrimination and sexual violence against women was, and is still, an inseparable part of the patriarchal norms, as well as the socio-cultural and judicial system, that give men authority over women's bodies and justify the use of violence, be it physical, sexual, psychological, or patrimonial to assert that authority, without using a legal argumentation of human rights of women and the perspective of gender.

33. These patriarchal norms, arising from these cultural origins, perpetuate the dominance of men over women in economic, legal, political and social relationships. Experts, including

---

[11] *Ley de Amnistía General para la Consolidación de la Paz* [General Amnesty Law for the Consolidation of Peace][Amnesty Law], Decreto No. 486, 20 de marzo de 1993, D.O. No.56Tomo 318, 22 de marzo de 1993 (El Sal.).

ABROP0695

myself, have referred to this insidious phenomenon as the cultural syncretism of the *conquista* – that is, Salvadoran society has absorbed the cultural norm that men are the conquerors and women are the conquered. The ways in which men violently subjugate women's bodies is analogous to the way the *conquistadors* subjugated the indigenous populations.

34. From a young age, girls are taught, from their family groups and schools, to obey their male relatives and that a woman's purpose in life is to marry a man and bear his children. The father of the children, however, is not seen to have obligations, as part of a culture of invisibilization of the paternal image in the country. Exacerbated paternal irresponsibility is a cultural phenomenon – it is socially acceptable for fathers to be absent from the home and have multiple sexual relationships, leaving the women with total responsibility for maintaining the home and raising children, so women in this situation are often pejoratively called "single mothers." On the other hand, women who violate gender roles, disobey men, or assert their independence are thought to deserve punishment. Permissible punishments include emotional abuse, deprivation of personal autonomy (e.g. confinement or denial of financial support), and physical as well as sexual violence. These norms reflect the socially-accepted beliefs that women are the property of the men with whom they have familial or romantic relationships.

35. Economic dependency on male partners and relatives typically leaves women without opportunities to free themselves from gender roles, or the ability to leave abusive relationships. Women are discouraged from seeking gainful employment outside the home, and are also unable to find employment, because of social stereotypes. The majority of women who do not find gainful employment enter into the informal workforce where they lack social security and an adequate salary to cover basic necessities for themselves and their families. Men are generally the sole income-earners in households, and also typically hold exclusive title to family property. Women are frequently denied educational opportunities that would empower them to overcome these limitations. Thus, it is customary for women in El Salvador to be completely dependent on the men of their household for income, sustenance and social status. As a consequence, women who are victims of domestic violence typically fear losing their only source of financial support, or fear that their family will reject them, if they seek outside help. Furthermore, mothers are more likely to tolerate high levels of abuse because they are responsible for the children in their care.

36. In El Salvador, certain social norms are considered "untouchable" and absolutely necessary – to change them would mean the destruction of Salvadoran culture. Deep-rooted patriarchy and the submission of women to the will of men are examples of such norms, and society discourages any discussion to the contrary. There are also some cultural phenomena that remain "unspeakable" and inappropriate to confront. Among these are widespread patterns of incest; abuse of women and children by parents, trusted friends, teachers and even members of the clergy; and the systematic use of rape during the Civil War, which has persisted as a result of the situation of insecurity caused by the war between rival gangs and organized crime syndicates. This war has continued the systematic use of rapes and sexual assaults, feminicides and other forms of human rights

ABROP0696

41. The persistence of feminicides is intrinsically linked to the social norms that condone or permit violence against women and the impunity that results when the existent laws are not enforced or when the opinions of officials within the justice system are biased. In my professional opinion, approximately 40% of feminicide victims were also victims of domestic violence who the system had failed to protect.[15] One example involved a young woman who had gone to court and obtained an order of protection, but law enforcement and judicial authorities failed to follow up on the young woman's case and enforce the order. The aggressor killed her shortly after she got her protective order. The police and the media regularly refer to feminicides as "crimes of passion," "crimes of jealousy" and "crimes related to social violence generated by gangs" – failing to recognize that these are killings motivated by visceral hate towards women, and justified by social norms which accept the use of violence against women. As a result of ignorance, inadequate resources and lack of training, and discrimination against women, girls and adolescents, law enforcement authorities fail to investigate feminicides sufficiently, allowing murderers to go unpunished and perpetuating impunity. Moreover, women lack access to public safety services, health, education, credit, and societal security.

42. Domestic violence remains a common occurrence in El Salvador, despite the existence of laws designed to address it. Violence against women in the domestic context can occur in the form of physical, sexual, psychological and patrimonial violence (e.g. the denial of material necessities).[16] Men, believing that women are their property and knowing that women are economically dependent on them, frequently use violence against their wives or girlfriends, daughters, stepdaughters and any other women in their household to assert authority. There are many cases where grown sons, influenced by their father's attitudes, physically and emotionally abuse their mothers or sisters, and perpetuate this abuse in their own romantic relationships.

43. Incestuous rape is a common phenomenon in El Salvador that, in the family context, tracks the same patriarchal norms that promote sexual violence against women in general. Many men believe they have sexual rights to any girl or woman whom they support financially, in the same way they enjoy the property they own. Many men rape their daughters, stepdaughters, nieces and other young girls believing that they have a "first right" to take her virginity. In one illustrative case from San Salvador, there was an uncle who not only raped his young niece, but also took her to have sex with his friends. To this day, the uncle has successfully evaded punishment. In another case, there was a stepfather who impregnated all five of his stepdaughters in the family. It is common for Salvadoran women to be abused by their father, uncle, brother or cousin. Victims of incestuous rape are almost always forced to bear the child because the law imposes severe punishments on women who seek abortions (*see* paragraphs 38-39 above). Despite the widespread occurrence of incest and its illegality under the Criminal Code,[17] a severe

---

[15] Though no institution compiles official statistics of this nature, I have based this estimate on my review of related statistics compiled by the National Civil Police, the Institute of Legal Medicine and the Procurator for the Defense of Human Rights.

[16] *See, e.g.*, 2009 National Report on the Situation of Women in El Salvador, *supra* note 9; LVIF, *as amended*, art. 3.

[17] Article 162(1) of the Criminal Code defines incest as an aggravated sexual aggression (*agresión sexual agravada*). C.P., *as amended*, art. 162, D.O. No. 128, Tomo 344, 9 de julio de 1999 (El Sal.).

ABROP0698

considered an acceptable form of retaliation because women are considered men's property, and destroying a rival's property is legitimate.

48. Gang members also use women to send symbolic messages through the mutilation of the women's bodies. For example, MS-13 is documented to have murdered women, chopping each of their bodies into thirteen pieces, representing the gang's name, MS-13.

49. The various forms of gang violence against women – whether it is random, symbolic, retaliatory, domestic, or of another nature – are committed because men believe women are inferior and mere objects for men to control. In March 2012, the two main gangs in El Salvador entered into a truce during which the number of homicides appeared to decrease. But during this period, the number of disappearances reported and clandestine graves discovered increased, leading to the conclusion that the number of killings did not really go down. Since the truce ended in June 2013, the increase in the strength of the gangs throughout El Salvador has resulted in even greater acts of violence against women.

50. Gangs are not the only form of criminality that contribute to violence against women. El Salvador is a source and transit point in the international trafficking of girls and women. Traffickers target women – especially girls and young women who are vulnerable to kidnapping and disappearance – simply because they are women. Organized criminal networks engaged in drug and human trafficking control vast territorial regions in El Salvador. In these areas, traffickers can easily kidnap, hide and transport women without police interference or impediment.

**Laws Aimed at Eradicating Violence Against Women Are Ineffective Because Police Officers, Prosecutors, and Judicial Authorities Discriminate Against Women and Lack Resources and Training**

51. Enforcement of laws against domestic violence related to violence and international treaties which purport to protect women in El Salvador have been ineffective. Like Salvadoran society as a whole, law enforcement officials, prosecutors, and judges discriminate against women, reduce the priority of women's claims and otherwise prevent women from accessing legal protections and justice. This results in impunity for aggressors, which reinforces aggressors' perception that they can inflict violence without interference or reprisal. Women are re-victimized by the aggressors who repeatedly abuse them, and the government officials who fail to protect them.

52. El Salvador has ratified a variety of international treaties[18] aimed at ending discrimination and violence against women, but law enforcement officials rarely pay heed to treaty obligations. In 1981, for example, the Legislative Assembly ratified the Convention on the Elimination of All Forms of Discrimination against Women (CEDAW),[19] pursuant to which El Salvador is bound to implement effective legal reforms to eliminate

---

[18] Article 144 of the Constitution proclaims all ratified treaties as the supreme law of the land.
[19] Convention on the Elimination of All forms of Violence Against Women [CEDAW], Sep. 3, 1981, 1249 U.N.T.S. 13, *ratified and enacted,* Decreto No. 705, D.O. 105, Tomo 271, 9 de junio de 1981 (El Sal.).

ABROP0700

discrimination against women.[20] Nevertheless, more than thirty years after ratification, there continues to be little awareness among legal authorities, professionals and women about the rights women are entitled to under the treaty. The lack of knowledge of rights is especially pervasive among the most vulnerable groups such as rural, indigenous and migrant women, domestic workers and women laboring in *maquiladoras* (assembly factories).[21] Similarly, the Legislative Assembly ratified the Convention of Belém do Pará in 1995,[22] under which El Salvador must provide women with "prompt recourse to a competent court for protection against acts that violate her rights [to respect of her physical, psychological and moral integrity and personal dignity]."[23] Pursuant to these legally binding principles, the Legislative Assembly has enacted various laws to eradicate domestic violence. Nevertheless, as described below, pervasive gender biases and a chronic lack of resources has led to ineffective implementation, rendering Salvadoran authorities unable to protect the rights of women and curtail violence against women.[24]

53. The Law Against Intrafamilial Violence (LVIF), which has been the primary law addressing domestic violence against women since its enactment in 1996, has been an ineffective norm that has not provided effective, integrated protection to women. The LVIF was implemented with the intention of increasing women's access to the legal system pursuant to the obligations adopted when the State ratified the Convention of Belém do Pará. The LVIF created special administrative and civil judicial procedures to prevent domestic violence and help women seek protection from abusive partners.[25]

54. The LVIF initially allowed women to enter into conciliation[26] with their abusive partners. This provision was mistakenly applied as a requirement to undergo conciliation, with government officials pressuring victims to *reconcile* with their abusers rather than seek damages or protection from future violence. Due to widespread abuse of this procedure, the Legislative Assembly abrogated conciliation by judicial officials in 2002. Nonetheless, judicial officials continue to value family unity over the needs of victims for protection from their abusers, and judges exert pressure on women victims to reconcile with their partners before adjudicating their legal claims.

55. The LVIF has caused widespread procedural confusion among judges, lawyers and victims alike, but law enforcement authorities typically resist training on effective and

---

[20] *See, e.g.,* CEDAW, art. 3.

[21] *See* United Nations Division for the Advancement of Women, Department of Economic and Social Affairs, Committee on the Elimination of Discrimination against Women [CEDAW Committee], *Consideration of Reports submitted by States parties under Article 18 of the Convention on the Elimination of All Forms of Discrimination against Women. Seventh Periodic Report of State Parties. El Salvador*, CEDAW/C/SLV/CO/7 (2008).

[22] Convention of Belém do Pará, *ratified and enacted*, Decreto No. 430, D.O. 154, Tomo 328, 23 de agosto de 1995 (El Sal.).

[23] Convention of Belém do Pará, *supra* note 5, at art. 4.

[24] The 2008 CEDAW Committee Seventh Periodic Report supports this finding. *See supra* note 23.

[25] Paragraph I of the Preamble to the LVI, defining the purpose and scope of the law, refers to Article 32 of the Constitution, which proclaims the "family is the fundamental basis of society and shall have the protection of the State."

[26] Conciliation is not the same as "reconciliation." Conciliation involves the determination of whether there are any issues between the two parties upon which they can agree, therefore removing them from further dispute. Reconciliation, in contrast, involves the restoration or reestablishment of the relationship between the couple.

ABROP0701

uniform implementation. Judges generally lack gender-sensitivity training, and I have heard judges express their lack of interest in such trainings because they believe it will "feminize" them and infringe upon their judicial autonomy. Judges often fail to respect the legal needs and personal dignity of women victims of violence, and they re-victimize women by discrediting their testimony in accusatory interrogations, and encouraging them to reconcile with their abusers.

56. Deep-seated discriminatory biases against women are still strong among judicial officials, police, prosecutors, doctors and other actors involved in the criminal justice system. The predominantly male National Civil Police (*Policía Nacional Civil*, or "police") and Prosecutor's Office inadequately investigate cases of violence against women and consistently fail to enforce legal protections for women victims. Police and prosecutors often re-victimize women by assigning blame to the victim, asking inappropriate and unnecessary questions, and subjecting the women to repeated interrogation. In some cases, the same authorities who are supposed to protect the women perpetrate additional violence; for example, there have been cases of girls who were victims of sex crimes, who went to the police, and were raped by these officers.

57. Police and prosecutors typically presume that a woman victim of violence deserved her injuries, or that her male aggressor acted within his rights. If a woman violates traditional gender roles, law enforcement officials often believe the man is justified for beating her or "putting her in her place" because of her "insubordinate" behavior. This is all the more common in domestic violence cases, where the cultural bias of the *pater familias* further justifies aggression because the man is allowed to treat his property (i.e., women) as he wishes. In those rare cases where the woman is successful in making a complaint with the police, the prosecutors often elect not to prosecute as a result of these same biases.

58. The LVIF provides for the issuance of an order of protection where a woman alleges domestic violence. However, as a result of institutional gender biases, it is complicated for a woman to obtain such an order. A woman's decision to denounce violence when she lacks the protection of the judicial system is often referred to as the "*ruta critica*" (critical route). Even in the unusual situation where a woman successfully acquires an order of protection from her aggressor, law enforcement officials do not enforce such orders. The same biases described above, coupled with inadequate resources, are the reason for a lack of enforcement and the lack of follow up on measures of protection for victims.

59. Furthermore, actors in the justice system, including officials with the courts, the Public Ministry (which includes the prosecutors), and the police, who issue orders of protection, and the police officers and prosecutors responsible for enforcing those orders have no official system for exchanging information or monitoring the status of cases due to lack of an adequate computerized system. Courts either do not possess or do not expend the resources to follow up on their own orders of protection and leave the enforcement to the police; the police simply ignore the orders of protection and do not enforce them in an effective manner.

ABROP0702

60. Another contributing factor to the lack of enforcement is the economic dependency of the women victims. Many times all it takes is for the aggressor himself to threaten to confiscate the financial and material support that the woman needs to survive, compelling her to forego reporting the ongoing abuse. Women victims also fear violent retaliation from their aggressors if they try to assert legal rights or enforce the orders of protection. Moreover, the futility of reporting prevents women from reporting repeat abuse or demanding the enforcement of legal protections.

**Laws Which Went into Effect in 2011 and 2012 Have Not Reduced Violence Against Women or Empowered Women to Obtain Legal Protection**

61. As described in paragraph 17 above, the Legislative Assembly enacted two laws to prevent and sanction violence against women and gender discrimination, the Ley de Igualdad and the Ley Integral, that went into effect in April 2011 and January 2012, respectively. The Ley Integral has as its objective guaranteeing women a life free of violence. It assigns various responsibilities to a range of government actors to address the different forms of violence systematically and criminalizes new crimes of violence against women not yet recognized in the Criminal Code, most notably recognizing the crime of femicide. The Ley de Igualdad provides for equal treatment of men and women in every legal, political, economic, labor and social arena, including education, employment, healthcare and access to public institutions. The laws have not yet brought about a reduction in discrimination or violence against women or reduction in impunity, as the institutions responsible for implementing the law are still in a period of restructuring and internal adaptation of the norms, and the institutions do not yet have adequate budgets to carry out their obligations and put the laws to effective use. Furthermore, women do not yet have adequate information to take advantage of the legal protections outlined in the laws.

62. Five years after the Ley Integral and the Ley de Igualdad have come into effect (and twenty years after the LVIF came into effect), not only has there not been a reduction in violence against women, or domestic violence in particular, levels of violence have risen dramatically.

63. As the levels of violence against women have risen, the near virtual impunity for those who commit these crimes has remained the same. A study released in 2015 by the University Institute of Public Opinion (*Instituto Universitario de Opinión Pública*, or IUDOP) based at the Centroamerican University José Simeón Cañas, shows that only 6.5% of all crimes initiated by the prosecutor result in a sentence.[27] Given that many crimes are never denounced and that the prosecutor does not initiate prosecution in all cases, the level of impunity is actually much higher. Although general levels of impunity are high, it is widely recognized that the level of impunity for crimes involving violence against women are even higher because of the attitudes described above that do not take these crimes seriously. To illustrate: according to ISDEMU, of the 628 murders of

---

[27] *La situación de la seguridad y la justicia 2009-2014: entre expectativas de cambio, mano dura militar y treguas pandilleras* [The situation of security and justice 2009-2014: between expectations of change, military Iron Fist and the gang truce], IUDOP (2014).

ABROP0703

women documented between January 2012 and June 2014, only approximately 5 percent of these cases even made it to the initial stages of trial, and even fewer resulted in a sentence.[28] And, according to ORMUSA, a non-governmental organization that investigates gender-based violence, out of the 978 cases of violence against women documented in 2014, only 4 resulted in convictions.[29]

64. The recognition that the two new laws have failed to improve conditions for women in the country, according to the obligations of the State under international law,[30] resulted in the recent passage of Decree 286 in February 2016 which is a decree that creates specialized courts to hear certain cases involving gender-based violence.[31] This decree – which states that the Constitution establishes the obligation of the State to protect the rights of life and physical integrity and the principle of equality of all people – has several flaws that wholly undermine their potential efficacy. First, these special courts will not hear any cases involving crimes of domestic violence or sexual violence, which are the forms of violence most prevalent in El Salvador. Second, the entry point to accessing these special courts are the ordinary courts (Peace Courts, the *Juzgados de Paz*), which have been the courts known to fail in providing justice for women. In addition, the decree only contemplates creation of courts in three areas. While these courts are intended to have a broader geographical coverage, the reality is that women who are victims of violence will find it difficult to travel the distances necessary to access these courts. Finally, there exists serious question about the government's committment to establishing these courts.

65. It is important to emphasize that the validity of the new jurisdiction of women's rights will gradually contribute to change the current legal argumentation. However, this will require a larger budget and more courts. And in this context, we still come up short with relation to the attention to violence and discrimination at a national level since there are

---

[28] El Feminicidio en El Salvador: Obstáculos para el acceso a la justicia [Feminicide in El Salvador: Obstacles to access to justice], ISDEMU (2015), at 7.

[29] El Salvador: Information Gathering Mission Report – Part 1: Gangs in El Salvador and the Situation of Witnesses of Crime and Corruption, Immigration and Refugee Board of Canada (2016) at 10.

[30] In addition to its constitutional obligations, the State of El Salvador has ratified various international instruments that make it necessary to create a new jurisdiction to respond immediately to cases of violations of rights committed against women. As noted above (*see* paragragh 52), these include: CEDAW by Legislative Decree No. 605, dated June 2, 1981, which obligates State Parties to adopt all appropriate measures, including legislative measures, to modify or repeal laws and practices that constitute discrimination against women; and the Convention of Bélem Do Pará by Legislative Decree No. 430 which, according to article 3, establishes that every woman has the right to a life free of violence both in the public and private spheres and in accordance with article 1, violence against women must be understood as any action or conduct based on gender that causes death, injury, or physical, sexual, or psychological suffering, and it is the obligation of State Parties, as provided for in article 7.C, to include in the internal legislation criminal norms that are necessary to prevent, punish, sanction, and eradicate violence against women.

[31] On the other hand, the creation of the specialized courts reflects that the LEIV establishes as a guiding principle the specialization in the area, whereby women have the right to differentiated and specialized attention with due diligence, which achieves a fair comparison and real equality on the judicial level; in this regard, it is imperative to create and develop processes that respond to the demand for specialized and integral services, taking all means necessary to achieve the full realization of the right to simple and effective resources before competent courts, that protect the woman against actors that violate her rights, in accordance with what is established both by the CEDAW as well as the Convention of Bélem Do Pará.

ABROP0704

only three courts and one chamber in the area of women's rights that recognize the national issue, having to deconstruct the criminal law regarding crimes against sexual liberty and other crimes that link women with their sexual and reproductive rights such as the complete prohibition of the right to terminate pregnancy for therapeutic reasons.

66. The ineffective implementation of the LVIF, the Ley Integral, and the Ley de Igualdad, shows that the passage of laws alone has almost no impact on the incidence of discrimination and violence, and that there is a persistent lack of adequate specialized treatments for victims and aggressors alike. Many of the provisions and principles in these recent statutes have already been part of Salvadoran law for many years.[32] Nonetheless, these earlier laws failed to protect women from gender violence and discrimination because sociocultural norms have continued to make women subordinate to men in most aspects of life.

67. For significant progress to come about, there are many other changes that need to occur. Those who apply the law must be trained to do so effectively. There must be a system established to monitor the consistent application of the laws and to discipline public officials who fail in proper application. The passage of these new lwas was intended to bring about these changes, but they have failed to do so given the lack of political will, the lack of adequate budget allocation for the institutions charged with implementing the laws, the lack of a uniform interpretation of the laws, and continued resistance on the part of public officials to apply the laws.

68. Most significantly, there must be a drastic change in social attitudes, which will likely take many years, in order for the women of El Salvador to experience any meaningful change as a result of these laws. The recent increase in suicides among adolescent girls and young women (mentioned in paragraph 43 above) who feel they have no other recourse demonstrates the effects of a patriarchal family and social environment in which the practices of sexual abuse and incest continue, and are part of the sexual, physical, emotional, economic, and symbolic abuses suffered by women in El Salvador.

**The Case of A███ B███**

69. I am aware of the facts of A██ B███'s case. The details of her family history and described upbringing and history of domestic abuse are consistent with my knowledge of violence against women and girls in El Salvador. As a Salvadoran woman who attempted to flee the abuses to which she was subjected in her relationship with her ex-husband and father of her children, Ms. B██ lacked any reliable means of protection from the police or other authorities or shelter, increasing her risk of harm. Indeed, her case illustrates the ineffectiveness of law enforcement in providing protection for women. For example, the police forced her to deliver the protective order directly to her abuser which exposed her to his retaliation. They also refused to take action when called, saying they

---

[32] For example, since 1983, Article 3 of the Constitution has guaranteed the equality of men and women, and Articles 2 and 11 have guaranteed the right to the "physical integrity" of one's person. As I have detailed above, the LVIF has enshrined the principles of equal access to justice and women's right to protection from domestic violence since 1996.

ABROP0705

9

## DECLARATION OF NANCY K. D. LEMON
## EXPERT ON DOMESTIC VIOLENCE

I do hereby declare:

### Introduction

1. My name is Nancy K. D. Lemon. I am a lawyer and advocate for victims of domestic violence and a lecturer in Domestic Violence Law at the University of California, School of Law (Boalt Hall), in Berkeley, California. I have worked as an advocate for battered women and teenagers for more than three decades, during which I have represented hundreds of battered women in civil and criminal cases and advised hundreds more. I have testified as an expert witness in legal and administrative proceedings on more than 70 occasions, and submitted many more expert declarations and reports. I have written, published, and spoken extensively on the subject of domestic violence. In addition, I have drafted, testified about, and lobbied for more than 15 pieces of legislation related to domestic violence that are currently law in California. Finally, as a consultant for numerous governmental and non-governmental organizations, I have developed curricula and conducted trainings on domestic violence for judges, prosecutors, police officers, social workers, child welfare workers, family law attorneys, domestic violence advocates, and court employees. My curriculum vitae is attached.

2. Based on my extensive research and writing, representation of hundreds of battered women, and reading of legal and academic literature on domestic violence, it is my opinion that gender is one of the main motivating factors, if not *the* primary factor, for domestic violence. In other words, the socially or culturally constructed and defined identities, roles, and responsibilities that are assigned to women, as distinct from those assigned to men, are at the root of domestic violence.[1]

3. I was contacted by counsel for A⬛⬛ B⬛ to provide an expert opinion on her case. I hereby present my knowledge of gender and domestic violence as it relates to the facts of Ms. B⬛'s case.

### Education and Experience

4. I graduated with honors from the University of California, Santa Cruz, where I earned a B.A. in Women's Studies in 1975, and obtained a Juris Doctor degree in 1980 from Boalt Hall. I have been admitted to the State Bar of California since 1980.

5. From 1981 to 1993, I worked at various non-profit organizations as an advocate for domestic violence victims. Among other things, I represented hundreds of battered women in civil proceedings, including restraining order proceedings; provided domestic violence awareness training for attorneys, shelter workers, and police; wrote a grant proposal launching the Southern Alameda County Domestic Violence Law Project; and authored law enforcement

---

[1] When I refer to "women" and "men" in this affidavit, the term is meant to include persons under the age of 18 as well. In many cases, persons involved in abusive relationships may be younger than 18 years old.

ABROP0728

policies relating to domestic violence victims. In doing so, I worked with a range of non-profit organizations in the greater Bay Area, including the Legal Aid Society of Alameda County, the Mid-Peninsula Support Network, Battered Women's Alternatives, and the Family Violence Law Center.

6. I began expert witness work in 1993, and continue to regularly testify as an expert on domestic violence issues, submit expert reports and declarations, and consult with attorneys and prosecutors. Since 1993, I have testified in over 70 criminal and civil proceedings, including proceedings before immigration courts, about domestic violence. I have drafted and submitted many more expert reports and declarations on the same topic in cases that resolved short of trial or relied on my reports in lieu of live testimony.

7. I have written and published extensively on the subject of domestic violence. I wrote the first textbook for domestic violence law in the United States, the first edition of which was published in 1996 as *Domestic Violence Law: A Comprehensive Overview of Cases and Sources*. A fourth edition, now widely used in law schools around the country, was published in 2013, and the fifth edition is forthcoming in 2018. I also co-authored two other published books on domestic violence: *Child Custody and Domestic Violence: A Call for Safety and Accountability*, published in 2003; and *Working Together to End Domestic Violence*, published in 1996. From 1995 to 2009, I was the Associate Editor of *Domestic Violence Report*, a national bimonthly journal published by Civic Research Institute, Inc. I was contributing editor to *Violence Against Women*, published in 2002, which featured reprints of articles from *Domestic Violence Report*. My scholarly articles on domestic violence have been published by the American Bar Association and the National Council of Juvenile and Family Court Judges, as well as the *California Lawyer; Berkeley Women's Law Journal; William Mitchell Law Review; Golden Gate University Law Review; Berkeley Journal of Gender, Law & Justice; Journal of Gender Specific Medicine; Journal of Aggression, Maltreatment, and Trauma; Health Law News; Domestic Violence Report;* and *the State Bar of California Family Law News*.

8. In addition to my research and writing, I have developed educational curricula on domestic violence awareness programs and laws for judges, prosecutors, police, child custody mediators and evaluators, and other court employees. I have also drafted a number of training manuals and judicial curricula for the California Center for Judicial Education and Research (CJER), the Family Violence Prevention Fund (now Futures Without Violence), the Family Violence Project (ditto), the California Women Lawyers Educational Foundation, and the U.S. Marine Corps.

9. I am actively involved in public policy work relating to domestic violence. As a long-time member and the former co-chair of the Public Policy and Research Committee of the California Alliance Against Domestic Violence (now the California Partnership to End Domestic Violence), I drafted, lobbied for, and/or testified before the California Legislature about more than 15 bills related to domestic violence, all of which were signed into law. These bills mandate the specifics of law enforcement response to domestic violence; extend restraining orders from 90 days to one year (now issuable up to five years); require judges to take domestic violence into account in custody cases; establish a right to separate mediation

ABROP0729

sessions in domestic violence cases; redefine marital rape such that its new definition paralleled that of non-marital rape; amend 19 penal code sections to include marital rape; create a rebuttable presumption against giving child custody to batterers; extend the duration of Emergency Protective Orders to one week; clarify a judge's ability to limit visitation in domestic violence cases; and expand California's state-sponsored confidential address program to enable more victims of domestic violence and stalking to qualify.

10. I served as a consultant to state legislators and gave testimony during the drafting of many other bills in the state legislature, all of which have been enacted into law. I have also presented legislative proposals to address domestic violence and testified at hearings before bodies such as the Domestic Violence Special Committee of the State Assembly, the Women's Caucus of the California Legislature, the State Senate Task Force on Family Equity, and the California Judicial Council Committee on Gender Bias in the Courts.

11. I have served as a consultant, speaker, and trainer on domestic violence issues for numerous governmental and non-governmental organizations, both in the United States and abroad, including Family Court Services (for employees from around California), California Judicial Council, the California Center for Judicial Education and Research, California State Office of Criminal Justice Planning, National Council of Juvenile and Family Court Judges, California District Attorneys Association, National Coalition Against Domestic Violence, California Alliance Against Domestic Violence, California Partnership to End Domestic Violence, Nevada Prosecutors Advisory Committee, and the Nevada Network Against Domestic Violence.

12. In 1995, I gave presentations on domestic violence issues at the Non Governmental Organizations Women's Forum at the World Conference on Women in Beijing. In 1998, I visited Mongolia on behalf of the Asia Foundation and helped draft that country's first domestic violence laws and lobby members of Parliament. In 1999, I gave a presentation on use of experts in domestic violence cases at the Women's Worlds International Conference in Norway. In 2007, I conducted a training in Cape Town, South Africa, which included the use of experts in domestic violence cases. In 2010, I conducted a training in Surabaya, Java, Indonesia, focusing on their domestic violence statute.

13. I have been a member of a number of committees and advisory boards. For several years starting in 1995, for instance, I sat on the Alameda County Family Violence Council and chaired its legislative committee; on occasion, I was a member of its judicial training committee. Between 2001 and 2005, I was a member of the Board of the California Alliance Against Domestic Violence. Between 2005 and 2007, I was a founding member of the Board of the California Partnership to End Domestic Violence. I have also been a member of the advisory committee for the National Battered Women's Justice Project in Reading, Pennsylvania, and sat on the steering committee of Free Battered Women, a project of the California Coalition for Battered Women in Prison.

14. I am the Legal Director of the Family Violence Appellate Project, a non-profit agency whose mission is to appeal California family law cases involving domestic violence and to build a body of published decisions to help guide trial courts. Part of my work as Legal Director

ABROP0730

includes training attorneys and advocates on California's statutes protecting survivors of domestic violence and their children in family court, and the science behind these statutes.

15. Finally, I am actively involved in teaching. For over a quarter century, since 1988 I have taught an annual Domestic Violence Law seminar – the first such course in the United States – at Boalt Hall. I have updated my textbook every four years. Since 1990, I have also directed a domestic violence clinic/practicum at Boalt, supervising students' work on a range of issues and placing them in local internships. Through the internships, my students draft restraining order applications, represent clients at civil and criminal hearings, assist in the prosecution of batterers, assist battered women in prison, work with battered immigrant women and teen victims of domestic violence, work with battered women who have employment or housing issues, assist family law attorneys on domestic violence cases, represent survivors of domestic violence who are seeking asylum, extern with family law judges, and work on policy issues. I have continuously supervised student research and writing, some of which has been published in law reviews, excerpted in my textbook, or submitted as *amicus* briefs in significant domestic violence cases.

## Gender and Domestic Violence[2]

16. Gender is one – if not *the* – primary motivating factor for domestic violence.[3] Statistics, comparative cross-cultural studies of domestic violence, and behaviors exhibited by male batterers show that disparities between the socially or culturally constructed roles assigned to women and those assigned to men are at the root of domestic violence. Being female, in short, is the strongest risk factor for whether an individual will become a victim of partner violence.[4]

### A.  Statistics

17. Statistics on domestic violence provide compelling evidence that gender is at the core of why domestic violence occurs. In the United States, domestic violence victims are

---

[2] The scope of this affidavit is to address gender dynamics and violence in the context of heterosexual relationships, excluding domestic violence in same-sex relationships. This is not to discount the existence of same-sex domestic violence and the fact that there are gendered aspects in this context as well. However, exploration of these are outside the scope of this affidavit.

[3] In order to understand what I mean when I say that domestic violence is primarily gender-motivated, it is first necessary to understand that gender is something distinct from, although related to, the biological concept of sex. The distinction between the terms "gender" and "sex" has been aptly articulated by the United Nations High Commission on Refugees in its guidelines on gender-related persecution:

> Gender refers to the relationship between women and men based on socially or culturally constructed and defined identities, status, roles and responsibilities that are assigned to one sex or another, while sex is a biological determination. Gender is not static or innate but acquires socially and culturally constructed meaning over time.

United Nations High Commissioner for Refugees, *Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, HCR/GIP/02/01 at 2 (2002).

[4] American Psychological Association, REPORT OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION PRESIDENTIAL TASK FORCE ON VIOLENCE AND THE FAMILY 19 (1996) [hereinafter "APA REPORT"].

ABROP0731

overwhelmingly women, and the perpetrators men.[5] A study from the U.S. Department of Justice (DoJ) reported that 82% of intimate partner violence was committed against females.[6] Examining statistics from a number of federal databases, the DoJ concluded that, "[w]hile about three-fourths of the victims of family violence were female, about three-fourths of the persons who committed family violence were male."[7] In 2008, females age 12 or older in the United States experienced 5 times more nonfatal violent victimizations (rape/sexual assault, robbery, or aggravated or simple assault) by an intimate partner than men.[8] Globally, women are six times more likely to be killed by an intimate partner than are men.[9] These statistics provide compelling evidence that heterosexual domestic violence is, in significant part, motivated by bias against women and the belief that men are entitled to beat and control women. Otherwise, we would expect heterosexual women to abuse their male partners as often as heterosexual men abuse their female partners.

18. Further, statistics show that the greater the inequality in a heterosexual relationship, the greater the risk that the dominant partner would use physical force to maintain control over the non-dominant partner.[10] Accordingly, egalitarian couples had the lowest rates of violence, while male-dominated couples had the highest rate of spousal abuse.[11] It is clear, based on this data, that the relative positions of the man and woman in a heterosexual relationship is a direct predictor of the likelihood that domestic violence will occur in that relationship.

**B. Cross-Cultural Studies**

19. Cross-cultural studies also confirm that domestic violence occurs because of gender inequality predicated on hierarchical and distinct gender roles. The results of several cross-cultural studies of societies with little or no domestic violence indicate that gender conditioning is a significant reason why domestic violence occurs. Specifically, these studies

---

[5] Although a few studies claim that there are equivalent levels of certain violent behaviors by both women and men in families, these studies are not reliable because they may not account for "minor" violence like pushing and shoving, which can skew the numbers to make it appear that women are equally likely to commit violence against their partners. *See* National Institute of Justice, *Measuring Intimate Partner (Domestic) Violence,* May 12, 2010, http://www.nij.gov/topics/crime/intimate-partner-violence/pages/measuring.aspx ("National surveys supported by NIJ [the National Institute of Justice], CDC [Centers for Disease Control and Prevention], and BJS [the Bureau of Justice Statistics] that examine more serious assaults do not support the conclusion of similar rates of male and female spousal assaults. These surveys…clearly find more partner abuse by men against women.").

[6] Jennifer L. Truman & Rachel E. Morgan, U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS, *Special Report: Nonfatal Domestic Violence, 2003-2012* (2014), http://www.bjs.gov/content/pub/pdf/ndv0312.pdf.

[7] Matthew R. Durose et al., U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS, *Family Violence Statistics: Including Statistics on Strangers and Acquaintances* (June 2005), http://www.bjs.gov/content/pub/pdf/fvs10.pdf.

[8] Shannon Catalano et al., U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS, *Selected Findings: Female Victims of Violence* (2009), http://www.bjs.gov/content/pub/pdf/fvv.pdf (552,000 incidents for women versus 101,000 for men).

[9] Heidi Stockl et al., *The global prevalence of intimate partner homicide: a systematic review*, 382 THE LANCET 859, 863 ("The proportion of murdered women killed by a partner is six times higher than the proportion of murdered men killed by a partner (38.6% and 6.3% of female and male homicides, respectively)").

[10] Dean Knudsen & Joann Miller, ABUSED AND BATTERED: SOCIAL AND LEGAL RESPONSES TO FAMILY VIOLENCE 26 (Aldine Transaction Publishers 1991).

[11] *Id.*

ABROP0732

the home; (2) presence of all-female work or solidarity groups; (3) active community intervention in violence; and (4) the presence of sanctuaries from violence.[16]

24. Studies that compared different states within the United States also show a correlation between patriarchal norms that support male dominance and violence against women by intimate partners. One survey of all fifty states showed that wife assault correlated with prevalence of patriarchal norms, and states with the most male-dominated norms had twice the incidence of wife assault as states with more egalitarian norms.[17] As such, hierarchical and distinct gender roles constitute a strong predictor of the prevalence of domestic violence.

## C. Behaviors Exhibited by Batterers are Based on Male Power and Control

25. In general, gender is culturally and socially constructed in such a way that men have a right to control and dominate women. That is, men are entitled to dominate and control women because the male sex is considered superior and the female sex inferior. Men have the power, within this cultural and social construct, to assign proper roles and duties to a woman, dictate her behavior, and punish her when she deviates from the proper norms. The existence of such a construct is indicative of pervasive domestic violence.

26. Indeed, rigid acceptance of men's entitlement to superiority and control over family members is among the leading risk factors for intrafamilial violence within a society.[18] Male abusers in treatment groups indicate that their abuse stemmed from a struggle for power closely tied to the abusers' need to control or dominate the female, their belief that female independence meant loss of male control, and their attempt to persuade or coerce the female into adopting their definition of how the relationship should be structured and how it should function.[19] The goal of the male batterer is not the violence itself, but to exercise power and control over the woman who is his spouse or partner. To this end, male batterers engage in a range of abusive behaviors that reflect their sense of male entitlement and superiority, as well as their authority to enforce stereotypical gender roles.

27. The "Power and Control Wheel"[20] (See Appendix 1 for a copy) illustrates the abusive behaviors of male batterers and the relationship of these behaviors to rigid and stereotypical gender roles. The Wheel "depicts how physical violence is connected to male power and control through a number of spokes or control tactics: minimizing, denying, and blaming;

---

[16] *Id.*

[17] Kersti A. Yllo & Murray A. Straus, *Patriarchy and Violence against Wives: The Impact of Structural and Normative Factors, in* PHYSICAL VIOLENCE IN AMERICAN FAMILIES 395–96 (Murray A. Straus & Richard J. Gelles eds., 1995).

[18] APA REPORT, *supra* note 4, at 18.

[19] Donald G. Dutton, THE DOMESTIC ASSAULT OF WOMEN: PSYCHOLOGICAL & CRIMINAL JUSTICE PERSPECTIVES 64 (UBC Press 1995).

[20] The "Power and Control Wheel" was developed in the early 1970s by pioneering domestic violence advocates and first used by the Duluth Abuse Intervention Project in Duluth, Minnesota. Today the "power and control theory" of battering illustrated by the Wheel is central to two of the three mainstream batterer intervention models identified by the Department of Justice – the Duluth Model and the AMEND model. *See* Kerry Healey, Christine Smith, & Chris O'Sullivan, U.S. DEP'T OF JUSTICE, BATTERER INTERVENTION: PROGRAM APPROACHES AND CRIMINAL JUSTICE STRATEGIES 35, 47-48 (1998). Even EMERGE, the third batterer intervention curriculum identified as a mainstream model by the DoJ, includes teaching batterers not to think of women as possessions or objects. *Id.* at 52.

ABROP0734

using intimidation, emotional abuse, [using] children, male privilege, economic abuse, and threats."[21]   A batterer uses each "spoke" or control tactic described in the Wheel to enforce male power and female subordination, and exploit the traditional socially constructed roles, identities, duties, and status of women in intimate relationships.

*Male Privilege*

28. The male batterer is motivated by a firm belief in male privilege, which expresses itself in an expectation that men and women conform to traditional and rigid gender roles in heterosexual relationships. The batterer treats his wife or partner like a servant or property rather than as an equal partner, acts like the "master of the castle," and assumes authority to define men's and women's gender roles and make final decisions regarding what his wife or partner will or will not do. His partner's failure to fulfill his traditional and rigid expectations for how a woman ought to behave may trigger an episode of abuse or violence, and "[m]en with rigid sex role expectations may justify their violent behavior by pointing to their partners' failure to live up to these expectations."[22] The APA Presidential Task Force Report estimates that 50% or more of male batterers abuse their female partners because they have stereotypical sex-role expectations for "their" women as well as poor anger management and conflict resolution skills.[23]

29. Interviews with batterers and their victims also reveal the batterers' gendered perspective on their wife-battering. In my own work, many female domestic violence survivors have told me that they were beaten if dinner was not ready when their abusers wanted it, or if they refused to have sex when the abusers wanted to have sex. The Director of the AMEND treatment program for batterers in Denver also noted that batterers often admit, for example: "The funny thing is, I wasn't even that mad. I just wanted to show her who's boss."[24]

30. James Ptacek, a sociology professor whose research focuses on domestic violence, conducted in-depth interviews with former male batterers as part of a study notable for what it revealed about batterer perspectives on wife-beating.[25] The interviews revealed that some of the men justified their behavior on the basis that the batterers, as men, were entitled to punish the women when they did not behave as the batterers thought women should.[26]  Seventy-eight percent of the men interviewed felt that their abusive behavior was justified by their wives' failure to fulfill the "obligations of a good wife" – that is, they believed their wives' failure to cook well, to be available for sex, and to act in a deferential manner constituted a reasonable basis for assault.[27]  Using this assumption of male entitlement, the batterers were able to deny the wrongness of the violence.[28]

---

[21] *Id.* at 47.

[22] Jeffrey L. Edleson & Richard M. Tolman, INTERVENTION FOR MEN WHO BATTER: AN ECOLOGICAL APPROACH 73 (Sage Publications 1992).

[23] APA REPORT, *supra* note 4, at 82.

[24] Healey, *supra* note 20, at 52.

[25] James Ptacek, *Why Do Men Batter Their Wives, in* FEMINIST PERSPECTIVES ON WIFE ABUSE 147-49 (Kersti Yllö & Michelle Bograd eds., Sage Publications 1988).

[26] *Id.* at 147-49.

[27] *Id.* at 147.

[28] *Id.* at 149.

ABROP0735

the batterer, 11% had batterers who actually kidnapped the children, and 21% returned to the batterer after being threatened with kidnapping.[47] Finally, by using children as blackmail, an abuser can control his partner through threats of *future* violence towards the children.[48]

49. Batterers also often verbally and psychologically abuse their partners by making them feel guilty for being "bad" mothers. For example, if anything bad happens to the children, a batterer is likely to blame it on his partner being a "bad mother." If she tries to leave the relationship, he may call her a "bad mother" for leaving the children or accuse her of taking them away from their father. He might also tell her that, because she will be seen as a "bad mother" for having "abandoned" her children, the court will award him custody if she leaves.

50. Using the children as blackmail and making a woman feel like she is a bad mother is gender-specific abuse, because such methods are intended to undermine and exploit what is very often the most significant and essential aspect of a woman's identity – motherhood. Many women are emotionally close to their children. In fact, for many of them, being a mother is the most important role in their lives – more important than being a wife – and, in many societies, women's central role and responsibility is to be a mother. Therefore, by abusing his partner's children, the batterer attacks her ability to be a good mother, thereby attacking her womanhood.[49]

51. When confronted with threats to their children and motherhood, many women will go to great lengths to protect or avoid losing their children, including staying with an abusive partner, being raped by him, or engaging in prostitution if he so demands. As such, using children as blackmail is both a form of abuse itself and a way to perpetuate *other* forms of abuse.

52. In contrast, for many men, in particular those with male-centric world views, the role of a father is to conceive children and financially support them, but not necessarily to nurture or establish a close emotional relationship with them. Thus, when a batterer fights for custody of the children, it is very often not because he is emotionally close to them, but because he wishes to use the children as pawns in a power struggle with their mother. In fact, studies of custody disputes indicate that fathers who batter the mother are twice as likely to seek sole physical custody of the children as are nonviolent fathers.[50] And, where the mother gets physical custody of the children, her abuser will often use his court-mandated visitation periods to abuse, threaten, and attack her.[51]

### D. Post-Separation Abuse and Impact on Ability of Women to Leave Abusive Relationships

53. The aforementioned behaviors exhibited by batterers can make it incredibly difficult for women to leave them. In particular, the combination of family and community pressure to

---

[47] APA REPORT, *supra* note 4, at 39.
[48] Araji, *supra* note 45, at 6-9; Stark, *supra* note 44, at 11-20.
[49] Healey, *supra* note 20, at 4.
[50] APA REPORT, *supra* note 4, at 40.
[51] *Id.*

ABROP0741

stay together, lack of options in many countries for women to live independently and support themselves without a male partner, and the use of shared children as leverage make it such that many women in abusive relationships are for all intents and purposes unable to leave.

54. The few women who overcome these impediments and take steps to escape abusive relationships often find that they are still unable to do so because their batterers will not let them go. Since the batterer is driven by his unwavering belief that the woman is and should be under his complete control, any attempts to divorce him, move out of the house, or seek assistance from friends and family can cause the batterer to retaliate with even more violence.[52] In fact, a study by the U.S. Department of Justice found that separated women are 30 times more likely to experience intimate partner violence than are married women who are living with their husbands,[53] underscoring the danger and barriers to attempts to leave or formally terminate an abusive relationship. A term—"separation assault"—has even been coined "to describe the violence men used to prevent women from leaving the relationship, to force them to return, or to retaliate after they left."[54] Many batterers would rather see their partners dead than living free of them. Numerous studies have shown that battered women are most likely to be killed when they try to leave their batterers.[55]

55. Although she may be able to physically leave the home or obtain a legal divorce, the woman may still effectively be unable to leave the relationship. Her abuser will often threaten, stalk, and commit violent acts against her in an effort to reassert his dominance.[56] Research has shown that men who engage in controlling behavior such as that described in this affidavit are significantly more likely to resort to stalking and violence when their partners try to separate from them.[57] Even if the woman is able to escape bodily harm for some period of

---

[52] Asylum and Withholding Definitions, 65 Fed. Reg. 76588, 76595 (proposed Dec. 7, 2000) (to be codified at 8 C.F.R. pt. 208) (hereinafter Proposed Regulations) ("domestic violence centers on power and control over the victim"…"[c]onsequently, when victims attempt to flee the abusive relationship, or otherwise assert their independence, abusers often pursue them and escalate the violence to regain or reassert control.").

[53] Shannan Catalono, *Special Report: Intimate Partner Violence, 1993-2010* (NCJ Publication No. 239203), U.S. Department of Justice, Bureau of Justice Statistics, available at http://www.bjs.gov/content/pub/pdf/ipv9310.pdf.

[54] Toews, *supra* note 42, at 3 (internal quotation marks and citations omitted). *See, also,* Martha R. Mahoney, *Legal Images of Battered Women: Redefining the Issue of Separation,* 90 Michigan Law Review 1, 65 (1991) (one of the first to define the term "separation assault," describing it as "the attack on the woman's body and volition in which her partner seeks to prevent her from leaving, retaliate for the separation, or force her to return.").

[55] Proposed Regulations, *supra* note 52, at 76595 (Studies have shown that "[t]he risk of lethality to the victim is typically greatest when she attempts to escape the abuse and, in contrast to other persecution cases where the persecutor's desire to harm the victim may wane if the victim leaves, the [domestic violence] victim's attempt to leave typically increases the abuser's motivation to locate and harm her."). *See also* Peter G. Jaffe et al., *Common Misconceptions in Addressing Domestic Violence in Child Custody Disputes,* 54 JUVENILE & FAMILY CT. J. 57, 59 (2003) ("separation may be a signal to the perpetrator to escalate his behavior in an attempt to continue to control or punish his partner for leaving"); Jennifer L. Hardesty, *Separation Assault in the Context of Postdivorce Parenting: An Integrative Review of the Literature,* 8 VIOLENCE AGAINST WOMEN 597, 601 (2002) ("a woman's risk of intimate femicide increases sixfold when she leaves an abusive partner"); Tina Hotton, *Spousal Violence After Marital Separation,* Statistics Canada, 21 Catalogue no. 85-002 6 ("Marital separation is a factor that elevates the rate of spousal homicide for women.").

[56] *See* Jane K. Stoever, *Enjoining Abuse: The Case for Indefinite Domestic Violence Protection Orders,* 67 VAND. L. REV. 1015, 1025–26 (2014); Cathy Humphreys & Ravi K. Thiara, *Neither Justice nor Protection: Women's Experiences of Post-Separation Violence,* 25 J. OF SOCIAL WELFARE & FAMILY L. 195, 199-201 (2003).

[57] Petra Ornstein & Johanna Rickne, *When Does Intimate Partner Violence Continue After Separation?,* 19(5) VIOLENCE AGAINST WOMEN 617, 627 (2013).

ABROP0742

### E. Domestic Violence and Other Variables Present in the Relationship

68. Domestic violence is not typically caused by behaviors unique to the victim or by inter-personal dynamics unique to the relationship between the abuser and the abused. Many batterers, in fact, establish patterns of control in their adult relationships and repeat these patterns regardless of the identity of the female partner.[69] Notably, studies indicate that regardless of "significant differences in the personalities or conduct of their intimate partners or in the characteristics of those particular relationships," batterers will continue their patterns of abusive control.[70] Further studies indicate that no change in a victim's behavior could alter the batterer's violent and controlling behavior.[71]

69. One common misconception[72] is that an abuser's use of alcohol and other substances is one external variable that drives domestic violence. This is not true.[73] Indeed, numerous studies by academics, practitioners, and government agencies, including the U.S. Department of Health and Human Services, have concluded that alcohol and other substance abuse is not the cause of domestic violence.[74] Research also shows that alcohol and most drugs do not produce the physiological effects that cause violent behavior.[75] In a 2015 study, over 90% of experts on intimate partner violence surveyed, ranging from academics to social workers, agreed that alcohol does not cause intimate partner violence.[76] The study concludes, "alcohol might be used as an excuse for violent behaviour and may trigger arguments that fuel

---

[69] Warshaw & Ganley, FAMILY VIOLENCE PREVENTION FUND, IMPROVING THE HEALTH CARE RESPONSE TO DOMESTIC VIOLENCE: A RESOURCE MANUAL FOR HEALTH CARE PROVIDERS 30 (1996).

[70] *Id.*

[71] *Id.*

[72] Despite evidence to the contrary, some individuals still subscribe to the "drunken bum" theory of domestic violence, which explains that men who batter are "drunken bums" who are more likely to commit domestic violence if they have a low income and abuse alcohol. Larry Bennett & Patricia Bland, *Substance Abuse and Intimate Partner Violence* 2 (May 2008), http://www.vawnet.org/Assoc_Files_VAWnet/AR_SubstanceRevised.pdf. Scholars, however, have criticized the "drunken bum" theory. Academics and practitioners, along with the U.S. Department of Health and Human Services, generally agree that, even when domestic violence and substance abuse coincide, they are separate and distinct behaviors, and one does not cause the other. Larry W. Bennett, *Substance Abuse by Men in Partner Abuse Intervention Programs: Current Issues and Promising Trends,* VIOLENCE AND VICTIMS, Vol. 23, Issue 2, at 237 (2008).

[73] Linda M. Peterman & Charlotte G. Dixon, *Assessment and Evaluation of Men Who Batter Women,* J. OF REHABILITATION, Vol. 67, Issue 4, at 40 (Oct. – Dec. 2001); *see also* Illinois Department of Human Services, SAFETY AND SOBRIETY: BEST PRACTICES IN DOMESTIC VIOLENCE AND SUBSTANCE ABUSE, at iv (July 2000) ("There are multiple causes for both substance abuse and for domestic violence. There is little evidence that one problem causes the other."); Minnesota Coalition for Battered Women, *Understanding Men Who Batter,* http://www.mcbw.org/files/u1/menwhobatter.pdf (last visited October 25, 2011) ("While many batterers have substance abuse problems, there is no evidence that alcohol or drugs cause violent behavior.")

[74] *See, e.g.,* U.S. DEP'T OF HEALTH AND HUMAN SERVICES, PUB. NO. [SMA] 97-4264, SUBSTANCE ABUSE TREATMENT AND DOMESTIC VIOLENCE (1997), *available at* http://www.ncbi.nlm.nih.gov/bookshelf/br.fcgi?book=hssamhsatip&part=A46712; Bennett, *supra* note 72.

[75] Bancroft, *supra* note 64 at 20.

[76] Aliraza Javaid, *The Role of Alcohol in Intimate Partner Violence: Causal Behaviour or Excusing Behaviour?*, 13 BRITISH JOURNAL OF COMMUNITY JUSTICE 75, 84 (2015), http://www.academia.edu/12452689/The_Role_of_Alcohol_in_Intimate_Partner_Violence_Causal_Behaviour_or_Excusing_Behaviour.

ABROP0746

violence, but it is usually not a direct cause of violent behaviour."[77] There is no evidence to suggest that alcohol use or dependence in batterers is linked to other forms of coercive behavior, such as economic control, sexual violence, and intimidation, which are part of the typical pattern of domestic violence.  When substance abuse and domestic violence occur simultaneously, "the choice to batter often precedes the drinking or drugging," and "there is a pre-existing pattern of dominant and controlling behavior by the perpetrator toward his traditional victim."[78] Additionally, "abstinent and recovering substance abusers are well-represented in domestic violence courts and batterers programs, some with many years of stable sobriety."[79]

70. In my own experience working with abusers, attendance at substance abuse treatment programs does not generally lead to changes in abusive behavior. As such, when I provide domestic violence awareness training to judges, I ask them to deal with substance abuse treatment and domestic violence intervention as separate problems.

71. The fact that variables in partners and in relationships do not change the batterer's behavior demonstrate that while domestic violence occurs within the context of a relationship, it is not caused by that particular relationship. Rather, heterosexual male batterers have certain expectations of intimate relationships with regard to which partner will control the relationship and how control will be exercised. These expectations are premised on a dogmatic adherence to male privilege and rigid, distinct, and unequal roles for women and men. It is these attitudes and beliefs, not the victim's behavior or personal dynamics unique to the specific relationship, or the abuser's use of alcohol or drugs that determine whether the relationship will be violent.[80]

### F.  Domestic Violence and Child Abuse

72. As shown, statistics, cross-cultural research, and behavioral studies compel the conclusion that gender is a primary motivator for domestic violence. The simultaneous occurrence of child abuse alongside domestic violence does not detract from that conclusion. Domestic violence often occurs alongside child abuse because both are based on male power and control. In other words, both types of abuse arise from the abuser's belief that he has the right to control the family and assert his male dominance. As one researcher put it, "they not only feel the need to control 'their' women but also 'their' children."[81]

73. In fact, research indicates that a batterer's behavior towards his partner is an important predictor of how he treats his children.[82] Male batterers of women are several times more likely than other men to physically abuse children, and severely violent batterers are ten times as likely to do so as are non-batterers.[83] Indeed, studies show that 30 to 60 percent of

---

[77] *Id.* at 78.
[78] Bennett, *supra* note 73, at 2.
[79] *Id.* at 3.
[80] *Id.*
[81] Carolina Overlien, *The Children of Patriarchal Terrorism*, 28 J. FAMILY VIOLENCE 277, 285 (2013).
[82] Bancroft, *supra* note 64, at 46.
[83] *Id.* at 42-43.

ABROP0747

10

# EL SALVADOR 2016 HUMAN RIGHTS REPORT

*Note: This report was updated 4/12/17; see Appendix F: Errata for more information.*

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic. Municipal and legislative elections held in March 2015 were generally free and fair. Election results were delayed, however, due to problems with the transmission, tabulation, and public dissemination of the vote count under the management of the Supreme Electoral Tribunal. Free and fair presidential elections took place in 2014.

Civilian authorities failed at times to maintain effective control over security forces.

The principal human rights problems stemmed from widespread extortion and other crime in poor communities throughout the country. They included widespread corruption; weak rule of law, which contributed to high levels of impunity and government abuse, including unlawful killings by security forces, discrimination, and delay and lack of compliance with court rulings; and violence against women and girls (including by gangs), gender discrimination, and commercial sexual exploitation of women and children. According to a 2016 CID Gallup poll, more than one in five families claim to have been victims of violent crimes.

Other human rights problems included harsh and potentially life-threatening prison conditions; lengthy pretrial detention; restrictions on freedom of speech and press; trafficking in persons; migrant smuggling, including of unaccompanied children; and discrimination against persons with disabilities and persons with HIV/AIDS. There was also widespread discrimination and some violence against lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons.

Impunity persisted despite government steps to dismiss and prosecute some officials in the security forces, the executive branch, and the justice system who committed abuses.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

ABROP0918

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

## Women

<u>Rape and Domestic Violence</u>:  The law criminalizes rape, and the criminal code's definition of rape may apply to spousal rape, at the judge's discretion.  The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and the law does not permit the victim to withdraw the criminal charge.  Cases may be dropped for lack of evidence if the victim refuses to provide it.  The penalty for rape is generally six to 10 years' imprisonment, but the law provides for a maximum sentence of 20 years for raping certain classes of victims, including children and persons with disabilities.

Incidents of rape continued to be underreported for several reasons, including societal and cultural pressures on victims, fear of reprisal, ineffective and unsupportive responses by authorities to victims, fear of publicity, and a perception among victims that cases were unlikely to be prosecuted.  Laws against rape were not effectively enforced.

Rape and other sexual crimes against women were widespread.  On February 26, the PDDH criticized the Ministry of Justice and Public Security's UTE general director Mauricio Rodriquez, for failing to provide adequate security to seven female witnesses and victims of sex trafficking, one of whom was sexually assaulted by a security guard in a shelter supervised by the UTE.  Although the victim filed a complaint, the security guard was not sanctioned or removed.

The Attorney General's Office reported that, as of July 18, 658 women had been victims of sexual-related crimes and 63 defendants had been convicted for sexual-related crimes against women.  As of March 9, the Salvadoran Institute for the Development of Women (ISDEMU) reported 385 cases of rape against women.

ISDEMU provided health and psychological assistance to women who were victims of sexual abuse, domestic violence, mistreatment, sexual harassment, labor harassment, trafficking in persons, commercial sexual exploitation, or alien smuggling.

Violence against women, including domestic violence, was a widespread and serious problem.  A large portion of the population considered domestic violence socially acceptable; as with rape, its incidence was underreported.  The law prohibits domestic violence and generally provides for sentences ranging from one

Country Reports on Human Rights Practices for 2016
United States Department of State • Bureau of Democracy, Human Rights and Labor

438

ABROP0938

11

United Nations

**CEDAW**/C/SLV/CO/8-9



# Convention on the Elimination of All Forms of Discrimination against Women

Distr.: General
9 March 2017

Original: English

**Committee on the Elimination of Discrimination against Women**

## Concluding observations on the combined eighth and ninth periodic reports of El Salvador*

1.    The Committee considered the combined eighth and ninth periodic reports of El Salvador (CEDAW/C/SLV/8-9) at its 1478th and 1479th meetings (see CEDAW/C/SR.1478 and 1479), held on 17 February 2017. The Committee's list of issues and questions is contained in CEDAW/C/SLV/Q/8-9 and the responses of El Salvador are contained in CEDAW/C/SLV/Q/8-9/Add.1.

### A.   Introduction

2.    The Committee appreciates the submission by the State party of its combined eighth and ninth periodic reports. It also appreciates the State party's written replies to the list of issues and questions raised by the pre-sessional working group and welcomes the oral presentation by the delegation and the further clarifications provided in response to the questions posed orally by the Committee during the dialogue.

3.    The Committee commends the State party on its multisectoral delegation, which was headed by the Vice-Minister for Foreign Affairs of El Salvador, Carlos Castaneda Magaña, and included the First Vice-President of the Legislative Assembly, the Permanent Representative of El Salvador to the United Nations Office and other international organizations in Geneva, the Head of the Salvadoran Institute for the Advancement of Women, representatives of the Ministry of Health, the Salvadoran Institute of Agrarian Reform and the Permanent Mission of El Salvador to the United Nations Office and other international organizations in Geneva.

### B.   Positive aspects

4.    The Committee welcomes the progress achieved since the consideration in 2008 of the State party's seventh periodic report (CEDAW/C/SLV/7) in undertaking legislative reforms, in particular the adoption of the following:

---

* Adopted by the Committee at its sixty-sixth session (13 February-3 March 2017).

17-03854 (E)    170317



Please recycle 

ABROP0954

**Gender-based violence against women**

24.   The Committee welcomes the introduction of a legislative and policy framework aimed at guaranteeing a life free of violence for all women and the creation of an institutional framework for its implementation. The Committee is, however, concerned at the:

(a)   Insufficient resources allocated to the implementation of the Special Comprehensive Act on a Violence-Free Life for Women, especially in the light of the increasing rates of femicide and the high rates of domestic and sexual violence against women and adolescent girls in the State party;

(b)   Lack of information on how cases of domestic violence are adjudicated;

(c)   Low number of prosecutions in cases of violence against women and femicide and the even lower number of convictions;

(d)   Limited application of the Protocol for Investigating Femicide, the limited enforcement of protection orders and the preference given to having victims reconcile with perpetrators;

(e)   Insufficient mechanisms for the protection, support, recovery and social reintegration of women who are victims of gender-based violence;

(f)   Limited efforts made for the protection and recovery of women and girls who are victims of gang violence and their families in the current national security plan, especially considering the link between gender-based violence and criminal gang activities.

25.   **Taking into account its general recommendation No. 19 (1992) on violence against women, the Committee recommends that the State party:**

(a)   **Allocate sufficient human, technical and financial resources to the implementation of the national policy and action plans on a violence-free life for women and monitor their implementation (see CEDAW/C/SLV/CO/7, para. 24);**

(b)   **Collect data on the treatment of domestic violence cases from the time of reporting until the final judgment and study the impact and effectiveness of the mechanisms for addressing such cases;**

(c)   **Expedite the development of protocols for the implementation of the Special Comprehensive Act on a Violence-Free Life for Women, in accordance with article 56 of the Act, guaranteeing the application of a victim-oriented approach and the due diligence principle;**

(d)   **Strengthen the capacity of judges, lawyers and law enforcement personnel for the strict application of the Special Comprehensive Act on a Violence-Free Life for Women, the Children and Adolescent Protection Act and their corresponding implementation guidelines;**

(e)   **Reinforce the protection, support, recovery and social reintegration of women and girls who are victims of gender-based violence, especially women who are victims of domestic violence;**

ABROP0959

(f)   **Attend to the specific needs of internally displaced and deported girls, women and their families in terms of protection from all forms of violence, in particular gang-related violence.**

**Trafficking and sexual exploitation**

26.  . The Committee welcomes the provisions for the protection of women who are victims of trafficking set out in the Special Comprehensive Act on a Violence-Free Life for Women and the conclusion of bilateral and multilateral cooperation agreements on the prosecution of traffickers and the protection of victims. It also notes the establishment of a shelter for victims of trafficking. The Committee is, however, alarmed at reports of the sexual exploitation of young women and girls by criminal gangs under threats of homicide against them and their families. It remains concerned at the absence of a strategy for protecting women and girls from trafficking and sexual exploitation and for reintegrating victims. The Committee is also concerned at the insufficient efforts made to monitor and combat trafficking and sexual exploitation, the lack of investigations into cases of trafficking in women and girls and the very low number of prosecutions and convictions of perpetrators.

27.   **The Committee reiterates its previous concluding observation (CEDAW/C/SLV/CO/7, para. 26) and recommends that the State party:**

(a)   **Develop a comprehensive strategy and plan of action to prevent and combat trafficking and sexual exploitation of women and girls, with particular attention to gang-related victimization;**

(b)   **Include in such a strategy preventive and protective programmes and measures for the rehabilitation and social integration of victims;**

(c)   **Provide in its next periodic report data on the trafficking, exploitation and prostitution of women and girls, the number of prosecutions and convictions in trafficking and sexual exploitation cases and the impact of the steps taken to combat such issues.**

28.   The Committee notes with concern that legislation on trafficking is indiscriminately applied to women working autonomously in prostitution, giving rise to discriminatory treatment by local law enforcement personnel. The Committee is also concerned at reports of discrimination by health personnel against women engaged in prostitution.

29.   **The Committee recommends that the State party:**

(a)   **Prohibit any discriminatory treatment of women by local law enforcement personnel in municipalities;**

(b)   **Develop a protocol for health services that ensures the non-discriminatory treatment of all women and adequately monitor its application.**

**Participation in political and public life**

30.   The Committee notes the adoption of the Pact for the Defence of Civil and Political Rights of Women and campaigns to raise awareness of women's rights. It welcomes the bill on parity, currently under discussion in the National Assembly, as

ABROP0960

12

United Nations  A/HRC/17/26/Add.2

# General Assembly

Distr.: General
14 February 2011

Original: English

---

**Human Rights Council**
**Seventeenth session**
**Agenda item 3**
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## Report of the Special Rapporteur on violence against women, its causes and consequences, Rashida Manjoo

**Addendum**

## Follow-up mission to El Salvador[*]

*Summary*

 The present report contains the findings of the Special Rapporteur on violence against women, its causes and consequences, following her follow-up mission to El Salvador, last visited by the mandate in 2004 (E/CN.4/2005/72/Add.2). She explores the extent to which the recommendations made in the previous report have been implemented by examining the most prevalent forms of violence encountered currently by women and girls in El Salvador, the State response to such violence, and the main remaining challenges.

 Despite the Government's intention to fulfil its due diligence obligations in the area of gender equality and violence against women, significant challenges remain. As the previous mandate holder pointed out, the failure of authorities to investigate, prosecute and punish those responsible for gender-based violence contributed to an environment of impunity that resulted in little confidence in the justice system; impunity for crimes, socio-economic disparities and the *machista* culture fostered a generalized state of violence, subjecting women to a continuum of multiple violent acts, including murder, rape, domestic violence, sexual harassment and commercial sexual exploitation. The discussions held and the information received during the visit suggested that the situation has changed little in El Salvador. In addition to the effective implementation of the law, remaining challenges relate to sexual and reproductive rights, in particular with regard to the consequences of the absolute ban on abortions, and the need to establish a comprehensive

---

[*]   The summary of the present report is circulated in all official languages. The report itself, contained in the annex to the summary, is circulated in the language of submission and in Spanish only.

Please recycle ♻

ABROP0987

shelters for adult victims of trafficking, and the establishment of a system to monitor and follow up on cases of trafficking.

53.    In July 2009, the National Secretariat for the Family was replaced by the Secretariat for Social Inclusion. This new entity, chaired by the First Lady, is responsible for addressing the needs of specific population groups, including women, children, young people, the elderly, the disabled, and indigenous peoples. Discussions held during the mission indicate that gender mainstreaming in public policies, targeted at the family, form the cornerstone of the Secretariat's work.

54.    The National Civil Police has introduced a gender-sensitive approach in its work, including by means of the training of staff on gender equality and the advancement of women's human rights. A major axis of its institutional strategic plan for the period 2009-2014 includes ensuring the protection and promotion of women's human rights, including through the promotion of equal opportunities within the institution. In this respect, the Special Rapporteur commended the increase in the number of women in senior positions inside the police force, in particular within the General Inspectorate and its monitoring and human rights units.

55.    The police academy has continued to develop a human rights programme that includes training on policing, gender equality and women's human rights for public security officials of all grades. Commendable developments in the past year include the establishment of internal structures responsible for developing awareness-raising campaigns on gender equality and ensuring that a gender perspective is introduced into all activities of the academy. Another positive development was the effective implementation and monitoring of Circular No. 8/2009 by the Director-General of the police academy, which prohibits sexual harassment and other forms of gender-based violence and provides for clear policies to address such violations, sanctions for perpetrators and remedies for victims.

56.    The Special Rapporteur also welcomed the work of Office of the Procurator for the Protection of Human Rights, an independent national human rights institution that includes the position of a Deputy for women's rights. Despite limited material and human resources, the Office has been monitoring the human rights situation throughout the country, including with regard to women's rights, and conducted comprehensive studies on the right to education in situations of adolescent pregnancy, the situation of women confined to penitentiaries with their children, and sexual violence against girls.

## VI.    Main remaining challenges

57.    In her report, the previous mandate holder identified the effective implementation of the law and access to health and reproductive rights as the main challenges remaining to effectively address and combat violence against women. As the section below illustrates, these challenges remain and require urgent attention. In addition, the establishment of a comprehensive and coordinated system on data collection and further training initiatives are also necessary.

## A.    Effective implementation of the law

58.    Commendable developments in legislation, policies and programmes over the past five years contrast with significant weaknesses in the investigation and prosecution of cases of violence against women and girls, as in inappropriate sentencing patterns. The failure of the authorities to prevent, investigate, prosecute and punish those responsible for gender-

15

ABROP1001

based violence has contributed to an environment of impunity that has resulted in low levels of confidence in the justice system.

59.     The pervasiveness of patriarchal attitudes in the law enforcement and justice system, coupled with a lack of resources and insufficient knowledge on existing applicable legislation, has led to inadequate responses to cases of violence against women and the persisting social acceptance of such acts. The testimonies of victims of domestic violence who attempted to find access to the legal system show that, unless violence results in serious physical injuries, the police, prosecutors and justices of the peace tend to minimize offences in the belief that domestic violence is a private matter. As such, they discourage victims from pursuing cases and promote conciliation, thus returning victims to situations of abuse.[21] Cases of domestic violence are often treated as administrative rather than criminal offences, or are classified as misdemeanours.

60.     Civil society organizations researching the phenomenon of femicide expressed concern at the lack of proper standards of investigations into reported cases. In their view, this is primarily due to the absence of institutional coordination among the Office of the Procurator-General, the National Civil Police and the Institute of Forensic Medicine, the absence of a reliable structure for the protection of victims and witnesses, and the reluctance of law enforcement and judicial structures to recognize the gender-based nature of such violence.[22] The Office of the Procurator for Human Rights noted that the majority of the 2,660 cases of murder of women recorded from 2001 to May 2009 remain under investigation and unpunished.[23] Relatives of victims of brutal murders referred to instances where their requests for investigation were treated with disregard and indifference by police and prosecution and judicial authorities.

61.     Impunity for perpetrators of sexual violence crimes appears to be widespread, sometimes owing to fear of social stigma and revictimization by victims and witnesses, but also to weaknesses in investigation and prosecution processes. Data show that, of the 2,057 cases of sexual violence brought to court by the Office of the Procurator-General in 2008, 812 were provisionally dismissed, 385 were definitively dismissed and 700 went to trial. According to the most recent figures available, the trials have resulted in 200 convictions and 153 acquittals.[24] Impunity resulting from the low number of prosecutions and convictions in sexual violence cases also contributes to an increase in the rate of incidents.

62.     The still unresolved case of the rape and murder of 9-year old Katia Miranda in April 1999, characterized by disconcerting irregularities and omissions that resulted in the acquittal of the accused, was referred to by many as emblematic of the climate of widespread impunity for perpetrators, especially those with high political and social status. The Special Rapporteur reminded interlocutors that accountability and addressing impunity are also part of the due diligence obligations of the State, and reiterates the call of the previous mandate holder to review the case further.

63.     Despite recent improvements at the institutional level, several interlocutors expressed their concern at the low number of prosecutions and convictions in trafficking cases. In 2008, the Government's special anti-trafficking police and prosecutorial units brought charges in 15 cases of human trafficking, securing eight convictions with sentences

---

[21]   "¿Por que las mujeres no denuncian la violencia de pareja …".

[22]   Asociación Movimiento de Mujeres Mélida Anaya Montes, "El femicidio en El Salvador: una forma extrema de violencia y discriminación hacia las mujeres", Las Mélidas, January-June 2009.

[23]   Ibid. See also A/HRC/WG.6/7/SLV/3.

[24]   Primer informe situacional sobre violencia sexual en niñas y adolescentes, Procuraduría para la Defensa de los Derechos Humanos, 2009.

ABROP1002

ranging from four to ten years of imprisonment. These figures compare with 46 prosecutions and 5 convictions secured in 2007.[25]

64.    The main causes for low levels of reporting include weaknesses in the criminal justice system, also in measures for victim and witness protection, and the lack of adequate training of law enforcement officials to register and investigate complaints and support prosecutions (for example, see the case study below).

---

**Case study**

Maria's case (assumed name) is illustrative of the revictimization faced by victims of domestic violence within the law enforcement system. After years of physical and psychological violence inflicted by her husband, Maria reported the situation to a justice of the peace and obtained a protection order for her and her three children. Following the procedure, she was referred to the psychosocial attention centre of the Supreme Court of Justice, where she was accused of provoking the violence and persuaded to stay in the marriage because of the "obedience she owed to her husband". Maria's daughter, aged 9, went through significant emotional distress as she was questioned about her mother's alleged "boyfriends and lovers". For months, Maria's husband continued to harass her and her children physically and verbally, systematically violating protection measures, without any intervention by the police or the Office of the Procurator General despite her numerous complaints. With the support of women's rights organizations, Maria filed for divorce, which she obtained after months of bureaucratic procedures and psychological tests. While she obtained the custody of her three children and a monthly amount of $200 for child alimony, Maria received no compensation of any kind for the violence endured throughout her marriage. Her precarious earnings have forced her to sell her belongings to pay the school fees of her two youngest children and move to a smaller apartment. Her oldest son lives with his father and is reportedly replicating his violent behaviour towards women.

---

## B.    Access to sexual and reproductive rights

65.    With regard to access to health care for women, the area of reproductive rights remains one of particular concern. While induced abortion has always been an unlawful act in El Salvador, therapeutic abortion, abortion following rape and abortion on eugenic grounds have been illegal since 1999, when the Constitution was amended to recognize the human person from the moment of conception. The interpretative conflict between the constitutional provisions and those of the Penal Code protecting the right to life of embryonic human beings has led to the criminalization of abortion. This has a direct impact on the current high rates of maternal mortality and adolescent pregnancies, and thus denies women and girls the right to control over their bodies and lives.

66.    The absolute prohibition of abortion means that women and girls are condemned to continue pregnancies and to face revictimization by family and society. It has also led women and girls impregnated as a result of rape or incest to resort to unsafe and clandestine abortion practices, sometimes with fatal consequences. According to the Ministry of Health, maternal mortality rates among adolescents was 15.3 per cent in 2003, 26 per cent in 2004 and 21.4 per cent in 2005, becoming the second of the 10 main causes of female mortality in El Salvador. According to a report of the Procurator for the Protection of

---

[25]  Trafficking in persons report, Department of State, 2009.

ABROP1003

13

## Statement of Karen Musalo Regarding Release of Case Documents

I, Karen Musalo am the attorney of record for the Mexican asylum seeker known as L.R. Ms. L.R. has authorized the public release and dissemination of redacted copies of the Department of Homeland Security's Supplemental Brief, dated April 13, 2009, as well as redacted copies of the Respondent's brief in support of applications for asylum, withholding of removal and CAT relief, dated March 10, 2010, and the accompanying documentary evidence submitted along with this brief.

_____          9/19/16
Karen Musalo                     Date


553

ABROP1053

## <u>Statement of Karen Musalo Regarding Release of Case Documents</u>

I, Karen Musalo am the attorney of record for the Mexican asylum seeker known as L.R. Ms. L.R. has authorized the public release and dissemination of redacted copies of the Department of Homeland Security's Supplemental Brief, dated April 13, 2009, as well as redacted copies of the Respondent's brief in support of applications for asylum, withholding of removal and CAT relief, dated March 10, 2010, and the accompanying documentary evidence submitted along with this brief.


_____          9/19/16
Karen Musalo                              Date

ABROP1053

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

**Non-Detained**

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS
### FALLS CHURCH, VIRGINIA

IN THE MATTER OF:       )



)       **IN REMOVAL PROCEEDINGS**
)
)
)
)
)
)
)

__RESPONDENTS_____)

### DEPARTMENT OF HOMELAND SECURITY'S
### SUPPLEMENTAL BRIEF

In timely response to the Board of Immigration Appeals' ("BIA" or "Board") December 23, 2008, supplemental briefing schedule, as extended to permit filing on April 13, 2009, the Department of Homeland Security ("DHS" or "Department") respectfully submits the following brief for the Board's consideration.

ABROP1054

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

## I. Procedural History

The respondents, ████████████████████ (hereinafter the "female respondent") and her two children, ████████████, ████████ ████████ and ████████████████, ████████████ (hereinafter the "male respondents"), are natives and citizens of Mexico who came to the United States in 2004 without being admitted or paroled.[1] They each alleged past harm and a fear of future harm at the hands of one ████████████████ ("████████"), who is the father of the female respondent's children.[2] The female respondent applied for asylum under section 208 of the Immigration and Nationality Act ("Act" or "INA"), withholding of removal under section 241(b)(3) of the Act, and protection under the regulations implementing the Convention Against Torture ("CAT").[3] The male respondents were included as derivative beneficiaries in the female respondent's asylum application, and also filed their own independent applications for section 241(b)(3) withholding and CAT protection. *See* I.J. at 2; Tr. at 35, 44-45, 47-48.[4] In a decision dated October 15, 2007, the Immigration Judge denied the respondents' applications for protection, but granted them voluntary departure. The respondents timely appealed from that decision to the

---

[1] ████████████████████████████████████

[2] In the interest of brevity and in order to comply with the Board's 30-page supplemental briefing limit, the Department will not set out a separate fact section, but will simply incorporate pertinent record facts into its analysis. The Department does not dispute the Immigration Judge's finding that the respondents were credible witnesses. I.J. at 11-12. In addition, except where otherwise specifically indicated, the Department will focus on the particular social group issue pertaining to the female respondent, as the claims of the male respondents are generally dependent on that of their mother.

[3] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. TREATY DOC. NO. 100-20 (1988), 1465 U.N.T.S. 85 (codified at, *inter alia*, 8 C.F.R. §§ 1208.16(c) – .18).

[4] All of the respondents filed their applications for protection on or after May 11, 2005. *See* Exhs. 2, 3A, 3B. Consequently, they are governed by the amendments to the INA brought about by the passage of the REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, 119 Stat. 302 ("REAL ID Act"). *See Matter of J-Y-C-*, 24 I&N Dec. 260, 262 (BIA 2007).

ABROP1055

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Board. Pursuant to the Board's initial appellate briefing schedule, the parties filed briefs in early 2008. On December 23, 2008, the Board requested supplemental briefing from the parties.

## II.  Supplemental Briefing Notice And Pertinent Issue History

The Board specifically has requested supplemental briefing in this matter "in view of" the Attorney General's recent decision in *Matter of R-A-*, 24 I&N Dec. 629 (A.G. 2008), as both cases involve "asylum claims based on domestic violence." BIA Supplemental Briefing Notice (Dec. 23, 2008). The Board specifically requested that the parties address the following issue in light of pertinent case law developments since 2001: "Whether the respondents are members of a particular social group within the meaning of the Immigration and Nationality Act, and can otherwise establish eligibility for asylum."

As the Board is aware, its only precedent decision to analyze this type of claim was *Matter of R-A-*, 22 I&N Dec. 906 (BIA 1999), *vacated,* 22 I&N Dec. 906 (A.G. 2001), *remanded,* 23 I&N Dec. 694 (A.G. 2005), *remanded,* 24 I&N Dec. 629 (A.G. 2008). Following the Board's original 1999 decision in *Matter of R-A-*, the Acting Commissioner of the former Immigration and Naturalization Service ("INS") referred the decision to the Attorney General for review. In 2001, Attorney General Reno vacated the Board's decision and directed the Board on remand to stay reconsideration of the matter pending the publication in final form of the INS proposed rule *Asylum and Withholding Definitions*, 65 Fed. Reg. 76,588 (Dec. 7, 2000). In 2003, Attorney General Ashcroft referred *Matter of R-A-* back to himself for review and provided an opportunity for additional briefing. In response, the Department filed a brief positing a number of

ABROP1056

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

alternative positions, including that a cognizable particular social group in the case could be defined as "married·women in Guatemala who are unable to leave the relationship." *See* 2004 DHS Brief at 26, *available at* http://cgrs.uchastings.edu/documents/ legal/dhs_brief_ra.pdf (last visited Apr. 13, 2009). However, Attorney General Ashcroft ultimately remanded *Matter of R-A-* back to the Board in 2005 and directed it to reconsider its decision once the proposed rule was finalized. In 2008, in the absence of a final rule, Attorney General Mukasey referred *Matter of R-A-* back to himself for review, lifted the stay previously imposed on the Board, and remanded the matter for reconsideration of the issues presented with respect to asylum claims based on domestic violence. In this regard, Attorney General Mukasey emphasized that since 2001 "both the Board and courts of appeals have issued numerous decisions" which may be relevant to the questions presented. *See Matter of R-A-*, 24 I&N Dec. at 630.

As requested by the Board, the instant supplemental brief represents the Department's current position as to whether victims of domestic violence, in circumstances like those faced by the respondents, are members of a particular social group within the meaning of the Act, and can otherwise establish eligibility for asylum. We note that the application of the provisions for asylum and withholding of removal in the domestic violence setting raises difficult issues and presents significant challenges, as reflected in the delay of over nine years in producing either regulations[5] or an authoritative administrative precedent governing the issues first addressed by the Board in its vacated decision in *Matter of R-A-*, despite direct involvement by a series of Attorneys General. Accordingly, the Department in this brief departs from normal

---

[5] The Department has.not abandoned the effort to produce regulations that address the issues covered by the December 7, 2000, notice of proposed rulemaking; its new leadership is considering the best way forward in view of administrative and case law developments during the intervening years.

ABROP1057

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

practice and does not focus only on critiquing the "particular social group" formulations advanced by the respondents, although we believe them to be flawed in certain respects. Although ordinarily a respondent is solely responsible for defining the contours of his or her asylum claim, some uncertainty in that endeavor in domestic violence cases has not been surprising, given the long-unsettled state of U.S. law as it applies to such claims. Therefore, in response to the Board's specific request for supplemental briefing, and in order to contribute to a process leading to the creation of better guidance to both adjudicators and litigants, the Department will offer here alternative formulations of "particular social group" that could, in appropriate cases, qualify aliens for asylum or withholding of removal.[6]   These are formulations that might well be applicable to the facts of this specific case, but the Department recommends a remand for additional pertinent factfinding, once the Board has issued its ruling and clarified the governing doctrine.

III.   Discussion

A. Analysis of the Respondents' Particular Social Groups

1. Summary of the Department's Position

Before the Immigration Court, the female respondent's particular social group was articulated as "Mexican women in an abusive domestic relationship who are unable to leave." I.J. at 15, Tr. at 59. In much the same vein, the male respondents' particular social group was articulated as "children of women in abusive relationships in Mexico

---

[6]   For the purposes of whether the respondents can establish membership in a particular social group and a nexus between the group and the harm suffered and feared, this supplemental brief supersedes the Department's "Reply Brief in Support of the Immigration Judge's Decision," filed April 1, 2008. As discussed below in Section III.C., however, the Department reasserts its prior arguments with respect to collateral issues that do not relate directly to the particular social group analysis, but that do bear on whether the respondents have met all the requirements for the protection they seek, such as satisfaction of the one-year filing requirement for asylum.

5

ABROP1058

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

who are unable to leave." I.J. at 16; Supplemental Brief in Support of Respondents ████████ and ████████ Applications for Withholding of Removal at 6 (Jan. 3, 2007).

As will be discussed in greater detail below, the Department avers that the respondents have failed to establish their eligibility for asylum or withholding of removal based on their submissions to date. Important decisions issued by the Board and the circuit courts since 2001 have held that a particular social group cannot be significantly defined by the persecution suffered or feared. Guidelines issued by the United Nations High Commissioner for Refugees (UNHCR) are in agreement. To allow such circularity in defining a particular social group – individuals are targeted for persecution because they belong to a group of individuals who are targeted for persecution – would not be true to the refugee definition in U.S. law and the treaties on which it is based: the refugee definition recognizes not all persecution, but only persecution based on one or more of five specified grounds.

The respondents' claimed particular social groups – centrally defined by the existence of the abuse they fear – are impermissibly circular. There may be other closely related conceptualizations, however, that would not suffer from this flaw and could possibly fit the facts of cases of the general type presented here. As indicated, the Department recommends remand to consider whether such an alternative would be appropriate in this case. If so, the Immigration Judge should also consider closely whether the claim should still be denied because of other relevant factors, such as the availability of sufficient protection elsewhere within the claimant's home country.

ABROP1059

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

### 2.  Particular Social Group In General – Seminal Case Law

Of the five protected grounds, "particular social group" is perhaps the least well-defined and understood.  As observed by then-Judge Samuel Alito in *Fatin v. INS*, 12 F.3d 1233, 1238-39 (3d Cir. 1993) (internal quotations and citations omitted): "Both courts and commentators have struggled to define 'particular social group.'  Read in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.'  Thus, the statutory language standing alone is not very instructive . . . Nor is there any clear evidence of legislative intent."  *See also* United Nations High Commissioner for Refugees (UNHCR), Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (hereinafter UNHCR Guidelines), ¶ I(2), U.N. Doc. HCR/GIP/02/02 (May 7, 2002) (noting that particular social group "category cannot be interpreted as a 'catch all' that applies to all persons fleeing persecution"), *available at http://www.unhcr.org/cgi-bin/texis/vtx/publ/opendoc.pdf?tbl=PUBL&id=3d58de2da*.

The seminal decision interpreting the term "particular social group" remains *Matter of Acosta*, 19 I&N Dec. 211, 232 (BIA 1985), *modified, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), in which the Board stated that it deems the phrase "'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic . . . .  The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that

7

ABROP1060

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *See Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1197 (11th Cir. 2006) ("*Acosta* strikes an acceptable balance between (1) rendering 'particular social group' a catch-all for all groups who might claim persecution, which would render the other four categories meaningless, and (2) rendering 'particular social group' a nullity by making its requirements too stringent or too specific."), *cert. denied sub nom. Castillo-Arias v. Gonzales*, 127 S. Ct. 977 (2007).[7]

Subsequent to *Acosta*, the Board has identified two additional important considerations applicable to particular social group claims. In *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006), *aff'd*, *Castillo-Arias*, *supra*, the Board clarified *Matter of Acosta* by holding that not all groups sharing an "immutable or fundamental characteristic" are cognizable as particular social groups. 23 I&N Dec. at 958. In addition to its "immutable or fundamental characteristic" approach, observed the Board, its prior cases had also "considered the recognizability, i.e., the social visibility, of the group in question. Social groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups." 23 I&N Dec. at 959. Thus, the Board rejected a particular social group composed of confidential informants, noting:    "When considering the visibility of groups of

---

[7]    Applying *Acosta*, the Board has found a number of "particular social groups" to be cognizable for asylum purposes: Filipinos of mixed Filipino-Chinese ancestry, *see Matter of V-T-S-*, 21 I&N Dec. 792 (BIA 1997), young women of the Tchamba-Kunsuntu tribe of northern Togo who had not undergone female genital mutilation (FGM) as practiced by that tribe and who opposed the practice, *see Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996), members of the Marehan subclan of Somalia who share ties of kinship and linguistic commonalities, *see Matter of H-*, 21 I&N Dec. 337 (BIA 1996), persons identified as homosexuals by the Cuban Government, *see Matter of Toboso-Alfonso*, 20 I&N Dec. 819 (BIA 1990), and former members of the national police of El Salvador, *see Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988).

ABROP1061

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

confidential informants, the very nature of the conduct at issue is such that it is generally out of the public view.  In the normal course of events, an informant against the Cali cartel intends to remain unknown and undiscovered.  Recognizability or visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members."  23 I&N Dec. at 960.  *Compare Ngengwe v. Mukasey*, 543 F.3d 1029, 1034 (8th Cir. 2008) (finding, *inter alia*, that the group Cameroonian widows satisfies the social visibility requirement, citing to background authority describing the rituals and societal treatment associated with such individuals).

Building upon these concepts of "immutability" and "visibility," in *Matter of S-E-G-*, 24 I&N Dec. 579, 584 (BIA 2008), the Board explained that particular social groups also, necessarily, have "particularity." The "essence" of particularity, reasoned the Board, is "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." While the proposed group's size may be an important factor in determining its recognizability, "the key question is whether the proposed description is sufficiently particular, or is too amorphous . . . to create a benchmark for determining group membership." 24 I&N Dec. at 584 (internal quotations and citations omitted).  For example, the Board found that a proposed group comprised of male children who lack stable families and meaningful protection, who are from middle and low income classes, who live in the territories controlled by gangs, and who refuse recruitment, was premised on characteristics that "remain amorphous because people's ideas of what those terms mean can vary." 24 I&N Dec. at 585 (internal quotations and citations omitted).

ABROP1062

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Similarly, the Board found that a proposed group that included "family members" of Salvadoran youth who have been subjected to gang recruitment and who have rejected or resisted gang membership "also is too amorphous" because "[t]he proposed group of 'family members'...could include fathers, mothers, siblings, uncles, aunts, nieces, nephews, grandparents, cousins, and others." 24 I&N Dec. at 585.

### 3. The Female Respondent Has Posited An Impermissibly "Circular" Particular Social Group

In elucidating these basic requirements, both the Board and the circuit courts since 2001 have emphasized that a particular social group cannot be significantly defined by the persecution suffered or feared. To do otherwise would sanction an illogical, circular "nexus" construct, i.e., individuals are targeted for persecution because they belong to a group of individuals who are targeted for persecution. *See, e.g., Lukwago v Ashcroft,* 329 F3d 157, 171-72 (3d Cir 2003); *Escobar v. Gonzales,* 417 F.3d 363, 367 (3d Cir. 2005); *Rreshpja v. Gonzales,* 420 F.3d 551, 555 (6th Cir. 2005); *Matter of A-M-E- & J-G-U-,* 24 I&N Dec. 69, 74 (BIA 2007); UNHCR Guidelines at ¶ II(B)(11) (defining particular social group to include, *inter alia,* "a group of persons who share a common characteristic *other than their risk of being persecuted*") (emphasis added); *Islam v. Secretary of State for the Home Department, and Regina v. Immigration Appeal Tribunal, ex parte Shah* [1999] 2 A.C. 629, 640 (House of Lords) (Lord Steyn, noting that "relying on persecution to prove the existence of the group would involve circular reasoning"). The female respondent's particular social group ultimately set forth before the Immigration Court suffers from this fatal flaw: "Mexican women in an *abusive* domestic relationship who are unable to leave." I.J. at 15 (emphasis added). That is, the

ABROP1063

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

central common characteristic is the fact or risk of the treatment that also constitutes the claimed persecution.[8]

## B. The Department's Alternative Particular Social Group Formulations

Although DHS believes that the particular social group formulations advanced by the respondents below fail under governing legal principles, it is possible that they or other applicants who have experienced domestic violence could qualify for asylum or withholding of removal based on alternative particular social group formulations. Below, the Department proposes two such formulations which outline a framework under which victims of domestic violence might be able to advance cognizable asylum claims.[9]  In the normal course, we acknowledge, particular social group formulations not raised below in the Immigration Court should not generally be entertained by the Board on appeal.  *See Matter of J-Y-C-*, 24 I&N Dec. 260, 261 n.1 (BIA 2007) ("not appropriate" for BIA to review asylum claim not raised below).  Where significant legal developments intervene, however, remand may be an appropriate mechanism to allow for full development of an applicant's eligibility for asylum or withholding on alternative theories.  *Cf. Matter of R-A-*, 24 I&N Dec. 629, 630-31 (A.G. 2008) (observing that "both the Board and courts of appeals have issued numerous decisions relating to various aspects of asylum law under the existing statutory and regulatory provisions" and that, "[g]iven the passage of time,

---

[8]   In addition to this problem of circularity, the female respondent's asserted particular social group may be deficient under post-2001 case law because it lacks "particularity."  As noted, the female respondent's particular social group is "Mexican women in an *abusive* domestic relationship who are unable to leave."  I.J. at 15 (emphasis added).  The female respondent has not shown that there exists in Mexican society a sufficient general consensus as to what constitutes an "abusive" domestic relationship, a term which is subjective and thus amorphous.  *See Webster's Third New International Dictionary* 8 (2002) (unabridged) (meanings of the term "abusive" include "characterized by wrong or improper use or action," "employing harsh insulting language," and "physically injurious").

[9]   These suggestions do not necessarily exhaust the range of possible particular social groups in domestic violence cases.  As the Board has emphasized in *Matter of Acosta*, 19 I&N Dec. at 233, "[t]he particular kind of group characteristic that will qualify...remains to be determined on a case-by-case basis."

ABROP1064

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

the Board may choose to . . . *remand cases to Immigration Judges for further factual development*") (emphasis added). Accordingly, if the Board agrees that either or both of the formulations posited below might serve as a cognizable basis for asylum or withholding of removal on particular social group grounds, the Department favors remand to the Immigration Judge for corresponding development of the record.

For the reasons set out above, the social group defined by the Immigration Judge in this case does not qualify as a particular social group. Nevertheless, DHS accepts that in some cases, a victim of domestic violence may be a member of a cognizable particular social group and may be able to show that her abuse was or would be persecution on account of such membership. This does not mean, however, that every victim of domestic violence would be eligible for asylum. As with any asylum claim, the full range of generally applicable requirements for asylum must be satisfied. *See Matter of Acosta*, 19 I&N Dec. at 219 (identifying the "separate elements that must be satisfied" for an applicant to meet the refugee definition and establish asylum eligibility); *cf. Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (characterizing an asylum seeker's evidentiary burden on appeal as a "heavy one"). For example, the harm feared must be serious enough to constitute persecution, and the fear of future harm must be well-founded, *see generally INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (discussing and clarifying well-founded fear standard). Asylum may be denied where the applicant has the reasonable option of avoiding abuse by relocating within the home country. *See, e.g., Cardenas v. INS*, 294 F.3d 1062, 1066 (9th Cir. 2002); 8 C.F.R. §§ 208.13(b)(1)(i)(B), (b)(2)(ii) and (b)(3). Further, as in any asylum case in which the persecutor is not the state itself, the applicant would have to show that the state is unwilling or unable to

ABROP1065

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

protect her. *See Llana-Castellon v. INS*, 16 F.3d 1093, 1097-98 (10th Cir. 1994); *Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000). The latter two considerations are likely to be of particular significance in domestic violence asylum cases.   To the extent that combined private and public efforts provide reasonable possibilities for protection within the territory of the asylum applicant's home state, even if not in the immediate town or region where the respondent had been living, applicants may appropriately be expected to avail themselves of such options rather than claiming asylum in a foreign country. *See Matter of Fuentes*, 19 I&N Dec. 658, 663 (BIA 1988) ("we do not find an asylum claim based on nongovernmental action adequately established where the evidence is directed to so local an area of his country of nationality"); *Quintanilla-Ticas v. INS*, 783 F.2d 955, 957 (9th Cir. 1986) ("deportation . . . does not require petitioners to return to the area of the country where they formerly lived").[10]

---

[10] To the extent that there may be concern that the availability of asylum to victims of domestic violence would result in an overwhelming number of applications, several factors should allay these concerns. Although domestic violence is a problem in a substantial number of countries worldwide, most victims of domestic violence abroad would not have the resources or ability to leave their situations and come to the United States.  It is useful to consider the experience of Canada.  Canada has recognized claims based on domestic violence since at least 1993.  *See* Canadian Immigration and Refugee Board, *Guidelines on Women Refugee Claimants Fearing Gender-Related Persecution, available at* http://www.irb-cisr.gc.ca/Eng/media/bckinfo/Pages/back_women2.aspx (last visited Apr. 13, 2009). According to Canadian authorities, Canada has not experienced a surge of such cases.  Canada received a total of 315 gender-related asylum claims in 1995 (including all other types of gender-related claims as well as those involving domestic violence), 270 such claims in 1996, 182 in 1997, 218 in 1998, and 175 in 1999.  (To the Department's knowledge, the 1999 Canadian statistics are the most recent publicly available.)

In addition, U.S. Citizenship and Immigration Services (USCIS) has granted asylum to victims of domestic violence under the DHS interpretation advanced in the DHS brief submitted to the Attorney General in *Matter of R-A-* in 2004, *see supra* sec. II, and this has not resulted in any notable increase in claims.  In fact, the overall number of asylum applications filed with USCIS has remained steady over the last five years:

| FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
|---------|---------|---------|---------|---------|
| 27,908  | 24,260  | 24,288  | 25,674  | 25,505  |

Source: USCIS Asylum Division

13

ABROP1066

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Whether or not the respondents are able to meet their burden of proof on all these issues requires remand to the fact finder for further development of the record. DHS believes, however, that, especially given the uneven development of the standards governing cases like this one, it is important to articulate how a social group in such cases might be defined. DHS suggests that the particular social group in asylum and withholding of removal claims based on domestic violence is best defined in light of the evidence about how the respondent's abuser and her society perceive her role within the domestic relationship. The evidence in this case at least raises the possibility that ███ believes that women should occupy a subordinate position within a domestic relationship and that, in his eyes, the female respondent remains in this subordinate position in the relationship even though she has physically separated from ███ The evidence further suggests that ███ believes that abuse of women within such a relationship can therefore be tolerated, and that social expectations in Mexico reinforce this view. A group defined in light of this evidence might be articulated as "Mexican women in domestic relationships who are unable to leave" or as "Mexican women who are viewed as property by virtue of their positions within a domestic relationship." DHS believes

---

An additional indicator may be found in the U.S. statistics for credible fear determinations – a form of screening applied to persons in the expedited removal process who ask for asylum or express a fear of return to the country of nationality.     Since 2000, USCIS has made positive credible fear determinations for aliens in expedited removal where there is a "significant possibility" that they can establish that the domestic violence suffered was on account of their membership in a particular social group consistent with the interpretation articulated here.   Considering that the top nationalities encountered in the credible fear context are countries in close proximity to the United States and that a lower screening standard is applied to these cases (i.e., a standard far less demanding than the test applied to decide an asylum claim on the merits), it is notable that credible fear receipts have also remained steady over the last several years:

| FY 2005 | FY 2006 | FY 2007 | FY 2008 |
|---------|---------|---------|---------|
| 4,539   | 5,307   | 5,252   | 4,995   |

Source: USCIS Asylum Division

14

ABROP1067

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

that groups understood in these ways, if adequately established in the record in any given case, would meet the requirements for a particular social group and that they may (depending on further inquiry to be accomplished on remand) both accurately identify the reason why ▮▮▮▮ chose the female respondent as his victim and continued to mistreat her.

In assessing the existence of a particular social group, it is first appropriate to identify the specific characteristic that the persecutor targets in choosing his victim. Here, it seems clear that an integral part of the answer to this inquiry in this case hinges on the status the female respondent acquired when she entered into the domestic relationship with ▮▮▮. The evidence of record shows that ▮▮▮ abused the female respondent because of his perception of the subordinate status she occupies within that domestic relationship. As noted in the Immigration Judge's decision, for example, "[r]espondent testified that ▮▮▮ used to tell her that he could do anything he wanted to her because she belonged to him." I.J. at pp. 3-4. ▮▮▮ belief that the female respondent cannot relieve herself of this status, even when she has physically separated from him, also reinforces his confidence that he may abuse her without interference or reprisal. Further, it is conceivably the case (though this issue merits further focused inquiry on remand) that social expectations in Mexico do little to disabuse ▮▮▮ of his views in this regard, which would consequently bolster his belief that he has the right to abuse the female respondent. Such factors would work in concert to create the trait which accounts for ▮▮▮ inclination to target her for abuse, whether that trait is interpreted as relating to her being perceived as property by virtue of her status in the domestic relationship, or as relating to her presence in a domestic relationship that she is

15

ABROP1068

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

unable to leave.[11]   As posited above, DHS believes that it may be possible to define a social group of individuals who share such a trait in either of these ways.

Either of these formulations may meet the requirements for a particular social group.  As set out above, members of a particular social group must share a common immutable or fundamental trait, must be socially distinct or "visible," and must be defined with sufficient particularity to allow reliable determinations about who comes within the group definition.

DHS believes that there are circumstances in which an applicant's status within a domestic relationship is immutable, within the meaning of *Acosta*, for purposes of particular social group analysis.  In a claim dealing with past persecution, this might be the case where economic, social, physical or other constraints made it impossible for the applicant to leave the relationship during the period when the persecution was inflicted.  It could also be the case in a claim that involves a fear of future persecution on return to the home country if the abuser would not recognize a divorce or separation as ending the abuser's right to abuse the victim.   In this case, for example, the female respondent testified about many instances of repeated abuse even after she had left ████   All asylum claims must be considered within the context of the social, political, and historical conditions of the country.  In determining whether an applicant cannot change, or should not be expected to change, the shared characteristic, all relevant evidence

---

[11]   It might also be possible in some cases for a victim of abuse to show that she is a member of a particular social group consisting of her nuclear family.  U.S. jurisprudence has interpreted the Board's holding in *Matter of Acosta* as recognizing family as a particular social group.  For instance, the First Circuit has held, "there can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family." *Gebremichael v. INS*, 10 F.3d at 28, 36 (1st Cir. 1993); *see also Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997); *Sanchez-Trujillo v. INS*, 801 F.2d 1571,1576 (9th Cir. 1986).  This particular social group formulation, however, may not be directly apposite to this case, however, because ████ motivation in targeting the female respondent is not her membership in her family, but rather her status as the female partner in a domestic relationship.

ABROP1069

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

should be considered including the applicant's individual circumstances and country conditions information about the applicant's society.

As explained *supra*, under governing precedents, a cognizable particular social group must reflect social perceptions or distinctions (i.e., be "visible"). DHS believes that, under the best understanding of this requirement applied to the facts of this case, the alternative social group formulations posited by DHS above could meet this requirement. Following the Board's clarification of applicable doctrine, the respondents should be given an opportunity to develop their claims, with their own articulation of the applicable social group and any necessary further factual inquiry. The female respondent testified about seeking help from the police multiple times. "She would show the police her bruises and injuries, but the police told her that her problems were private and that her life was not in danger." I.J. at 4. Respondent's son, ███████ further testified that "his mother was never able to obtain help from the police." I.J. at 9. There is also country conditions evidence in the record relating to the social perception in Mexico of domestic violence. The Immigration Judge, for example, discussed reporting by the United Nations Special Rapporteur on Violence Against Women indicating that Mexican authorities have taken numerous steps to address the problem, but "police and prosecutors are reluctant to take action when they receive a domestic violence complaint." The Immigration Judge also discusses the Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Mexico Country Report on Human Rights Practices for Mexico – 2006* (Mar. 2007), *available at* http://www.state.gov/g/drl/rls/ hrrpt/2006/78898.htm, which notes that while there is law that "prohibits domestic violence[;] ... actual sentences were normally lenient" and that "seven states have not yet

ABROP1070

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

criminalized domestic violence, and 15 states sanction family violence only when it is a repeated offence." I.J. at 9.  This evidence may reflect a societal view, applicable at least in parts of Mexico, that the status of a woman in a domestic relationship places the woman into a segment of society that will not be accorded protection from harm inflicted by a domestic partner.  In this light, the female respondent's status by virtue of her relationship to ███ could indeed be the kind of important characteristic that results in a significant social distinction being drawn in terms of who will receive protection from serious physical harm.  Ultimately, however, the record evidence is inconclusive on this point, as the female respondent's experiences were limited to a small town in Mexico where, in fact, she was eventually able, on at least one occasion, to obtain state protection on a significant matter relating to the abusive relationship with ███ namely a court order affirming and enforcing her parental rights. Exh. 2-4, ¶¶ 36-37, 44-45.  In short, the respondents may be able to demonstrate the requisite "social distinction" or "social perception" if this matter is remanded for the record to be supplemented in that regard, but this is a specific factual question that requires further inquiry.[12]

Finally, as also set out above, a particular social group must be defined with sufficient particularity that it clearly delineates who is in the group and accurately identifies the shared trait on account of which the applicant is targeted by the persecutor

---

[12]  That is not to say that disparate treatment of women in domestic relationships by the Mexican government would then necessarily compel the conclusion that the Mexican government is "unable or unwilling" to protect the respondents for purposes of the "state action" element of asylum adjudication, see *Arteaga v. INS*, 836 F.2d 1227, 1231 (9th Cir.1988).  Rather, the fact that Mexican government action may deliberately vary based on whether mistreatment is inflicted on a stranger or in one's home supports the view that sufficient social distinction exists to support a cognizable particular social group premised on certain domestic relationships. Remanding this case to the Immigration Judge will also allow the respondents to present further evidence addressing the Immigration Judge's finding that non-marital relationships do not entail an inability to leave.  On remand, respondents may also be able to provide additional evidence to demonstrate that respondent's non-marital status in the relationship does not defeat her membership in the Department's alternative particular social group formulations or her ability to show the required nexus to ███ abuse.

18

ABROP1071

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

for harm. DHS believes that, subject to proof, the alternate particular social group formulations posited above satisfy "particularity." While it may require complex and subtle fact inquiries in each case to determine whether an applicant in fact possesses the traits advanced as defining these groups, the definitions are capable of application in a manner that allows the fact finder to determine with clarity whether an applicant is or is not a member of the group. We recognize that there may be concerns that the term "domestic relationship," which is integral to both of the group formulations DHS has posited, is "amorphous" such that the particularity requirement would not be satisfied. DHS believes, however, that it is possible to interpret the term in a manner that entails considerable particularity. For instance, under U.S. immigration law, a detailed framework exists for conceptualizing domestic relationships. Section 237(a)(2)(E)(I) of the Act defines "crime of domestic violence" to include offenses "against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs." DHS believes, for purposes of particular social group assessments, it would be appropriate to expect the term to have a similar level of specificity, albeit tailored to the unique situation of an asylum applicant's own society,[13] in order to satisfy the particularity requirement.

---

[13] *Cf. Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007) (noting that "[w]hether a proposed group has a shared characteristic with the requisite 'social visibility' must be considered in the context of the country of concern..."); *Mezvrishvili v. U.S. Att'y Gen.*, 467 F.3d 1292, 1296 (11th Cir. 2006) (noting that one should not impose "western standards" in assessing a persecution claim).

19

ABROP1072

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

DHS also recognizes that reference to a victim's inability to leave a domestic relationship as an element of the social group definition could also raise concerns about particularity. The words in the group definition do not themselves convey exactly how an applicant's ability to leave a relationship would be assessed. Nevertheless, DHS believes that, if the Board were to adopt such an approach, the process of applying the standard articulated in the group definition to the facts of individual cases would enable these assessments to be made with sufficient particularity.[14]  Similar to the determinations made under the regulatory provisions that require fact finders to determine whether an applicant could avoid persecution by relocating to another part of the home country, DHS suggests that assessments of a victim's ability to leave a domestic relationship would involve case-by-case, fact-specific examinations of whether it would be reasonable to expect the victim to do so under all the circumstances. 8 CFR § 208.13(b)(1)((i)(B).

Further, as discussed above, DHS believes that such a group definition may well most accurately identify the reason for which a victim of domestic violence was chosen by the abuser as the target for harm. DHS recognizes that there can be serious debate

---

[14]  In this case, for example, there are some statements in the Immigration Judge's decision indicating that the female respondent may have been unable to leave the relationship in any real, enduring sense. She testified that she attempted to escape ▓▓▓▓ when she was pregnant with her first son, but that ▓▓▓▓ found her at the bus stop, hit her, and forced her back into the house. I.J. at 4. ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ when she was pregnant, ▓▓▓▓ followed her and abused her. I.J. at 4. Respondent's testimony also indicates that she may have felt compelled to remain near her children and ▓▓▓▓ in Mexico in order to protect them from his abuse, and that she consequently continued to be perceived by ▓▓▓▓, the police, and the community as in a personal relationship with ▓▓▓▓ that she could not reasonably leave when her children were at risk. See I.J. at 5-7. Even when respondent did physically leave the relationship temporarily, ▓▓▓▓ apparently continued to believe she belonged to him and to tell her that "she 'shouldn't forget that he could do whatever he wanted' with her." I.J. at 6. On the other hand however, record evidence also suggests that ▓▓▓▓ ultimately elected to abandon the female respondent, actually seeking to keep her from her children and out of his household. Exh. 2-4, ¶ 33. Thus, while the Department is not asserting that this evidence is necessarily conclusive as to respondent's inability to leave the relationship, the Department believes that remand is appropriate for development of further evidence on this issue.

ABROP1073

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

about which aspects of the factual setting that create a victim's vulnerability to domestic violence should be included in the particular social group definition as opposed to being assessed in the context of other elements of the refugee definition.  For example, a victim's inability to leave the domestic relationship could be analyzed in determining whether a fear of future abuse is well-founded.  Inability to leave the relationship could also be relevant to the determination that the harm amounts to persecution.  Certainly, if a victim is seriously harmed when she tries to leave a relationship, those facts would relate both to the persecution analysis and to the assessment of her ability to leave. Nevertheless, DHS posits that, in some cases, the persecutor's perception that his victim cannot leave the relationship can play a central role in that persecutor's choice of the domestic partner as his victim.  In such cases, DHS believes that it may be appropriate to include this factor in the social group analysis.

## C. Non-Particular Social Group Appellate Issues

As stated, the Department believes remand of this matter is appropriate, so that the respondents' claims can be considered under intervening case law and in light of the alternative particular social group formulations suggested above. But because the Board's supplemental briefing notice to the parties directed them to address the question of whether the respondents "can otherwise establish eligibility for asylum," the Department will comment briefly on additional issues unrelated to the particular social group aspects of their case.[15] Also, as noted above, the Department believes that the third and fourth factors addressed in this section are likely to be central issues in most domestic violence

---

[15]  As noted, the Department's Reply Brief in Support of the Immigration Judge's Decision, filed April 1, 2008, addresses many of these collateral issues, and the Department reasserts its arguments on these issues.  The following discussion is merely intended to supplement the Department's prior filing on these collateral issues, in light of Board's supplemental briefing notice.

ABROP1074

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

asylum and withholding cases, namely: a careful determination whether the government of the country of origin is unwilling or unable to provide protection, and an assessment of the availability of a reasonable internal relocation alternative for the specific asylum applicants involved.

> 1. <u>The Female Respondent Failed To Establish That She Suffered And/Or Will Be Persecuted In The Future On Account Of Her "Feminist" Political Opinion</u>

The female respondent asserts that ██████ also persecuted her on account of her "feminist" political opinion, including her "defiance of his domination." Exh. 2 (Form I-589, Part B, Question 1A). The Department avers, however, that the there is no record evidence to reflect that, even if ██████ was aware of the female respondent's feminist views and opposition to dominance, his abuse was related to her opinions on this matter. Rather, it appears that he continued to abuse her regardless of what she said or did. The Department's position in this regard is consistent with the Supreme Court's reasoning in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). There is no record evidence that the female respondent was politically active or made feminist / anti-male domination political statements. *See Matter of S-E-G-*, 24 I&N Dec. at 589. The Department's position in this regard is also consistent with the Board's long-standing approach that harm is not on account of political opinion when it is inflicted *regardless* of the victim's opinion rather than *because of* that opinion. *Matter of Chang*, 20 I&N Dec. 38 (BIA 1989), *superseded on other grounds, Matter of X-P-T-*, 21 I&N Dec. 634 (BIA 1996).

With respect to the male respondents, the Department notes that they did not raise the protected ground of political opinion in their withholding of removal application forms, but, rather, only mentioned particular social group as a basis for their claim. *See*

ABROP1075

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Exhs. 3A and 3B (Form I-589, Part B, Question 1). Further, in their initial brief to the Immigration Judge, the male respondents did not affirmatively raise the protected ground of political opinion. *See* Amended Brief In Support Of Respondents' Application For Asylum, Withholding Or Removal And Relief Under The Convention Against Torture at 34-35 (Sept. 12, 2006). Rather, the male respondents only affirmatively raised political opinion in a supplemental brief to the Immigration Judge in which their counsel argues: "By choosing to escape ████████ control and fleeing to the United States with their mother . . . the boys implicitly expressed their political belief that they do not have to accept ████████ abuse and control for the rest of their lives" and that, in the past, the male respondents had been abused because ████ "perceived their conduct as an expression of the political belief that they do not have to accept his control and abuse." *See* Supplemental Brief In Support Of Respondents ████████ And ████████ Application For Withholding Of Removal at 7-8 (Jan. 3, 2007). As noted by the Immigration Judge, however, their brief is "not evidence." Tr. at 75; *see also Matter of Ramirez-Sanchez*, 17 I&N Dec. 503, 506 (BIA 1980) (noting that the arguments of counsel are not evidence). The male respondents never provided any testimony or sworn statements as to the political opinion basis of their withholding of removal claim. *See* Tr. at 235-47; *see generally Matter of Fefe*, 20 I&N Dec. 116, 118 (BIA 1989) (holding that, "[a]t a minimum . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct."). In fact, only ████████ ████ ████████, provided specific testimony in support of his withholding of removal application, and simply noted that, "most of the time," ████ abused him

ABROP1076

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

"because of my mother," Tr. at 239-40, and that sometimes ███ abused him for reasons unrelated to his mother, "[b]ecause I didn't do what he want me to do," Tr. at 246-47.

Consequently, the Board should refuse to consider this political opinion aspect of the male respondents' withholding of removal claims. Concomitantly, to the extent that the male respondents claim that ███ will be motivated to harm them not on the basis of their *own* political opinions, but, rather, "because he imputed their mother's political opinion to them," I.J. at 16; Respondents' Brief In Support Of Appeal Of Immigration Judge's Decision at 32 (Feb. 14, 2008), such a claim is deficient insofar as the foundational "non-imputed" political opinion claim of the female respondent is deficient.

> 2. The Female Respondent Failed To Establish That "Extraordinary Circumstances" Prevented Her From Filing Her Application For Asylum Within One Year Of Arrival

Like the Immigration Judge, I.J. at 12-13, the Department does not believe that the female respondent has established extraordinary circumstances to excuse the untimely filing of her asylum application. *See* INA § 208(a)(2)(A); 8 C.F.R. § 1208.4(a)(5). In taking this position, the Department does not seek to trivialize the severe abuse the female respondent suffered at the hands of ███ or the lasting impact that such abuse may have. Rather, the Department simply avers that, based upon the record evidence, the female respondent has not established by clear and convincing evidence that extraordinary circumstances prevented her from applying for asylum within one year of her arrival so as to gain protection from ███ In addition to proving a conscientious caregiver to her children, *see, e.g.,* Exh. 2-4, ¶¶ 50-51, 62-65 ██████████

████████████████████████████████████████

24

ABROP1077

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION



While suffering from Post Traumatic Stress Disorder (PTSD) could certainly constitute "extraordinary circumstances" excusing the untimely filing of an asylum application, it does not appear that the female respondent's untimely filing is "directly related," 8 C.F.R. § 1208.4(a)(5), to her PTSD. Indeed, the female respondent testified that, in spite of being "stressed out" and "depressed," Tr. at 153, she applied for asylum within months of learning about asylum in June 2005. *Id.* Thus, while the record evidence reflects that the female respondent faced challenges relating to her past abuse, she consistently overcame these challenges, including upon learning of the availability of asylum. It is clear, then, that the only thing keeping the female respondent from seeking asylum was her unfamiliarity with this form of immigration relief. However, because ignorance of legal requirements does not excuse noncompliance therewith, *see, e.g., Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384-85 (1947); *Antonio-Martinez v. INS,* 317 F.3d 1089, 1093 (9th Cir. 2003) (applying the general rule that "ignorance of the law is no excuse" to the immigration context); *Kay v. Ashcroft,* 387 F.3d 664, 671 (7th Cir. 2004) (noting that an alien who alleged PTSD and further claimed that ignorance of the law had led to his mistaken belief that providing the Immigration Court with a change of address form would change the venue of his removal proceedings, did not establish exceptional

25

ABROP1078

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

circumstances justifying rescission of his in absentia removal order to permit him to pursue asylum), the respondents are not eligible for asylum. (Nonetheless, of course, the delay does not prevent eligibility for withholding of removal; hence the issues addressed above having to do with "particular social group," nexus, internal relocation alternatives, and the extent of effective state protection, all remain germane.)

### 3. The Respondents Have Not Provided Evidence Sufficient to Establish That The Mexican Government Is Unwilling Or Unable To Protect Them

The respondents did not convincingly establish that reporting ███ crimes and abuse was or would have been futile, or would have subjected her to further abuse. *See Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006). For example, although the female respondent testified that the local police did not take effective action when she reported domestic abuse "a handful of times," Exh. 2-4, ¶ 24, these incidents were limited to one small town in Mexico. In addition, she claimed to have been kidnapped by ███ and held against her will, but never reported these serious crimes to the police. Furthermore, even though the female respondent's pleas for assistance were rebuffed by two judges, one of whom was corrupt, the record reflects that a Mexican court eventually saw fit to grant the female respondent custody of two of her children[16] as well as a protection order against ███ even though she apparently never discussed her abuse at the hands of ███ Exh. 2-4, ¶¶ 36-37, 44-45. Subsequently, a Mexican court, in a child support action, also awarded the female respondent use of a home owned by ███. Tr. at 208; Exh. 2-4, ¶¶ 55-57.

---

[16] The female respondent stated that her oldest son, ███ "wanted to live with his father because ███ was showering him with toys and money." Exh. 2-4, ¶ 44-45.

ABROP1079

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Under these circumstances, there remains considerable doubt whether the female respondent has established that the Mexican authorities were unwilling or unable to protect her from █████ *See Castro-Perez v. Gonzales*, 409 F.3d 1069, 1072 (9th Cir. 2005) (finding that the Honduran government did not bear responsibility for rapes suffered by applicant because it is either unable or unwilling to control rape in that country, where she failed to report alleged persecution because she believed police would do nothing). No country, not even the United States, can provide complete protection to targets of violence at all times and in all cases. If the Board agrees that this case is appropriate for remand, the respondents could further develop the evidentiary record on this point.

### 4. On the Current Record, the Evidence Suggests that the Respondents Could Avoid Future Harm By Relocating Within Mexico

The asylum and withholding regulations explicitly provide that the ability to avoid persecution by relocating to another part of the home country will negate an asylum or withholding of removal claim when "under all the circumstances, it would be reasonable to expect the applicant" to do so. 8 C.F.R. §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(B). The regulations list a variety of humanitarian factors, such as social and cultural constraints, age and health, and social and familial ties that should be taken into account in assessing the reasonableness of internal relocation. 8 C.F.R. §§ 1208.13(b)(3), 1208.16(b)(3).

On balance, the record suggests that it is reasonable to expect the respondents to relocate within Mexico to avoid future harm by █████ Although the female respondent noted that █████ curried favor with the authorities in his locality and that, in addition, he had two friends of influence, the ████████████████████████

27

ABROP1080

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

██████████████████████████████████████████████

████████████████ Exh. 2-4, ¶ 71, Tr. at 232, the willingness and ability of these individuals to assist █████ in tracking her down should she relocate within Mexico is entirely speculative. █████ apparent influence appeared to be limited to the locality of █████ and, as noted, any influence he had did not ultimately prevent Mexican courts from awarding the female respondent custody of two of their children, entering a *sua sponte* protective order against him, and awarding the female respondent the use of one of his homes. Mexico is a vast country composed of thirty-one states and a federal district. Exh. 6-1 (Bureau of Democracy, Human Rights, and Labor, U.S. Department of State, *Mexico, Country Report on Human Rights Practices* – 2003 (Feb. 2004)), at 1. The female respondent testified that she is a ████████████ Tr. at 157. Further, she has family members in ██████████ who, despite threats from █████ apparently have not been harmed. Tr. at 166-67. While one of the respondents' witnesses, Dr. Flores, referenced "documented" cases where male abusers had "hunted down their wives after the women have left them" and testified that "there was no guarantee that [the female respondent] would be safe anywhere in Mexico," Tr. at 301, Dr. Flores's testimony contained no details on these "documented" cases, failed to specify whether these cases were isolated or widespread, and conceded the inability to "scientific[ally]" predict █████ behavior, Tr. at 309-10.

If the Board agrees that this case is appropriate for remand, the respondents and DHS could further develop the evidentiary record on this point as appropriate and the Immigration Judge could apply the appropriate standards and burden of proof to this issue. Clearly, the Immigration Judge's framework for analyzing this question would

ABROP1081

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

depend upon the determinations made on remand regarding the respondent's claim of past persecution. If the Immigration Judge were to determine that the respondent has established past persecution on account of a protected ground, then she would be accorded a presumption of a well-founded fear of future persecution on the basis of the original claim and it would be DHS's burden to rebut this presumption with evidence that she could reasonably be expected to avoid future persecution by relocating within Mexico (or other proof). 8 C.F.R. § 208.13(b)(1).

## IV. Conclusion

Accordingly, as discussed above and in response to the Board's Supplemental Briefing Notice, the Department respectfully avers that the respondents have failed to articulate a cognizable particular social group in the first instance. However, owing to the unique complexities in this area of law, the Department contends that remand is warranted so that the respondents may refine their claims and evidentiary presentations in light of the alternative particular social group formulations described above.

29

ABROP1082

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

Respectfully submitted on April 13, 2009, [17]

*Appellate Counsel, USICE, DHS  for:*

_____

David A. Martin
Principal Deputy General Counsel
U.S. Department of Homeland Security

On Brief:

Alice Smith
Attorney Advisor
Office of the General Counsel
U.S. Department of Homeland Security

Dorothea B. Lay
Associate Counsel
Office of the Chief Counsel
U.S. Citizenship and Immigration Services

Michael P. Davis
Dep'y Chief, Appellate & Protection Law Div.
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

George R. Martin
Appellate Counsel
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

_____

[17]  The Department also respectfully requests that any decision in this matter be directed, in the first instance, to the local U.S. Immigration and Customs Enforcement (ICE) Office of Chief Counsel in San Francisco, with copies to the DHS Principal Deputy General Counsel and the ICE Chief Appellate Counsel.

30

ABROP1083

PROVIDED BY CGRS, DO NOT CIRCULATE WITHOUT PERMISSION

## CERTIFICATE OF SERVICE

| Respondent's Counsel: | I _George R. Martin_ certify under penalty of perjury that a copy of this brief was served by Federal Express, on the opposing party's counsel, named at left, on the date indicated below. |
|---|---|
| Kirkland & Ellis LLP<br>555 California Street, Suite 2700<br>San Francisco, CA  94104 | _____ Date: 4/13/09<br>Department of Homeland Security |

ABROP1084

14

# UNITED STATES DEPARTMENT OF JUSTICE
## OFFICE OF THE ATTORNEY GENERAL

_____

Matter of A-B-,
*Respondent*

_____

Referred from:
United States Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals
A_____

_____

## BRIEF OF *AMICUS CURIAE* INNOVATION LAW LAB
_____

Nadia H. Dahab, OSB No. 125630
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
(503) 227-1600
ndahab@stollberne.com

Stephen W. Manning, OSB No. 013373
Innovation Law Lab
P.O. Box 40103
Portland, OR 97204
(503) 241-0035
stephen@innovationlawlab.org

*Counsel for Amicus Curiae*
*Innovation Law Lab*

ABROP1586

**B.    The Attorney General's conduct and statements since assuming office evince racial animus, anti-immigrant and anti-asylum bias, and therefore an inability to fairly administer the immigration laws.**

The Attorney General's deeply seated ties to anti-immigrant and nativist groups provide relevant context for—and potentially explain—more recent statements and conduct of the Attorney General and his staff since he assumed office in early 2017.  The statements demonstrate, without serious doubt, that the Attorney General deeply has entrenched himself in anti-immigrant—and, specifically, anti-asylum—positions, "making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record" in this case.  *Cinderella Career & Finishing Sch., Inc.*, 425 F.2d at 591.  Because he has prejudged the issues presented here in all respects, he cannot decide this case.

The INA, by its text, provides all noncitizens physically present in the United States with the right to apply for asylum.  INA § 208(a)(1).  To establish eligibility for asylum, the noncitizen must show that he or she is a "refugee," which the INA defines as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

25

ABROP1621

INA § 101(42)(A).  Thus, in an immigration proceeding in which the noncitizen has applied for asylum, the noncitizen "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."  INA § 208(b)(1)(B)(i); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481–82 (1992) (recognizing those five protected grounds); *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011) (same).  The INA's five protected grounds—and asylum as a form of relief for persecution on those grounds—have been part of our country's immigration laws since 1980.

This case involves the scope of the asylum protections—in particular, whether a "particular social group" within the meaning of INA § 101(42)(A) may include victims of private criminal acts.  The Board, in a series of precedential decisions, has already held that whether a "particular social group" exists depends on the circumstances of the country in question, and has already concluded that a "particular social group" may include victims of private criminal conduct.  *See generally Matter of A-R-C-G-*, 26 I&N Dec. 388, 392–94 (BIA 2014) (citing cases).

The Attorney General has stated, however, that, in his opinion, the asylum system "is meant to protect those who [face] persecution based on fundamental things like their religion or nationality," not bases such as race, political opinion, or

ABROP1622

membership in a particular social group.[37]  To the Attorney General, those other

bases for asylum—about which Congress, through the INA, has otherwise been

explicit—amount to "rampant abuse and fraud" that plague our "overloaded

[immigration] system."[38]  That view—of course consistent with the Attorney

General's established anti-immigrant and xenophobic views—is unprecedented in

our legal system and directly contravenes our country's immigration laws.  But the

Attorney General has made himself abundantly clear, and as a result, has prejudged

the legal issues presented in this case.

Unsurprisingly, the Attorney General has made other public statements

evincing his anti-immigrant and nativist views and his intent to implement

immigration enforcement strategies that comport with those views.  Each of the

statements below further demonstrates that the Attorney General has prejudged the

issues that this case presents—specifically, issues relating to asylum eligibility on

bases other than "fundamental things like . . . religion or nationality"[39]—and

therefore cannot exercise his refer and review authority.

- In August 2017, the Department of Justice, under the leadership of the
  Attorney General, issued a press release equating a substantial uptick

---

[37]    Jefferson B. Sessions III, *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review*, U.S. Dep't of Justice (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

[38]    *Id.*

[39]    *Id.*

ABROP1623

in deportations with a "return to rule of law."[40]  That, of course, is a concerning conflation, given that the mission of the immigration courts should be the fair adjudication of cases, whether they result in removal or a grant of relief.  The statement likewise evidences either a misunderstanding of, or an outright disregard for, the nonrefoulement principle that makes essential to our immigration laws the protection of individuals against returning to a country where they fear persecution.[41]

- Between September and December 2017, the U.S. Department of Justice, under the leadership of the Attorney General, twice requested vacatur of former Maricopa County Sheriff Joe Arpaio's criminal contempt conviction. Sheriff Arpaio is notorious for his aggressive anti-immigrant positions and for "employ[ing] systemic racism in the name of immigration enforcement."[42]

- In October 2017, the Attorney General delivered remarks to EOIR staff outlining his positions with respect to closing "loopholes" in the immigration system and radically restricting the number of legal and illegal immigrants who may remain in the United States.  It was here that the Attorney General stated, as noted above, that the asylum system "is meant to protect those who [face] persecution based on fundamental things like their religion or nationality."  According to the Attorney General, applicants alleging persecution on some other ground—even those contemplated by the INA and international law—

---

[40]    *See* Dep't of Justice Press Release No. 17-889, *Return to rule of law in Trump administration Marked By Increase in Key Immigration Statistics* (Aug. 8, 2017), https://www.justice.gov/opa/pr/return-rule-law-trump-administration-marked-increase-key-immigration-statistics.

[41]    Convention Relating to the Status of Refugees, art. 33(1), July 28, 1951, 189 U.N.T.S. 137, 19 U.S.T. 6223.  In 1968, the United States agreed to comply with the substantive provisions of Articles 2 through 34.  *See id.*; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987).

[42]    Michelle Ye Hee Lee, *What You Need to Know About Former Arizona Sheriff Joe Arpaio's Record on Illegal Immigration*, The Washington Post (Aug. 23, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/08/23/what-you-need-to-know-about-former-arizona-sheriff-joe-arpaios-record-on-illegal-immigration/?utm_term=.bf645854da6f.

ABROP1624

present "fake claims," resulting in an "overloaded" immigration system plagued by "rampant abuse and fraud."[43]

- In December 2017, the Attorney General remarked that he "look[s] forward to working with [President Trump] to protect the President's ambitious [immigration] agenda."[44]  President Trump has made explicit his immigration agenda, which is "[f]or those here illegally today, who are seeking legal status, the will have one route and one route only.  To return home . . . ."[45]

- In February 2018, White House staff held their second meeting with ProEnglish, a nativist group also founded and financed by John Tanton and designated by the SPLC as an anti-immigrant hate group. According to a press release issued by ProEnglish, the purpose of the meeting was to discuss with White House staff the potential for English-language-only legislation.[46]  The Attorney General, through

---

[43]     Jefferson B. Sessions III, *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review*, U.S. Dep't of Justice (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.

[44]     Jefferson B. Sessions III, *Attorney General Sessions Delivers Remarks on the Administration's Efforts to Combat MS-13 and Carry Out Its Immigration Priorities*, U.S. Dep't of Justice (Dec. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-administrations-efforts-combat-ms-13-and-carry.

[45]     Transcript: Donald Trump's Full Immigration Speech, Annotated, LA Times (Aug. 31, 2016, 9:35 PM), http://www.latimes.com/politics/la-na-pol-donald-trump-immigration-speech-transcript-20160831-snap-htmlstory.html; *see also President Trump Meeting with Cabinet* (June 12, 2017), C-SPAN, https://www.cspan.org/video/?429863-1/president-touts-accomplishments-cabinet-meeting ("Great success . . . . They're being thrown out in record numbers and rapidly. And, uh, they're being depleted. They'll all be gone pretty soon. So, you're right, Jeff. Thank you very much.").

[46]     Stephen Guschov, *ProEnglish Has 2nd White House Meeting to Discuss Official English Legislation*, ProEnglish (Feb. 13, 2018), https://proenglish.org/2018/02/13/proenglish-has-2nd-white-house-meeting-to-discuss-official-english-legislation/.

ABROP1625

his ties with other Tanton hate groups, is a longtime supporter of ProEnglish and its mission.[47]

- Also in February 2018, the Attorney General demonstrated, in a nationally televised press conference, bias in his praise of the nation's sheriffs and their "Anglo-American heritage."[48]

- On April 4, 2018, the Department of Homeland Security, under the leadership of the Attorney General, issued a "Fact Sheet" identifying "the problem" with the existing immigration system as "legal loopholes" and "asylum fraud" connected with marked increases in the number of women and children arriving in the United States.[49]

- On April 11, 2018, the Attorney General reaffirmed his commitment to vigorously prosecute immigration cases in a manner consistent with the President's unprecedented and xenophobic immigration enforcement agenda.  In a speech to the Southwestern Border Sheriff's Coalition in Las Cruces, New Mexico, the Attorney General emphasized that "[t]he president expects us to not just play around with this problem [of illegal immigration], but to fix it and that is my goal."  He went on to proclaim, "We are determined to end catch and release—zero tolerance!  Our goal is to prosecute every case that is brought to us.  There must be consequences to breaking the law . . . . *If you break into this country, we will prosecute you.*"[50]  The Attorney

---

[47]    ProEnglish, *Longtime English Supporter Jeff Sessions, Tapped to Be Attorney General* (Dec. 16, 2016), https://proenglish.org/2016/12/16/longtime-official-english-supporter-senator-jeff-sessions-tapped-to-be-attorney-general/.

[48]    Marwa Eltagouri, *Jeff Sessions Spoke of the 'Anglo-American Heritage of Law Enforcement.'  Here's What That Means*, The Washington Post (Feb. 12, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/02/12/jeff-sessions-spoke-of-the-anglo-american-heritage-of-law-enforcement-heres-what-that-means/?utm_term=.d54f63903a6e.

[49]    Department of Homeland Security, Fact Sheet: To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard (Apr. 4, 2018), https://www.dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard.

[50]    Jose Villasana, *Attorney General: Constitution Doesn't Outside States.  We Don't Have to Apologize*, KVIA (Apr. 11, 2018, 11:21 AM),

30

General's statements evidence his flagrant disregard for our country's commitment to the U.N. Convention Relating to the Status of Refugees, in which the United States agreed "not [to] impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened . . . provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."[51]

- Finally, just this week, the Attorney General suggested in a press release issued by the Department of Justice that a group of individuals, largely women and children seeking to escape violence in Central America, were "deliberate[ly] attempt[ing] to undermine our laws and overwhelm our [immigration] system. . . . Smugglers and traffickers and those who lie or commit fraud will be prosecuted to the fullest extent of the law."[52]   The Attorney General's statements on

---

http://www.kvia.com/news/new-mexico/attorney-general-constitution-doesnt-apply-outside-states-we-dont-have-to-apologize/728159275 (emphasis added).

[51]   Convention Relating to the Status of Refugees, art. 31(1), July 28, 1951, 189 U.N.T.S. 137, 19 U.S.T. 6223.

[52]   Jefferson B. Sessions III, *Attorney General Jeff Sessions Statement on Central American "Caravan,"* U.S. Dep't of Justice (Apr. 23, 2018), https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-statement-central-american-caravan.  The Attorney General's statement is another example of his anti-rule-of-law approach to immigration adjudication.  It is absolutely true—and completely contrary to his statement—that the only way an individual can apply for asylum is to be physically present in the United States.  INA § 208(a).  To state that individuals who are complying with the law are seeking to undermine it suggests that the Attorney General views some laws—like that of deportation—as more valuable than others—like that of asylum.  But both are laws of this country and the Attorney General is charged with administering both fairly.  The rule of law requires that all laws apply; not only those laws that the Attorney General prefers to enforce—after all, that would be arbitrary and capricious.

Importantly, the caravan here was organized as a means to subvert the trafficking and smuggling networks and provide a safe, lawful mechanism for individuals to comply with § 208(a).  *See* Pueblos Sin Fronteras (@puebloSF), Twitter (Apr. 25, 2018), https://twitter.com/pueblosf?lang=en (providing that "[o]ur mission is to provide shelter and safety to migrants and refugees in transit.") The Attorney General's distortion in his statement threatening prosecution does his office no credit.

ABROP1627

Monday evince either a blatant intent not to afford the protections that our immigration laws provide or, at the very least, prejudgment of the meritorious asylum claims that these individuals might have.

As is clear from his relationships, conduct, and statements, the Attorney General continues to be one of the most aggressive voices in the United States against immigrants, particularly those from communities of color. Through his relationships, he has both lauded and adopted radical anti-immigrant and nativist views that, given the circumstances and relationships out of which those views arose, pose a substantial risk to the administration of justice in these proceedings. By his conduct and statements—both on his own and through members of his staff, he has made abundantly clear that his immigration agenda and enforcement strategies are motivated by his anti-immigrant bias and racial animus. Indeed, his conduct and his statements evince an intent to disregard entirely the powerful protections that our immigration laws provide to individuals with meritorious claims for relief from removal.

Because the Attorney General and his staff have prejudged the asylum issues presented in this case, they cannot—by the standards of either the INA or the Due Process Clause—permissibly exercise their refer and review authority this case. To permit them to do so would be to allow flagrant abuses of executive power as an instrument of oppression and at the expense of individual liberties and the rule

ABROP1628

of law.  That is not, and should never be, the function of the U.S. Department of

Justice.

## CONCLUSION

For the foregoing reasons, the Attorney General is disqualified for rendering

a decision on the merits in this proceeding.  The matter should therefore be

returned to the Board for reinstatement of its earlier decision.

DATED:  April 27, 2018         Respectfully submitted,

Nadia H. Dahab, OSB No. 125630
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
(503) 227-1600
ndahab@stollberne.com

*Counsel for Amicus Curiae*
*Innovation Law Lab*

33

ABROP1629